Date Filed 11/25/2025 6:31 PM
Superior Court - Bristol
Docket Number 2573CV00914

#5

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss. SUPERIOR COURT DEPARTMENT

KAREN READ,

Plaintiff,

v.

MICHAEL PROCTOR, in his personal capacity; SGT. YURIY BUKHENIK, in his personal capacity; LT. BRIAN TULLY, in his personal capacity; BRIAN ALBERT; NICOLE ALBERT; JENNIFER McCABE; MATTHEW McCABE; and BRIAN HIGGINS,

Defendants,

C.A. No. 2573-CV-00914

BRISTOL SUPERIOR COURT
FILED
NOV 25 2025
JENNIFER A. SULLIVAN, ESQ
CLERK/MAGISTRATE

**NOTICE OF FILING NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT**

PLEASE TAKE NOTICE that Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe and Brian Higgins have, on this date, filed a Notice of Removal in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1446, *et seq*. A copy of the Notice of Removal and all accompanying documents is attached hereto as Exhibit A.



A True Copy By Photostatic Process
Attest:

Asst. Clerk of Courts

Respectfully submitted,

BRIAN ALBERT, NICOLE ALBERT,
JENNIFER McCABE, MATTHEW McCABE,
and BRIAN HIGGINS

By their attorneys,

James L. Tuxbury (BBO No. 624916)
HINCKLEY ALLEN LLP
28 State Street
Boston, MA 02109
(617) 378-4162
jtuxbury@hinckleyallen.com

Dated: November 25, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2025, I caused this document to be served via the Court's electronic filing system and e-mail on the following counsel of record for Plaintiff:

Aaron Davis Rosenberg, Esq.,
Sheehan Phinney Bass and Green PA
28 State St., 22nd Floor
Boston, MA 02109

Damon M. Seligson, Esq.,
Sheehan Phinney Bass and Green PA
28 State St., 22nd Floor
Boston, MA 02109

Charles Waters, Esq.,
Sheehan Phinney Bass and Green PA
28 State St., 22nd Floor
Boston, MA 02109

James L. Tuxbury



70148588 v1

Date Filed 11/25/2025 6:31 PM
Superior Court - Bristol
Docket Number 2573CV00914

# EXHIBIT A

Date Filed 11/25/2025 6:31 PM
Superior Court - Bristol
Docket Number 2573CV00914



# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Karen Read

**(b)** County of Residence of First Listed Plaintiff: Bristol
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Damon M. Seligson, Sheehan Phinney Bass & Green PA, 28 State Street, 22nd Floor, Boston, MA 02109
(617) 897-5600

## DEFENDANTS

Michael Proctor, Sgt. Yuriy Buknenik, Lt. Brian Tully, Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe

County of Residence of First Listed Defendant: Norfolk
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Counsel for McCabes, Albert and Higgins: James L. Tuxbury, Hinckley, Allen, 28 State Street, Boston, MA 02109 (617) 345-9000; Counsel for Brian Tully: Timothy

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [X] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [X] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1983

Brief description of cause:
Alleged Conspiracy to Deprive Plaintiff of Fourth Amendment Rights

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE: November 25, 2025

SIGNATURE OF ATTORNEY OF RECORD: /s/ James L. Tuxbury

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| KAREN READ,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL PROCTOR, in his personal capacity; SGT. YURIY BUKHENIK, in his personal capacity; LT. BRIAN TULLY, in his personal capacity; BRIAN ALBERT; NICOLE ALBERT; JENNIFER McCABE; MATTHEW McCABE; and BRIAN HIGGINS,<br><br>Defendants, | ) | Civil Action No.<br><br>(Superior Court Department, C.A. No. 2573-CV-00914) |

**NOTICE OF REMOVAL**

Defendants Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe and Brian Higgins (collectively, "Removing Defendants") hereby remove Case No. 2573-CV-00914 (entitled *Karen Read, Plaintiff v. Michael Proctor, et al., Defendants*) from Bristol County Superior Court (the "Superior Court") to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. §§ 1331 and 1441[1], and as grounds for their removal state as follows:

[1] In filing this Notice of Removal, Removing Defendants preserve all defenses and objections, including those pursuant to Federal Rule of Civil Procedure 12(b). *See* Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1395 (3d ed. 2004) (quoting *Greenberg v. Giannini*, 140 F.2d 550, 553 (2d Cir. 1944) ("When a defendant removes an action from a state court in which he has been sued, he consents to nothing and 'waives' nothing; he is exercising a privilege unconditionally conferred by statute, and, since the district court to which he must remove it is fixed by law, he has no choice, without which there can be no 'waiver.'")).

## STATEMENT OF THE CASE

1. On or about November 17, 2025, Plaintiff Karen Read ("Plaintiff") filed the above-captioned action in the Superior Court (the "State Court Action"). The Complaint purports to assert seven causes of action: 42 U.S.C. § 1983 – Malicious Prosecution under the Fourth Amendment (Count 1); 42 U.S.C. § 1983 – Supervisor Liability (Count 2); 42 U.S.C. § 1983 – Conspiracy to Deprive Ms. Read of Her Fourth Amendment Rights (Count 3); Massachusetts Civil Rights Act (Count 4); Common Law Malicious Prosecution (Count 5); Intentional Infliction of Emotional Distress (Count 6); and Civil Conspiracy (Count 7), with Counts 3, 4, 5, 6 and 7 being asserted against the Removing Defendants. A true and correct copy of the Complaint; Civil Action Cover Sheet; Civil Tracking Order; Acceptance of Service on Defendant Brian Tully; and Acceptance of Service on Defendants Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe and Brian Higgins are attached hereto as Exhibit A.[2]

2. By way of background, the Superior Court Action arises from Plaintiff's ongoing and malicious attempt to evade responsibility for the death of John O'Keefe by smearing and defaming witnesses who participated in the prosecution of her. The case is a vengeful abuse of the judicial process, and Removing Defendants will make arguments in that regard at the appropriate time.

## REMOVAL

3. Counsel for Removing Defendants accepted service of process on Removing Defendants' behalf on November 25, 2025. (*See* Ex. A., pp. 53-54). Therefore, Removing Defendants are timely filing this Notice of Removal within the 30-day time period from date of

[2] No proceedings have occurred or been scheduled in the State Court Action. Accordingly, Exhibit A constitutes all process, pleadings, and orders that have been served on Removing Defendants or retrieved from the Superior Court's docket prior to the filing of this Notice.

service set forth in 28 U.S.C. § 1446(b).[3] *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999) (30-day removal period runs from service of summons and complaint).

4. All named defendants who have been served consent to and join in this removal in accordance with 28 U.S.C. § 1446(b)(2)(A). Defendant Brian Tully's acceptance of service was docketed in the Superior Court on November 24, 2025, and counsel for Defendant Tully has confirmed that he assents to this removal. While no acceptance of service has yet been filed with respect to Defendant Sgt. Yuriy Bukhenik, Sgt. Bukhenik's counsel has informed undersigned counsel that he consents to removal. Upon information and belief, Defendant Michael Proctor has not yet been served, but his counsel has advised undersigned counsel that Defendant Proctor consents to removal as well. A civil action removed pursuant to Section 1441(a) requires the consent of all defendants who have been served. *See* 28 U.S.C. §§ 1446(b)(2)(A), 1441(c)(2); *see also Hill v. Boston*, 706 F. Supp. 966, 968 (D. Mass. 1989).

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1441(a) and 1446(a) because the United States District Court for the District of Massachusetts is the federal district in which the Superior Court is located and where the State Court Action was originally filed.

6. As required by 28 U.S.C. § 1446(d), Removing Defendants will promptly serve written notice of the filing of this Notice of Removal and the removal of the State Court Action on counsel for Plaintiff, as evidenced by the attached certificate of service, and will promptly file the same with the Clerk of the Superior Court.

7. Pursuant to 28 U.S.C. § 1446(a) and L.R., D. Mass. 81.1, within 28 days of the filing of this Notice of Removal, Removing Defendants shall file certified copies of all records and

[3] Removing Defendants have not yet filed an answer or otherwise responded to the Complaint, but will file such an answer and/or response, absent an extension, within twenty-one (21) days of service in accordance with Fed. R. Civ. P. 81(c)(2). As noted, Removing Defendants accepted service of process on November 25, 2025.

proceedings in the Superior Court, as well as a certified copy of the docket and all docket entries.

8. The removal of this action terminates all potential proceedings in the Superior Court.[4] *See* 28 U.S.C. § 1446(d).

**FEDERAL JURISDICTION EXISTS UNDER 28 U.S.C. § 1331**

9. This is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1331 and is one that may be removed to this Court under 28 U.S.C. § 1441(a), because, as set forth more fully below, Plaintiff's federal civil rights claim against Removing Defendants – namely Count 3 (42 U.S.C. § 1983 – Conspiracy to Deprive Ms. Read of her Fourth Amendment Rights Against Proctor, Bukhenik, Tully, the Alberts, the McCabes, and Higgins) – is exclusively and expressly based upon the federal statute, 42 U.S.C. § 1983, *et. seq.*, and, therefore, raises substantial federal issues central to establishing Plaintiff's claims for relief.[5]

10. In particular, Plaintiff alleges in Count 3 of the Complaint that the Removing Defendants violated her federal civil rights by purportedly acting in concert to deprive her of her Fourth Amendment rights under the United States Constitution. Where a complaint invokes 42 U.S.C. § 1983, federal question jurisdiction exists. *See, e.g., Local Union No. 12004, United Steelworkers Of Am. v. Massachusetts*, 377 F.3d 64, 75 (1st Cir. 2004) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)) ("Almost by definition, a claim under § 1983 arises under federal law and will support federal-question jurisdiction so long as it does not 'clearly appear[ ] to be immaterial and made solely for the purpose of obtaining jurisdiction.'"); *see also Nieves v.*

[4] Removing Defendants have good and sufficient defenses to this action, and do not waive any defenses, jurisdictional or otherwise, by the filing of this Notice. Removing Defendants intend no admission of fact, law, or liability by this Notice, and expressly reserve all defenses and/or motions.

[5] Counts 1 and 2 of the Complaint assert separate 42 U.S.C. § 1983 claims against Defendants Proctor, Bukhenik and Tully.

Case 1:25-cv-13588 Document 1 Filed 11/25/25 Page 5 of 7

*McSweeney*, 73 F. Supp. 2d 98, 101 (D. Mass. 1999) (providing Court had jurisdiction over counts alleging conspiracy to deprive plaintiffs of their constitutional rights under 42 U.S.C. § 1983).

11. In addition, this Court has jurisdiction over the remaining counts in the Complaint by way of supplemental jurisdiction under 28 U.S.C. § 1367(a), which provides, in relevant part, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ."

12. Indeed, the First Circuit has explained, "[s]tate and federal claims are part of the same 'case or controversy' for the purposes of section 1367(a) if they 'derive from a common nucleus of operative fact' or 'are such that [they] . . . would ordinarily be expected to [be] tr[ied] . . . in one judicial proceeding.'" *Allstate Interiors & Exteriors, Inc. v. Stonestreet Const., LLC*, 730 F.3d 67, 72 (1st Cir. 2013) (quoting *Penobscot Indian Nation v. Key Bank of Me.*, 112 F.3d 538, 564 (1st Cir.1997)). Plaintiff's claims refer to and rest upon the same allegations. (*See* Ex. A., Compl. ¶¶ 109, 118, 128, 140, 148, 155, 161) (incorporating the allegations set forth in the preceding paragraphs).

13. Accordingly, this Court may exercise supplemental jurisdiction over the remaining four state-law and common law claims (Counts 4 through 7) in the Complaint.

## CONCLUSION

WHEREFORE, Defendants Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe and Brian Higgins respectfully request that the State Court Action be removed to the United District Court for the District of Massachusetts and that the Court enter such order as may be necessary to accomplish the requested removal.

Respectfully submitted,

BRIAN ALBERT, NICOLE ALBERT,
JENNIFER McCABE, MATTHEW McCABE,
and BRIAN HIGGINS

By their attorneys,

James L. Tuxbury (BBO No. 624916)
HINCKLEY ALLEN LLP
28 State Street
Boston, MA 02109
(617) 378-4162
jtuxbury@hinckleyallen.com

Dated: November 25, 2025

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed through the ECF system on November 25, 2025, and will be sent electronically to any registered participants identified on the Notice of Electronic Filing. Additionally, I certify that on November 25, 2025, a copy of the foregoing document was sent via first class mail and email to counsel of record for Plaintiff listed below:

Aaron Davis Rosenberg, Esq.,
Sheehan Phinney Bass and Green PA
28 State St., 22nd Floor
Boston, MA 02109

Damon M. Seligson, Esq.,
Sheehan Phinney Bass and Green PA
28 State St., 22nd Floor
Boston, MA 02109

Charles Waters, Esq.,
Sheehan Phinney Bass and Green PA
28 State St., 22nd Floor
Boston, MA 02109

James L. Tuxbury

# EXHIBIT A

#1

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.: 2573CV00914 A

KAREN READ,

Plaintiff,

v.

