# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

KAREN READ,           )
                     )
         Plaintiff,    )
                     )     Civil Action No. 1:25-CV-13588-DJC
v.                    )
                     )
MICHAEL PROCTOR, in his personal  )
capacity; SGT. YURIY BUKHENIK, in his )
personal capacity; LT. BRIAN TULLY, in )
his personal capacity; BRIAN ALBERT; )
NICOLE ALBERT; JENNIFER McCABE; )
MATTHEW McCABE; and BRIAN   )
HIGGINS,               )
                     )
         Defendants.  )
                     )

## MEMORANDUM OF LAW IN SUPPORT OF THE COMMONWEALTH WITNESSES' [1] SPECIAL MOTION TO DISMISS UNDER MASSACHUSETTS' ANTI-SLAPP STATUTE; AND [2] MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

James L. Tuxbury (BBO #624916)
Kieran T. Murphy (*pro hac vice* forthcoming)
HINCKLEY ALLEN & SNYDER LLP
28 State Street
Boston, MA 02109
Telephone: 617-345-9000
jtuxbury@hinckleyallen.com

30 South Pearl Street – Suite 1101
Albany, NY 12207
Telephone: 518-396-3100
kmurphy@hinckleyallen.com

*Counsel for Defendants Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe, and Brian Higgins*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 4

   I.   Officer O'Keefe's Death ....................................................................................... 4

   II.   The Investigation & Arrest of Read ..................................................................... 5

   III.   The Commonwealth's Statement of the Case ........................................................ 6

   IV.   Read's Criminal Trials ......................................................................................... 8

   V.   The Instant Action ................................................................................................ 8

ARGUMENT ...................................................................................................................... 9

   **I.**   **The Case Should Be Dismissed Against the Commonwealth Witnesses Pursuant to Mass. Gen. L. c. 231, § 59H (the "anti-SLAPP" statute).** ............................................. 9

   A.   Anti-SLAPP Legal Standard ................................................................................ 9

   B.   Each State Law Claim Against Each Commonwealth Witness is Based Solely on Petitioning Activity. ................................................................................................... 11

     1.   Nicole Albert ................................................................................................ 12

     2.   Matthew McCabe .......................................................................................... 17

     3.   Jennifer McCabe ........................................................................................... 18

     4.   Brian Albert .................................................................................................. 19

     5.   Brian Higgins ............................................................................................... 21

   C.   Ms. Read Cannot Meet Her Burden of Showing Each Commonwealth Witness Had No Factual or Legal Basis for their Petitioning Activity ..................................... 22

   **II.**   **This Case Should Be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6).** ...................... 25

   A.   Fed. R. 12(b)(6) Legal Standard ......................................................................... 25

   B.   Ms. Read's § 1983 Conspiracy, Common Law Conspiracy, MCRA, and Intentional Infliction of Emotional Distress Claims Are Time-Barred. ............................. 26

   C.   The Complaint Fails to State Any Claims Against Any of the Commonwealth Witnesses Upon Which Relief Could be Granted. ............................................................. 30

     1.   Common Law Malicious Prosecution ........................................................... 30

     2.   42 U.S.C. § 1983 Conspiracy ....................................................................... 33

     3.   Common Law Conspiracy ............................................................................ 35

     4.   Massachusetts Civil Rights Act .................................................................... 37

     5.   Intentional Infliction of Emotional Distress ................................................. 38

CONCLUSION .................................................................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*477 Harrison Ave., LLC v. Jace Boston, LLC*,
477 Mass. 162 (2017) ........................................................... 10, 14, 17, 19

*Aetna Cas. Sur. Co. v. P & B Autobody*,
43 F.3d 1546 (1st Cir. 1994) ............................................................. 36

*Andresen v. Diorio*,
349 F.3d 8 (1st Cir. 2003) ................................................................ 34

*Arsenault v. Otto*,
628 F. Supp. 3d 377 (D. Mass. 2022) ................................................. 26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................... 14, 25

*Bednarz v. Bednarz*,
27 Mass. App. Ct. 668 (Mass. App. Ct. 1989) ...................................... 31

*Beecy v. Pucciarelli*,
387 Mass. 589 (1982) ..................................................................... 33

*Benoit v. Frederickson*,
454 Mass. 148 (2009) ................................................................ 10, 13

*Bixby v. Town of Rehoboth*,
2024 WL 3430501 (D. Mass. Mar. 22, 2024) ....................................... 15

*Blanchard v. Steward Carney Hosp., Inc.*,
477 Mass. 141 (2017) .................................................................... 9, 11

*Briscoe v. LaHue*,
460 U.S. 325 (1983) ....................................................................... 29

*Bristol Asphalt Co., Inc. v. Rochester Bituminous Prods., Inc.*,
493 Mass. 539 (2024) ............................................................ 10, 11, 22, 25

*Britton v. Athenahealth, Inc.*,
2013 WL 2181654 (Mass. Super. Ct. May 3, 2013) ............................... 35

*Bryson v. Gonzales*,
534 F.3d 1282 (10th Cir. 2008) ........................................................ 14

*Canney v. City of Chelsea*,
925 F. Supp. 58 (D. Mass. 1996) ...................................................... 37

*Chadbrown v. Coles*,
2011 WL 5325610 (D. Me. Nov. 2, 2011) ............................................ 35

*Chatman v. Gentle Dental Center of Waltham*,
973 F. Supp. 228 (D. Mass. 1997) ..................................................... 25

*Chin v. Garda CL New England, Inc.*,
2017 WL 5771464 (D. Mass. Aug. 16, 2017) ....................................... 19

*Cifazzari v. Town of Milford*,
2025 WL 1899043 (D. Mass. July 9, 2025) .......................................... 38

*Com. v. Cotto*,
471 Mass. 97 (2015) ....................................................................... 37

*Costa v. Rasch*,
2014 WL 12803016 (D.R.I. July 29, 2014) ........................................... 32

*Currier v. Nat'l Bd. of Med. Examiners*,
  462 Mass. 1 (2012) ......................................................................................... 15, 37

*Davignon v. Clemmey*,
  322 F.3d 1 (1st Cir. 2003) .................................................................................... 38

*Degree v. Gendreau*,
  2025 WL 3702535 (D. Mass. Dec. 19, 2025) ....................................................... 31

*Doe Next Friend of A v. Spears*,
  630 F. Supp. 3d 290 (D. Mass. 2022) .............................................................. 14, 17

*Doyle v. Hasbro, Inc.*,
  103 F.3d 186 (1st Cir. 1996) ................................................................................. 38

*Duracraft Corp. v. Holmes Prods. Corp.*,
  427 Mass. 156 (1998) ......................................................................................... 9, 12

*Duracraft*,
  427 Mass. ................................................................................................................ 9

*Fleming v. Lind-Waldock & Co.*,
  922 F.2d 20 (1st Cir. 1990) ................................................................................... 36

*Fromm v. Boston Redevelopment Auth.*,
  73 Mass. App. Ct. 1109 (Mass. App. Ct. 2008) ................................................... 15

*Gallagher v. S. Shore Hosp., Inc.*,
  101 Mass. App. Ct. 807 (2022) ....................................................................... 15, 37

*Galvin v. U.S. Bank, N.A.*,
  852 F.3d 146 (1st Cir. 2017) ................................................................................. 39

*García-Catalán v. U.S.*,
  734 F.3d 100 (1st Cir. 2013) ................................................................................. 25

*Giragosian v. Ryan*,
  547 F.3d 59 (1st Cir. 2008) .................................................................... 6, 7, 8, 25

*Giragosian*,
  547 F.3d ................................................................................................................ 32

*Glaros v. Perse*,
  628 F.2d 679 (1st Cir. 1980) ................................................................................. 34

*Goddard v. Kelly*,
  629 F. Supp. 2d 115 (D. Mass. 2009) ................................................................... 30

*Godin v. Schencks*,
  629 F.3d 79 (1st Cir. 2010) ..................................................................................... 9

*Gouin v. Gouin*,
  249 F. Supp. 2d 62 (D. Mass. 2003) ..................................................................... 33

*Grant v. John Hancock Mut. Life Ins. Co.*,
  183 F. Supp. 2d 344 (2002) .................................................................................. 36

*Guckenberger v. Bos. Univ.*,
  957 F. Supp. 306 (D. Mass. 1997) ....................................................................... 40

*Gutierrez v. Mass. Bay Transp. Auth.*,
  437 Mass. 396 (2002) ..................................................................................... 16, 35

*Haley v. City of Boston*,
  657 F.3d 39 (1st Cir. 2011) ................................................................................... 25

*Hanamura v. Newton*,
  104 Mass. App. Ct. 1108, 2024 WL 2721522 (Mass. App. Ct. May 28, 2024) ........... 10

*Hernandez-Cuevas*,
  723 F.3d .......................................................................................... 33
*Hidalgo v. Watch City Const. Corp.*,
  105 Mass. App. Ct. 148 (Mass. App. Ct. 2024) ....................... 12
*Jarvis v. Village Gun Shop, Inc.*,
  805 F.3d 1 (1st Cir. 2015) ........................................................... 33
*Kaiser v. Kirchick*,
  662 F. Supp. 3d 76 (D. Mass. 2023) ......................................... 26
*Kennedy v. Town of Billerica*,
  502 F. Supp. 2d 150 (D. Mass. 2007) ....................................... 28
*Keystone Freight Corp. v. Bartlett Consolidated, Inc.*,
  77 Mass. App. Ct. 304 (Mass. App. Ct. 2010) ......................... 16
*Kirby v. Petit*,
  2025 WL 2409905 (D. Mass. June 24, 2025) ............................ 10
*Kurker v. Hill*,
  44 Mass. App. Ct. 184 (Mass. App. Ct. 1998) ......................... 36
*Limone v. U.S.*,
  579 F.3d 79 (1st Cir. 2009) .................................................. 30, 39
*Lincoln v. Shea*,
  361 Mass. 1 (1972) ...................................................................... 32
*Lund v. Henderson*,
  22 F. Supp. 3d 94 (D. Mass. 2014) ........................................... 39
*Mantell v. P & J.V. Management Corp.*,
  2013 WL 6175642 (Mass. Super. Ct. Sept. 22, 2013) .............. 16
*Mass. ex rel. Powell v. Holmes*,
  546 F. Supp. 3d 58 (D. Mass. 2021) .................................... 16, 35
*McGillicuddy v. Clements*,
  746 F.2d 76 (1st Cir. 1984) ........................................................ 34
*McNell v. Hugel*,
  1994 WL 264200 (D.N.H. May 16, 1994) ................................. 36
*Miller v. SBA Towers V, LLC*,
  391 F. Supp. 3d 123 (D. Mass. 2019) ......................................... 9
*Molina v. Toledo*,
  718 F. Supp. 2d 194 (D.P.R. 2010) ........................................... 33
*Nieves v. McSweeney*,
  73 F. Supp. 2d 98 (D. Mass. 1999) ........................................... 29
*Nieves v. McSweeney*,
  241 F.3d 46 (1st Cir. 2001) ........................................................ 28
*Office One, Inc. v. Lopez*,
  437 Mass. 113 (2002) .................................................................. 15
*O'Gara v. St. Germain*,
  91 Mass. App. Ct. 490 (Mass. App. Ct. 2017) .................... 10, 13
*Pagliuca v. City of Boston*,
  35 Mass. App. Ct. 820 (Mass. App. Ct. 1994) ......................... 26
*People v. Dawson*,
  50 N.Y.2d 311 (N.Y. 1980) ........................................................ 37

*Piccone v. Carrington Mortg. Servs., LLC*,
2023 WL 3293054 (D. Mass. May 5, 2023)................................................................ 14

