# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

KAREN READ,

        Plaintiff,

v.

MICHAEL PROCTOR, in his personal capacity; SGT. YURIY BUKHENIK, in his personal capacity; LT. BRIAN TULLY, in his personal capacity; TOWN OF CANTON; BRIAN ALBERT; NICOLE ALBERT; JENNIFER McCABE; MATTHEW McCABE; and BRIAN HIGGINS,

        Defendants.

Civil Action No. 1:25-cv-13588-DJC

## AMENDED COMPLAINT

### I.    Introduction

1.    For three and a half years, Plaintiff Karen Read was wrongly accused of homicide and subjected to suspicion, arrest, two prosecutions, and public condemnation, all resulting from the gross misconduct of the Massachusetts State Police ("MSP") - and those working in tandem with the MSP - to shield from liability the party or parties responsible for the death of Boston Police Officer John O'Keefe III.  Now, after being acquitted of all charges relating to Mr. O'Keefe's death, Ms. Read brings this action to recover for and address the actions of those actually involved in Mr. O'Keefe's death and the law enforcement officers who abjectly failed to ensure that justice was sought and served in the aftermath of January 29, 2022.

2.    Karen Read did not kill her then-boyfriend, Mr. O'Keefe.  Rather, in the early morning hours of January 29, Mr. O'Keefe was killed in Defendants Brian and Nicole Albert's home at 34 Fairview Road in Canton ("House") in an altercation during a late-night house party

with other Defendants (collectively, the "House Defendants") after a night of heavy drinking. The House Defendants responsible for Mr. O'Keefe's death – some of whom had professional experience with police investigations – concocted a plan immediately after the altercation to avoid culpability and to frame Karen Read. Rather than call first responders for help, among other actions, the House Defendants conducted a Google-search for information about "hos long to die in the cold," moved Mr. O'Keefe's body outside, and placed him on the Alberts' front lawn near the road to make it look like Mr. O'Keefe was hit by a vehicle and that he died in the snow without ever coming into the House that night. Mr. O'Keefe's body remained on the Alberts' lawn until Karen Read found him later in the morning.

3.     From the beginning, investigators from the MSP allowed the House Defendants to direct the investigation away from themselves, and towards Ms. Read. The House Defendants were a well-connected and close social group with strong ties to law enforcement. The Alberts are a prominent family in Canton, and the investigating police officers knew them well. The lead investigator for the MSP, Michael Proctor, grew up in Canton and resides there to this day. He has been, and remains, close personal friends with the Albert family. House Defendant Brian Albert was a long-time Boston Police Department officer, and House Defendant Brian Higgins was an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

4.     Adhering to the unwritten rule of "protecting their own," Proctor and his MSP colleagues intentionally disregarded the obvious and compelling evidence tying the House Defendants to Mr. O'Keefe's murder. Specifically, Mr. O'Keefe's injuries were consistent with a physical altercation. He had bruises and lacerations on his face, and a deep gash to the back of the head – suggesting that he was punched and fell backwards hitting his head on a ridged surface. He also had dog bite wounds and scratches on his right arm and forearm. Equally

evident, Mr. O'Keefe did *not* have a single injury consistent with being struck by a vehicle. He did not have any broken bones, or even a bruise on his legs, feet, arms, shoulders, torso, back, ribs, or anywhere below his neck that a medical examiner would otherwise expect to find on a person struck and killed by an impact from a three ton vehicle. And, to erase any doubt, the Commonwealth's own medical examiner - the pathologist who conducted the autopsy for the Commonwealth - concluded that Mr. O'Keefe's body showed *no signs* of a vehicular strike.

5.    Despite that, Proctor and others shielded the House Defendants by intentionally sidestepping fundamental investigatory procedures. Propelled by the House Defendants' false statements, including that Mr. O'Keefe "never went into the house," Proctor reported in text messages just hours into the investigation that the House Defendants weren't going to get any "shit for this," because "he's [Brian Albert] a Boston cop," and that Proctor was determined "to make [the investigation] cut and dry" by bringing "charges against the girl." Indeed, Proctor made his intentions clear in writing: Karen Read had "zero chance [of] skating…she's fucked." This pronouncement was a mere 16 hours after Mr. O'Keefe's body was discovered on the Alberts' lawn - and Proctor had not even walked into the House, let alone investigated inside the House.

6.    True to his promise, Proctor and his colleagues did not search the House for blood evidence resulting from the gash to the back of Mr. O'Keefe's head, or for fingerprints, or for DNA evidence. Proctor did not search the House despite the fact that Mr. O'Keefe was discovered without a winter coat, without the hat that several witnesses said he had been wearing that night, and without his left shoe. At Proctor's direction, the House was never processed by a criminalist or even photographed. No member of the MSP, including Proctor, set foot inside 34 Fairview for nearly *a week*. The police did not examine or take evidence from the Alberts'

German Shepherd that was in the House on January 29 – a dog that had a history of attacking other dogs and people.

7.     Neither Proctor nor any of the MSP troopers conducted physical examinations of the House Defendants for evidence of involvement in the altercation, such as marks on their hands, knuckles, or face, or bruises on their bodies.  They did not seize or search the House Defendants' phones – except that which belonged to Jennifer McCabe, who turned her phone over only after making Settings changes to the phone on February 2, 2022.  They conducted only perfunctory unrecorded conversations with Proctor's friends and acquaintances without any attempt to corroborate their stories.  They permitted would-be witnesses to communicate with each other and coordinate their stories *before* any formal interviews.  They allowed critical evidence to be manipulated in some instances, and outright destroyed in others.  In short, by focusing the investigation solely on Ms. Read as implicitly directed by the House Defendants through the misrepresentations they made to police, Proctor and his colleagues disregarded and failed to obtain pertinent interviews and other critical evidence from the House Defendants that cannot now be recovered or recreated.

8.     Proctor also secretly communicated with the Alberts on his personal phone, deliberately back-channeling those communications to circumvent his state-issued device, and used his sister as a conduit.  For instance, on multiple occasions Proctor disclosed critical and confidential information about the investigation to his sister, who passed that information to her close friend, Julie Albert, Brian Albert's sister-in-law.  Julie Albert then passed that same information on to the rest of her family and the House Defendants.  Part of these communications included Julie Albert's promise to buy Proctor a "thank you gift" for handling this investigation in a manner that intentionally avoided implicating the House Defendants and

singularly focused on Ms. Read.

9.    Proctor then went so far as to manufacture evidence to ensure that Ms. Read, not his friends and fellow law enforcement officers, was blamed for Mr. O'Keefe's death.  This included planting evidence at the scene, on Mr. O'Keefe's clothes, and on Ms. Read's vehicle to support the false narrative that Ms. Read hit Mr. O'Keefe with her car, even though he knew Mr. O'Keefe's injuries were *inconsistent* with a motor vehicle strike, and *consistent* with a physical altercation and dog attack.

10.    Far from conducting an objective investigation with integrity, Proctor personally sexualized and dehumanized Ms. Read throughout the investigation.  Specifically, Proctor's private communications to his high school buddies, sister, and MSP colleagues – that he believed would never be discovered – expose the corruption and bias at the core of MSP's entire investigation.  Specifically, only hours into the investigation, in a text chain with eight of his high school buddies, Proctor stated that Ms. Read is a "whack job c—t," "retarded," a "nut bag," and "a babe [with] no ass."  Proctor further ridiculed and derided Ms. Read for her serious medical condition, stating that her "balloon knot" "leaked poo."   In other private text messages to his MSP supervisors and colleagues, Proctor bragged that while conducting a search of Ms. Read's phone he was looking for naked pictures of Ms. Read.  Disappointed, he reported that there were "no nudes so far."  In an unfiltered utterance, Proctor revealed his true mindset: "Hopefully she kills herself."

11.    Indeed, Proctor's supervisors and the MSP knew about and condoned Proctor's unlawful conduct – and in some instances, expressly encouraged this flagrant abuse of power.  For example, on one occasion Proctor's immediate supervisor, Yuriy Bukhenik, responded with " 👍 " (a thumbs-up emoji) to a text calling Ms. Read "retarded."  Proctor's supervisors and the

MSP knew Proctor had a close relationship with the Alberts and that he made no secret of his bias against Ms. Read, demonstrating a clear prejudice against her from the outset.

12.    Relying on manufactured evidence, actively ignoring exculpatory evidence, and without investigating obvious signs pointing toward the House Defendants, the Commonwealth secured two separate arrest warrants for Ms. Read and a knowingly-baseless indictment against her, and then wrongfully prosecuted her for murder - twice.  As alleged below, these unlawful acts not only underly Plaintiffs' meritless wrongful death claim against Ms. Read, but they also form the foundation for Ms. Read's claims against the Defendants.  These acts violated Ms. Read's state and federal constitutional rights, the Massachusetts Civil Rights Act, and well-established Massachusetts tort principles.

13.    On June 18, 2025, after a two-month trial, a jury rejected the Commonwealth's theory, in part, because the overwhelming physical, scientific, and medical evidence established that Ms. Read's vehicle did not strike Mr. O'Keefe, and that Mr. O'Keefe's injuries did not come from a vehicle strike.  Although Ms. Read was ultimately and finally acquitted of *all charges* related to the death of Mr. O'Keefe, Proctor was fired, and nearly every MSP officer in Proctor's chain of command was disciplined for their egregious abuses and misdeeds, the Commonwealth still has not sought or provided justice - not to the O'Keefe family, not to the community at large, and certainly not to Ms. Read.

14.    In response, the Commonwealth has offered only empty platitudes instead of solutions.  The head of MSP, Col. Geoffrey Noble stated: *"The events of the last three years have challenged our Department to thoroughly review our actions and take concrete steps to deliver advanced investigative training, ensure appropriate oversight, and enhance accountability. Under my direction as Colonel, the State Police has, and will continue to,*

*improve in these regards."*  In an interview, with <u>The Boston Herald</u>, Noble acknowledged the systemic nature of MSP's conduct in Ms. Read's case: "*I'm eyes wide open to a culture issue that I have concerns with as it relates to Trooper Proctor.*"  These hollow words do nothing to right the devastating wrongs that have been visited on Ms. Read.  Col. Noble's words confess a sickness deep in the marrow of the MSP, but offer no remedy, no medicine, no relief to someone so brutally victimized by it.

15.    On March 19, 2025, following the public disclosure of Proctor's illegal and unethical conduct related to the Read investigation, the MSP's Trial Board found Michael Proctor "GUILTY" of a Class A violation, which included "*that he was biased in his dealings with a homicide suspect and/or brought otherwise himself and the Massachusetts State Police into disrepute.*"

16.    Ms. Read's life was not merely turned upside down by the MSP's and the House Defendants' misconduct, it was forever changed by the Defendants' transgressions and wrongdoing.  The years of uncertainty and unimaginable emotional distress have left lasting scars that will never heal.  At the same time, neither Mr. O'Keefe nor his family has received justice.  His killer, or killers, still walk free.  By asserting her claims against MSP, Proctor, his supervisors, the Town of Canton, and the House Defendants, Ms. Read seeks, at minimum, to confront and redress these wrongs and others.  More importantly, she seeks to force the Commonwealth to fulfill its duty to stop law enforcement from trampling the innocent to protect their own.

