**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KAREN READ,<br><br>            Plaintiff,<br><br>v.<br><br>MICHAEL PROCTOR, in his personal capacity; SGT. YURIY BUKHENIK, in his personal capacity; LT. BRIAN TULLY, in his personal capacity; BRIAN ALBERT; NICOLE ALBERT; JENNIFER McCABE; MATTHEW McCABE; and BRIAN HIGGINS,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:25-CV-13588-DJC |

<u>**MEMORANDUM OF LAW IN SUPPORT OF THE COMMONWEALTH WITNESSES'**</u>
<u>**[1] SPECIAL MOTION TO DISMISS UNDER MASSACHUSETTS' ANTI-SLAPP**</u>
<u>**STATUTE; AND [2] MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**</u>

James L. Tuxbury (BBO #624916)
Kieran T. Murphy (*pro hac vice*)
HINCKLEY ALLEN & SNYDER LLP
28 State Street
Boston, MA 02109
Telephone: 617-345-9000
JTuxbury@hinckleyallen.com

30 S. Pearl Street, Suite 1101
Albany, NY 12210
Telephone: 518-396-3100
KMurphy@hinckleyallen.com

*Counsel for Defendants Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe, and Brian Higgins*

i

## TABLE OF CONTENTS

INTRODUCTION................................................................................................................ 1

FACTUAL BACKGROUND............................................................................................... 4

I.      Officer O'Keefe's Death........................................................................................ 4

II.     The Investigation & Arrest of Ms. Read................................................................ 4

III.    The Commonwealth's Statement of the Case......................................................... 5

IV.     Read's Criminal Trials........................................................................................... 7

V.      The Instant Action................................................................................................. 7

ARGUMENT...................................................................................................................... 7

I. The Case Should be Dismissed Against the Commonwealth Witnesses Pursuant to Mass. Gen. L. c. 231, § 59H (the "anti-SLAPP" statute)......................................................... 7

        A.      Anti-SLAPP Standard of Review ................................................................ 8

        B.      Each State Law Claim Against Each Commonwealth Witness is Based on Petitioning Activity ................................................................................................................ 9

                1. Nicole Albert.................................................................................... 10

                2. Matthew McCabe.............................................................................. 14

                3. Jennifer McCabe .............................................................................. 15

                4. Brian Albert ..................................................................................... 18

                5. Brian Higgins................................................................................... 19

        C.      Ms. Read Cannot Meet Her Burden of Showing that Each of the Commonwealth Witnesses Had No Factual or Legal Basis for their Petitioning Activity ............................ 20

II. The Case Against the Commonwealth Witnesses Should be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6).......................................................................................................... 22

        A.      Fed. R. Civ. P. 12(b)(6) Standard of Review.............................................. 22

        B.      All Claims Brought Against the Commonwealth Witnesses are Shielded by the Doctrine of Absolute Immunity........................................................................................ 23

        C.      Ms. Read's § 1983 Conspiracy, Common Law Conspiracy, MCRA, and Intentional Infliction of Emotional Distress Claims are Time-Barred....................................... 26

        D.      The Amended Complaint Fails to State Any Claims Against Any of the Commonwealth Witnesses Upon Which Relief Could be Granted..................................... 30

                1. Common Law Malicious Prosecution................................................ 30

                2. 42 U.S.C. § 1983 Conspiracy............................................................ 34

                3. Common Law Conspiracy ................................................................ 35

                4. Massachusetts Civil Rights Act ....................................................... 37

                5. Intentional Infliction of Emotional Distress ................................... 39

CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*477 Harrison Ave., LLC v. Jace Boston, LLC,*
  477 Mass. 162 (2017) ...............................................................................................*passim*
*Aborn v. Lipson,*
  357 Mass. 71 (1970) .............................................................................................................. 25
*Aetna Cas. Sur. Co. v. P & B Autobody,*
  43 F.3d 1546 (1st Cir. 1994)................................................................................................. 36
*Andresen v. Diorio,*
  349 F.3d 8 (1st Cir. 2003)..................................................................................................... 34
*Arsenault v. Otto,*
  628 F. Supp. 3d 377 (D. Mass. 2022)................................................................................... 26
*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .............................................................................................................. 11
*Beddall v. State St. Bank & Tr. Co.,*
  137 F.3d 12 (1st Cir. 1998)................................................................................................... 23
*Bednarz v. Bednarz,*
  27 Mass. App. Ct. 668 (1989) .............................................................................................. 32
*Beecy v. Pucciarelli,*
  387 Mass. 589 (1982) ........................................................................................................... 33
*Bixby v. Town of Rehoboth,*
  2024 WL 3430501 (D. Mass. Mar. 22, 2024) ...................................................................... 12
*Blanchard v. Steward Carney Hosp., Inc.,*
  477 Mass. 141 (2017) ................................................................................................. 8, 9, 22
*Briscoe v. LaHue,*
  460 U.S. 325 (1983) .............................................................................................................. 24
*Bristol Asphalt Co., Inc. v. Rochester Bituminous Prods., Inc.,*
  493 Mass. 539 (2024) ....................................................................................... 8, 9, 20, 22
*Britton v. Athenahealth, Inc.,*
  2013 WL 2181654 (Mass. Sup. Ct. May 3, 2013)................................................................ 35
*Burns v. Reed,*
  500 U.S. 478 (1991) .............................................................................................................. 25
*Canney v. City of Chelsea,*
  925 F. Supp. 58 (D. Mass. 1996).......................................................................................... 38
*Chadbrown v. Coles,*
  2011 WL 5325610 (D. Me. Nov. 2, 2011) ........................................................................... 35
*Chin v. Garda CL New England, Inc.,*
  2017 WL 5771464 (D. Mass. Aug. 16, 2017) ...................................................................... 17
*Cifazzari v. Town of Milford,*
  2025 WL 1899043 (D. Mass. July 9, 2025) ......................................................................... 38
*Com. v. Cotto,*
  471 Mass. 97 (2015) .............................................................................................................. 37

*Conway v. Smerling*,
   37 Mass. App. Ct. 268 (1994) ........................................................................................... 32
*Correllas v. Viveiros*,
   410 Mass. 314 (1991) ....................................................................................................... 24
*Currier v. Nat'l Bd. of Med. Examiners*,
   462 Mass. 1 (2012) .................................................................................................... 13, 38
*Degree v. Gendreau*,
   2025 WL 3702535 (D. Mass. Dec. 19, 2025) ................................................................. 31
*Doe Next Friend of A v. Spears*,
   630 F. Supp. 3d 290 (D. Mass. 2022) ...................................................................... 11, 15
*Doyle v. Hasbro, Inc.*,
   103 F.3d 186 (1st Cir. 1996) ............................................................................................ 39
*Duracraft Corp. v. Holmes Prods. Corp.*,
   427 Mass. 156 (1998) .................................................................................................. 8, 10
*Eberle v. Diviacchi*,
   1996 WL 218210 (Mass. Super. Ct. Mar. 29, 1996) ...................................................... 26
*Fleming v. Lind-Waldock & Co.*,
   922 F.2d 20 (1st Cir. 1990) .............................................................................................. 37
*Fromm v. Boston Redevelopment Auth.*,
   73 Mass. App. Ct. 1109 (2008) ....................................................................................... 13
*Gallagher v. S. Shore Hosp., Inc.*,
   101 Mass. App. Ct. 807 (2022) ................................................................................. 13, 37
*Galvin v. U.S. Bank, N.A.*,
   852 F.3d 146 (1st Cir. 2017) ............................................................................................ 40
*García-Catalán v. U.S.*,
   734 F.3d 100 (1st Cir. 2013) ............................................................................................ 23
*Giragosian v. Ryan*,
   547 F.3d 59 (1st Cir. 2008) .................................................................................... 5, 6, 23
*Glaros v. Perse*,
   628 F.2d 679 (1st Cir. 1980) ............................................................................................ 34
*Goddard v. Kelly*,
   629 F. Supp. 2d 115 (D. Mass. 2009) .............................................................................. 31
*Godin v. Schencks*,
   629 F.3d 79 (1st Cir. 2010) ................................................................................................ 8
*Goodwin v. City of Shepherdstown*,
   241 W. Va. 416 (2019) ..................................................................................................... 32
*Gouin v. Gouin*,
   249 F. Supp. 2d 62 (D. Mass. 2003) ................................................................................ 34
*Guckenberger v. Bos. Univ.*,
   957 F. Supp. 306 (D. Mass. 1997) ................................................................................... 40
*Gutierrez v. Mass. Bay Transp. Auth.*,
   437 Mass. 396 (2002) .................................................................................................14, 36
*Haley v. City of Boston*,
   657 F.3d 39 (1st Cir. 2011) .............................................................................................. 23
*Hanamura v. Newton*,
   104 Mass. App. Ct. 1108, 2024 WL 2721522 (May 28, 2024) ......................................... 8

*Hernandez-Cuevas v. Taylor*,
  723 F.3d 91 ................................................................................................................ 34
*Hidalgo v. Watch City Const. Corp.*,
  105 Mass. App. Ct. 148 (2024) ............................................................................... 10, 16
*Jarvis v. Village Gun Shop, Inc.*,
  805 F.3d 1 (1st Cir. 2015)........................................................................................... 34
*Kaiser v. Kirchick*,
  662 F. Supp. 3d 76 (D. Mass. 2023)........................................................................... 26
*Kennedy v. Town of Billerica*,
  502 F. Supp. 2d 150 (D. Mass. 2007)......................................................................... 28
*Keystone Freight Corp. v. Bartlett Consolidated, Inc.*,
  77 Mass. App. Ct. 304 (2010) ................................................................................... 14
*Kirby v. Petit*,
  2025 WL 2409905 (D. Mass. June 24, 2025)................................................................ 8
*Kowalski v. Gagne*,
  914 F.2d 299 (1st Cir. 1990)....................................................................................... 23
*Kurker v. Hill*,
  44 Mass. App. Ct. 184 (1998) ................................................................................... 36
*Kyte v. Philip Morris Inc.*,
  408 Mass. 162 (1990) ................................................................................................ 37
*Limone v. U.S.*,
  579 F.3d 79 (1st Cir. 2009)..................................................................................... 30, 40
*Lincoln v. Shea*,
  361 Mass. 1 (1972) .................................................................................................... 33
*Lund v. Henderson*,
  22 F. Supp. 3d 94 (D. Mass. 2014)............................................................................. 39
*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006) ...................................................................................... 23
*Mantell v. P & J.V. Management Corp.*,
  2013 WL 6175642 (Mass. Super. Ct. Sept. 22, 2013)................................................. 14
*Mass. ex rel. Powell v. Holmes*,
  546 F. Supp. 3d 58 (D. Mass. 2021)....................................................................... 14, 36
*McGillicuddy v. Clements*,
  746 F.2d 76 (1st Cir. 1984).......................................................................................... 35
*McGrath v. Town of Sandwich*,
  22 F. Supp. 3d 58 (D. Mass. 2014)............................................................................. 24
*McNell v. Hugel*,
  1994 WL 264200 (D.N.H. May 16, 1994) .................................................................. 36
*Mezullo v. Maletz*,
  331 Mass. 233 (1954) ................................................................................................ 25
*Miller v. SBA Towers V, LLC*,
  391 F. Supp. 3d 123 (D. Mass. 2019).......................................................................... 8
*Molina v. Toledo*,
  718 F. Supp. 2d 194 (D.P.R. 2010) ............................................................................ 34
*Monrose v. B & O Enterprises, Inc.*,
  1991 WL 11818251 (V.I. Terr. Ct. Aug. 5, 1991)....................................................... 24

