# Exhibit A

# COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, ss.**                               **NORFOLK SUPERIOR COURT**
                                               **DOCKET NO. 2282CR0117**

---

### COMMONWEALTH

**v.**

### KAREN READ

---

### COMMONWEALTH'S STATEMENT OF CASE

Now comes the Commonwealth in the above-captioned matter and respectfully indicates that the following is a brief narration of the allegations in the above-captioned matter. The following is not intended to serve as a Bill of Particulars nor does it represent all of the facts known to the Commonwealth.

On January 29, 2022, at approximately 6:04 a.m., the Canton Police Department received a 911 call from a woman reporting a male party, subsequently identified as the victim, John O'Keefe, found in the snow at 34 Fairview Road. Fairview Road being a publicly maintained roadway within the Town of Canton. At the time of the 911 call, there was an active blizzard occurring with heavy snow and the temperature in the teens. Officers Saraf and Mullaney, both of the Canton Police Department, were dispatched to the scene along with Canton Fire and EMS. Officer Saraf was the first officer to arrive on scene where he observed three females waving at him from the front yard area of the residence. Looking at the residence of 34 Fairview Road from the street, the three females were in the left corner of the property, in the area of a flagpole and fire hydrant.

1

Officer Saraf observed the victim lying on the ground as two of the females were performing CPR on him. The three females on scene were identified as the defendant, Karen Read, Jennifer McCabe, and Kerry Roberts. Officer Saraf further observed the victim to be cold to the touch and not breathing. He returned to his cruiser to retrieve his AED device, however, at this time Canton Fire and EMS arrived on scene and took over resuscitative efforts. Paramedics transported Mr. O'Keefe to the Good Samaritan Medical Center in Brockton where he was subsequently determined to be deceased by Dr. Justin Rice, hours later.

Lt. Paul Gallagher, Detective Sergeant Michael Lank, and Sergeant Sean Goode, also of the Canton Police, arrived on scene moments after the 911 call had been received. Following the victim's transport from the scene, they began to search for any evidence around where Mr. O'Keefe had been discovered. They located a broken cocktail style glass and multiple patches of red that appeared to be blood in the vicinity of where the body had been located. The Canton officers secured the glass and six blood samples from the snow as evidence.

Later that morning, the Massachusetts State Police Detective Unit of the Norfolk County District Attorney's Office was notified and responded to the scene as well. Trooper Michael Proctor and Sergeant Yuriy Bukhenik were among the troopers whom responded to the scene and began interviewing witnesses. They first spoke with Ms. McCabe. Ms. McCabe indicated that she and some friends were at the Waterfall Bar and Grille the evening of January 28. She arrived with her husband Matthew at approximately 9:00 p.m. At approximately 11:00 p.m., Mr. O'Keefe and Ms. Read arrived at the Waterfall together. Ms. McCabe stated that Mr. O'Keefe and Ms. Read have been in a

2

dating relationship for approximately two years and that Ms. Read stayed at Mr. O'Keefe's house most nights. Ms. McCabe observed Ms. Read walk into the bar holding a glass cup from C.F. McCarthy's with a clear liquid inside that she believed was a vodka soda drink. Ms. Read had entered the Waterfall with the glass inside her coat. Mr. O'Keefe and Ms. Read had been at C.F. McCarthy's, a bar across the street from the Waterfall, prior to coming to the Waterfall. Ms. McCabe observed Mr. O'Keefe to be wearing a baseball hat, jeans and sneakers. She stated that the defendant and the victim appeared to be in a good mood and did not observe any arguing between the two throughout the course of the evening. She further described the atmosphere within the bar as friendly with no arguments amongst any of the patrons. This description of the group and the atmosphere within the bar and between the defendant and the victim was consistent with each of the witnesses present that the troopers interviewed throughput the course of their investigation. As the bar began to close down, everyone within their group was invited back to 34 Fairview Road, the residence of Ms. McCabe' sister, Nicole Albert and her husband, Brian. She observed Mr. O'Keefe and Ms. Read to leave the Waterfall together.

