# Exhibit C



**COMMONWEALTH OF MASSACHUSETTS**

NORFOLK, SS.

SUPERIOR COURT DEPARTMENT
NO. 2282-CR-00117

COMMONWEALTH OF
MASSACHUSETTS,
    Plaintiff

V.

KAREN READ,
    Defendant

)
)
)
)
)
)
)
)
)
)
)

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
2022 SEP 16 PM 3:52

## DEFENDANT'S MOTION FOR ORDER PURSUANT TO MASS. R. CRIM. P. 17 DIRECTED TO BRIAN ALBERT, JULIE ALBERT, COLIN ALBERT, BRIAN HIGGINS, AND THE COMMONWEALTH AND MEMORANDUM IN SUPPORT THEREOF

Now comes the defendant, Karen Read ("Ms. Read", or "the Defendant"), and respectfully moves this Court to (1) issue a summons pursuant to Mass. R. Crim. P. 17(a)(2) ordering key percipient witnesses Brian Albert, Nicole Albert, Matthew McCabe, Julie Albert, Brian Higgins, Colin Albert, and Julie Nagel to provide to the Clerk of the Court in advance of trial any cell phones used by the respective parties on January 28, 2022, so that defense counsel may conduct a forensic examination of the parties' respective cell phone(s) for the purpose of recovering location data for a 7-day period spanning January 28, 2022 to February 4, 2022, and communications sent and/or received by the respective individuals between January 28, 2022, and February 28, 2022; and (2) issue an order that the Commonwealth produce a complete copy of the Cellebrite extraction obtained from Jennifer McCabe's phone to defense counsel for examination pursuant to Mass. R. Crim. P. 14, Mass. R. Crim P. 17, and the common law, subject to any protective orders deemed necessary by the Court.[1]

---

[1] Law enforcement previously completed a forensic download and extraction of Jennifer McCabe's cell phone in connection with this case. To date, however, the Commonwealth has conveniently limited its forensic analysis and subsequent production of Ms. McCabe's cell phone records to communications between Ms. McCabe, John O'Keefe, Karen Read, and Kerry Roberts.

*Denied* The △ has not met her burden under Mass R. Crim. P. 17 - Lampron. The court is not satisfied that the requested phones contain information that is evidentially relevant nor is the court satisfied that the application is made in good faith & is not intended as a general fishing expedition.
*BJ Cannone* 10/5/22



# I.
# INTRODUCTION

John O'Keefe was found unresponsive in the early morning hours of January 29, 2022, in the front yard of the Canton home of Boston Police Officer Brian Albert. O'Keefe had been beaten severely and left for dead, having sustained blunt force injuries to both sides of his face as well as to the back of his head. In addition to suffering numerous defensive wounds on his hands consistent with a brutal fight, O'Keefe also suffered a cluster of what appear to be deep scratches or bite marks to his right upper arm and forearm.[2] Brian Albert, a highly trained boxer and fighter,[3] has deep familial and personal ties with two other police agencies, the Canton Police Department and the Massachusetts State Police—the very agencies that took control of the investigation into O'Keefe's death.[4] Even more alarmingly, Brian Albert has an intimate and personal relationship with Massachusetts State Police Trooper Michael D. Proctor ("Trooper Proctor"), the lead investigator assigned to this case. All of the individuals who were present at the home of Brian Albert in the hours before O'Keefe was found deceased in his yard are *related* to Brian Albert and/or have a close personal relationship with him and his family. Unsurprisingly, Brian Albert has exerted an enormous amount of control over this investigation, going so far as to hold an in-person meeting with the percipient witnesses at his residence in the hours immediately following the discovery of O'Keefe's body—and ensuring that he was in close proximity to them as they were interviewed by the Canton Police Department, where his brother Kevin Albert works as a law enforcement agent. As set forth herein, text messages and calls between and among the individuals who were at the crime scene on the early morning of January 29, 2022, and in the days that followed, will unquestionably provide necessary and exculpatory details regarding what actually transpired after Ms. Read dropped O'Keefe off at Brian Albert's residence that night. Ms. Read's Constitutional right to defend herself against these charges demands that she have access to these critical communications in order to further establish the intimidation, influence, and deception that Brian Albert has injected into this investigation—along with the individuals he has used to do it.

---

[2] Photographs of Mr. O'Keefe's injuries are attached hereto as Exhibit 1.

[3] See Exhibit 2, Photographs of Brian Albert 1.

[4] See Exhibit 3, Photographs Establishing Brian Albert's Personal Ties with Law Enforcement.

