UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KAREN READ,<br><br>        Plaintiff,<br>v.<br><br>MICHAEL PROCTOR, in his personal capacity; SGT. YURIY BUKHENIK, in his personal capacity; LT. BRIAN TULLY, in his personal capacity; TOWN OF CANTON; BRIAN ALBERT; NICOLE ALBERT; JENNIFER McCABE; MATTHEW McCABE; and BRIAN HIGGINS,<br><br>        Defendants. | Civil Action No. 1:25-CV-13588-DJC |

## **OPPOSITION TO Lt. TULLY'S MOTION TO DISMISS**

Lt. Brian Tully's ("Tully") Motion to Dismiss Plaintiff Karen Read's ("Read") Amended Complaint should be denied. As the direct supervisor of the lead investigating officers – Michael Proctor ("Proctor") and Yuriy Bukhenik ("Bukhenik") – Tully had an affirmative duty to ensure the investigation into the death of Mr. O'Keefe was conducted in a fair, thorough, and unbiased manner. Instead, Tully either intentionally looked the other way or inexcusably and grossly failed to properly supervise the investigators under his charge. Considering the Rule 12(b)(6) standard and the reasonable inferences the Court must take in Read's favor at this stage of the case, the Amended Complaint alleges more than enough to state a claim.

Among other things, the Amended Complaint alleges that Tully stood by – either intentionally or with gross negligence – as Proctor and Bukhenik suppressed the close, family-like relationship between Proctor and the Alberts and Proctor's other biases and shortcomings. As a result of Tully's failures, and Proctor's and Bukhenik's actions, the investigation zeroed in

immediately, solely, and exclusively on Read – on the very first day – without even considering, let alone investigating, other possible suspects. Tully failed to act as the officers he was obligated to supervise purposefully chose not to search the inside of the Alberts' house; as they failed to investigate whether any of the House Defendants had physical injuries consistent with a fight; and as they failed search the phones of most of the House Defendants, thereby allowing potentially exculpatory evidence to be destroyed when Defendants Brian Higgins ("Higgins") and Brian Albert destroyed their phones. Moreover, as the supervising officer, Tully failed to act as the two investigating officers under his charge chose not to investigate Higgins and instead acted to suppress video of Higgins at the Canton Police Department early in the morning of January 29. Tully failed to intercede as the investigating officers chose not to secure the crime scene at the Alberts' home, which allowed the House Defendants time to destroy evidence and gave Proctor and Bukhenik the opportunity to deposit pieces of Ms. Read's vehicle's taillight at the crime scene. These acts and omissions by Tully led to Read being targeted and then maliciously and wrongfully prosecuted twice for a crime she did not commit. For Ms. Read, the devastating consequences of this travesty of justice – which occurred in large part because of Tully's abject failure of duty – have been profound.

Put simply, despite his protestations and efforts to evade accountability for what was an unfair, unlawful, and maliciously wrongful prosecution, Tully's failures as the direct supervisor of the two lead investigating officers were, at best, grossly negligent or, at worst, intentional, and the facts that support these claims are well pleaded in the Amended Complaint. Accordingly, his motion should be denied.

I.      **Count 1 – the Section 1983 Malicious Prosecution Claim - Should Not Be Dismissed Because the Amended Complaint Plausibly Alleges Lack of Probable Cause.**

Tully argues that Count 1 of the Amended Complaint, asserting a Section 1983 malicious prosecution claim, must be dismissed because of several intervening acts that "sever any causal link between Tully's alleged misconduct and Ms. Read's prosecution." Tully Mot. to Dismiss at 3. Tully's argument should be rejected. The very case he relies on, Hernandez-Cuevas v. Taylor, 723 F.3d 91 (1st Cir. 2013), holds that a Section 1983 claim premised on a malicious prosecution Fourth Amendment claim "does not end when an arrestee becomes held pursuant to legal process." Id. at 99-100. Thus, a police officer's Fourth Amendment liability does not, as Tully claims, automatically end upon a neutral magistrate's determination of probable cause, a grand jury indictment, or Superior Court arrest warrant. Instead, "officers may be liable for unlawful pretrial detention when they have (1) lied to or misled the prosecutors, (2) failed to disclose exculpatory evidence, or (3) unduly pressured the prosecutor to seek the indictment." Id. at 100 (quotation omitted). In other words, and for obvious reasons, "those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." Id.