MICHAEL PROCTOR, in his personal capacity; SGT. YURIY BUKHENIK, in his personal capacity; LT. BRIAN TULLY, in his personal capacity; BRIAN ALBERT; NICOLE ALBERT; JENNIFER McCABE; MATTHEW McCABE; and BRIAN HIGGINS,

Defendants[1].

BRISTOL SUPERIOR COURT
FILED
NOV 17 2025
JENNIFER A. SULLIVAN, ESQ
CLERK/MAGISTRATE

## COMPLAINT[2]

### I. Introduction

1. For three and a half years, Plaintiff Karen Read was wrongly accused of homicide and subjected to suspicion, arrest, two prosecutions, and public condemnation, all resulting from the gross misconduct of the Massachusetts State Police ("MSP") - and those working in tandem with the MSP - to shield from liability the party or parties responsible for the death of Boston Police Officer John O'Keefe III. Now, after being acquitted of all charges relating to Mr. O'Keefe's death, Ms. Read brings this action to recover for and address the actions of those

[1] The Massachusetts State Police and Town of Canton will be added as Defendants after presentment is made pursuant to G.L. c. 258 § 4.

[2] Plaintiff intends to move to consolidate this action with the related-action *Estate of John O'Keefe et al. v. Read et al.*, Civil Action No. 2483-CV-00692 ("Related Action") for discovery and trial efficiencies.

actually involved in Mr. O'Keefe's death and the law enforcement officers who abjectly failed to ensure that justice was sought and served in the aftermath of January 29, 2022.

2. Karen Read did not kill her then-boyfriend, Mr. O'Keefe. Rather, in the early morning hours of January 29th, Mr. O'Keefe was killed in Defendants Brian and Nicole Albert's home at 34 Fairview Road in Canton ("House") in an altercation during a late-night house party with other Defendants (collectively, the "House Defendants") after a night of heavy drinking. The House Defendants responsible for Mr. O'Keefe's death – some of whom had professional experience with police investigations – concocted a plan immediately after the altercation to avoid culpability and to frame Karen Read. Rather than call first responders for help, among other actions, the House Defendants conducted a Google-search for information about "hos long to die in the cold," moved Mr. O'Keefe's body outside, and placed him on the Alberts' front lawn near the road to make it look like Mr. O'Keefe was hit by a vehicle and that he died in the snow without ever coming into the House that night. Mr. O'Keefe's body remained on the Alberts' lawn until Karen Read found him later in the morning.

3. From the beginning, investigators from the MSP allowed the House Defendants to direct the investigation away from themselves, and towards Ms. Read. The House Defendants were a well-connected and close social group with strong ties to law enforcement. The Alberts are a prominent family in Canton, and the investigating police officers knew them well. The lead investigator for MSP, Michael Proctor, grew up in Canton and resides there to this day. He has been, and remains, close personal friends with the Albert family. House Defendant Brian Albert was a long-time Boston Police Department officer, and House Defendant Brian Higgins was an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

4. Adhering to the unwritten rule of "protecting their own," Proctor and his MSP colleagues intentionally disregarded the obvious and compelling evidence tying the House Defendants to Mr. O'Keefe's murder. Specifically, Mr. O'Keefe's injuries were consistent with a physical altercation. He had bruises and lacerations on his face, and a deep gash to the back of the head – suggesting that he was punched and fell backwards hitting his head on a ridged surface. He also had dog bite wounds and scratches on his right arm and forearm. Equally evident, Mr. O'Keefe did *not* have a single injury consistent with being struck by a vehicle. He did not have any broken bones, or even a bruise on his legs, feet, arms, shoulders, torso, back, ribs, or anywhere below his neck that a medical examiner would otherwise expect to find on a person struck and killed by an impact from a three ton vehicle. And, to erase any doubt, the Commonwealth's own medical examiner - the pathologist who conducted the autopsy for the Commonwealth - concluded that Mr. O'Keefe's body showed *no signs* of a vehicular strike.

5. Despite that, Proctor and others shielded the House Defendants by intentionally sidestepping fundamental investigatory procedures. Propelled by the House Defendants' false statements, including that Mr. O'Keefe "never went into the house," Proctor reported in text messages just hours into the investigation that the House Defendants weren't going to get any "shit for this," because "he's [Brian Albert] a Boston cop," and that Proctor was determined "to make [the investigation] cut and dry" by bringing "charges against the girl." Indeed, Proctor made his intentions clear in writing: Karen Read had "zero chance [of] skating…she's fucked." This pronouncement was a mere 16 hours after Mr. O'Keefe's body was discovered on the Alberts' lawn - and Proctor had not even walked into the House.

6. True to his promise, Proctor and his colleagues did not search the House for blood evidence resulting from the gash to the back of Mr. O'Keefe's head, or for fingerprints, or for

DNA evidence. Proctor did not search the House despite the fact that Mr. O'Keefe was discovered without a winter coat, without the hat that several witnesses said he had been wearing that night, and without his left shoe. At Proctor's direction, the House was never processed by a criminalist or even photographed. No member of the MSP, including Proctor, set foot inside 34 Fairview for nearly *a week*. The police did not examine or take evidence from the Alberts' German Shepherd that was in the House on January 29th – a dog that had a history of attacking other dogs and people.

7. Neither Proctor nor any of the MSP troopers conducted physical examinations of the House Defendants for evidence of involvement in the altercation, such as marks on their hands, knuckles, or face, or bruises on their bodies. They did not seize or search the House Defendants' phones. They conducted only perfunctory unrecorded conversations with Proctor's friends and acquaintances without any attempt to corroborate their stories. They permitted would-be witnesses to communicate with each other and coordinate their stories *before* any formal interviews. They allowed critical evidence to be manipulated in some instances, and outright destroyed in others. In short, by focusing the investigation solely on Ms. Read as implicitly directed by the House Defendants through the misrepresentations they made to police, Proctor and his colleagues disregarded and failed to obtain pertinent interviews and other critical evidence from the House Defendants that cannot now be recovered or recreated.

8. Proctor also secretly communicated with the Alberts on his personal phone, deliberately back-channeling those communications to circumvent his state-issued device, and used his sister as a conduit. For instance, on multiple occasions Proctor disclosed critical and confidential information about the investigation to his sister, who passed that information to her close friend, Julie Albert, Brian Albert's sister-in-law. Julie Albert then passed that same

information on to the rest of her family and the House Defendants. Part of these communications included Julie Albert's promise to buy Proctor a "thank you gift" for handling this investigation in a manner that intentionally avoided implicating the House Defendants and singularly focused on Ms. Read.

9. Proctor then went so far as to manufacture evidence to ensure that Ms. Read, not his friends and fellow law enforcement officers, was blamed for Mr. O'Keefe's death. This included planting evidence at the scene, on Mr. O'Keefe's clothes, and on Ms. Read's vehicle to support the false narrative that Ms. Read hit Mr. O'Keefe with her car, even though he knew Mr. O'Keefe's injuries were *inconsistent* with a motor vehicle strike, and *consistent* with a physical altercation and dog attack.

10. Far from conducting an objective investigation with integrity, Proctor personally sexualized and dehumanized Ms. Read throughout the investigation. Specifically, Proctor's private communications to his high school buddies, sister, and MSP colleagues – that he believed would never be discovered – expose the corruption and bias at the core of MSP's entire investigation. Specifically, only hours into the investigation, in a text chain with eight of his high school buddies, Proctor stated that Ms. Read is a "whack job c—t," "retarded," a "nut bag," and "a babe [with] no ass." Proctor further ridiculed and derided Ms. Read for her serious medical condition, stating that her "balloon knot" "leaked poo." In other private text messages to his MSP supervisors and colleagues, Proctor bragged that while conducting a search of Ms. Read's phone he was looking for naked pictures of Ms. Read. Disappointed, he reported that there were "no nudes so far." In an unfiltered utterance, Proctor revealed his true mindset: "Hopefully she kills herself."

11. Indeed, Proctor's supervisors and the MSP knew about and condoned Proctor's unlawful conduct – and in some instances, expressly encouraged this flagrant abuse of power. For example, on one occasion Proctor's immediate supervisor, Yuriy Bukhenik, responded with "👍" (a thumbs-up emoji) to a text calling Ms. Read "retarded." Proctor's supervisors and the MSP knew Proctor had a close relationship with the Alberts and that he made no secret of his bias against Ms. Read, demonstrating a clear prejudice against her from the outset.

12. Relying on manufactured evidence, actively ignoring exculpatory evidence, and without investigating obvious signs pointing toward the House Defendants, the Commonwealth secured two separate arrest warrants for Ms. Read and a knowingly-baseless indictment against her, and then wrongfully prosecuted her for murder - twice. As alleged below, these unlawful acts not only underly Plaintiffs' meritless wrongful death claim against Ms. Read, but they also form the foundation for Ms. Read's claims against the Defendants. These acts violated Ms. Read's state and federal constitutional rights, the Massachusetts Civil Rights Act, and well-established Massachusetts tort principles.

13. On June 18, 2025, after a two-month trial, a jury rejected the Commonwealth's theory, in part, because the overwhelming physical, scientific, and medical evidence established that Ms. Read's vehicle did not strike Mr. O'Keefe, and that Mr. O'Keefe' injuries did not come from a vehicle strike. Although Ms. Read was ultimately and finally acquitted of *all charges* related to the death of Mr. O'Keefe, Proctor was fired, and nearly every MSP officer in Proctor's chain of command was disciplined for their egregious abuses and misdeeds, the Commonwealth still has not sought or provided justice - not to the O'Keefe family, not to the community at large, and certainly not to Ms. Read.

14. In response, the Commonwealth has offered only empty platitudes instead of solutions. The head of MSP, Col. Geoffrey Noble stated: *"The events of the last three years have challenged our Department to thoroughly review our actions and take concrete steps to deliver advanced investigative training, ensure appropriate oversight, and enhance accountability. Under my direction as Colonel, the State Police has, and will continue to, improve in these regards."* In an interview, with The Boston Herald, Noble acknowledged the systemic nature of MSP's conduct in Ms. Read's case: *"I'm eyes wide open to a culture issue that I have concerns with as it relates to Trooper Proctor."* These hollow words do nothing to right the devastating wrongs that have been visited on Ms. Read. Col. Nobel's words confess a sickness deep in the marrow of the MSP, but offer no remedy, no medicine, no relief to someone so brutally victimized by it.

15. On Wednesday March 19, 2025, following the public disclosure of Proctor's illegal and unethical conduct related to the Read investigation, the MSP's Trial Board found Michael Proctor "GUILTY" of a Class A violation, which included *"that he was biased in his dealings with a homicide suspect and/or brought otherwise himself and the Massachusetts State Police into disrepute."*

16. Ms. Read's life was not merely turned upside down by the MSP's and the House Defendants' misconduct, it was forever changed by the Defendants' transgressions and wrongdoing. The years of uncertainty and unimaginable emotional distress have left lasting scars that will never heal. At the same time, neither Mr. O'Keefe nor his family has received justice. His killer, or killers, still walk free. By asserting her claims against MSP, Proctor, his supervisors, the Town of Canton, and the House Defendants, Ms. Read seeks, at minimum, to confront and redress these wrongs and others. More importantly, she seeks to force the

Commonwealth to fulfill its duty to stop law enforcement from trampling the innocent to protect their own.

## II. Parties[3]

17. Plaintiff Karen Read is an individual residing in North Dighton, Massachusetts.

18. Defendant Michael Proctor ("Proctor") is a former Massachusetts State Police trooper, residing in Canton, Massachusetts. He is being sued in his personal capacity.

19. Defendant Sgt. Yuriy Bukhenik ("Bukhenik") is a Massachusetts State Police trooper, residing in Stoughton, Massachusetts. He is being sued in his personal capacity.

20. Defendant Lt. Brian Tully is a Massachusetts State Police trooper, residing in Hingham, MA. He is being sued in his personal capacity.

21. Defendant Brian Albert is an individual residing in Norwood, Massachusetts.

22. Defendant Nicole Albert is an individual residing in Norwood, Massachusetts.

23. Defendant Jennifer McCabe is an individual residing in Canton, Massachusetts.

24. Defendant Matthew McCabe is an individual residing in Canton, Massachusetts.

25. Defendant Brian Higgins is an individual residing in Sandwich, Massachusetts.

## III. Jurisdiction and Venue

26. This Court has jurisdiction over all claims in this case pursuant to G.L. c. 12, §11I, and, with regard to the federal claims, pursuant to Rzeznik v. Chief of Police, 374 Mass. 475, 484 n.8 (1978).

27. Venue is appropriate in this Court pursuant to M.G.L. c. 223, § 1 because at least one party to this case, Plaintiff Karen Read, resides in Bristol County.

[3] As stated above, MSP will be added as a new party by amendment, once the applicable presentment period expires.