*Planned Parenthood League of Mass., Inc. v. Blake*,
417 Mass. 467 (1994).................................................................................................... 37

*Polay v. McMahon*,
468 Mass. 379 (2014).................................................................................................... 38

*Poy v. Boutselis*,
352 F.3d 479 (1st Cir. 2003)........................................................................................ 26

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982)...................................................................................................... 33

*Rendondo Waste Sys., Inc. v. Lopez-Freytes*,
659 F.3d 136 (1st Cir. 2011)........................................................................................ 14

*Rizzuti v. Cappabianca*,
791 F. Supp. 3d 270 (D. Mass. 2025)................................................................... 12, 30

*Robbins v. Oklahoma*,
519 F.3d 1242 (10th Cir. 2008).................................................................................... 14

*Roman v. Trustees of Tufts College*,
461 Mass. 707 (2012).................................................................................................... 38

*Salcedo v. Town of Dudley*,
629 F. Supp. 2d 86 (D. Mass. 2009)............................................................................ 29

*Salmon v. Lang*,
57 F.4th 296 (1st Cir. 2022)......................................................................................... 37

*Schand v. City of Springfield*,
380 F. Supp. 3d 106 (D. Mass. 2019)..................................................................... 26, 28

*Schatz v. Republican State Leadership Comm.*,
669 F.3d 50 (1st Cir. 2012).......................................................................................... 25

*Sena v. Com.*,
417 Mass. 250 (1994).................................................................................................... 39

*Sholley v. Town of Holliston*,
49 F. Supp. 2d 14 (D. Mass. 1999).............................................................................. 39

*Sindi v. El-Moslimany*,
896 F.3d 1 (1st Cir. 2018)....................................................................................... 16, 38

*Smith v. Egan*,
802 F. Supp. 3d 86 (D. Mass. 2025)............................................................................ 33

*Steinmetz v. Coyle & Caron, Inc.*,
2016 WL 4074135 (D. Mass. July 29, 2016) .............................................................. 10

*Taylor v. Am. Chemistry Council*,
576 F.3d 16 (1st Cir. 2009)........................................................................................... 35

*Thomas v. Harrington*,
909 F.3d 483 (1st Cir. 2018)........................................................................................ 37

*U.S. v. McMullin*,
568 F.3d 1 (1st Cir. 2009)............................................................................................ 32

*U.S. v. Silva*,
742 F.3d 1 (1st Cir. 2014)............................................................................................ 32

*Watson v. Mita*,
396 F. Supp. 3d 220 (D. Mass. 2019)........................................................................... 30

*Watterson v. Page*,
   987 F.2d 1 (1st Cir. 1993) ........................................................................ 25
*Wenger v. Aceto*,
   451 Mass. 1 (2008) ................................................................................. 13
*White v. Peabody Constr. Co.*,
   386 Mass. 121 (1982) .............................................................................. 26
*Wynn v. Schmidt*,
   2017 WL 4169746 (D. Mass. Sept. 20, 2017) ....................................... 39

## Statutes

42 U.S.C. § 1983 .............................................................................. 8, 33
Mass. Gen. L. c. 231, § 59H ............................................................. *passim*
Mass. Gen. L. c. 260, § 2A ............................................................... 26

## Rules

Fed. R. Civ. P. 12(b)(6) ............................................................. 25, 30, 32
Mass. R. Crim. P. 17 ......................................................................... 20

<u>**INTRODUCTION**</u>

The preponderance of the evidence shows that, just after midnight on January 29, 2022, Plaintiff Karen Read ("Ms. Read") killed Boston police officer John O'Keefe ("Officer O'Keefe") when she hit him with her car while driving drunk after a night of heavy drinking causing him to fall and hit his head on the frozen ground. Within three days of Officer O'Keefe's death, Ms. Read was arrested. Six months later, a Massachusetts grand jury indicted her for, *inter alia*, murder and manslaughter. In 2024, the Commonwealth tried Ms. Read on those charges. The jury was deadlocked as to whether Ms. Read was guilty, and a mistrial was declared. The next year, the Commonwealth tried Ms. Read again. Ms. Read was acquitted of murder, manslaughter, and leaving the scene of an accident, but found guilty of operating a vehicle while intoxicated.

Then, on November 17, 2025, Ms. Read filed the present Complaint against, among others, Defendants Brian Albert ("Mr. Albert"), Nicole Albert ("Ms. Albert"), Jennifer McCabe ("Ms. McCabe"), Matthew McCabe ("Mr. McCabe") and Brian Higgins ("Mr. Higgins") (collectively, the "Commonwealth Witnesses" or, individually, a "Commonwealth Witness") whose only alleged, relevant misconduct was providing statements to the police on or around January 29, 2022. Ironically, the complained-of statements—specifically, that Officer O'Keefe did not ever enter the home at 34 Fairview Road—are ***identical*** to a statement that Ms. Read, herself, made to police on January 29, 2022. Ms. Read seeks to hold each Commonwealth Witness civilly liable for her arrest, indictment, and prosecution under five counts: (1) conspiracy to deprive Ms. Read of her fourth amendment rights ("1983 conspiracy") (count 3); (2) violation of the Massachusetts Civil Rights Act ("MCRA") (count 4); (3) malicious prosecution (count 5); (4) intentional infliction of emotional distress ("IIED") (count 6); and (5) civil conspiracy (count 7). Ms. Read's Complaint against each individual Commonwealth Witness is intended to deflect from her own liability in a pending civil wrongful death action filed by Officer O'Keefe's family and is a transparent act of

revenge against these individuals simply for providing truthful information to the police back in early 2022.

Moreover, the Complaint is a work of conspiratorial fiction devoid of supporting evidence. Regardless, even putting aside the Complaint's conspiratorial, conclusory and speculative allegations—which are entitled to no deference on these motions to dismiss—Ms. Read's claims against these fact witnesses are virtually unprecedented under both state and federal law and fail on several grounds.

First, the Complaint violates the Massachusetts' anti-SLAPP statute, Mass. Gen. L. c. 231, § 59H, because Ms. Read seeks to hold each witness liable for their petitioning activity—namely, speaking to the police on or around January 29, 2022. Talking to the police is core protected petitioning activity safeguarded by the Massachusetts anti-SLAPP statute. Moreover, Ms. Read cannot meet her burden under the anti-SLAPP statute that each Commonwealth Witness's statements to the police had no basis whatsoever in fact. Indeed, Ms. Read cannot meet her burden because the evidence **_conclusively_** established that Officer O'Keefe **_did not_** enter 34 Fairview Road on January 29, 2022. Indeed, the afternoon after Officer O'Keefe's body was discovered, Ms. Read told the police exactly that: she did not see Officer O'Keefe enter the home. Furthermore, there is other substantial evidence validating the Commonwealth Witnesses' statements to police and the arrest of Ms. Read, including third-party statements, Ms. Read's intoxication, and Ms. Read's own repeated admissions that she "hit" Officer O'Keefe with her car. There is also uncontradicted physical evidence from Ms. Read's criminal trial that Officer O'Keefe never entered 34 Fairview Road: his phone's GPS data confirmed that Officer O'Keefe ceased moving at 12:32am, just moments after Ms. Read left 34 Fairview Road. Indeed, Officer O'Keefe's phone stopped moving on the front lawn and was never unlocked again by Officer O'Keefe after that

moment, with its battery temperature dropping significantly by 1:00am, further confirming that the phone and Officer O'Keefe remained outside.

Beyond the anti-SLAPP statute, the allegations against each Commonwealth Witness are almost four years old, dating back to late January 2022, when they spoke to the police, and Ms. Read's February 1, 2022 arrest. Yet, Ms. Read's 1983 conspiracy, MCRA, IIED, and civil conspiracy claims all have three-year statute of limitations that begin to run at the moment Ms. Read became aware of the injuries underlying those claims. Ms. Read's unfounded malicious prosecution theory does not alter the claims' accrual dates since the allegations against the Commonwealth Witnesses relate to Ms. Read's purported wrongful arrest. Under such circumstances, courts parse identical civil rights claims for purposes of analyzing a statute of limitations defense. Because Ms. Read's claims accrued in early February 2022, they are all time-barred. Indeed, in Court filings from the summer of 2022 in her criminal case—referenced in the Complaint—Ms. Read argued the same conspiratorial theories that she continues to repeat here well over three years later.

Finally, all claims against the Commonwealth Witnesses fail to satisfy even the generous pleading standard under Rule 12(b)(6). First, Ms. Read fails to state a malicious prosecution claim because she cannot plausibly establish: (1) that the Commonwealth Witnesses "commenced or continued" the criminal proceedings brought against her; (2) that her arrest, indictment, and prosecution lacked any requisite probable cause; or (3) that the Commonwealth Witnesses acted with any semblance of malice against her. Second, Ms. Read's 1983 conspiracy claim fails because the allegations are insufficient to impute state action onto the Commonwealth Witnesses. Third, Ms. Read fails adequately to set forth a common law conspiracy claim because her allegations rely entirely on conjecture and, more notably, because she fails to set forth any

allegation that the Commonwealth Witnesses acted with knowledge that a wrongful act was being perpetrated. Fourth, the MCRA claim fails because the Complaint lacks any claim that Ms. Read experienced any physical harm as a result of the Commonwealth Witnesses' conduct and otherwise fails to set forth that Ms. Read was ever threatened, intimidated, or coerced by them. And finally, Ms. Read fails to state a claim for IIED because nothing in the Complaint outlines conduct that any reasonable person would consider beyond all possible bounds of human decency.

Make no mistake: on its face, this lawsuit is nothing more than an act of retribution against those who did nothing more than speak to police and testify against her at her criminal trials. The Complaint violates the Commonwealth Witnesses' statutory rights, contains time-barred claims, fails to meet any semblance of plausibility necessary to state valid civil claims, and should be dismissed. Any other result would set a dangerous precedent for aggrieved criminal defendants to use the civil courts as a means to sue adverse witnesses in the future, potentially encouraging future witnesses not to provide information to police.

## FACTUAL BACKGROUND

### I. Officer O'Keefe's Death

On the evening of January 28, 2022, Ms. Read and Officer O'Keefe, who had been dating for several years, spent time at a bar in Canton, Massachusetts, where they met the Commonwealth Witnesses. Compl. at ¶¶ 28-30. Ms. McCabe then invited Ms. Read and Officer O'Keefe to a gathering at 34 Fairview Road in Canton, Massachusetts ("34 Fairview"), which was the residence of Mr. and Ms. Albert. *Id.* at ¶ 30. Despite consuming several alcoholic drinks, *id.* at ¶ 29, Ms. Read drove herself and Officer O'Keefe to 34 Fairview, *id.* at ¶ 33. Ms. Read did not enter the residence and, instead, left Officer O'Keefe at 34 Fairview alone. *Id.*

The next morning, Officer O'Keefe was found unresponsive on the front lawn of 34 Fairview. *Id.* at ¶ 41. Ms. Read first discovered Officer O'Keefe "almost immediately" after she

returned to 34 Fairview following a search with Ms. McCabe and third-party Kerry Roberts, despite an ongoing snowstorm and it being dark outside. *Id.* at ¶¶ 38, 41, 43.

## II. <u>The Investigation & Arrest of Read</u>

Soon after Ms. Read discovered Officer O'Keefe's body in the darkness of a nor'easter, the Canton Police Department ("CPD") arrived at 34 Fairview. *Id.* at ¶ 43. Several police officers, ambulance personnel, and the fire department arrived to assist. *Id.* at ¶ 45. As part of the investigative efforts, CPD Sergeant Michael Lank interviewed Mr. Albert, Mr. McCabe, and Ms. McCabe at 34 Fairview the same morning, at which point they informed him that Officer O'Keefe was invited, but never entered, 34 Fairview. *Id.* at ¶ 46. Ms. McCabe also informed Sergeant Lank that Ms. Read admitted twice that morning that she may have hit Officer O'Keefe with her car after she attempted to drop him off at 34 Fairview. *Id.* at ¶ 48.