## II.    <u>Parties</u>

17.    Plaintiff Karen Read is an individual residing in North Dighton, Massachusetts.

18.    Defendant Michael Proctor ("Proctor") is a former Massachusetts State Police

trooper, residing in Canton, Massachusetts.  He is being sued in his personal capacity.

19.    Defendant Sgt. Yuriy Bukhenik ("Bukhenik") is a Massachusetts State Police trooper, residing in Stoughton, Massachusetts.  He is being sued in his personal capacity.

20.    Defendant Lt. Brian Tully is a Massachusetts State Police trooper, residing in Hingham, MA.  He is being sued in his personal capacity.

21.    Defendant Brian Albert is an individual residing in Norwood, Massachusetts.

22.    Defendant Nicole Albert is an individual residing in Norwood, Massachusetts.

23.    Defendant Jennifer McCabe is an individual residing in Canton, Massachusetts.

24.    Defendant Matthew McCabe is an individual residing in Canton, Massachusetts.

25.    Defendant Brian Higgins is an individual residing in Sandwich, Massachusetts.

**III.    Jurisdiction**

26.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1367. This case was removed to this Court by certain Defendants pursuant to 28 U.S.C. § 1441.

**IV.    Facts Common to All Counts**

*Mr. O'Keefe's Death*

27.    Before his death, Mr. O'Keefe and Ms. Read were dating.

28.    On the evening of January 28, 2022, Mr. O'Keefe and Ms. Read went out for the night.  They first went to C.F. McCarthy's in Canton, where they had several drinks.  They then went to the Waterfall Bar in Canton.

29.    There, they met up with a group of acquaintances including Brian Albert, his wife Nicole Albert, Brian's brother Chris Albert, and his wife Julie, Jennifer McCabe (Nicole's sister and Brian's sister-in-law), her husband Matthew McCabe, and Brian Higgins.  The group of

acquaintances had several drinks and planned to continue the party back at the Alberts' home in Canton at 34 Fairview Road (the "House").  House Defendant Jennifer McCabe told John O'Keefe that he should come to the House.

30.    The group had overlapping social relationships.  At the time, Brian Albert was a Boston police officer, as was Mr. O'Keefe, though they did not know each other well.  Brian Albert and Brian Higgins were close friends.  Higgins resided in Canton for many years through January 2022, and was an officer with the ATF.  He also was permitted to keep an office at the Canton Police Department ("CPD") alongside Brian Albert's brother, Canton Police Detective Kevin Albert.  Kevin Albert had a professional and social relationship with Michael Proctor as well as with Brian Higgins.  Higgins had been on a trip with both Brian and Kevin Albert in the days preceding January 29, 2022.

31.    Brian and Nicole Albert's son, Brian Albert Jr., and his friends were already at the House for Brian Jr.'s birthday.  In addition, Colin Albert (Brian Albert's nephew) was present.

32.    Ms. Read and Mr. O'Keefe had never been to the House before January 29, 2022. They arrived in front of the Alberts' home around 12:20 am.  Ms. Read was reluctant to attend the party for several reasons, including that she was unsure whether they were at the correct location, and whether they were even welcome to the late-night party.  Mr. O'Keefe got out of Ms. Read's SUV and indicated that he would check out the party, and report back to her.  Mr. O'Keefe walked toward the front door / garage door area of the House and entered one of the two doors.  According to O'Keefe's Apple Health data, his final steps covered just enough distance to get from the foot of the driveway and into the house or garage.  A period of time passed without any word from Mr. O'Keefe. Ms. Read, who was still hesitant to join, presumed that Mr. O'Keefe intended to stay, and therefore, she left to go home without him.

9

33.    At some point after entering the House/garage, Mr. O'Keefe was involved in a physical altercation either inside the House or garage.  During that altercation, the Alberts' German Shepherd attacked him and Mr. O'Keefe sustained multiple dog bites and scratches on his right arm.  He also suffered an incapacitating contrecoups wound on the back of his head.  Mr. O'Keefe's head wound was caused by falling backward and striking a ridged surface.  The Alberts' garage contains such surfaces.  By contrast, the head wound could not have been caused by a vehicle strike or falling backward onto a flat, cold lawn, like the Alberts'.

34.    Because of their knowledge of criminal investigations, the Alberts, the McCabes, and Higgins (House Defendants) knew that calling for medical care to help save Mr. O'Keefe's life would trigger immediate and irreversible risk of their own criminal exposure.  Therefore, at least the five of them agreed on a simple plan to exonerate themselves and implicate Ms. Read: they would tell anyone who inquired that Mr. O'Keefe "never entered the house," and hide evidence that he was there, including his body.

35.    Sometime during the night, they re-positioned a Ford Edge vehicle at a spot adjacent to the front lawn, which obscured the view of that area of the lawn from potential passersby.  At some point further in the night, they carried or dragged Mr. O'Keefe's body to that same area in the yard, close to where one or more of them later claimed Ms. Read dropped off Mr. O'Keefe earlier that night.  The plan was devised to make it appear that Mr. O'Keefe had been struck by Ms. Read's vehicle and then died as a result of exposure to the cold.

36.    Mr. O'Keefe was either dead when the House Defendants left him on the Alberts' lawn, or he died shortly thereafter.

37.    After the physical altercation, Higgins left the House and drove to the Canton Police Department in the middle of the night.  He later told investigators he had to do some

"administrative work," but then changed his story subsequently stating that he drove to the station because he had to move cars in the parking lot due to the snowstorm, even though he could have done that earlier in the evening when he was at the station to drop off Kevin Albert. However, video from inside the station shows Higgins walking down the hallway and surreptitiously entering offices while wearing a hoodie to obscure his face. Surveillance video outside reveals Higgins transporting a large bag from one vehicle to another before driving away.

38.    After leaving the police station, Higgins and Brian Albert continued to coordinate their stories by calling each other multiple times in the early morning hours, and ultimately spoke with each other on their cell phones at 2:22 a.m. Later, both Brian Albert and Higgins denied the existence of these phone calls, and then when confronted with their existence by a "separate law enforcement agent" (a non-MSP and non-CPD law enforcement agency) at a "separate proceeding," they coordinated the same exact lie, falsely claiming the multiple calls, answers, and hang-ups were just "butt dials." However, five minutes after the Higgins/Albert call, Ms. McCabe performed a Google search on her phone at 2:27 a.m.: "Hos long to die in cold," misspelling the first word.

### Ms. Read Searches for Mr. O'Keefe

39.    Ms. Read began the search for Mr. O'Keefe on January 29 just before 5 a.m. when she awoke and realized he had not returned home. She phoned House Defendant Jennifer McCabe, who already knew exactly what had happened to Mr. O'Keefe. McCabe insisted that Ms. Read drive to McCabe's house rather than to 34 Fairview Road, which Ms. Read did. At the exact same minute Ms. Read left Mr. O'Keefe's home, 5:07 a.m., McCabe made a 38 second phone call to her sister Nicole Albert at 34 Fairview. Nicole Albert said she was asleep until

after 6 a.m. and Jennifer McCabe, when confronted with the call artifact at trial, claimed not to have any knowledge of the call. Ms. Read and McCabe were then joined by Kerry Roberts, and the three of them left the McCabe residence. However, rather than go to 34 Fairview, oddly, McCabe directed them to go *back* to Mr. O'Keefe's home – where Ms. Read had just come from. After, the three of them finally drove to 34 Fairview. The illogical, McCabe-directed route to 34 Fairview was intentional. It allowed the House Defendants more time to finish creating the scene and hiding evidence before Mr. O'Keefe's body was discovered on the Alberts' lawn, and first-responders arrived.

40.    As they approached the House, with Roberts driving, Ms. Read saw Mr. O'Keefe almost immediately. She screamed for Roberts to stop the vehicle, and jumped from the moving car to run to Mr. O'Keefe. She began rendering aid, including CPR. As the House Defendants had planned, Mr. O'Keefe's body was "discovered" in front of the Alberts' house near a flagpole and fire hydrant on the left side of the Alberts' property as seen from the roadside. The Ford Edge, which had been parked in a position to obscure Mr. O'Keefe's body in the middle of the night, had been moved.

41.    While Roberts joined Ms. Read with administering CPR, McCabe did not help or even approach Mr. O'Keefe. Rather, she sat in the cab of the vehicle, called 9-1-1 and reported that "there's a man passed out in the snow." Despite knowing that her brother-in-law Brian Albert - a police officer and first-responder - was just feet away inside the House, McCabe *never went into the House* or requested that Albert come down to help Mr. O'Keefe. Rather, as Mr. O'Keefe lay dying in the snow, McCabe stood and watched with no fear, urgency, or even concern for her family members residing mere feet away.

*Investigation Begins*

42.    The CPD were the first on the scene shortly after 6 a.m.  At the time, there was no evidence that Mr. O'Keefe had been hit by a vehicle.  In fact, the evidence suggested just the opposite.  His body did not show signs of trauma commonly associated with being struck by a car.  There were no bone fractures or trauma to his lower body, his torso, or any other part of his body as investigators would expect from a vehicle strike.  Rather, Mr. O'Keefe's injuries were consistent with being physically assaulted to the face and head, and attacked by a dog.  For good reason, the ranking CPD officer on the scene, Sgt. Michael Lank, opined on a telephone call to MSP homicide, captured on a dashcam audio, that Mr. O'Keefe looked like he had been in a fight.

43.    Moreover, the initial search conducted by Canton police officers revealed that there was no vehicle debris on the lawn at 34 Fairview, let alone any debris at or near Mr. O'Keefe's body.  Not a single piece of taillight material was discovered on the lawn or in the roadway that morning, notwithstanding multiple searches and the use of a leaf blower to remove snow.

44.    Tellingly, despite the commotion outside, including more than a dozen first responders, three police cruisers, two ambulances, a ladder fire engine - all with their emergency lights flashing - and at least two civilian vehicles, plus Ms. Read's screams upon finding Mr. O'Keefe's body, no one from the Alberts' house, including police officer Brian Albert, ever went outside to see what was happening, let alone help.  They wanted to avoid scrutiny from the police investigators.

45.    Sgt. Lank was a long-time friend of the Alberts and the first law enforcement officer to enter the House.  He spoke to the Alberts and the McCabes.  Pursuant to their plan, the Alberts and the McCabes told Sgt. Lank that Mr. O'Keefe had never entered the Alberts' house

the night before.  The Alberts' and McCabes' statements were false.  Mr. O'Keefe arrived at and entered the House or garage, where he was assaulted, attacked by the Alberts' dog, and suffered a fatal injury to the back of this head.

46.    Despite Mr. O'Keefe's injuries being wholly inconsistent with the story the House Defendants were now telling him, neither Sgt. Lank nor any other member of the CPD searched the House to determine whether the occupants - or anyone else - were involved in Mr. O'Keefe's death.  Nor did they request to search the occupants' cell phones, observe their bodies for evidence of a fight, or even secure the scene where Mr. O'Keefe's body was found.  They failed to do so because of bias borne of friendship and loyalty in favor of the Alberts and McCabes.