*Nieves v. McSweeney*,
 241 F.3d 46 (1st Cir. 2001)..................................................................................................... 28
*Nieves v. McSweeny*,
 73 F. Supp. 2d 98 (D. Mass. 1999)......................................................................................... 29
*Office One, Inc. v. Lopez*,
 437 Mass. 113 (2002) ............................................................................................................. 12
*O'Gara v. St. Germain*,
 91 Mass. App. Ct. 490 (2017) ................................................................................................. 8
*Pagliuca v. City of Boston*,
 35 Mass. App. Ct. 820 (1994) ............................................................................................... 26
*People v. Dawson*,
 50 N.Y.2d 311 (N.Y. 1980)................................................................................................... 37
*Piccone v. Carrington Mortg. Servs., LLC*,
 2023 WL 3293054 (D. Mass. May 5, 2023)........................................................................... 12
*Planned Parenthood League of Mass., Inc. v. Blake*,
 417 Mass. 467 (1994) ............................................................................................................ 38
*Polay v. McMahon*,
 468 Mass. 379 (2014) ............................................................................................................ 39
*Poy v. Boutselis*,
 352 F.3d 479 (1st Cir. 2003)................................................................................................... 26
*Rehberg v. Paulk*,
 566 U.S. 356 (2012) ............................................................................................................... 24
*Rendell-Baker v. Kohn*,
 457 U.S. 830 (1982) ............................................................................................................... 34
*Rendondo Waste Sys., Inc. v. Lopez-Freytes*,
 659 F.3d 136 (1st Cir. 2011)................................................................................................... 11
*Rizzuti v. Cappabianca*,
 791 F. Supp. 3d 270 (D. Mass. 2025)................................................................................ 10, 30
*Roman v. Trustees of Tufts College*,
 461 Mass. 707 (2012) ............................................................................................................ 39
*Salcedo v. Town of Dudley*,
 629 F. Supp. 2d 86 (D. Mass. 2009)....................................................................................... 29
*Salmon v. Lang*,
 57 F.4th 296 (1st Cir. 2022) ................................................................................................... 38
*Schand v. City of Springfield*,
 380 F. Supp. 3d 106 (D. Mass. 2019)................................................................................ 26, 29
*Schatz v. Republican State Leadership Comm.*,
 669 F.3d 50 (1st Cir. 2012)..................................................................................................... 23
*Sena v. Com.*,
 417 Mass. 250 (1994) ............................................................................................................ 39
*Sholley v. Town of Holliston*,
 49 F. Supp. 2d 14 (D. Mass. 1999)......................................................................................... 39
*Sindi v. El-Moslimany*,
 896 F.3d 1 (1st Cir. 2018)................................................................................................... 13, 39
*Smith v. Egan*,
 802 F. Supp. 3d 86 (D. Mass. 2025)....................................................................................... 33

*Sriberg v. Raymond*,
  370 Mass. 105 (1976) ........................................................................................... 24
*Taylor v. Am. Chemistry Council*,
  576 F.3d 16 (1st Cir. 2009)................................................................................... 36
*Thomas v. Harrington*,
  909 F.3d 483 (1st Cir. 2018).................................................................................. 38
*Tran v. Healey*,
  2022 WL 12480458 (D. Mass. Sept. 13, 2022)....................................................... 23
*U.S. v. McMullin*,
  568 F.3d 1 (1st Cir. 2009)...................................................................................... 33
*U.S. v. Rockland Tr. Co.*,
  860 F. Supp. 895 (D. Mass. 1994).......................................................................... 26
*U.S. v. Silva*,
  742 F.3d 1 (1st Cir. 2014)...................................................................................... 32
*Watson v. Mita*,
  396 F. Supp. 3d 220 (D. Mass. 2019)..................................................................... 31
*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993)...................................................................................... 23
*Wenger v. Aceto*,
  451 Mass. 1 (2008) ........................................................................................... 9, 11
*White v. Peabody Constr. Co.*,
  386 Mass. 121 (1982) ........................................................................................... 26
*Williams v. City of Boston*,
  974 F. Supp. 2d 13 (D. Mass. 2013)....................................................................... 24
*Williams v. Hepting*,
  844 F.2d 138 (3d Cir. 1988) .................................................................................. 25
*Wynn v. Delorie*,
  105 Mass. App. Ct. 1108, 2025 WL 15405 (Jan. 2, 2025)............................... 8, 11, 15
*Wynn v. Schmidt*,
  2017 WL 4169746 (D. Mass. Sept. 20, 2017)......................................................... 39
*Ziemba v. Fo'cs'le, Inc.*,
  19 Mass. App. Ct. 484 (1985) ............................................................................... 32

## Statutes

42 U.S.C. § 1983....................................................................................................... 34
Mass. Gen. L. 260, § 2A ........................................................................................... 26
Mass. Gen. L. c. 231, § 59H .................................................................................... 2, 7

## Rules

Fed. R. Civ. P. 12(b)(6)..................................................................................... *passim*

**INTRODUCTION**

Plaintiff Karen Read ("Ms. Read") was given a full opportunity to cure her deficient pleading. She failed, and instead only made the case for dismissal stronger. The Amended Complaint, Dkt. No. 54 ("Amended Complaint" or "AC"), doubles down on the same fatal theories, the same conspiratorial fictions, and the same baseless allegations. It bolsters accusations that are immune from liability based on hundreds of years of controlling precedent and highlights that dismissal is not just appropriate, but unavoidable.

The material facts, as alleged throughout the Amended Complaint and detailed in publicly available information that Ms. Read now incorporates by reference, cannot be reasonably disputed. Just after midnight on January 29, 2022, after a night of heavy drinking, Ms. Read dropped off Boston police officer John O'Keefe ("Officer O'Keefe") outside of 34 Fairview Road in Canton, Massachusetts ("34 Fairview"), where he was later found dead lying on the frozen ground in the midst of a blizzard. The following morning—still intoxicated—Ms. Read admitted to police that she drove Officer O'Keefe to 34 Fairview, and that she never saw him enter the home. She also could not explain recently sustained damage to the back of her car. Ms. Read told witnesses at the scene: "I hit him." Within three days, she was arrested. Ms. Read was then indicted by a grand jury and prosecuted twice. In 2024, the jury was unable to render a verdict based on the evidence presented, and in 2025 a jury acquitted her of murder, manslaughter, and leaving the scene of an accident, but convicted her of operating a vehicle while intoxicated.

Defendants Brian Albert ("Mr. Albert"), Nicole Albert ("Ms. Albert"), Jennifer McCabe ("Ms. McCabe"), Matthew McCabe ("Mr. McCabe") and Brian Higgins ("Mr. Higgins") (collectively, the "Commonwealth Witnesses" or, individually, a "Commonwealth Witness"), were each questioned by police about the events of January 29 and each testified on behalf of the Commonwealth during at least one of Ms. Read's criminal trials. For that, and that alone, Ms.

1

Read now seeks civil money damages from each of them.  The Amended Complaint attempts to assert five counts against each Commonwealth Witness:  (1) conspiracy to deprive Ms. Read of her Fourth Amendment rights ("1983 conspiracy"); (2) violation of the Massachusetts Civil Rights Act ("MCRA"); (3) malicious prosecution; (4) intentional infliction of emotional distress ("IIED"); and (5) civil conspiracy.  Each count is premised on the same protected conduct: speaking to police and testifying at trial.

At least with respect to the Commonwealth Witnesses, the Amended Complaint is a transparent act of revenge.  Stripped of its rhetoric and salacious factual characterizations, it is a work of conspiratorial fiction devoid of any good faith basis in fact and in law.  Ms. Read asserts a variety of conclusory and speculative allegations that are entitled to no deference on these motions to dismiss.  The claims are unprecedented, violate controlling state and federal law, are plainly barred by the absolute immunity privilege, and fail on several other grounds.

First, the Amended Complaint violates Massachusetts' anti-SLAPP statute, Mass. Gen. L. c. 231, § 59H, because Ms. Read seeks to hold each witness liable for their petitioning activity— namely, testifying at her criminal trials and speaking to police on or around January 29.  Testifying at a criminal proceeding and talking to police before they independently initiate criminal proceedings are core protected petitioning activities safeguarded by the anti-SLAPP statute.  That is the only relevant conduct alleged against each Commonwealth Witness in connection with those five counts.  Moreover, Ms. Read cannot meet her burden under the anti-SLAPP statute of showing that each Commonwealth Witness's statements had no basis whatsoever in fact.

Beyond the anti-SLAPP statute, Ms. Read's Amended Complaint must be dismissed because the Commonwealth Witnesses are entitled to absolute immunity against civil liability for their trial testimony, grand jury testimony, statements to police, and statements to a "separate law

2

enforcement agency." The U.S. Supreme Court and Massachusetts Supreme Judicial Court have both held that witnesses like the Commonwealth Witnesses are entitled to absolute immunity for exactly these types of allegations. Even under the most favorable reading of Ms. Read's claims, the Supreme Court has expressly extended absolute immunity to protect witness statements that were made in any relation to the judicial process—including when witnesses are accused of having engaged in a conspiracy to present false testimony. Since Ms. Read's Amended Complaint against the Commonwealth Witnesses concerns their involvement in the judicial process—*i.e.*, statements to law enforcement, trial testimony, and alleged conspiracy between them regarding their testimony—the Amended Complaint fails and must be dismissed.

Most claims against the Commonwealth Witnesses should also be dismissed for the independent reason that the allegations underlying them are over four years old. Almost all claims are premised on events dating back to late January 2022, when the Commonwealth Witnesses spoke to the police, and on Ms. Read's February 1, 2022 arrest. Yet, Ms. Read's 1983 conspiracy, MCRA, IIED, and civil conspiracy claims all have a three-year statute of limitations that began to run as soon as Ms. Read became aware of the alleged injuries underlying them. Ms. Read's unfounded malicious prosecution theory and the allegations regarding trial testimony in 2024 and 2025 do not alter those claims' accrual dates. Indeed, in her own court filings from the *fall of 2022*—which are incorporated by reference in the Amended Complaint—Ms. Read argued the same baseless conspiratorial theories that she regurgitates here.

Finally, all claims against the Commonwealth Witnesses fail to satisfy even the generous pleading standard under Rule 12(b)(6).

Make no mistake: on its face, this lawsuit is nothing more than an act of retribution brought against those who did nothing more than speak to police and testify for the Commonwealth at Ms.

3

Read's criminal trials. Any result other than dismissal would set a dangerous precedent for aggrieved criminal defendants to use the civil courts to sue adverse witnesses and potentially discourage future witnesses from being willing to stand up and tell the truth in the face of an orchestrated scheme—like the one Ms. Read has hatched—to attack and defame them.

## FACTUAL BACKGROUND

### I.     Officer O'Keefe's Death

On the evening of January 28, 2022, Ms. Read and Officer O'Keefe, who had been dating for several years, spent time at a bar in Canton, Massachusetts, where they met the Commonwealth Witnesses. AC at ¶¶ 27-29. Mr. and Mrs. Albert then invited the group to their residence at 34 Fairview for a gathering, which Ms. McCabe encouraged Ms. Read and Officer O'Keefe to attend. *Id.* at ¶ 29. Despite consuming several alcoholic drinks, *id.* at ¶ 28, Ms. Read drove herself and Officer O'Keefe to 34 Fairview, *id.* at ¶ 32. Ms. Read did not enter the residence and, instead, left Officer O'Keefe at 34 Fairview alone. *Id.*

The next morning, Officer O'Keefe was found unresponsive on the front lawn of 34 Fairview. *Id.* at ¶ 40. Ms. Read first discovered Officer O'Keefe "almost immediately" after she returned to 34 Fairview with Ms. McCabe and third-party Kerry Roberts, despite an ongoing blizzard and it being dark outside. *Id.* at ¶¶ 39-40.

### II.    The Investigation & Arrest of Ms. Read

Soon after Ms. Read discovered Officer O'Keefe's body in the darkness of a blizzard, the Canton Police Department ("CPD") arrived at 34 Fairview. *Id.* at ¶ 42. Several police officers, ambulance personnel, and the fire department arrived to assist. *Id.* at ¶ 44. As part of the investigative efforts, CPD Sergeant Michael Lank interviewed Mr. Albert, Mr. McCabe, and Ms. McCabe at 34 Fairview the same morning, at which point they informed him that Officer O'Keefe was invited, but never entered, 34 Fairview. *Id.* at ¶ 45. Ms. McCabe also informed Sergeant

4

Lank that Ms. Read admitted twice that morning that she may have hit Officer O'Keefe with her car after she dropped him off at 34 Fairview. *Id.* at ¶ 47.