As Ms. McCabe was arriving at her vehicle, she received a text message from Mr. O'Keefe asking "Where to" at 12:14 a.m. Ms. McCabe replied with the address of 34 Fairview Road. At 12:18 a.m., Mr. O'Keefe called Ms. McCabe to ask more specifically, where the house was located on Fairview. While inside the residence following her arrival there, Ms. McCabe observed a black SUV, consistent with Ms. Read's vehicle, a 2021 black Lexus SUV, arrive in front of the residence, from her vantage point at the front door of the home. Ms. McCabe texted Mr. O'Keefe at 12:31 a.m., stating "Hello"

3

and again at 12:40 a.m., "Pull up behind me."; referencing her vehicle's parking spot within the driveway to the home, located on the right side of the property if looking at the residence from the street. Ms. McCabe then observed the black SUV move from its initial place where it had stopped on the street, near the driveway, and proceed to the left side of the property, where Mr. O'Keefe's body was subsequently discovered later in the morning. At 12:45 a.m., Ms. McCabe texted Mr. O'Keefe again, "Hello", and then observed the black SUV drive away from the home.

At approximately 4:53 a.m., Ms. McCabe stated that she received a phone call from Ms. Read looking for Mr. O'Keefe. The defendant sounded distraught over the phone and drove over to Ms. McCabe's home. The defendant told Ms. McCabe that she last remembered seeing the victim at the Waterfall Bar. Ms. McCabe then informed the defendant that she observed the defendant and the victim leave the bar together. Ms. McCabe also later informed the defendant she had seen them in Ms. Read's vehicle in front of the home on Fairview. The defendant also informed Ms. McCabe that she and the victim had gotten into an argument the last time that she had seen him. Shortly after the defendant arrived at Ms. McCabe's home, Ms. Kerry Roberts arrived there as well as she had also received phone calls from the defendant that early morning looking for the victim. Ms. McCabe then drove Ms. Read's vehicle from her house back to Mr. O'Keefe's house as she was too hysterical, and Ms. Roberts followed along in her own vehicle.

While driving to Mr. O'Keefe's house, the defendant stated to Ms. McCabe, "Could I have hit him", "Did I hit him". Ms. McCabe stated that the defendant also told her about a cracked tail light on her vehicle. Once they arrived at the victim's home, the

4

defendant had Ms. McCabe look at the cracked tail light which Ms. McCabe described as the passenger side, right rear tail light as cracked and missing pieces. Ms. McCabe and the defendant then entered Ms. Roberts vehicle to go looking for the victim. The defendant was seated within the back passenger's side, while Ms. Roberts drove and Ms. McCabe was seated within the front passenger's seat. Ms. McCabe stated that they turned onto Fairview Road from Chapman Street and at that time it was snowing heavily with the wind blowing, creating poor visibility. Ms. McCabe stated that just prior to 34 Fairview, there is a cluster of trees and immediately the defendant stated that she saw the victim. This statement initially confused Ms. McCabe and Ms. Roberts, as they were unable to see Mr. O'Keefe's body lying in the snow. Ms. McCabe stated that the defendant screamed to open the door and ran directly over to the body, near that cluster of trees, and laid on top of him for warmth and began CPR. Ms. McCabe stated that the victim was lying on his back covered with approximately six inches of snow, with his phone on the ground underneath him. The defendant yelled at Ms. McCabe twice to Google, "How long do you have to be left outside to die from hypothermia?"

On January 29, the troopers interviewed Mr. Matthew McCabe. Mr. McCabe indicated that he has known Mr. O'Keefe for approximately eight years and had met Ms. Read a handful of times. He stated that he was at the Waterfall Bar on Saturday night and observed the victim and the defendant enter together. He observed the victim to be wearing a baseball hat with a curved visor and Ms. Read to be drinking a clear liquid drink, possibly vodka. Mr. McCabe stated that he left the bar last from his group and was heading to his in-laws home at 34 Fairview Road. He entered his vehicle and his wife, Jennifer, was on the phone with the victim telling him to go to 34 Fairview. While at the

5

Fairview residence, he observed a large dark SUV pull up in front of the house on the street. He had been looking out the opened front door, through the glass storm door, and described the SUV's positioning as initially parked in front of the house. Mr. McCabe looked out the window some minutes later and observed the same vehicle had moved toward the left side of the property. Minutes following that, he observed the same vehicle driving off down Fairview, heading in the same direction it had been facing while parked.