2

## II.
## STATEMENT OF FACTS

### I.    FACTS RELATING TO THE INSTANT CASE

The events that transpired the night before Mr. O'Keefe's death on January 29, 2022, are largely undisputed. The evidence incontrovertibly establishes that on the evening of January 28, 2022, the decedent John O'Keefe, his girlfriend Karen Read, Brian and Nicole Albert, their daughter Caitlin Albert, Jennifer McCabe (Brian Albert's sister-in-law and friend of Mr. O'Keefe), Matt McCabe, and Brian Higgins (close friend of Brian Albert and special agent with the Massachusetts Bureau of Alcohol, Tobacco, Firearms and Explosives, with an office inside the Canton Police Department), along with several other individuals, met and enjoyed drinks at the Waterfall Bar and Grille ("the Waterfall") in Canton, Massachusetts. All of the witnesses interviewed in connection with this case indicated that Ms. Read and Mr. O'Keefe appeared happy at the bar and in good spirits.[5]

As the bar was set to close around midnight, the parties discussed going to Nicole and Brian Albert's residence located close by at 34 Fairview Road ("the Fairview Residence") to continue the party and celebrate their son, Brian Albert, Jr.'s, birthday. Although Mr. O'Keefe and Ms. Read were not well-acquainted with the Alberts, the invitation was extended to them by Mr. O'Keefe's longtime friend, Jennifer McCabe. Shortly before midnight, the Alberts (Brian, Nicole, and Caitlin), the McCabes (Jennifer and Matthew), and Brian Higgins (the ATF agent) left the bar in their respective cars and drove to Brian Albert's residence for the after-party. Brian Albert, Jr. was already at the house with two of his friends, Julie Nagel, and another young woman who was never identified by law enforcement. According to Nicole and Brian Albert's testimony before the grand jury, their nephew, Colin Albert, was also present for at least part of the party.[6] Video surveillance footage and witness statements confirm Ms. Read and Mr. O'Keefe left the Waterfall around midnight and departed together in Ms. Read's black Lexus SUV.

---

[5] See Excerpt of Grand Jury Transcript, Exhibit 4.
[6] In January 2022, Colin Albert lived with his parents Julie and Chris Albert at 7 Meadows Ave in Canton, Massachusetts, just two houses down from Mr. O'Keefe. See Exhibit 5.

3



Text messages and call detail records from Ms. McCabe and Mr. O'Keefe conclusively establish the following timeline:

1. At 12:14 a.m. Mr. O'Keefe texts Ms. McCabe, "where to?"
2. At 12:14 a.m. Ms. McCabe calls Mr. O'Keefe and they discuss directions to the residence.
3. At 12:18 a.m. Mr. O'Keefe calls Ms. McCabe back
4. At 12:27 a.m. Ms. McCabe texts Mr. O'Keefe, "Here?!"
5. At 12:29 a.m. Mr. O'Keefe answers a call from Ms. McCabe
6. At 12:31 a.m. Ms. McCabe texts Mr. O'Keefe, "pull behind me."
7. At 12:40 a.m. Ms. McCabe texts Mr. O'Keefe,, "Hello"
8. At 12:42 a.m. Mr. McCabe texts Mr. O'Keefe "Where are u"
9. At 12:45 a.m. Ms. McCabe texts Mr. O'Keefe ,"hello."[7]

Multiple witnesses confirm seeing a Black SUV pull up to the Albert residence at 34 Fairview Road at approximately 12:15 a.m. Thus, by all accounts Mr. O'Keefe and his girlfriend, Karen Read, arrived outside the Albert residence in the early morning of January 29, 2022.

What transpired thereafter, is less clear. According to her interview with Sergeant Michael Lank, Jennifer McCabe claims that on January 29, 2022, at around 12:30 a.m., she observed a black SUV pull up alongside the Fairview Residence with the passenger-side of the vehicle closest to the house. According to Ms. McCabe, although the vehicle sat outside the residence for approximately fifteen minutes, no person ever came inside.[8] According to Trooper Proctor, Matthew McCabe, Jennifer's husband, reported that he had observed a big dark SUV parked to the right of the house from the front door (if you are facing the house from the street).[9] Mr. McCabe further explained that he saw the same SUV move to the other side of the property fifteen feet away.[10] Later, from the kitchen window of the Fairview Residence, he purportedly

---

[7] Excerpts from Jennifer McCabe's and John O'Keefe's cell phone extractions are attached hereto as Exhibit 6.
[8] See Exhibit 7, Grand Jury Testimony of Michael Lank.
[9] See Exhibit 8, Grand Jury Testimony of Michael Proctor.
[10] Id.

4

noticed that the SUV was gone and observed "tire tracks" in a "V-shape" consistent with a three-point turn.[11]

Ryan Nagel, one of the only percipient witnesses present on the night in question who is *not* a suspect or closely related to Brian Albert, arrived at the Albert residence around 12:15 a.m.— approximately the same time as Ms. Read and O'Keefe. Mr. Nagel's observations are consistent with Ms. Read's version of events. Ryan Nagel testified before the grand jury that he received a text from his sister, Julie Nagel, around 12:00 a.m., requesting that he pick her up at Brian Albert, Jr.'s house (a longtime friend of hers for 15 years).[12] According to Mr. Nagel, he and his friend and girlfriend arrived approximately fifteen minutes later to pick up his sister, Julie.[13] As they drove from Dedham down Cedarcrest to take a left onto Fairview Road, he observed a dark SUV coming towards them from the opposite direction preparing to take a right onto Fairview Road.[14] The dark SUV went before them and they followed the dark SUV toward the Fairview Residence.[15] Once there, Mr. Nagel and his friends parked their Ford F-150 directly in front of the driveway alongside the property, such that the passenger-side of their vehicle was adjacent to the entrance.[16] Mr. Nagel testified that the dark SUV was parked in front of their vehicle facing the same direction, about 20 to 25 feet in front of him.[17] Mr. Nagel texted his sister to let her know they had arrived.[18] Sometime thereafter, Julie Nagel came outside to greet them. She said that she wanted to stay a while longer and would most likely spend the night at 34 Fairview.[19] As Mr. Nagel continued to try to convince his sister to get in the car, he noticed that the dark SUV pulled up a car's length or two, farther in front of him. Mr. Nagel testified that the SUV was never in park because he specifically recalls that the brake lights were activated the entire time.[20] Eventually, unable to convince his sister to get in the car and leave the party, he and his friends left. As they pulled up past the SUV, Mr. Nagel, who was seated in the front passenger