The Amended Complaint alleges exactly this type of behavior. It alleges that Tully, Proctor, and Bukhenik suppressed the relationships between investigators and certain witnesses, that the investigation instead targeted Read, that officers did not search the inside of the Alberts' house, that they did not investigate whether any of the House Defendants had physical injuries consistent with a fight, and that they did not search the phones of most of the House Defendants, allowing potentially exculpatory evidence to be destroyed when Higgins and Brian Albert destroyed their phones. See id. ¶¶49-50, 68-72, 84. The Amended Complaint also alleged that, instead of investigating Higgins, the officers suppressed video of him at the Canton Police

3

Department early in the morning of January 29 and did not secure the crime scene, allowing Proctor and Bukhenik to deposit pieces of Read's vehicle's taillight, which they gathered from her impounded vehicle. See id. ¶¶ 67, 88, 95.

The Amended Complaint thus alleges that the biased investigating officers failed to look for, much less uncover, exculpatory evidence, allowing it to later be destroyed, and, in the case of Proctor and Bukhenik, fabricated evidence to frame Read. Therefore, the later, independent determinations to arrest, indict, and prosecute Read do not insulate the officers from Fourth Amendment liability.

Tully also argues that the Amended Complaint's allegations "repeatedly groups Tully with Defendants Proctor and Bukhenik in a formulaic and undifferentiated fashion," and that "[s]uch group pleading is insufficient," Mot. to Dismiss at 11. But "group pleading" is not deficient when it is "entirely plausible for two individuals to engage in the same conduct at the same time." Ramhit v. Luu, 799 F. Supp. 3d 1, 8 (D. Mass. 2025). Tully was the supervisory officer of the investigating unit and the other MSP defendants, see Am. Complaint ¶48, so the alleged "coordinated conduct is entirely plausible." See Rahmit, 799 F. Supp. 3d at 8. In this role, he had an affirmative duty to ensure that the investigation was fair, thorough, and unbiased. He failed in this duty, and rather than act, as he was lawfully obligated to, he was either grossly negligent in failing to properly supervise the investigators, or he intentionally looked the other way as they embarked on a campaign to target Read and nobody else despite whatever exculpatory evidence existed.

Furthermore, contrary to Tully's assertions, the Amended Complaint does allege sufficient facts that detail Tully's personal involvement in Ms. Read's arrest, indictment, and prosecution. Specifically, Tully knew about Proctor's conflicted relationship with the Alberts

4

and he inexplicably suppressed that information.  See Am. Complaint ¶¶11, 49, 86.  Moreover,

he allowed evidence to be destroyed or made inaccessible by failing to search the Alberts' home

for DNA evidence or ridged surfaces consistent with the wound on  O'Keefe's head; he failed to

inspect the House Defendants for wounds consistent with the altercation-related wounds on

O'Keefe's body; and he did not secure or search the House Defendants' phones (other than

McCabe's).  Id. ¶¶50, 68.  Lt. Tully, like Proctor and Bukhenik, also failed to investigate Higgins

despite the presence of texts between him and Read, and suppressed the video of Higgins taken

at the Canton Police Department on the morning O'Keefe's body was found.  See id. ¶67.  These

specific allegations concerning Tully's personal involvement and his specific failures to act as

supervising officer of the lead investigators are distinguishable from the conclusory allegations

in the case cited by Tully, Soto-Torres v. Fraticelli, 654 F.3d 153, 160 (1st Cir. 2011) (alleging

officer was "in charge," "participated in or directed . . . or knew of the violations").  Count One

of the Amended Complaint states a claim and the motion should therefore be denied.

## II.     The Amended Complaint Sufficiently Alleges Supervisor Liability Under Section 1983.

Count 2 against Tully, asserting supervisor liability under Section 1983 also states a

claim, despite Tully's arguments. Supervisor liability under Section 1983 exists when the

"subordinate's behavior led to constitutional violation" and the supervisor encourages, condones,

or acquiesces in the behavior or acts with gross negligence amounting to deliberate indifference.

See Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016).  The supervisor is "deliberately

indifferent," if he has "actual or constructive knowledge" of a "grave risk of harm" posed by the

subordinate and fails to take "easily available measures to address the risk."

Tully seeks dismissal, claiming that the Amended Complaint does not allege "actual or

constructive knowledge" of the underlying constitutional violation. That is simply false.  The

Amended Complaint alleges that Proctor told his supervisors that he knew the Alberts, see Am. Complaint ¶86.  It alleges that he told them prior to Read's first trial that he had been questioned by a United States Attorney about his relationship as well as the biased texts he had sent about Read on the very first night of the investigation, focusing exclusively on her, see id. ¶142.  The Amended Complaint also alleges that Tully learned before Read's first trial that one of the Commonwealth's most important witnesses, Jennifer McCabe, had visited Sgt. Lank of the Canton Police Department, who was one of the first responders on the scene at his personal residence on January 30, the day after O'Keefe's body was found.  See id. ¶132.