## IV. Facts Common to All Counts

***Mr. O'Keefe's Death***

28. Before his death, Mr. O'Keefe and Ms. Read were dating.

29. On the evening of January 28, 2022, Mr. O'Keefe and Ms. Read went out for the night. They first went to C.F. McCarthy's in Canton, where they had several drinks. They then went to the Waterfall Bar in Canton.

30. There, they met up with a group of acquaintances including Brian Albert, his wife Nicole Albert, Brian's brother, Chris Albert, and his wife Julie, Jennifer McCabe (Nicole's sister and Brian's sister-in-law), her husband Matthew McCabe, and Brian Higgins. The group of acquaintances had several drinks and planned to continue the party back at the Alberts' home in Canton at 34 Fairview Road (the "House"). House Defendant Jennifer McCabe told John O'Keefe that he should come to the House.

31. The group had overlapping social relationships. At the time, Brian Albert was a Boston police officer, as was Mr. O'Keefe, though they did not know each other well. Brian Albert and Brian Higgins were close friends. Higgins was an officer with the ATF. He also was permitted to keep an office at the Canton Police Department ("CPD") alongside Brian Albert's brother, Canton Police Detective Kevin Albert. Kevin Albert had a professional and social relationship with Michael Proctor.

32. Brian and Nicole Albert's son, Brian Albert Jr., and his friends were already at the House for Brian Jr.'s birthday. In addition, Colin Albert (Brian Albert's nephew) was present.

33. Ms. Read and Mr. O'Keefe had never been to the House before January 29, 2022. They arrived in front of the Alberts' home around 12:20 am. Ms. Read was reluctant to attend the party for several reasons, including that she was unsure whether they were at the correct

location, and whether they were even welcome to the late-night party. Mr. O'Keefe got out of Ms. Read's SUV and indicated that he would check out the party, and report back to her. Mr. O'Keefe walked toward the front door / garage door area of the House and entered one of the two doors. A period of time passed without any word from Mr. O'Keefe. Ms. Read, who was still hesitant to join, presumed that Mr. O'Keefe intended to stay, and therefore, she left to go home without him.

34. At some point after entering the House/garage, Mr. O'Keefe was involved in a physical altercation either inside the House or garage. During that altercation, the Alberts' German Shepherd attacked him and Mr. O'Keefe sustained multiple dog bites and scratches on his right arm. He also suffered an incapacitating contrecoups wound on the back of his head. Mr. O'Keefe's head wound was caused by falling backward and striking a ridged surface. The Alberts' garage contains such surfaces. By contrast, the head wound could not have been caused by a vehicle strike or falling backward onto a flat, cold lawn, like the Alberts'.

35. Because of their knowledge of criminal investigations, the Alberts, the McCabes, and Higgins (House Defendants) knew that calling for medical care to help save Mr. O'Keefe's life would trigger immediate and irreversible risk of their own criminal exposure. Therefore, at least the five of them agreed on a simple plan to exonerate themselves and implicate Ms. Read: they would tell anyone who inquired: Mr. O'Keefe "never entered the house," and hide evidence that he was there, including his body.

36. Sometime during the night, they re-positioned a Ford Edge vehicle at a spot adjacent to the front lawn, which obscured the view of that area of the lawn from potential passersby. At some point further in the night, they carried or dragged Mr. O'Keefe's body to that same area in the yard, close to where one or more of them later claimed Ms. Read dropped

off Mr. O'Keefe earlier that night. The plan was devised to make it appear that Mr. O'Keefe had been struck by Ms. Read's vehicle and then died as a result of exposure to the cold.

37. Mr. O'Keefe was either dead when the House Defendants left him on the Alberts' lawn, or he died shortly thereafter.

38. After the physical altercation, Higgins left the House and drove to the Canton Police Department in the middle of the night. He later told investigators he had to do some "administrative work," but then changed his story subsequently stating that he drove to the station because he had to move cars in the parking lot due to the snowstorm. However, video from inside the station shows Higgins walking down the hallway and surreptitiously entering offices while wearing a hoodie to obscure his face. Surveillance video outside reveals Higgins transporting a large bag from one vehicle to another before driving away.

39. After leaving the police station, Higgins and Brian Albert continued to coordinate their stories by calling each other multiple times in the early morning hours, and ultimately spoke with each other on their cell phones at 2:22 a.m. Later, both Brian Albert and Higgins denied the existence of these phone calls, and then when confronted with their existence by a "separate law enforcement agent" (a non-MSP and non-CPD law enforcement agency) at a "separate proceeding," they coordinated the same exact lie, falsely claiming the multiple calls and answers were just "butt dials." However, five minutes after the Higgins/Albert call, Ms. McCabe performed a Google search on her phone at 2:27 a.m.: "Hos long to die in cold," misspelling the first word.

***Ms. Read Searches for Mr. O'Keefe***

40. Ms. Read began the search for Mr. O'Keefe on January 29th just before 5 a.m. when she awoke and realized he had not returned home. She phoned House Defendant Jennifer

McCabe, who already knew exactly what had happened to Mr. O'Keefe. Ms. McCabe insisted that Ms. Read drive to McCabe's house rather than driving to 34 Fairview Road, which Read did. The two of them were then joined by Kerry Roberts, and the three of them left the McCabe residence. However, rather than go to 34 Fairview, oddly, Ms. McCabe directed them to go *back* to Mr. O'Keefe's home – where Ms. Read had just come from. After, the three of them finally drove to 34 Fairview. The illogical, McCabe-directed route to 34 Fairview was intentional. It allowed the House Defendants more time to finish creating the scene and hiding evidence before Mr. O'Keefe's body was discovered on the Alberts' lawn, and first-responders arrived.

41. As they approached the House, with Ms. Roberts driving, Ms. Read saw Mr. O'Keefe almost immediately. She screamed for Ms. Roberts to stop the vehicle, and jumped from the moving car to run to Mr. O'Keefe. She began rendering aid, including CPR. As the House Defendants had planned, Mr. O'Keefe's body was "discovered" in front of the Alberts' house near a flagpole and fire hydrant on the left side of the Alberts' property as seen from the roadside. The Ford Edge, which had been parked in a position to obscure Mr. O'Keefe's body in the middle of the night, had been moved.

42. While Ms. Roberts joined Ms. Read with administering CPR, Ms. McCabe did not help or even approach Mr. O'Keefe. Rather, she sat in the cab of the vehicle, called 9-1-1 and reported that "there's a man passed out in the snow." Despite knowing that her brother-in-law Brian Albert - a police officer and first-responder - was just feet away inside the House, Ms. McCabe *never went into the House* or requested that Albert come down to help Mr. O'Keefe. Rather, as Mr. O'Keefe lay dying in the snow, Ms. McCabe stood and watched with no fear, urgency, or even concern for her family members residing mere feet away.

***Investigation Begins***

43. The CPD were the first on the scene shortly after 6 a.m. At the time, there was no evidence that Mr. O'Keefe had been hit by a vehicle. In fact, the evidence suggested just the opposite. His body did not show signs of trauma commonly associated with being struck by a car. There were no bone fractures or trauma to his lower body, his torso, or any other part of his body as investigators would expect from a vehicle strike. Rather, Mr. O'Keefe's injuries were consistent with being physically assaulted to the face and head, and attacked by a dog. For good reason, the ranking CPD officer on the scene, Sgt. Michael Lank, opined on a telephone call captured on a dashcam that Mr. O'Keefe looked like he had been in a fight.

44. Moreover, the initial search conducted by Canton police officers revealed that there was no vehicle debris on the lawn at 34 Fairview, let alone any debris at or near Mr. O'Keefe's body. Not a single piece of taillight material was discovered on the lawn that morning or in the roadway, notwithstanding multiple searches and the use of a leaf blower to remove snow.

45. Tellingly, despite the commotion outside, including more than a dozen first responders, three police cruisers, two ambulances, a ladder fire engine - all with their emergency lights flashing - and at least two civilian vehicles, plus Ms. Read's screams upon finding Mr. O'Keefe's body, no one from the Alberts' house, including police officer Brian Albert, ever went outside to see what was happening, let alone help. They wanted to avoid scrutiny from the police investigators.

46. Sgt. Lank was a long-time friend of the Alberts and the first law enforcement officer to enter the House. He spoke to the Alberts and the McCabes. Pursuant to their plan, the Alberts and the McCabes told Sgt. Lank that Mr. O'Keefe had never entered the Alberts' house the night before. The Alberts' and McCabes' statements were false. Mr. O'Keefe arrived at and

Date Filed 11/7/2025 3:34 PM Case 1:25-cv-13588 Document 1-1 Filed 11/25/25 Page 15 of 54
Superior Court - Bristol
Docket Number

entered the House or garage, where he was assaulted, attacked by the Alberts' dog, and suffered a fatal injury to the back of this head.

47. Despite Mr. O'Keefe's injuries being wholly inconsistent with the story the House Defendants were now telling him, neither Sgt. Lank nor any other member of the CPD searched the House to determine whether the occupants – or anyone else - were involved in Mr. O'Keefe's death. Nor did they request to search the occupants' cell phones, observe their bodies for evidence of a fight, or even secure the scene where Mr. O'Keefe's body was found. They failed to do so because of bias borne of friendship and loyalty in favor of the Alberts and McCabes.

48. After Sgt. Lank returned to the CPD, three hours after the discovery of Mr. O'Keefe's body, and more than two hours after being interviewed at the Alberts' home that morning, Ms. McCabe called Sgt. Lank to report that she "recalled" additional information. As part of the plan to implicate Ms. Read and remove suspicion from the House Defendants, she falsely told Sgt. Lank that Ms. Read told her twice that morning, "I hope I didn't hit him." More than a year later, at a separate proceeding, Ms. McCabe changed her story on this topic yet again. In furtherance of the House Defendants' plan, McCabe then falsely reported that Ms. Read outright confessed to hitting Mr. O'Keefe right after she first found him in the snow.

***Proctor Leads MSP Investigation Despite Conflicts***

49. Michael Proctor was assigned as the case officer and had primary responsibility for the MSP investigation of Mr. O'Keefe's death. Sgt. Yuriy Bukhenik was Proctor's direct supervisor. Lt. Brian Tully was the supervisory officer at the Norfolk County State Police Detective Unit, and thus supervised both Bukhenik and Proctor. In their roles, Bukhenik and Tully both knew at all times exactly the extent of Proctor's misconduct in investigating Mr. O'Keefe's death, as described below.

50. From the beginning, Proctor should never have been assigned as an investigating officer - let alone the lead investigator. He grew up and resides in Canton, is a good friend of the Alberts, and had known the family for years. Proctor and Julie Albert, Brian Albert's sister-in-law, had each other's personal cell phone numbers. In fact, just days before Mr. O'Keefe's death, Proctor communicated with Julie Albert about babysitting Proctor's minor child. Proctor's sister, Courtney, was also a close friend of Julie. In fact, Proctor's own mother referred to the Alberts as the Proctors' "second family." The existence of these relationships was intentionally suppressed by Proctor and other members of the MSP, including Bukhenik and Tully, in an effort to ensure that the House Defendants were protected, and that Ms. Read's right to a fair investigation and trial were undermined.

***Proctor, Bukhenik, and Tully Engage in a Corrupt and Biased Investigation By Not Investigating Inside the House, and Interviewing House Defendants as Friends Rather than Suspects***

51. Proctor, Bukhenik, Tully, and the MSP never searched for DNA evidence inside the House, never looked for ridged surfaces that could have caused the gash on the back of Mr. O'Keefe's head, never inspected the House Defendants' bodies for indication of bruises or cuts that resulted from an altercation, and did not search the House Defendants' cell phones. This allowed potential evidence to be destroyed, disposed of, removed, or simply become unrecoverable.

52. Proctor's, Bukhenik's, and Tully's interviews of the House Defendants were also outside of normal protocol. They were all interviewed either at their home, their family member's home, their lawyer's home (in the case of Brian Higgins), their lawyer's office (in the case of Brian Jr. and Caitlin Albert), their place of employment, or over the phone. These

interviews were each untimely, unrecorded, and fundamentally designed to protect the House Defendants. And, the House Defendants took full advantage of it.

53. Specifically, Jennifer McCabe became the point person for the House Defendants in providing their false narrative to investigators. She managed and communicated details about the House Defendants' messaging and the investigation itself, including visiting Proctor's and other investigators' private residences, mapping out timelines to coordinate statements with other witnesses, leading group text-message chains that were later partially deleted, and planning private meetings at all hours of the day and night. Indeed, these were never the acts of innocent witnesses seeking to help an investigation concerning the death of an alleged friend. Rather, they were predicate acts of a conspiracy among a group of people with a shared goal of deflecting their criminal exposure onto someone else.

54. The remaining group texts that were not deleted, or that were recovered later, reveal some of their planning. For instance, on the evening of January 29th, Jennifer McCabe texted with her sister, Nicole Albert, that Kerry Roberts, who was present when Mr. O'Keefe's body was found: "talked to cops and kept it simple." Of course, there would be no reason to report back to other House Defendants about Roberts "keep[ing] it simple," unless what really happened was more ***complicated***. Proctor, Bukhenik, and the MSP never sought these communications, rather, they were obtained by Karen Read's defense attorneys' repeated motions to compel access to data on Ms. McCabe's iPhone.