Later that day, the Massachusetts State Police ("MSP") seized Ms. Read's cell phone and car following an interview that Ms. Read gave to the MSP. *Id.* at ¶ 68. After the seizure, it was discovered that Ms. Read's car had a damaged taillight. *Id.* at ¶ 75. Forensic analysis of the car also uncovered pieces of broken glass on Ms. Read's bumper that were at least partially consistent with a cocktail glass that Officer O'Keefe had been holding when he exited Ms. Read's vehicle at 34 Fairview. *Id.* at ¶ 87. Broken pieces of Ms. Read's taillight were found at 34 Fairview near Officer O'Keefe's body, as well as on Officer O'Keefe's clothing. *Id.* at ¶¶ 80, 82-83, 86.

Based on the foregoing, on February 1, 2022, Ms. Read was arrested on the theory that she backed into Officer O'Keefe with her car after refusing to attend the 34 Fairview gathering and left him on the lawn to die. *Id.* at ¶¶ 9, 97. On June 9, 2022, a grand jury returned an indictment against Ms. Read, and she was ultimately charged with second-degree murder, manslaughter, and leaving the scene of an accident resulting in death. *Id.* at ¶ 98.

### III.    The Commonwealth's Statement of the Case

Following her indictment, the Commonwealth publicly filed on Ms. Read's criminal docket in the Norfolk Superior Court a Statement of the Case (the "Commonwealth's Statement"), signed by District Attorney Michael W. Morrissey, setting forth a preliminary narration of the allegations against Ms. Read that justified her indictment. *See* Tuxbury Decl. Ex. A (*Commonwealth v. Read*, Case No. 2282CR00117 (Mass. Super. Ct.) at Dkt. No. 5 (June 13, 2022) (the "Commonwealth Statement")) at 12.[1]  In it, the Commonwealth confirmed Ms. Read's story that she and Officer O'Keefe on the evening of January 28, 2022 were drinking at the Waterfall Bar & Grille with certain of the Commonwealth Witnesses before being invited to a gathering at 34 Fairview. *Id.* at 2-3.  The Commonwealth's Statement also confirmed that Ms. Read found Officer O'Keefe's body in an active nor'easter outside of 34 Fairview in the early morning hours of January 29, 2022, and was accompanied by Ms. McCabe and non-party Kerry Roberts. *Id.* at 1-2.

According to the Commonwealth's Statement, Ms. McCabe informed law enforcement that, while she invited Ms. Read and Officer O'Keefe to 34 Fairview the night prior, the two never entered the home. *Id.* at 3-4.  Instead, Ms. McCabe observed Ms. Read's vehicle outside of 34 Fairview before the vehicle eventually pulled away. *Id.*  The next time Ms. McCabe heard from Ms. Read was at 4:53am on January 29, 2022, when Ms. Read called Ms. McCabe in a "distraught" state looking for Officer O'Keefe. *Id.* at 4.  Ms. Read then drove to Ms. McCabe's home, where the two—along with non-party Kerry Roberts—began searching for Officer O'Keefe. *Id*. According to the Commonwealth's Statement, Ms. McCabe informed law enforcement that,

---

[1] As detailed below, "[a] court may consider matters of public record" in assessing a motion to dismiss. *Giragosian v. Ryan*, 547 F.3d 59, 66 (1st Cir. 2008) (citations and quotations omitted).

during that drive, Ms. Read asked, "Could I have hit him?" and "Did I hit him?" *Id*. Ms. McCabe also confirmed that she saw that, when the three were at Officer O'Keefe's home, Ms. Read's taillight was cracked and missing pieces. *Id.* at 4-5. The Commonwealth's Statement also summarizes the witness statement of non-party Kerry Roberts, who stated that Ms. Read called her immediately after calling Ms. McCabe and informed Ms. Roberts that Officer O'Keefe was missing. *Id.* at 7. Ms. Read further told Ms. Roberts before ever arriving back at 34 Fairview, "John's dead. Kerry, Kerry, I wonder if he's dead. It's snowing, he got hit by a plow." *Id.* According to the Commonwealth's Statement, Ms. Read also told Ms. Roberts that she was so intoxicated the night prior that she did not even remember going to 34 Fairview. *Id.* at 8. The Commonwealth's Statement additionally details other witness statements gathered by law enforcement following the discovery of Officer O'Keefe, including those given by Mr. and Ms. Albert, and Mr. McCabe, who all confirmed Ms. McCabe's initial report that Officer O'Keefe never entered 34 Fairview on January 29, 2022. *Id.* at pp. 5-7. Moreover, the Commonwealth's Statement outlines accounts given by emergency personnel who responded to the scene, including one by Canton Firefighter Katie McLaughlin. In that statement, Ms. McLaughlin informed law enforcement that she observed Ms. Read at the scene repeatedly stating, "I hit him, I hit him, I hit him." *Id.* at 10.

Ms. Read herself also gave statements to police on January 29, 2022, which are detailed in the Commonwealth's Statement. Specifically, Ms. Read informed law enforcement that, while she was invited to 34 Fairview the night prior, she did not enter the home and that, after dropping Officer O'Keefe off, she did not see him enter the home. *Id.* at 12 ("***[Ms. Read] stated that she did not see the victim enter the residence***.") (emphasis added). Ms. Read also stated that she

noticed that her taillight had been damaged the night before but did not recall how the damage occurred. *Id.*

## IV.    Read's Criminal Trials

Ms. Read was first tried for the murder of Officer O'Keefe in April 2024. *See* Compl. at ¶ 99. After over two months of testimony, the jury was unable to reach a unanimous decision as to Ms. Read's guilt, and a mistrial was declared. *Id.* Approximately one year later, Ms. Read was tried again on the same charges. *Id.* at ¶ 100. The jury found her guilty of operating a vehicle while intoxicated, but not guilty of murder, manslaughter, and leaving the scene of an accident resulting in death. *Id.* Ms. Read chose not to testify at either trial.

## V.    The Instant Action

Almost four years after Officer O'Keefe's death, on November 17, 2025, Ms. Read filed the present Complaint. In it, Ms. Read asserts five causes of action against each of the Commonwealth Witnesses: (1) 42 U.S.C. § 1983 conspiracy (count 3); (2) violation of the Massachusetts Civil Rights Act (count 4); (3) common law malicious prosecution (count 5); (4) intentional infliction of emotional distress (count 6); and (5) civil conspiracy (count 7). *Id.* at ¶¶ 128-172. The primary theory underlying these claims is that the Commonwealth Witnesses falsely told police, or conspired to falsely tell police, that Officer O'Keefe never entered 34 Fairview on January 29, 2022, which contributed to the Commonwealth's decision to arrest Ms. Read. *Id.* at ¶¶ 130, 143, 153, 157, 163. For each count, Ms. Read seeks damages caused by her arrest, claiming a loss of employment, professorship, private health insurance, home, and reputation. *See, e.g.*, *id.* at ¶ 101. She also seeks legal fees and costs. *Id.*[2]

---

[2] Ms. Read asserts several other claims against police officers Michael Proctor, Yuriy Bukhenik and Brian Tully, and has threatened to sue the Massachusetts State Police and the Town of Canton. *See id.* at 1, n.1 & p. 32, n.4.

**ARGUMENT**

I.   **The Case Should Be Dismissed Against the Commonwealth Witnesses Pursuant to Mass. Gen. L. c. 231, § 59H (the "anti-SLAPP" statute).**

Each Commonwealth Witness individually brings a special motion to dismiss Ms. Read's state law claims (counts 4-7) under the Massachusetts anti-Strategic Litigation Against Public Participation ("anti-SLAPP") statute, M.G.L. c. 231, §59H.

   **A.  Anti-SLAPP Legal Standard**

Massachusetts' anti-SLAPP statute was enacted "to counteract 'SLAPP' suits, defined broadly as 'lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" *Blanchard v. Steward Carney Hosp., Inc.*, 477 Mass. 141, 147 (2017) (quoting *Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 161 (1998)).  "The main 'objective of SLAPP suits is not to win them, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech.'" *Id.* (quoting *Duracraft*, 427 Mass. at 147).  The anti-SLAPP statute provides:

> The court shall grant such special motion, unless the party against whom such special motion is made shows that: (1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party.  In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

M.G.L. c. 231, § 59H.

The anti-SLAPP statute applies to state law claims filed in federal court.  *See Miller v. SBA Towers V, LLC*, 391 F. Supp. 3d 123, 134 (D. Mass. 2019) (citing *Godin v. Schencks*, 629 F.3d 79, 89-92 (1st Cir. 2010)).  In *Godin*, the First Circuit held that a federal court should apply the Maine anti-SLAPP statute to state law claims filed in federal court.  *Godin*, 629 F.3d at 89-92.  As the Massachusetts anti-SLAPP statute is identical in substance to the Maine statute, pursuant to *Godin*, federal courts have applied the Massachusetts anti-SLAPP statute to state law claims in the District

of Massachusetts.  *See Steinmetz v. Coyle & Caron, Inc.*, 2016 WL 4074135, at \*3 (D. Mass. July 29, 2016) (extending *Godin* to the Massachusetts anti-SLAPP statute because "[t]he Massachusetts anti-SLAPP statute is . . . in all relevant respects the same as the Maine anti-SLAPP statute.").

The Massachusetts Supreme Judicial Court recently adopted a simplified anti-SLAPP framework to be applied under M.G.L. c. 231, § 59H.  First, the movant "must show that the challenged count has no substantial basis in conduct other than or in addition to the special motion proponent's alleged petitioning activity." *Bristol Asphalt Co., Inc. v. Rochester Bituminous Prods., Inc.*, 493 Mass. 539, 555-56 (2024).  "To determine if statements are petitioning, [courts] consider them in the over-all context in which they were made."  *Kirby v. Petit,* 2025 WL 2409905, at \*4 (D. Mass. June 24, 2025) (citations omitted) (alterations in original).  Traditional categories of petitioning activity include, among other things, "reporting violations of law, writing to government officials, attending public hearings, [and] testifying before government bodies."  *Id.* (citation and quotation omitted); *see also Benoit v. Frederickson,* 454 Mass. 148, 153 (2009) (reporting rape allegations to the police is protected activity); *O'Gara v. St. Germain*, 91 Mass. App. Ct. 490, 497 (Mass. App. Ct. 2017) (reporting suspected criminal activity to the police is protected activity).

Courts review this first part of the anti-SLAPP analysis on a claim-by-claim basis.  *See Hanamura v. Newton*, 104 Mass. App. Ct. 1108, 2024 WL 2721522, at \*3 (Mass. App. Ct. May 28, 2024).  Further, in assessing whether there is any non-petitioning conduct, "a judge considers only the allegations that are relevant to the discrete causes of action brought."  *477 Harrison Ave., LLC v. Jace Boston, LLC*, 477 Mass. 162, 168 (2017).

If the moving party meets that burden as to any claim, the second stage shifts to the opposing party. Under the *Bristol* framework, Ms. Read must show, by a preponderance of the evidence, that each individual Commonwealth Witness's petitioning activities were "devoid of any reasonable factual support or any arguable basis in law" and "caused actual injury" to her. *Bristol Asphalt*, 493 Mass. at 557 (quoting M.G.L. c. 231, § 59H). This is a "high bar." *Blanchard*, 477 Mass. at 156 n.20.