47.    After Sgt. Lank returned to the CPD, three hours after the discovery of Mr. O'Keefe's body, and more than two hours after being interviewed at the Alberts' home that morning, Jennifer McCabe called Sgt. Lank to report that she "recalled" additional information. Except for this one call to Sgt. Lank, McCabe deleted from her phone evidence of all other phone calls she made and received from January 28 to just before 9 a.m. on January 29. As part of the plan to implicate Ms. Read and remove suspicion from the House Defendants, she falsely told Sgt. Lank that Ms. Read told her twice that morning, "I hope I didn't hit him."  More than a year later, at a separate proceeding, McCabe changed her story on this topic yet again. In furtherance of the House Defendants' plan, McCabe then falsely reported that Ms. Read outright confessed to hitting Mr. O'Keefe right after she first found him in the snow.

### Proctor Leads MSP Investigation Despite Conflicts

48.    Michael Proctor was assigned as the case officer and had primary responsibility for the MSP investigation of Mr. O'Keefe's death.  Sgt. Yuriy Bukhenik was Proctor's direct supervisor. Lt. Brian Tully was the supervisory officer at the Norfolk County State Police

Detective Unit, and thus supervised both Bukhenik and Proctor.  In their roles, Bukhenik and

Tully both knew at all times the exact extent of Proctor's misconduct in investigating Mr.

O'Keefe's death, as described below.

49.    From the beginning, Proctor should never have been assigned as an investigating

officer - let alone the lead investigator.  He grew up and resides in Canton, is a good friend of the

Alberts, and had known the family for years. Proctor and Julie Albert, Brian Albert's sister-in-

law, had each other's personal cell phone numbers.   In fact, just days before Mr. O'Keefe's

death, Proctor communicated with Julie Albert about babysitting Proctor's minor child.

Proctor's sister, Courtney, was also a close friend of Julie, and lived walking distance to the

Alberts' home at 34 Fairview Rd.  In fact, Proctor's own mother referred to the Alberts as the

Proctors' "second family."  The existence of these relationships was intentionally suppressed by

Proctor and other members of the MSP, including Bukhenik and Tully, in an effort to ensure that

the House Defendants were protected, and that Ms. Read's right to a fair investigation and trial

were undermined.

### Proctor, Bukhenik, and Tully Engage in a Corrupt and Biased Investigation By Not Investigating Inside the House, and Interviewing House Defendants as Friends Rather than Suspects

50.    Proctor, Bukhenik, Tully, and the MSP never searched for DNA evidence inside the

House, never looked for ridged surfaces that could have caused the gash on the back of Mr.

O'Keefe's head, never inspected the House Defendants' bodies for indication of bruises or cuts

that resulted from an altercation, and did not search the House Defendants' cell phones with the

exception of Jennifer McCabe.  This allowed potential evidence to be destroyed, disposed of,

removed, or simply become unrecoverable.

51.    Proctor's, Bukhenik's, and Tully's interviews of the House Defendants were also

outside of normal protocol. They were all interviewed either at their home, their family member's home, their lawyer's home (in the case of Brian Higgins), their lawyer's office (in the case of Brian Jr. and Caitlin Albert), their place of employment, or over the phone. These interviews were each untimely, unrecorded, and fundamentally designed to protect the House Defendants. And, the House Defendants took full advantage of it.

52.     Specifically, Jennifer McCabe became the point person for the House Defendants in providing their false narrative to investigators, and continued to serve that role for years.

53.     She managed and communicated details about the House Defendants' messaging and the investigation itself, including visiting Proctor's and other investigators' private residences, mapping out timelines to coordinate statements with other witnesses, leading group text-message chains that were later partially deleted, and planning private meetings at all hours of the day and night. Indeed, these were never the acts of innocent witnesses seeking to help an investigation concerning the death of an alleged friend. Rather, they were predicate acts of a conspiracy among a group of people with a shared goal of deflecting their criminal exposure onto someone else.

54.     McCabe was wildly active on her phone in the immediate aftermath of the House altercation that killed Mr. O'Keefe. Her cellular data reveals that she arrived back at her home at 12 Country Lane at 2:12:38 a.m. on January 29; her phone was unlocked between 2:23:41 a.m. and 2:31:07 a.m.; text messages were sent between 2:25:11 a.m. and 2:25:26 a.m.; two screenshots were deleted at 2:26:37 a.m.; her Apple Health recorded steps throughout the night after she arrived home - at 2:14:03 a.m., 2:15:33 a.m., 2:16:34 a.m., 2:17:38 a.m., 2:18:32 a.m., 2:19:23 a.m., 2:21:10 a.m., 2:22:22 a.m., 2:23:20 a.m., 2:31:44 a.m., 2:33:07 a.m., 2:31:44 a.m., 2:33:07, 3:51:37 a.m., and 3:51:45 a.m.; 18 calls were deleted between 5:33:47 a.m. and 8:50:15

a.m.; and an outgoing call to Nicole Albert at 5:07:21 a.m. The last cellular artifact is particularly revealing because McCabe's call to her sister occurred one hour *before* John O'Keefe's body was discovered – mere moments after a 43 second call at 5:05:14 a.m. during which Read and McCabe agreed to go searching for O'Keefe (Ring video from One Meadows shows Read leaving the property at exactly 5:07 a.m.).

55.     McCabe's coordination continued on February 1, 2022, when she worked with another witness – Kerry Roberts – to draft a timeline in order to align their stories regarding what had occurred on January 29.  They did this in preparation for Roberts's interview with MSP, which occurred *at the McCabes' residence* despite MSP's protocol to separate witnesses when interviewed.

56.     While MSP interviewed Roberts, McCabe simultaneously texted her husband, Matthew McCabe, Nicole Albert, and Brian Albert, saying, "She's telling them everything", "all the stuff." Nicole Albert responded, "Good" and "call us after."

57.     Two months later, after being prodded and influenced by McCabe and the other House Defendants, Roberts changed part of her story to better fit with Jennifer McCabe's own false statements. Specifically, Roberts testified falsely in a state grand jury proceeding on April 26, 2022 that she heard Ms. Read ask McCabe to Google "hypothermia."  She had not made this claim in any of the (at least) three interviews she gave to MSP investigators in the days after Mr. O'Keefe's death, in part, because it never happened.

58.     Kerry's new (and false) story to the state grand jury aligned exactly with McCabe's testimony that Ms. Read asked her to Google hypothermia.  Roberts even adopted McCabe's (false) claim that Ms. Read had supposedly asked the question while praying in a CPD cruiser outside of 34 Fairview Road.

17

59.    Later, Roberts conceded that she *never* heard Ms. Read ask McCabe to Google *anything*. She admitted this a year later at a separate proceeding on April 19, 2023 conducted by different law enforcement authority (not Proctor and MSP), and again during Read's criminal retrial in 2025.

60.    The House Defendants deleted many of their texts among themselves and others in the aftermath of Mr. O'Keefe's death.  The texts captured before deletion or recovered later, also reveal some of the House Defendants' planning.  For instance, on the evening of January 29, Jennifer McCabe texted with her sister, Nicole Albert, that Kerry Roberts, who was present when Mr. O'Keefe's body was found: "talked to cops and kept it simple."  Of course, there would be no reason to report back to other House Defendants about Roberts "keep[ing] it simple," unless what really happened was more *complicated*.  Proctor, Bukhenik, and the MSP never sought these communications, rather, they were obtained by Ms. Read's defense attorneys' repeated motions to compel access to data on Jennifer McCabe's iPhone.

61.    Later, in other group texts with Jennifer McCabe and Brian and Nicole Albert, Matthew McCabe suggested having Chris Albert publicize their crafted story to a reporter, saying "Ask Chris to ask some questions. Tell them the guy never went in the house."  As an endorsement of the plan, Brian Albert responded: "Exactly."

62.    Importantly, the text messages from the House Defendants' phones that were ultimately recovered and that provide a window into their conspiracy and misconduct, as well as MSP's unlawful investigation, were not the product of CPD or MSP's investigative work. Rather, based on media reports raising serious questions about MSP's investigation and the House Defendants' role in Mr. O'Keefe's death, another "separate law enforcement agency" began its own subsequent investigation.  That investigation – and not MSP's – resulted in

obtaining (some of) the House Defendants' phones, taking statements from the House

Defendants, and conducting "a separate proceeding," all of which MSP refused to do itself.

Indeed, the evidence procured by the "separate law enforcement agency's" investigation

demonstrates the House Defendants' conspiracy and unlawful conduct, as well as MSP's bias and

corruption.

63.    Proctor and Bukhenik initially interviewed the McCabes and Brian Albert on

January 29 at the McCabes' home at 12 Country Lane in Canton, at which time they again

falsely stated that Mr. O'Keefe never entered the Alberts' home. However, Jennifer

McCabe's cell phone location data shows that she was at 34 Fairview all morning, leaving

at 11:15 a.m., just in time to meet Proctor at 12 Country Lane at 11:30 a.m.

64.    According to Proctor, he was at CPD, just a mile from 34 Fairview, before

proceeding to the McCabes' home for their scheduled interview.  At that point, Proctor had

still not inspected 34 Fairview, and had not interviewed either the McCabes or the Alberts.

He could have done both simply by driving a mile to 34 Fairview where both the McCabes

and the Alberts were minutes earlier, rather than drive across town minutes later in a

snowstorm.  He did this intentionally to avoid 34 Fairview, where he would have been

required to inspect the House and property and make reportable observations.  He also

wanted to make the McCabes and Alberts more comfortable for their interviews.

65.    Bukhenik and Proctor did not interview Nicole Albert and Brian Higgins until

February 3, 2022, did not interview Chris and Julie Albert until February 10th (nearly two

weeks after Mr. O'Keefe's death and more than a week after Ms. Read was arrested and

charged), and did not interview Caitlin Albert and Brian Albert Jr. until September 15,

2023 - nearly two years later.  Before both interviews, the McCabes and Alberts continued

to coordinate their stories, as evidenced in group texts.

66.    Proctor, Bukhenik, and Tully likewise failed to conduct a meaningful investigation into Higgins's involvement.  When Proctor and Bukhenik interviewed Higgins on February 3, at Higgins' attorney's home in Sharon, Massachusetts, Higgins presented the troopers with a select set of self-curated texts between himself and Ms. Read.  They learned that Higgins and Ms. Read had been exchanging flirtatious texts and that Higgins reported at least one instance in which Ms. Read and Higgins had kissed while at Mr. O'Keefe's house mere weeks before his death.

67.    Rather than pursuing Higgins as a possible suspect, Proctor, Bukhenik, and Tully refused to investigate the matter further.  They never interviewed Higgins again, even after surveillance video revealed Higgins was suspiciously hiding his face in the halls and the parking lot of CPD at 1:30 a.m. on January 29.  The video contradicts Higgins's statements about his actions that night.  However, not only did Proctor, Bukhenik, Tully, and MSP not investigate what Higgins was doing or what was in the bag he was carrying in the video, but they went so far as to hide this video from Ms. Read and her criminal defense attorneys for years.  Ms. Read's defense did not receive these videos until *after* she stood trial for the first time.  And, even after the "separate law enforcement agency's" investigation revealed late night phone calls between Brian Albert and Brian Higgins, MSP failed to pursue either witness further or seek a full forensic extraction of Higgins's phone or even a simple call log from his cellular provider.