Later that day, the Massachusetts State Police ("MSP") seized Ms. Read's cell phone and car following an interview that Ms. Read gave to the MSP. *Id.* at ¶ 83. After the seizure, investigators discovered that Ms. Read's car had a damaged taillight. *Id.* at ¶ 91. Forensic analysis of the car also uncovered pieces of broken glass on Ms. Read's bumper that were at least partially consistent with a cocktail glass that Officer O'Keefe had been holding when he exited Ms. Read's vehicle at 34 Fairview. *Id.* at ¶ 103. Broken pieces of Ms. Read's taillight were found at 34 Fairview near Officer O'Keefe's body, as well as on Officer O'Keefe's clothing. *Id.* at ¶¶ 97, 102.

Based on the foregoing, on February 1, 2022, police arrested Ms. Read on the theory that she backed into Officer O'Keefe with her car after refusing to attend the 34 Fairview gathering and left him on the lawn to die. *Id.* at ¶¶ 12, 115. On June 9, 2022, a grand jury returned an indictment against Ms. Read, and she was ultimately charged with second-degree murder, manslaughter, and leaving the scene of an accident resulting in death. *Id.* at ¶¶ 115-118.

## III.    The Commonwealth's Statement of the Case

Following her indictment, the Commonwealth publicly filed on Ms. Read's criminal docket in the Norfolk Superior Court a Statement of the Case (the "Commonwealth Statement"), signed by District Attorney Michael W. Morrissey, setting forth a preliminary narration of the allegations against Ms. Read that justified her indictment. *See* attached Declaration of James L. Tuxbury in Support of the Motion to Dismiss ("Tuxbury Decl."), Ex. A (Commonwealth Statement) at 12.[1] According to the Commonwealth Statement, the police spoke with Ms. McCabe

---

[1] As detailed below, "[a] court may consider matters of public record" in assessing a motion to dismiss. *Giragosian v. Ryan*, 547 F.3d 59, 66 (1st Cir. 2008) (citations and quotations omitted).

on January 29, who informed them that she had encouraged Ms. Read and Officer O'Keefe to accept Mr. Albert's invitation to attend the gathering at 34 Fairview the night prior, but that the two never entered the home. *Id.* at 3-4. The next time Ms. McCabe heard from Ms. Read was at 4:53am on January 29, when Ms. Read called Ms. McCabe in a "distraught" state looking for Officer O'Keefe. *Id.* at 4.

Ms. Read then drove to Ms. McCabe's home, where the two—along with non-party Kerry Roberts—began searching for Officer O'Keefe. *Id.* According to the Commonwealth Statement, Ms. McCabe informed law enforcement that, during that drive, Ms. Read asked, "Could I have hit him?" and "Did I hit him?" *Id.* Ms. McCabe also confirmed that she saw that Ms. Read's taillight was cracked and missing pieces. *Id.* at 4-5. The Commonwealth Statement additionally details other witness statements gathered by law enforcement following the discovery of Officer O'Keefe, including those given by Mr. and Ms. Albert, and Mr. McCabe, who all confirmed Ms. McCabe's initial report that Officer O'Keefe never entered 34 Fairview on January 29. *Id.* at pp. 5-7. Moreover, the Commonwealth Statement outlines accounts given by emergency personnel who responded to the scene, including one by Canton Firefighter Katie McLaughlin. In that statement, Ms. McLaughlin informed law enforcement that she observed Ms. Read at the scene repeatedly stating, "I hit him, I hit him, I hit him." *Id.* at 10.

Ms. Read also gave a brief statement to police on January 29. Specifically, Ms. Read informed law enforcement that, while she was invited to 34 Fairview the night prior, she did not enter the home and that, after dropping Officer O'Keefe off, she did not see him enter the home. *Id.* at 12 ("***[Ms. Read] stated that she did not see the victim enter the residence***.") (emphasis added). Ms. Read also stated that she noticed that her taillight had been damaged the night before but did not recall how the damage had occurred. *Id.*

## IV.    Read's Criminal Trials

Ms. Read was first tried for the murder of Officer O'Keefe in April 2024.  *See* AC at ¶ 117. After over two months of testimony, the jury was unable to reach a unanimous verdict, and a mistrial was declared.  *Id.*  Approximately one year later, Ms. Read was tried again on the same charges.  *Id.* at ¶ 118.  The jury found her guilty of operating a vehicle while intoxicated, but not guilty of murder, manslaughter, and leaving the scene of an accident resulting in death.  *Id.*

## V.    The Instant Action

Almost four years after Officer O'Keefe's death, on November 17, 2025, Ms. Read filed the Complaint, and then an Amended Complaint on March 13, 2026.  The Amended Complaint asserts five causes of action against each Commonwealth Witness and seeks to hold each individually liable for what Ms. Read perceives as their role in Ms. Read's arrest, indictment and prosecution.  The Amended Complaint asserts that some or all of the Commonwealth Witnesses: (1) falsely told police, or conspired to falsely tell police, that Officer O'Keefe never entered 34 Fairview on January 29; (2) discussed their statements to the police with each other; (3) testified before a grand jury; (4) met with the investigating police officers; (5) made inaccurate statements to federal investigators; (6) failed to maintain allegedly incriminating evidence; and (7) provided false testimony at Ms. Read's criminal trial(s).  *See, e.g.*, *id.* at ¶¶ 79, 164, 167, 171-72, 178. Based on information that the Commonwealth Witnesses provided police, and because of their trial testimony, for each count, Ms. Read seeks damages for loss of employment, private health insurance, and reputational harm caused by her arrest, indictment and prosecutions.  *See, e.g.*, *id.* at ¶¶ 119, 193.

## ARGUMENT

## I.    The Case Should be Dismissed Against the Commonwealth Witnesses Pursuant to Mass. Gen. L. c. 231, § 59H (the "anti-SLAPP" statute)

### A.  Anti-SLAPP Standard of Review

The Massachusetts anti-SLAPP statute was enacted "to counteract 'SLAPP' suits, defined broadly as 'lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" *Blanchard v. Steward Carney Hosp., Inc.*, 477 Mass. 141, 147 (2017) (quoting *Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 161 (1998)).  The anti-SLAPP statute applies to state law claims filed in federal court. *See Miller v. SBA Towers V, LLC*, 391 F. Supp. 3d 123, 134 (D. Mass. 2019) (citing *Godin v. Schencks*, 629 F.3d 79, 89-92 (1st Cir. 2010)).

The Massachusetts Supreme Judicial Court recently adopted a simplified anti-SLAPP framework.  First, the movant "must show that the challenged count has no substantial basis in conduct other than or in addition to the special motion proponent's alleged petitioning activity." *Bristol Asphalt Co., Inc. v. Rochester Bituminous Prods., Inc.*, 493 Mass. 539, 555-56 (2024).  "To determine if statements are petitioning, [courts] consider them in the over-all context in which they were made." *Kirby v. Petit,* 2025 WL 2409905, at *4 (D. Mass. June 24, 2025) (citations omitted) (alterations in original).  Traditional categories of petitioning activity include "reporting violations of law, writing to government officials, attending public hearings, [and] testifying before government bodies." *Id.* (citation and quotation omitted); *see also Wynn v. Delorie,* 105 Mass. App. Ct. 1108, 2025 WL 15405, at *1 (Jan. 2, 2025) ("reports to the police and [defendant's] trial testimony were 'core petitioning activities.'"); *O'Gara v. St. Germain*, 91 Mass. App. Ct. 490, 497 (2017) (reporting suspected criminal activity to the police is protected activity).  Courts review this first part of the anti-SLAPP analysis on a claim-by-claim basis.  *See Hanamura v. Newton*, 104 Mass. App. Ct. 1108, 2024 WL 2721522, at *3 (May 28, 2024).  Further, in assessing whether there is any non-petitioning conduct, "a judge considers only the allegations that are relevant to the discrete causes of action brought." *477 Harrison Ave., LLC*

8

*v. Jace Boston, LLC*, 477 Mass. 162, 168 (2017); *see also Wenger v. Aceto*, 451 Mass. 1, 5 (2008) (affirming defendants' meeting first prong of anti-SLAPP test because allegations of non-petitioning activity in the amended complaint "have no apparent relationship to the malicious prosecution and abuse of process claims").

If the moving party meets that burden, the second stage shifts to the opposing party. Ms. Read must show, by a preponderance of the evidence, that each Commonwealth Witness's petitioning activities were "devoid of any reasonable factual support or any arguable basis in law" and "caused actual injury" to her. *Bristol Asphalt*, 493 Mass. at 557 (quoting M.G.L. c. 231, § 59H). This is a "high bar." *Blanchard*, 477 Mass. at 156 n.20.

## B. Each State Law Claim Against Each Commonwealth Witness is Based on Petitioning Activity

For each asserted state law claim against each Commonwealth Witness, Ms. Read complains that she was injured because of her arrest, indictment, and prosecution. The only alleged conduct by each Commonwealth Witness relevant to this alleged injury is the fact that each gave information to police and testified at Ms. Read's criminal trials. *See, e.g.*, AC at ¶ 191 (under malicious prosecution count, "the [Commonwealth Witnesses] also provided false testimony at Read's criminal trials."). Ms. Read's speculative (and defamatory) suggestion that the Commonwealth Witnesses are responsible for Officer O'Keefe's death (a claim that Ms. Read lacks any good faith basis or evidence to assert) provides no basis for the state causes of action against them. Indeed, these salacious and baseless allegations are designed to further Ms. Read's scheme to impugn the reputation of the Commonwealth Witnesses as Ms. Read does not—and cannot—assert a wrongful death claim or related tort against them.

Ms. Read's attempt to hold private citizens civilly liable for speaking to police and for testifying at her trial pursuant to duly issued subpoenas is without precedent in Massachusetts.

9

The effort to financially punish those who spoke to police and testified for the Commonwealth violates the core policy of the anti-SLAPP statute: to prevent meritless suits "to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Duracraft*, 427 Mass. at 161 (internal quotations and citation omitted).

### 1. Nicole Albert

Ms. Albert lived at 34 Fairview at the time of Officer O'Keefe's death. There is no allegation that Ms. Albert reached out to the police, initiated any criminal complaint against Ms. Read, or even mentioned Ms. Read to the police. Instead, Ms. Albert is a fact witness whom the police interviewed on February 3, 2022 (two days after Ms. Read's arrest). AC at ¶¶ 22, 29, 65. Ms. Albert also testified at Ms. Read's first criminal trial. *Id.* at ¶¶ 171, 179, 191, 197, 212. Beyond the unremarkable factual allegations that Ms. Albert spoke to her husband and friends about Officer O'Keefe's death, *id.* at ¶¶ 60, 76, the Amended Complaint is devoid of any other factual allegations against her.

### a) Malicious Prosecution

First, for a malicious prosecution claim against Ms. Albert, Ms. Read must establish: "(1) the commencement or continuation of a criminal proceeding against" Ms. Read at the "behest" of Ms. Albert; "(2) the termination of the proceeding in favor of [Ms. Read]; (3) an absence of probable cause for the charges; and (4) actual malice." *Rizzuti v. Cappabianca*, 791 F. Supp. 3d 270, 320 (D. Mass. 2025) (internal quotations and citations omitted).

Because a malicious prosecution claim is based on the initiation of civil or criminal legal proceedings, it is commonly subject to an anti-SLAPP motion. *See Hidalgo v. Watch City Const. Corp.*, 105 Mass. App. Ct. 148, 151 (2024) (noting that the "vast majority" of malicious prosecution cases "are based solely on the opposing party's petitioning activity, and thus are prima facie subject to dismissal under the anti-SLAPP statute."). Ms. Read's malicious prosecution

10

claim against Ms. Albert (and the other Commonwealth Witnesses) is no different.  She alleges that Ms. Albert falsely told police on February 3 that Officer O'Keefe did not enter her home on January 29 and testified at Ms. Read's first trial, and that such statements and testimony caused Ms. Read's damages.  AC at ¶¶ 65, 197, 210.  Providing information to the police and testifying at trial is protected petitioning activity.  *See Wynn,* 2025 WL 15405, *1.