Troopers also interviewed the homeowners of 34 Fairview Road, Brian and Nicole Albert. Both confirmed that they had been at the Waterfall Bar the previous evening with family and friends and had left around closing and returned to their home. Throughout the evening, they both indicated that the victim and defendant, neither of whom they knew particularly well, entered the bar and joined their group. They indicated that several people from the group had been invited back to their home following the bar, and several arrived staying for approximately one hour. Neither were aware that the defendant and victim had planned on coming over, although they would have had no issue if they had been aware. Neither heard nor saw anything outside of their home over the course of the morning until they were awoken by Ms. McCabe.

Troopers also interviewed Mr. Ryan Nagel. Mr. Nagel's sister had been at 34 Fairview the evening of January 28, visiting with the Alberts' son for his birthday. Mr. Nagel stated that he had been contacted by his sister asking for a ride home. His friend drove, with Mr. Nagel in the front passenger's seat and his girlfriend in the rear cab, of his friend's Ford F-150 pickup truck to Fairview. As the truck was driving down Cedarcrest Road, he observed a set of headlights of a mid-size black SUV coming from the opposite direction on Cedarcrest, and the truck he was traveling in yielded to the SUV

6

making a right turn onto Fairview and then followed behind it after executing its left turn onto Fairview. Mr. Nagel stated that the truck stopped directly in front of the driveway to the home and remembered the black SUV stopping along the right hand curb toward the left side of the property. He remained within the truck while his sister exited the home and asked them to come inside. He declined the invitation and his sister eventually decided to stay at the home and make other transportation arrangements. As his sister returned to the house, Mr. Nagel observed the black SUV pull up an approximate one to one and a half car lengths to the far left edge of the home's property, where the flagpole was located along with some bushes. He stated that the SUV's driver did not appear to place the vehicle in park at any point he observed it as the rear brake lights were illuminated throughout his observations to include the third top center light. Mr. Nagel reported hearing no noises coming from the interior of the SUV. Mr. Nagel indicated that as his friend pulled away from the side of the road when they were leaving, they drove past the black SUV and he observed the interior light on within the vehicle and a Caucasian female operator seated inside the vehicle holding the steering wheel at 10 and 2, staring straight ahead of her.

Later that day, Troopers Mathew Dunne and David Dicicco interviewed Ms. Kerry Roberts. Ms. Roberts stated to them that at approximately 5:00 a.m., she received a call from the defendant stating that John did not come home, it was snowing and she was worried. The defendant further stated to Ms. Roberts "John's dead. Kerry, Kerry, I wonder if he's dead. It's snowing, he got hit by a plow." Ms. Roberts got dressed and left in her vehicle, eventually meeting the defendant at Ms. McCabe's home where she observed the defendant to be hysterical. Ms. Roberts stated that she believed the

7

defendant was still intoxicated in the morning and had told her that she did not remember last night. Ms. Roberts reported the defendant as stating to her "I was so drunk I don't even remember going to your sister's last night", referring to Ms. McCabe's sister, the homeowner of 34 Fairview Road. Ms. Roberts followed the defendant's black Lexus SUV back to Mr. O'Keefe's house. They went inside the home for a period of time looking for him to no avail. Ms. Roberts then drove her vehicle, with Ms. McCabe in the front passenger's seat and the defendant in the rear passenger's side, to 34 Fairview Road. She and Ms. McCabe were scanning the sides of the roadway along the drive looking for the victim, while the defendant periodically screamed and texted on her phone as they drove. Ms. Roberts described the weather as white out conditions as they were driving around. As they arrived in the area of 34 Fairview, Ms. Roberts stated that the defendant screamed, "There he is, I see him" from inside the vehicle and screamed to be let out. Even after initially exiting the vehicle, Ms. Roberts stated that she still could not see the victim in the conditions and further stated that his body was covered in snow. She stated that the victim's body was approximately twelve feet from the roadway. She observed him to have a swollen right eye with a laceration above it and blood around his nose and mouth. Ms. Roberts stated that they immediately began CPR and Ms. McCabe called 911. Ms. Roberts stated that she observed the victim to be lying on his back with his arms by his side. She noticed that his right eye was swollen shut and that there was blood coming from his nose and mouth. When the paramedics arrived and lifted the victim's body onto the stretcher, Ms. Roberts observed the grass underneath the victim's back, not covered in snow as the remainder of the area was. The defendant repeatedly asked Ms. Roberts, Ms. McCabe, and the officers and paramedics on scene "is he dead?"