---

[11] *Id.*

[12] See Exhibit 10, Grand Jury Testimony of Ryan Nagel, at p. 61.

[13] *Id.*

[14] *Id.* at p. 62.

[15] *Id.* at p. 63.

[16] *Id.* at p. 64.

[17] *Id.*

[18] *Id.* at p. 63

[19] GJ testimony of Yurik Bukhenik is attached hereto as Exhibit 9.

[20] See Exhibit 10, p. 67

seat of his friend's Ford F-150, observed a woman matching Ms. Read's description seated in the driver's seat of the vehicle with the interior lights of her car on and her hands at "10 and 2."[21] Mr. Nagel testified that **he did not see a passenger inside the vehicle or anywhere else in the surrounding area of the vehicle.**[22] **He further testified that he did *not* observe any damage to the vehicle and testified that the car's taillights were intact and undamaged.**[23]

Ms. Read has always maintained that she drove her boyfriend, Mr. O'Keefe, to drop him off at the Albert residence on the night in question. According to Ms. Read, once there, Mr. O'Keefe exited the vehicle to confirm that they were at the right house.[24] Ms. Read waited for him for quite some time, but he never returned. After calling him several times with no answer, she eventually left, presuming he proceeded into the house for the party. Notably, Brian Albert testified at the grand jury that sometime after arriving home, he retrieved and brought his "large German Shepherd" dog downstairs because it was "barking."[25] Mr. Albert testified that he kept the dog restrained because it was "not great with strangers," and then let the dog outside, unaccompanied so that it could go to the bathroom in the fenced-in back yard of the house.[26] In unusually definitive testimony, Brian Albert further insisted that he never went outside or looked outside at any point for any reason on the night in question.

The Commonwealth's theory of this case, led by Trooper Proctor's investigation, appears to be that Ms. Read became suddenly angry with Mr. O'Keefe outside the Fairview Residence, reversed into him with her vehicle while negotiating a three-point turn, intentionally hit him in the head with the taillight during a blizzard, killing him and shattering the taillight lens, and then fled the scene. **Ryan Nagel's testimony, however, completely undermines the Commonwealth's theory by confirming that Mr. O'Keefe had already left the vehicle and the surrounding area *before* Ms. Read could possibly have initiated a three-point turn, striking Mr. O'Keefe in the head with the back of her vehicle.**

---

[21] *Id.* at pp. 69-70.

[22] *Id.* at pp. 71-72.

[23] *Id.* at p. 70.

[24] Mr. O'Keefe and Ms. Read had never previously been to the 34 Fairview Residence.

[25] See Exhibit 11, Grand Jury Testimony of Brian Albert, at p. 80.

[26] *Id.* at p. 80.

6

To be clear, no witness suggests that they observed Ms. Read strike Mr. O'Keefe with her vehicle, injure him in any way, make a three-point turn, or otherwise drive erratically on the night in question. Not one. The Commonwealth's theory is predicated entirely on flimsy speculation and presumption, underpinned by a questionable investigation and highly dubiously claimed physical "evidence." Meanwhile, at least six individuals claim to have left the Albert residence in the early morning of January 29, 2022, after Ms. Read had left the Fairview Residence and returned home: Jennifer McCabe and Matthew McCabe purportedly drove Julie Nagel and an unnamed female home at 1:30 a.m.;[27] Brian Higgins supposedly went to complete "administrative work" at the Canton Police Department around 1:30 a.m.;[28] and Colin Albert returned home to his parents' residence at approximately 12:30 a.m.[29] Yet, none of these individuals — not one — claims to have seen Mr. O'Keefe's body sprawled in Brian Albert's front yard, mere feet from the very roadway all of them would have driven on.

Several hours later, when Mr. O'Keefe failed to return home or respond to any of her phone calls and messages, Ms. Read grew increasingly concerned. Third-party witnesses confirmed it would have been completely out of character for Mr. O'Keefe to leave his two adopted children home alone unattended overnight. Phone records from the night in question establish that Ms. Read made numerous calls to Mr. O'Keefe in the early morning of January 29, 2022.[30] Unable to reach him, she began frantically calling his friends beginning around 5:00 a.m. in an effort to locate him. Jennifer McCabe (Brian Albert's sister-in-law) and Kerry Roberts answered her early morning calls and offered to assist her in searching for Mr. O'Keefe.[31] During their call, Ms. McCabe suggested that Ms. Read drive to her residence located on the other side of town at 12 Country Lane so that they could look for John together.[32] Ms. Read subsequently drove to pick up Ms. McCabe across town. Ms. McCabe then drove Ms. Read's car to Mr. O'Keefe's residence, where they met Kerry Roberts.[33] They left Mr. Read's car there and – after conducting

---

[27] GJ testimony of Kathleen Prince is attached hereto as Exhibit 12.