But, despite this knowledge that Proctor was compromised and that the House Defendants were meeting with friendly law enforcement officials like Sgt. Lank, and despite the obvious risk that Proctor was rushing the investigation and precipitously implicating Read to protect his friends and to satisfy his internal bias, Tully did nothing. The Amended Complaint describes specific measures that Tully could have but did not take to guard against these risks. See id. ¶156. He could have removed Proctor from the case, but he failed to do so.  He could have directed that standard investigatory steps be taken that would have adequately examined the House Defendants' involvement and eliminated the risk Proctor was directing the investigation away from them (like securing the crime scene and not permitting Proctor custody of the physical evidence).  See id.   Tully never did so, as the Amended Complaint alleges.

Indeed, Tully's inaction is itself specifically actionable in the First Circuit. Supervisory liability exists when the "the supervisor's . . . inaction was affirmatively linked to [the subordinate's] behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Salvidar, 818 F.3d at 18.  Here, the Amended Complaint alleges Tully knew or should have

known there was a substantial risk that a Proctor-led investigation would avoid the House Defendants. He was duty-bound to ensure a fair, thorough, and unbiased investigation. Because it would have been easy for him to mitigate the readily foreseeable risk of a biased investigation by following standard investigative techniques, the Amended Complaint adequately alleges Tully condoned, acquiesced, or was grossly negligent to the risk, and therefore liable under a supervisor theory.

### III.    Tully Summarizes General Law Regarding Qualified Immunity But Does Not Even Explain Why It Allegedly Supports Dismissal Here. It Does Not.

Although. Tully states that all claims against him are barred by qualified immunity, he does not advance **any** rationale, argument, or analysis supporting that position. See Mot. to Dismiss at 5. He simply quotes well-established, but inapposite, caselaw outlining the various elements of the qualified immunity defense. See id. For that reason alone, the Court should reject qualified immunity at this stage.

Even if the Court were to consider the defense and analyze the issue without the benefit of Tully's argument, it does not support dismissal. Qualified immunity applies unless Tully "[1] violated a federal statutory or constitutional right, and (2) the unlawfulness of [his] conduct was clearly established at the time." Eves v. LePage, 927 F.3d 575, 582-83 (1st Cir. 2019). Unlawfulness is clearly established when the "law was sufficiently clear such that every reasonable official would understand that what he was doing is unlawful." Id. at 583 (quotations and alterations omitted). The clearly-established prong is evaluated under a two-part inquiry: "The first focuses on the clarity of the law at the time of the violation while the second focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." Marrero v. City of Brockton, 710 F. Supp. 3d 83, 88 (D. Mass. 2024) (quotations omitted).

First, the Amended Complaint alleges violations of federal statutory and constitutional rights.  It alleges violations of Read's Fourth Amendment rights under a malicious prosecution theory (Count 1), liability for that violation under a supervisor liability theory (Count 2), and a conspiracy to deprive Read of her Fourth Amendment rights (Count 3).  It alleges that Read was arrested, indicted and tried without probable cause because the investigation (a) was conflicted by Proctor's bias and personal relationship with the Alberts, (b) allowed exculpatory evidence to be destroyed by not investigating and securing the crime scene and evidence possessed by the House Defendants (like their phones), and (c) permitted Proctor and Bukhenik to manufacture and plant evidence.  See Am. Complaint ¶¶146, 156-57, 165-66.

Second, the right to not be arrested, indicted, and tried based on manufactured evidence was clearly established.  See Hernandez-Cuevas, 723 F.3d at 100 ("We now further specify that one constitutional source of this 'self-evident' prohibition against manufactured evidence in the pretrial detention context is the Fourth Amendment's guarantee of freedom from seizure but upon probable cause.").  Similarly, the law was equally clear that officers cannot hide exculpatory evidence.  See id.  ("[O]fficers may be liable for unlawful pretrial detention when they have . . . failed to disclose exculpatory evidence"); see also Limone v. Condon, 372 F.3d 39, 48 (1st Cir. 2004) ("We conclude, without serious question, that *Mooney* and its pre-1967 progeny provided reasonable law enforcement officers fair warning that framing innocent persons would violate the constitutional rights of the falsely accused.")