55. Later, in group texts with Jennifer McCabe and Brian and Nicole Albert, Matthew McCabe suggested having Chris Albert publicize their crafted story to a reporter, saying "Ask Chris to ask some questions. Tell them the guy never went in the house." As an endorsement of the plan, Brian Albert responded: "Exactly."

56. Importantly, the text messages from the House Defendants' phones that were ultimately recovered and that provide a window into their conspiracy and misconduct, as well as MSP's unlawful investigation, were not the product of CPD or MSP's investigative work. Rather, based on media reports raising serious questions about MSP's investigation and the House Defendants' role in Mr. O'Keefe's death, another "separate law enforcement agency" began its own subsequent investigation. That investigation – and not MSP's – resulted in obtaining the House Defendants' phones, taking statements from the House Defendants, and conducting "a separate proceeding," all of which MSP refused to do itself. Indeed, the evidence procured by the "separate law enforcement agency's" investigation demonstrates the House Defendants' conspiracy and unlawful conduct, as well as MSP's bias and corruption.

57. Proctor and Bukhenik initially interviewed the McCabes and Brian Albert on January 29th at the McCabes' home at 12 Country Lane in Canton, at which time they again falsely stated that Mr. O'Keefe never entered the Alberts' home. Bukhenik and Proctor did not interview Nicole Albert and Brian Higgins until February 3, 2022, and did not interview Chris and Julie Albert until February 10th, nearly two weeks after Mr. O'Keefe's death and more than a week after Ms. Read was arrested and charged. Before both interviews, the McCabes and Alberts continued to coordinate their stories, as evidenced in group texts.

58. Proctor, Bukhenik, and Tully likewise failed to conduct a meaningful investigation into Higgins's involvement. When Proctor and Bukhenik interviewed Higgins on February 3rd, Higgins presented the troopers with a select set of self-curated texts between himself and Ms. Read. They learned that Higgins and Ms. Read had been exchanging flirtatious texts and that Higgins reported at least one instance in which Ms. Read and Higgins had kissed while at Mr. O'Keefe's house mere weeks before his death.

59. Rather than pursuing Higgins as a possible suspect, Proctor, Bukhenik, and Tully neglected to investigate the matter further. They never interviewed Higgins again, even after surveillance video revealed Higgins was suspiciously hiding his face in the halls and the parking lot of CPD at 1:30 a.m. on January 29th. The video contradicts Higgins's statements about his actions that night. However, not only did Proctor, Bukhenik, Tully, and MSP not investigate what Higgins was doing or what was in the bag, but they went so far as to hide this video from Karen Read and her criminal defense attorneys for years; Read's defense did not receive these videos until *after* Read stood trial for the first time. And, even after the "separate law enforcement agency's" investigation revealed late night phone calls between Brian Albert and Brian Higgins, MSP failed to pursue either witness further or seek a full forensic extraction of Higgins's phone or even a simple call log from his cellular provider.

60. When it was revealed that Ms. Read's defense team requested the preservation of Brian Albert's and Higgins's phones in order to forensically image them (this request was allowed by the court), both men got rid of their phones within days of one another. Higgins went so far as to drive to a military base on Cape Cod, remove the SIM card from the phone, cut the SIM card with scissors he brought with him, and destroy and dispose of the phone and card separately in two dumpsters, and then drive back home. Their destruction of their phones eliminated potentially incriminating communications between them and was a direct result of Proctor's, Bukhenik's, and Tully's intentional refusal to collect important investigative evidence that would be exculpatory to Ms. Read. Even after learning about the destruction of both witnesses' cell phones, MSP investigators had other avenues they could have used to pursue evidence, such as cellular toll records or simply interviewing Brian Higgins and Brian Albert to

inquire about the nature of the late-night communications. They intentionally ignored these avenues as well.

61. Not only did Proctor fail to probe his friends' stories, he coordinated with them through his sister. Proctor spoke to Courtney multiple times a day and knew she was in close contact with, and providing information to, Julie Albert. Julie and Courtney called each other many times between February 1st and 2nd, and at least 67 times between February 1st and September 6, 2022.

62. For example, as he prepared to question Chris and Julie Albert on February 10th, Proctor told his sister Courtney that the interview was "not a big deal." Courtney told Proctor that Julie Albert had been nervous and wanted to give him a "thank you gift" after the interview. To avoid scrutiny, Proctor instructed Courtney to tell Julie to give the gift to his wife, Elizabeth Proctor.

63. Proctor shared investigatory details with Courtney before they were public. In the same instance referenced above, when his sister informed him that Julie Albert had been "so nervous" before the interview, instead of investigating further, he shrugged it off, laughed, and asked "Why?" But Proctor knew exactly why Julie Albert was nervous. He sought to reassure her by telling Courtney that "it was fine, just a quick convo." And then after the interview, Proctor spoke to Julie on his personal cell phone in an unreported conversation. Proctor never treated the Alberts as witnesses in a murder investigation; he treated them like the family friends that they were.

64. At one point leading up to the some of the interviews, Ms. McCabe asked Nicole Albert if she had heard anything more about the investigation. Confident she would learn more

from Julie Albert – again, through Courtney - Nicole Albert responded, "We'll get more info tomm. Don't want to text about it."

65. House Defendants did not "want to text about" their activities and communications because they tried to hide and/or lie about them. For instance, it was discovered in the second criminal trial that Ms. McCabe had lied in her sworn testimony in the first trial about not visiting 34 Fairview with Kerry Roberts on January 30th on their way to Michael Lank's house. However, while they did not text about this meeting, McCabe's cell phone location data obtained later by Read's defense reveals that she did, in fact, visit 34 Fairview just one day after O'Keefe's death, and lied about it.

66. The McCabes, Alberts, and Higgins all told the same false story to investigators in their interviews, and Proctor, Bukhenik, and Tully accepted their coordinated statements without making efforts to corroborate their stories.

***Rather than Investigate their Friends and Brethren, Proctor, Bukhenik, Tully, and MSP Target Karen Read***

67. Instead of taking the routine, objective, and necessary steps of investigating the McCabes, Higgins, and the Alberts, Proctor, Bukhenik, and Tully focused exclusively on Ms. Read as a suspect from the start of the investigation, despite substantial evidence exonerating her and implicating others, just as the House Defendants intended.

68. Proctor seized Ms. Read's cell phone and her SUV within 30 minutes of interviewing her on January 29th. He arrested her 72 hours later, before reviewing any surveillance from the bars or Ring camera footage, before interviewing exculpatory witnesses, and before the medical examiner's official conclusion that the manner of death "could not be determined" and that there were no injuries to Mr. O'Keefe's body consistent with a vehicle strike.

69. Much to Proctor's surprise, through the "separate law enforcement agency's" investigation, his contemporaneous text messages were discovered. Among them, Proctor texted with his high school friends on the evening of January 29th, the day he began his investigation. He told them that the MSP had already determined the Alberts were not going to receive any scrutiny about Mr. O'Keefe's death, even though the MSP had not at that point visited the crime scene or been inside the Alberts' home, and had performed only a cursory interview of the McCabes and Brian Albert.

70. Proctor told his friends that Mr. O'Keefe had been hit by a car and had not been in a fight despite the fact that Mr. O'Keefe had suffered no injuries consistent with a vehicle strike, but he *did* have injuries consistent with a fight and dog attack. Proctor rejected a friend's belief that Brian Albert, the homeowner of the property where Mr. O'Keefe's body was found, would "receive some shit," instead agreeing with another friend's assumption that "you guys [the MSP] are out to make it cut and dry since it involves cops." Proctor revealed that he had already decided he was "going to put serious charges" on Ms. Read, that she was "fucked," and that there was "zero chance she skates." From the outset, Proctor was determined to *pin it on the girl.*

71. Proctor's supervisors were aware of his bias and conflicted relationships in this investigation. They didn't have to guess - Proctor told them. He told them he knew the Alberts. Text messages from Proctor to Bukhenik and other MSP troopers show Proctor had decided to focus suspicion on Ms. Read to the exclusion of everyone else. He told the troopers that Ms. Read was "retarded" and that he was searching her phone for "nudes" of her. In the text chain, Sgt. Bukhenik "liked" Proctor's text describing Ms. Read as "retarded." Bukhenik received Proctor's texts and never reprimanded Proctor or addressed his improper bias and conduct.

72. Because he was determined to "put serious charges" on Ms. Read, Proctor ignored the fact that the Commonwealth's medical examiner could not conclude that Mr. O'Keefe's death was a homicide, determining instead that the manner of his death could not be determined. The medical examiner also refused to conclude that Mr. O'Keefe died as a result of being struck by a vehicle, and later testified at trial that his injuries were *not consistent* with a car strike. Proctor later admitted that, in his entire career, he had never seen a homicide investigation where the medical examiner could not determine the manner of death. But he remained undeterred in his quest to charge Ms. Read. As he later admitted, the medical examiner's refusal to rule the death a homicide did not matter to him "*because either way Ms. Read was going to be charged.*"

***Proctor and Bukhenik Plant Certain Evidence, and Make False Statements in Court and Other Legal Documents to Frame Karen Read***

73. Proctor made this investigation "cut and dry" by manufacturing a case against Ms. Read. A crucial first step was to ensure that the crime scene and evidence was not secured. This was in violation of MSP policy and well-established best practices for critical incident investigations. Specifically, the MSP Crime Laboratory requires proper processing of evidence at major crime scenes, including "crime scene photography and evidence processing, and recovery of latent fingerprint, footwear, and tire track evidence." Neither the MSP troopers involved in the investigation nor the CPD police officers on the scene secured the Alberts' home or the area where Mr. O'Keefe's body was found. The MSP did not take any photographs of the House, including any part of the yard where O'Keefe's body was found, until February 1st, more than three full days later. No photographs were ever taken of the inside or garage of 34 Fairview. This intentional departure from established protocols permitted Proctor and Bukhenik to generate false incriminating evidence against Ms. Read, and give the House Defendants time to destroy the actual evidence.

Date Filed 11/17/2025 3:34 PM Case 1:25-cv-13588 Document 1-1 Filed 11/25/25 Page 24 of 54
Superior Court - Bristol
Docket Number 2573CV00914

74. By approximately 2:30 p.m. on January 29th - before he had even met or interviewed Ms. Read or seen her Lexus SUV - Proctor had already ordered seizure of the vehicle at her parents' home in Dighton. By 4:17 p.m., the vehicle was in MSP's physical possession. The vehicle was then towed to the CPD "sallyport" even though the MSP has at least two closer barracks and Massachusetts was in the middle of an historic Nor'easter. Proctor knew he had more leeway to manipulate evidence regarding the SUV at CPD than at MSP's facilities and he knew he needed to have that evidence in close proximity to the crime scene at 34 Fairview Road.

75. Before the vehicle arrived at the garage, Ms. Read's Lexus's taillight had a minor crack but was intact. The crack occurred when Ms. Read backed into Mr. O'Keefe's car at 5 a.m. that morning as she was leaving to search for him. That incident was captured on video.

76. Bukhenik and Proctor followed the vehicle from Dighton and arrived at CPD at 5:35 p.m., just moments after the tow truck with the Lexus. At some point after the vehicle arrived at the sallyport, the right rear taillight was almost entirely destroyed. Video taken from different angles in the sallyport shows Bukhenik, Proctor, Canton Police Chief Ken Berkowitz, and other individuals near the taillight, but notably, no video captures the taillight's appearance at the precise time it arrived at the sallyport. The available surveillance video from the sallyport, as well as a CPD access card swipe log obtained by a separate law enforcement agency, reveal seemingly unfettered access to the sallyport by a myriad of individuals throughout the evening of January 29th, including just before and just after 5:30 p.m.

77. One or more of them destroyed the taillight, secretly took pieces of it into their possession, and then planted some of them in various places at 34 Fairview and on Mr. O'Keefe's clothes.

78. Knowing that there were video cameras both inside and outside the sallyport, Proctor and Bukhenik worked together to obscure their role in manipulating the right rear taillight and then, ultimately, to present false evidence at the first criminal trial. Specifically, Proctor directed Bukhenik to secure video footage from surveillance cameras located both inside and outside the sallyport garage, which he did. These videos were manipulated in two significant ways. First, a critical 42 minute portion was deleted from the footage from the sallyport "front wall" camera; the portion from 5:08:02 p.m. to 5:50:50 p.m. – which included the exact time Ms. Read's Lexus arrived in the garage. This footage would have shown that the taillight was intact. Second, footage from the sallyport "back wall" camera was inverted, which made the right side of the Ms. Read's vehicle appear to be the left side, and *vice versa*. Another camera, "main driveway side exterior," captured the back end of the Lexus as it arrived at CPD but was too grainy to decipher the condition of the passenger taillight.