## B. Each State Law Claim Against Each Commonwealth Witness is Based Solely on Petitioning Activity.

While Ms. Read's claims against each Commonwealth Witness must be evaluated individually and independently under the anti-SLAPP statute, as an initial matter, it is evident that she seeks to hold all of the Commonwealth Witnesses liable simply for talking to and answering questions from the police. The Commonwealth Witnesses neither swore out a complaint against Ms. Read nor initiated any police interaction. Instead, they were mere bystanders whom police questioned and who provided truthful answers—nothing more.

Further, Ms. Read's complained-of injuries are limited to harm caused by her arrest, indictment, and prosecution. The only pleaded conduct by each Commonwealth Witness relevant to this alleged injury is the fact that each gave information to the police, information that was used (along with evidence from Ms. Read herself and others) to arrest Ms. Read. Ms. Read's speculative (and defamatory) suggestion that some of the Commonwealth Witnesses are responsible for Officer O'Keefe's death (a claim that Ms. Read lacks any good faith basis or evidence to assert) provides no basis for the state law causes of action.

Now that Ms. Read was found not guilty—at a second criminal trial—she seeks to hold civilly liable private citizens who merely spoke to the police and were forced to testify at her trial. The Complaint against the Commonwealth Witnesses has no precedent in Massachusetts law.

Indeed, Ms. Read's current attempt to punish financially those who spoke to the police and testified for the Commonwealth violates the core policy of the anti-SLAPP statute: to prevent meritless suits "to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Duracraft*, 427 Mass. at 161 (internal quotations and citation omitted).

### 1. Nicole Albert

Ms. Albert lived at 34 Fairview at the time of Officer O'Keefe's death. There is no allegation that Ms. Albert reached out to the police, initiated any criminal complaint against Ms. Read, or even mentioned Ms. Read to the police. Instead, Ms. Albert is a fact witness whom the police interviewed on February 3, 2022. Compl. at ¶¶ 22, 30, 57. Ms. Albert told police that Officer O'Keefe did not enter her home on January 29, 2022. Compl. at ¶ 46. Beyond the unremarkable factual allegations that Ms. Albert spoke to her husband and friends about Officer O'Keefe's death, the Complaint is devoid of any other factual allegations against her.

Accordingly, because each claim against Ms. Albert is based on her allegedly false statements to police about the events on January 29, 2022, or implicitly her testimony before the grand jury and at trial, the claims against her are subject to dismissal under M.G.L. c. 231, § 59H.

### a) Malicious Prosecution

First, for a malicious prosecution claim against Ms. Albert, Ms. Read must establish: "(1) the commencement or continuation of a criminal proceeding against" Ms. Read at the "behest" of Ms. Albert; "(2) the termination of the proceeding in favor of [Ms. Read]; (3) an absence of probable cause for the charges; and (4) actual malice." *Rizzuti v. Cappabianca*, 791 F. Supp. 3d 270, 320 (D. Mass. 2025) (internal quotations and citations omitted).

Because a malicious prosecution claim is based on the initiation of civil or criminal legal proceedings, it is commonly subject to an anti-SLAPP motion. *See Hidalgo v. Watch City Const.*

*Corp.*, 105 Mass. App. Ct. 148, 151 (Mass. App. Ct. 2024) (noting that the "vast majority" of malicious prosecution cases "are based solely on the opposing party's petitioning activity, and thus are prima facie subject to dismissal under the anti-SLAPP statute."). Ms. Read's malicious prosecution claim against Ms. Albert is no different. She alleges that Ms. Albert falsely told the police on February 3, 2022 (**after** Ms. Read's arrest) that Officer O'Keefe did not enter her home just after midnight on January 29, 2022 and that statement caused Ms. Read to be arrested. Compl. at ¶¶ 46. However, providing information to the police is core petitioning activity protected under M.G.L. c. 231, § 59H. *See Benoit,* 454 Mass. at 153; *O'Gara*, 91 Mass. App. Ct. at 497.

In the Complaint, Ms. Read alleges no other conduct by Ms. Albert that is relevant to the commencement of the criminal action against Ms. Read. *See Wenger v. Aceto*, 451 Mass. 1, 5-6 (2008) (while complaint included other alleged misconduct by defendant, that misconduct was not relevant to the malicious prosecution and abuse of process claims, which were solely based on reporting criminal activity to the police). While Ms. Read includes an allegation that "[o]ne or more of [the Commonwealth Witnesses] then relocated [Officer] O'Keefe's body and deposited it in front of the Alberts' house," Compl. at ¶ 169, this speculative allegation, which lacks any good faith evidentiary basis, does not avoid application of the anti-SLAPP statute to this malicious prosecution claim. Indeed, Ms. Read included this speculative allegation in what appears to be a misguided attempt to avoid the statute's application.[3]

As an initial matter, Ms. Read does not allege that **Ms. Albert** relocated Officer O'Keefe's body; rather, she simply speculates that "one or more" of the Commonwealth Witnesses relocated the body. The First Circuit has held that, for the court to draw reasonable inferences in favor of a

---

[3] Lest there be any doubt about Ms. Read's misguided attempt to avoid the anti-SLAPP statute, Ms. Read notably omits any purportedly material allegations relating to anyone allegedly moving Officer O'Keefe's body from her 1983 Conspiracy claim against the Commonwealth Witnesses, a federal statute that is not subject to the anti-SLAPP statute. *See generally* Compl. at ¶¶ 128-139.

plaintiff, the "complaint must allege facts linking each defendant to the grounds on which that particular defendant is potentially liable." *Rendondo Waste Sys., Inc. v. Lopez-Freytes*, 659 F.3d 136, 140 (1st Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Cases are subject to dismissal where the complaint "does not identify who, if any, of the [] individual defendants was responsible for" the purported misconduct. *Doe Next Friend of A v. Spears*, 630 F. Supp. 3d 290, 296 (D. Mass. 2022) (citing *Iqbal*, 556 U.S. at 676). In a notable example, a court held that allegations that a plaintiff's personal property was removed from her home "at some point . . . ***by one or more of the defendants***" was insufficient to infer that any of the defendants was liable for the removal of plaintiff's property. *Piccone v. Carrington Mortg. Servs., LLC*, 2023 WL 3293054, at *4 (D. Mass. May 5, 2023) (emphasis added) (citations omitted) (complaint must allege more than the "sheer possibility that a defendant has acted unlawfully"); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (use of "collective term 'Defendants'" not proper pleading); *Bryson v. Gonzales*, 534 F.3d 1282, 1290 (10th Cir. 2008) ("conclusory allegations that simply name the 'Defendants' generically" fail).

Further, this allegation is not pertinent to the malicious prosecution claim. The question is whether Ms. Read alleges that Ms. Albert "engaged in any conduct germane to her [malicious prosecution claim] apart from [Ms. Albert's statements to the police], which can provide a substantial basis for her claim." *477 Harrison Ave., LLC*, 477 Mass. at 169. That answer is no. An allegation that one or more of the Commonwealth Witnesses relocated Officer O'Keefe's body is not relevant to whether Ms. Albert initiated criminal or civil proceedings against Ms. Read. Ms. Albert only possibly achieved that by speaking to the police. At best, that "allegation" is intended to show that the statements made by Ms. Albert to the police were false and intended to cover-up

her own culpability.[4]  However, "the motive behind the petitioning activity is irrelevant at this initial stage." *Office One, Inc. v. Lopez*, 437 Mass. 113, 122 (2002); *Bixby v. Town of Rehoboth*, 2024 WL 3430501, at *7 (D. Mass. Mar. 22, 2024).

### b)  MCRA

Next, Ms. Read asserts an MCRA violation by Ms. Albert.  To prove this claim, Ms. Read must establish "(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion."  *Gallagher v. S. Shore Hosp., Inc.*, 101 Mass. App. Ct. 807, 824 (2022) (citing *Currier v. Nat'l Bd. of Med. Examiners*, 462 Mass. 1, 12 (2012)).

Here, Ms. Read alleges that Ms. Albert interfered with Ms. Read's Fourth Amendment rights.  Again, the only specifically alleged ***conduct*** against Ms. Albert relevant to this count, *i.e.*, conduct that could amount to "threats, intimidation, or coercion," is that Ms. Albert allegedly falsely told the police that Officer O'Keefe did not enter 34 Fairview.  Like the malicious prosecution claim, that conduct is plainly petitioning activity, and protected by the anti-SLAPP statute.  *See Fromm v. Boston Redevelopment Auth.*, 73 Mass. App. Ct. 1109 (Mass. App. Ct. 2008) (affirming dismissal of MCRA claim under anti-SLAPP).

### c)  Intentional Infliction of Emotional Distress

Next, Ms. Read complains that Ms. Albert is liable for intentional infliction of emotional distress, again related to Ms. Read's arrest.  Compl. at ¶ 157.  To state an IIED claim, Ms. Read must allege that (1) the defendant intended to inflict emotional distress or knew or reasonably should have known that emotional distress was likely to result from such conduct, (2) the conduct

---

[4] Ms. Read's suggestion that the Commonwealth Witnesses are responsible for Officer O'Keefe's death is irresponsible, knowingly false, and defamatory.  To deflect her own responsibilities, Ms. Read has conspired with others to engage in a scheme to defame and injure Ms. McCabe and others, simply to deflect from Ms. Read's own liabilities.

was extreme and outrageous, (3) the defendants' conduct proximately caused plaintiff's emotional distress, and (4) the distress was so severe that no reasonable man could be expected to endure it. *Sindi v. El-Moslimany*, 896 F.3d 1, 21 (1st Cir. 2018).  Ms. Read again includes the same allegations as contained in her MCRA claim—namely, that Ms. Albert falsely represented to the police that Officer O'Keefe never entered her home.  Other speculative or group-pleaded allegations simply are not germane to the IIED claim.  Accordingly, the IIED claim is based solely on petitioning activities, and subject to dismissal under the anti-SLAPP statute if Ms. Read cannot meet her burden of showing that Ms. Albert's petitioning activity was devoid of any reasonable factual basis, which, we submit, she will be wholly unable to do.

### d)  Civil Conspiracy

The final count against Ms. Albert is for civil conspiracy.  Compl. at ¶¶ 161-172.  To state such a claim, Ms. Read "must demonstrate that a combination of persons acted pursuant to an agreement to injure the plaintiff."  *Mass. ex rel. Powell v. Holmes*, 546 F. Supp. 3d 58, 81 (D. Mass. 2021) (quoting *Gutierrez v. Mass. Bay Transp. Auth.*, 437 Mass. 396, 415 (2002)).

Again, Ms. Read regurgitates the same specific allegations against Ms. Albert—namely, that she lied to the police when she spoke to them.  *See* Compl. at ¶ 163.  Ms. Read also claims that Ms. Albert texted and communicated with her husband, the McCabes, and Mr. Higgins regarding what they each told the police about what happened to Officer O'Keefe.  *Id.*  However, characterizing Ms. Albert's petitioning activity as a conspiracy because she allegedly discussed her petitioning activity with others does not avoid application of the anti-SLAPP statute.  *See Mantell v. P & J.V. Management Corp.*, 2013 WL 6175642, *3 (Mass. Super. Ct. Sept. 22, 2013) (citing *Keystone Freight Corp. v. Bartlett Consolidated, Inc.*, 77 Mass. App. Ct. 304, 314 (Mass. App. Ct. 2010)) ("The allegation of a conspiracy is not enough to maintain a counterclaim because

there is no activity outside of the petition to which the defendants point that would support a conspiracy"). As with the other counts, Ms. Read includes no specific factual allegations against Ms. Albert outside of her petitioning activity that would support a conspiracy. *Id.*; *see also 477 Harrison Ave., LLC*, 477 Mass. at 170 (alleged statements by the defendants regarding motive for filing suit are not substantial non-petitioning activity on an abuse of process claim).