68.    This concerted inaction by MSP, Proctor, Bukhenik, and Tully directly benefited the House Defendants, especially Higgins and Brian Albert, who proceeded to dispose of and destroy their phones just as the criminal court ordered them preserved in response to a motion by Read's criminal defense team.

69.    Specifically, on September 15, 2022, Ms. Read's defense attorneys filed a motion requesting that the court order Brian Albert and Higgins to preserve the contents of their phones. A Superior Court judge held a hearing on that motion on September 22 and announced in open court that the Defendants were required to preserve their phones, signing a preservation letter to that effect on September 23.

70.    Higgins was served with a copy of the court's order on September 30. He later testified that he changed phones and mobile carriers on September 29. Later, in October 2022, Higgins then destroyed his old phone, which was subject to the court's preservation letter. In fact, Higgins went so far as to drive to a military base on Cape Cod, remove the SIM card from the phone, cut the SIM card with scissors he brought with him, and destroy and dispose of the phone and card in two separate dumpsters, before driving back home.

71.    Brian Albert received a copy of the preservation letter sometime between September 23 and 24. He originally testified that he threw away his phone in the "third week of September" 2022, but then later claimed that he did so on September 22, one day before being notified of the court's order and the *same day* Ms. Read's defense attorneys argued in open court that the phones should be preserved.

72.    Higgins' and Albert's destruction of their phones eliminated potentially incriminating communications between them and was a direct result of Proctor's, Bukhenik's, and Tully's intentional refusal to collect important investigative evidence that would be exculpatory to Ms. Read.  Even after learning about the destruction of both witnesses' cell phones, MSP investigators had other avenues they could have used to pursue evidence, such as cellular toll records or simply interviewing Higgins and Albert to inquire about the nature of the late-night communications.  They intentionally ignored these avenues as well.

73.    Not only did Proctor fail to probe his friends' stories, he coordinated with them through his sister.  Proctor spoke to Courtney multiple times a day and knew she was in close contact with, and providing information to, Julie Albert.  Julie and Courtney called each other many times between February 1 and 2, and at least 67 times between February 1 and September 6, 2022.

74.    For example, as he prepared to question Chris and Julie Albert on February 10, Proctor told his sister Courtney that the interview was "not a big deal."  Courtney told Proctor that Julie Albert had been nervous and wanted to give him a "thank you gift" after the interview. To avoid scrutiny, Proctor instructed Courtney to tell Julie to give the gift to his wife, Elizabeth Proctor.

75.    Proctor shared investigatory details with Courtney before they were public.  In the same instance referenced above, when his sister informed him that Julie Albert had been "so nervous" before the interview, instead of investigating further, he shrugged it off, laughed, and asked "Why?"  But Proctor knew exactly why Julie Albert was nervous.  He sought to reassure her by telling Courtney that "it was fine, just a quick convo."  And then after the interview, Proctor spoke to Julie on his personal cell phone in an unreported conversation.  Proctor never treated the Alberts as witnesses in a murder investigation; he protected them and treated them like the family friends that they were.

76.    At one point leading up to the some of the interviews, Jennifer McCabe asked Nicole Albert if she had heard anything more about the investigation. Confident she would learn more from Julie Albert - again, through Courtney - Nicole Albert responded, "We'll get more info tomm. Don't want to text about it."

77.    House Defendants did not "want to text about" their activities and communications

because they tried to hide and/or lie about them. For instance, it was discovered in the second criminal trial that Jennifer McCabe had lied in her sworn testimony in the first trial about not visiting 34 Fairview with Kerry Roberts on January 30 on their way to Sgt. Lank's house. However, while they did not text about this meeting, McCabe's cell phone location data obtained later by Ms. Read's defense reveals that she did, in fact, visit 34 Fairview just one day after O'Keefe's death, and lied about it. Again, this cellular evidence - and the deception by McCabe - was never investigated further by the MSP, despite the fact that they had McCabe's full phone extraction since February 2022.

78. The McCabes, Alberts, and Higgins all told similar false stories to investigators in their interviews, and Proctor, Bukhenik, and Tully accepted their coordinated statements without making efforts to corroborate their stories.

79. For example, Higgins testified before the state grand jury on April 28, 2022 that he parked his Jeep Wrangler in front of 34 Fairview Road for the duration of his stay on January 29, 2022. However, none of the other House Defendants or the percipient witnesses who parked briefly out front around 12:30 a.m. (Ryan Nagel, Heather Maxon, and Ricky D'Antuono) ever testified about seeing any other vehicle parked there, other than Ms. Read's Lexus.

80. Matthew McCabe claims to have seen "v-shaped" tire tracks in the snow; another observation not corroborated by any other witnesses. Further, Brian and Nicole Albert initially told Sgt. Lank of CPD that their daughter, Caitlin Albert, left the house that night around 12:15 a.m. when she was picked up by her boyfriend. However, when Caitlin Albert and Brian Albert Jr. were interviewed in August of 2023, they both testified that Caitlin was the *last* person to leave 34 Fairview that night, at approximately 1:45 a.m.

81. Brian and Nicole Albert clearly made efforts to exclude placing their eldest

23

daughter in the House when Mr. O'Keefe was there. Neither Proctor, Bukhenik, Tully, Lank, MSP, or CPD ever further investigated this 90 minute discrepancy regarding the presence of a key witness to an alleged murder.

### *Rather than Investigate their Friends and Brethren, Proctor, Bukhenik, Tully, and MSP Coordinate with the House Defendants to Target Karen Read*

82.    Instead of taking the routine, objective, and necessary steps of investigating the McCabes, Higgins, and the Alberts, Proctor, Bukhenik, and Tully focused exclusively on Ms. Read as a suspect from the start of the investigation, despite substantial evidence exonerating her and implicating others, just as the House Defendants intended.

83.    Proctor seized Ms. Read's cell phone and her SUV within 30 minutes of interviewing her on January 29.  He arrested her 72 hours later, before reviewing any surveillance from the bars or Ring camera footage, before interviewing exculpatory witnesses, and before the medical examiner's official conclusion that the manner of death "could not be determined" and that there were no injuries to Mr. O'Keefe's body consistent with a vehicle strike.

84.    Much to Proctor's surprise, through the "separate law enforcement agency's" investigation, his contemporaneous text messages were discovered.  Among them, Proctor texted with his high school friends on the evening of January 29, the day he began his investigation. He told them that the MSP had already determined the Alberts were not going to receive any scrutiny about Mr. O'Keefe's death, even though the MSP had not at that point visited the crime scene or been inside the Alberts' home, and had performed only a cursory interview of the McCabes and Brian Albert.

85.    Proctor told his friends that Mr. O'Keefe had been hit by a car and had not been in a fight despite the fact that Mr. O'Keefe had suffered no injuries consistent with a vehicle strike,

but he *did* have injuries consistent with a fight and dog attack. Proctor rejected a friend's belief that Brian Albert, the homeowner of the property where Mr. O'Keefe's body was found, would "receive some shit," instead agreeing with another friend's assumption that "you guys [the MSP] are out to make it cut and dry since it involves cops." Proctor revealed that he had already decided he was "going to put serious charges" on Ms. Read, that she was "fucked," and that there was "zero chance she skates." From the outset, Proctor was determined to *pin it on the girl*.

86. Proctor's supervisors were aware of his bias and conflicted relationships in this investigation. They didn't have to guess - Proctor told them. He told them he knew the Alberts. Text messages from Proctor to Bukhenik and other MSP troopers show Proctor had decided to focus suspicion on Ms. Read to the exclusion of everyone else. He told the troopers that Ms. Read was "retarded" and that he was searching her phone for "nudes" of her. In the text chain, Sgt. Bukhenik "liked" Proctor's text describing Ms. Read as "retarded." Bukhenik received Proctor's texts and never reprimanded Proctor or addressed his improper bias and conduct.

87. Because he was determined to "put serious charges" on Ms. Read, Proctor ignored the fact that the Commonwealth's medical examiner could not conclude that Mr. O'Keefe's death was a homicide, determining instead that the manner of his death could not be determined. The medical examiner also refused to conclude that Mr. O'Keefe died as a result of being struck by a vehicle, and later testified at trial that his injuries were *not consistent* with a car strike. Proctor later admitted that, in his entire career, he had never seen a homicide investigation where the medical examiner could not determine the manner of death. But he remained undeterred in his quest to charge Ms. Read. As he later admitted, the medical examiner's refusal to rule the death a homicide did not matter to him "*because either way Ms. Read was going to be charged*."

***Proctor and Bukhenik Plant Certain Evidence, and Make False Statements in Court and
Other Legal Documents to Frame Karen Read***

88.    Proctor made this investigation "cut and dry" by manufacturing a case against Ms.

Read.  A crucial first step was to ensure that the crime scene and evidence was not secured.  This

was in violation of MSP policy and well-established best practices for critical incident

investigations.  Specifically, the MSP Crime Laboratory requires proper processing of evidence

at major crime scenes, including "crime scene photography and evidence processing, and

recovery of latent fingerprint, footwear, and tire track evidence."  Neither the MSP troopers

involved in the investigation nor the CPD police officers on the scene secured the Alberts' home

or the area where Mr. O'Keefe's body was found.  The MSP did not take any photographs of the

House, including any part of the yard where Mr. O'Keefe's body was found, until February 1,

more than three full days later.   No photographs were ever taken of the inside or garage of 34

Fairview.  This intentional departure from established protocols permitted Proctor and Bukhenik

to generate false incriminating evidence against Ms. Read, and give the House Defendants time

to destroy the actual evidence.

89.    By approximately 2:30 p.m. on January 29 - before he had even met or  interviewed

Ms. Read or seen her Lexus SUV - Proctor had already ordered seizure of the  vehicle at her

parents' home in Dighton.  By 4:17 p.m., the vehicle was in MSP's physical possession.  The

vehicle was then towed to the CPD "sallyport" even though the MSP has at  least two closer

barracks, including Middleboro, the MSP headquarters for accident reconstruction and where the

vehicle would ultimately reside for analysis, and Massachusetts was in the middle of an historic

Nor'easter.  Proctor knew he had more leeway to manipulate evidence regarding the SUV at

CPD than at MSP's facilities and he knew he needed to have that evidence in close proximity to

the crime scene at 34 Fairview Road.

90.    Before the vehicle arrived at the garage, Ms. Read's Lexus's taillight had a minor crack but was intact, an observation ultimately testified to by Dighton Officer Nicholas Barros, who was never interviewed by Proctor or any member of the MSP.  The crack occurred when Ms. Read backed into Mr. O'Keefe's car at 5 a.m. that morning as she was leaving to search for him.  That incident was captured on video. For nearly two years, however, Proctor memorialized the event as Ms. Read's Lexus "coming close" but not hitting Mr. O'Keefe's Chevy Traverse.  Proctor ultimately changed that narrative to admit the vehicles *did* come in contact with each other.