Ms. Read alleges no other conduct by Ms. Albert that is relevant to the commencement of the criminal action against Ms. Read.  *See Wenger*, 451 Mass. at 5-6 (while complaint included other alleged misconduct by defendant, that misconduct was not relevant to the malicious prosecution and abuse of process claims, which were solely based on reporting criminal activity to the police).  While Ms. Read alleges that "[o]ne or more of [the Commonwealth Witnesses] [] relocated O'Keefe's body and deposited it in front of the Alberts' house," AC at ¶ 211, this speculative, group-pled allegation does not avoid application of the anti-SLAPP statute.  Indeed, Ms. Read included this allegation in what appears to be a misguided attempt to bypass the statute.[2]

As an initial matter, Ms. Read does not allege that **Ms. Albert** relocated Officer O'Keefe's body; rather, she simply speculates that "one or more" of the Commonwealth Witnesses relocated the body.  For the court to draw inferences in favor of a plaintiff, the "complaint must allege facts linking each defendant to the grounds on which that particular defendant is potentially liable." *Rendondo Waste Sys., Inc. v. Lopez-Freytes*, 659 F.3d 136, 140 (1st Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).  Complaints are dismissed where they "do[] not identify who, if any, of the [] individual defendants was responsible for" the purported misconduct.  *Doe Next Friend of A v. Spears*, 630 F. Supp. 3d 290, 296 (D. Mass. 2022) (citing *Iqbal*, 556 U.S. at

---

[2] Lest there be any doubt, the Amended Complaint notably omits any allegations relating to anyone allegedly moving Officer O'Keefe's body from her 1983 conspiracy claim against the Commonwealth Witnesses, a federal claim that is not subject to the anti-SLAPP statute.  *See generally* Compl. at ¶¶ 128-139.

11

676). In a notable example, a court held that allegations that a plaintiff's personal property was removed from her home "at some point . . . *by one or more of the defendants*" was insufficient to infer that any of the defendants was liable for the removal. *Piccone v. Carrington Mortg. Servs., LLC*, 2023 WL 3293054, at \*4 (D. Mass. May 5, 2023) (emphasis added) (citations omitted).

Further, this allegation is not pertinent to the malicious prosecution claim. The question is whether Ms. Read alleges that Ms. Albert "engaged in any conduct *germane to her [malicious prosecution claim]* apart from [Ms. Albert's statements to the police], which can provide a substantial basis for her claim." *477 Harrison Ave., LLC*, 477 Mass. at 169 (emphasis added). That answer is no. An allegation that one or more of the Commonwealth Witnesses relocated Officer O'Keefe's body is not relevant to whether Ms. Albert initiated criminal proceedings against Ms. Read. This conduct itself does not relate to any cause of action. Ms. Albert could only possibly have achieved that by speaking to the police and testifying at trial. At best, that "allegation" is intended to show that the statements made by Ms. Albert to the police were false and intended to cover-up her own culpability.[3] However, "the motive behind the petitioning activity is irrelevant at this initial stage." *Office One, Inc. v. Lopez*, 437 Mass. 113, 122 (2002); *Bixby v. Town of Rehoboth*, 2024 WL 3430501, at \*7 (D. Mass. Mar. 22, 2024).

### b) MCRA

Next, Ms. Read asserts an MCRA violation by Ms. Albert. To prove this claim, Ms. Read must establish "(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats,

---

[3] Ms. Read's suggestion that the Commonwealth Witnesses are responsible for Officer O'Keefe's death is irresponsible, knowingly false, and defamatory. To deflect her own responsibilities, Ms. Read has conspired with others to engage in a scheme to defame and injure the Commonwealth Witnesses. Most importantly, Ms. Read has not plead a cause of action against any of the Commonwealth Witnesses relating to Officer O'Keefe's death, such as a wrongful death action. Thus, Ms. Read's superfluous allegations are irrelevant to the claims that she has brought and should be disregarded in the anti-SLAPP petitioning activity analysis.

intimidation, or coercion." *Gallagher v. S. Shore Hosp., Inc.*, 101 Mass. App. Ct. 807, 824 (2022) (citing *Currier v. Nat'l Bd. of Med. Examiners*, 462 Mass. 1, 12 (2012)).

Here, Ms. Read alleges that Ms. Albert interfered with Ms. Read's Fourth Amendment rights. Again, the only specifically alleged ***conduct*** against Ms. Albert relevant to this count, *i.e.*, conduct that could amount to "threats, intimidation, or coercion," is that Ms. Albert falsely told the police that Officer O'Keefe did not enter 34 Fairview and testified at the criminal trial. AC at ¶¶ 178-79. That conduct is plainly petitioning activity and protected by the anti-SLAPP statute. *See Fromm v. Boston Redevelopment Auth.*, 73 Mass. App. Ct. 1109 (2008) (affirming dismissal of MCRA claim under anti-SLAPP).

### c) Intentional Infliction of Emotional Distress

Next, Ms. Read complains that Ms. Albert is liable for IIED, again related to Ms. Read's arrest. AC at ¶ 196. To state an IIED claim, Ms. Read must allege that (1) the defendant intended to inflict emotional distress or knew or reasonably should have known that emotional distress was likely to result from such conduct, (2) the conduct was extreme and outrageous, (3) the conduct proximately caused plaintiff's emotional distress, and (4) the distress was so severe that no reasonable person could be expected to endure it. *Sindi v. El-Moslimany*, 896 F.3d 1, 21 (1st Cir. 2018). Ms. Read again includes the same allegations as contained in her MCRA claim—namely, that Ms. Albert falsely represented to the police that Officer O'Keefe never entered her home, and "provided false testimony at Read's criminal trial." AC at ¶¶ 196-97. Other speculative or group-plead allegations simply are not germane to the IIED claim.

### d) Civil Conspiracy

The final count against Ms. Albert is for civil conspiracy. AC at ¶¶ 203-216. To state such a claim, Ms. Read "must demonstrate that a combination of persons acted pursuant to an agreement

13

to injure the plaintiff." *Mass. ex rel. Powell v. Holmes*, 546 F. Supp. 3d 58, 81 (D. Mass. 2021) (quoting *Gutierrez v. Mass. Bay Transp. Auth.*, 437 Mass. 396, 415 (2002)).

Again, Ms. Read regurgitates the same specific allegations against Ms. Albert—namely, that she lied to the police and in her trial testimony. *See* AC at ¶¶ 210-212. Ms. Read also claims that Ms. Albert texted and communicated with her husband, the McCabes, and Mr. Higgins regarding what they each told the police about what happened to Officer O'Keefe. *Id.* at ¶ 56, 61. However, characterizing Ms. Albert's petitioning activity as a conspiracy because she allegedly discussed her petitioning activity with others does not avoid application of the anti-SLAPP statute. *See Mantell v. P & J.V. Management Corp.*, 2013 WL 6175642, \*3 (Mass. Super. Ct. Sept. 22, 2013) (citing *Keystone Freight Corp. v. Bartlett Consolidated, Inc.*, 77 Mass. App. Ct. 304, 314 (2010)) ("The allegation of a conspiracy is not enough to maintain a counterclaim because there is no activity outside of the petition to which the defendants point that would support a conspiracy"). As with the other counts, Ms. Read includes no specific factual allegations against Ms. Albert outside of her petitioning activity that would support a conspiracy. *Id.*; *see also 477 Harrison Ave., LLC*, 477 Mass. at 170 (alleged statements by the defendants regarding motive do not constitute substantial non-petitioning activity).

### 2. Matthew McCabe

Mr. McCabe lives in Canton, was questioned by police on January 29 about the death of Officer O'Keefe and testified at Ms. Read's first criminal trial. AC at ¶¶ 24, 80. Like Ms. Albert, Ms. Read includes few specific factual allegations against Mr. McCabe and identifies him only a handful of times. The few references to Mr. McCabe are allegations almost identical to those against Ms. Albert—namely, (1) Mr. McCabe was at 34 Fairview on January 29; (2) on that day, he told the police that Officer O'Keefe did not enter the home; (3) subsequently, Mr. McCabe was

14

included on text messages with his wife and the Alberts regarding statements to police; and (4) Mr. McCabe testified at Ms. Read's criminal trial. *Id.* at ¶¶ 29, 45, 56, 61.

Like Ms. Albert, Ms. Read also includes the generalized and speculative claim that "one or more" Commonwealth Witness relocated Officer O'Keefe's body. *Id.* at ¶ 211. Ms. Read, however, does not allege that Mr. McCabe, specifically, relocated Officer O'Keefe's body. *See Doe Next Friend A*, 630 F. Supp. 3d at 296 ("Plaintiff's claim, therefore, is subject to dismissal because the amended complaint does not identify who, if any, of the three individual defendants was responsible for writing and/or submitting the allegedly false report to the Massachusetts Probate Court.") (citation omitted). Further, like Ms. McCabe, *infra*, Ms. Read includes allegations that Mr. McCabe was home the morning of January 29. Accordingly, for the same reasons outlined above, Mr. McCabe has shown that the claims against him are based solely on petitioning activity.

### 3. Jennifer McCabe

The Amended Complaint reflects Ms. Read's extraordinary animus and desire for revenge against Ms. McCabe. Ms. Read alleges that Ms. McCabe lied to police, lied to the FBI, and provided false testimony at Ms. Read's criminal trials. *See e.g.,* AC at ¶ 45; *id.* at ¶ 122; *id.* at ¶ 78. Like Ms. Albert and Mr. McCabe, Ms. McCabe's statements to law enforcement and trial testimony are core petitioning activities, rendering the state law claims against Ms. McCabe barred under Massachusetts' anti-SLAPP law. *See Wynn*, 2025 WL 15405, *1 ( Jan. 2, 2025) (reversing denial of anti-SLAPP motion on malicious prosecution claim noting that "reports to the police and [defendant's] trial testimony were 'core petitioning activities.'").

Ms. Read's assertion that Ms. McCabe's statements to police and her trial testimony were false and motivated to cover up Ms. McCabe's own alleged involvement in Officer O'Keefe's

death does not save these claims.  When assessing whether alleged conduct is petitioning activity, the veracity or motivation of the alleged activity is not relevant.  *See Hidalgo*, 105 Mass. App. Ct. 148 (argument that activity was performed in bad faith or for "ulterior purpose" not relevant to assessment of petitioning activity under anti-SLAPP).

The Amended Complaint includes several additional allegations against Ms. McCabe concerning her conduct on and after January 29.  But stripped of the sensational characterizations, which are entitled to no deference, Ms. Read merely alleges mundane conduct by Ms. McCabe that is not relevant to any of the counts asserted.  *See 477 Harrison Ave, LLC*, 477 Mass. at 162 ("In assessing the conduct complained of, a judge [on an anti-SLAPP motion] considers only the allegations that are relevant to the discrete causes of action brought.").  For example, Ms. Read alleges that Ms. McCabe was "wildly active" during the early morning hours of January 29.  AC at ¶ 54.  Putting aside that characterization, the factual allegations reflect ordinary conduct.  Ms. Read alleges Ms. McCabe: (1) returned to her home at 2:12am; (2) spent 13 minutes walking around her house; (3) stopped moving and opened her iPhone for approximately 6.5 minutes; and (4) then closed her phone and moved for one minute before settling back down.  *Id.*  This is not "wild activity" but, rather, is indicative of the actions of someone getting ready for bed.  *Id.*  These extraneous allegations do not impact the anti-SLAPP petitioning activity analysis because they are not relevant to Ms. Read's counts.

Ms. Read also alleges that, at 2:27am, Ms. McCabe performed a Google search on her phone, stating: "Hos long to die in cold."  AC at ¶ 38.  This allegation has no good-faith basis in fact or law.[4]  Nevertheless, it does not salvage Ms. Read's claims from the anti-SLAPP statute.

---

[4] At the second criminal trial, it was unrebutted that the Google search at issue (which, notably, was not even completed) occurred at 6:24am.  Indeed, the evidence at trial revealed that any contention that the Google search occurred at 2:27am was based on a fundamentally erroneous reading of the data.