8

repeating that phraseology numerous times to each. The defendant further grabbed Ms. Roberts by the arm at one point and asked her if they were really working on John or was he already dead.

In addition, Trooper Bukhenik interviewed Nicholas and Karina Kolokithas. Both were present with the group at the Waterfall on the evening of January 28. They arrived there at approximately 9:00 and 9:30 p.m., respectively; as they came in separate cars following their daughter's high school basketball game. They had known the victim for approximately 5-6 years and had met the defendant a handful of times. They stated that the victim and the defendant arrived at the waterfall together at approximately 11:00 p.m., arriving from C.F. McCarthy's across the street. Mrs. Kolokithas spoke for a period with the defendant and observed her to be drinking vodka soda cocktails while at the bar. She also recalled the defendant "pushing quite a bit" for a member of the group, Christopher Albert, the owner of a local pizza shop to go across the street after leaving the bar to keep partying while he made pies for everyone. When it was time to leave, Mrs. Kolokithas indicated that she walked outside with Ms. McCabe and observed the victim and the defendant to walk out together and proceed to the left of the driveway, and up Washington Street, where their vehicle was parked along the curb, facing back up toward the Waterfall. Mrs. Kolokithas indicated that her vehicle was also parked along Washington Street, but further down and facing the opposite direction. From there, she observed the defendant walking toward the driver's side door of her black Lexus SUV. She further indicated that during the course of her conversation that evening with the defendant, the defendant complained about the victim's mother and the lack of private time the couple had for vacations, because of the children, their activities and

responsibilities. She also described her as fine and did not believe the defendant to be overly intoxicated.

On January 30, Troopers Bukhenik and Proctor interviewed Canton Firefighter Katie McLaughlin. She had been assigned to Station One on the 29th and indicated that at approximately 6:00 a.m., Canton Fire and EMS had been dispatched to 34 Fairview Road for a male party in the snow and unresponsive. Upon arrival, Ms. McLaughlin observed the victim to have trauma to his face and eye area and vomit in his mouth. She observed the victim to be dressed in jeans, socks and one black Nike sneaker. The victim's shirts were cut and his chest exposed for chest compressions. Ms. McLaughlin had exited the ambulance to speak with the defendant as to the victim's identity and medical history. The defendant provided the victim's name and date of birth. Ms. McLaughlin asked the defendant if she knew where the victim had suffered the trauma to his face/eye and the defendant turned to her friend and stated repeatedly, "I hit him, I hit him, I hit him."

Following their initial witness interviews on January 29, Troopers Bukhenik and Proctor then proceeded to the Good Samaritan to view the victim. They observed six bloodied lacerations varying in length on his right arm. The cuts extended from his forearm to his bicep. Both of the victim's eyes were swollen shut and black and blue in color. The troopers observed a cut to the right eyelid area of the victim. The victim's clothing, consisting of blue jeans, an orange t-shirt, long sleeve grey shirt, and boxer shorts were soaking wet and saturated with blood and vomit. The victim was also observed to have one black Nike sneaker with a white Nike logo on the side.

On January 31, Dr. Irini Scordi-Bellow from the Office of the Chief Medical Examiner conducted the autopsy of Mr. O'Keefe. The doctor advised the troopers that

she observed several abrasions to the victim's right forearm, two swollen black eyes, a small cut above the right eye, a cut to the left side of his nose, an approximately two inch laceration to the back right of his head, and multiple skull fractures that resulted in bleeding of the brain. Dr. Scordi-Bellow further advised the troopers that the victim's pancreas was a dark red color indicating hypothermia was a contributing factor to his death. Dr. Scordi-Bello opined from her examination that the significant blunt force trauma injuries occurred prior to Mr. O'Keefe becoming hypothermic, as evidenced by hemorrhaging in his pancreas and stomach. Mr. O'Keefe had arrived at the Good Samaritan Medical Center with a body temperature reading in the low 80's. The doctor opined that the extensive injuries to his head likely rendered Mr. O'Keefe incapacitated.