[28] GJ testimony of Yuriy Bukhenik is attached hereto as Exhibit 13.

[29] GJ testimony of Julie Albert is attached hereto as Exhibit 14.

[30] Excerpts from John O'Keefe's cell phone extractions are attached hereto as Exhibit 15.

[31] Id.

[32] GJ testimony of Michael Proctor is attached hereto as Exhibit 16.

[33] Id.

7

a final check to ensure that he had not returned home – Kerry Roberts drove Ms. McCabe and Ms. Read, back to the Fairview Residence to see if he might be there.

As they pulled up to Brian Albert's house at 6:04 a.m., Ms. Read spotted an unconscious Mr. O'Keefe lying face-up on his back in the front yard of the Brian Albert's residence. While Ms. Read and Ms. Roberts attempted to render aid, Ms. McCabe called 9-1-1. Mr. O'Keefe was subsequently transported by EMTs to Good Samaritan Hospital, where, tragically, he was pronounced dead at 7:59 a.m.

## II.    COLLUSION BETWEEN BRIAN ALBERT AND THE WITNESSES IN THIS CASE

One of Canton Police Department's first-responding officers on scene, Officer Mullaney, testified that the homeowners of 34 Fairview Road (i.e. Brian Albert), never came outside to interact with anyone at the crime scene or speak to the responding officers.[34] Instead, all of the percipient witnesses in this case apparently gathered at Brian Albert's house to get their stories straight. Canton Police Department Detective Sergeant Lank, who was not scheduled to work on January 29, 2022, was asked by Sergeant Goode to respond to the scene for some unknown reason to conduct interviews with Brian Albert and his family.[35] Sergeant Lank arrived at Brian Albert's house at approximately 6:24 a.m. and was only on scene for about an hour before returning to the Canton Police Department.[36]

Sergeant Goode and Sergeant Lank first interviewed Jennifer McCabe (Brian Albert's sister-in-law) at the crime scene.[37] During that interview, Jennifer McCabe gave a relatively innocuous statement, indicating that she had seen Ms. Read's vehicle outside the Fairview Residence shortly after midnight and texted O'Keefe about where to park, but that no one ever came inside.[38] She also confirmed that she **did not** see O'Keefe's body on Brian Albert's front lawn when she left his residence at 1:30 a.m. with her husband to give her nephew's friend, Julie Nagel, a ride home.[39] Next, Sergeant Goode and Sergeant Lank went inside the Albert residence and conducted what appears to have been a group interview with Brian Albert, Nicole Albert,

---

[34] GJ Testimony of Stephen Mullaney hereto as Exhibit 17
[35] GJ Testimony of Michael Lank is attached hereto as Exhibit 7.
[36] Exhibit 7, pp. 60-62
[37] Id. at p. 63.
[38] Id. at pp. 64-65.
[39] Id. at p. 65.

and Matthew McCabe.[40] The three witnesses—all of whom should have been prime suspects—were not separated and were interviewed by Sergeant Goode and Sergeant Lank together inside Brian Albert's home.[41] All three witnesses stated that O'Keefe was invited to Brian Albert's home but never arrived.

Brian Albert's sister, Julie Albert, also appeared at Brian Albert's residence that morning. Julie Albert testified at the grand jury that she went to Brian Albert's house at 8:30 a.m. on January 29, 2022, to drop off Dunkin Donuts for Brian Albert, Jr.'s birthday.[42] She explained that when she got there, Brian Albert "insisted" that she come inside, and told her there had been an accident.[43] **However, in a prior statement to Sergeant Bukhenik and Sergeant Tully on February 10, 2022, Ms. Albert accidentally let it slip that she actually "found out about John dying" when her phone woke her up at 4:55 a.m. to a call from Jennifer McCabe.**[44] Thus, in a prior statement to law enforcement Julie Albert indicated that she was notified about John's death *before Karen Read ever found O'Keefe's body.*

At 9:00 a.m., after apparently conferring with Brian Albert, her sister, her husband, and Julie Albert, outside the presence of the police, Jennifer McCabe personally called Sergeant Lank and asked him to return to Brian Albert's home because she had suddenly "recalled some new information that she was not sure if [law enforcement] was aware of" and wanted to change her statement.[45] This time, in the presence of Brian Albert, Ms. McCabe reported to Sergeant Lank, for the very first time, that while they were driving around that morning looking for O'Keefe, Ms. Read made a statement to the effect of "I hope I didn't hit him," and then repeated it again at the scene of the crime.[46] Thus, after meeting with Brian Albert, Jennifer McCabe changed her story to insinuate that Ms. Read had hit O'Keefe with her vehicle.

Brian Albert also made sure to inform his close friend, Brian Higgins, that O'Keefe's body had been found. Brian Higgins testified at the grand jury that on January 29, 2022, he woke

---

[40] *Id.* at pp. 69-70.

[41] *Id.* at pp. 69-71.

[42] GJ testimony of Julie Albert is attached hereto as Exhibit 18.