Third, the final element of the qualified immunity analysis, "whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights," is also satisfied.  "On . . . a motion to dismiss -- a situation in which the court of appeals is required to credit the allegations of the complaint -- the first two steps will frequently go a long way

8

toward resolving the third." Limone v. Condon, 372 F.3d at 48. Here, the Amended Complaint alleges Tully – the trooper charged with ensuring those he supervised investigated the death of O'Keefe thoroughly and without bias – at all material times knew Proctor was conflicted, see Am. Complaint ¶86, that he impermissibly suppressed that conflict, see id. ¶49, and that along with other members of the MSP, he hid video of Higgins at the Canton Police Department on the night O'Keefe died, see id. ¶67. In fact, Tully was also the supervisory officer of the Norfolk County State Police Detective Unit overseeing all investigations that team conducted, id. ¶48, leading to the reasonable inference that he was privy to the glaring deficiencies in the investigation, such as failing to secure the crime scene, id. ¶50, failing to search the crime scene (like the interior of the Alberts' house), id. ¶88, failing to obtain evidence such as the House Defendants' phones, id. ¶¶60, 68, failing to investigate Higgins after disclosure of texts between himself and Ms. Read, id. ¶66, and failing to secure physical evidence such as O'Keefe's clothing, id. ¶98. See Limone v. Condon, 372 F.3d at 49-50 (finding that because defendant municipal police officer was "as an active member of the joint federal-state task force" there was "a plausible inference that he was privy to information gathered by the other members of the team").

Plainly stated, Tully, like Proctor and Bukhenik, knew Read had been arrested, charged, and tried after suppression of exculpatory evidence (like Proctor's relationship with the Alberts and the Canton Police Department video of Higgins) and after allowing other potentially exculpatory evidence to be destroyed. A reasonable officer in Tully's position thus would have known he was violating a defendant's Fourth Amendment rights.

**IV.    The Massachusetts Tort Claims Act Does Not Bar the State Law Claims Against Tully Because They Are All Intentional Torts.**

Next, Tully argues that Counts 4-7, the state law claims against him, should be dismissed because he is immune under the Massachusetts Tort Claims Act ("MTCA").  Specifically, he argues that "G.L. c. 258, § 10(b) immunizes public employees from tort claims arising from 'the exercise or performance or the failure to exercise or perform a discretionary function or duty.'" See Mot. to Dismiss at 5-6.  He also argues that "[a]ny claim based upon a 'failure to . . . investigate, detect or solve crimes' is further barred by G.L. c. 258 §10(h)."  Id. That is incorrect as a matter of law.

Chapter 258, § 2 renders government employees immune from "any injury or loss of property or personal injury or death caused by his **negligent or wrongful act or omission** while acting within the scope of his office or employment." (Emphasis added.)  This does **not** immunize employees like Lt. Tully from intentional torts.  In fact, Section 10(c) explicitly makes the MTCA inapplicable to "any claim arising out an intentional tort." See Breault v. Chairman of Bd. of Fire Comm'rs, 401 Mass. 26, 35 (1987) ("Significantly, however, the Tort Claims Act withheld immunity from public employees (and retained immunity for public entities) where the acts complained of were 'intentional,' as opposed to negligent.").  All the state law claims in Counts 4-7 against Tully are intentional torts, from which he is not immune.  See Breault, 401 Mass. at 35-36 (no immunity from Civil Right Act claims); G.L. c. 258, § 10(c) (no immunity from intentional torts "including . . . intentional mental distress, malicious prosecution); Dobelle v. Flynn, 12 F. Supp. 3d 274, 292 (D. Mass. 2014) (denying immunity from civil conspiracy claim because "although M.G.L. c. 258, § 10(c) does not specifically enumerate conspiracy, [it] still contemplates such claims by the language of § 10(c) in that the essence of civil conspiracy is

10

the intent to act in concert with another to the detriment of a third party" (quotation and citation omitted)). Therefore, the MTCA does not support dismissal here.

## V.    Conclusion

The Amended Complaint, which must be taken as true in connection with this Motion, alleges that Tully oversaw and supervised the biased and flawed investigation into O'Keefe's death. It alleges that he had more than enough information to know of the major failures and problems with that investigation, the causes of those failures, and steps he could have taken to remedy them. It alleges that he did none of those things either intentionally or in a grossly negligent manner, causing harm to Read. That is sufficient to state each of Read's claims. Therefore, Tully's Motion to Dismiss should be denied.

Respectfully submitted,

KAREN READ,

By her attorneys,

/s/ Damon M. Seligson

Damon M. Seligson (BBO# 632763)
Charles M. Waters (BBO# 631425)
Aaron D. Rosenberg (BBO# 684826)
Sheehan Phinney Bass & Green, PA
28 State Street, 22nd Floor
Boston, MA 02109
617.897.5600
dseligson@sheehan.com
cwaters@sheehan.com
arosenberg@sheehan.com

Dated: May 14, 2026

11

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was filed electronically today via the Court's CM/ECF Electronic Filing System.  A notice of electronic filing will be sent by e-mail to all parties via operation of the Court's CM/ECF Electronic Filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Damon M. Seligson*

Damon M. Seligson

Dated: May 14, 2026