79. The videos from inside and outside the sallyport - and Proctor's request for Bukhenik to obtain it - was intentionally hidden from Karen Read and her defense attorneys for more than two years to avoid scrutiny. The video was then sprung on them immediately before and during the first criminal trial. One driveway camera's footage was not revealed to the defense until just prior to the start of the *second* trial. In fact, Bukhenik presented one part of the video during his direct testimony under questioning by the assistant district attorney, Adam Lally. Bukhenik narrated the video to the jury, correctly identified that Proctor was at the rear of the vehicle, but claimed that he never approached the right rear taillight area of the vehicle. That testimony, however, was entirely false. As he well knew, the video that Bukhenik authenticated as "fair and accurate" was actually neither "fair" nor "accurate" because it had been inverted. Proctor was actually behind the right taillight for a significant period, but because it was

inverted, it appeared in the video that he was behind the left taillight. They hoped this would allow Bukhenik to lie about this issue at trial without detection. With this video and Bukhenik's false testimony, the MSP, Proctor, and Bukhenik attempted to mislead the jury in order to conceal the tampering with and planting of taillight material.

80. Proctor and Bukhenik also took taillight pieces from the sallyport, brought them back to 34 Fairview to plant them in the location where Mr. O'Keefe's body was found, and then falsified various documents in an attempt to hide their conduct.

81. In warrant applications to the Stoughton District Court and Norfolk Superior Court for searches of Google's electronic records, Ring videos, Ms. Read's phone, Ms. Read's vehicle, cell tower records, and other sources of information, Proctor swore he seized Ms. Read's vehicle from her parents' home at 5:30 p.m. on January 29, 2022, and had the vehicle towed to the CPD. Reports shared by the Dighton Police Department in 2023 reveal that the Lexus was towed from Dighton at 4:17 p.m. Proctor's assertion that he seized it at 5:30 p.m. was intentionally false to hide the fact that the car was in police custody for 73 minutes longer than indicated in his sworn affidavits.

82. Proctor maintained that false narrative because it would hide the exact timeframe when he had the opportunity to remove pieces of the taillight from Ms. Read's vehicle and bring them back to the House so that he could later claim the pieces had been there since approximately 12:30 a.m. on January 29th. However, unbeknownst to him, driveway video from the Read residence in Dighton and a report written by the Dighton Police Report revealed Proctor's lie and revealed the true and accurate time the Lexus SUV came into MSP's possession.

83. Proctor also deposited the SUV taillight pieces that he and others removed from the vehicle in the sallyport on Mr. O'Keefe's clothes. Proctor retrieved Mr. O'Keefe's clothes from the floor of the hospital where he was pronounced deceased. Instead of securing the clothes in a sealed container or bag, as protocol requires, Proctor and Bukhenik drove them around in his car all day and then placed them in the Norfolk County District Attorney's office for at least six days, where they were accessible to Proctor, Bukhenik, and any other MSP troopers.

84. Proctor and Bukhenik failed to create a log to document the chain of custody of the clothing. Therefore, and by design, there is no record of when, how many times, and under what circumstances Proctor and Bukhenik touched, manipulated, handled, or otherwise tampered with that clothing.

85. The MSP Evidence Submission Handbook dictates that chain of custody begins *at the time of collection* and that the collector "seal evidence packages as soon as possible after collection to ensure integrity of evidence items and limit loss of transient evidence."

86. Here, in violation of MSP's stated policies, the chain of custody for *all* of John O'Keefe's clothing – as well as dozens of pieces of taillight material – does not begin until March 14, 2022, nearly two months after it was collected, when Proctor finally submitted it to the MSP Crime Lab. At some point before providing those clothes to the crime lab, Proctor and/or Bukhenik placed pieces of the SUV taillight on them, where they were then identified by the crime lab in 2023.

87. Proctor also planted pieces of glass on the bumper of Ms. Read's SUV while it was in his possession at the CPD sallyport garage, which he then claimed to have "recovered" later on February 1st. Proctor planted this evidence to make it look like these shards originated from a cocktail glass that Mr. O'Keefe was holding when he exited the Waterfall Bar. Evidently,

Proctor did not plan on Karen Read's defense attorneys insisting on forensic testing on the glass shards, which showed that they *did not match the cocktail glass* in Mr. O'Keefe's possession. In fact, the five glass pieces originated from multiple *different* sources. One shard of glass on the bumper *did* match another piece of glass that had been in Proctor's possession during the investigation. The only way for the glass to have ended up on the SUV bumper is that Proctor planted it there in an attempt to connect the vehicle to the death of Mr. O'Keefe.

***Other Aspects of the Conflicted and Corrupt Investigation***

88. Proctor's, Bukhenik's, and MSP's investigation was rife with other examples of corruption and bias.

89. For example, despite evidence that Brian Albert may have had video surveillance at the House, neither Proctor nor Bukhenik nor any other member of the MSP issued subpoenas to Ring or any other home surveillance company; and no one questioned any other member of the Albert family about the presence of video monitoring.

90. Proctor and the MSP also failed to track down other important witnesses and evidence. For example, Brian Loughran, a Town of Canton snowplow operator turned out to be one of the most significant witnesses in the entire criminal trial. Proctor and his colleagues never spoke to him during their investigation, and only did so once Loughran was interviewed by a "separate law enforcement agency" and provided statements inconsistent with the MSP's narrative - 18 months after Ms. Read was already indicted and awaiting trial.

91. Specifically, Mr. Loughran drove his snowplow by the House multiple times in the early morning hours of January 29th, including at 2:30 a.m. and 3:30 a.m. He reported that there was no body on the lawn at 34 Fairview, nor cars on the street in front of the House at 2:30 a.m. Mr. Loughran believes he would have seen a body had it been on the lawn where Mr. O'Keefe

was found several hours later. Instead, the second time he drove by the House around 3:30 a.m., Mr. Loughran saw a Ford Edge in front of the Alberts' home that had not been there an hour before, but which was then parked where Mr. O'Keefe's body was later found. Brian Albert drove a Ford Edge at the time.

92. However, the Ford Edge was gone by the time Ms. Read arrived to the House around 6:00 a.m., and in its place, she discovered Mr. O'Keefe's body. Proctor, Bukhenik, and Tully never made any effort during the actual investigation to track down Mr. Loughran or any information relating to the Ford Edge.

93. Proctor also secretly made efforts to protect other Albert family members during the investigation who may also have had a role in Mr. O'Keefe's death. Witness Julie Nagel told Proctor that Colin Albert, Brian Albert's nephew, had been present at the House the night of January 28th - 29th. But Proctor omitted his name from his official summary of Ms. Nagel's interview, even though he listed all others who had been present at the house with Colin. When Ms. Read's attorneys filed a motion to obtain Proctor's notes, his handwritten memorialization of the Julie Nagel interview mirrored almost exactly what was typed up in his police report - except for the words "Colin Albert."

94. Proctor's interactions with Kevin Albert (Brian Albert's brother) during the investigation also demonstrate his close relationships with the Albert family, as well as his propensity for violating MSP rules and Massachusetts criminal laws. Repeatedly, Proctor used his personal cell phone to speak with Kevin (a CPD officer) instead of official channels when he coordinated interviews of witnesses, even though CPD was recused from the investigation.

95. Further, in the middle of Proctor's investigation in the summer of 2022, it was discovered that Proctor and Kevin Albert were out together drinking alcohol and driving in

Proctor's cruiser on Cape Cod. At the end of the night, Kevin Albert forgot to bring home his gun and badge, and left them in Proctor's cruiser. Their drinking and driving in Proctor's MSP vehicle violated both MSP policies, as well as various Massachusetts criminal statutes, and further highlights the conflicted nature of MSP's investigation.

96. Moreover, because of their close relationship, Proctor, Bukhenik, and Tully, worked together with CPD in hiding certain videos from Karen Read's criminal defense team. Specifically, upon information and belief, MPD and CPD collaborated to keep exculpatory surveillance video from Karen Read's criminal defense team in preparation for the first trial. Those videos captured Brian Higgins's activities in the CPD parking lot and inside the police station shortly after the physical altercation at the House that led to Mr. O'Keefe's death. They demonstrated that Higgins's statements about his post-House party activities on the night of Mr. O'Keefe's death were not accurate. Upon information and belief, CPD knew it had this evidence and worked with MSP to keep it from Ms. Read. Additionally, upon information and belief, CPD set its "auto-delete" function for saving certain surveillance videos from the sallyport to "30 days," therefore, assuring the immediate destruction of likely additional exculpatory evidence. The 30-day autodelete setting conflicts with the fact that CPD videos were shared with the defense over the course of three years. Therefore, either the setting was changed to prevent a defense expert from auditing the footage (which is when the 30-day setting was discovered), or the footage was obtained within 30 days of January 29th and withheld from the defense.

***The Indictments, Trials, and Aftermath***

97. Ms. Read was arrested on February 1, 2022, pursuant to a criminal complaint charging her with manslaughter, among other charges. She was required to post $50,000 for bail,

and the Court imposed several other conditions of release including loss of her driver's license and stay away orders from the O'Keefe family and John O'Keefe III's home.

98. Ms. Read was later re-arrested on June 9, 2022, after being indicted for second-degree murder, manslaughter, and leaving the scene of an accident resulting in death. Her bail was set at $100,000 by the Norfolk County Superior Court. In February of 2023, her bail was reduced to $80,000 at the defense's request.

99. Ms. Read was tried twice by the Commonwealth. The first trial started in April 2024 and ended on July 1st after the court ordered a mistrial because of a hung jury.

100. On June 18, 2025, following another nearly two-month trial, Ms. Read was *acquitted* of all charges associated with the death of John O'Keefe - murder, manslaughter, and leaving the scene of an accident resulting in death. For the first time in three and a half years, Karen Read was able to leave Court knowing that the forces aligned against her had failed to convince a jury to buy their deception.

101. Beginning in January 2022, the Defendants' actions have had profound effect on Ms. Read. She lost her employment and income. She lost her professorship. She lost her private health insurance. She lost her car and her driver's license. She lost her house. Her reputation - both personally and professionally - was utterly destroyed. She incurred multiple millions of dollars in debt for legal fees, and additional millions in expert fees, and costs. In addition, after being arrested twice, jailed twice, and tried twice, she has suffered years of intense stress and emotional harm, worried that she would be imprisoned for the rest of her natural life for a crime she did not commit.

102. Ms. Read suffers from both Crohn's disease and multiple sclerosis. As documented, under seal with the criminal court, Ms. Read has undergone tens of surgeries to

manage her illnesses prior to January 29, 2022, and endured a blood infusion just months before Mr. O'Keefe's death. In the aftermath of the charges, two arrests, and during both trials, Ms. Read suffered a well-documented exacerbation of her symptoms amid the stress, anxiety, and emotional and physical impacts of being wrongfully accused of murder. While fighting for her freedom against a corrupt prosecution, Ms. Read underwent dozens upon dozens of documented medical procedures and treatments to attempt to address her health issues.

103. The Defendants concocted a plan, executed that plan, and framed an innocent woman, and they are now responsible for these extraordinary damages Ms. Read has suffered at their hands.

***MSP Investigates and Punishes Proctor, Bukhenik, and Tully for Their Misconduct During the Investigation.***

104. Proctor wrote more than one-third of the police reports in this case, testified at the state grand jury three separate times, interviewed every member of the Albert and McCabe families, had possession – at least until March 14, 2022 – of *all* of John O'Keefe's clothing and *all* of the taillight pieces found broken from the housing, processed Mr. O'Keefe's Chevrolet Traverse the day after Ms. Read was arraigned, had access to and reviewed all the Ring videos, had access to and reviewed the surveillance from C.F. McCarthy's, had possession of *all* of the CPD sallyport and driveway videos, and numerous other critical investigative activities. And yet, once evidence of Proctor's conflicts and lies became public, he was extricated from this case in an effort to hide him from the jury and sanitize the compromised investigation while Ms. Read was forced to trial not once but twice.

105. Ultimately, Michael Proctor was relieved from duty and transferred out of the detective unit of the Norfolk County District Attorney's Office on July 7, 2024, mere days after the conclusion of Ms. Read's first trial. Proctor was terminated from the MSP on March 19,

2025. Upon a release from the District Attorney of more implicating text messages from Proctor's phone, on October 18, 2025, Proctor officially ended his appeal with the Civil Service Commission.

106. On September 23, 2024, an MSP internal affairs investigation found Yuriy Bukhenik "failed to perform his supervisory duties in an ongoing investigation." On July 7, 2025, Bukhenik was transferred out of the NDAO detective unit and reassigned to an administrative role in another division.

107. On October 18, 2024, Brian Tully was disciplined and reassigned from SPDU and stripped of his "Detective" designation. Tully was given special dispensation by Norfolk County District Attorney Michael Morrissey to continue detective work on the Read case despite his demotion because of his behavior *on this case*.