### 2. Matthew McCabe

Mr. McCabe lives in Canton, Mass. and was questioned by the police on January 29, 2022 about the death of Officer O'Keefe. Compl. at ¶¶ 24, 57. Like Ms. Albert, Ms. Read includes few specific factual allegations against Mr. McCabe and identifies him only a handful of times in her Complaint despite asserting four state law claims against him. The few references to Mr. McCabe are allegations almost identical to those against Ms. Albert—namely, (1) Mr. McCabe was at 34 Fairview on January 29, 2022; (2) on that day, he told the police that Officer O'Keefe did not enter the home; and (3) after speaking to the police, Mr. McCabe was included on text messages with his wife and the Alberts regarding what happened to Officer O'Keefe. Compl. at ¶¶ 53-55, 57. The only distinction from the allegations against Ms. Albert is a claim that Mr. McCabe spoke to the police on January 29, 2022 prior to Ms. Read's arrest. *See* Compl. at ¶ 57 (Nicole Albert interviewed on February 3, while Mr. McCabe was interviewed on January 29).

Like Ms. Albert, Ms. Read also includes the generalized and speculative claim that "one or more" Commonwealth Witness relocated Officer O'Keefe's body. *Id.* at ¶ 169. Ms. Read, however, does not allege that Mr. McCabe, specifically, relocated Officer O'Keefe's body. *See Doe Next Friend A*, 630 F. Supp. 3d at 296 ("Plaintiff's claim, therefore, is subject to dismissal because the amended complaint does not identify who, if any, of the three individual defendants

was responsible for writing and/or submitting the allegedly false report to the Massachusetts Probate Court.") (citation omitted).

Accordingly, for the same reasons above, Mr. McCabe has met his burden of showing the claims against him are based solely on petitioning activity.

### 3. Jennifer McCabe

Ms. McCabe is married to Mr. McCabe and lives in Canton, Mass. Ms. McCabe was questioned by the police on January 29, 2022 and provided truthful information to the police about what she observed that day. Compl. at ¶¶ 23, 57. Ms. Read asserts the same four state law claims against Ms. McCabe and similar petitioning activity as against Ms. Albert and Mr. McCabe, except that Ms. Read alleges that Ms. McCabe provided the police with additional information, including inculpatory statements made by Ms. Read the morning of January 29, 2022. Compl. at ¶ 130. These additional allegations only strengthen Ms. McCabe's argument that the claims against her are based solely on her petitioning activity. Ms. Read also does not allege that Ms. McCabe, specifically, relocated Officer O'Keefe's body. Accordingly, Ms. McCabe has met her burden of showing that each claim against her is based solely on petitioning activity and should be dismissed under the anti-SLAPP statute.

Ms. Read does include one additional factual allegation against Ms. McCabe: that, at 2:27am, Ms. McCabe performed a Google search on her phone, stating: "Hos long to die in cold." Compl. ¶ 39. This allegation against Ms. McCabe has no good faith basis in fact or law.[5] Nevertheless, this baseless allegation does not salvage Ms. Read's claims from the anti-SLAPP statute. Ms. Read can only avoid anti-SLAPP dismissal if this alleged conduct relates to the

---

[5] At the second criminal trial, it was unrebutted that the Google search at issue occurred at 6:24am. Indeed, the evidence at trial revealed that any contention that the Google search at issue occurred at 2:27am was based on a fundamentally erroneous reading of the information. Ms. Read did not rebut this evidence.

elements of the claims brought against Ms. McCabe. *See 477 Harrison Ave, LLC*, 477 Mass. at 162 ("In assessing the conduct complained of, a judge considers only the allegations that are relevant to the discrete causes of action brought."). The answer is clearly that it does not. Whether Ms. McCabe conducted a Google search at 2:27am is not germane conduct as to every count asserted against Ms. McCabe. For example, a Google search conducted at 2:27am is not relevant to Ms. Read's malicious prosecution claim against Ms. McCabe, as it has nothing to do with initiating a criminal proceeding against Ms. Read. *See Chin v. Garda CL New England, Inc.*, 2017 WL 5771464, *7 (D. Mass. Aug. 16, 2017) (granting anti-SLAPP motion to dismiss malicious prosecution claim even though complaint includes allegations of non-petitioning conduct as non-petitioning conduct was not the basis for the malicious prosecution claim). Indeed, Ms. Read's irrelevant (and specious) Google search allegation confirms that her Complaint against Ms. McCabe and the other Commonwealth Witnesses is the exact type of act of revenge designed to stifle petitioning activity that the anti-SLAPP statute is designed to prevent. Ms. Read is simply trying to smear (again) Ms. McCabe with a knowingly frivolous claim that Ms. McCabe had something to do with Officer O'Keefe's death. All Ms. McCabe did was tell the police the truth. For that, Ms. Read is suing her.

### 4. Brian Albert

Mr. Albert previously lived at 34 Fairview, is married to Ms. Albert and, on January 29, 2022, told the police that Officer O'Keefe did not enter his home. Compl. at ¶¶ 21, 30, 5. There is no specific allegation that Mr. Albert relocated Officer O'Keefe's body. As a result, just like his wife and the McCabes, every claim against Mr. Albert is based solely on his petitioning activity and should be dismissed under the anti-SLAPP statute.

The only unique allegation against Mr. Albert is that he—sometime after Ms. Read was arrested—"destroy[ed]" his phone, which Ms. Read alleges "eliminated potentially incriminating communications." Compl. at ¶¶ 60, 153 ("Mr. Albert "caused Ms. Read's . . . arrest . . . by destroying or discarding [his] phone[].")." Much like Ms. McCabe's alleged Google search, however, this allegation is a red herring. This alleged "conduct" has no relevance to any claim asserted against Mr. Albert. For example, whether Mr. Albert "destroyed" his personal cell phone, the characterization of which is disputed,[6] is not relevant to Ms. Read's malicious prosecution claim, as the only conduct related to the initiation of Read's criminal proceedings is Mr. Albert's conversations with police, which is unquestionably petitioning activity.

Further compounding the lack of relevance, the Complaint conspicuously omits that Mr. Albert had any legal obligation to retain his phone or that Ms. Read had any legal right to access his phone. Nor could Ms. Read make such an allegation because that issue was already decided against her during her criminal proceedings. On October 5, 2022, Judge Cannone denied Ms. Read's motion for a subpoena to access Mr. Albert and Mr. Higgins's phones, finding that, "The defendant has not met her burden under Mass. R. Crim. P. 17. The Court is not satisfied that the requested phones contain information that is evidentiary and relevant, nor is the Court satisfied that the application is made in good faith and is not intended as a general fishing expedition." Tuxbury Decl., Ex. C (September 19, 2022 Order of Judge Cannone). The Court did so again on June 20, 2023. *Id.*, Ex. D (June 20, 2023 Order of Judge Cannone). There, the Court held that Ms. Read had "not shown with credible evidence that relevant or admissible evidence will be found on Albert's cell phone or in his cell phone records." *Id.* at 4. The Court noted that the "single,

---

[6] While not relevant to the Court's inquiry on this motion, the evidence will show that Ms. Read's phone destroying contentions, both with respect to Mr. Albert and Mr. Higgins (*see infra*), are false.

unanswered phone call from McCabe to Albert shortly after [Officer] O'Keefe's body was discovered is insufficient to establish any meaningful connection between Albert's cell phone" and the criminal case against Ms. Read. *Id.* The Court similarly found that later communications between Mr. Albert and Ms. McCabe were not relevant to the question of whether Ms. Read was criminally liable for Officer O'Keefe's death. *Id.*

Accordingly, Ms. Read's superfluous allegation that Mr. Albert destroyed his personal phone has zero bearing on her claims against Mr. Albert, and it does not defeat Mr. Albert's showing that her claims are based solely on Mr. Albert's petitioning activity.

### 5. Brian Higgins

Mr. Higgins was at 34 Fairview on January 29, 2022 and, when interviewed by the police on February 3, 2022, told the police that Officer O'Keefe did not enter the home on January 29, 2022. Compl. at ¶¶ 25, 30-31, 57. Ms. Read does not allege that Mr. Higgins mentioned Ms. Read in his statements to police, or that Mr. Higgins, specifically, relocated Officer O'Keefe's body. Accordingly, Mr. Higgins is entitled to the protection of the anti-SLAPP statute because the four state-law claims against him are based solely on his petitioning activity.

Similar to Mr. Albert, Ms. Read alleges that Mr. Higgins "destroyed" his personal phone.[7] Compl. at ¶ 60. For the same reasons described above, including that Ms. Read's motion for a subpoena of Mr. Higgins's cell phone was denied and found to be nothing more than a "fishing expedition" in October 2022, this allegation is not related to any of the counts that Ms. Read asserts against Mr. Higgins. Therefore, the allegation does not prevent application of the anti-SLAPP statute to the state law counts against Mr. Higgins.

---

[7] *See* footnote 6, *supra.*

### C. Ms. Read Cannot Meet Her Burden of Showing Each Commonwealth Witness Had No Factual or Legal Basis for their Petitioning Activity

Because the Commonwealth Witnesses met their burden that one or more of Ms. Read's claims are based solely on their respective petitioning activity, under the *Bristol* framework, the burden shifts to Ms. Read to establish by a preponderance of the evidence that the Commonwealth Witnesses' exercise of their petitioning rights "was devoid of any reasonable factual support or any arguable basis in law." *Bristol Asphalt*, 493 Mass. at 557 (quoting M.G.L. c. 231, § 59H). The Court in *Bristol* characterized this as a "difficult task" for the party opposing a special motion under the anti-SLAPP statute because the mere submission of opposing affidavits and credibility challenges are not enough. *Id.* at 558 ("material, disputed credibility issues may not be resolved in the special motion opponent's favor"). Similarly, Ms. Read "cannot merely rely on speculation, conclusory assertion or averments outside of [her] personal knowledge." *Id.*

Here, there is no doubt that Ms. Read cannot meet this standard. Indeed, she cannot provide any genuine evidence even to dispute the factual bases for the Commonwealth Witnesses' petitioning activity, much less satisfy the much higher bar of establishing that their activity was devoid of any reasonable factual basis. Foremost, Ms. Read complains that each Commonwealth Witness told the police on or around January 29, 2022 that Officer O'Keefe did not enter the home at 34 Fairview. *See e.g.,* Compl. ¶ 57. Each Commonwealth Witness has submitted a supporting declaration attesting to the fact that they made those statements to the police and that those statements were truthful. *See* Declarations of Jennifer McCabe, Matthew McCabe, Brian Higgins, Brian Albert, and Nicole Albert.

Ms. Read cannot rebut that or show that any petitioning activity was devoid of a factual basis because ***that is exactly what Read told the police on January 29, 2022***. Just hours after

Officer O'Keefe died, Ms. Read briefly spoke to the police and told the police that she did not see Officer O'Keefe enter the home at 34 Fairview Road. *See* Tuxbury Decl., Ex. A at 12.

Ms. Read never changed her January 29, 2022 statement to the police. She did not provide any further information to the police after that statement or testify at either criminal trial.

Besides Ms. Read's own statement to the police, there is undisputed evidence that Officer O'Keefe never entered 34 Fairview. As reflected in the Commonwealth's Statement, Officer O'Keefe was found covered in snow on the front lawn of 34 Fairview, but no snow was found underneath his body. *Id.* at 8. This evidence is consistent with Officer O'Keefe being injured at the time Ms. Read dropped him off, prior to the blizzard conditions. *Id.* at 1.