91.    Bukhenik and Proctor followed the vehicle from Dighton and arrived at CPD at 5:35 p.m., just moments after the tow truck with the Lexus.  At some point after the vehicle arrived at the sallyport, the right rear taillight was almost entirely destroyed.  Video taken from different angles in the sallyport shows Bukhenik, Proctor, Canton Police Chief Ken Berkowitz, and other individuals near the taillight, but notably, no video captures the taillight's appearance at the precise time it arrived at the sallyport.  The available surveillance video from the sallyport, as well as a CPD access card swipe log obtained by a separate law enforcement agency, reveal seemingly unfettered access to the sallyport by a myriad of individuals, including Brian Higgins, throughout the evening of January 29, including just before and just after 5:30 p.m.

92.    One or more of them destroyed the taillight, secretly took pieces of it into their possession, and then planted some of them in various places at 34 Fairview and on Mr. O'Keefe's clothes.

93.    Knowing that there were video cameras both inside and outside the sallyport, Proctor and Bukhenik worked together to obscure their role in manipulating the right rear

taillight and then, ultimately, to present false evidence at the first criminal trial.

Specifically, Proctor directed Bukhenik to secure video footage from surveillance cameras located both inside and outside the sallyport garage, which he did. These videos were manipulated in two significant ways. First, a critical 42 minute portion was deleted from the footage from the sallyport "front wall" camera; the portion from 5:08:02 p.m. to 5:50:50 p.m. – which included the exact time Ms. Read's Lexus arrived in the garage and the period Proctor was at the passenger side taillight. This footage would have shown that the taillight was intact. Second, footage from the sallyport "back wall" camera was inverted, which made the right side of the Ms. Read's vehicle appear to be the left side, and *vice versa*. Another camera, "main driveway side exterior," captured the back end of the Lexus as it arrived at CPD but was too grainy to decipher the condition of the passenger taillight.

94. The videos from inside and outside the sallyport - and Proctor's request for Bukhenik to obtain it - was intentionally hidden from Karen Read and her defense attorneys for more than two years to avoid scrutiny. The video was then sprung on them immediately before and during the first criminal trial. One driveway camera's footage was not revealed to the defense until just prior to the start of the *second* trial. In fact, Bukhenik presented one part of the video during his direct testimony under questioning by the assistant district attorney, Adam Lally. Bukhenik narrated the video to the jury, correctly identified that Proctor was at the rear of the vehicle, but claimed that he never approached the right rear taillight area of the vehicle. That testimony, however, was entirely false. As he well knew, the video that Bukhenik authenticated as "fair and accurate" was actually neither "fair" nor "accurate" because it had been inverted. Proctor was actually behind the right taillight for a significant period, but because it was

inverted, it appeared in the video that he was behind the left taillight.  They hoped this would allow Bukhenik to lie about this issue at trial without detection.  With this video and Bukhenik's false testimony, the MSP, Proctor, and Bukhenik attempted to mislead the jury in order to conceal the tampering with and planting of taillight material.

95.    Proctor and Bukhenik took taillight pieces from the sallyport, brought them back to 34 Fairview to plant them in the location where Mr. O'Keefe's body was found, and then falsified various documents in an attempt to hide their conduct.

96.    In warrant applications to the Stoughton District Court and Norfolk Superior Court for searches of Google's electronic records, Ring videos, Ms. Read's phone, Ms. Read's vehicle, cell tower records, and other sources of information, Proctor swore he seized Ms. Read's vehicle from her parents' home at 5:30 p.m. on January 29, 2022, and had the vehicle towed to the CPD. Reports shared by the Dighton Police Department in 2023 reveal that the Lexus was towed from Dighton at 4:17 p.m.  Proctor's assertion that he seized it at 5:30 p.m. was intentionally false to hide the fact that the car was in police custody for 73 minutes longer than indicated in his sworn affidavits.

97.    Proctor maintained that false narrative because it would hide the exact timeframe when he had the opportunity to remove pieces of the taillight from Ms. Read's vehicle and bring them back to the House so that he could later claim the pieces had been there since approximately 12:30 a.m. on January 29.  However, unbeknownst to him, driveway video from the Read residence in Dighton and a report written by the Dighton Police Report revealed Proctor's lie and revealed the true and accurate time the Lexus SUV came into MSP's possession.

98.    Proctor also deposited the SUV taillight pieces that he and others removed from the

vehicle in the sallyport on Mr. O'Keefe's clothes. Proctor retrieved Mr. O'Keefe's clothes from the floor of the hospital where he was pronounced deceased. Instead of securing the clothes in a sealed container or bag, as protocol requires, Proctor and Bukhenik drove them around in his car all day and then placed them in the Norfolk County District Attorney's office for at least six days, where they were accessible to Proctor, Bukhenik, and any other MSP troopers.

99.    In his trial testimony, Bukhenik asserted that both he and Proctor were at the Norfolk District Attorney's Office, drying out O'Keefe's clothing on butcher paper, well into the evening – at least until 8:30 p.m. on January 29, 2022. But in front of the MSP Trial Board in March 2025, Proctor testified that he arrived back home at 7 p.m. that night. Furthermore, Proctor stated that he went from a debrief at CPD straight home, and never mentioned visiting the NDAO with Bukhenik and handling key items of evidence, despite Bukhenik's claims that Proctor was handling the clothing that night. On these matters, Bukhenik's and Proctor's sworn statements significantly differ, and cannot both be true.

100.    Proctor and Bukhenik also failed to create a log to document the chain of custody of the clothing. Therefore, and by design, there is no record of when, how many times, and under what circumstances Proctor and Bukhenik touched, manipulated, handled, or otherwise tampered with that clothing.

101.    The MSP Evidence Submission Handbook dictates that chain of custody begins *at the time of collection* and that the collector "seal evidence packages as soon as possible after collection to ensure integrity of evidence items and limit loss of transient evidence."

102.    Here, in violation of MSP's stated policies, the chain of custody for *all* of John O'Keefe's clothing – as well as dozens of pieces of taillight material – does not begin until March 14, 2022, nearly two months after it was collected, when Proctor finally submitted it to

the MSP Crime Lab.  At some point before providing those clothes to the crime lab, Proctor

and/or Bukhenik placed pieces of the SUV taillight on them, where they were then identified by

the crime lab in 2023.

103.  Proctor also planted pieces of glass on the bumper of Ms. Read's SUV while it was

in his possession at the CPD sallyport garage, which he then claimed to have "recovered" later

on February 1.  Proctor planted this evidence to make it look like these shards originated from a

cocktail glass that Mr. O'Keefe was holding when he exited the Waterfall Bar.  Evidently,

Proctor did not plan on Karen Read's defense attorneys insisting on forensic testing on the glass

shards, which showed that they *did not match the cocktail glass* in Mr. O'Keefe's possession.  In

fact, the five glass pieces originated from multiple *different* sources.  One shard of glass on the

bumper *did* match another piece of glass that had been in Proctor's possession during the

investigation.  The only way for the glass to have ended up on the SUV bumper is that Proctor

planted it there in an attempt to connect the vehicle to the death of Mr. O'Keefe.

### *Other Aspects of the Conflicted and Corrupt Investigation*

104.  Proctor's, Bukhenik's, and MSP's investigation was rife with other examples of

corruption and bias.

105.  For example, despite evidence that Brian Albert may have had video surveillance at

the House, neither Proctor nor Bukhenik nor any other member of the MSP issued subpoenas to

Ring or any other home surveillance company; and no one questioned any other member of the

Albert family about the presence of video monitoring.

106.  Proctor and the MSP also failed to track down other important witnesses and

evidence.  For example, Brian Loughran, a Town of Canton snowplow operator turned out to be

one of the most significant witnesses in the entire criminal trial.  Proctor and his colleagues never

spoke to him during their investigation, and only did so once Loughran was interviewed by a "separate law enforcement agency" and provided statements inconsistent with the MSP's narrative - 18 months after Ms. Read was already indicted and awaiting trial.

107.    Specifically, Mr. Loughran drove his snowplow by the House multiple times in the early morning hours of January 29, including at 2:30 a.m. and 3:30 a.m.  He reported that there was no body on the lawn at 34 Fairview, nor cars on the street in front of the House at 2:30 a.m. Mr. Loughran believes he would have seen a body had it been on the lawn where Mr. O'Keefe was found several hours later.  Instead, the second time he drove by the House around 3:30 a.m., Mr. Loughran saw a Ford Edge in front of the Alberts' home that had not been there an hour before (despite a town-wide ban on street parking during the storm), but which was then parked where Mr. O'Keefe's body was later found.  Brian Albert drove a Ford Edge at the time.

108.    However, the Ford Edge was gone by the time Ms. Read arrived to the House around 6:00 a.m., and in its place, she discovered Mr. O'Keefe's body.  Proctor, Bukhenik, and Tully never made any effort during the actual investigation to track down Mr. Loughran or any information relating to the Ford Edge.

109.    Proctor also secretly made efforts to protect other Albert family members during the investigation who may also have had a role in Mr. O'Keefe's death.  Witness Julie Nagel told Proctor that Colin Albert, Brian Albert's nephew, had been present at the House the night of January 28 - 29.  But Proctor omitted his name from his official summary of Ms. Nagel's interview, even though he listed all others who had been present at the house with Colin.  When Ms. Read's attorneys filed a motion to obtain Proctor's notes, his handwritten memorialization of the Julie Nagel interview mirrored almost exactly what was typed up in his police report - except for the words "Colin Albert."

110. Proctor's interactions with Kevin Albert (Brian Albert's brother) during the investigation also demonstrate his close relationships with the Albert family, as well as his propensity for violating MSP rules and Massachusetts criminal laws. Repeatedly, Proctor used his personal cell phone to speak with Kevin (a CPD officer) instead of official channels when he coordinated interviews of witnesses, even though CPD was recused from the investigation.

111. On January 30, 2022, Kevin Albert texted Proctor on Proctor's *personal* cell to coordinate Proctor's use of CPD facilities to interview witnesses, and about what witnesses Proctor planned to interview and when. Tellingly, despite the fact that he was investigating the murder of a law enforcement officer, and that MSP rules and regulations require recorded witness and suspect interviews when possible, Proctor never used the recorded interview room at CPD and instead chose to keep the interviews offline.

112. Further, in the middle of Proctor's investigation in the summer of 2022, it was discovered that Proctor and Kevin Albert were out together drinking alcohol and driving in Proctor's cruiser on Cape Cod. At the end of the night, Kevin Albert forgot to bring home his gun and badge, and left them in Proctor's cruiser. Their drinking and driving in Proctor's MSP vehicle violated both MSP policies, as well as various Massachusetts criminal statutes, and further highlights the conflicted nature of MSP's investigation.

113. Moreover, because of their close relationship, Proctor, Bukhenik, and Tully, worked together with CPD in hiding certain videos from Karen Read's criminal defense team. Specifically, upon information and belief, MSP and CPD collaborated to keep exculpatory surveillance video from Karen Read's criminal defense team in preparation for the first trial. Those videos captured Higgins's activities in the CPD parking lot and inside the police station shortly after the physical altercation at the House that led to Mr. O'Keefe's death. These videos

demonstrate that Higgins's statements about his post-House party activities on the night of Mr.