Ms. Read can only avoid anti-SLAPP dismissal if this alleged conduct relates to the elements of the claims brought against Ms. McCabe. *See 477 Harrison Ave, LLC*, 477 Mass. at 162 (only conduct relevant to the claims is assessed for petitioning activity). The answer is clearly that it does not. For example, a Google search conducted at 2:27am is not relevant to Ms. Read's malicious prosecution claim against Ms. McCabe, as it has nothing to do with initiating a criminal proceeding against Ms. Read. *See Chin v. Garda CL New England, Inc.*, 2017 WL 5771464, *7 (D. Mass. Aug. 16, 2017) (granting anti-SLAPP motion to dismiss malicious prosecution claim even though complaint includes allegations of non-petitioning conduct since non-petitioning conduct was not the basis for the malicious prosecution claim). This false allegation is only included to imply that Ms. McCabe had some responsibility for Officer O'Keefe's death, but Ms. Read brings no such claim—nor could she—related to the death of Officer O'Keefe.

Finally, like the other Commonwealth Witnesses, Ms. Read also includes the generalized and speculative claim that "one or more" Commonwealth Witnesses relocated Officer O'Keefe's body. AC at ¶ 211. Ms. Read, however, does not allege that Ms. McCabe, specifically, relocated Officer O'Keefe's body. Moreover, additional allegations confirm that Ms. McCabe (and her husband) could not have been involved in any relocation of Officer O'Keefe's body. The Amended Complaint alleges that at approximately 2:12am, Ms. McCabe arrived at her home and remained there until she was visited by Ms. Read after 5:00am. AC at ¶¶ 39, 54. Further, Ms. Read alleges—again, without any good-faith basis in fact or law—that Officer O'Keefe was not located on the lawn at 34 Fairview Road until after 3:30am. *Id.* at ¶ 107. As such, Ms. Read's allegations exclude Ms. McCabe—and her husband—from any role in the alleged relocation of Officer O'Keefe.

17

### 4. Brian Albert

Mr. Albert previously lived at 34 Fairview, is married to Ms. Albert, told the police that Officer O'Keefe did not enter his home on January 29, 2022, and testified against Ms. Read. AC at ¶¶ 178-79. There is no specific allegation that Mr. Albert relocated Officer O'Keefe's body. As a result, just like his wife and the McCabes, every claim against Mr. Albert is based solely on his petitioning activity and should be dismissed under the anti-SLAPP statute.

The only unique allegation against Mr. Albert is that he—months after Ms. Read was arrested and indicted—allegedly "destroy[ed]" his phone, which Ms. Read alleges "eliminated potentially incriminating communications." *Id.* at ¶¶ 72; 178 ("[Mr.] Albert "caused Ms. Read's wrongful indictment, arrest, and prosecution by destroying or discarding [his] phone[].""). Much like Ms. McCabe's alleged Google search, however, this allegation is false and a red herring. This purported "conduct" has no relevance to the elements of any claim asserted against Mr. Albert. For example, whether Mr. Albert "destroyed" his personal cell phone, the characterization of which is disputed,[5] is not relevant to Ms. Read's malicious prosecution claim, as it doesn't relate to the initiation of Ms. Read's criminal proceedings.

Further, the Amended Complaint conspicuously omits that Ms. Read did not have a right to any information on Mr. Albert's phone in connection with her 2022 arrest or her 2024-2025 criminal trials. Mr. Albert had no duty to give to Ms. Read any alleged incriminating evidence, did not receive a subpoena for those records, and was never ordered to produce any phone records to Ms. Read. On the contrary, on October 5, 2022, Judge Cannone denied Ms. Read's motion for a subpoena to access Mr. Albert and Mr. Higgins's phones, finding that, "[t]he Court is not satisfied that the requested phones contain information that is evidentiary and relevant, nor is the Court

---

[5] While not relevant to the Court's inquiry on this motion, the evidence will show that Ms. Read's phone destroying contentions, both with respect to Mr. Albert and Mr. Higgins (*see infra*), are knowingly false.

18

satisfied that the application is made in good faith and is not intended as a general fishing expedition." Tuxbury Decl., Ex. C (October 5, 2022 Order of Judge Cannone). The Court did so again on June 20, 2023. *Id.*, Ex. D (June 20, 2023 Order of Judge Cannone). There, the Court held that Ms. Read had "not shown with credible evidence that relevant or admissible evidence will be found on Albert's cell phone or in his cell phone records." *Id.* at 4. Furthermore, Mr. Albert was never found to have violated any Court Order, nor was he—like the other Commonwealth Witnesses—ever investigated or charged with perjury.

Accordingly, Ms. Read's superfluous allegation that Mr. Albert destroyed his personal phone has zero bearing on the actual claims she brings against Mr. Albert, and does not defeat Mr. Albert's showing that her claims are based solely on Mr. Albert's petitioning activity.

### 5. Brian Higgins

Mr. Higgins was at 34 Fairview on January 29 and, when interviewed by police on February 3, told police that Officer O'Keefe did not enter the home. He also provided testimony before the state grand jury in April 2022 and at Ms. Read's first criminal trial, *see* AC at ¶¶ 29, 65-66, 79, 178-79, both of which are soundly petitioning activity.

Similar to Mr. Albert, Ms. Read alleges that Mr. Higgins "destroyed" his personal phone.[6] AC at ¶ 72. For the same reasons described above, this allegation is not related to any of the counts that Ms. Read asserts against Mr. Higgins. Indeed, the Amended Complaint admits that Mr. Higgins maintained his old phone until at least ***October 2022***—months after Ms. Read was arrested and indicted by a grand jury. AC at ¶ 70. Thus, even assuming that Mr. Higgins "destroyed" his phone at that time (which is disputed), that act could not have contributed to law enforcement's

---

[6] *See* footnote 5, *supra*. Should this case proceed to discovery, the evidence will show that Mr. Higgins actually preserved his original phone and retained it for approximately three months after learning that the state court issued a preservation order and denied Ms. Read's motion for a subpoena.

19

decision to charge and prosecute Ms. Read.  Therefore, it does not prevent application of the anti-SLAPP statute.  Mr. Higgins is also included in the group-pled allegation that "one or more" of the Commonwealth Witnesses relocated Officer O'Keefe's body.  AC at ¶ 211.  Yet, similar to the allegations against Ms. McCabe, Ms. Read admits in other portions of the Amended Complaint that Mr. Higgins left 34 Fairview hours prior to when she claims Officer O'Keefe's body appeared on the front lawn.  *Compare* AC at ¶ 67 (Mr. Higgins seen in the parking lot of CPD at 1:30am), *with* AC at ¶ 107 (no body on the front lawn of 34 Fairview at 2:30am).

### C. Ms. Read Cannot Meet Her Burden of Showing that Each of the Commonwealth Witnesses Had No Factual or Legal Basis for their Petitioning Activity

Because the Commonwealth Witnesses have satisfied the first prong of the *Bristol* framework, the burden shifts to Ms. Read to show that the Commonwealth Witnesses' exercise of their petitioning rights "was devoid of any reasonable factual support or any arguable basis in law." *Bristol Asphalt*, 493 Mass. at 557 (quoting M.G.L. c. 231, § 59H).  This is a "difficult task" because the mere submission of opposing affidavits and credibility challenges are not enough.  *Id.* at 558 ("material, disputed credibility issues may not be resolved in the special motion opponent's favor").

Ms. Read cannot meet this standard.  Indeed, she cannot provide any genuine evidence to dispute the factual bases for the Commonwealth Witnesses' petitioning activity, much less satisfy the higher bar of establishing that their activity was devoid of any reasonable factual basis. Foremost, Ms. Read complains that each Commonwealth Witness told the police (and testified to the same) that Officer O'Keefe did not enter 34 Fairview on January 29.  *See e.g.,* AC at ¶ 34. Each Commonwealth Witness has submitted a supporting declaration attesting to the fact that they made those statements to the police and that those statements were truthful.  *See* Declarations of Jennifer McCabe, Matthew McCabe, Brian Higgins, Brian Albert, and Nicole Albert.  Ms. Read

20

cannot rebut that or show that any petitioning activity was devoid of a factual basis since this *is exactly what Read told the police on January 29, 2022*.  *See* Tuxbury Decl., Ex. A at 12.

Besides Ms. Read's own statement to the police, other evidence established that Officer O'Keefe never entered 34 Fairview.  As reflected in the Commonwealth Statement, Officer O'Keefe was found covered in snow on the front lawn of 34 Fairview, but no snow was found underneath his body.  *Id.* at 8.  This evidence is consistent with Officer O'Keefe being injured at the time Ms. Read dropped him off, prior to the blizzard conditions.  *Id.* at 1.  Further, there was no evidence of any foot tracks in the snow between the home at 34 Fairview and the location of Officer O'Keefe's body.  If someone had relocated his body from the home to the lawn sometime after 3:30am—in the middle of a blizzard—there would have been significant tracks in the snow between the home and body.

Officer O'Keefe was also found missing one shoe.  *Id.* at 13.  According to trial testimony, the missing shoe was located hours later under snow, next to the curb where Ms. Read dropped off Officer O'Keefe.  *See* Tuxbury Decl. ¶ 6, (May 5, 2025 Testimony of Lt. Kevin O'Hara, with relevant testimony at 23:35-30:00).  In addition, Officer O'Keefe's shoe was found near pieces of broken taillight.  *Id.*, Ex. A at 13.

Moreover, Officer O'Keefe's cell phone was found underneath his body.  *Id.* at 5.  At the second trial, the Commonwealth presented GPS data from Officer O'Keefe's phone that showed his cell phone ceased moving at approximately 12:32am at the same location where his body was found.  *See* Tuxbury Decl. at ¶ 7, (April 28, 2025 Testimony of Ian Whiffin, with relevant testimony at 1:19-2:33).  Further testimony revealed that Officer O'Keefe's phone locked for a final time at 12:32am, meaning that Officer O'Keefe did not access his phone after that time.  *Id.*

21

Ms. Read alleges in her Amended Complaint that Officer O'Keefe's "Apple Health data" showed he had "just enough distance" to get from the driveway into the house. AC at ¶ 32. The problem here is that Officer O'Keefe and his phone were found by the flagpole on the front lawn. *Id.* at ¶ 40. Thus, even disregarding Plaintiff's misrepresentation of the Apple Health data, the fact that there was "just enough distance" to get into the house cannot account for Officer O'Keefe's location back on the front lawn hours later. And even if there is some dispute about the number of steps taken by Officer O'Keefe, that would not be sufficient to satisfy the burden of showing that the petitioning activity lacked *any* reasonable basis in fact. *Blanchard*, 477 Mass. at 156 n.20.

Ms. Read also claims that Ms. McCabe falsely told police that Ms. Read made "inculpatory" statements the morning of January 29. AC at ¶ 164. But again, Ms. Read cannot meet her burden that those statements to police, *i.e.*, her petitioning activity, were devoid of any reasonable factual basis. On the contrary, the Commonwealth Statement identifies that several other individuals heard Ms. Read make incriminating statements on January 29. For example, on January 30, police spoke to Canton Firefighter Katie McLaughlin, who arrived at 34 Fairview shortly after the 911 call. Ms. McLaughlin spoke with Ms. Read at the scene and heard Ms. Read state repeatedly, "*I hit him, I hit him, I hit him*." Tuxbury Decl., Ex. A at 10.

Accordingly, because each Commonwealth Witness has shown that Ms. Read's state law claims are based solely on petitioning activity for which she cannot establish the absence of any reasonable factual basis, each Commonwealth Witness is entitled to dismissal of those claims and an award of their attorneys' fees. *See Bristol*, 493 Mass. at 540.

II.    **The Case Against the Commonwealth Witnesses Should be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6)**

   A. **Fed. R. Civ. P. 12(b)(6) Standard of Review**

   On a motion to dismiss, the Court must determine if the facts alleged "plausibly narrate a

22

claim for relief." *Schatz v. Republican State Leadership Comm.,* 669 F.3d 50, 55 (1st Cir. 2012). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. *García-Catalán v. U.S.,* 734 F.3d 100, 103 (1st Cir. 2013). First, it must distinguish the factual allegations from the conclusory legal allegations. *Id.* Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. *Id.* Second, it must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Haley v. City of Boston,* 657 F.3d 39, 46 (1st Cir. 2011)).