At approximately 4:30 p.m., on January 29, Troopers Bukhenik and Proctor arrived at a residence in Dighton, MA, the home of the defendant's parents. Upon their arrival, they observed a large black Lexus SUV, bearing MA Reg. #: 3GC684, registered to the defendant, parked outside the garage door in the driveway to the home. The troopers observed the rear right passenger side tail light to be shattered and a large red piece of plastic to be missing from the tail light. The troopers were invited into the home and observed the defendant seated on the living room couch. The defendant agreed to speak with the troopers. The defendant indicated to the troopers that she had met the victim at C.F. McCarthy's bar in Canton at approximately 9:00 p.m., the evening prior. The victim had been there with friends prior to her arrival. She stated that the victim was drinking beers and she was drinking vodka sodas. She described the glassware she was drinking out of as a vase style. The defendant stated that she and the victim left C.F. McCarthy's and went to the Waterfall, but denied that she had taken any drink from one

11

bar to the next. She stated that they were at the Waterfall for approximately an hour and during that time there were no arguments amongst anyone present there. When she and the victim were leaving the Waterfall, she stated they were invited to a house on Fairview Road. The defendant stated that she had dropped the victim at the house on Fairview and went home since she was having stomach issues at the previous bar. The defendant stated that she dropped the victim off, then made a three point turn in the street and left. She stated that she did not see the victim enter the residence. The defendant indicated that she first observed the broken tail light in the morning and did not know how she had broken it the previous evening. The victim was uninjured when she dropped him off at the house, however, when she discovered him the next morning, she observed him lying face up, snow on his legs, his eyes swollen, and blood coming from his nose and mouth. She stated that she began providing him mouth to mouth. The defendant further stated that she had attempted to contact the victim throughout the night, calling and texting him numerous times with no response. She stated that they had a verbal argument that morning over what the defendant fed the victim's niece for breakfast.

The black Lexus SUV was seized from the driveway of the defendant's parents' home in Dighton on January 29 as well. The vehicle was then transported via tow to the Canton Police Department. On February 1, members of the Massachusetts State Police Crime Scene Services Section, a Crime Lab chemist, and Trooper Joseph Paul, of the Massachusetts State Police Collision Analysis and Reconstruction Section (CARS), responded to the department. They observed fragments of broken glass on the rear bumper of the vehicle. The rear right passenger side tail light was shattered and pieces were observed missing from the red and clear areas. On the right side of the rear tailgate,

12

a deep scratch and minor dent were observed. On the right side of the rear bumper, above a small red light, two scratches were observed and one area where the paint was chipped off. Troopers from the CARS Unit performed a rapid acceleration, forward and reverse tests with the vehicle and noted no deficiencies with the vehicle's braking system or other operations. The troopers placed a training figure resembling a human, approximately six feet in height behind the Lexus. The vehicle was operated by a CARS trooper and documented with video from Crime Scene. The vehicle was placed in reverse and started to travel toward the training figure. The rearview camera within the vehicle was operating properly, displayed on a screen in the center of the dashboard, and provided a 360-degree visual. As the Lexus traveled closer to the figure, both auditory and visual ques within the vehicle sounded off, indicating an obstruction to the rear.

In addition, Forensic Scientist Maureen Hartnett responded to the Canton Police Department that date as well and observed and took samples from the Lexus. She noted damage to the rear of the vehicle on the passenger side including a dent with chipped paint in the trunk door, a broken tail light, and scratches on the bumper. An apparent hair was noted on the rear passenger side quarter panel. Apparent glass was also noted on the rear bumper.

Also on January 29, the Massachusetts State Police Special Emergency Response Team (SERT) was activated to assist in searching for possible evidence outside of the 34 Fairview Road. Members from the SERT team located a black Nike sneaker with a white Nike logo along the side, matching the one worn by the victim at the time his body was discovered. In the same area, where the body had been recovered, two red plastic pieces of a tail light were located, consistent to the pieces missing from the defendant's black

13

Lexus. One piece of clear plastic tail light was located in the same area as well, also consistent with the broken tail light of the Lexus.