[43] *Id.* at p. 46

[44] GJ Testimony of Brian Tully is attached hereto as Exhibit 19.

[45] See Exhibit 7 at p. 72.

[46] *Id.* at p. 72-73.

up to a call from Canton's Chief of Police.[47] After ignoring the Chief's call, he did take a call from Brian Albert, who informed him that the authorities had found O'Keefe.[48] Thus, in the hours after O'Keefe's body was found, Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe, Julie Albert, and Brian Higgins, all immediately convened at Brian Albert's house to discuss the instant investigation.

## III.    FACTS RELATING TO LAW ENFORCEMENT'S SUBSEQUENT INVESTIGATION INTO THE DEATH OF MR. O'KEEFE

Given that Brian Albert and Brian Higgins were so closely tied to the Canton Police Department, jurisdiction was transferred to the Massachusetts State Police.[49] Despite that fact, high-ranking members of the Canton Police Department have continued to insinuate themselves in the investigation of this case.

A timeline of the recovery of evidence – and the involvement of law enforcement agents who have close personal relationships with the percipient witnesses and potential suspects involved in this case – at the very least, raise serious questions as to the objectivity and veracity of the police investigation that has been conducted to date. According to the Supplemental Report prepared by Canton Police Sergeant Michael J. Lank, after first responders secured the scene on January 29, 2022, shortly after 6 a.m., Sergeant Lank, Lieutenant Gallagher, and Sergeant Goode attempted to retrieve "as much evidence as possible" in and around the area where Mr. O'Keefe had been found using an over-the-counter leaf blower to "blow away the top layers of snow."[50] At the grand jury, Sergeant Goode testified that he and his team spent approximately two hours using the leaf blower to "clear" off the scene "pretty good".[51] That morning they recovered the following evidence from the crime scene: (1) a clear broken drinking glass; and (2) six frozen blood drops, which they placed in over-the-counter red Solo plastic cups that were provided by a

---

[47] GJ Testimony of Brian Higgins is attached hereto as Exhibit 20
[48] GJ Testimony of Brian Higgins is attached hereto as Exhibit 21
[49] Brian Albert's brother is a law enforcement agent for the Canton Police Department. Additionally, Brian Higgins not only works out of the Canton Police Department, but also testified that he has a close personal relationship with the Canton Police Department's Chief of Police, which will prove noteworthy. See Exhibit 20.
[50] See Exhibit 22, Excerpt of Grand Jury Testimony of Michael Lank.
[51] Id. at p. 39

neighbor.[52] **No red or clear pieces of plastic consistent with a taillight lens were observed or recovered by any of the officers inspecting the scene at that time.**

The Massachusetts State Police officially assumed jurisdiction of the case upon Mr. O'Keefe's passing at 7:59 a.m.[53] According to Trooper Proctor's affidavit filed in support of the Geo-Fence Search Warrant, Trooper Proctor claims that he and Sergeant Bukhenik traveled to 345 Country Hill Drive in North Dighton, MA (Ms. Read's parents' residence) for the purpose of interviewing Ms. Read and recovering her black Lexus SUV. [54] According to his sworn affidavit, upon arriving in North Dighton at 4:30 p.m. on January 29, 2022, Trooper Proctor claims that he noticed that the right rear (passenger side) taillight of Ms. Read's vehicle was "shattered" and a "large red plastic piece was missing from the taillight."[55] According to his sworn affidavit, "at approximately 5:30 p.m. Sgt. Bukhenik and I seized the black Lexus LX from the driveway" and "Diamond Towing transported the vehicle to the Canton Police Department where it was secured in their Sally Port garage."[56] Thus, Trooper Proctor claimed that the seizure and subsequent towing of the vehicle did not occur until 5:30 p.m.

According to Kevin O'Hara, Team Leader of the Massachusetts State Police Special Emergency Response Team ("SERT Team"), he received a call from State Police Lieutenant Brian Tully on the afternoon of January 29, 2022, stating he did not have authorization to dispatch the SERT Team "yet" but was going to need assistance searching for evidence on the roadway in front of the residence located at 34 Fairview Road. **Subsequent reports confirm that at 5:30 p.m., the SERT Team along with Detective Lieutenant Brian Tully from the Massachusetts State Police conducted a second search of the crime scene located outside the Fairview Residence.**[57] This time, police recovered three pieces of red and clear plastic from the exact same area Sergeant Lank and his colleagues had searched hours earlier and saw no such

---

[52] *See* Exhibit 7 at p. 71.
[53] GJ Testimony of Michael Lank is attached hereto as Exhibit 23.
[54] The Geo-Fence Warrant Affidavit is attached hereto as Exhibit 24.
[55] *Id.*
[56] *Id.*
[57] See Exhibit 25, Tully Report.