108. Upon information and belief, MSP Troopers David DiCicco and Jeffrey Kotkowski were also disciplined for their misconduct associated with MSP's investigation of Ms. Read.

## V. Counts[4]

### Count 1 – 42 U.S.C. § 1983 – Malicious Prosecution under the Fourth Amendment (Against Proctor, Bukhenik, Tully)

109. The preceding paragraphs are incorporated herein by reference.

110. Proctor, Bukhenik, and Tully violated Ms. Read's Fourth Amendment rights by engaging in a malicious prosecution of Ms. Read by causing her to be seized pursuant to legal process unsupported by probable cause.

111. The criminal proceedings against Ms. Read terminated in her favor when she was acquitted of murder, manslaughter, and leaving the scene of an accident with a death.

[4] After making presentment pursuant to G.L. c. 258, § 4, Ms. Read will add Counts against (a) MSP for negligent training, supervision, and retention of MSP troopers, including Proctor, Bukhenik, and Tully; and (b) the Town of Canton for negligent oversight of the investigation into Mr. O'Keefe's death and of its own officers and facilities.

112. Proctor, Bukhenik, and Tully caused Ms. Read to be seized without probable cause as described above, including but not limited to, by:

a. Leading, handling, and participating in the O'Keefe investigation even though Proctor was conflicted due to personal relationships with various witnesses, suspects, and potential suspects, which conflict led to Ms. Read's unlawful treatment;

b. Handling the investigation even though Proctor had an extreme and personal negative bias towards Karen Read, which bias led to Ms. Read's unlawful treatment;

c. Violating MSP's rules, policies, and procedures in all aspects of the investigation;

d. Planting, fabricating, and manipulating evidence, falsifying documents, preparing false affidavits, and committing perjury;

e. Failing to secure evidence and the crime scene, obtain evidence, timely and appropriately interview suspects, and investigate the Alberts, McCabes, or Higgins and allowing them to destroy potentially exculpatory evidence;

f. Failing to consider and present exculpatory evidence to prosecutors and the grand jury investigating Mr. O'Keefe's death, such as the evident dog bite injuries on Mr. O'Keefe's arm and evidence that his injuries were caused by an altercation and not a vehicle strike (such as the lack of lower body trauma);

113. Following her indictment by a grand jury, Ms. Read was re-arrested without probable cause, forced to pay a $100,000 bond to be released from custody, and required to comply with numerous pre-trial release provisions. These post-arraignment deprivations of her liberty constitute seizures under the Fourth Amendment.

114. Those deprivations continued during Ms. Read's second trial in part because of Proctor's false testimony at Ms. Read's first trial. Among other things, Proctor falsely testified that:

a. When he first saw the taillight on Ms. Read's car at Ms. Read's parents' house in Dighton, it had large pieces missing and the shattered taillight displayed at the first trial, as photographed on February 1, 2022, was in the same condition as on January 29th;

b. He and Bukhenik never touched any part of Ms. Read's vehicle when it was stored in the CPD sallyport;

c. He retrieved taillight pieces on subsequent searches at the Alberts' home, when he knew he had deposited or arranged for someone to deposit taillight pieces at the property;

d. Chris and Julie Albert were his loose acquaintances rather than friends; and

e. His statements in sworn affidavits all claiming the Lexus was seized at 5:30 p.m. and that he arrived in Dighton at 4:30 p.m. were "typos."

115. Thus, Proctor, Bukhenik, and Tully acting under color of law, violated Ms. Read's Fourth Amendment rights against unreasonable searches and seizures.

116. As a proximate result of this misconduct, Ms. Read was wrongfully prosecuted for Mr. O'Keefe's death and made to defend herself in two trials in the Superior Court for Norfolk County resulting in the loss of employment, reputational damages, and millions of dollars of legal expenses as well as serious emotional and physical distress and injury.

117. In addition to an award of damages for these harms, Ms. Read is entitled to her attorneys' fees under 42 U.S.C. § 1988, costs, interest, and punitive damages.

**Count 2 - 42 U.S.C. § 1983 – Supervisor Liability**
**(Against Bukhenik and Tully in their individual capacities)**

118. The preceding paragraphs are incorporated herein by reference.

119. A supervisor is liable under 42 U.S.C. § 1983 when the supervisor supervises, trains, or hires a subordinate with deliberate indifference towards the possibility that the subordinate's deficient performance will result in deprivation of an individual's constitutional rights.

120. Bukhenik and Tully knew or should have known that there was a grave risk that Proctor would fail to investigate the Alberts with whom he had a close personal relationship, which he had disclosed.

121. They also knew or should have known that there was a grave risk Proctor would wrongly seek to have Ms. Read charged given the manifest bias evidenced in his text messages, which were sent to Bukhenik, among others.

122. Bukhenik and Tully could have taken easily available steps to avoid a constitutionally deficient malicious prosecution of Ms. Read. Those measures include, but are not limited to, (1) replacing Proctor with an unbiased investigator that had no personal relationship with anyone involved in Mr. O'Keefe's death, (2) safeguarding the crime scene and the physical evidence, including Mr. O'Keefe's clothing and 47 pieces of taillight material, to prevent anyone from planting, manufacturing, or manipulating evidence, (3) initiating timely searches at the Alberts' house, and (4) quickly seizing the cellphones and other forms of electronic evidence in the possession of the Alberts, the McCabes, and Higgins, which would have prevented their later manipulation and destruction.

123. By not taking any of those measures, Bukhenik and Tully permitted Proctor, and Tully permitted Bukhenik, to violate Ms. Read's Fourth Amendment rights against unreasonable searches and seizures, and thus themselves violated Ms. Read's Fourth Amendment rights.

124. In these ways and others, Bukhenik's conduct constituted condonation of, or acquiescence to, Proctor's behavior, or gross negligence amounting to deliberate indifference.

125. In these ways and others, Tully's conduct constitute condonation of, or acquiescence to, Bukhenik's and Proctor's behavior, or gross negligence amounting to deliberate indifference.

126. As a proximate result of their breaches, Ms. Read was wrongfully prosecuted for Mr. O'Keefe's death resulting in the loss of employment, reputational damages, and millions of dollars of legal expenses as well as serious emotional and physical distress and injury.

127. In addition to an award of damages for these harms, Ms. Read is entitled to her attorneys fees' under 42 U.S.C. § 1988, costs, interest, and punitive damages.

**Count 3 – 42 U.S.C. § 1983 – Conspiracy to Deprive Ms. Read of Her Fourth Amendment Rights (Against Proctor, Bukhenik, Tully, the Alberts, the McCabes, and Higgins)**

128. The preceding paragraphs are incorporated herein by reference.

129. Proctor, Bukhenik, Tully, the Alberts, the McCabes, and Higgins shared a common design, and acted in concert, to frame Ms. Read for Mr. O'Keefe's death.

130. As part of their concerted efforts, and among their many other misrepresentations, the Alberts, McCabes, and Higgins agreed with each other to tell investigators that Mr. O'Keefe never entered the House, that they did not see Mr. O'Keefe in the House that night, and that Ms. Read made inculpatory statements on the morning of January 29th.

131. When they made these statements, the House Defendants did so only because they were aware that Proctor, Bukhenik, and Tully would also act similarly, by solely investigating Ms. Read.

132. Proctor, Bukhenik, and Tully knew or should have known that the statements made to them by the House Defendants were false, and that obvious and easily-obtainable evidence existed demonstrating Mr. O'Keefe went into the House where he was involved in a physical altercation during which he was beaten up, fell back gashing his head, and attacked by a dog. Instead, because of their close personal and professional ties to the House Defendants, Proctor, Bukhenik, and Tully agreed with each other to use the House Defendants' misrepresentations as the predicate for and implicit direction to conduct an investigation that solely targeted Ms. Read to the exclusion of everyone and anyone else.

133. In furtherance of this plan, among other unlawful conduct, Proctor, Bukhenik, and Tully agreed:

a. to continue to handle the investigation even though they had personal relationships with suspects in the murder, which led to unlawful and favorable treatment of potential suspects;

b. to continue to handle the investigation even though they had biases against investigating the House Defendants because of the House Defendants' ties to law enforcement;

c. to continue to handle the investigation even though they had exhibited an extreme and personal negative bias towards Karen Read;

d. to violate rules, policies, and procedures in all aspects of the investigation;

e. to plant, manufacture, and manipulate evidence, falsify documents, and commit perjury;

f. to not secure evidence and the crime scene;

g. to not investigate and obtain available evidence or timely and appropriately interview suspects; and

h. to not investigate the Alberts, McCabes, or Higgins.

134. The McCabes and Alberts coordinated their efforts through text messages, phone calls, and conversations. Higgins and Brian Albert coordinated their efforts through telephone calls and texts on their phones, which were later destroyed or discarded. Finally, Proctor, Bukhenik, and Tully coordinated with the Alberts and McCabes though Proctor's sister, Courtney, who communicated frequently with Julie Albert.

135. Acting pursuant to the plan, Proctor and Bukhenik interviewed the McCabes and Brian Albert in a cursory manner, and all at the same location, midday on January 29th, and Nicole Albert on February 3rd. Proctor and Bukhenik only interviewed Higgins once, at his attorney's home, and did not secure or search his phone or search for communications between him, the Alberts, and the McCabes. Proctor and Bukhenik did not search the Alberts' phones or home where there was likely evidence of Mr. O'Keefe's murder. Brian Albert and Higgins destroyed or discarded their phones, destroying evidence of the murder and cover-up.

136. As a result of the conspiracy between and among them, Proctor, Bukhenik, and Tully never investigated the House Defendants, and instead Ms. Read was wrongfully arrested and prosecuted in violation of her Fourth Amendment rights.

137. Proctor, Bukhenik, Tully, and the House Defendants acted in unison and had a peculiar power of coercion over Ms. Read because Proctor, Bukhenik, and Tully were the state

police employees investigating Mr. O'Keefe's murder and the House Defendants were able to direct that investigation solely towards Ms. Read because of their personal and professional connections to Proctor, Bukhenik, and Tully and their superior knowledge of police and criminal investigations as a result of their own work in, and connection to, law enforcement.

138. The proximate result of Ms. Read's wrongful prosecution was her loss of employment, reputational damages, millions of dollars of legal expenses, and serious emotional and physical distress and injury.

139. In addition to an award of damages for these harms, Ms. Read is entitled to her attorneys fees' under 42 U.S.C. § 1988, costs, interest, and punitive damages.

**Count 4 – Massachusetts Civil Rights Act ("MCRA")**
**(Against Proctor, Bukhenik, Tully, Alberts, McCabes, and Higgins)**

140. The preceding paragraphs are incorporated herein by reference.

141. Proctor, Bukhenik, Tully, and the House Defendants interfered or attempted to interfere with Ms. Read's exercise or enjoyment of her rights under the federal and Commonwealth constitutions and laws, through threats, intimidation, or coercion.

142. Among other acts, by manufacturing and planting evidence, not securing the crime scene, not searching the Alberts' home or the Alberts' and Higgins's phones, and ignoring exculpatory evidence such as the dog-bite injuries and lack of injuries consistent with a vehicle strike, Proctor and Bukhenik caused Ms. Read's wrongful indictment, arrest, and prosecution and thereby interfered and attempted to interfere with her rights under the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights.

143. By falsely representing that Mr. O'Keefe never entered the Albert house and by relocating his body to the location on the Alberts' property where they would claim Ms. Read dropped off Mr. O'Keefe, the Alberts, the McCabes, and Higgins caused Ms. Read's wrongful

indictment, arrest, and prosecution. Brian Albert and Brian Higgins also caused Ms. Read's wrongful indictment, arrest, and prosecution by destroying or discarding their phones, eliminating exculpatory evidence. The House Defendants thereby interfered and attempted to interfere with Ms. Read's rights under the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights.

144. Ms. Read's wrongful indictment, arrest, and prosecution were intrinsically coercive under Massachusetts law.

145. Moreover, the House Defendants' and Proctor's, Bukhenik's, and Tully's conduct amounted to threats, intimidation, and coercion designed to force Ms. Read to give up her defense and plead guilty to a crime she did not commit.

146. As a proximate result of Defendants' actions, Ms. Read was wrongfully prosecuted for Mr. O'Keefe's death resulting in the loss of employment, reputational damages, and millions of dollars of legal expenses as well as serious emotional distress and injury.

147. In addition to an award of damages for these harms, Ms. Read is entitled to her costs, interest, and attorneys fees' under G.L. c. 12, §11I.

**Count 5 – Common Law Malicious Prosecution**
**(Against Proctor, Bukhenik, Tully, the Alberts, the McCabes, and Higgins)**

148. The preceding paragraphs are incorporated herein by reference.

149. By manufacturing and planting evidence, not securing the crime scene, not searching the Alberts' home or the Alberts' and Higgins's phones, and ignoring exculpatory evidence such as Mr. O'Keefe's dog bite injuries and lack of injuries consistent with a vehicle strike, Proctor, Bukhenik, and Tully caused Ms. Read's indictment, arrest, and prosecution.