Officer O'Keefe also was found missing one shoe. *Id.* at 13. According to trial testimony, the missing shoe was located hours later under snow, next to the curb where Ms. Read dropped off Officer O'Keefe. *See* Tuxbury Decl. ¶ 6, (May 5, 2025 Testimony of Lt. Kevin O'Hara, with relevant testimony at 23:35-30:00)). Officer O'Keefe's shoe also was full of snow. *Id.* In addition, Officer O'Keefe's shoe was found near pieces of broken taillight. *Id.*, Ex. A at 13.

Officer O'Keefe's cell phone also was found underneath his body. *Id.* at 5. At the second trial, the Commonwealth presented GPS data from Officer O'Keefe's phone that showed his cell phone ceased moving at approximately 12:32am at the same location where his body was found around 6:00am. *See* Tuxbury Decl. at ¶ 7, (April 28, 2025 Testimony of Ian Whiffin, with relevant testimony at 1:19-2:33). Further testimony revealed that Officer O'Keefe's phone also locked for a final time at 12:32am, meaning that Officer O'Keefe did not access his phone after that time. *Id.* Trial evidence also revealed that Officer O'Keefe's phone's temperature dropped from 82 degrees Fahrenheit around midnight to 55 degrees Fahrenheit just after 1:00am, which is consistent with Officer O'Keefe never entering the home and remaining on the front lawn. *Id.*

Ms. Read also claims that Ms. McCabe falsely told police that Ms. Read made "inculpatory" statements the morning of January 29, 2022. Compl. at ¶ 163. But again, Ms. Read cannot meet her burden that Ms. McCabe's statements to police, *i.e.*, her petitioning activity, were devoid of any reasonable factual basis. On the contrary, the Commonwealth's Statement identifies that several other individuals heard Ms. Read make incriminating statements on January 29, 2022. According to that Statement, Kerry Roberts told police that around 5:00am on January 29, 2022—prior to the discovery of Officer O'Keefe's body—Ms. Read told her, "John's Dead. Kerry, Kerry, I wonder if he's dead. Its snowing, he got hit by a plow." Tuxbury Decl., Ex. A at 7. Ms. Roberts also described Read as "hysterical" at that time. *Id.* In addition, Ms. Roberts told police that Ms. Read said to Ms. McCabe (in front of Ms. Roberts): "I was so drunk I don't even remember going to your sister's last night." *Id.* at 8.

Officer O'Keefe's then-14-year-old-niece told police that Ms. Read woke her up at 4:30am on January 29, 2022 and was "screaming and acting frantic." *Id.* at 18. She also told police that Ms. Read changed her story several times while talking on the phone. *Id.*

On January 30, the police spoke to Canton Firefighter Katie McLaughlin, who arrived at 34 Fairview shortly after the 911 call. Ms. McLaughlin spoke with Ms. Read at the scene and heard Ms. Read state repeatedly, "I hit him, I hit him, I hit him." *Id.* at 10.

Finally, there is substantial and independent evidence derived from Ms. Read herself on January 29 that further undermines any challenge to the factual basis of the Commonwealth Witnesses' petitioning activity: the Commonwealth's Statement discloses that Ms. Read admitted to police that she was drinking the night before, and her intoxication was proven through receipts from the bar and a blood test administered upon Ms. Read the next morning. *Id.* at 12; 14-19. Ms.

Read also told the police that her right rear taillight had been damaged the night before, but she did not know how it was damaged. *Id.* at 12.

Accordingly, because each Commonwealth Witness has shown that Ms. Read's state law claims against them are based solely on their respective petitioning activity, and because Ms. Read cannot meet her high burden of establishing that their petitioning activity was devoid of a reasonable factual basis, each Commonwealth Witness is entitled to have those state law claims dismissed and receive an award of their attorneys' fees. *See Bristol*, 493 Mass. at 540.

## II.  This Case Should Be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6).

### A.  Fed. R. 12(b)(6) Legal Standard

On a motion to dismiss, the Court must determine if the facts alleged "plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. *García-Catalán v. U.S.*, 734 F.3d 100, 103 (1st Cir. 2013). First, it must distinguish the factual allegations from the conclusory legal allegations. *Id.* Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. *Id.* Second, it must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)). Overall, the Complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A court may consider matters of public record," including "documents from prior state court adjudications," in deciding a Rule 12(b)(6) motion. *Giragosian v. Ryan*, 547 F.3d 59, 66 (1st Cir. 2008) (citations and quotations omitted); *see also Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) ("official public records" properly considered on a motion to dismiss) (citations omitted); *Chatman v. Gentle*

*Dental Center of Waltham*, 973 F. Supp. 228, 231 n.6 (D. Mass. 1997) (court can consider public records without treating motion as one under Rule 56).

### B. Ms. Read's § 1983 Conspiracy, Common Law Conspiracy, MCRA, and Intentional Infliction of Emotional Distress Claims Are Time-Barred.

Besides dismissal under the anti-SLAPP statute, Ms. Read's 1983 conspiracy, MCRA, IIED, and common law civil conspiracy claims against all of the Commonwealth Witnesses must be dismissed because they are all subject to a three-year statute of limitations that has expired. *See Poy v. Boutselis*, 352 F.3d 479, 483 (1st Cir. 2003) (Section 1983 conspiracy); *Schand v. City of Springfield*, 380 F. Supp. 3d 106, 138 (D. Mass. 2019) (common law conspiracy); *Arsenault v. Otto*, 628 F. Supp. 3d 377, 380 (D. Mass. 2022) (MCRA); Mass. Gen. L. c. 260, § 2A. For all four claims, the limitations period begins to run when the plaintiff "knows or should know that she has been injured." *See Kaiser v. Kirchick*, 662 F. Supp. 3d 76, 94 (D. Mass. 2023) (citing *Pagliuca v. City of Boston*, 35 Mass. App. Ct. 820, 824 (Mass. App. Ct. 1994)). This does not mean that the plaintiff must have "notice of every fact which must eventually be proved in support of the claim" but, rather, "knowledge that an injury has occurred." *White v. Peabody Constr. Co.*, 386 Mass. 121, 130 (1982); *see also Arsenault*, 628 F. Supp. 3d at 380 ("A plaintiff need not know the extent or severity of the harm suffered. To start the limitations period a plaintiff need only have knowledge of all the facts necessary to make out [her] civil rights claim.").

The crux of Ms. Read's claims against the Commonwealth Witnesses for conspiracy, violations of the MCRA, and intentional infliction of emotional distress are that they undertook certain efforts in early 2022 to lie to law enforcement and frame Ms. Read for the killing of Officer O'Keefe. *See* Compl. at ¶¶ 143, 153, 157, 163, 169. Even assuming that were true (something the Commonwealth Witnesses vehemently deny), the claims are time-barred because Ms. Read was aware of those purported efforts long before November 17, 2022 (*i.e.*, three years before Ms. Read

filed the instant Complaint). The untimeliness of the Complaint is evident from Ms. Read's own pleading. Further, publicly available information from the underlying criminal trials, upon which the Complaint heavily relies, confirms Ms. Read's awareness of the basis for her claims well before November 17, 2022. For example, on June 10, 2022, Ms. Read obtained a large tranche of discovery from the Commonwealth, including the Commonwealth Witnesses' statements to police, which the Complaint alleges was when these individuals told law enforcement that Officer O'Keefe never entered 34 Fairview. *See* Tuxbury Decl., Ex. B (Case No. 2282CR0117 at Dkt. No. 6 ("Notice of Discovery") at ¶¶ 41, 54, 59-61); Compl. at ¶ 57. Also on June 10, 2022, Ms. Read acquired extraction data from Ms. McCabe's cellphone, which the Complaint alleges contained the text messages that evidence the purported plan to "frame" Ms. Read. *See* Tuxbury Decl., Ex. B at ¶¶ 88, 91; Compl. at ¶¶ 55-56 (admitting that the text messages "provide[d] a window into [the] conspiracy and misconduct"). Indeed, the Complaint goes so far as to allege that Ms. McCabe was "the point person" in the efforts to coordinate the alleged statements to police, Compl. at ¶ 53, bolstering the significance of the data that Ms. Read has been in possession of since June 2022 to her overall theory of the case. Ms. Read even used this June 2022 evidence to support a Rule 17 motion, filed on September 15, 2022, in which Ms. Read argued ***the exact same theory*** that she presents in the instant case. *See* Tuxbury Decl., Ex. C ("all of the percipient witnesses in this case apparently gathered at Brian Albert's house to get their stories straight.").

The Complaint sets forth one additional allegation in support of the conspiracy, MCRA, and IIED claims—namely, Mr. Albert and Mr. Higgins's purported efforts to destroy their cellphones—but that allegation cannot cure the time bar. Compl. at ¶ 60. First, the Complaint is conspicuously silent as to when Ms. Read learned of this allegation. Yet, even if this awareness came after November 17, 2022, such does not modify the requisite accrual dates. "[T]he First

Circuit has rejected the notion that 'the statute of limitations . . . should run from the date of the last overt act that causes damage to the plaintiff.'" *Kennedy v. Town of Billerica*, 502 F. Supp. 2d 150, 155 (D. Mass. 2007) (quoting *Nieves v. McSweeney*, 241 F.3d 46, 51 (1st Cir. 2001)). Instead, these claims accrued "***at the moment*** [Ms. Read knew], or ha[d] reason to know, of the injury that is the basis for the claim[s]." *Nieves*, 241 F.3d at 52 (emphasis added). It is undisputed that Ms. Read became aware of, and was purportedly injured by, the main allegations forming the basis of her conspiracy, MCRA, and IIED claims—namely, that the Commonwealth Witnesses coordinated purported false statements to police to frame Ms. Read for murder—in June 2022 at the latest. Accordingly, the claims are time-barred. *See Schand v. City of Springfield*, 380 F. Supp. 3d 106, 138-39 (D. Mass. 2019) (tort claims ancillary to malicious prosecution are not tolled due to plaintiff's criminal trial or incarceration).

Furthermore, to the extent that Ms. Read attempts to save these claims by relying on her malicious prosecution theory, such efforts must fail. First, as discussed *infra*, Section (B)(3)(ii), the Complaint is entirely devoid of allegations that the Commonwealth Witnesses ever coordinated or agreed with law enforcement to have Ms. Read indicted and prosecuted. At best, the allegations against the Commonwealth Witnesses are that they coordinated ***amongst each other*** in early 2022 to have Ms. Read investigated and arrested to absolve themselves of potential liability. *See, e.g.*, Compl. at ¶ 134; ¶ 136 ("[a]s a result of the conspiracy between and among [the Commonwealth Witnesses], Proctor, Bukhenik, and Tully never investigated" them); ¶ 164 (describing that the purpose of the alleged false representations was for law enforcement to investigate Read). Accordingly, the only civil rights violation that the Commonwealth Witnesses are alleged to have infringed upon is Ms. Read's Fourth Amendment right to be free from wrongful arrest. Absolutely nothing in the Complaint affirmatively connects the Commonwealth Witnesses to the prosecution

of Ms. Read.  And courts do not hesitate to parse out civil rights claims that are generally associated with both wrongful arrest and wrongful prosecution when analyzing a statute of limitations defense.  *See, e.g.*, *Nieves v. McSweeney*, 73 F. Supp. 2d 98, 102 (D. Mass. 1999), *aff'd*, 241 F.3d 46 (1st Cir. 2001); *Salcedo v. Town of Dudley*, 629 F. Supp. 2d 86, 98 (D. Mass. 2009).  Those cases are clear: while claims associated with wrongful prosecution accrue after the termination of the underlying criminal proceeding, claims associated with wrongful arrest do not.  Accordingly, the fact that Ms. Read was acquitted in June 2025 does not save her time barred claims against the Commonwealth Witnesses.