O'Keefe's death were not accurate.  Upon information and belief, CPD knew it had this evidence

and worked with MSP to keep it from Ms. Read.

114.   Additionally, upon information and belief, CPD set its "auto-delete" function for

saving certain surveillance videos from the sallyport to "30 days," therefore, assuring the

immediate destruction of likely additional exculpatory evidence.  The 30-day autodelete setting

conflicts with the fact that CPD videos were shared with the defense over the course of three years.

Therefore, either the setting was changed to prevent a defense expert from auditing the footage

(which is when the 30-day setting was discovered), or the footage was obtained within 30 days of

January 29 and withheld from the defense.

### The Indictments, Trials, and Aftermath

115.   Ms. Read was arrested on February 1, 2022, pursuant to a criminal complaint

charging her with manslaughter, among other charges. She was required to post $50,000 for bail,

and the Court imposed several other conditions of release including loss of her driver's license

and stay away orders from the O'Keefe family and John O'Keefe III's home.

116.   Ms. Read was later re-arrested on June 9, 2022, after being indicted for second-

degree murder, manslaughter, and leaving the scene of an accident resulting in death.  Her bail

was set at $100,000 by the Norfolk County Superior Court.  In February of 2023, her bail was

reduced to $80,000 at the defense's request.

117.   Ms. Read was tried twice by the Commonwealth.  The first trial started in April

2024 and ended on July 1 after the court ordered a mistrial because of a hung jury.

118.   On June 18, 2025, following another nearly two-month trial, Ms. Read was

*acquitted* of all charges associated with the death of John O'Keefe - murder, manslaughter, and

leaving the scene of an accident resulting in death. For the first time in three and a half years, Karen Read was able to leave Court knowing that the forces aligned against her had failed to convince a jury to buy their deception.

119.  Beginning in January 2022, the Defendants' actions have had profound effect on Ms. Read.  She lost her employment and income.  She lost her professorship.  She lost her private health insurance.  She lost her car and her driver's license.  She lost her house.  Her reputation - both personally and professionally - was utterly destroyed.  She incurred multiple millions of dollars in debt for legal fees, and additional millions in expert fees, and costs.  In addition, after being arrested twice, jailed twice, and tried twice, she has suffered years of intense stress and emotional harm, worried that she would be imprisoned for the rest of her natural life for a crime she did not commit.

120.  Ms. Read suffers from both Crohn's disease and multiple sclerosis.  As documented, under seal with the criminal court, Ms. Read has undergone tens of surgeries to manage her illnesses prior to January 29, 2022, and endured a blood infusion just months before Mr. O'Keefe's death.  In the aftermath of the charges, two arrests, and during both trials, Ms. Read suffered a well-documented exacerbation of her symptoms amid the stress, anxiety, and emotional and physical impacts of being wrongfully accused of murder.  While fighting for her freedom against a corrupt prosecution, Ms. Read underwent dozens upon dozens of documented medical procedures and treatments to attempt to address her health issues.

121.  The Defendants concocted a plan, executed that plan, and framed an innocent woman, and they are now responsible for these extraordinary damages Ms. Read has suffered at their hands.

***The House Defendants and Investigators Continue to Lie and Manufacture Evidence, and Coordinate and Conspire Together, Years Later.***

122. The House Defendants continued to execute on their strategy of misdirection and dishonesty for years after Mr. O'Keefe's death.

123. For example, on April 10, 2023, two agents from a "separate law enforcement agency" made an unannounced visit to Jennifer McCabe at her home. She initially lied to these agents when she answered the door, saying she was Nicole Albert.

124. She then asked the agents to wait ten minutes while she got ready.

125. Afterwards, when asked by the agents, McCabe first told them she had called her husband, House Defendant Matthew McCabe and Kerry Roberts.

126. But after the "separate law enforcement agency" agents warned her of the penalties for lying to federal officers, McCabe then revealed that she had also contacted John O'Keefe's mother, the NDAO, and Brian Albert.

127. McCabe made sure to warn other House Defendants immediately, like Brian Albert and Matthew McCabe, that another agency was asking questions.

128. The coordination between the House Defendants and MSP, Proctor, Bukhenik, and Tully was also not short-lived.

129. For example, in the evening of September 25, 2023, McCabe visited Proctor's house. This visit – by a key witness in a murder case to the home of the lead investigatory – is not explained or even acknowledged or mentioned in any MSP report.

130. In fact, Read's criminal defense team only learned of McCabe's visit to Proctor's house when a photo of her Jeep was publicized.

131. Furthermore, in 2024, on the eve of Ms. Read's first trial, Ms. Read's team learned

36

that McCabe had visited CPD Sgt. Michael Lank – who was the ranking CPD officer on scene on January 29 – at his personal residence at 5:43 p.m. on January 30, 2022 and stayed until 6:28 p.m.

132.  It was only *after* Ms. Read's attorneys shared this data with the Commonwealth, two weeks before McCabe's trial testimony, that Tully met with members of the NDAO and McCabe to discuss her visit to Sgt. Lank's home.

133.  Neither Tully, Proctor, nor any other trooper memorialized this meeting or McCabe's visit to Sgt. Lank's home.

134.  Furthermore, McCabe later testified, on May 21, 2024, that she went straight to Sgt. Lank's house from One Meadows on January 30. But her cellular data shows that too was false. McCabe's phone shows she stopped at 34 Fairview Road from 5:36 p.m. to 5:40 p.m.

135.  And even after this case was filed, some of the investigators have continued to coordinate and work with the House Defendants.

136.  For example, in the fall of 2025, Defendant Bukhenik repeatedly fundraised for the House Defendants on social media sites. He urged support for the House Defendants against Ms. Read's "evil, chaos. And lunacy."

***MSP Investigates and Punishes Proctor, Bukhenik, and Tully for Their Misconduct During the Investigation.***

137.  Proctor wrote more than one-third of the police reports in this case, testified at the state grand jury three separate times, interviewed every member of the Albert and McCabe families, had possession – at least until March 14, 2022 – of *all* of John O'Keefe's clothing and *all* of the taillight pieces found broken from the housing, processed Mr. O'Keefe's Chevrolet Traverse the day after Ms. Read was arraigned, had access to and reviewed all the Ring videos,

had access to and reviewed the surveillance from C.F. McCarthy's, had possession of *all* of the CPD sallyport and driveway videos, and numerous other critical investigative activities. And yet, once evidence of Proctor's conflicts and lies became public, he was extricated from this case in an effort to hide him from the jury and sanitize the compromised investigation while Ms. Read was forced to trial not once but twice.

138. Ultimately, Michael Proctor was relieved from duty and transferred out of the detective unit of the Norfolk County District Attorney's Office on July 7, 2024, mere days after the conclusion of Ms. Read's first trial. Proctor was terminated from the MSP on March 19, 2025. Upon a release from the District Attorney of more implicating text messages from Proctor's phone, on October 18, 2025, Proctor officially withdrew his appeal with the Civil Service Commission.

139. On September 23, 2024, an MSP internal affairs investigation found Yuriy Bukhenik "failed to perform his supervisory duties in an ongoing investigation." On July 7, 2025, Bukhenik was transferred out of the NDAO detective unit and reassigned to an administrative role in another division.

140. On October 18, 2024, Brian Tully was disciplined and reassigned from SPDU and stripped of his "Detective" designation. Tully was given special dispensation by Norfolk County District Attorney Michael Morrissey to continue detective work on the Read case despite his demotion because of his behavior *on this case*.

141. Upon information and belief, MSP Troopers David DiCicco and Jeffrey Kotkowski were also disciplined for their misconduct associated with MSP's investigation of Ms. Read.

142. Nearly every instance of such discipline in Proctor's unit occurred before this case was even fully adjudicated in the second trial. Proctor himself admitted to a Trial Board in

March of 2025 that he informed his superiors Bukhenik, Fanning, and Tully in February of 2024 (before the first trial) that he had testified before a "berating" U.S. Attorney regarding the prejudicial messages on his phone and his relationship with the Alberts. Nevertheless, no member in Proctor's chain of command or in the MSP sought to discipline these individuals until *after* Ms. Read stood trial.

### V.    Counts

**Count 1 – 42 U.S.C. § 1983 – Malicious Prosecution under the Fourth Amendment**
**(Against Proctor, Bukhenik, Tully)**

143.  The preceding paragraphs are incorporated herein by reference.

144.  Proctor, Bukhenik, and Tully violated Ms. Read's Fourth Amendment rights by engaging in a malicious prosecution of Ms. Read by causing her to be seized pursuant to legal process unsupported by probable cause.

145.  The criminal proceedings against Ms. Read terminated in her favor when she was acquitted of murder, manslaughter, and leaving the scene of an accident with a death.

146.  Proctor, Bukhenik, and Tully caused Ms. Read to be seized without probable cause as described above, including but not limited to, by:

    a.  Leading, handling, and participating in the O'Keefe investigation even though Proctor was conflicted due to personal relationships with various witnesses, suspects, and potential suspects, which conflict led to Ms. Read's unlawful treatment;

    b.  Handling the investigation even though Proctor had an extreme and personal negative bias towards Karen Read, which bias led to Ms. Read's unlawful treatment;

c. Violating MSP's rules, policies, and procedures in all aspects of the investigation;

d. Planting, fabricating, and manipulating evidence, falsifying documents, preparing false affidavits, and committing perjury;

e. Failing to secure evidence and the crime scene, obtain evidence, timely and appropriately interview suspects, and investigate the Alberts, McCabes, or Higgins and allowing them to destroy potentially exculpatory evidence;

f. Failing to consider and present exculpatory evidence to prosecutors and the grand jury investigating Mr. O'Keefe's death, such as the evident dog bite injuries on Mr. O'Keefe's arm and evidence that his injuries were caused by an altercation and not a vehicle strike (such as the lack of lower body trauma);

147.  Following her indictment by a grand jury, Ms. Read was re-arrested without probable cause, forced to pay a $100,000 bond to be released from custody, and required to comply with numerous pre-trial release provisions.  These post-arraignment deprivations of her liberty constitute seizures under the Fourth Amendment.

148.  Those deprivations continued during Ms. Read's second trial in part because of Proctor's false testimony at Ms. Read's first trial.  Among other things, Proctor falsely testified that:

a. When he first saw the taillight on Ms. Read's car at Ms. Read's parents' house in Dighton, it had large pieces missing and the shattered taillight displayed at the first trial, as photographed on February 1, 2022, was in the same condition as on January 29;

b. He and Bukhenik never touched any part of Ms. Read's vehicle when it was stored in the CPD sallyport;

c. He retrieved taillight pieces on subsequent searches at the Alberts' home, when he

knew he had deposited or arranged for someone to deposit taillight pieces at the property;

d.   Chris and Julie Albert were his loose acquaintances rather than friends; and

e.   His statements in sworn affidavits all claiming the Lexus was seized at 5:30 p.m. and that he arrived in Dighton at 4:30 p.m. were "typos."