"[A] court resolving a Rule 12(b)(6) motion to dismiss is not necessarily limited to the complaint alone." *Tran v. Healey*, 2022 WL 12480458, at *2 (D. Mass. Sept. 13, 2022) (citing, *inter alia*, *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998)). It "may [also] consider matters of public record," including "documents from prior state court adjudications." *Giragosian v. Ryan*, 547 F.3d 59, 66 (1st Cir. 2008) (citations and quotations omitted); *see also Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) ("official public records" properly considered on a motion to dismiss) (citations omitted). Indeed, "it is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand." *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990); *see also Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (docket sheets are public records of which court may take judicial notice).

### B. All Claims Brought Against the Commonwealth Witnesses are Shielded by the Doctrine of Absolute Immunity

Ms. Read's original complaint only hinted that her claims might be premised on the Commonwealth Witnesses' prior testimony against her. The Amended Complaint now confirms it beyond question. Controlling law, based on precedent dating back centuries, is unequivocally clear that claims of this nature cannot survive.

It is "well established" that "the immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings" is absolute. *Briscoe v. LaHue*, 460 U.S. 325, 330-31 (1983) (citing *Cutler v. Dixon*, 76 Eng. Rep. 886 (K.B. 1585); *Anfield v. Feverhill*, 80 Eng. Rep. 1113 (K.B. 1614); *Henderson v. Broomhead*, 157 Eng. Rep. 964, 968 (Ex. 1859)). This immunity extends to "all persons—governmental or otherwise—who were integral parts of the judicial process." *Id.* at 335. Without it, "the truth-seeking process would be impaired. Witnesses 'might be reluctant to testify,' and even if a witness took the stand, the witness 'might be inclined to shade his testimony in favor of the potential plaintiff' for 'fear of subsequent liability.'" *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) (quoting *Briscoe*, 460 U.S. at 333)). This Court has made clear that this doctrine "cannot be circumvented by pleading that the witness conspired to present false testimony." *McGrath v. Town of Sandwich*, 22 F. Supp. 3d 58, 71 (D. Mass. 2014). The Massachusetts Supreme Judicial Court also has historically recognized this privilege, attaching it wherever statements "relate[] to a proceeding which is contemplated in good faith and which is under serious consideration." *Sriberg v. Raymond*, 370 Mass. 105, 109 (1976). Thus, witness statements are absolutely privileged, even if rendered outside of the courtroom, so long as they are made "in the context of a proposed judicial proceeding." *Correllas v. Viveiros*, 410 Mass. 314, 320-21 (1991) ("an absolute privilege was appropriately applied . . . because police and prosecutors were contemplating a criminal action when the defendant made the alleged defamatory statements.") (citing cases); *see also Williams v. City of Boston*, 974 F. Supp. 2d 13, 17 (D. Mass. 2013) ("[a]bsolute immunity at the pre-trial motion stage is as important as it is during grand jury proceedings, or at trial."). This has historically extended to statements made to police "prior to arrest" that are analogous to testimony given during grand jury proceedings or analogous to appearing at a probable cause hearing. *See Monrose v. B & O Enterprises, Inc.*, 1991

24

WL 11818251, at *2 (V.I. Terr. Ct. Aug. 5, 1991) (citing *Williams v. Hepting*, 844 F.2d 138 (3d

Cir. 1988) and *Burns v. Reed*, 500 U.S. 478 (1991)).

Here, the Amended Complaint expressly references and relies on the Commonwealth

Witnesses' testimonial activity over a dozen times. *See* AC at ¶¶ 71, 79-80, 123, 129, 131, 171-

72, 179-180, 191-92, 197-98, 212-13. Indeed, each claim brought against the Commonwealth

Witnesses directly alleges that (1) they coordinated to tell investigators that Mr. O'Keefe never

entered 34 Fairview and that Ms. Read made inculpatory statements on the morning of January

29; (2) some of them "provided false testimony at Read's criminal trials"; and (3) Ms. McCabe

"lied" to a separate law enforcement agency in 2023. *See id.* at ¶¶ 164, 171-72 (1983 conspiracy);

¶¶ 178-180 (MCRA); ¶¶ 190-92 (malicious prosecution); ¶¶ 196-98 (IIED) ¶¶ 209, 211-13 (civil

conspiracy).[7] These allegations, having occurred during the investigation and prosecution of Ms.

Read, are protected by the absolute privilege because they were "pertinent to" judicial proceedings

as a matter of law. *See Aborn v. Lipson*, 357 Mass. 71, 73 (1970) (agreeing that absolute immunity

attaches so long as "the statement [has] some reasonable relation or reference to the subject of

inquiry, or [is] one that may possibly be pertinent, with all doubts resolved in favor of the

defendant") (internal quotations and citation omitted). Moreover, it is of no importance that Ms.

Read alleges that Ms. McCabe "lied" to the separate law enforcement agency or that some of the

Commonwealth Witnesses rendered "false" testimony during Ms. Read's criminal trials. While

those allegations are vigorously contested, black-letter law is clear that statements made in relation

to judicial proceedings are protected "even if uttered maliciously or in bad faith." *Mezullo v.*

---

[7] As detailed *supra*, Section I, the additional baseless allegations that one or more of the Commonwealth Witnesses relocated Officer O'Keefe's body and that Mr. Albert and Mr. Higgins discarded or destroyed their cellphones well after Ms. Read was arrested and indicted do not—by themselves—support any element underlying the claims made against them. Without repeated reliance on the Commonwealth Witnesses' testimonial activity, Ms. Read fails to satisfy the requisite pleading standards.

*Maletz*, 331 Mass. 233, 236 (1954) (citations omitted); *see also U.S. v. Rockland Tr. Co.*, 860 F. Supp. 895, 903-04 (D. Mass. 1994); *Eberle v. Diviacchi*, 1996 WL 218210, at *2 (Mass. Super. Ct. Mar. 29, 1996) ("immunity covers all statements by a witness, regardless of motive").

In sum, the allegations made in support of the elements of each of Ms. Read's claims are based on statements made during Ms. Read's criminal trials or to law enforcement officials in the context of Ms. Read's arrest, indictment, and prosecution.  Because such allegations are protected by the absolute immunity doctrine, the claims they purport to support must be dismissed.

### C. Ms. Read's § 1983 Conspiracy, Common Law Conspiracy, MCRA, and Intentional Infliction of Emotional Distress Claims are Time-Barred

As an additional basis for dismissal, Ms. Read's claims against the Commonwealth Witnesses for civil conspiracy, the Massachusetts Civil Rights Act ("MCRA"), and intentional infliction of emotional distress ("IIED") are all subject to a three-year statute of limitations that has expired.  *See Poy v. Boutselis*, 352 F.3d 479, 483 (1st Cir. 2003) (Section 1983 conspiracy); *Schand v. City of Springfield*, 380 F. Supp. 3d 106, 138 (D. Mass. 2019) (common law conspiracy); *Arsenault v. Otto*, 628 F. Supp. 3d 377, 380 (D. Mass. 2022) (MCRA); Mass. Gen. L. 260, § 2A. For all four claims, the limitations period begins to run when the plaintiff "knows or should know that she has been injured."  *See Kaiser v. Kirchick*, 662 F. Supp. 3d 76, 94 (D. Mass. 2023) (citing *Pagliuca v. City of Boston*, 35 Mass. App. Ct. 820, 824 (1994)).  This does not mean that the plaintiff must have "notice of every fact which must eventually be proved in support of the claim" but, rather, "knowledge that an injury has occurred."  *White v. Peabody Constr. Co.*, 386 Mass. 121, 130 (1982); *see also Arsenault*, 628 F. Supp. 3d at 380 ("A plaintiff need not know the extent or severity of the harm suffered.  To start the limitations period, a plaintiff need only have knowledge of all the facts necessary to make out [her] civil rights claim.").

The crux of Ms. Read's claims against the Commonwealth Witnesses for conspiracy,

violations of the MCRA, and intentional infliction of emotional distress are that they undertook certain efforts in early 2022 to lie to law enforcement and frame Ms. Read for the killing of Officer O'Keefe. *See* AC at ¶¶ 164, 178, 196, 209. Even assuming these allegations were true (something the Commonwealth Witnesses vehemently deny), the claims are time-barred because Ms. Read was aware of those purported efforts long before November 17, 2022 (*i.e.*, three years before Ms. Read filed her original complaint in state court). Publicly available information docketed during the underlying criminal trials, which the Amended Complaint incorporates by reference, confirms Ms. Read's awareness.[8] For example, on June 10, 2022, Ms. Read obtained a tranche of discovery from the Commonwealth, including the Commonwealth Witnesses' statements to police, which the Amended Complaint alleges was when these individuals told law enforcement that Officer O'Keefe never entered 34 Fairview. *See* Tuxbury Decl., Ex. B, ("Notice of Discovery," Case No. 2282CR0117, Dkt. No. 6) at ¶¶ 41, 54, 59-61. Also on June 10, 2022, Ms. Read acquired extraction data from Commonwealth Witness Ms. McCabe's cellphone, which Ms. Read alleges contained the text messages that evidence the purported plan to "frame" her. Tuxbury Decl., Ex. B at ¶¶ 88, 91; *see also* AC at ¶ 62 (admitting that the text messages "provide[d] a window into [the] conspiracy and misconduct"), ¶ 77. Indeed, the Amended Complaint goes so far as to allege that Commonwealth Witness Ms. McCabe was "the point person" in the efforts to coordinate the alleged statements to police, AC at ¶ 52, bolstering the significance of the data that Ms. Read has had since June 2022 to her overall theory of the case. Ms. Read even used this June 2022 evidence to support a Rule 17 motion, filed on *September 15, 2022*, wherein Ms. Read argued *the exact same theory* that she presents in the instant case. Tuxbury Decl. Ex. C (Case No. 2282CR0117,

---

[8] See discussion, *supra*, Section II(A) ("A court may consider matters of public record," including "documents from prior state court adjudications" in deciding a Rule 12(b)(6) motion to dismiss).

Dkt. No. 27) at 9 ("all of the percipient witnesses in this case apparently gathered at Brian Albert's house to get their stories straight."), at 16 ("Brian Albert and the other individuals who were at his house on the night in question have engaged in considerable communications about the facts and circumstances surrounding O'Keefe's death. . . . [I]t is absolutely necessary to obtain communications from all interested parties in order to . . . reveal the extent of the communication and coordination with law enforcement that the defense has reason to believe has occurred in this case."). Like Ms. McCabe's cellphone data, Ms. Read's September 2022 Rule 17 motion is incorporated by reference in the Amended Complaint and is therefore appropriately considered at this stage. *See* AC at ¶ 69.

The Amended Complaint sets forth one other allegation in support of the conspiracy, MCRA, and IIED claims—namely, Mr. Albert and Mr. Higgins's purported efforts to destroy their cellphones—but that allegation cannot cure the time bar. AC at ¶ 68.[9] First, the Amended Complaint is silent as to when Ms. Read learned of this allegation. Yet, even if her awareness came after November 17, 2022, such does not modify the requisite accrual dates. "[T]he First Circuit has rejected the notion that 'the statute of limitations . . . should run from the date of the last overt act that causes damage to the plaintiff.'" *Kennedy v. Town of Billerica*, 502 F. Supp. 2d 150, 155 (D. Mass. 2007) (quoting *Nieves v. McSweeney*, 241 F.3d 46, 51 (1st Cir. 2001)). Instead, these claims accrued "***at the moment*** [Ms. Read knew], or ha[d] reason to know, of the injury that is the basis for the claim[s]." *Nieves*, 241 F.3d at 52 (emphasis added). It is undisputed that Ms. Read became aware of, and was purportedly injured by, the main allegations forming the basis of her conspiracy, MCRA, and IIED claims in June 2022 at the latest. Accordingly, the claims are

---

[9] While the Court must accept this allegation as true for purposes of analyzing the Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Commonwealth Witnesses vigorously note that, should the instant motions be denied, discovery will reveal that this allegation—like many others—is demonstrably false.

time-barred.  *See Schand v. City of Springfield*, 380 F. Supp. 3d 106, 138-39 (D. Mass. 2019) (tort claims ancillary to malicious prosecution not tolled due to plaintiff's criminal trial).