On January 31, investigators observed video from the Ring cameras affixed to One Meadows Avenue, the residence of Mr. O'Keefe. The video was observed by utilizing the Ring application on the victim's cell phone. The data in the application showed that two cameras are connected on the victim's account under his email. The two cameras cover the front door and the driveway to the home. From 6:00 p.m. on January 28 through 6:00 a.m. on January 29, the Ring application showed approximately fifteen events between the two cameras at the residence. Investigators observed on the Ring video from the driveway camera, the defendant's SUV leaving the right garage door and traveling out of the driveway, onto Meadows Avenue, and turning left onto Pleasant Street at approximately 5:08 a.m. on January 29. Investigators were not able to locate any Ring video of the same SUV arriving at the home prior to that. The victim's Chevrolet Traverse SUV was parked in the far right corner of the driveway as the defendant's SUV exited in reverse from the garage, coming close to the victim's SUV. As the defendant's vehicle exits the driveway, the troopers observed her right passenger side tail light to be broken. On February 3, Trooper Evan Brandt from Crime Scene Services arrived with Trooper Proctor at the home and documented all sides of the Traverse and the garage doors. No damage was observed anywhere on either the vehicle or the doors.

On February 1, Troopers Bukhenik and Keefe traveled to C.F. McCarthy's bar and spoke with the manager of the bar. They reviewed and secured video from inside the establishment from January 28 and receipts. From the interior surveillance video, the troopers observed Mr. O'Keefe walk into the establishment, wearing jeans, black Nike

14

sneakers, a gray and dark gray long sleeve shirt, and a dark baseball hat with an American flag on the front, at approximately 7:37 p.m., along with his friend Michel Camerano. Approximately an hour later, at 8:51 p.m., the defendant enters the bar, wearing a black jacket, black boots, black pants, a handbag/small purse, and a white shirt underneath her jacket. Seven minutes later, at approximately 8:58 p.m., the bartender hands the defendant a tall cylinder style glass containing a clear liquid with a lime in it. At approximately 9:15 p.m., the victim hands the defendant a cylinder style glass, with a clear liquid and a lime in it. At the following times, the troopers observed in the video the defendant receiving a shot glass with a clear liquid in it, which she subsequently pours into her cylinder glass: 9:20; 9:33; 10:22 and 10:29 p.m. At approximately 9:57 p.m., the bartender is observed handing the defendant a tall cylinder style glass with a clear liquid in it and a shot glass with a clear liquid in it, for a total of seven drinks the defendant receives and consumes during her time at this bar. At approximately 10:40 p.m., the victim and the defendant are observed leaving the bar, with the defendant holding her last drink in her right hand as they exit.

Also on February 1, troopers traveled to the Waterfall Bar and reviewed and secured both interior and exterior surveillance camera footage, as well as receipts, from that establishment as well. From the interior camera, the troopers observed the victim and the defendant enter the bar at approximately 10:54 p.m. The defendant was observed grabbing the drink she walked into the Waterfall with in her right hand and walking to the left side of the table/screen. The defendant was observed on this video consuming two additional drinks, one shot and one mixed drink, during her time at this bar, for a total of nine drinks between the two establishments. At approximately 12:10 a.m., the defendant

15

walks out with two females, leaving through the front door. Moments later, the victim standing alone at the table, takes a sip from a short cocktail glass and walks out the front door holding the glass in his right hand. From the exterior camera, the troopers observed the victim walk out at approximately 12:11 a.m., carrying a short cocktail glass in his right hand, meet up with the defendant, and then the two walk together toward Washington Street. The troopers also observed from this exterior camera that it appeared to have just begun snowing with a light coating on the ground and cars within the parking lot.

On February 2, Troopers Dunne and Moore were canvassing for video footage in relation to this investigation. They proceeded to the Edward J. Lynch, Jr. House at Pequitside Farm on Pleasant Street in Canton. There they were able to retrieve video footage from the town's IT director who confirmed that the date and timestamps on the video were correct. The troopers also viewed and recovered video from the Canton Town Library external cameras, and on February 3, from the Temple Beth Abraham (B'Nai Tikyah). Both the Library and the Temple's cameras overlook Washington Street in Canton. The distance between these two buildings is approximately one mile. From the Library video, at approximately 12:15 a.m., the troopers observed a large black SUV, consistent with the defendant's Lexus, traveling on Washington Street and continue toward the Temple, four minutes after the victim and the defendant exited the Waterfall. At approximately 12:17 a.m., from the Temple video, the troopers observed, a large black SUV traveling by the building toward the intersection of Washington and Dedham Streets, in the direction of Fairview Road.