11

"evidence."[58] Trooper Proctor claimed in his report that the plastic shards were consistent with Ms. Read's taillight.[59]

Significantly, Trooper Proctor's timeline of events, as set forth in his sworn affidavit in support of the Geofence Warrant, is provably false. Security footage taken from Ms. Read's parents' residence at 345 Country Hill Drive establishes that **Ms. Read's black Lexus SUV was towed from the driveway by Diamond Towing in North Dighton, MA at 4:12 p.m., not 5:30 p.m. as Trooper Proctor's affidavit suggests.**[60] That altered timeline means that both the Lexus SUV as well as Trooper Proctor would be unaccounted for during the entirety of that one-hour-and-18-minute gap. Thus, Trooper Proctor and certain personnel from the Canton Police Department (where the vehicle was towed) had unfettered access not only to Ms. Read's vehicle (and its taillight), but to the crime scene as well, for more than an hour *before* the SERT team executed its search of that scene. Thereafter, that search miraculously revealed — for the first time — red and white pieces of plastic found on the ground consistent with the taillight of Ms. Read's vehicle, thereby establishing the *only* physical evidence against Ms. Read in the entire case.

The investigation of the crime scene, however, did not stop there. According to Detective Michael Lank's testimony before the grand jury, on February 4, 2022 (one full week after Mr. O'Keefe's passing), Ken Berkowitz, the Chief of the Canton Police Department purportedly drove by the Fairview Residence on a whim and saw *from his moving vehicle* an **additional** piece of red plastic that was consistent with the taillight of Ms. Read's vehicle.[61] It is worth recalling that this was a scene that had been searched, re-searched, and searched again by no fewer than three sets of police officials. Yet Chief Berkowitz claims that he glanced from his moving car while driving, saw a tiny shard of lens material on the ground many yards away and — at speed — recognized the shard's evidentiary value, and stopped his car to report the finding. Straining credulity does not begin to describe this account. It is worth noting that one of the officers under the Chief's command – Kevin Albert – is Brian Albert's brother.

---

[58] *Id.*
[59] *Id.*
[60] Still frame from Read residence's Alarm.com is attached hereto as Exhibit 26.
[61] See Exhibit 7 at p. 73.

Detective Lank testified that the Chief of Police then notified the Massachusetts State Police to report what he had discovered.[62] However, before state troopers arrived, Canton Police officers had already responded to the scene and taken photographs of what the Chief of Police claimed to have found on the roadway on February 4, 2022. When an incredulous grand juror specifically inquired as to why the Chief of Police had responded to the Fairview Residence and how he discovered the evidence, Detective Lank explained "nobody called the chief."[63] When pressed further by the juror as to why he "just wandered over there," Detective Lank recounted through hearsay, "He was driving down Fairview Road and he saw it, the evidence."[64] Equally suspicious is that Brian Higgins testified that his close personal friend, the Chief of Police Ken Berkowitz, called Higgins for some unknown reason in the early morning of January 29, 2022, *just before* Brian Albert notified Higgins that Mr. O'Keefe had been found dead in his front yard.[65] Chief Berkowitz's repeated and convenient involvement in an investigation that is outside his jurisdiction should, at the very least, raise eyebrows, especially considering his close ties to the January 29, 2022 occupants of 34 Fairview Road.

Finally, the fact that law enforcement retrieved pieces of Ms. Read's taillight outside Brian Albert's house during multiple subsequent searches is particularly unsettling, given that a motion-activated Ring Camera from Mr. O'Keefe's residence suggests that the damage to Ms. Read's vehicle actually occurred **hours later** at 5:07 a.m. on January 29, 2022, when she left the residence to begin her frantic search for Mr. O'Keefe, long after he was already dead. Video surveillance footage captured at 5:07 a.m. on January 29, 2022, shows Ms. Read reverse her Lexus SUV out of Mr. O'Keefe's parking garage such that the right rear taillight of her vehicle struck Mr. O'Keefe's parked Chevy Traverse. As shown in the attached video, video surveillance clearly shows Ms. Read's vehicle striking the Chevy traverse at 0:18, causing the Traverse to jostle back and forth[66]. As Ms. Read drives out of frame from left to right, a flash of the white taillight bulb is clearly visible through what is an obvious a crack in the red taillight lens. It is undisputed that after the Lexus struck the Chevy, it *never* went back to the scene at Brian

---

[62] *Id.*
[63] GJ Testimony of Michael Lank is attached hereto as Exhibit 27
[64] *Id.*
[65] See Exhibit 21
[66] See Exhibit 28

13

Albert's house. It did, however, go into police custody before the police miraculously started finding pieces of the taillight at 34 Fairview Road.

In sum, the evidence establishes that the Lexus taillight lens was, in fact, *not* shattered at Brian Albert's house at or around 12:15 a.m. Rather, it was cracked when it contacted the Chevy Traverse at Mr. O'Keefe's residence at 5:07 a.m., hours after O'Keefe's death. How those shards of lens plastic actually got to the crime scene to be "recovered" by the SERT team is becoming clearer as the defense investigation continues.

### III.
### ARGUMENT

Under *Commonwealth v. Lampron*, 441 Mass. 265 (2004), a court may issue a pretrial summons for records in the possession of third parties if the party seeking the summons shows that (1) the documents are evidentiary and relevant; (2) they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) the party cannot properly prepare for trial without inspection of the records before trial and that the late disclosure of the records might unreasonably delay trial; and (4) the application is made in good faith and is not intended as a general "fishing expedition." *Lampron*, 441 Mass. at 269. As explained below, the categories of records sought by this motion meet all four prongs of the *Lampron* test.