150. Ms. Read's indictment, arrest, and prosecution occurred without probable cause because they were based on false, manufactured, manipulated, and planted evidence, and because

Proctor, Bukhenik, and Tully ignored exculpatory evidence and allowed potentially exculpatory evidence to be destroyed.

151. These criminal proceedings were instituted with malice, as evidenced by Proctor's, Bukhenik's, and Tully's knowledge that it was based on false evidence, Proctor's, Bukhenik's, and Tully's bias and ill will towards Ms. Read, and for the improper purpose to protect Proctor's friends and acquaintances, the Alberts.

152. The criminal proceedings terminated in Ms. Read's favor when she was acquitted of murder, manslaughter, and leaving the scene of an accident with a death.

153. By falsely representing that Mr. O'Keefe never entered the Albert house and by relocating his body to the location on the Albert property where Jennifer McCabe would claim Ms. Read dropped off Mr. O'Keefe, Brian and Nicole Albert, the McCabes, and Higgins caused Ms. Read's wrongful indictment, arrest, and prosecution. Brian Albert and Brian Higgins also caused Ms. Read's wrongful indictment, arrest, and prosecution by destroying or discarding their phones, eliminating exculpatory evidence.

154. As a proximate result of Defendants' actions, Ms. Read was wrongfully prosecuted for Mr. O'Keefe's death resulting in the loss of employment, reputational damages, and millions of dollars of legal expenses as well as serious emotional distress and injury.

**Count 6 – Intentional Infliction of Emotional Distress**
**(Against Proctor, Bukhenik, Tully, Alberts, McCabes, and Higgins)**

155. The preceding paragraphs are incorporated herein by reference.

156. By manufacturing and planting evidence, not securing the crime scene, not searching the Alberts' home or the Alberts' and Higgins's phones, and ignoring exculpatory evidence such as Mr. O'Keefe's dog bite injuries and lack of injuries consistent with a vehicle strike, Proctor, Bukhenik, and Tully caused Ms. Read's indictment, arrest, and prosecution.

157. By falsely representing that Mr. O'Keefe never entered the Albert house and by relocating his body to the location on the Albert property where Jennifer McCabe claimed Ms. Read dropped Mr. O'Keefe, the Alberts, the McCabes, and Higgins caused Ms. Read's wrongful indictment, arrest, and prosecution of Ms. Read. Brian Albert and Brian Higgins also caused Ms. Read's wrongful indictment, arrest, and prosecution by destroying or discarding their phones, eliminating exculpatory evidence.

158. The Defendants knew or should have known their conduct would cause Ms. Read emotional distress since it would lead to her prosecution for murder and other crimes, and the conduct did cause, and is causing, Ms. Read severe emotional and physical distress.

159. The Defendants' conduct perverted the justice system, allowed Mr. O'Keefe's true killer to escape liability, and threatened to imprison Ms. Read. It is the type of behavior that threatens civilized society and is therefore extreme and outrageous.

160. As a proximate result of Defendants' actions, Ms. Read suffered serious emotional and physical distress and injury.

**Count 7 – Civil Conspiracy**
**(Against Proctor, Bukhenik, Tully, the Alberts, McCabes, and Higgins)**

161. The preceding paragraphs are incorporated herein by reference.

162. Proctor, Bukhenik, Tully, the Alberts, the McCabes, and Higgins shared a common design, and acted in concert, to frame Ms. Read for Mr. O'Keefe's death.

163. As part of their concerted efforts, and among their many other misrepresentations, the Alberts, McCabes, and Higgins agreed with each other to tell investigators that Mr. O'Keefe never entered the House, that they did not see Mr. O'Keefe in the House that night, and that Ms. Read made inculpatory statements on the morning of January 29th.

164. When they made these statements, the House Defendants did so only because they were aware that Proctor, Bukhenik, and Tully would also act similarly, by solely investigating Ms. Read.

165. Proctor, Bukhenik, and Tully knew or should have known that the statements made to them by the House Defendants were false, and that obvious and easily-obtainable evidence existed demonstrating Mr. O'Keefe went into the House where he was involved in a physical altercation during which he was beaten up, fell back gashing his head, and attacked by a dog. Instead, because of their close personal and professional ties to the House Defendants, Proctor, Bukhenik, and Tully agreed with each other to use the House Defendants' misrepresentations as the predicate for and implicit direction to conduct an investigation that solely targeted Ms. Read to the exclusion of everyone and anyone else.

166. In furtherance of the conspiracy, Proctor, Tully, and Bukhenik agreed to fabricate, plant, and manipulate evidence purporting to show that Ms. Read's vehicle hit Mr. O'Keefe. Pursuant to their plan, Proctor, Bukhenik and Tully carried out multiple overt acts, including damaging the taillight on Ms. Read's vehicle while it was in the Town of Canton's sallyport, not securing the crime scene, and depositing taillight pieces on January 29th, prior to the MSP SERT team's arrival on site. In addition, Proctor deposited some of the broken taillight pieces on Mr. O'Keefe's clothing while the clothing was in his unprotected custody. Proctor also deposited glass, alleged to have been from a cocktail glass, on the bumper of Ms. Read's Lexus SUV sometime prior to the vehicle's processing by MSPCL on February 1, 2022.

167. Another part of the conspiracy was to take coordinated steps to ignore and destroy potentially exculpatory evidence that pointed to other suspects like the Alberts and Higgins. The McCabes, the Alberts, and Higgins coordinated through text messages, phone calls, and, on

information and belief, conversations. Higgins and Brian Albert coordinated through telephone calls and, on information and belief, texts on their phones, which were later destroyed or discarded. Finally, Proctor coordinated with the Alberts and McCabes though his sister, Courtney, who spoke frequently with Julie Albert.

168. Acting pursuant to the plan, Proctor and Bukhenik interviewed the McCabes and Brian Albert in a cursory manner the morning of January 29th, and Nicole Albert on February 3rd. All told the same false story that Mr. O'Keefe never entered the Alberts' house. Proctor, Bukhenik, and Tully also only interviewed Higgins once, with his attorney, at his attorney's home, and did not secure or search Higgins' phone or search for communications between him, the Alberts, and the McCabes. Pursuant to the coordinated plan, Proctor, Bukhenik, and Tully also did not search the Alberts' phones or home where there was likely evidence of O'Keefe's murder. Further, Brian Albert and Higgins destroyed or discarded their phones, destroying evidence of the murder and cover-up.

169. Following Mr. O'Keefe's death, among other acts, the McCabes and Alberts agreed to make it look like Mr. O'Keefe died due to exposure after being hit by Ms. Read's car. As part of this common plan, Brian Albert and Higgins, both law enforcement officers familiar with investigations, communicated at 2:22 a.m. on January 29th after Higgins left the house. Shortly thereafter, as part of the plan, Jennifer McCabe deleted a Google search at 2:27 a.m. on January 29th for how long it takes a person to die in the cold. One or more of them then relocated Mr. O'Keefe's body and deposited it in front of the Alberts' house where Jennifer McCabe claimed Ms. Read had dropped Mr. O'Keefe off earlier. The McCabes and Alberts then coordinated what they would say to the police, all of them falsely telling investigators that Mr. O'Keefe never entered the house.

170. Proctor, Bukhenik, Tully, and the House Defendants acted in unison and had a peculiar power of coercion over Ms. Read because Proctor, Bukhenik, and Tully were the state police employees investigating Mr. O'Keefe's murder and the House Defendants were able to direct that investigation solely towards Ms. Read because of their personal and professional connections to Proctor, Bukhenik, and Tully and their superior knowledge of police and criminal investigations as a result of their own work in, and connection to, law enforcement.

171. Proctor's, Bukhenik's, Tully's, and the House Defendants' conduct described herein were unlawful and tortious. Among other things, they constitute intentional infliction of emotional distress, negligence, common law malicious prosecution, and violations of Ms. Read's rights pursuant to the United States Constitution and the Massachusetts Declaration of Rights.

172. As a proximate result of Defendants' actions, Ms. Read was wrongfully prosecuted for Mr. O'Keefe's death resulting in the loss of employment, reputational damages, and millions of dollars of legal expenses as well as serious emotional and physical distress and injury.

## JURY DEMAND

Ms. Read respectfully requests a jury trial on all matters so triable.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Read respectfully requests that the Court grant her the following relief:

A. Enter judgment in her favor and against each relevant Defendant on each Count of this Complaint;

B. Award her damages in an amount to be calculated at trial, along with pre- and post-judgment interest, costs, and expenses;

C. Award her reasonable attorneys' fees incurred in connection with this litigation, pursuant to 42 U.S.C. § 1988 and any other applicable statute or law; and

D. Grant her such other relief as the Court deems equitable and just.

Date Filed 11/17/2025 3:34 PM
Superior Court - Bristol
Docket Number

Respectfully submitted,
Karen Read
By Her Attorneys,

SHEEHAN, PHINNEY, BASS & GREEN, P.A.

*/s/ Damon M. Seligson*
Damon M. Seligson, BBO # 632763
Charles M. Waters, BBO # 631425
Aaron D. Rosenberg, BBO # 684826
Sheehan Phinney Bass & Green PA
28 State Street, 22nd Floor
Boston, MA 02109
(617) 897-5600
dseligson@sheehan.com
cwaters@sheehan.com
arosenberg@sheehan.com

WERKSMAN JACKSON & QUINN LLP

*/s/ Alan Jackson*
Alan J. Jackson, *pro hac vice*
Caleb E. Mason, *pro hac vice*
Elizabeth S. Little, *pro hac vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com
cmason@werksmanjackson.com
elittle@werksmanjackson.com

Dated: November 17, 2025

Date Filed 11/25/2025 6:31 PM
Superior Court - Bristol
Docket Number 2573CV00914

Date Filed 11/17/2025 3:34 PM
Superior Court - Bristol
Docket Number



#2

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 2573CV00914 A | Massachusetts Trial Court Superior Court |
|---|---|---|
| | | COUNTY Bristol Superior Court (Taunton) |

| | |
|---|---|
| **Plaintiff** Karen Read | **Defendant:** Michael Proctor |
| **ADDRESS:** | **ADDRESS:** 6 Wentworth Road, Canton MA 02021 |
| **Plaintiff Attorney:** Damon Seligson, Charles Waters, Aaron Rosenberg | **Defendant:** Sgt. Yuriy Bukhenik |
| **ADDRESS:** Sheehan Phinney Bass & Green PA<br>28 State Street, 22nd Floor<br>Boston, MA 02109 | **ADDRESS:** 60 Jamie Lane, Stoughton, MA 02072 |
| **BBO:** DMS - 632763; CMW - 631425; ADR - 684826 | |
| **Plaintiff Attorney:** | **Defendant:** Brian Tully |
| **ADDRESS:** | **ADDRESS:** c/o Timothy M. Burke, Esq. Law Offices of Timothy M. Burke<br>117 Kendrick Street, Suite 300, Needham, MA 02494 |
| **BBO:** | |
| **Plaintiff Attorney:** | **Defendant:** Brian Albert |
| **ADDRESS:** | **ADDRESS:** c/o James Tuxbury, Esq. Hinkley Allen<br>28 State Street, Boston, MA 02109 |
| **BBO:** | |
| **Plaintiff Attorney:** | **Defendant:** Nicole Albert |
| **ADDRESS:** | **ADDRESS:** c/o James Tuxbury, Esq. Hinkley Allen<br>28 State Street, Boston, MA 02109 |
| **BBO:** | |
| **Plaintiff Attorney:** | **Defendant:** Jennifer McCabe |
| **ADDRESS:** | **ADDRESS:** c/o James Tuxbury, Esq. Hinkley Allen<br>28 State Street, Boston, MA 02109 |
| **BBO:** | |
| **Plaintiff Attorney:** | **Defendant:** Matthew McCabe |
| **ADDRESS:** | **ADDRESS:** c/o James Tuxbury, Esq. Hinkley Allen<br>28 State Street, Boston, MA 02109 |
| **BBO:** | |
| **Plaintiff Attorney:** | **Defendant:** Brian Higgins |
| **ADDRESS:** | **ADDRESS:** c/o James Tuxbury, Esq. Hinkley Allen<br>28 State Street, Boston, MA 02109 |
| **BBO:** | |
| **Plaintiff Attorney:** | **Defendant:** |
| **ADDRESS:** | **ADDRESS:** |
| **BBO:** | |

BRISTOL SUPERIOR COURT
FILED
NOV 17 2025
JENNIFER A. SULLIVAN, ESQ
CLERK/MAGISTRATE

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section on next page)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| E17 | Civil Rights Act | A | ☒ YES ☐ NO |

*If "Other" please describe:

Date Filed 11/17/2025 3:34 PM
Superior Court - Bristol
Docket Number


Is there a claim under G.L. c. 93A? ☐ YES ☒ NO

Is there a class action under Mass. R. Civ. P. 23? ☐ YES ☒ NO

**STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. (Note to plaintiff: for this form, do not state double or treble damages; indicate single damages only.)