Concerning here is the implication that the Commonwealth Witnesses are to be associated with the indictment and prosecution of Ms. Read because they testified before the grand jury and in her criminal trials.  It is undisputed that the statements given to police in early 2022 regarding Mr. O'Keefe's presence at 34 Fairview are the same as those that the Commonwealth Witnesses ultimately gave during Ms. Read's two trials.  By failing to allege that the Commonwealth Witnesses participated in the indictment or prosecution in any other manner, Ms. Read is essentially asking this Court to infer that, since the statements that caused Ms. Read's "wrongful" arrest were also elicited as part of the evidence presented against her at trial, the Commonwealth Witnesses also should be associated with Ms. Read's prosecution.  Of course, the Complaint fails to mention the Commonwealth Witnesses' trial testimony explicitly because, as Ms. Read and her counsel are well aware, it is black-letter law that trial witnesses are entitled to absolute immunity from civil liability for statements given during the course of judicial proceedings.  *See Briscoe v. LaHue*, 460 U.S. 325, 326 (1983).  Thus, any effort to revive Ms. Read's otherwise untimely claims by relying on the Commonwealth Witnesses' testimony at her criminal trials should be swiftly rejected.

### C. The Complaint Fails to State Any Claims Against Any of the Commonwealth Witnesses Upon Which Relief Could be Granted.

Even if the Court finds against the Commonwealth Witnesses on statute of limitations grounds, none of the claims brought against them pass muster under Fed. R. Civ. P. 12(b)(6).

### 1. Common Law Malicious Prosecution

To sufficiently plead a malicious prosecution claim, a plaintiff must establish four elements: "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice." *Rizzuti*, 791 F. Supp. 3d at 320 (internal quotations and citations omitted). Ms. Read fails to satisfy at least three of these prongs.

### a) Ms. Read Fails to Establish that the Commonwealth Witnesses "Commenced or Continued" the Criminal Proceedings

"[A]n individual may be said to have instituted criminal proceedings against another if he caused those proceedings to be initiated." *Limone v. U.S.*, 579 F.3d 79, 89 (1st Cir. 2009). For a malicious prosecution claim against individuals not vested with charging decisions, a plaintiff must show that the defendants "induce[d] another person (say, a police officer or prosecutor) to lodge formal criminal charges," or that the defendants "exercise[d] a peculiar degree of control over the charging official or adamantly presse[d] that official to bring a criminal complaint." *Id.* Where there is no allegation that the defendants "did anything to further the prosecution of plaintiff," or that the state actor "relied on information from [the defendants] when deciding whether to submit the criminal complaint," this element is not satisfied. *Goddard v. Kelly*, 629 F. Supp. 2d 115, 130 (D. Mass. 2009). "The mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held [to be] sufficient." *Watson v. Mita*, 396 F. Supp. 3d 220, 225 (D. Mass. 2019). And "[i]t is

not enough that [the defendant] appears as a witness against the accused . . . and thereby aids in the prosecution of the charges which he knows to be groundless. His share in continuing the prosecution must be ***active***, as by insisting upon or urging further prosecution." *Degree v. Gendreau*, 2025 WL 3702535, at *10 (D. Mass. Dec. 19, 2025) (emphasis added) (citation omitted).

Ms. Read fails to allege that the Commonwealth Witnesses took an active role in her investigation or prosecution, and she does not assert that they induced or pressured law enforcement to arrest Read in any way. The Complaint alleges only that these individuals "caused Ms. Read's wrongful indictment, arrest, and prosecution" by (1) falsely representing that Officer O'Keefe never entered 34 Fairview; (2) relocating Officer O'Keefe's body; and (3) (as to Mr. Albert and Mr. Higgins) destroying or discarding their phones. *See* Compl. at ¶ 153. Indeed, removing the speculation that Defendant Proctor had a relationship with the Alberts through a purported relationship with non-parties Julie or Kevin Albert, *see* Compl. at ¶¶ 31, 50, the only interactions that the Commonwealth Witnesses are accused of having with the investigation and prosecution are through their witness statements and trial testimony. Such is wholly insufficient. Moreover, Ms. Read fails to state that the charges filed against her were made *in reliance* on the Commonwealth Witnesses' statements. The Complaint, as well as publicly available information (detailed *infra*), outlines a vast amount of other evidence used to charge Ms. Read, all of which the Commonwealth Witnesses had no role in.

### b) Ms. Read Fails to Establish an Absence of Probable Cause

"[P]robable cause" is defined as "such a state of facts in the mind of the defendant as would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the plaintiff has committed a crime." *Bednarz v. Bednarz*, 27 Mass. App. Ct. 668, 672 (Mass. App. Ct. 1989) (quotations and citations omitted). Accordingly, "[i]n evaluating

probable cause, a court looks at the objective facts, not at the actors' subjective intent.'" *U.S. v. Silva*, 742 F.3d 1, 8 (1st Cir. 2014) (quotations and citation omitted); *Lincoln v. Shea*, 361 Mass. 1, 5 (1972) ("defendant's conduct must be adjudged by his honest and reasonable belief at the time he instituted the complaint rather than by what may turn out later to have been the actual state of things."). Where the plaintiff purports that an arrest, indictment, or prosecution was procured through false or inaccurate testimony, courts have not found probable cause lacking where the finding was supported by other corroborating or undisputed evidence. *See, e.g.*, *U.S. v. McMullin*, 568 F.3d 1, 6-7 (1st Cir. 2009); *Costa v. Rasch*, 2014 WL 12803016, at *9 (D.R.I. July 29, 2014).

In the instant case, any reasonable person would have suspected Ms. Read's culpability given the evidence that Ms. Read herself outlines in the Complaint. For example, Ms. Read admits to being outside the home in the area where Officer O'Keefe was found the morning of his death. Compl. at ¶ 33. It is undisputed that Ms. Read's taillight was cracked when Officer O'Keefe's body was discovered. *Id.* at ¶ 75. Ms. Read admits to seeing Officer O'Keefe's body "almost immediately" the morning of January 29th, notwithstanding the darkness and nor'easter conditions and that she had never been to the house until the night prior. *Id.* at ¶ 31. And a secondary, independent investigation was conducted prior to the probable cause determinations, undermining the theory that fact development was entirely controlled by the Defendants. *Id.* at ¶ 56.[8] Collectively, this evidence is sufficient for any reasonable person to find probable cause to arrest Ms. Read.

---

[8] The Complaint also intentionally omits critical facts that were available at the time Read was arrested and prosecuted, which further supported the probable cause determinations. The Commonwealth's June 2022 Statement of the Case, *see* Tuxbury Decl., Ex. A, notes that Ms. Read admitted, less than twelve hours after finding Officer O'Keefe's body, that she did not see him enter the residence the night he died, which is consistent with the statements made by the Commonwealth Witnesses. Additionally, medical professionals told law enforcement that Ms. Read stated on various occasions on January 29 that she may have hit Officer O'Keefe with her car. *See Giragosian*, 547 F.3d at 66 ("A court may consider matters of public record," including "documents from prior state court adjudications," in deciding a Rule 12(b)(6) motion to dismiss.).

### c) Ms. Read Fails to Establish that the Commonwealth Witnesses Acted with "Actual Malice"

"[M]alice is defined as any wrong or unjustifiable motive." *Smith v. Egan*, 802 F. Supp. 3d 86, 92 (D. Mass. 2025) (citation and quotations omitted). A plaintiff must show that the defendants were "attempting to achieve an unlawful end or a lawful end through unlawful means," or intended to harass, vex, or annoy her. *Beecy v. Pucciarelli*, 387 Mass. 589, 593 (1982). Generally, "[t]he malice element . . . requires that the accuser knew there was no probable cause for the commencement of the action, and that the accuser acted with an improper motive." *Gouin v. Gouin*, 249 F. Supp. 2d 62, 71 (D. Mass. 2003). Thus, "the malice analysis is largely duplicative of the probable cause analysis." *Hernandez-Cuevas*, 723 F.3d at 102 (citation omitted).

For the same reasons why the malicious prosecution claim fails under the prior two elements, it fails to show that the Commonwealth Witnesses acted with actual malice. *See, e.g.*, *Molina v. Toledo*, 718 F. Supp. 2d 194, 208 (D.P.R. 2010).[9]

### 2. 42 U.S.C. § 1983 Conspiracy

"When the named defendant in a section 1983 case is a private party, the plaintiff must show that the defendant's conduct can be classified as state action." *Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 8 (1st Cir. 2015) ("If there is no state action, the plaintiff's claim fails.") (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). "The bar for such a showing is set quite high, and [the First Circuit has] cautioned that '[i]t is [o]nly in rare circumstances that private parties can be viewed as state actors.'" *Id.* (citation omitted). Where a conspiracy is alleged between state actors and private parties, "the relationship or nature of cooperation between the state and a

---

[9] Tellingly, the Complaint is devoid of allegations that the Commonwealth Witnesses harbored any personal animus toward Ms. Read or even gave statements or testimony that would have implicated her in Officer O'Keefe's death. Merely reporting that Officer O'Keefe did not enter 34 Fairview cannot reasonably establish that the Commonwealth Witnesses acted with actual malice toward Ms. Read.

private individual [must] be pled in some detail." *Glaros v. Perse*, 628 F.2d 679, 685 (1st Cir. 1980). Notably, "it is settled that the fact that private parties give the police information on which official action is then taken does not by itself convert the private parties into state actors." *Andresen v. Diorio*, 349 F.3d 8, 13 (1st Cir. 2003) (citation omitted).

Dispositively, the Complaint fails to allege any coordination between the Commonwealth Witnesses and any state actors. Even reading the allegations in the light most favorable to Ms. Read, it includes only accusations that the Commonwealth Witnesses "coordinated their efforts" through text messages and phone calls among ***themselves***. Compl. at ¶ 134. There is no allegation that any of them communicated with ***law enforcement*** outside of the statements they gave in late January and early February. *Id.* at ¶¶ 46-48, 57, 66. Indeed, the Complaint does not allege that the Commonwealth Witnesses spoke to law enforcement ***at all*** after making their witness statements. Thus, there is no basis for the Court to infer any relationship between Proctor, Bukhenik, Tully and the Commonwealth Witnesses, let alone a relationship "pled in some detail" that is sufficient to impute state action. The confusing proposition that Proctor, Bukhenik, and Tully "coordinated with the Alberts and McCabe's through Proctor's sister, Courtney, who communicated frequently with Julie Albert," *id.* at ¶ 134, does not salvage the claim. For the Court to impute state action based on that assertion, it would need to find that an agreement between the Commonwealth Witnesses and law enforcement was somehow established through three levels of back-channel communications involving two individuals who Ms. Read does not allege participated in the conspiracy. Notably, the reader is left to guess what "confidential information" Courtney Proctor purportedly shared with Julie Albert, *see id.* ¶ 8, or what Julie Albert purportedly shared with the Commonwealth Witnesses. Such speculation cannot satisfy the high bar necessary to impute state action. *See McGillicuddy v. Clements*, 746 F.2d 76, 78 (1st Cir. 1984) ("Speculation

about what might have happened can not [sic] save an otherwise inadequate complaint."); *Chadbrown v. Coles*, 2011 WL 5325610, at *2 (D. Me. Nov. 2, 2011) (dismissing complaint where "conspiracy theory in terms of the nondefendant state actors [was] premised entirely on speculation fueled by [plaintiff's] own suspicions.").