149.  Thus, Proctor, Bukhenik, and Tully acting under color of law, violated Ms. Read's Fourth Amendment rights against unreasonable searches and seizures.

150.  As a proximate result of this misconduct, Ms. Read was wrongfully prosecuted for Mr. O'Keefe's death and made to defend herself in two trials in the Superior Court for Norfolk County resulting in the loss of employment, reputational damages, and millions of dollars of legal expenses as well as serious emotional and physical distress and injury.

151.  In addition to an award of damages for these harms, Ms. Read is entitled to her attorneys' fees under 42 U.S.C. § 1988, costs, interest, and punitive damages.

## Count 2 -  42 U.S.C. § 1983 – Supervisor Liability
### (Against Bukhenik and Tully in their individual capacities)

152.  The preceding paragraphs are incorporated herein by reference.

153.  A supervisor is liable under 42 U.S.C. § 1983 when the supervisor supervises, trains, or hires a subordinate with deliberate indifference towards the possibility that the subordinate's deficient performance will result in deprivation of an individual's constitutional rights.

154.  Bukhenik and Tully knew or should have known that there was a grave risk that Proctor would fail to investigate the Alberts with whom he had a close personal relationship, which he had disclosed.

41

155.  They also knew or should have known that there was a grave risk Proctor would wrongly seek to have Ms. Read charged given the manifest bias evidenced in his text messages, which were sent to Bukhenik, among others.

156.  Bukhenik and Tully could have taken easily available steps to avoid a constitutionally deficient malicious prosecution of Ms. Read.  Those measures include, but are not limited to, (1) replacing Proctor with an unbiased investigator that had no personal relationship with anyone involved in Mr. O'Keefe's death, (2) safeguarding the crime scene and the physical evidence, including Mr. O'Keefe's clothing and 47 pieces of taillight material and 19 pieces of glass from various sources, to prevent anyone from planting, manufacturing, or manipulating evidence, (3) initiating timely searches at the Alberts' house, and (4) quickly seizing the cellphones and other forms of electronic evidence in the possession of the Alberts, the McCabes, and Higgins, which would have prevented their later manipulation and destruction.

157.  By not taking any of those measures, Bukhenik and Tully permitted Proctor, and Tully permitted Bukhenik, to violate Ms. Read's Fourth Amendment rights against unreasonable searches and seizures, and thus themselves violated Ms. Read's Fourth Amendment rights.

158.  In these ways and others, Bukhenik's conduct constituted condonation of, or acquiescence to, Proctor's behavior, or gross negligence amounting to deliberate indifference.

159.  In these ways and others, Tully's conduct constitute condonation of, or acquiescence to, Bukhenik's and Proctor's behavior, or gross negligence amounting to deliberate indifference.

160.  As a proximate result of their breaches, Ms. Read was wrongfully prosecuted for

Mr. O'Keefe's death resulting in the loss of employment, reputational damages, and millions of dollars of legal expenses as well as serious emotional and physical distress and injury.

161.  In addition to an award of damages for these harms, Ms. Read is entitled to her attorneys fees' under 42 U.S.C. § 1988, costs, interest, and punitive damages.

### Count 3 – 42 U.S.C. § 1983 – Conspiracy to Deprive Ms. Read of Her Fourth Amendment Rights
### (Against Proctor, Bukhenik, Tully, the Alberts, the McCabes, and Higgins)

162.  The preceding paragraphs are incorporated herein by reference.

163.  Proctor, Bukhenik, Tully, the Alberts, the McCabes, and Higgins shared a common design, and acted in concert, to frame Ms. Read for Mr. O'Keefe's death.

164.  As part of their concerted efforts, and among their many other misrepresentations, the Alberts, McCabes, and Higgins agreed with each other to tell investigators that Mr. O'Keefe never entered the House, that they did not see Mr. O'Keefe in the House that night, and that Ms. Read made inculpatory statements on the morning of January 29. When they made these statements, the House Defendants did so only because they were aware that Proctor, Bukhenik, and Tully would also act similarly, by solely investigating Ms. Read.

165.  Proctor, Bukhenik, and Tully knew or should have known that the statements made to them by the House Defendants were false, and that obvious and easily-obtainable evidence existed demonstrating Mr. O'Keefe went into the House where he was involved in a physical altercation during which he was beaten up, fell back gashing his head, and attacked by a dog. Instead, because of their close personal and professional ties to the House Defendants, Proctor, Bukhenik, and Tully agreed with each other to use the House Defendants' misrepresentations as the predicate for and implicit direction to conduct an investigation that solely targeted Ms. Read to the exclusion of everyone and anyone else.

166.  In furtherance of this plan, among other unlawful conduct, Proctor, Bukhenik, and Tully agreed:

    a.  to continue to handle the investigation even though they had personal relationships with suspects in the murder, which led to unlawful and favorable treatment of potential suspects;

    b.  to continue to handle the investigation even though they had biases against investigating the House Defendants because of the House Defendants' ties to law enforcement;

    c.  to continue to handle the investigation even though they had exhibited an extreme and personal negative bias towards Karen Read;

    d.  to violate rules, policies, and procedures in all aspects of the investigation;

    e.  to plant, manufacture, and manipulate evidence, falsify documents, and commit perjury;

    f.  to not secure evidence and the crime scene;

    g.  to not investigate and obtain available evidence or timely and appropriately interview suspects; and

    h.  to not investigate the Alberts, McCabes, or Higgins.

167.  The McCabes and Alberts coordinated their efforts through text messages, phone calls, and conversations.  Higgins and Brian Albert coordinated their efforts through telephone calls and texts on their phones, which were later destroyed or discarded.  Finally, Proctor, Bukhenik, and Tully coordinated with the Alberts and McCabes though Proctor's sister, Courtney, who communicated frequently with Julie Albert.

168.  Acting pursuant to the plan, Proctor and Bukhenik interviewed the McCabes and

Brian Albert in a cursory manner, and all at the same location, midday on January 29, and

Nicole Albert on February 3.  Proctor and Bukhenik only interviewed Higgins once, at his

attorney's home, and did not secure or search his phone or search for communications between

him, the Alberts, and the McCabes.  Proctor and Bukhenik did not search the Alberts' phones or

home where there was likely evidence of Mr. O'Keefe's murder.  Brian Albert and Higgins

destroyed or discarded their phones, destroying evidence of the murder and cover-up.

169.  As a result of the conspiracy between and among them, Proctor, Bukhenik, and

Tully never investigated the House Defendants, and instead Ms. Read was wrongfully arrested

and prosecuted in violation of her Fourth Amendment rights.

170.  Proctor, Bukhenik, Tully, and the House Defendants acted in unison and had a

peculiar power of coercion over Ms. Read because Proctor, Bukhenik, and Tully were the state

police employees investigating Mr. O'Keefe's murder and the House Defendants were able to

direct that investigation solely towards Ms. Read because of their personal and professional

connections to Proctor, Bukhenik, and Tully and their superior knowledge of police and criminal

investigations as a result of their own work in, and connection to, law enforcement.

171.  As part of their conspiracy to direct law enforcement towards Ms. Read, at least

some of the House Defendants provided false testimony at Read's criminal trials.

172.  House Defendant Jennifer McCabe also lied to agents of a "separate law

enforcement agency" when they interviewed her in 2023 about Mr. O'Keefe's death and the

investigation into it and, along with the other House Defendants, took steps in furtherance of

their scheme at through each of Read's criminal trials in 2024 and 2025.

173.  The proximate result of Ms. Read's wrongful prosecution was her loss of

employment, reputational damages, millions of dollars of legal expenses, and serious emotional

and physical distress and injury.

174.  In addition to an award of damages for these harms, Ms. Read is entitled to her attorneys fees' under 42 U.S.C. § 1988, costs, interest, and punitive damages.

### Count 4 – Massachusetts Civil Rights Act ("MCRA")
### (Against Proctor, Bukhenik, Tully, Alberts, McCabes, and Higgins)

175.  The preceding paragraphs are incorporated herein by reference.

176.  Proctor, Bukhenik, Tully, and the House Defendants interfered or attempted to interfere with Ms. Read's exercise or enjoyment of her rights under the federal and Commonwealth constitutions and laws, through threats, intimidation, or coercion.

177.  Among other acts, by manufacturing and planting evidence, not securing the crime scene, not searching the Alberts' home or the Alberts' and Higgins's phones, and ignoring exculpatory evidence such as the dog-bite injuries and lack of injuries consistent with a vehicle strike, Proctor and Bukhenik caused Ms. Read's wrongful indictment, arrest, and prosecution and thereby interfered and attempted to interfere with her rights under the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights.

178.  By falsely representing that Mr. O'Keefe never entered the Albert house and by relocating his body to the location on the Alberts' property where they would claim Ms. Read dropped off Mr. O'Keefe, the Alberts, the McCabes, and Higgins caused Ms. Read's wrongful indictment, arrest, and prosecution.  Brian Albert and Higgins also caused Ms. Read's wrongful indictment, arrest, and prosecution by destroying or discarding their phones, eliminating exculpatory evidence. The House Defendants thereby interfered and attempted to interfere with Ms. Read's rights under the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights.

46

179.  As part of their attempts to direct law enforcement towards Read, at least some of the House Defendants also provided false testimony at Read's criminal trials.

180.  House Defendant Jennifer McCabe also lied to agents of a "separate law enforcement agency" when they interviewed her in 2023 about Mr. O'Keefe's death and the investigation into it and, along with the other House Defendants, took steps in furtherance of their scheme at through each of Read's criminal trials in 2024 and 2025.

181.  Ms. Read's wrongful indictment, arrest, and prosecution were intrinsically coercive under Massachusetts law.

182.  Moreover, the House Defendants' and Proctor's, Bukhenik's, and Tully's conduct amounted to threats, intimidation, and coercion designed to force Ms. Read to give up her defense and plead guilty to a crime she did not commit.

183.  As a proximate result of Defendants' actions, Ms. Read was wrongfully prosecuted for Mr. O'Keefe's death resulting in the loss of employment, reputational damages, and millions of dollars of legal expenses as well as serious emotional distress and injury.

184.  In addition to an award of damages for these harms, Ms. Read is entitled to her costs, interest, and attorneys fees' under G.L. c. 12, §11I.

### Count 5 – Common Law Malicious Prosecution
### (Against Proctor, Bukhenik, Tully, the Alberts, the McCabes, and Higgins)

185.  The preceding paragraphs are incorporated herein by reference.

186.  By manufacturing and planting evidence, not securing the crime scene, not searching the Alberts' home or the Alberts' and Higgins's phones, and ignoring exculpatory evidence such as Mr. O'Keefe's dog bite injuries and lack of injuries consistent with a vehicle strike, Proctor, Bukhenik, and Tully caused Ms. Read's indictment, arrest, and prosecution.

187.  Ms. Read's indictment, arrest, and prosecution occurred without probable cause because they were based on false, manufactured, manipulated, and planted evidence, and because Proctor, Bukhenik, and Tully ignored exculpatory evidence and allowed potentially exculpatory evidence to be destroyed.