Furthermore, to the extent that Ms. Read attempts to salvage the time bar by relying exclusively on her malicious prosecution claim, such efforts must fail.  First, as discussed *infra*, Section II(D)(2), the Amended Complaint is entirely devoid of allegations that the Commonwealth Witnesses ever coordinated or agreed with law enforcement to have Ms. Read indicted and prosecuted.  At best, the allegations against the Commonwealth Witnesses are that they coordinated ***amongst each other*** in early 2022 to have Ms. Read investigated and arrested to absolve themselves from potential liability.  *See, e.g.*, AC at ¶ 164 (describing that the purpose of the alleged false representations was for law enforcement to investigate Read); ¶ 169 ("[a]s a result of the conspiracy between and among [the Commonwealth Witnesses], Proctor, Bukhenik, and Tully never investigated" them).  Accordingly, the only civil rights violation that the Commonwealth Witnesses are alleged to have infringed upon is Ms. Read's Fourth Amendment right to be free from wrongful arrest.  Absolutely nothing in the Amended Complaint, aside from their protected testimony offered against Ms. Read, affirmatively connects the Commonwealth Witnesses to the prosecution.  And courts do not hesitate to parse out civil rights claims that are generally associated with both wrongful arrest and wrongful prosecution when analyzing a statute of limitations defense.  *See, e.g.*, *Nieves v. McSweeny*, 73 F. Supp. 2d 98, 102 (D. Mass. 1999), *aff'd*, 241 F.3d 46 (1st Cir. 2001); *Salcedo v. Town of Dudley*, 629 F. Supp. 2d 86, 98 (D. Mass. 2009).  Those cases are clear: while claims associated with wrongful prosecution accrue after the termination of the underlying criminal proceeding, claims associated with wrongful arrest do not.  And, as discussed above, any effort to revive Ms. Read's otherwise untimely claims by relying on the Commonwealth Witnesses' statements made throughout and in anticipation of Ms. Read's

29

criminal trials should be swiftly rejected since such testimony is shielded by absolute immunity.[10]

In sum, Ms. Read was fully aware of the pertinent facts underlying her conspiracy, MCRA, and IIED claims before November 2022. The fact that she was acquitted in June 2025 does not save those time barred claims.

### D. The Amended Complaint Fails to State Any Claims Against Any of the Commonwealth Witnesses Upon Which Relief Could be Granted

Even if the Court finds against the Commonwealth Witnesses pursuant to the arguments above, none of the claims brought against them pass muster under Fed. R. Civ. P. 12(b)(6).

#### 1. Common Law Malicious Prosecution

To sufficiently plead a malicious prosecution claim, a plaintiff must establish four elements: "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice." *Rizzuti v. Cappabianca*, 791 F. Supp. 3d 270, 320 (D. Mass. 2025) (internal quotations and citations omitted). Ms. Read fails to satisfy at least three of these prongs.

##### i. Ms. Read Fails to State that the Commonwealth Witnesses "Commenced or Continued" the Criminal Proceedings

"[A]n individual may be said to have instituted criminal proceedings against another if he caused those proceedings to be initiated." *Limone v. U.S.*, 579 F.3d 79, 89 (1st Cir. 2009). For individuals not vested with charging decisions, a plaintiff must show that the defendants "induce[d] another person (say, a police officer or prosecutor) to lodge formal criminal charges,"

---

[10] Indeed, the only relevant allegations that this purported conspiracy continued "for years after Mr. O'Keefe's death" are that Ms. McCabe "lied" to a separate law enforcement agency in April 2023 and spoke with other law enforcement officials in anticipation of Ms. Read's trial in September 2023—activity that is similarly barred by absolute immunity. *See* AC at ¶¶ 122-134. Moreover, the allegation that Defendant Bukhenik "fundraised" for the Commonwealth Witnesses is a red herring, since the Amended Complaint concedes that such efforts took place after Ms. Read's June 2025 acquittal and, therefore, could not be a component of a conspiracy to have Ms. Read prosecuted.

or that the defendants "exercise[d] a peculiar degree of control over the charging official or adamantly presse[d] that official to bring a criminal complaint." *Id.* Where there is no allegation that the defendants "did anything to further the prosecution of plaintiff," or that the state actor "relied on information from [the defendants] when deciding whether to submit the criminal complaint," this element is not satisfied. *Goddard v. Kelly*, 629 F. Supp. 2d 115, 130 (D. Mass. 2009). "The mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held [to be] sufficient." *Watson v. Mita*, 396 F. Supp. 3d 220, 225 (D. Mass. 2019) (citation omitted). And "[i]t is not enough that [the defendant] appears as a witness against the accused . . . and thereby aids in the prosecution of the charges which he knows to be groundless. His share in continuing the prosecution must be ***active, as by insisting upon or urging further prosecution***." *Degree v. Gendreau*, 2025 WL 3702535, at \*10 (D. Mass. Dec. 19, 2025) (emphasis added).

Ms. Read fails to allege that the Commonwealth Witnesses took an active role in her investigation or prosecution, and she does not assert that they induced or pressured law enforcement to arrest Ms. Read in any way. The Amended Complaint alleges only that these individuals "caused Ms. Read's wrongful indictment, arrest, and prosecution" by (1) falsely representing that Officer O'Keefe never entered 34 Fairview; (2) relocating Officer O'Keefe's body; and (3) (as to Commonwealth Witnesses Mr. Albert and Mr. Higgins) destroying or discarding their phones. *See* AC at ¶ 186. Indeed, removing the speculation that Defendant Proctor had a relationship with the Alberts through a purported relationship with non-parties Julie or Kevin Albert, *see* AC at ¶¶ 8, 30, 73, the only interactions that the Commonwealth Witnesses are accused of having with the investigation and prosecution are through their witness statements and trial testimony. Such is wholly insufficient. And even though the Amended Complaint

generally states that Ms. McCabe once visited the homes of Defendant Proctor and Sergeant Lank leading up to Ms. Read's criminal trials, *see id.* at ¶¶ 129, 131, Ms. Read fails to assert what was discussed at those meetings or, more notably, that such meetings influenced Ms. Read's prosecution or induced Proctor or Lank to do anything at all.  There are simply no allegations that the Commonwealth Witnesses, for example, "presse[d] the police to apply for a complaint," *Conway v. Smerling*, 37 Mass. App. Ct. 268, 271 (1994), "demanded or directed the police to arrest [Ms. Read]," *Ziemba v. Fo'cs'le, Inc.*, 19 Mass. App. Ct. 484, 488 (1985), *review denied*, 394 Mass. 1104 (1985), or otherwise "assert[ed] control over the pursuit of the prosecution." *Goodwin v. City of Shepherdstown*, 241 W. Va. 416, 423 (2019) (citing, *inter alia*, Black's Law Dictionary 1401 (10th ed. 2014)).  Tellingly, the Amended Complaint is devoid of allegations that the Commonwealth Witnesses harbored any personal animus toward Ms. Read or even implicated her in Officer O'Keefe's death.  Merely reporting that Officer O'Keefe did not enter 34 Fairview cannot reasonably establish that the Commonwealth Witnesses acted in a manner that "commenced or continued" Ms. Read's criminal proceedings.

Moreover, Ms. Read fails to state that the charges filed against her were made ***in reliance*** on the Commonwealth Witnesses' statements.  The Amended Complaint, as well as publicly available information incorporated by reference (detailed *infra*), outlines a vast amount of other evidence used to charge Ms. Read, all of which the Commonwealth Witnesses had no role in.

### ii.    Ms. Read Fails to Establish an Absence of Probable Cause

"[P]robable cause" is defined as "such a state of facts in the mind of the defendant as would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the plaintiff has committed a crime." *Bednarz v. Bednarz*, 27 Mass. App. Ct. 668, 672 (1989) (quotations and citations omitted).  Accordingly, "[i]n evaluating probable cause, a court looks at the objective facts, not at the actors' subjective intent.'" *U.S. v. Silva*, 742 F.3d 1, 8

(1st Cir. 2014) (quotations and citation omitted); *Lincoln v. Shea*, 361 Mass. 1, 5 (1972) ("defendant's conduct must be adjudged by his honest and reasonable belief at the time he instituted the complaint rather than by what may turn out later to have been the actual state of things."). Where the plaintiff purports that an arrest, indictment, or prosecution was procured through false or inaccurate testimony, courts have not found probable cause lacking where there was other corroborating evidence. *See, e.g.*, *U.S. v. McMullin*, 568 F.3d 1, 6-7 (1st Cir. 2009).

In the instant case, any reasonable person would have suspected Ms. Read's culpability. For example, Ms. Read admits to being outside the home in the early hours of January 29 in the area where the body of Officer O'Keefe was found the following morning. AC at ¶ 32. It is undisputed that Ms. Read's taillight was cracked when Officer O'Keefe's body was discovered. *Id.* at ¶ 90. Ms. Read admits to seeing Officer O'Keefe's body "almost immediately" the morning of January 29, notwithstanding the darkness and blizzard conditions. *Id.* at ¶ 40. And a secondary, independent investigation was conducted that resulted in no additional arrests, undermining Ms. Read's theory that fact development was entirely controlled by the Defendants. *Id.* at ¶ 62.[11]

### iii.    Ms. Read Fails to Establish that the Commonwealth Witnesses Acted with "Actual Malice"

"[M]alice is defined as any wrong or unjustifiable motive." *Smith v. Egan*, 802 F. Supp. 3d 86, 92 (D. Mass. 2025) (citation and quotations omitted). A plaintiff must show that the defendants were "attempting to achieve an unlawful end or a lawful end through unlawful means," or intended to harass, vex, or annoy her. *Beecy v. Pucciarelli*, 387 Mass. 589, 593 (1982).

---

[11] The Amended Complaint also intentionally omits critical facts that were available at the time Ms. Read was arrested and prosecuted, and which further supported the probable cause determinations. The Commonwealth Statement, *see* Tuxbury Decl., Ex. A, notes that Ms. Read admitted, less than twelve hours after finding Officer O'Keefe's body, that she did not see him enter the residence the night he died, which is consistent with the statements made by the Commonwealth Witnesses. Additionally, medical professionals told law enforcement that Ms. Read stated on various occasions on January 29 that she may have hit Officer O'Keefe with her car. Collectively, this is sufficient for a reasonable person to find probable cause. *See Giragosian*, 547 F.3d at 66 ("A court may consider matters of public record," including "documents from prior state court adjudications," in deciding a Rule 12(b)(6) motion to dismiss.).

Generally, "[t]he malice element . . . requires that the accuser knew there was no probable cause for the commencement of the action, and that the accuser acted with an improper motive." *Gouin v. Gouin*, 249 F. Supp. 2d 62, 71 (D. Mass. 2003). Thus, "the malice analysis is largely duplicative of the probable cause analysis." *Hernandez-Cuevas*, 723 F.3d 91, 102 (1st Cir. 2013) (citation omitted).

Those same reasons why the malicious prosecution claim fails under the prior two elements demonstrate how Ms. Read fails to show that the Commonwealth Witnesses acted with actual malice. *See, e.g.*, *Molina v. Toledo*, 718 F. Supp. 2d 194, 208 (D.P.R. 2010) (no actual malice where there was probable cause).

### 2. 42 U.S.C. § 1983 Conspiracy

"When the named defendant in a section 1983 case is a private party, the plaintiff must show that the defendant's conduct can be classified as state action." *Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 8 (1st Cir. 2015) ("If there is no state action, the plaintiff's claim fails.") (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). "The bar for such a showing is set quite high, and [the First Circuit has] cautioned that '[i]t is *[o]nly in rare circumstances* that private parties can be viewed as state actors.'" *Id.* (emphasis added) (citation omitted). Where a conspiracy is alleged between state actors and private parties, "the relationship or nature of cooperation between the state and a private individual [must] be pled in *some detail*." *Glaros v. Perse*, 628 F.2d 679, 685 (1st Cir. 1980) (emphasis added). Notably, "it is settled that the fact that private parties give the police information on which official action is then taken does not by itself convert the private parties into state actors." *Andresen v. Diorio*, 349 F.3d 8, 13 (1st Cir. 2003) (citation omitted).