16

From the Library video, at approximately 5:11 a.m., the troopers observed a large black SUV traveling down Sherman Street, take a left onto Washington and travel in the direction of the Waterfall. At approximately 5:15 a.m., the troopers observed a large black SUV traveling away from the area of the Waterfall on Washington Street, crossing over Sherman and continue on Washington toward the Temple. From the Temple video, at approximately, 5:18 a.m., the troopers observed a large black SUV traveling by the front of the building toward the intersection of Washington Street and Dedham Streets. In addition, the troopers received via a search warrant, the defendant's Verizon cell phone records. Lieutenant Brian Tully, of the Massachusetts State Police, examined said records and was able to plot the defendant's movements, while the phone was in use for various periods of time. The phone's movements coincided with the directions of travel of the black SUV observed on the videos from the Library and the Temple, during both time frames.

On February 22, both the ten-year-old nephew, C.F., and the fourteen-year-old niece, K.F., of the victim were interviewed at the Norfolk Advocates for Children Center in Foxboro, MA. The children indicated that they had lived with their uncle, the victim, for approximately eight years following the passing of both of their parents. Both children indicated that the victim and the defendant had started dating approximately two years ago, after having dated some time before in the distant past. They both indicated that the defendant would stay over their house on Meadows Avenue several nights a week. P.F. stated that the defendant and victim argued "a decent amount of time." P.F. recalled a recent argument over groceries and the victim expressing needing a break from the defendant. After that particular argument, the victim wanted the defendant to leave

17

their house, however she refused. P.F. indicated that he had left the home on January 28 at approximately 8:00 p.m. for a sleepover at a friend's house, and was not present at the home overnight. P.F. indicated that neither he nor his sister had access to the Ring System, but believed that the defendant did from the family computer within the home.

K.F. indicated during her interview that the defendant and the victim had argued a lot toward the end, approximately two to three times a week. She further stated that approximately a week prior to January 29, she was sitting on the stairway inside the house while the victim and the defendant were arguing. K.F. stated that she heard the victim tell the defendant that their relationship had run its course and that it isn't healthy. She stated that the defendant did not want the relationship to end and refused to leave their house. K.F. stated that she had gone to bed at approximately 11:00 p.m., on January 28, after her friend had left and was awoken by the defendant at approximately 4:30 a.m., with the defendant screaming and acting frantic. The defendant ran into the victim's bedroom to retrieve K.F.'s cell phone and K.F. then began texting and calling the victim with no response. The defendant then had K.F. call Ms. McCabe and put the defendant on the phone with her. After speaking with Ms. McCabe, the defendant left the house and told K.F. to call Mr. Camerano to come and pick her up. K.F. indicated during her interview that the defendant changed her story several times while speaking to Ms. McCabe on the phone, with initially the defendant stating that she and the victim got into an argument and she dropped him off.

On January 29, the troopers also recovered Mr. O'Keefe's cell phone and were subsequently able to forensically extract the data from said phone. Their forensic extraction of the call logs, voicemails and text messages between the victim and the

18

defendant, including the date of January 28-29, detailed strains within their relationship, the victim's desire to end their relationship and the defendant's description of their relationship with them and the two children together as "toxic". The troopers recovered several voicemails from the victim's phone from the defendant, following the time period they were in front of the residence at 34 Fairview, in which the defendant screamed to the victim that she hated him.

Lastly, on January 29, the defendant was transported from the scene to the Good Samaritan Medical Center. While there, blood was drawn pursuant to her medical diagnosis and treatment at that facility. The ethanol results from said records indicate that 9:08 a.m., on the 29th, her blood had a reading of 93 mg/dl. Nicholas Roberts, a forensic toxicologist from the Massachusetts State Police Crime Laboratory performed both a serum conversion and retrograde extrapolation of said result, opining that Ms. Read's BAC at that time on the 29th was .07-.08%. From his retrograde extrapolation analysis, he opined that her BAC around the time period of 12:45 a.m., would have been between .13% - .29%.

19

Respectfully Submitted,
For the Commonwealth

Michael W. Morrissey
District Attorney

By: Adam C. Lally
Assistant District Attorney
45 Shawmut Road
Canton, MA 02021
(781) 830-4800, ext. 4842

Dated: June , 2022

20