### A.   THE REQUESTED RECORDS ARE EVIDENTIARY AND RELEVANT

To satisfy the first requirement of *Lampron*, the defendant must make a factual showing 'that the . . . evidence sought has a "rational tendency to prove [or disprove] an issue in the case."''" *Com. v. Jones*, 478 Mass. 65, 68 (2017), quoting *Lampron*, 441 Mass. at 269-270. To meet this standard, "the defendant need not make a showing that the records *actually* contain information that carries, for example, the potential for establishing the unreliability of either the criminal charge or a witness on whose testimony the charge depends." *Com. v. Sosnowski*, 43 Mass. App. Ct. 367, 373 (1997). Rather, the defendant must only advance, in good faith, at least some factual basis indicating how the records are likely to be relevant to an issue in the case. *See id.* Relevance is a "broad concept" and "any information which tends to establish or at least shed light on an issue is relevant." *Adoption of Carla*, 416 Mass. 510, 513 (1993); *see also Com. v. Tucker*, 189 Mass. 457, 467 (1905) (explaining evidence is relevant and admissible if, in connection with other evidence, "it helps a little").

14

Here, as explained in the fact section above, Ms. Read has uncovered significant evidence tending to show that a third party is responsible for the death of her late-boyfriend, John O'Keefe. A review of the autopsy photographs clearly show injuries consistent with Mr. O'Keefe having been severely beaten and left for dead. Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe, Brian Higgins, Colin Albert, and Julie Nagel were all present at Brian Albert's residence around 12:15 a.m. when Ms. Read dropped him off to attend Brian Albert's party on January 29, 2022. The importance of uncovering the parties' movements and communications in the early morning of January 29, 2022, cannot be understated. Ryan Nagel's testimony clearly establishes that O'Keefe had already exited Ms. Read's vehicle and gone *somewhere* before Ms. Read could possibly have initiated a three-point turn, supposedly striking O'Keefe in the head with the back of her vehicle. O'Keefe – by all accounts – had every intention of joining Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe, Brian Higgins, Colin Albert, and Julie Nagel. Thus, the communications and location information of the seven individuals who **are known** to have been in close proximity of O'Keefe at the time of his passing are unquestionably relevant to this case.

Moreover, the defense has cited ample evidence that in the days following O'Keefe's death, Brian Albert and the other individuals who were at his house on the night in question have engaged in considerable communications about the facts and circumstances surrounding O'Keefe's death. Therefore, communications obtained from the parties' cell phones will undoubtedly reveal communications between and among the parties themselves about their knowledge and involvement in this case, and their communications with the members of law enforcement who were assigned to investigate this case. Because of the close familial relationships between and among the percipient witnesses in this case, it is absolutely necessary to obtain communications from all interested parties in order to reveal the extent of the communication and coordination with law enforcement that the defense has reason to believe has occurred in this case.

**B.    THE REQUESTED RECORDS ARE NOT OTHERWISE PROCURABLE REASONABLY IN ADVANCE OF TRIAL BY EXERCISE OF DUE DILIGENCE**

Second, *Lampron* requires that the requested records "are not otherwise procurable reasonably in advance of trial by exercise of due diligence." *Lampron*, 441 Mass. at 269.

15

Here, the cell phone records sought from Brian Albert, Nicole Albert, Matthew McCabe, Julie Albert, Brian Higgins, Colin Albert, and Julie Nagel are in the possession of the witnesses themselves and have not been turned over to law enforcement. Additionally, with respect to Ms. McCabe's cell phone records, the Commonwealth has—up to this point—withheld all communications between and among Ms. McCabe and any witnesses other than Karen Read, Kerry Roberts, and John O'Keefe. Thus, Ms. Read cannot obtain these critical records without the issuance of a summons and/or order for production from this Court.

**C.    THE DEFENSE CANNOT EFFECTIVELY PREPARE FOR TRIAL WITHOUT THESE RECORDS AND THE FAILURE TO OBTAIN THIS INFORMATION MAY UNREASONABLY DELAY TRIAL**

Third, *Lampron* requires that the party seeking the records show that he or she cannot properly prepare for trial without inspection of the records before trial and that the late disclosure of the records might unreasonably delay trial. *Lampron*, 441 Mass. at 269.

Here, Ms. Read needs access to this information well in advance of trial in order to effectively cross-examine the prosecution's witnesses and establish her third party culpability defense at trial. In order to obtain the communications and location data the defense is seeking, a forensic examiner will need time to make a forensic copy of the devices and subsequently analyze the data such that the relevant data (i.e. communications exchanged between January 28, 2022 and February 28, 2022 and location data for a 7-day period spanning January 28, to February 4, 2022) can be produced for defense counsel review. Even after that process is complete, it is likely that the production of this information will identify additional witnesses that the defense will need to interview. If this cellular data is not obtained in advance of trial it will unquestionably result in an unreasonable delay.