**TORT CLAIMS**

A. Documented medical expenses to date

1. Total hospital expenses ______
2. Total doctor expenses ______
3. Total chiropractic expenses ______
4. Total physical therapy expenses ______
5. Total other expenses (describe below) ______

N/A: Civil Rights Case; to the extent applicable, damages will be determined in discovery

Subtotal (1-5): $0.00

B. Documented lost wages and compensation to date ______

C. Documented property damages to date ______

D. Reasonably anticipated future medical and hospital expenses ______

E. Reasonably anticipated lost wages ______

F. Other documented items of damages (describe below) ______

TOTAL (A-F): $0.00

G. Briefly describe plaintiff's injury, including the nature and extent of the injury:

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | N/A: Civil Rights Case | |
| | Total | |

Signature of Attorney/Self-Represented Plaintiff: X *[/s/ Damon M. Seligson]* Date: November 17, 2025

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION UNDER S.J.C. RULE 1:18(5)**

I hereby certify that I have complied with requirements of Rule 5 of Supreme Judicial Court Rule 1:18: Uniform Rules on Dispute Resolution, requiring that I inform my clients about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney: X */s/ Damon M. Seligson* Date: November 17, 2025

# CIVIL ACTION COVER SHEET INSTRUCTIONS — SELECT A CATEGORY THAT BEST DESCRIBES YOUR CASE*

**AC Actions Involving the State/Municipality†***

| Code | Type | Track |
|---|---|---|
| AA1 | Contract Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AB1 | Tortious Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AC1 | Real Property Action involving Commonwealth, Municipality, MBTA etc. | (A) |
| AD1 | Equity Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AE1 | Administrative Action involving Commonwealth, Municipality, MBTA,etc. | (A) |

**CN Contract/Business Cases**

| Code | Type | Track |
|---|---|---|
| A01 | Services, Labor, and Materials | (F) |
| A02 | Goods Sold and Delivered | (F) |
| A03 | Commercial Paper | (F) |
| A04 | Employment Contract | (F) |
| A05 | Consumer Revolving Credit - M.R.C.P. 8.1 | (F) |
| A06 | Insurance Contract | (F) |
| A08 | Sale or Lease of Real Estate | (F) |
| A12 | Construction Dispute | (A) |
| A14 | Interpleader | (F) |
| BA1 | Governance, Conduct, Internal Affairs of Entities | (A) |
| BA3 | Liability of Shareholders, Directors, Officers, Partners, etc. | (A) |
| BB1 | Shareholder Derivative | (A) |
| BB2 | Securities Transactions | (A) |
| BC1 | Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. | (A) |
| BD1 | Intellectual Property | (A) |
| BD2 | Proprietary Information or Trade Secrets | (A) |
| BG1 | Financial Institutions/Funds | (A) |
| BH1 | Violation of Antitrust or Trade Regulation Laws | (A) |
| A99 | Other Contract/Business Action - Specify | (F) |

* See Superior Court Standing Order 1-88 for an explanation of the tracking deadlines for each track designation: F, A, and X. On this page, the track designation for each case type is noted in parentheses.

†* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

‡ Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

| Code | Type | Track |
|---|---|---|
| D01 | Specific Performance of a Contract | (A) |
| D02 | Reach and Apply | (F) |
| D03 | Injunction | (F) |
| D04 | Reform/ Cancel Instrument | (F) |
| D05 | Equitable Replevin | (F) |
| D06 | Contribution or Indemnification | (F) |
| D07 | Imposition of a Trust | (A) |
| D08 | Minority Shareholder's Suit | (A) |
| D09 | Interference in Contractual Relationship | (F) |
| D10 | Accounting | (A) |
| D11 | Enforcement of Restrictive Covenant | (F) |
| D12 | Dissolution of a Partnership | (F) |
| D13 | Declaratory Judgment, G.L. c. 231A | (A) |
| D14 | Dissolution of a Corporation | (F) |
| D99 | Other Equity Action | (F) |

**PA Civil Actions Involving Incarcerated Party ‡**

| Code | Type | Track |
|---|---|---|
| PA1 | Contract Action involving an Incarcerated Party | (A) |
| PB1 | Tortious Action involving an Incarcerated Party | (A) |
| PC1 | Real Property Action involving an Incarcerated Party | (F) |
| PD1 | Equity Action involving an Incarcerated Party | (F) |
| PE1 | Administrative Action involving an Incarcerated Party | (F) |

**TR Torts**

| Code | Type | Track |
|---|---|---|
| B03 | Motor Vehicle Negligence - Personal Injury/Property Damage | (F) |
| B04 | Other Negligence - Personal Injury/Property Damage | (F) |
| B05 | Products Liability | (A) |
| B06 | Malpractice - Medical | (A) |
| B07 | Malpractice - Other | (A) |
| B08 | Wrongful Death - Non-medical | (A) |
| B15 | Defamation | (A) |
| B19 | Asbestos | (A) |
| B20 | Personal Injury - Slip & Fall | (F) |
| B21 | Environmental | (F) |
| B22 | Employment Discrimination | (F) |
| BE1 | Fraud, Business Torts, etc. | (A) |
| B99 | Other Tortious Action | (F) |

**RP Summary Process (Real Property)**

| Code | Type | Track |
|---|---|---|
| S01 | Summary Process - Residential | (X) |
| S02 | Summary Process - Commercial/ Non-residential | (F) |

**RP Real Property**

| Code | Type | Track |
|---|---|---|
| C01 | Land Taking | (F) |
| C02 | Zoning Appeal, G.L. c. 40A | (F) |
| C03 | Dispute Concerning Title | (F) |
| C04 | Foreclosure of a Mortgage | (X) |
| C05 | Condominium Lien & Charges | (X) |
| C99 | Other Real Property Action | (F) |

**MC Miscellaneous Civil Actions**

| Code | Type | Track |
|---|---|---|
| E18 | Foreign Discovery Proceeding | (X) |
| E97 | Prisoner Habeas Corpus | (X) |
| E22 | Lottery Assignment, G.L. c. 10, § 28 | (X) |

**AB Abuse/Harassment Prevention**

| Code | Type | Track |
|---|---|---|
| E15 | Abuse Prevention Petition, G.L. c. 209A | (X) |
| E21 | Protection from Harassment, G.L. c. 258E | (X) |

**AA Administrative Civil Actions**

| Code | Type | Track |
|---|---|---|
| E02 | Appeal from Administrative Agency, G.L. c. 30A | (X) |
| E03 | Certiorari Action, G.L. c. 249, § 4 | (X) |
| E05 | Confirmation of Arbitration Awards | (X) |
| E06 | Mass Antitrust Act, G.L. c. 93, § 9 | (A) |
| E07 | Mass Antitrust Act, G.L. c. 93, § 8 | (X) |
| E08 | Appointment of a Receiver | (X) |
| E09 | Construction Surety Bond, G.L. c. 149, §§ 29, 29A | (A) |
| E10 | Summary Process Appeal | (X) |
| E11 | Worker's Compensation | (X) |
| E16 | Auto Surcharge Appeal | (X) |
| E17 | Civil Rights Act, G.L. c.12, § 11H | (A) |
| E24 | Appeal from District Court Commitment, G.L. c.123, § 9(b) | (X) |
| E94 | Forfeiture, G.L. c. 265, § 56 | (X) |
| E95 | Forfeiture, G.L. c. 94C, § 47 | (F) |
| E99 | Other Administrative Action | (X) |
| Z01 | Medical Malpractice - Tribunal only, G.L. c. 231, § 60B | (F) |
| Z02 | Appeal Bond Denial | (X) |

**SO Sex Offender Review**

| Code | Type | Track |
|---|---|---|
| E12 | SDP Commitment, G.L. c. 123A, § 12 | (X) |
| E14 | SDP Petition, G.L. c. 123A, § 9(b) | (X) |

**RC Restricted Civil Actions**

| Code | Type | Track |
|---|---|---|
| E19 | Sex Offender Registry, G.L. c. 6, § 178M | (X) |
| E27 | Minor Seeking Consent, G.L. c.112, § 12S | (X) |

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES ☐ NO |

## STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF** — On the face of the Civil Action Cover Sheet (or on attached additional sheets, if necessary), the plaintiff shall state the facts on which the plaintiff relies to determine money damages. A copy of the completed Civil Action Cover Sheet, including the statement concerning damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT** — If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with the defendant's answer a statement specifying the potential damages which may result if the plaintiff prevails.

**A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT. IF THIS COVER SHEET IS NOT FILLED OUT THOROUGHLY AND ACCURATELY, THE CASE MAY BE DISMISSED.**

| CIVIL TRACKING ORDER (STANDING ORDER 1-88) | DOCKET NUMBER 2573CV00914 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: Read, Karen vs. Proctor, Michael et al | | Jennifer A Sullivan Bristol County |
| TO: File Copy | | COURT NAME & ADDRESS Bristol County Superior Court - New Bedford 441 County Street, 1st floor New Bedford, MA 02740 |

**TRACKING ORDER - A - Average**

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

**STAGES OF LITIGATION** / **DEADLINE**

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 02/17/2026 | |
| Response to the complaint filed (also see MRCP 12) | | 03/18/2026 | |
| All motions under MRCP 12, 19, and 20 | 03/18/2026 | 04/17/2026 | 05/18/2026 |
| All motions under MRCP 15 | 01/12/2027 | 02/11/2027 | 02/11/2027 |
| All discovery requests and depositions served and non-expert depositions completed | 11/08/2027 | | |
| All motions under MRCP 56 | 12/08/2027 | 01/07/2028 | |
| Final pre-trial conference held and/or firm trial date set | | | 05/08/2028 |
| Case shall be resolved and judgment shall issue by | | | 11/17/2028 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED | ASSISTANT CLERK | PHONE |
|---|---|---|
| 11/18/2025 | Kellee-Sue Milord | (508)996-2051 |

#3

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS SUPERIOR COURT DEPARTMENT

| | |
|---|---|
| KAREN READ,<br><br>Plaintiff,<br>v.<br><br>MICHAEL PROCTOR, in his personal capacity; SGT. YURIY BUKHENIK, in his personal capacity; LT. BRIAN TULLY, in his personal capacity; TOWN OF CANTON; BRIAN ALBERT; NICOLE ALBERT; JENNIFER McCABE; MATTHEW McCABE; and BRIAN HIGGINS,<br><br>Defendants. | Civil Action No. 2573CV00914<br><br>BRISTOL SUPERIOR COURT<br>FILED<br>NOV 24 2025<br>JENNIFER A. SULLIVAN, ESQ<br>CLERK/MAGISTRATE |

## ACCEPTANCE OF SERVICE OF PROCESS

The undersigned hereby accepts service of the Summons and Complaint in this case on behalf of his client, defendant Brian Tully ("Tully"). Tully hereby waives any further service requirements pursuant to the Massachusetts Rules of Civil Procedure.

Respectfully submitted,

**BRIAN TULLY**

By his attorney,

Dated: November 21, 2025

*/s/ Timothy M. Burke*

Timothy M. Burke (BBO # 065720)
Law Offices of Timothy M. Burke
117 Kendrick Street, Suite 300
Needham, MA 02494
P: (781) 455-0707
tburke@timburkelaw.com

Date Filed 11/25/2025 6:31 PM
Superior Court - Bristol
Docket Number 2573CV00914



#4

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.

SUPERIOR COURT
CIVIL ACTION NO. 2573CV00914 A

KAREN READ,

Plaintiff,

v.

MICHAEL PROCTOR, in his personal capacity: SGT. YURIY BUCHENIK, in his personal capacity; LT. BRIAN TULLY, in his personal capacity; BRIAN ALBERT; NICOLE ALBERT; JENNIFER McCABE; MATTHEW McCABE; and BRIAN HIGGINS,

Defendants.

BRISTOL SUPERIOR COURT
FILED
NOV 25 2025
JENNIFER A. SULLIVAN, ESQ
CLERK/MAGISTRATE

## ACCEPTANCE OF SERVICE

Defendants Brain Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe and Brian Higgins, by and through undersigned counsel, hereby accept service of process upon them of the Summonses and Complaint in the above-entitled action and waive the necessity of service by other means. In accepting service of process, Brain Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe and Brian Higgins waive and surrender any defense in this action based on insufficiency of service of process only and otherwise preserve any and all defenses.

Date Filed 11/25/2025 1:31 PM Case 1:25-cv-13588 Document 1-1 Filed 11/25/25 Page 54 of 54
Superior Court - Bristol
Docket Number 2573CV00914

Respectfully submitted,

BRIAN ALBERT, NICOLE ALBERT, JENNIFER MCCABE, MATTHEW MCCABE and BRIAN HIGGINS

By their attorney,

*/s/ James L. Tuxbury*
James L. Tuxbury (BBO# 624916)
Hinckley, Allen & Snyder, LLP
28 State Street
Boston, MA 02021
(617) 345-9000
jtuxbury@hinckleyallen.com

November 25, 2025