### 3. Common Law Conspiracy

Plaintiff's common law civil conspiracy claim fails since the Complaint does not state a claim for the underlying tort of malicious prosecution. *See Britton v. Athenahealth, Inc.*, 2013 WL 2181654, at *7-8 (Mass. Super. Ct. May 3, 2013) (dismissing civil conspiracy claim where plaintiff failed to plausibly allege underlying torts). Nonetheless, assuming *arguendo* that the malicious prosecution claim survives, the Complaint still fails to plead facts sufficient to establish a common law conspiracy among the Commonwealth Witnesses.[10]

To state a claim for civil conspiracy, "a plaintiff must demonstrate that a combination of persons acted pursuant to an agreement to injure the plaintiff." *Mass. ex rel. Powell v. Holmes*, 546 F. Supp. 3d 58, 81 (D. Mass. 2021) (quoting *Gutierrez v. Mass. Bay Transp. Auth.*, 437 Mass. 396, 415 (2002)). Massachusetts recognizes two types of civil conspiracy: (1) "true conspiracy"; and (2) conspiracy based on Section 876 of the Restatement (Second) of Torts—so called "concerted action conspiracy." *See Taylor v. Am. Chemistry Council*, 576 F.3d 16, 34 (1st Cir. 2009).

The Complaint is silent as to which civil conspiracy theory is being alleged. However, based on the nature of the allegations, it appears that Ms. Read seeks to proceed on a concerted

---

[10] To the extent that Ms. Read's conspiracy claim against the Commonwealth Witnesses is premised exclusively on the theory that they conspired with law enforcement, as opposed to only a conspiracy among themselves, such claim should fail for the reasons outlined with respect to the 1983 conspiracy claim—namely, that the Complaint is devoid of allegations that the Commonwealth Witnesses ever came to an agreement with law enforcement to commit a wrongful act.

action civil conspiracy theory. *See, e.g.*, Compl. at ¶ 163 ("As part of their concerted efforts…),

¶ 171 (describing alleged underlying tortious acts). For such a claim to survive, Ms. Read must

first adequately allege "a common design or an agreement . . . between two or more persons to do

a wrongful act and, second, proof of some tortious act in furtherance of the agreement." *Aetna

Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994), *abrogated on other grounds*,

*U.S. v. Valezquez-Fontanez*, 6 F.4th 205 (1st Cir. 2021)). "Key to this cause of action is a

defendant's substantial assistance, with the knowledge that such assistance is contributing to a

common tortious plan." *Kurker v. Hill*, 44 Mass. App. Ct. 184, 189 (Mass. App. Ct. 1998). The

allegations do not satisfy this burden.

First, the accusation that an unnamed Commonwealth Witness or group of Commonwealth

Witnesses relocated Mr. O'Keefe's body is vague and speculative. "Subjective characterizations

and unsubstantiated conclusions are not sufficient" to support a civil conspiracy. *McNell v. Hugel*,

1994 WL 264200, at *9 (D.N.H. May 16, 1994) (citing *Fleming v. Lind-Waldock & Co.*, 922 F.2d

20, 23 (1st Cir. 1990)). Moreover, regarding the allegations that the Commonwealth Witnesses

came to an agreement to tell investigators that Officer O'Keefe never entered 34 Fairview, the

Complaint fails to allege that the Commonwealth Witnesses knew that such statements were false

when they were made. "Because a conspiracy requires an agreement to commit a wrongful act,

none can exist where an alleged participant lacks knowledge that a wrongful act is being

perpetrated." *Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 364 (2002). Ms.

Read alleges only her subjective belief that these statements were false, which is insufficient to

adequately plead the scienter required to maintain this type of conspiracy claim. Moreover, even

accepting as true the allegations that the Commonwealth Witnesses hid exculpatory evidence from

law enforcement, courts have long recognized that "a citizen ordinarily has no legal obligation to

volunteer exculpatory information to law enforcement authorities." *People v. Dawson*, 50 N.Y.2d 311, 317-18 (N.Y. 1980); *see also Com. v. Cotto*, 471 Mass. 97, 109 (2015) (no duty to disclose exculpatory evidence if private citizens are not "agents of the prosecution team"). If they were not committing a wrongful act in the first place, the Commonwealth Witnesses could not have **known** that they were committing a wrongful act when they gave their witness statements.

Simply put, Ms. Read cannot support a legally recognized, valid **civil conspiracy cause of action** with a concocted and baseless **conspiracy theory**.

### 4. Massachusetts Civil Rights Act

To establish an MCRA claim, "a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Gallagher v. S. Shore Hosp., Inc.*, 101 Mass. App. Ct. 807, 824 (Mass. App. Ct. 2022) (citing *Currier v. Nat'l Bd. of Med. Examiners*, 462 Mass. 1, 12 (2012)). "Whether conduct amounts to threats, intimidation, or coercion is assessed under an objective, 'reasonable person' standard." *Salmon v. Lang*, 57 F.4th 296, 316-17 (1st Cir. 2022) (citation omitted). A "threat" means "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; "intimidation" means "putting in fear for the purpose of compelling or deterring conduct"; and "coercion" means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994) (citations omitted). For these, **non-physical acts** rarely support a basis for recovery. *Salmon*, 57 F.4th at 317 (citing *Thomas v. Harrington*, 909 F.3d 483, 492-93 (1st Cir. 2018)). "[M]ere recitals of boilerplate claims of threats, intimidation, or coercion do not meet the requirements." *Canney v. City of Chelsea*, 925 F. Supp. 58, 70 (D. Mass. 1996) (citation

omitted).

The Complaint does not adequately plead that Ms. Read was ever threatened, intimidated, or coerced by any of the Commonwealth Witnesses. The allegations are merely that the Commonwealth Witnesses gave false testimony and altered or destroyed certain evidence. Even accepting these allegations as true, this Court recently held that "conducting a sham investigation of the actual perpetrator, [] coaching, coercing or otherwise fabricating evidence against the Plaintiff, or causing witnesses to give statements and/or testimony that would result in [] misidentification, or by offering false statements and testimony" do not constitute "threats, intimidation, or coercion" under the MCRA. *Cifazzari v. Town of Milford*, 2025 WL 1899043, at *15 (D. Mass. July 9, 2025). And, destructively, the Complaint does not state that Ms. Read experienced any physical harm based on the Commonwealth Witnesses' purported conduct.

### 5. Intentional Infliction of Emotional Distress

The elements of an IIED claim are that (1) the defendants intended to inflict emotional distress or knew or reasonably should have known that emotional distress was likely to result from such conduct; (2) the conduct was extreme and outrageous; (3) the defendants' conduct proximately caused plaintiff's emotional distress; and (4) the distress was so severe that no reasonable man could be expected to endure it. *See Sindi*, 896 F.3d at 21. "Conduct qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'" *Polay v. McMahon*, 468 Mass. 379, 386 (2014) (quoting *Roman v. Trustees of Tufts College*, 461 Mass. 707, 718 (2012)). "The standard for making a claim of intentional infliction of emotional distress is very high." *Id.* (quoting *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996)). The ensuing distress must be so severe "that no reasonable man could be expected to endure it." *Davignon v. Clemmey*, 322

F.3d 1, 8 n.2 (1st Cir. 2003).

Ms. Read purports to have suffered "severe emotional and physical distress" from the Commonwealth Witnesses' representations to law enforcement and other acts. Compl. at ¶¶ 157-59. These allegations fail to adequately plead an IIED claim. First, courts recognize that IIED claims cannot survive where the basis of the purported distress stems from an arrest supported by probable cause. *See Sholley v. Town of Holliston*, 49 F. Supp. 2d 14, 22 (D. Mass. 1999); *see also Sena v. Com.*, 417 Mass. 250, 264 (1994) ("Neither applying for an arrest warrant, nor making an arrest pursuant to an issued warrant can be considered utterly intolerable in a civilized community.") (quotation and citation omitted). And even where probable cause is lacking (which, in Ms. Read's case, it clearly was not[11]), distress associated with "wrongful" arrests is "not sufficiently outrageous." *Compare Wynn v. Schmidt*, 2017 WL 4169746, at *13 (D. Mass. Sept. 20, 2017) and *Lund v. Henderson*, 22 F. Supp. 3d 94, 106 (D. Mass. 2014) ("The plaintiff has cited no case in which an unlawful arrest alone . . . has been found to reach the level of 'extreme and outrageous conduct'"), *with Limone v. U.S.*, 579 F.3d 79 (1st Cir. 2009) (IIED found where law enforcement "knowingly participated in the events leading to the wrongful . . . incarceration of [] scapegoats and engaged in egregious governmental misconduct," including by assisting an informant in doctoring their original statement and bribing the informant). Additionally, the fact that the Commonwealth Witnesses would not even have been under a legal duty to report exculpatory evidence to the police if that had any, discussed *supra*, Section (C)(3), undermines Ms. Read's allegations that their conduct was sufficiently outrageous for purposes of an IIED claim. *C.f. Galvin v. U.S. Bank, N.A.*, 852 F.3d 146, 161 (1st Cir. 2017) (holding that the standard is "very high" and is not met even if the defendant "acted with an intent which is tortious ***or even***

---

[11] *See generally* Tuxbury Decl., Ex. A.

*criminal*, with malice, or with a degree of aggravation which would entitle the plaintiff to punitive damages for another tort") (emphasis added) (internal quotations omitted).    Overall, the Complaint's conclusory accusations merely recite routine harm associated with the vicissitudes of litigation, which is wholly insufficient to assert an IIED claim against any of the Commonwealth Witnesses.  *See, e.g.*, *Guckenberger v. Bos. Univ.*, 957 F. Supp. 306, 319 (D. Mass. 1997) ("[T]he mere fact that the defendants' conduct may turn out to be violative of the plaintiff['s] civil rights does not . . . necessitate a finding that the conduct is sufficiently egregious to state a claim for [IIED].") (citation omitted).

<h2 align="center"><u>CONCLUSION</u></h2>

For the foregoing reasons, the Court should dismiss Ms. Read's Complaint against the Commonwealth Witnesses, award the Commonwealth Witnesses their attorneys' fees for filing these motions, and award any other relief that the Court deems just and proper.

Dated: January 23, 2026

Respectfully submitted,

BRIAN ALBERT, NICOLE ALBERT, JENNIFER McCABE, MATTHEW McCABE, and BRIAN HIGGINS

By their attorneys,

*/s/ James L. Tuxbury*

James L. Tuxbury (BBO #624916)
Kieran T. Murphy (*pro hac vice* forthcoming)
HINCKLEY, ALLEN & SNYDER LLP
28 State Street
Boston, MA 02109
Telephone: 617-345-9000
jtuxbury@hinckleyallen.com

30 South Pearl Street – Suite 1101
Albany, NY 12207
Telephone: 518-396-3100
kmurphy@hinckleyallen.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed through the ECF system on January 23, 2026, and will be sent electronically to any registered participants identified on the Notice of Electronic Filing.  Additionally, I certify that on January 23, 2026, a copy of the foregoing document was sent via email to counsel of record for Plaintiff listed below:

Aaron Davis Rosenberg, Esq.,
Sheehan Phinney Bass and Green PA
28 State St., 22nd Floor
Boston, MA 02109

Damon M. Seligson, Esq.,
Sheehan Phinney Bass and Green PA
28 State St., 22nd Floor
Boston, MA 02109

Charles Waters, Esq.,
Sheehan Phinney Bass and Green PA
28 State St., 22nd Floor
Boston, MA 02109

*/s/ James L. Tuxbury*
James L. Tuxbury