188.  These criminal proceedings were instituted with malice, as evidenced by Proctor's, Bukhenik's, and Tully's knowledge that it was based on false evidence, Proctor's, Bukhenik's, and Tully's bias and ill will towards Ms. Read, and for the improper purpose to protect Proctor's friends and acquaintances, the Alberts.

189.  The criminal proceedings terminated in Ms. Read's favor when she was acquitted of murder, manslaughter, and leaving the scene of an accident with a death.

190.  By falsely representing that Mr. O'Keefe never entered the Albert house and by relocating his body to the location on the Albert property where Jennifer McCabe would claim Ms. Read dropped off Mr. O'Keefe, Brian and Nicole Albert, the McCabes, and Higgins caused Ms. Read's wrongful indictment, arrest, and prosecution.  Brian Albert and Brian Higgins also caused Ms. Read's wrongful indictment, arrest, and prosecution by destroying or discarding their phones, eliminating exculpatory evidence.

191.  As part of their attempts to direct law enforcement towards Read, at least some of the House Defendants also provided false testimony at Read's criminal trials.

192.  House Defendant Jennifer McCabe also lied to agents of a "separate law enforcement agency" when they interviewed her in 2023 about Mr. O'Keefe's death and the investigation into it and, along with the other House Defendants, took steps in furtherance of their scheme at through each of Read's criminal trials in 2024 and 2025.

193.  As a proximate result of Defendants' actions, Ms. Read was wrongfully prosecuted

for Mr. O'Keefe's death resulting in the loss of employment, reputational damages, and millions of dollars of legal expenses as well as serious emotional distress and injury.

**Count 6 – Intentional Infliction of Emotional Distress (Against Proctor, Bukhenik, Tully, Alberts, McCabes, and Higgins)**

194.  The preceding paragraphs are incorporated herein by reference.

195.  By manufacturing and planting evidence, not securing the crime scene, not searching the Alberts' home or the Alberts' and Higgins's phones, and ignoring exculpatory evidence such as Mr. O'Keefe's dog bite injuries and lack of injuries consistent with a vehicle strike, Proctor, Bukhenik, and Tully caused Ms. Read's indictment, arrest, and prosecution.

196.  By falsely representing that Mr. O'Keefe never entered the Albert house and by relocating his body to the location on the Albert property where Jennifer McCabe claimed Ms. Read dropped Mr. O'Keefe, the Alberts, the McCabes, and Higgins caused Ms. Read's wrongful indictment, arrest, and prosecution of Ms. Read.  Brian Albert and Brian Higgins also caused Ms. Read's wrongful indictment, arrest, and prosecution by destroying or discarding their phones, eliminating exculpatory evidence.

197.  As part of their attempts to direct law enforcement towards Read, at least some of the House Defendants also provided false testimony at Read's criminal trials.

198.  House Defendant Jennifer McCabe also lied to agents of the "separate law enforcement agency" when they interviewed her in 2023 about Mr. O'Keefe's death and the investigation into it and, along with the other House Defendants, took steps in furtherance of their scheme at through each of Read's criminal trials in 2024 and 2025.

199.  The Defendants knew or should have known their conduct would cause Ms. Read emotional distress since it would lead to her prosecution for murder and other crimes, and the

conduct did cause, and is causing, Ms. Read severe emotional and physical distress.

200.  The Defendants' conduct perverted the justice system, allowed Mr. O'Keefe's true killer to escape liability, and threatened to imprison Ms. Read.  It is the type of behavior that threatens civilized society and is therefore extreme and outrageous.

201.  As a proximate result of Defendants' actions, Ms. Read suffered serious emotional and physical distress and injury.

### Count 7 – Civil Conspiracy
### (Against Proctor, Bukhenik, Tully, the Alberts, McCabes, and Higgins)

202.  The preceding paragraphs are incorporated herein by reference.

203.  Proctor, Bukhenik, Tully, the Alberts, the McCabes, and Higgins shared a common design, and acted in concert, to frame Ms. Read for Mr. O'Keefe's death.

204.  As part of their concerted efforts, and among their many other misrepresentations, the Alberts, McCabes, and Higgins agreed with each other to tell investigators that Mr. O'Keefe never entered the House, that they did not see Mr. O'Keefe in the House that night, and that Ms. Read made inculpatory statements on the morning of January 29.

205.  When they made these statements, the House Defendants did so only because they were aware that Proctor, Bukhenik, and Tully would also act similarly, by solely investigating Ms. Read.

206.  Proctor, Bukhenik, and Tully knew or should have known that the statements made to them by the House Defendants were false, and that obvious and easily-obtainable evidence existed demonstrating Mr. O'Keefe went into the House where he was involved in a physical altercation during which he was beaten up, fell back gashing his head, and attacked by a dog. Instead, because of their close personal and professional ties to the House Defendants, Proctor,

Bukhenik, and Tully agreed with each other to use the House Defendants' misrepresentations as the predicate for and implicit direction to conduct an investigation that solely targeted Ms. Read to the exclusion of everyone and anyone else.

207.  In furtherance of the conspiracy, Proctor, Tully, and Bukhenik agreed to fabricate, plant, and manipulate evidence purporting to show that Ms. Read's vehicle hit Mr. O'Keefe.

208.  Pursuant to their plan, Proctor, Bukhenik and Tully carried out multiple overt acts, including damaging the taillight on Ms. Read's vehicle while it was in the Town of Canton's sallyport, not securing the crime scene, and depositing taillight pieces on January 29, prior to the MSP SERT team's arrival on site.  In addition, Proctor deposited some of the broken taillight pieces on Mr. O'Keefe's clothing while the clothing was in his unprotected custody.  Proctor also deposited glass, alleged to have been from a cocktail glass, on the bumper of Ms. Read's Lexus SUV sometime prior to the vehicle's processing by MSPCL on February 1, 2022.

209.  Another part of the conspiracy was to take coordinated steps to ignore and destroy potentially exculpatory evidence that pointed to other suspects like the Alberts and Higgins. The McCabes, the Alberts, and Higgins coordinated through text messages, phone calls, and, on information and belief, conversations.  Higgins and Brian Albert coordinated through telephone calls and, on information and belief, texts on their phones, which were later destroyed or discarded.  Finally, Proctor coordinated with the Alberts and McCabes though his sister, Courtney, who spoke frequently with Julie Albert.

210.  Acting pursuant to the plan, Proctor and Bukhenik interviewed the McCabes and Brian Albert in a cursory manner the morning of January 29, and Nicole Albert on February 3. All told the same false story that Mr. O'Keefe never entered the Alberts' house.  Proctor,

Bukhenik, and Tully also only interviewed Higgins once, with his attorney, at his attorney's home, and did not secure or search Higgins' phone or search for communications between him, the Alberts, and the McCabes.  Pursuant to the coordinated plan, Proctor, Bukhenik, and Tully also did not search the Alberts' phones or home where there was likely evidence of O'Keefe's murder.  Further, Brian Albert and Higgins destroyed or discarded their phones, destroying evidence of the murder and cover-up.

211.  Following Mr. O'Keefe's death, among other acts, the McCabes and Alberts agreed to make it look like Mr. O'Keefe died due to exposure after being hit by Ms. Read's car.  As part of this common plan, Brian Albert and Higgins, both law enforcement officers familiar with investigations, communicated at 2:22 a.m. on January 29 after Higgins left the house.  Shortly thereafter, as part of the plan, Jennifer McCabe deleted a Google search at 2:27 a.m. on January 29 for how long it takes a person to die in the cold.  One or more of them then relocated Mr. O'Keefe's body and deposited it in front of the Alberts' house where Jennifer McCabe claimed Ms. Read had dropped Mr. O'Keefe off earlier.  The McCabes and Alberts then coordinated what they would say to the police, all of them falsely telling investigators that Mr. O'Keefe never entered the house.

212.  At least some of the House Defendants also provided false testimony at Read's criminal trials.

213.  House Defendant Jennifer McCabe also lied to agents of a "separate law enforcement agency" when they interviewed her in 2023 about Mr. O'Keefe's death and the investigation into it and, along with the other House Defendants, took steps in furtherance of their scheme at through each of Read's criminal trials in 2024 and 2025.

214.  Proctor, Bukhenik, Tully, and the House Defendants acted in unison and had a

peculiar power of coercion over Ms. Read because Proctor, Bukhenik, and Tully were the state police employees investigating Mr. O'Keefe's murder and the House Defendants were able to direct that investigation solely towards Ms. Read because of their personal and professional connections to Proctor, Bukhenik, and Tully and their superior knowledge of police and criminal investigations as a result of their own work in, and connection to, law enforcement.

215.  Proctor's, Bukhenik's, Tully's, and the House Defendants' conduct described herein were unlawful and tortious. Among other things, they constitute intentional infliction of emotional distress, negligence, common law malicious prosecution, and violations of Ms. Read's rights pursuant to the United States Constitution and the Massachusetts Declaration of Rights.

216.  As a proximate result of Defendants' actions, Ms. Read was wrongfully prosecuted for Mr. O'Keefe's death resulting in the loss of employment, reputational damages, and millions of dollars of legal expenses as well as serious emotional and physical distress and injury.

### JURY DEMAND

Ms. Read respectfully requests a jury trial on all matters so triable.

### PRAYER FOR RELIEF

WHEREFORE, Ms. Read respectfully requests that the Court grant her the following relief:

A.    Enter judgment in her favor and against each relevant Defendant on each Count of this Complaint;

B.    Award her damages in an amount to be calculated at trial, along with pre- and post-judgment interest, costs, and expenses;

C.    Award her reasonable attorneys' fees incurred in connection with this litigation, pursuant to 42 U.S.C. § 1988 and any other applicable statute or law; and

D.    Grant her such other relief as the Court deems equitable and just.

Respectfully submitted,
Karen Read
By Her Attorneys,


SHEEHAN, PHINNEY, BASS & GREEN, P.A.    WERKSMAN JACKSON & QUINN LLP


*/s/ Damon M. Seligson*                              */s/ Alan Jackson*
Damon M. Seligson, BBO # 632763          Alan J. Jackson, *pro hac vice*
Charles M. Waters, BBO # 631425           Caleb E. Mason, *pro hac vice*
Aaron D. Rosenberg, BBO # 684826       Elizabeth S. Little, *pro hac vice*
Sheehan Phinney Bass & Green PA           Werksman Jackson & Quinn LLP
28 State Street, 22nd Floor                        888 West Sixth Street, Fourth Floor
Boston, MA 02109                                     Los Angeles, CA 90017
(617) 897-5600                                         (213) 688-0460
dseligson@sheehan.com                           ajackson@werksmanjackson.com
cwaters@sheehan.com                             cmason@werksmanjackson.com
arosenberg@sheehan.com                         elittle@werksmanjackson.com




Dated:  March 13, 2026

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically today via the Court's CM/ECF Electronic Filing System.  A notice of electronic filing will be sent by e-mail to all parties via operation of the Court's CM/ECF Electronic Filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Damon M. Seligson*
Damon M. Seligson

Dated:  March 13, 2026