Dispositively, the Amended Complaint fails to allege any coordination between the Commonwealth Witnesses and any state actors. Even reading the allegations in the light most favorable to Ms. Read, the Amended Complaint only alleges that the Commonwealth Witnesses

34

"coordinated their efforts" through text messages and phone calls among *themselves*.  AC at ¶ 167.  There is no allegation that any of them communicated with law enforcement outside of the statements they gave in late January and early February.  And while Ms. McCabe is now alleged to have visited Defendant Proctor's home in September 2023, the Amended Complaint lacks any allegations by which this Court could reasonably infer that such visit established the type of relationship necessary to confer state action.  The confusing proposition that Proctor, Bukhenik, and Tully somehow "coordinated with the Alberts and McCabes through Proctor's sister, Courtney, who communicated frequently with Julie Albert," *id.* at ¶ 167, does not salvage the claim.  For the Court to impute state action based on that assertion, it would need to find that an agreement between the Commonwealth Witnesses and law enforcement was somehow established through three levels of back-channel communications involving two individuals who Ms. Read does not allege participated in the conspiracy.  Notably, the reader is left to guess what "confidential information" Courtney Proctor purportedly shared with Julie Albert, *see id.* ¶ 8, and what Julie Albert then purportedly shared with the Commonwealth Witnesses.  While Ms. Read may be afforded reasonable inferences, this theory of coordination simply asks the Court to fill in too many gaps.  *See McGillicuddy v. Clements*, 746 F.2d 76, 78 (1st Cir. 1984) ("Speculation about what might have happened can not [sic] save an otherwise inadequate complaint."); *Chadbrown v. Coles*, 2011 WL 5325610, at \*2 (D. Me. Nov. 2, 2011) (dismissing complaint where "conspiracy theory . . . [was] premised entirely on speculation fueled by [plaintiff's] own suspicions.").

### 3.  Common Law Conspiracy

Plaintiff's common law civil conspiracy claim fails since the Amended Complaint fails to state a claim for the underlying tort of malicious prosecution.  *See Britton v. Athenahealth, Inc.*, 2013 WL 2181654, at \*7-8 (Mass. Sup. Ct. May 3, 2013) (dismissing civil conspiracy claim where plaintiff failed to plausibly allege underlying torts).  Nonetheless, assuming *arguendo* that the

35

malicious prosecution claim survives, the Amended Complaint still fails to plead facts sufficient to establish a common law conspiracy among the Commonwealth Witnesses.[12]

To state a claim for civil conspiracy, "a plaintiff must demonstrate that a combination of persons acted pursuant to an agreement to injure the plaintiff." *Mass. ex rel. Powell v. Holmes*, 546 F. Supp. 3d 58, 81 (D. Mass. 2021) (quoting *Gutierrez v. Mass. Bay Transp. Auth.*, 437 Mass. 396, 415 (2002)). Massachusetts recognizes two types of civil conspiracy: (1) "true conspiracy"; and (2) conspiracy based on Section 876 of the Restatement (Second) of Torts—a "concerted action conspiracy." *See Taylor v. Am. Chemistry Council*, 576 F.3d 16, 34 (1st Cir. 2009).

The Amended Complaint is silent as to which civil conspiracy theory is being alleged. However, based on the nature of the allegations, it appears Ms. Read seeks to proceed on a concerted action civil conspiracy theory. *See, e.g.*, AC at ¶ 204 ("As part of their concerted efforts…), ¶ 215 (describing alleged underlying tortious acts). For such a claim to survive, Ms. Read must first adequately allege "a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994). "Key to this cause of action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan." *Kurker v. Hill*, 44 Mass. App. Ct. 184, 189 (1998).

The accusation that an unnamed Commonwealth Witness or group of Commonwealth Witnesses relocated Mr. O'Keefe's body is vague and speculative. "Subjective characterizations

---

[12] To the extent that Ms. Read's conspiracy claim against the Commonwealth Witnesses is premised exclusively on the theory that they conspired with law enforcement, as opposed to conspiring among themselves, such claim should fail for the reasons outlined with respect to the 1983 conspiracy claim—namely, that the Amended Complaint is devoid of sufficient allegations that the Commonwealth Witnesses ever came to an agreement with law enforcement to commit a wrongful act.

and unsubstantiated conclusions are not sufficient" to support a civil conspiracy. *McNell v. Hugel*, 1994 WL 264200, at *9 (D.N.H. May 16, 1994) (citing *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 23 (1st Cir. 1990)). Moreover, regarding the allegations that the Commonwealth Witnesses came to an agreement to tell investigators that Officer O'Keefe never entered 34 Fairview, the Amended Complaint fails to allege that the Commonwealth Witnesses knew that they were committing a wrongful act when such statements were made. *See* AC at ¶ 206 (stating only that Proctor, Bukhenik, and Tully "knew or should have known that the statements made to them by the [Commonwealth Witnesses] were false"). "Because a conspiracy requires an agreement to commit a wrongful act, none can exist where an alleged participant lacks knowledge that a wrongful act is being perpetrated." *Kyte v. Philip Morris Inc.*, 408 Mass. 162, 167-68 (1990). Ms. Read alleges only her subjective belief that these statements were false, which is insufficient to adequately plead requisite scienter for this type of conspiracy claim. Moreover, even accepting as true the allegations that the Commonwealth Witnesses hid certain exculpatory evidence from law enforcement, courts have long recognized that "a citizen ordinarily has no legal obligation to volunteer exculpatory information to law enforcement authorities." *People v. Dawson*, 50 N.Y.2d 311, 317-18 (N.Y. 1980); *see also Com. v. Cotto*, 471 Mass. 97, 109 (2015) (no duty to disclose exculpatory evidence if private citizens are not "agents of the prosecution team"). Thus, if they were never committing a wrongful act in the first place, the Commonwealth Witnesses could not have ***known*** that they were committing a wrongful act when they gave their witness statements.

Simply put, Ms. Read cannot support a legally recognized, valid civil ***conspiracy cause of action*** with a concocted and baseless ***conspiracy theory***.

### 4.  Massachusetts Civil Rights Act

To establish an MCRA claim, "a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered

37

with; and (3) such interference was by threats, intimidation, or coercion." *Gallagher v. S. Shore Hosp., Inc.*, 101 Mass. App. Ct. 807, 824 (2022) (citing *Currier v. Nat'l Bd. of Med. Examiners*, 462 Mass. 1, 12 (2012)). "Whether conduct amounts to threats, intimidation, or coercion is assessed under an objective, 'reasonable person' standard." *Salmon v. Lang*, 57 F.4th 296, 316-17 (1st Cir. 2022) (citation omitted). A "threat" means "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; "intimidation" means "putting in fear for the purpose of compelling or deterring conduct"; and "coercion" means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994). ***Non-physical acts*** rarely support a basis for recovery. *Salmon*, 57 F.4th at 317 (citing *Thomas v. Harrington*, 909 F.3d 483, 492-93 (1st Cir. 2018)) (emphasis added). "[M]ere recitals of boilerplate claims of threats, intimidation, or coercion do not meet the requirements." *Canney v. City of Chelsea*, 925 F. Supp. 58, 70 (D. Mass. 1996) (citation omitted).

The Amended Complaint does not adequately allege that any Commonwealth Witness ever threatened, intimidated, or coerced Ms. Read. The allegations are merely that the Commonwealth Witnesses gave false testimony and altered or destroyed certain evidence. Even accepting these as true, this Court recently held that "conducting a sham investigation of the actual perpetrator, [] coaching, coercing or otherwise fabricating evidence against the Plaintiff, or causing witnesses to give statements and/or testimony that would result in [] misidentification, or by offering false statements and testimony" do not constitute "threats, intimidation, or coercion" under the MCRA. *Cifazzari v. Town of Milford*, 2025 WL 1899043, at *15 (D. Mass. July 9, 2025). And, destructively, the Amended Complaint does not state that Ms. Read experienced any physical harm based on the Commonwealth Witnesses' purported conduct. *See* AC at ¶ 183 (describing Ms.

38

Read's MCRA damages as her "loss of employment, reputational damages, millions of dollars of legal expenses as well as serious emotional distress and injury").

### 5.   Intentional Infliction of Emotional Distress

The elements of an IIED claim are that (1) the defendants intended to inflict emotional distress or knew or reasonably should have known that emotional distress was likely to result from their conduct; (2) the conduct was extreme and outrageous; (3) the conduct proximately caused plaintiff's emotional distress; and (4) the distress was so severe that no reasonable man could be expected to endure it. *Sindi v. El-Moslimany*, 896 F.3d 1, 21 (1st Cir. 2018). "Conduct qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'" *Polay v. McMahon*, 468 Mass. 379, 386 (2014) (quoting *Roman v. Trustees of Tufts College*, 461 Mass. 707, 718 (2012)). "The standard for making a claim of intentional infliction of emotional distress is very high." *Id.* (*quoting Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996)).

Ms. Read purports to have suffered "severe emotional and physical distress" from the Commonwealth Witnesses' representations to law enforcement and other acts. AC at ¶ 199. These allegations fail to adequately plead an IIED claim. First, courts recognize that IIED claims cannot survive where the basis of the purported distress stems from an arrest supported by probable cause. *See Sholley v. Town of Holliston*, 49 F. Supp. 2d 14, 22 (D. Mass. 1999); *see also Sena v. Com.*, 417 Mass. 250, 264 (1994) ("Neither applying for an arrest warrant, nor making an arrest pursuant to an issued warrant can be considered utterly intolerable in a civilized community.") (quotation and citation omitted). And even where probable cause is lacking (which, in Ms. Read's case, it clearly was not[13]), distress associated with "wrongful" arrests and indictments is "not sufficiently

---

[13] *See* Tuxbury Decl., Ex. A.

outrageous." *Wynn v. Schmidt*, 2017 WL 4169746, at \*13 (D. Mass. Sept. 20, 2017); and *Lund v. Henderson*, 22 F. Supp. 3d 94, 106 (D. Mass. 2014) ("The plaintiff has cited no case in which an unlawful arrest alone . . . has been found to reach the level of 'extreme and outrageous conduct'"), *with Limone v. U.S.*, 579 F.3d 79 (1st Cir. 2009) (IIED found where law enforcement "knowingly participated in the events leading to the wrongful . . . incarceration of [] scapegoats and engaged in egregious governmental misconduct," including by assisting an informant in doctoring their original statement and bribing the informant). Additionally, the fact that the Commonwealth Witnesses were under no legal duty to report exculpatory (or self-incriminating) evidence to the police, discussed *supra*, Section II(D)(3), undermines Ms. Read's allegations that their conduct was sufficiently outrageous. *Cf. Galvin v. U.S. Bank, N.A.*, 852 F.3d 146, 161 (1st Cir. 2017) (holding that the standard is "very high and is not met even if the defendant acted with an intent which is tortious *or even criminal*[.]") (emphasis added). Overall, the Complaint's conclusory accusations merely recite routine harm associated with the vicissitudes of litigation. *See, e.g.*, *Guckenberger v. Bos. Univ.*, 957 F. Supp. 306, 319 (D. Mass. 1997) ("[T]he mere fact that the defendants' conduct may turn out to be violative of the plaintiff['s] civil rights does not . . . necessitate a finding that the conduct is sufficiently egregious to state a claim for [IIED].") (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Ms. Read's Amended Complaint against the Commonwealth Witnesses, award the Commonwealth Witnesses their attorneys' fees for filing these motions, and award any other relief that the Court deems just and proper.

Dated: April 3, 2026

Respectfully submitted,

BRIAN ALBERT, NICOLE ALBERT, JENNIFER McCABE, MATTHEW McCABE, and BRIAN HIGGINS

By their attorneys,

*/s/ James L. Tuxbury*
James L. Tuxbury (BBO No. 624916)
Kieran T. Murphy (*pro hac vice*)
HINCKLEY, ALLEN & SNYDER LLP
28 State Street
Boston, MA  02109
(617) 378-4162
jtuxbury@hinckleyallen.com

30 S. Pearl Street, Suite 1101
Albany, NY 12210
(518) 396-3100
kmurphy@hinckleyallen.com

41

42

## CERTIFICATE OF SERVICE

I certify that, on April 3, 2026, this document was electronically filed with the Clerk of the Court using the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing, pursuant to Local Rule 5.4(C).

*/s/ Kieran T. Murphy*
Kieran T. Murphy