**D.    THE INSTANT REQUEST IS NOT A FISHING EXPEDITION**

Fourth, *Lampron* requires a party seeking a summons to show that the application is made in good faith and not merely as a "fishing expedition." *Lampron*, 441 Mass. at 269. Here, Ms. Read's request is narrow and targeted to messages stored on percipient witness's devices between January 28, 2022, and February 29, 2022. Moreover, Ms. Read's request for location information is limited to a 7-day period between January 29, 2022, and January 31, 2022 (i.e. the days in which the substantive investigation and recovery of evidence was taking place). Based on a review of the police reports and transcripts produced in the instant case, defense counsel has a

16

good faith belief that the cell phones at issue will contain numerous communications between and among the percipient witnesses about O'Keefe and the instant investigation. Thus, Ms. Read's request is narrowly tailored to ensure that he has access to this probative information.

Accordingly, as set forth above, the defense has satisfied its burden under *Lampron*. As such, Ms. Read respectfully requests that this Court issue the Order attached hereto and require key percipient witnesses Brian Albert, Nicole Albert, Matthew McCabe, Julie Albert, Brian Higgins, Colin Albert, and Julie Nagel to produce the requested information and objects to the Clerk's Office for review and examination by defense counsel.

> Respectfully Submitted,
> For the Defendant,
> Karen Read
> By her attorney,
>
> David R. Yannetti, Esq.
> Yannetti Criminal Defense Law Firm
> 44 School Street.
> Suite 1000A
> Boston, MA 02108
> (617) 338-6006
> BBO #555713
> law@davidyannetti.com

September 15, 2022

17

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                                         SUPERIOR COURT
                                                    NO. 2282-CR-0117

COMMONWEALTH OF          )
MASSACHUSETTS,           )
    Plaintiff        )
                         )
V.                       )
                         )
KAREN READ,              )
    Defendant        )

### AFFIDAVIT OF COUNSEL IN SUPPORT OF DEFENDANT'S MOTION FOR ORDER PURSUANT TO MASS.R.CRIM.P. 17 DIRECTED TO BRIAN ALBERT, JULIE ALBERT, COLIN ALBERT, BRIAN HIGGINS AND THE COMMONWEALTH AND MEMORANDUM IN SUPPORT THEREOF

I, David R. Yannetti, do hereby depose and state that the following is true to the best of my knowledge, information and belief:

1.    I am an attorney licensed to practice in Massachusetts since December 20, 1989. My office address is 44 School Street, Suite 1000A, Boston, MA 02108. On January 29, 2022, I was retained to represent the defendant, Karen Read, regarding circumstances giving rise to the above-captioned matter.

2.    I believe that the requests I have made in this motion are reasonable, and supported by Massachusetts Rule of Criminal Procedure 14, as well as relevant case law.

3.    I believe that it is in the interests of justice for this court to allow this motion.

So sworn under the pains and penalties of perjury this ___15th___ day of September, 2022,

_____
David R. Yannetti

## CERTIFICATE OF SERVICE

I, Attorney David R. Yannetti, do hereby certify that today I served the attached "Defendant's Motion for Order pursuant to Mass.R.Crim.P. 17 Directed to Brian Albert, Julie Albert, Colin Albert, Brian Higgins and the Commonwealth and Memorandum in support thereof" upon the Commonwealth by sending a copy via e-mail this date to Norfolk County Assistant District Attorney Adam Lally at adam.lally@state.ma.us.


_____          _____9/15/22_____
David R. Yannetti, Esq.                              Date

**Exhibit 1**



*Source*: Copy of Massachusetts State Police, Crime Scene Services Section Report, Case#: 22-02184, Good Samaritan Photos, LDM_2865.JPG



*Source*: Copy of Massachusetts State Police, Crime Scene Services Section Report, Case#: 22-02184, Autopsy Photos, DSCN0161.JPG



*Source*: Copy of Massachusetts State Police, Crime Scene Services Section Report, Case#: 22-02184, Autopsy Photos, DSCN0155.JPG



*Source*: Copy of Massachusetts State Police, Crime Scene Services Section Report, Case#: 22-02184, Autopsy Photos, DSCN0156.JPG



*Source*: Copy of Massachusetts State Police, Crime Scene Services Section Report, Case#: 22-02184, Autopsy Photos, DSCN0139.JPG



*Source*: Copy of Massachusetts State Police, Crime Scene Services Section Report, Case#: 22-02184, Autopsy Photos, DSCN0138.JPG

**Exhibit 2**

| | |
|---|---|
|  |  |
| Brian Albert (back right)<br>*Source: Boston Herald* | Brian Albert (left), Brian Higgins (right)<br>*Source: Read Notice of Discovery II > Waterfall Bar & Grille_Canton > ch03-20220128-233827-235959-103000000000.avi* |

**Exhibit 3**

| | |
|---|---|
| <br><small>Officers James Galanis, Jonathan McCourt and Sean Goode; detective Kevin Albert; and Sgt. Paul DiGiampietro hold their Meritorious Service Awards from the Irish American Police Officers Association. Officer Eric Wade also received the award but was unable to attend. [Photo courtesy/Canton Police Department] *The Repository*</small> |  |
| Center: Sgt Sean Goode; second from R: Kevin Albert, brother of Brian Albert<br>*Source: Canton Police Department, 5/22/19* | Tpr Proctor's mother (white shirt), Colin Albert (white T), Courtney Proctor Elburg (cardigan), Chris Albert (blue polo), Matthew & Jennifer McCabe's daughter (blue headband)<br>*Source: Courtney Proctor Elburg public Facebook photos* |