# ATTACHMENT 1

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT


* * * * * * * * * * * * * * * * * * *
                                    *
                                    *
COMMONWEALTH OF MASSACHUSETTS,      *
                                    *
v.                                  * Docket No. 2282CR00117
                                    *
                                    *
KAREN READ.                         *
                                    *
* * * * * * * * * * * * * * * * * * *


               BEFORE THE HONORABLE BEVERLY CANNONE
               THURSDAY, JUNE 20, 2024
               TESTIMONY OF RENEE STONEBRIDGE AND IRINI SCORDI-BELLO


APPEARANCES:

For the Commonwealth:
     BY:  ADAM LALLY, A.D.A.
          LAURA MCLAUGHLIN, A.D.A.

For the defendant:
     BY:  DAVID YANNETTI, ESQ.
          ALAN JACKSON, ESQ.
          ELIZABETH LITTLE, ESQ.


                    Dedham, Massachusetts
                    Room 25


Christine D. Blankenship, CVR
Court Reporter/Transcriber

I N D E X

WITNESS:                DIRECT    CROSS    REDIRECT    RECROSS

Nicholas Guarino
(By Mr. Lally)            3

Irini Scordi-Bello
(By Mr. Lally)           23

Exhibits:

641   Medical Records of John O'Keefe

642   Death Certificate

643   Diagram of Injuries on Body from Medical Examiner

644   Diagram of Injuries on Head from Medical Examiner

638   Overview of Plotted Points from Axiom

639   Map of Plotted Points from Cellebrite

640   Printout from John O'Keefe's Phone

1-3

(Court in session.)

(Defendant is present with counsel.)

(Jury in.)

THE COURT: Your next witness, Mr. Lally.

MR. LALLY: Yes, Your Honor. Commonwealth call Dr. Renee Stonebridge to the stand.

THE COURT: Okay.

RENEE STONEBRIDGE, sworn

THE COURT: Once you sit, I'm going to tell you that you have to keep your voice up. We want to keep our air conditioning on. So just if you'd speak loudly into the microphone, that would be great.

THE WITNESS: Yes.

THE COURT: Thank you. Go ahead, Mr. Lally.

**DIRECT EXAMINATION**

**BY MR. LALLY:**

Q    Good afternoon.

A    Good afternoon.

Q    Could you please state your name and spell your last name for the jury?

A    Yes. My name is Renee Stonebridge. Last name Stonebridge, S-T-O-N-E-B-R-I-D-G-E.

Q    And what do you do for work, ma'am?

A    I'm employed through the Chief Medical Examiner's Office at Boston as Director of Cardiac and Neuropathology

1-4

and Medical Examiner.

Q    Now, if I could ask you just a few questions about sort of your educational and work history background, if that's all right.

A    Yes.

Q    Starting with your bachelor's degree, where did you go and what if any area did you receive a degree in?

A    So I went to SUNY at Stony Brook in New York. I was a double major in biology and dramatic languages and literature.  I graduated with a Bachelor's of Science degree. After that, I went to the American University of Antigua for medical school, and I graduated with honors, magna cum laude. After that, I did four year combined in anatomic and clinical pathology residency program at NYU Winthrop Hospital in Long Island, New York. After that, I did a one year forensic pathology fellowship at the Boston office of the chief medical examiner. And after that, I did a two year neuropathology fellowship program through Brown University at Rhode Island Hospital.

Q    And, Doctor, are you board certified?

A    Yes, I am board certified in anatomic pathology, clinical pathology, forensic pathology, and neuropathology.

Q    And if you could just explain to the jury a little bit about what sort of what -- what does board certified mean?

A    Board certification means that every medical specialty

1-5

has their own board.  So, for example, the American Board of Pathology dictates whether or not you can be board certified based on certain criteria. So you have to meet certain criteria, meaning that you have to complete a certain number of surgical specimens, a certain number of autopsies, and then once you meet that criteria, you can take an exam, which, if you pass, leads to your board certification.

Q    Now, if I could ask you just a couple -- and your board certification is up to date at this point; is that correct?

A    Yes.

Q    In each of those areas that you just spoke of?

A    Yes.

Q    Now, if I could ask you some general terms, as far as if you could define them for the jury.  First of all, what is pathology in a general sense?

A    Pathology is essentially the study of any sort of disease or abnormal state of the body tissue.  So anything that can go wrong in the body and any of the body systems is essentially the study of pathology.

Q    And now starting with anatomic pathology, what is -- what is anatomic pathology, more specifically?

A    Anatomic pathology consists of the study of surgical specimens. So, for example, if someone goes to the hospital to have a tumor removed, that specimen will go to

1-6

pathology. The pathologist will look at it, cut it, look at specimens under the microscope. Order any ancillary tests, if necessary, and then make a diagnosis, which is then conveyed to the clinician.

An anatomic pathology also consists of cytopathology which is looking at individual cells, and then it also consists of autopsy pathology.

Q    And as far as clinical pathology, what does that mean?

A    Clinical pathology is anything that is lab related in pathology. So if you have to get blood drawn and then the results come back, that is clinical pathology. If there's any sort of blood work that needs to be done, for example, if you're going to have a surgery and they have to cross match and type you in case of a blood transfusion, that's considered clinical pathology.  Also microbiology.  So anything infectious.  So essentially, anything that goes through a lab is clinical pathology.

Q    And what is forensic pathology?

A    Forensic pathology is the study of autopsies in a medical legal sense. It doesn't necessarily mean that it's always going to be something that is legal. Sometimes it may be just a person who has not seen a doctor many years dies at home. There's no physician that is willing to sign a death certificate. So we work on those types of cases, plus anything that is not natural.

1-7

Q    Now, neuropathology, what is that?

A    Neuropathology is the study of the brain, spinal cord, eyes, muscles, and nerves.

Q    And if you could just again in general terms, as far as case work is concerned, related to your work as a director of the neuropathology, can you explain to the jury, sort of what it is that you do with respect to neuropathology?

A    Yes. So my job primarily entails me to be a consultant for the medical examiner. So the medical examiners have a certain set of criteria that they follow in order to determine whether or not a brain needs to be saved for neuropathologic analysis. So upon following that criteria, if the brain is saved, it gets put into formalin which essentially fixes the brain so it firms it up, so it makes it easier to analyze. So after the brain has been fixed, I usually let them fix about two weeks. Sometimes it could be a little more, little less, depending on circumstances.  I will then look at the brain, take photographs of it from all sides, and then cut the brain, take photographs, document any sort of abnormalities. And then if I feel the need to take sections to look at under the microscope, then I will take those sections. They will be processed through histology. I will look at the slides. Sometimes you may have to add in additional testing, for example, immunohistochemistry, to see if there's anything in

1-8

particular that you cannot maybe diagnose solely on looking at the histology. And then once that is done, I will issue a report to the medical examiner, and then they use it in terms of determining their cause and manner of death, if necessary.

Q    Now, as far as that formalin process, as far as the solution is concerned, is there a typical time period that the brain would have to be in that solution prior to you examining it or cutting it or any of those other things?

A    Usually about two weeks, give or take, maybe a few days here and there, but I usually try to let them fix at least ten days minimum.

Q    And again, in general terms with respect to the types of cases that are referred to you, what types of cases are typically referred to you?

A    So part of the criteria that we use is that any cases for children or babies under the age of two years, those always come to me. Also, if there is any cases that have blunt head trauma that may be suspicious or homicidal in nature, those will typically come to me as well. Some of the other cases may be just difficult neuropathologic entity that a non-neuropath trained medical examiner may not be able to really diagnose. And then sometimes there's cases that are just surprise cases where the medical examiner opens up the head and they see something

interesting or abnormal and they decide to save that case for me to look at further.

Q    Now, with respect to -- with respect to the cases that you do see, at some point, did you become involved in analysis or testing of a brain belonging to a John O'Keefe?

A    Yes.

Q    And who was the doctor that was the medical examiner that made that referral in this case?

A    It was Dr. Irini Scordi-Bello.

Q    And with respect to your analysis here, obviously you looked at the brain. What, if any, other sources of information did you review or did you look at in ultimately formulating your opinion in this case?

A    So at the time when I was able to cut the brain of Mr. O'Keefe, I had information that was relayed to us from our intake department. So when a case gets called into the medical examiner, it gets taken by the intake department, and they're given kind of just a rough summary of the case. I also had the police report.  I had the EMS report.  I had the medical records from when Mr. O'Keefe was in the hospital. I also had medical records from the primary care physician. I had autopsy photos, and I also had, I believe, the -- I'm just going to refer to my notes here because I had a lot of notes. I also had the inventory and tracking sheets, which are notes created by the medical examiner,

1-10

and the neuropath request itself.

Q    Now, are you familiar with some terms in relation to injuries that you would observe, as far as from a neuropathological perspective, as far as injuries being acute, subacute, or remote?

A    Yes.

Q    And can you explain to the jury sort of what those are and what those mean?

A    So it depends on circumstances. Acute, generally is something that it happened within a very short time frame. So when I refer to something as being acute, I usually refer to that as something that's occurring from the time of an injury to maybe a day or so afterwards. As I said, it's variable, dependent on circumstances.

Subacute is something that has not happened within the last few minutes, few hours, maybe even a day, and maybe something that is now in the process of healing. And then chronic is usually something that has happened a while ago in the past.  You may see some sort of evidence of some type of injury in a chronic state. You may also not see any evidence, because it may have completely healed by that point.

Q    And so from your analysis in this case, how would you characterize, or how did you characterize, in your opinion, from everything that you reviewed as far as the injuries

you observed to Mr. O'Keefe's brain?

A    The injuries I observed were acute injuries, meaning that they probably occurred minutes to hours.

Q    Now, if I could turn your attention to your findings as far as when you conducted your analysis and your testing in this particular case, what, if anything, did you find as far as injuries to Mr. O'Keefe's brain?

A    So when I look at the brain, what I do is I look at all surfaces from all sides, and one of the things that I look for is anything grossly obvious, meaning anything I could look at the brain and see that there's something there that shouldn't be there. So one of the first things I noticed was a subarachnoid hemorrhage. And subarachnoid hemorrhage is something that occurs when you have bleeding within the leptomeninges. The leptomeninges are a very thin membrane that encase the brain and the spinal cord, and there should not be blood freely floating within the leptomeninges. So if you have a subarachnoid hemorrhage, most of the time, the causes are either a ruptured aneurysm, which is something I would see upon cutting the brain, or some type of trauma. So that was the first finding.

THE COURT:  Can I stop you there just for a second of those taking notes and for our court reporter, could you spell the type of hemorrhage and the membrane?

THE WITNESS:  Yes.  Subarachnoid is S-U-B-A-R-A-C-H-N-

1-12

O-I-D. And leptomeninges, L-E-P-T-O-M-E-N-I-N-G-E-S.

THE COURT:  Thank you very much.

THE WITNESS:  You're welcome.

Q    Now with regard to anything related to the aneurysm that you indicated that you would have seen, what, if anything, did you see during the course of your review or testing or analysis of Mr. O'Keefe's brain?

A    So aneurysms are typically seen in the cerebral vessels that sit around the base of the brain. So there's something called the Circle of Willis, which is the main arterial supply sits around the base of the brain, and it's kind of shaped like a circle that has vessels that come off that extend to other areas of the brain. So typically, if there is an aneurysm that is ruptured, it's going to be located somewhere in one of those vessels. So upon observing those vessels, I did not see any evidence of any aneurysm or any sort of natural disease state that might have led to a rupture in one of these vessels.

Also, sometimes these vessels since they do go deep into the brain, you may only see the rupture upon cutting the brain, and I did not see any evidence of any rupture of any of these vessels anywhere in the brain.

Q    Now, as far as the subarachnoid hemorrhage that you observed, where was that located within the brain, and if you could --

A     So the subarachnoid hemorrhage was on the frontal poles which is essentially right here (indicating) in the front of the brain. So the frontal lobes obviously sit in the front, and then the poles are the very front most portion of the brain. So it was on the frontal poles. It was also on the left temporal pole. So the temporal region is right here in the temporal region, and because of the way that the temporal lobe is shaped, it kind of has a little loop right in the front, so it has a pole as well. So it was on the left temporal pole.  And then it was also in the left lateral fissure. So you have a frontal pole here.  You have the temporal lobe right here, and then the lateral fissure goes kind of in between the temporal and the frontal lobe. So you have the hemorrhage here, hemorrhage here, and then hemorrhage right there. So it's kind of all concentrated almost in one area, but then there was also hemorrhage of the posterior surface of the right temporal as well, so on this side.

Q     Now, Doctor, I'm probably going to butcher this horribly, but just as far as the bilateral unci, are you familiar with that?

A     Yes. So the unci are the medial portion of the temporal lobes. So the brain is essentially oriented in a way that each hemisphere, the right and left hemisphere, are the same. The unci are the most inner portion of the temporal

1-14

lobes, so the unci sit just next to the brainstem. So if you have anything that causes herniation of these unci, they start to push inwards onto the brainstem. So say this is a brainstem here, the unci, they start to push in. And because the brain is within the skull, the skull is hard, you have no room for any sort of expansion of the brain, if there is herniation, it will start to push in that area because the brain stem turns into the spinal cord and goes out of the skull through the foramen magnum. So you have this hole about this big or so (indicating) at the base of the skull where the brain stem turns to the spinal cord then comes out. So that's one of the only areas in which the brain can actually move because it's encased in the hard skull.

So if you have a herniation, it'll start to push and then push downwards.

THE COURT REPORTER:  Could I ask you to spell unci?

THE WITNESS:  U-N-C-I.

Q    And with reference to this bi -- excuse me -- bilateral unci area, what, if any, herniation did you observe?

A    So when the unci herniate, it can be subtle. Sometimes, if it's herniated enough, you may see hemorrhages in the brainstem. And this happens because this tissue is now pushing on the brainstem, and it's essentially being compressed. So there was herniation noted, and then there

was hemorrhage within the brainstem.

Q    Now, if I could ask you, Doctor, just to -- are familiar with the term or the medical term known as contusion?

A    Yes.

Q    And can you explain just in general terms to the jury what you understand that term to mean?

A    So a contusion is essentially a bruise. It's blood that's coming out from a blood vessel. It's a blood vessel that has been broken in some way, and now there's blood coming out.

Q    Now, are you also familiar with another term part of that term known as a punctate contusion?

A    Yes.  So a punctate is essentially just a way to describe the size of a contusion. When I say punctate, I mean something that's very, very tiny. It almost just like a dot.

Q    And with respect to punctate contusion, what, if anything, did you observe in Mr. O'Keefe's brain and where was it located?

A    So there were punctate contusions in the frontal and temporal cortices. So frontal, once again, is the front portion right here. Temporal is kind of right behind it in this area. And the cortex is the gray matter of the brain. So it's a thin strip that kind of just goes around the

brain and then the white matter is underneath all that.

So in traumatic injuries, you can see punctate contusions or even larger contusions in the cortex. It usually indicates that the brain has been pushed against something which is now causing these little blood vessels to rupture, hence seeing the contusions, because the blood is no longer contained in the blood vessels.

Q    Now, Doctor, with regard to the subarachnoid hemorrhage, is there anything that you're able to do as far as measuring that?

A    It's hard to measure because it's usually pretty vague. It's not usually something that is a well circumscribed, meaning I could say it starts here and ends here.  A lot of times a subarachnoid hemorrhage because it's sitting in this space that it's not supposed to be in, it can spread. So it may be thicker in one area, thinner in another. So you may have some that may appear just as a very faint hemorrhage, and then some that might be very thick, which you can physically measure. So I usually just give an area where it is and say it's here, it's here, it's there because it's -- it's almost like measuring something that has blurred edges. You can't really get a completely accurate measurement.

Q    And what, if anything, were you able to observe or measure with regard to subarachnoid hemorrhage in the area

of the left prefrontal -- prefrontal lobe.

A    So it appeared thicker in that area, meaning that as opposed to it looking just like a faint red color that should not be that color, it was actually thick enough that it was obscuring the underlying brain parenchyma.

Q    If I could turn your attention, Doctor, just back for a moment to the punctate contusions that you were testifying about before.

As far as your observations of those, was that one or more than one or what? How many did you observe?

A    So there were multiple.  There were multiple contusions to the point where it's not something that you can count. I mean, you could count it, but it would probably take a very long time. If it had been something like one or two, three, four, maybe a handful, it would probably be something I would say there are three here, four there, but there were so many that it didn't serve a purpose to count.

Q    And the number of those, what, if any, significance did that have in regard to your analysis, your observations, or your opinion?

A    So given that there's multiple it means that there's enough pressure in the brain that there were many surfaces that were pressing on the bony prominences of the skull, which was leading to a lot of blood vessels rupturing causing these contusions.

Q    Now, I think you've talked a little bit, but just in general terms, if you could describe for the jury, what is a hemorrhage?

A    So a hemorrhage is essentially blood that's coming out from a vessel. So it's like a bruise, hemorrhage, bruise, contusion. They're fairly similar. Some people use them interchangeably, but it's essentially blood that's no longer contained in the blood vessel.

Q    And when something is termed medically, based on your training and experience, as a diffuse hemorrhage, what does that mean?

A    So diffuse means it's over a very large area. It's not something that's just a tiny little area you could say, okay, I'm looking at this person's, let's say, liver, and there's a 2 by 2 centimeter hemorrhage sitting right there in the right lobe of the liver.  Diffuse would mean there's hemorrhage throughout nearly the entirety of the liver.

Q    Now, with regard to you made a note as far as there being a diffuse hemorrhage within the pons, P-O-N-S; is that correct?

A    Yes.

Q    And can you explain to the jury sort of what that means and where is that located within the brain?

A    So the pons is part of the brainstem. So the brainstem starts right in the middle of the brain, and you have the

midbrain, the pons, the medulla, and then it turns into the spinal cord. So the pons is kind of in the middle of the brainstem. And when you have hemorrhage in the pons, in this circumstance, it was because there was the herniation of those unci which began moving closer and closer towards the pons, pressing on it, causing hemorrhage because now the tissue is compressed, the blood is not going to be able to flow in and out freely, therefore hemorrhage.

Q    Now, with regard to the totality of what you reviewed, in this case, in regard to Mr. O'Keefe, were you able to form any opinions to a reasonable degree of medical certainty in regard to the injuries that you observed to Mr. O'Keefe's brain?

A    I was able to determine that these are acute, traumatic injuries. I know that based on what I observed and in combination with the autopsy findings, that this is due to some type of trauma.

Q    If I could ask as far as you have certain findings as far as an intraventricular hemorrhage in occipital forms of the lateral ventricles, correct?

A    Yes.

Q    If you could please explain to the jury what exactly does that mean?

A    Yes. So the ventricles are almost like a tunnel system of the brain in which the cerebral spinal fluid flows

1-20

through. So the cerebral spinal fluid serves as a fluid that nourishes the brain. It provides a flow of nutrients, oxygen, things like that. And it starts in the frontal portion of the brain, and then it goes backwards towards the occipital, which is the back, and it also flows downward through the brain stem and then into the spinal cord as well. So the occipital horns of the lateral ventricles are in the back of the head, and having hemorrhage in those areas, and in any area of the ventricular system, is usually indicative of some type of trauma. So there should not be blood freely flowing within the ventricular system.

Q   Now, Dr. Stonebridge, with regard to your findings, you mentioned that your findings were that the injuries were acute and that the injuries were the result of trauma, correct?

A   Yes.

Q   What, if anything, can you say or can you opine as to the mechanism for those acute traumatic injuries?

A   It was something that required some type of force given that there were skull fractures. I can't say what type of force or how much force, but it was definitely something that caused some type of force which led to the skull fractures and then the subsequent brain findings.

Q   And the brain findings in particular that you made,

were those consistent with the fall?

A    They can be, yes.

Q    Can they also be consistent with being struck by a vehicle and then going to the ground?

A    Yes, they can be.

MR. LALLY:  Thank you, Doctor, I have no further questions, Your Honor.

THE WITNESS:  You're welcome.

THE COURT:  Cross-examination.

MS. LITTLE:  No questions.  Thank you.

THE WITNESS:  You're welcome.

THE COURT:  Doctor, thank you very much. You are all set. Thank you.

All right. Mr. Lally, your next witness.

MR. LALLY:  Yes, Your Honor. The Commonwealth calls Dr. Irini Scordi-Bello to the stand.

THE COURT:  Okay.

MR. LALLY:  And, Your Honor, as she's coming in, may we approach briefly?

THE COURT:  Sure.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

THE COURT:  So, Madam Court Reporter, what was previously marked SS for identification is now the next

exhibit.

(Whereupon Exhibit No. 641, Medical Records of John O'Keefe (formerly SS for ID), was marked as an exhibit.)

THE COURT:  So are you looking for my instruction now, Mr. Lally?

MR. LALLY:  Yes, please, Your Honor.

THE COURT:  All right.  So, jurors, I gave you a similar instruction before about photographs. So the Commonwealth intends to introduce into evidence, through the next witness, certain photographs showing Mr. O'Keefe post-mortem. You'll have those photographs with you in connection with this case. I understand that they will be some of them will be shown up on the screen, and that's why I want to sort of give you a warning that that will happen.

When they come to you as exhibits, they'll be placed in an envelope. You can look at them briefly. They'll be covered, is what I'm saying to you. So the photographs are not pleasant.  They can be described as graphic, and I instruct you that your verdict must not in any way be influenced by the fact that these photographs will be unpleasant, perhaps sad, and graphic.

The defendant is entitled to a verdict based solely on the evidence, and not one based on pity or sympathy for Mr. O'Keefe, which might be occasioned by the photographs. So please consider those photographs only as they draw your

attention to a clinical, medical status, or to the nature of Mr. O'Keefe's injury or to the nature of the incident itself.  Okay.  All right.  Now your next witness please, Mr. Lally.

MR. LALLY:  Yes, Your Honor.

IRINI SCORDI-BELLO, sworn

THE COURT:  Good afternoon, Doctor.

THE WITNESS:  Good afternoon.

THE COURT:  All right. Mr. Lally, whenever you're ready.

**DIRECT EXAMINATION**

**BY MR. LALLY:**

Q    Good afternoon, Doctor.

A    Good afternoon.

Q    Could you please state your name and spell your last name for the jury?

A    My name is Irini Scordi-Bello. My last name is spelled S-C-O-R-D-I hyphen B-E-L-L-O.

Q    And how are you employed, ma'am?

A    I am employed as a medical examiner.

Q    And for whom are you employed?

A    I'm employed by the Office of the Chief Medical Examiner for the Commonwealth of Massachusetts.

Q    And how long has it been that you've been medical examiner for the Office of the Chief Medical Examiner of

Massachusetts?

A    I have been with OCME in Massachusetts since the -- since December of 2016.

Q    Now, ma'am, if I could take you back and just ask you a few questions regarding your educational background, work history a little bit prior to working at the OCME in Massachusetts.  If I could start with your undergraduate work as far as where did you go, and what, if anything, did you receive a degree in?

A    I completed a bachelor's degree in microbiology at the University of California.

Q    And after receiving that degree, where did you go from there?

A    I went on to the University of Miami where I completed my doctorate degree in immunology. And following that, I moved up to New York City, where I went to medical school, and completed four years of medical school at the Mount Sinai School of Medicine. And following medical school, I completed three years of pathology residency at the Mount Sinai Hospital.

Q    And then following your residency at Mount Sinai, where did you go from there?

A    And from there I went downtown in New York City, and I completed a one year fellowship in forensic pathology of the at the Office of the Chief Medical Examiner for the

1-25

city of New York.

Q    And following that one year fellowship there, where did you go from there?

A    I worked in New York City until 2016, when I moved here to Massachusetts.

Q    Now, are you board certified?

A    Yes, I am.

Q    And what are you board certified in?

A    I'm board certified in atomic pathology and forensic pathology.

Q    And if you could explain to the jury just briefly, what does it mean to be board certified and sort of what is entailed in that process?

A    Board certification is actually a voluntary process that a physician decides to go through. It involves completing an accredited program in the specialty of choice. In my case, it was pathology and forensic pathology, and then completing a number of requirements, as well as taking and successfully passing exams and then being able to say that you're board certified.

Q    And is that certification at this time, is that up to date?

A    Yes.

Q    Now, with regard to the time that you've been working as a forensic pathologist, are there any organizations that

you belong to in relation to your work in that field?

A    Yes, I am a member of the National Association of Medical Examiners.

Q    And that's an acronym as far as NAME; is that correct?

A    NAME, yes.

Q    Now, with respect to that time frame as well, what if any experience do you have in regard to teaching the areas related to your field?

A    I have always been interested in teaching. I started teaching as a pathology resident, teaching other residents and medical students, and during my time in New York City, I enjoyed teaching medical students and residents. We had a very active program -- education program in New York City. So I've always been involved with teaching both pathology and forensic pathology.

Q    Now two of those terms themselves, if I could ask you briefly, just to describe to the jury, as far as pathology in a general sense, what is -- what is pathology?

A    Pathology is a specialty of medicine, and pathology looks at disease processes and as well as trauma and the effect they have on the human body.

Q    And what is forensic pathology?

A    Forensic pathology looks at disease processes and injuries in the human body and tries to determine the cause of death in deceased individuals.

Q    And as far as anatomic pathology, what exactly is that?

A    Anatomic pathology, as opposed to clinical pathology, is anything -- any -- has to do with any organ that is in the body versus clinical pathology that deals with fluids and blood analysis and things like that. So anatomic pathology, a lot of anatomic pathologists, are surgical pathologists. That's another term that you will hear. These are pathologists in the hospital that look at tissues under the microscope and they come to a diagnosis, whether something is benign or malignant. And forensic pathology takes anatomic pathology to another step, to another level, by looking at the whole body and trying to determine the cause of death instead of organ specific.  Instead of just looking at one organ, forensic pathology looks at the whole body.

Q    Now, you're also familiar through your work and training and experience in regard to forensic pathology with the term called autopsy?

A    Yes.

Q    And is that something that typically you would do in the case of sort of your investigation and your analysis in regard to pathological analysis when it came to a body or a patient that comes in?

A    Yes, an autopsy is a procedure that we do to determine the cause and manner of death.

Q    And so, Doctor, with respect to an autopsy, it may be a term that's pretty well understood, but if you could explain in general terms, as far as when a body or a patient comes in to the OCME, as far as what is an autopsy, what is involved in it, and sort of what is that consist of?

A    Yes, when a case -- a death is first reported to the medical examiner's office, we make a determination as to whether that death falls under our jurisdiction. Cases that fall under the jurisdiction of the medical examiner include all violent deaths, all deaths that are due to not natural causes, all accidents, intoxications, deaths of babies and children and deaths in individuals that were not under the care of a physician when the death occurred. So once a case is accepted and it falls under our jurisdiction, it is given a numerical number, and then the body is transported from either the location of the death or the hospital to our facility, a facility -- these. We have three facilities in the state of Massachusetts.

Once the body comes to our facility, then there are a number of steps that are taken. The body is processed. What that means is that their pictures are taken, a weight is taken, a height is taken. Everything is input into our computer system, and then a determination is made as to whether an autopsy is required in order for us to determine

the cause and manner of death. If the answer is yes, then we proceed with the autopsy.

Q    And as far as an autopsy is concerned, there are two sort of primary components of that as far as an external examination and an internal examination; is that correct?

A    Yes.

Q    And can you describe to the jury and again general terms sort of what the process is in reference to both external and internal?

A    Yes. So the autopsy or the postmortem examination has two main parts. The first one is the external exam, and it is basically what it sounds like. We do a very thorough exam of the outside of the body. We document physical characteristics, eye color, hair color.  We document any scars or tattoos that may be on the body. We take pictures. We make notes.  We look for any signs of disease and any signs of injury. All that is, as I mentioned, documented, and once we're during the external examination, sometimes we will take evidence. We will collect hair and nails from the body we think that that is necessary or warranted.

And once the external examination is done, then we proceed to the internal examination.  That involves making surgical type cuts on the body, what's known as the Y incision that goes from shoulder to shoulder and down the middle of the body.  And the organs of the neck, the chest,

the abdomen are examined thoroughly, again, looking for and documenting signs of disease or signs of injury. We do the same thing with the head. The head is open.  The brain is removed, and we document any disease or injury.

Q    Now, turning your attention to January 31, 2022, did you have occasion to perform an autopsy in regard to a patient or a body of John O'Keefe?

A    I did.

Q    And do you recall which of -- you mentioned there were three different officers of the chief medical examiner within the state of Massachusetts, correct?

A    Yes, it was in the Cape Cod office.

Q    Is that the office that you typically work out of?

A    No, that's not the office I typically work out of. I -- my permanent position is in the Westfield office in Western Massachusetts. I was covering the office that day because we were short staffed.

Q    And in the reference to the autopsy that you performed with regard to Mr. O'Keefe, was that in conformity with what you were speaking about just before, generally, as far as how you conduct autopsies?

A    Yes.

Q    Now, during the course of the autopsy that you performed in reference to Mr. O'Keefe, during the course of the external examination, what, if anything, did you note

in reference to that external examination of Mr. O'Keefe?

A    First, I noted that there was evidence of medical intervention.  Mr. O'Keefe's body was transported to our facility from the hospital, and he had evidence of attempted resuscitation. After I documented that, I proceeded to document some injuries that I saw on Mr. O'Keefe's body.

Q    And before we turn to that, if I could just ask you a couple more general questions. You've made some mention earlier in your testimony as far as the cause and manner of death in general, that's two things that you're trying to determine during any sort of forensic pathological examination, correct?

A    Yes.

Q    And what I'm going to ask you first is just in reference to manner of death.  Can you describe for the jury sort of what are the different types of manner and death, and how are they sort of classified from a perspective from your office?

A    Okay, yes. So the manner of death are the circumstances that led to the cause of death. The cause of death being the disease or the injury that initiated the sequence that led to the fatal events. So the manner of death is circumstance dependent. There are five general manners of death or five umbrellas. The first one is natural. When we

determine manner of death to be natural, it means that the death was caused exclusively by natural disease. That would be heart disease, liver disease, cancer, aging, Alzheimer's, dementia, et cetera.

The second manner of death is accident. That means that the cause of death was due to an injury or due to an intoxication, either a physical injury or a chemical injury, but the circumstances show little or no evidence that that intoxication or that injury was intentional. So most motor vehicle accidents, more -- most drug overdoses, most, you know, elderly falls are classified as accidents. The fatal outcome was not intentional.

Homicide is a manner of death when we use when there is injury inflicted by another person, but there is evidence that there was intent to cause fear, harm, or death to the other individual.

And suicide is due to either an injury or an intoxication, and again, the circumstances and the evidence suggest or point strongly to the fact that that was a self-inflicted, intentional act on behalf of the person with the intent to cause harm to themselves or cause death to themselves. So most hangings, intentional overdoses by prescription medications are classified as suicides.

And then we have -- I'm sorry -- and then we have one more manner that we call undetermined. Some jurisdictions,

they call it could not be determined. That means that evidence pointing towards one set of circumstances or one manner is no more compelling than evidence pointing towards another manner of death. So if we don't have enough information to know whether something -- or to be able to determine the circumstances, then we are left with an undetermined manner of death.

Q    Now, am I correct in stating that the cause of death is something that's more like a medical determination; is that correct?

A    Yes, the cause --

MS. LITTLE:  Objection.

THE COURT:  So watch the leading questions, Mr. Lally. It's sustained.

Q    How would you characterize the determination that you make in regard to a cause of death?

A    The cause of death is based on my findings at the time of autopsy along with any medical information that I may have on that deceased individual.

Q    Now, as far as the manner of death, how are you making that determination?

A    The manner of death, as I mentioned, is circumstance dependent. I make that determination based on investigative information that is provided to me by law enforcement, by the people who did the investigation.

Q    And what if any legal determination are you making as far as when you classify something as a -- either of those five categories in a manner of death?

A    I am not making a legal determination. I'm making a medical determination.

Q    And so as far as the medical determination is manner of death, when, specifically, when I'm talking about something that could be ruled or listed as manner of death as absent, is that -- what, if anything -- what if any determination are you making as far as that is concerned?

A    I'm making the determination that the information that I have either shows no evidence or very little evidence that the injury that led to the cause of death was intentional. So I don't have any information to suggest that that was an intentional act.

Q    Thank you. Am I correct in saying that routinely people charge with, say, motor vehicle homicides, it gets classified as a manner of death as accident, correct?

MS. LITTLE:  Objection.

THE COURT:  Sustained.

MR. LALLY:  May I approach, Your Honor?

THE COURT:  Yes.

Q    Doctor, I'm showing you a document.  Ask you to review it, look up when you're finished.

A    (Witness complies.) Yes.

Q    And do you recognize that document, Doctor?

A    I do.

Q    What do you recognize that to be?

A    This is a copy of the death certificate for Mr. John O'Keefe.

Q    That's signed by yourself; is that correct?

A    Correct.

Q    And as far as the listing related to cause of death, what did you list as cause of death on Mr. O'Keefe with regard to his death certificate?

A    Cause of death was blunt impact injuries of head and hypothermia.

Q    And with reference to manner of death, what, if anything, did you list on Mr. O'Keefe's death certificate in relation to manner of death?

A    I listed could not be determined.

Q    And as far as that listing for could not be determined, if you could explain to the jury why it was that you have that listed as a manner of death with relation to Mr. O'Keefe?

A    Again, the cause of death is something that I can determine by the autopsy. I did the autopsy on Mr. O'Keefe and determined that he had injuries to his head as well as signs of hypothermia. So the combination of those two was the cause of death. The manner of death has to do with the

1-36

circumstances under which Mr. O'Keefe sustained those injuries, and I did not have enough information to be able to determine whether those injuries were accidental or not, and so my manner of death was undetermined or could not be determined.

Q    And just from the spectrum that you had just talked about, sort of the five different manners of death, fair to say did you not determine that this was either suicide or natural causes, correct?

A    Correct.

Q    And so as far as your determination of manner of death being could not be determined, which of the two were you sort of in between?

A    The two manners of death that remain are accident and homicide.

MR. LALLY:  Your Honor, may I approach?

THE COURT:  Yes.

MR. LALLY:  The Commonwealth would seek to introduce and admit as the next exhibit.

MS. LITTLE:  No objection.

THE COURT:  Okay.

(Whereupon Exhibit No. 642, Death Certificate of John
        O'Keefe, was marked as an exhibit.)

Q    Now, Dr. Scordi-Bello, you had made reference as far as cause of death being a blunt force injury; is that correct?

A    Correct.

Q    At least one of the contributing causes.  If you could explain to the jury sort of what you understand that to mean as far as what is a blunt -- blunt force injury?

A    Blunt force injuries are caused by any blunt object that is very big category of objects. A microphone could be a blunt object. This bottle, if heavy enough, could be a blunt object. The ground can be a blunt object. So anything that doesn't have a sharp edge or a razor edge, not a knife, not a scalpel, is a blunt object.

Blunt impact injuries are categorized into contusions, which are bruises, abrasions, which are scratches, fractures, which are a break in the bone, and lacerations, which are tears in the skin. So when we say blunt impact injuries, we could be referring to any of those or a combination of those four types, and all those are the result of impact of the body with a blunt object.

Q    Now, we'll get more into specifics in a moment, just in general terms, as far as from your external examination of Mr. O'Keefe's body, where -- whereabout, sort of geographically, on the body did you observe these blunt force injuries?

A    The majority of the blunt force injuries were to the face and the head, as well as to the upper extremities, the arms.

1-38

Q    Now, starting with Mr. O'Keefe's head, what was it specifically or where was it that you observed blunt force injuries to Mr. O'Keefe's head?

A    Okay. I observed a number of different injuries on Mr. O'Keefe's death -- head.  Starting with his eyes, he had hemorrhage or bleeding on the upper eyelids of both eyes as well as swelling of the eyes. He had a small laceration, a small tear in the skin on the right eyelid, again, associated with the bleeding. He had some abrasions. Abrasions are superficial scratches on the skin on the left side of his nose, I believe. And when I looked at the back of Mr. O'Keefe's head, he had a laceration, that's a tear in the skin, that was surrounded, or there was -- it was associated with an abrasion, a scrape.

Q    Now in terms of the extremities, and I'll start with upper extremities, as far as his arms, what, if anything, did you observe in regard to blunt impact injuries to his arms?

A    He had on the right upper extremity, he had a number of somewhat linear, somewhat patterned abrasions, scrapes, varying sizes ranging from small - 2 to 3 millimeters - to, I believe, 5 or 6 centimeters, both on the upper arm and part of his forearm.

He had some contusions or some bruising on the dorsal aspect of the right hand that I measured and documented. He

had some other -- he had a very small abrasion, I believe, on the lower extremities near the right knee, but I would have to look at my notes to be absolutely sure.

THE COURT: You can go ahead and look at your notes anytime you need to, Doctor.

THE WITNESS: I can go into my notes?

THE COURT: Yes.

A    So as far as his extremities, I noted a 3 centimeter superficial abrasion to his right medial upper arm. That would be the medial aspect would be the inner aspect of the right arm. I noted the abrasions on his posterior right arm and forearm. Those ranged from 3 millimeters to up to 7 centimeters. I noted two red contusions on the dorsal aspect of the right hand. Again, that's the back of the hand. A faint abrasion, a faint scratch on the dorsal aspect of the left hand, and a small, half a centimeter abrasion on his right lateral knee on the side of his knee -- on the right side. QNow, I think you've defined it fairly well so far, but I'm just going to ask you this for delineation purposes. If you could explain to the jury sort of what is the difference between an abrasion versus a contusion versus a laceration from a medical perspective?

A    Okay. An abrasion is a scrape. It's a scrape of the superficial layers of the skin. A contusion is a bruise. So if I hit myself hard enough on my nightstand, I -- and I

break blood vessels and under the skin, then I can end up with a bruise or a contusion.

A laceration is a tear, not necessarily a cut. There's a distinction between a cut and a tear. A tear in the skin is due to a blunt object, maybe the corner of the nightstand that's sharp enough to tear my skin, but not so sharp as a blade that would actually cut the skin smoothly. So we differentiate between lacerations and cuts, because cuts are due to sharp objects. Lacerations are due to blunt objects, and fractures are basically a break in the bone again due to blunt trauma.

Q    Are you familiar with what is termed as an incised wound?

A    I'm sorry.  I didn't hear you.

Q    Incised? I-N-C-I --

A    Incised, yes.

Q    If you could explain the difference between sort of the mechanism and sort of what you observe between a laceration and an incised wound?

A    So an incised wound is what I what I previously called a cut. So the analogy I like to give is if you have a loaf of bread and you're trying to cut the bread.  If you take a very good bread knife, sharp knife, you will be able to smoothly cut the bread. If you take a hammer, which is a blunt object, and you try to cut the bread, you're going to

1-41

shred it up.  So a -- an incised wound, it's a -- it's a smooth cut - knives, razors will cause incised wounds on the skin. A blunt object will cause a laceration. It will break the skin, and the edges will not be uniform, and there might even be some bruising around it.

Q    Now, with respect to the injuries that you talked about as far as the abrasions on Mr. O'Keefe's right arm, how was that located in reference to sort of the circumference of the arm?  And what I'm asking there is, was it on top, on the bottom, or everywhere?

A    I describe them as being on the posterior right arm and forearm. So when we examine a body, we examine the body in what's known as the anatomic position, which is the body on the table with the palms upwards. And so the posterior right arm and forearm would be what would be facing the table as the body is laying on the table, the backside of the arm and the forearm.

Q    So the opposite of posterior would be what?

A    Would be anterior and it would be this area right here that cleans up.

Q    And as far as --

A    Or forward.

Q    And as far as the anterior of Mr. O'Keefe's right arm, what, if anything, did you observe as far as injuries there?  AI, again, I noted in my -- in my diagrams and my

charts that they were mostly on the posterior right arm and forearm. Q    Now, Dr. Scordi-Bello, if I could turn your attention to the internal examination as far as the injuries that you observed there.  What, if anything, did you observe during the course of your internal examination of Mr. O'Keefe?

A    Okay.  The internal examination, I will start with the head.  Once the skull was open and the head was examined, I noted that there were skull fractures in Mr. O'Keefe's skull, both in the back and the front aspect of his skull. I noted that there was recent subdural hemorrhage, that is blood that is under the dura.  And the dura is a very tough protective cover that sits over the brain. I noted that there was subarachnoid hemorrhage. That's hemorrhage that is directly on top of the brain under the leptomeninges which is a very thin membrane that covers the brain. And at that point, I removed the brain, and I instead of examining it right then and there, I saved it in a special solution, and I sent it to our office in Boston for a neuropathologist to fully examine.

Q    And is it your understanding that a neuropathologist ultimately conducted a fuller examination of Mr. O'Keefe's brain?

A    Yes.

Q    And who was that neuropathologist within your office?

A    Dr. Stonebridge.

Q    Now with reference to the head, as far as the skull, you indicated that there were fractures as in plural, correct?

A    Yes.

Q    And with reference to the fractures there, what if any relationship did you note between the fractures that you observed and the laceration to the back of Mr. O'Keefe's head that you spoke about in your external exam?

A    So the laceration on the scalp that I observed was overlying the area of the skull that appeared to be fractured, or at least appeared that the fractures were originating from that point of impact and extending into the rest of the skull.

Q    Now, what, if anything, as far as your observations of the skull in that point and the -- I'm sorry.  Which part of the skull was the originating fracture?

A    This would be the back of the skull, slightly right of midline.

Q    Is that the medical term that that's referred to as?

A    I'm sorry?

Q    Is there a medical term that that's referred to as far as the right rear, sort of?

A    It's the right occipital.

Q    And what, if anything, led you to that opinion that

that was sort of the originating source of multiple fractures in the skull that you observed?

A    Again, observing or looking at the skull fractures and their pattern, there appear to be a central point with fractures radiating or originating from that central point and going into other parts of the skull.

Q    Now, in reference to that laceration in the area of the originating fracture in the back of the skull, what, if anything, did you determine in regard to impact in regard to that area of the head?

A    Well, the laceration, along with -- so the tear in the skin along with the scrape, because they were adjacent, are both evidence of blunt impact. So I knew at that point that Mr. O'Keefe's head had come in contact with a blunt object.

Q    And would that be sort of the point of impact between the blunt object and Mr. O'Keefe's head?

A    Right.

Q    Now, with reference to the fractures that you would observe, how extensive were the fractures that you observed, the multiple ones?

A    Well, there were multiple fractures. So by definition, multiple fractures in multiple chambers or parts of the skull. So I would say they were extensive.

MR. LALLY:  May I have a moment, Your Honor?

THE COURT:  Yes.

1-45

Q    Now, when you're conducting this internal examination, is there a sort of division of the body that you're doing as far as what you're examining and in what order and sort of things that you're looking at from the internal examination?

A    Well, we examine everything, and usually we start in the external examination. We start from the head and work our way down. During the internal examination, we're doing two things at the same time sometimes.  And so I start with the chest, move to the abdomen, and then the pelvis, while at the same time we're working on the head.

THE COURT:  All right.  I'm going to pause you there for a minute. We're going to take a short recess, and we'll be back.

Doctor, you can step down if you'd like, too. You don't have to but you can step down if you want to, and I'd ask that you just follow the jurors.

THE WITNESS:  I'll hold this.  Thank you.

(Jury out.)

THE COURT:  I'll see counsel at sidebar.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

(Court in recess.)

1-46

(Court in session.)

(Defendant is present with counsel.)

(Jury in.)

THE COURT:  All right, Mr. Lally.

Q     (By Mr. Lally) Now, Doctor, as far as the internal examination was concerned with regard to Mr. O'Keefe, starting with his stomach, what, if anything, did you observe of any significance in that area?

A     I observed that there were some small hemorrhages, small areas of bleeding in Mr. O'Keefe's stomach.

Q     And are those described in medical literature as a specific type of spot?

A     They are give -- they have a name. They're called Wischnewski spots, W-I-S-C-H-N-E-W-S-K-I, and they have been associated with cases of hypothermia.

Q     And how so?  How have they been associated with cases of hyperthermia?

A     They have been seen in cases of hypothermia. It's one of the findings that supports the diagnosis of hypothermia. They are not always there, and their presence doesn't definitively diagnose hypothermia, but they are one of the findings that, if present, suggest the diagnosis of hypothermia.

Q     And based on your training and experience and based on other types of literature that you've reviewed in regard to

hypothermia, what is as far as these Wischnewski spots -- and thank you very much for saving me for saying that until after you had said it -- with regard to that, what if anything, does it say as far as the causality of that, or how that occurs or is related to hypothermia?

A    We don't really know the pathophysiology of these spots. There have been various hypotheses. There -- people have suggested that they are a response to stress. Some people have suggested that hypothermia increases secretion of acid in the stomach, and that leads to these spots, but their exact pathophysiology is still under investigation.

Q    Now, in addition to these areas of small hemorrhage in Mr. O'Keefe's stomach, what, if anything, did you observe in the pancreas?

A    In the pancreas, I again observed some more diffuse hemorrhage of the pancreas and the tissues around it.

Q    And same question with regard to the spots and hemorrhages you observed in the stomach, what if any relationship do the hemorrhages or the bleeding in the pancreas have in relation to hypothermia?

A    Again, it's one of the findings that if present should alert the medical examiner to consider the possibility of hypothermia.

Q    And as far as the observations that you made as far as the hemorrhages in the stomach area of Mr. O'Keefe and the

1-48

hemorrhages in the pancreatic area of Mr. O'Keefe, the sort of juxtaposition of those, what if any significance did that have in regard to your hypothermic diagnosis?

A    When the case was called into our office and when we accepted the case, it was -- it was reported to us that this was an individual that was found in the snow, covered with snow, and it appeared that he may have been there for a period of time. So one of the questions for me as a medical examiner is to determine whether there are any signs of hypothermia, in addition to what I had already observed, which was the blunt impact injuries, and the combination of the gastric, the stomach, and the pancreatic hemorrhages strongly suggested, given the circumstances and how the body was found, that hypothermia did, in fact, play a role in his death.

Q    Now, I probably should have asked this first as a precursor, but when you use the term hypothermia, what do you understand -- what does hypothermia mean from a medical diagnostic?

A    Hypothermia is a term used to describe low body temperature - by definition 35 degrees centigrade or below, and there are levels of hypothermia from mild hypothermia to severe hypothermia. It just basically means the body is losing heat faster than it can generate it.

Q    And typically what would be the sort of core body

temperature that would determine someone as hypothermic versus not?

A    We're usually at 98 degrees or 37 degrees centigrade, so anything higher than that is considered a fever or hyperthermia. Anything lower, lower than 35 degrees centigrade or 95 degrees Fahrenheit, is considered hypothermia.

Q    Now, if you could explain to the jury sort of a little bit about the type of diagnosis that is involved in hypothermia, and sort of what other sort of types of information you would be looking at in order to make that diagnosis?

A    Hypothermia is a difficult diagnosis to make and sometimes it's a diagnosis of exclusion.  Meaning that all other possible causes of death have been ruled out, and you're left with hypothermia. So a body that is found in the snow or in a cold environment and has a core body temperature of 85 degrees and is unresponsive or asystolic, meaning that there is no heart activity, could be a hypothermic death or it could not be a hypothermic death, and it's up to us to determine, by doing the autopsy, what other factors are at play.  So the example I like to give is a person with severe coronary artery disease goes out to shovel their driveway, suffers a heart attack, and drops to the ground and is dead within seconds, and no one discovers

their body for a few hours during the storm.  When they're found, their asystolic -- their core body temperature is 80 degrees. But the autopsy shows another reason for their death. It shows a massive heart attack which is what killed them. They just happened to be outside after they died and they lost heat and their body temperature dropped.  It doesn't mean they died from hypothermia.

However, if you take a person, an elderly person, or any person, an intoxicated person, a person who is intoxicated with drugs, that goes out into bad weather, gets confused, loses their direction, doesn't -- isn't able to get to shelter and they die, their body temperature starts to drop. They get more disoriented. They get more confused. You know, their organ systems start to shut down, and eventually they die from hypothermia. So that person will also be found in the snow with a core body temperature of 80, 85 degrees. But when we do the autopsy, if we see those gastric hemorrhages, if we see that bleeding in the stomach, if we see the bleeding in the pancreas, if we look at their toxicology and we see that they were intoxicated with multiple substances, then we can determine, or we can opine, that the cause of death was at least partly due to the hypothermia because they were still alive when they started losing heat, as opposed to someone who had the heart attack and was already dead when they started losing

heat from the body.

Q    Doctor, when coming to your opinion in relation to the cause of death of Mr. O'Keefe, in addition to your autopsy, your internal, your external examination, what if any other materials were you provided, and what if any other materials did you review in relation?

A    I was provided with a police report and an investigative report. I was provided with some of his prior medical records. I was provided with records from the hospital where he was first taken by emergency medical personnel. And during the course of the autopsy, of course, I forgot, I didn't mention this, we also, during the autopsy, collect fluids from the body that are sent to the lab for toxicologic analysis. And after a few weeks after the autopsy, we get a report from the toxicology lab. And in this case, I looked at the toxicology report, as I mentioned, all the information from the investigators, the autopsy findings, the neuropathology findings, and came to conclusion as to the cause.

Q    Now, as part of the documentation that you received from the investigators, did that include photographs of the scene as well?

A    Yes, it did, some photographs.

Q    Turning back to the toxicological findings that you received, what if any indication did those findings have,

or did they indicate, in regard to blood alcohol concentration with regard to Mr. O'Keefe?

A    Mr. O'Keefe had alcohol in his system, and I do believe -- I don't have the toxicology in front of me, but in his blood at the time of autopsy, the level was .21 grams per deciliter.

Q    Now, contained within those toxicology findings there's also something listed as a vitreous humor; is that correct?

A    Yes.

Q    And can you explain to the jury sort of what that is, where that sample is taken from and why it is?

A    Yeah, that sample, the vitreous humor, is taken from the back chamber of the eye. It's one of the routine samples that we take in addition to blood from the body and urine, and it's again used to look for the presence of different drugs.  In cases of alcohol intoxication, sometimes we will get a value for the vitreous and sometimes that value might not be exactly the same as the value that we get for the blood. It gives us an idea of where in the curve of alcohol metabolism, you know, the individual is.

Q    And so based on sort of the disparity between the vitreous humor level and the -- I'm sorry I may not have asked.  What was the level in the vitreous humor?

A    I believe it was higher point -- I'm sorry.  I just

1-53

have to find it. It was .26.  I'm sorry.  I can't find it in this notes. I don't know if you have the --

MR. LALLY:  Your Honor, may I approach?

THE COURT:  Yes.

Q    Showing you a copy of the toxicology report?

A    Yes, it was 0.28.

Q    Now, Doctor, with respect to the disparity between what was contained as a BAC in vitreous humor versus the other number from his blood, what, if anything, does that indicate to you as far or what if anything did you take from??

A    That suggests that the level in Mr. O'Keefe's blood had been higher than .21, and that's reflected by the .28 that was in the vitreous. The vitreous metabolism of alcohol lags. It's a little slower, lags behind that of the -- of the blood and the circulation. The alcohol is metabolized in the liver.  But the fact that it is higher in the vitreous suggests that the level in the blood was also higher at some point prior.

Q    So at some point, whenever Mr. O'Keefe died, his level of alcohol was on the decrease; is that fair to say?

A    Correct.

Q    Now, with respect to you mentioned that you have reviewed the EMS reports of Mr. O'Keefe as well as his medical records from Good Samaritan; is that correct?

A    Correct.

Q    And if you could just briefly for the jury explain your understanding as far as some of the terms within those medical records. Are you familiar with your review of Mr. O'Keefe's medical records that he was labeled as being in cardiac arrest?

A    Yes.

Q    And can you explain to the jury what means?

A    Yes, he was labeled as asystolic, or in asystole, which is basically a flat line. So if you attach leads to the body, there is no electrical activity coming from the heart.

Q    Now, with respect to Mr. O'Keefe, as far as certain vital signs were taken in the course of his treatment at the Good Samaritan; is that correct?

A    Yes.

Q    Including a core temperature; is that correct?

A    Yes.

Q    Do you recall what that core temperature was?

A    Yes, it was noted as 80.1.

Q    And that was a temperature reading that was taken at 7:19 a.m.; is that correct?

A    It was taken, actually, this temperature reading in the records that I'm looking at was taken at 6:57 a.m.

Q    And with respect to that 80.1 degree temperature that's

in Fahrenheit; is that correct?

A    Yes.

Q    And so what if any relationship does that have, or what if any relationship does that have to your hypothermic diagnosis?

A    Well, that is the temperature -- at this point, Mr. O'Keefe is asystolic, meaning he has no cardiac activity. That is the temperature of his body at the time that he was taken to -- that he was examined by EMS and taken to the hospital. So it is a very hypothermic temperature. It is well below the 95 degrees, which we consider hypothermia.

Q    Now, I believe you alluded to it earlier in your testimony, but with respect to hypothermia, what are some of the manifestations of that type of onset as it progresses?

A    Well, the first evidence of hypothermia, which we have no problem in this room, is shivering. When someone starts to get cold, they start to shiver to conserve heat. Then as the body loses more and more heat, there are neurologic consequences. People can get confused. We see this in the elderly all the time. They can get disoriented, and eventually at very low temperatures, you know, below 90 degrees, everything ceases to function. The heart stops.

Q    And would physical weakness be or lack of strength be one of those manifestations as well?

A    Yes.

Q    And how many different sort of stages of hypothermia are there from the beginning of or onset of progression to the end?

A    There is mild hypothermia to extreme severe hypothermia.

MR. LALLY:  If may I have a moment, Your Honor.

THE COURT:  Yes.

Q    Now, with regards as far as the type of clothing that someone is wearing when they're outside in these types of conditions, what if any relationship would that have with regard to the quickness or the rapidity of the onset of hypothermia?

A    Clearly, the more layers someone has, the slower they will lose heat from their body.  The fewer layers, the faster they can become hypothermic.

Q    What if any information did you have as far as how Mr. O'Keefe was dressed when he was found in the snow on the morning of 29th?

A    The information that I was given stated that he was wearing a pair of jeans and a long sleeve shirt.

Q    Now, with respect to someone as far as that hypothermia onset and rapidity of it, what if any relationship with the condition of the clothing -- what I'm asking there is more sort of the dryness versus wet clothing, what if any

relationship would that have?

A    Again, wet clothing or wet conditions will speed up the rate at which the body loses heat.

Q    Now, lastly with regard to this area, Doctor, in regard to Mr. O'Keefe having sort of alcohol on board in his system at the time that hypothermia onsets, what if any relationship does that have in respect to the onset of hypothermia and the rapidity of that?

A    Alcohol intoxication, it has been shown to inhibit some of the mechanisms that the body uses to maintain heat. So it's definitely a factor that is a negative factor when it comes to hypothermia.

MR. LALLY:  Your Honor, may I approach?

THE COURT:  Yes.

Q    So, Doctor, I'm showing you a single-paged document. If you could just review that, and look up when you're finished. A    (Witness complies.) Yes.

Q    And do you recognize that, Doctor?

A    I do. It is a photocopy of the exam notes that I took at the time of autopsy.

Q    Does that also contain a body diagram with relation to your notes as far as where you observed injuries on Mr. O'Keefe?

A    Yes.

MR. LALLY:  Your Honor, may I approach?

1-58

THE COURT: Yes.

MR. LALLY: Commonwealth would seek to introduce it as the next exhibit.

MS. LITTLE: No objection.

THE COURT: Thank you.

(Whereupon Exhibit No. 643, Diagram of Injuries on Body from Medical Examiner, was marked as an exhibit.)

MR. LALLY: And, Your Honor, with the Court's permission, if we could publish that to the jury at this time.

THE COURT: Okay.

Q    Doctor, there should be somewhere before you on the desk over there a laser pointer.

MR. LALLY: Ms. Gilman, if you could mark that just a bit, if you could focus in towards the top of the head.

Q    Now, Dr. Scordi-Bello, what's up on the screen, is that what you have before you as the next exhibit?

A    Yes.

Q    And on this as far as the examination that you conducted, that also included certain measurements, as far as height, weight, things like that, that you did with regard to Mr. O'Keefe's body, correct?

A    Correct.

Q    And if you could, what did you record as your measurements for both height and the weight of Mr. O'Keefe?

A    He was weighed by our staff as 216 pounds and measuring 73 inches, which is 6 feet 1 inch.

Q    Now, Doctor, if you could using the laser pointer before you, direct the jury's attention to starting with the front or the facial area and then to the back of the head, but just with reference to the head area, directing their attention to, what, if anything, you observed in the area of the head of Mr. O'Keefe?

A    In terms of injuries?

Q    Yes.

A    Would you like me to point out the injuries?  So as I mentioned, there were ecchymosis. That's another word for collection of blood under the upper eyelids on Mr. O'Keefe. the ecchymosis on the right eyelid was also associated with a very small laceration. Then there was an abrasion on the left side of the nose, and then on the back of the head there was a 3 centimeter laceration. So this is the right side. It would be towards, you know, the back lower side on the right side of the head.

Q    And that laceration on the black(sic) lower side or right side of the head, is that in the same area that you observed what you described as sort of the originating skull fracture?

A    Yes, when the -- when the scalp was reflected, there was bleeding under the scalp in that particular area, and

1-60

then when the skull was opened, that's the area that appeared fractured and appeared to have other fractures originating or radiating from it.

MR. LALLY: Ms. Gilman, if you wouldn't mind scrolling down to sort of the middle of the torso.

Q    And, Dr. Scordi-Bello, if you could again using the laser pointer just direct jury's attention to what if any injuries you noted in this sort of middle torso or upper extremity portion of this photo?

A    So on the right upper extremity, and, again, this is the back of the body. We have this collection of linear abrasions. I think the battery is dead.  That measured up to 7 centimeters and extended from the upper arm down to the middle of the forearm.

Q    If I could interrupt you for one second.  May I switch with you?

A    Thanks. This would be the abrasions.

MR. LALLY: And, Ms. Gilman, if I could ask you to scroll down for the lower extremities.

Q    Again, Dr. Scordi-Bello, if you could again using the laser pointer direct the jury's attention to what, if any, injuries you observed on the lower extremities in regards to Mr. O'Keefe?

A    The lower extremities, didn't have a lot of injuries. There was a small abrasion on his right knee area on the

side.  And if you don't mind pushing the diagram just a little bit more up to see the hands?

There were some contusions or some bruises on the dorsal aspects of the right hand and some very faint bruise on the left.

MR. LALLY:  Ms. Gilman, you can take that down.

Your Honor, may I approach again?

THE COURT:  Yes.

Q    Doctor, if I could show you what's a two page document. Ask you to just review that and look up when you're finished. A    (Witness complies.) Yes.

Q    And do you recognize what that is?

A    I do.

Q    And what do you recognize that to be?

A    These are copies of diagrams that I used at the time of autopsy to document some of the injuries on the face and the skull.

MR. LALLY:  May I approach again, Your Honor?

THE COURT:  Yes.

MR. LALLY:  Commonwealth would seek to introduce and admit as the next exhibit.

THE COURT:  Any objection?

MS. LITTLE:  No objection.

THE COURT:  Thank you.

(Whereupon Exhibit No. 644, Diagram of Injuries on Head

from Medical Examiner, was marked as an exhibit.)

MR. LALLY: And, Your Honor, may I return that to the witness?

THE COURT: Yes.

MR. LALLY: With the Court's permission, if we could publish that for the jury.

THE COURT: Okay.

MR. LALLY: May I have moment, Your Honor?

THE COURT: Yep.

Q    Dr. Scordi-Bello, do you recognize what's depicted up on the screen as the next exhibit before you?

A    Yes.

Q    And if you could, again, using the laser pointer, direct the jury's attention to what, if anything, you observed or noted of significance in these particular diagrams?

A    So the upper eyelids, the areas of the upper eyelids on both sides had ecchymosis or blood under them. On the right side, there was a very small laceration or a small tear associated with that. Both eyes had some swelling to them, and then on the nose there were two abrasions, two scrapes. One was small, .5 centimeters. The other one was 1 centimeter and it was linear, and I noted them right there.

MR. LALLY: Ms. Gilman, if you could scroll down a bit.

Q    And again from the bottom right diagram before you,

Doctor, if you could using the (indiscernible) direct the jurors' attention to what if any injuries or significance you noted in that portion of that diagram?

A    This is the area where I noted the laceration to the scalp. I noted something called tissue bridging, which is a morphologic feature of the laceration is what makes it different from an incised wound or from a cut because again, the skin is crushed, and now it's more irregular. The edges are more irregular. And then above that laceration, I noted that there was a scrape as well associated with it. So that was one injury.

MR. LALLY:  And, Ms. Gilman, if I could have the next page of that.

Q    Doctor if I direct you to the next page of that exhibit before you.

MR. LALLY:  And, Ms. Gillman, if you could (indiscernible) top left diagram?

A    Yes.

Q    Now, Doctor, before we get into a diagram that's up on the screen, if I could ask just a bit more if you could expound upon when you use the term ecchymosis, what exactly does that mean in specific reference to the area of the eyes?

A    Ecchymosis are a word that we use to describe bruising, orbital ecchymosis or periorbital ecchymosis, or

1-64

supraorbital ecchymosis, just referred to the location of the bleeding in relation to the eye.  And when we see ecchymosis or bleeding around the eyes, one of the differential diagnoses, one of the etiologies, is blunt trauma to the head, and specifically, fractures to what is known as the base of the skull. And this what you're seeing here is the base of the skull.

Q    Now, Doctor, if you could using that diagram up on the screen, explain to the jury -- well, let me ask first.

Were you able to formulate an opinion to a reasonable degree of medical certainty as to how the injuries within the skull and the brain sort of interacted with each other, in particular, interacted also with the ecchymosis that you described in the orbital region?

A    So the injuries inside the skull, this is the base of the skull. This is -- think of it as the tray where the brain would be sitting on top. The brain has been removed, and now we're looking at the bones.  Right here is where I noted the skull -- one of the skull fractures to be originating or starting with fractures. These are linear fractures that are extending or radiating from this one point of impact. This is known as the posterior fossa of the base. These two chambers are known as the middle cranial fossa and this area is known as the anterior cranial fossa.

1-65

As you look at this, the eyes would be sitting back here. So the eyes are actually very intimately associated with the anterior cranial fossa, which is very thin, and the bones are quite thin and friable. So an impact to the back of the head as was in this case because we do have a laceration and we do have an abrasion, so we know that the head impacted something blunt with enough force to break the skull, and enough force for those fractures to propagate or radiate into the middle cranial fossa and also the anterior cranial fossa, which is the front chambers of the base.

When the anterior cranial fossa are fractured, as I mentioned, they are very thin bones, blood can seep from this area into the soft tissues and manifest as hemorrhage or bleeding or a contusion or an ecchymosis around the eye when you look at the person face -- when you look at their face. So it is a well-known fact that fractures to the base of the skull can present with orbital ecchymosis and that particular manifestation has a name. It's called raccoon eye because it resembles, I guess, what raccoon eyes look like. But emergency room physicians are always very alerted to any hemorrhage and any bleeding around the eyes, because it could signify or it could mean that there's a much bigger injury inside the skull, and that that is not just some bleeding around the eyes, that it actually is

1-66

associated with a skull fracture.

Q    So the ecchymosis itself, as far as the sort of drainage or seepage of blood that's coming into, that's what causes the eyes to sort of swell up; is that correct?

A    Correct.

Q    And, Doctor, if I could ask you with reference to -- if you could illustrate with the laser pointer on the diagram up on the screen, as far as the subarachnoid hemorrhage, subdural hematoma, as far as the bleeding within the brain, what, if any, impact that has on the skull as far as the fractures are concerned or the building up of pressure itself?

A    Subarachnoid hemorrhage is a thin layer of hemorrhage on top of the brain - directly on top of the brain, under the leptomeninges. The main effect, or I guess one of the effects, the subarachnoid hemorrhage has, is that it is very irritating to the brain and can lead to seizures.

Subdural hemorrhage is hemorrhage that is due to veins in the dura, that very tough protective cover on top of the brain that are broken and leak blood into the space between the dura and the brain. That kind of injury, given enough time, you can have accumulation of the blood, and you can cause significant shift in to the brain. That's not something that we had here. Here we had some subdural hemorrhage, but not enough that it was what we call space

1-67

occupying, but it was present. So it was due to bridging veins in the dura being injured from the trauma from the fractures.

And in terms of the effect that all these injuries have - the subdural and the subarachnoid and the skull fractures - anytime the brain is injured, it responds by swelling. And the skull is a closed space without the ability to expand, unlike the skin, where you can have a bruise or a significant amount of blood accumulate under the skin. In the skull, once the brain starts to react to the injury and it starts to swell, there's nowhere to go except for down, and that's the foramen magnum, that is the area where the brain stem and the spinal cord will run. You know, spinal cord connects, obviously, the brain to the rest of the body, and this is one of the few spaces that the brain can try and squeeze into because he has nowhere else to go. So herniation, brain swelling and herniation, are a general response that the brain has to any sort of trauma.

MR. LALLY: And, Ms. Gilman, thank you very much. You can take that down and put the lights back on.

Your Honor, may I approach just to retrieve?

THE COURT: Yes.

Q    Now, Doctor, with respect to the head injury, specifically the fracture, what, if any, opinion can you give or can you say in regard to the type of force or

amount of force necessary to cause the fracture to the skull that you observed with regard to Mr. O'Keefe?

A    I can't really give you a number. I'm not a physicist. I can tell you that the skull is a pretty thick bone. It takes considerable amount of force to fracture the skull, so that was a pretty considerable impact.

Q    Now, with respect to the injuries to Mr. O'Keefe's head and the onset of hypothermia, what if any opinion do you have with regard to that timing of those respective to each other? A Well, I do believe the injuries, the blunt impact injuries were sustained first. These are not injuries that are immediately lethal. This is not something that would cause death in seconds. And therefore, Mr. O'Keefe may have been incapacitated by the injuries or knocked out, if you will, and was not able to get himself into a warmer environment, and therefore, hypothermia set in, given the environmental conditions and given the clothing on the body, or the lack of clothing, I should say - no big jacket or anything like that.

Q    Now, when you say something as far as some type of injury being immediately lethal, can you give an example of that?

A    The one that forensic pathologists like to use is a gunshot wound to the head that goes from one side to the other disrupting the neural systems of the brain and

causing the person to immediately drop and die within seconds or milliseconds. This is not that kind of injury. This is an injury that took a little bit of time to develop as is manifested by the fact that we have some bleeding, which means that the heart is still pumping and blood is still coming out of the vessels.

Q    And so I guess, to that point, as far as what was it from your examination and your findings and your review of sort of the overall materials that leads you to believe that the head injuries happened prior to hypothermia setting in?

A    Again, the findings of hypothermia, the blunt impact injuries, if someone is -- it's not completely out of the realm of possibility that someone becomes hypothermic and then falls as a result, but that the hypothermia would continue along with, you know, the brain injuries that took some time to develop. So in my opinion, I believe the impact, the injury to the head, came first.  Mr. O'Keefe was most likely incapacitated or unable to move into a warmer environment and then the hypothermia set in.

Q    And if you can what, if anything, can you say as to the sort of in contrast to sort of the bullet to the head or the instantaneous death, what, if anything, can you say as to the time that this would take to manifest itself as far as the injury to the head and the hypothermic state?

A    Again, I can't give you specifics. I would say this was definitely in the matter of minutes, many minutes, or hours.

MR. LALLY:  If I may have a moment, Your Honor.

THE COURT:  Yes.

Q    Now, Doctor, you had mentioned that at some point you had reviewed some photographs from the scene where Mr. O'Keefe's body was recovered; is that correct?

A    Yes, I was shown some photographs.

Q    And from the photographs that you were shown, what, if anything, of significance, did you observe or lack thereof in the area where Mr. O'Keefe's body was recovered?

A    Well, based on those photographs, limited number of photographs that I saw and I was shown, there didn't appear to be a lot of disruption around the area where I was told that Mr. O'Keefe's body was found.

Q    And that lack of sort of disruption in the snow around where Mr. O'Keefe's body was found, what if any significance would that have for you as far as from a diagnostic perspective?

A    Well, it suggests that he really didn't travel a very long distance once the injury was inflicted.

Q    And as far as anything related to footprints, drag marks, anything like that, did you observe anything like that in that area?

A    On the pictures that I saw, no.

Q    Now, from your extent of your examination of Mr. O'Keefe's body, what, if anything, that you -- did you observe that would indicate any sort of altercation or a fight or anything like that Mr. O'Keefe was in?

A    I didn't see any signs, major signs, of what I would call a significant altercation.

Q    And with regard to that as far as signs, what are some of the signs and what would you be expecting to see and what was lacking as far as your observations of Mr. O'Keefe?

A    I looked at Mr. O'Keefe's hands. As you saw in the diagrams, I did document that there were some contusions on the dorsal aspect, very vague and faint contusion on the left, and contusion on the right hand. That particular contusion has a central little pinpoint mark that may suggest that it was due to attempts to get IV access on his hand. That's very commonplace. But I didn't see any bruising on Mr. O'Keefe's knuckles. His nails were intact. I didn't see any breaks on his nails, and I didn't see any fractures or feel any fractures on any of his hands.

Q    Now, with respect to the diagrams that were up on the screen before, as well as your observations from internal examination, you observed some fractures to Mr. O'Keefe's ribs; is that correct?

A    Yes, he did have some fractures I believe to the fourth and fifth ribs near the sternum. It's a very common location for CPR associated fractures.

Q    And so I believe you just alluded to it right there, but as far as any fractures to Mr. O'Keefe's ribs, what if any opinion do you have as to the origin -- origination or causality of those rib fractures?

A    As I mentioned, those are very consistent with resuscitation. We see those quite often given the history that I was provided that extensive resuscitation was attempted.  I documented those as most likely due to resuscitation.

Q    Now, Doctor, with regard to the -- just by way of contrast, you talked a bit about the significant impact or the thickness of the skull. How does that relate to the area of the ribs that you're talking about as far as can be fractured in resuscitated efforts?

A    Well -- I don't understand the question.

Q    Let me rephrase.  What is the difference sort of between thickness of the bone and the skull versus the thickness of the bone and the ribs?

A    The skull in general is a thicker bone. It requires more force.

Q    Now, Doctor, if I could, are you familiar with a medical term known as vasodilation?

1-73

A    Yes.

Q    And can you explain what that term is and how it relates to Mr. O'Keefe's condition?

A    I can explain what the term is. Vasodilation means opening up. Vaso refers to blood vessel. So vasodilation is the opening up of blood vessels to bring more blood to the extremities or any part of the body.

Q    And again, that's a bit of an unfair question as me as far as relations, but -- so how does that manifest itself as far as someone who's in colder conditions, or has that sort of onset of hypothermia, what if any relation does the vasodilation have to that?

A    You can see vasodilation. You can see vasoconstriction and vasodilation in hypothermia. Initially, the blood vessels will constrict in an attempt to reduce blood flow to the extremities so there's no heat loss. Anyone who has Raynaud's knows what that feels like. Then ultimately, the blood vessels will dilate bringing more blood to the extremities. Again, the normal regulatory mechanisms that the brain has to maintain our body temperature are disrupted when you get into those very low temperatures, and therefore, sometimes in hypothermia, you can see very, very red extremities due to vasodilation.

Q    And with regard to the redness due to vasodilation, is there also a whiteness sort of discoloration to the

extremities that can be observed in hypothermic patients as well?

A    That's been described as well. Yes.

Q    Now, with reference to when you make your observations of Mr. O'Keefe, why is it that -- well, let me ask you this. You didn't see any signs of vasodilation or white fingertips or anything like that; is that correct?

A    Correct.  I rarely see signs of vasodilation, especially if someone has died in the hospital.

Q    And can you explain to the jury, sort of why that is?

A    So for two reasons. In this particular reason, Mr. O'Keefe was taken to the hospital and attempts were made at rewarming the body.  So he was given warm intravenous fluids, and attempts were made to bring the body temperature up with the hope that the heart would start working once that happened.

Also, I did not physically see the body until Monday morning, and therefore, I can't really comment on vasodilation on any effects that hypothermia may or may not have had acutely on the body, because I'm seeing the body hours after death and already the body has been transferred from the scene to the hospital, stored at the hospital, and then transferred from the hospital to our facility. So there's just too much time between when the body was discovered to when I looked at the body to make any

1-75

reasonable comments on whether there was vasodilation or not.

MR. LALLY:  May I approach, Your Honor?

THE COURT:  Yes.

Q    Doctor, I'm showing you a series of five photographs. I'd ask you to review those and look up when you're finished.

A    (Witness complies.)

THE COURT:  I'm actually going to see counsel at sidebar for a minute, please.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

THE COURT:  And having looked at the photographs, it makes sense that we break for today and we'll start fresh with us tomorrow, rather than showing these to folks now. So thank you. So we are going to end for today. We are on track. Maybe we are definitely on track for finishing this case next week, probably because of staying all day tomorrow and some of the work we did today and on Tuesday.

Please follow the three instructions. Do not discuss this case with anyone. Don't do any independent research or investigation into the case. If you happen to see, hear, or read anything about the case, please disregard it. Let us know.  We'll see you tomorrow morning.

(Jury out.)

(Witness exits.)

THE COURT:  Thank you. It does seem like the appropriate place to stop. Does anybody -- so we're still in session. Does anybody need me for anything now?

MR. LALLY:  If we could just approach briefly just regarding scheduling, Your Honor.

THE COURT:  Yep.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

(Court in recess.)

1-77

CERTIFICATION


I, CHRISTINE D. BLANKENSHIP, NOTARY PUBLIC, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT FROM THE RECORD OF THE COURT PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I, CHRISTINE D. BLANKENSHIP, FURTHER CERTIFY THAT THE FOREGOING IS IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE OF THE TRIAL COURT DIRECTIVE ON TRANSCRIPT FORMAT.

I, CHRISTINE D. BLANKENSHIP, FURTHER CERTIFY THAT I NEITHER AM COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THIS ACTION.


*Christine D. Blankenship, October 4, 2024*
CHRISTINE D. BLANKENSHIP, NOTARY PUBLIC
RECORDED BY FTR, TRANSCRIPT PRODUCED FROM COMPUTER
29B MECHANIC STREET
FOXBORO, MASSACHUSETTS 02035
(508) 904-9508
C.DORANBLANKENSHIP@GMAIL.COM

## A

**Abdomen** - 30:1, 45:10
**Ability** - 67:7
**Able** - 8:23, 9:14, 16:9, 16:24, 19:7, 19:10, 19:14, 25:20, 33:5, 36:2, 40:23, 50:11, 64:10, 68:15
**Abnormal** - 5:18, 9:1
**Abnormalities** - 7:20
**Above** - 63:9
**Abrasion** - 38:14, 39:1, 39:9, 39:15, 39:17, 39:21, 39:23, 59:15, 60:25, 65:6
**Abrasions** - 37:12, 38:9, 38:10, 38:20, 39:11, 41:7, 60:12, 60:17, 62:21
**Absent** - 34:8
**Accepted** - 28:15, 48:5
**Access** - 71:17
**Accident** - 32:5, 34:18, 36:14
**Accidental** - 36:3
**Accidents** - 28:12, 32:10, 32:11
**Accredited** - 25:16
**Accumulate** - 67:9
**Accumulation** - 66:22
**Accurate** - 16:23
**Acid** - 47:10
**Acronym** - 26:4
**Act** - 32:20, 34:15
**Active** - 26:13
**Activity** - 49:19, 54:11, 55:7
**Acute** - 10:5, 10:9, 10:11, 11:2, 19:14, 20:15, 20:19
**Acutely** - 74:20
**Add** - 7:24
**Addition** - 47:12, 48:10, 51:3, 52:14
**Adjacent** - 44:12
**Admit** - 36:19, 61:21
**Afternoon** - 3:17, 3:18, 23:7, 23:8, 23:13, 23:14
**Against** - 16:4
**Age** - 8:17
**Aging** - 32:3
**Ahead** - 3:14, 39:4
**Air** - 3:10
**Alcohol** - 52:1, 52:3, 52:16, 52:20, 53:14, 53:16, 53:21, 57:5, 57:9
**Alert** - 47:22
**Alerted** - 65:21
**Alive** - 50:23
**Alluded** - 55:12, 72:4
**Altercation** - 71:4, 71:7
**Alzheimer's** - 32:4
**American** - 4:11, 5:1
**Amount** - 67:9, 68:1, 68:5

**Analogy** - 40:21
**Analysis** - 7:12, 9:5, 9:10, 10:23, 11:5, 12:7, 17:19, 27:5, 27:21, 27:22, 51:14
**Analyze** - 7:15
**Anatomic** - 4:14, 4:21, 5:21, 5:22, 5:23, 6:5, 27:1, 27:2, 27:5, 27:6, 27:11, 41:13
**Ancillary** - 6:2
**Aneurysm** - 11:19, 12:4, 12:14, 12:16
**Aneurysms** - 12:8
**Anterior** - 41:19, 41:23, 64:24, 65:3, 65:10, 65:12
**Antigua** - 4:12
**Anytime** - 39:5, 67:6
**Anywhere** - 12:22
**Appear** - 16:17, 44:4, 70:14
**Appeared** - 17:2, 43:11, 43:12, 48:7, 60:2
**Approach** - 21:19, 34:21, 36:16, 53:3, 57:13, 57:25, 61:7, 61:18, 67:21, 75:3, 76:6
**Appropriate** - 76:4
**Areas** - 5:12, 12:13, 14:12, 20:9, 26:7, 46:10, 47:12, 62:17
**Arm** - 38:22, 39:9, 39:11, 41:7, 41:9, 41:11, 41:15, 41:17, 41:23, 42:1, 60:13
**Arms** - 37:25, 38:16, 38:18
**Arrest** - 54:6
**Arterial** - 12:10
**Artery** - 49:23
**Aspect** - 38:25, 39:10, 39:14, 39:16, 42:10, 71:14
**Aspects** - 61:4
**Associated** - 38:9, 38:14, 46:15, 46:16, 59:14, 62:20, 63:11, 65:2, 66:1, 72:3
**Association** - 26:2
**Asystole** - 54:9
**Asystolic** - 49:18, 50:2, 54:9, 55:7
**Atomic** - 25:9
**Attach** - 54:10
**Attack** - 49:24, 50:4, 50:25
**Attempt** - 73:15
**Attempted** - 31:5, 72:11
**Attempts** - 71:17, 74:12, 74:14
**Attention** - 11:4, 17:6, 23:1, 30:5, 42:3, 59:4, 59:7, 60:7, 60:21, 62:14,

63:2
**Autopsies** - 5:6, 6:19, 30:21

## B

**Babies** - 8:17, 28:12
**BAC** - 53:8
**Bachelor's** - 4:6, 4:10, 24:10
**Background** - 4:3, 24:5
**Backside** - 41:16
**Backwards** - 20:4
**Base** - 12:9, 12:11, 14:10, 64:6, 64:7, 64:15, 64:23, 65:11, 65:17
**Based** - 5:3, 18:9, 19:15, 22:22, 22:23, 33:17, 33:23, 46:24, 52:22, 70:13
**Battery** - 60:12
**Become** - 9:4, 56:16
**Becomes** - 69:14
**Began** - 19:5
**Behind** - 15:23, 53:15
**Bello** - 9:9, 21:16, 23:6, 23:17, 36:24, 42:2, 58:16, 60:6, 60:20, 62:10
**Belong** - 26:1
**Belonging** - 9:5
**Below** - 48:21, 55:11, 55:22
**Benign** - 27:10
**Bi** - 14:19
**Big** - 14:10, 37:6, 68:18
**Bilateral** - 13:20, 14:19
**Biology** - 4:9
**Bit** - 4:23, 18:1, 24:6, 49:9, 58:15, 61:2, 62:24, 63:20, 69:3, 72:14, 73:8
**Black** - 59:20
**Blade** - 40:7
**Bleeding** - 11:14, 38:6, 38:9, 46:10, 47:19, 50:18, 50:19, 59:25, 64:2, 64:3, 65:15, 65:22, 65:25, 66:9, 69:4
**Blurred** - 16:22
**Board** - 4:20, 4:21, 4:24, 4:25, 5:1, 5:2, 5:7, 5:9, 25:6, 25:8, 25:9, 25:12, 25:14, 25:20, 57:5
**Bone** - 37:13, 40:11, 68:4, 72:20, 72:21, 72:22
**Bones** - 64:18, 65:4, 65:13
**Bony** - 17:23
**Boston** - 3:25, 4:16, 42:19
**Both** - 26:14, 29:8, 38:6, 38:22, 42:10, 44:13, 58:25, 62:18, 62:20
**Bottle** - 37:7

**Bottom** - 41:10, 62:25
**Brainstem** - 14:1, 14:3, 14:4, 14:23, 14:24, 15:1, 18:24, 19:3
**Bread** - 40:22, 40:23, 40:24, 40:25
**Break** - 37:13, 40:1, 40:10, 41:4, 65:7, 75:15
**Breaks** - 71:20
**Bridging** - 63:5, 67:1
**Broken** - 15:10, 66:20
**Brook** - 4:8
**Brown** - 4:18
**Bruise** - 15:8, 18:5, 39:24, 40:2, 61:4, 67:8
**Bruises** - 37:12, 61:3
**Bruising** - 38:24, 41:5, 63:24, 71:19
**Building** - 66:11
**Bullet** - 69:22
**Butcher** - 13:19

## C

**California** - 24:11
**Call** - 3:5, 32:25, 33:1, 66:25, 71:7
**Called** - 9:16, 12:10, 27:18, 40:20, 46:13, 48:4, 63:5, 65:19
**Calls** - 21:15
**Cancer** - 32:3
**Can't** - 16:22, 20:21, 53:1, 68:3, 70:1, 74:18
**Cape** - 30:12
**Cardiac** - 3:25, 54:6, 55:7
**Care** - 9:21, 28:14
**Cases** - 6:24, 8:14, 8:16, 8:18, 8:21, 8:24, 9:3, 28:9, 46:15, 46:16, 46:18, 52:16
**Categories** - 34:3
**Categorized** - 37:11
**Category** - 37:6
**Causality** - 47:4, 72:7
**Caused** - 20:23, 32:2, 37:5
**Causes** - 11:19, 14:2, 28:12, 36:9, 37:2, 49:15, 66:4
**Causing** - 16:5, 17:25, 19:6, 69:1
**Ceases** - 55:23
**Cells** - 6:6
**Centigrade** - 48:21, 49:3, 49:6
**Centimeter** - 18:15, 39:8, 39:16, 59:17, 62:23
**Centimeters** - 38:22, 39:13, 60:13, 62:22
**Central** - 44:4, 44:5, 71:16
**Cerebral** - 12:8, 19:25,

20:1
**Certain** - 5:3, 5:4, 5:5, 7:10, 19:18, 22:10, 54:13, 58:20
**Certainty** - 19:12, 64:11
**Certificate** - 6:24, 35:4, 35:10, 35:14, 36:22
**Certification** - 4:25, 5:8, 5:10, 25:14, 25:21
**Certified** - 4:20, 4:21, 4:24, 5:3, 25:6, 25:8, 25:9, 25:12, 25:20
**Cetera** - 32:4
**Chamber** - 52:13
**Chambers** - 44:22, 64:23, 65:10
**Characteristics** - 29:14
**Characterize** - 10:24, 33:15
**Charge** - 34:17
**Charts** - 42:1
**Chemical** - 32:7
**Chest** - 29:25, 45:10
**Chief** - 3:24, 4:17, 23:22, 23:25, 24:25, 30:10
**Children** - 8:17, 28:13
**Choice** - 25:17
**Chronic** - 10:18, 10:20
**Circle** - 12:10, 12:12
**Circulation** - 53:16
**Circumference** - 41:8
**Circumscribed** - 16:12
**Circumstance** - 19:4, 31:24, 33:22
**Circumstances** - 7:17, 10:9, 10:14, 31:20, 32:8, 32:18, 33:2, 33:6, 36:1, 48:13
**City** - 24:16, 24:23, 25:1, 25:4, 26:11, 26:13
**Classified** - 31:18, 32:11, 32:23, 34:18
**Classify** - 34:2
**Cleans** - 41:20
**Clinical** - 4:14, 4:22, 6:8, 6:9, 6:11, 6:15, 6:17, 23:1, 27:2, 27:4
**Clinician** - 6:4
**Closed** - 67:7
**Closer** - 19:5
**Clothing** - 56:9, 56:24, 56:25, 57:2, 68:17, 68:18
**Cod** - 30:12
**Cold** - 49:17, 55:18
**Colder** - 73:10
**Collect** - 29:19, 51:13
**Collection** - 59:13, 60:11
**Color** - 17:3, 17:4, 29:14
**Combination** - 19:16, 35:24, 37:16, 48:12

**Combined** - 4:13
**Come** - 6:11, 8:18, 8:20, 12:12, 22:15, 27:9, 44:14
**Comes** - 14:12, 27:23, 28:4, 28:20, 57:12
**Coming** - 15:9, 15:11, 18:4, 21:18, 51:2, 54:11, 66:3, 69:6
**Commences** - 21:21, 45:21, 75:11, 76:9
**Comment** - 74:18
**Comments** - 75:1
**Common** - 72:2
**Commonplace** - 71:18
**Commonwealth** - 3:5, 21:15, 22:9, 23:23, 36:18, 58:2, 61:20
**Compelling** - 33:3
**Complete** - 5:4
**Completed** - 24:10, 24:14, 24:17, 24:19, 24:24
**Completely** - 10:21, 16:22, 69:13
**Completing** - 25:16, 25:18
**Complies** - 34:25, 57:17, 61:11, 75:8
**Components** - 29:4
**Compressed** - 14:25, 19:7
**Computer** - 28:24
**Concentrated** - 13:15
**Concentration** - 52:2
**Concerned** - 7:5, 8:7, 29:3, 34:10, 46:6, 66:11
**Conclusion** - 51:19
**Condition** - 56:24, 73:3
**Conditioning** - 3:11
**Conditions** - 56:11, 57:2, 68:17, 73:10
**Conduct** - 30:21
**Conducted** - 11:5, 42:22, 58:20
**Conducting** - 45:1
**Conformity** - 30:19
**Confused** - 50:11, 50:14, 55:20
**Connection** - 22:12
**Connects** - 67:14
**Consequences** - 55:20
**Conserve** - 55:18
**Consider** - 22:25, 47:22, 55:11
**Considerable** - 68:5, 68:6
**Considered** - 6:15, 49:4, 49:6
**Consist** - 28:5
**Consistent** - 21:1, 21:3, 72:8
**Consists** - 5:23, 6:5, 6:7

**Constrict** - 73:15
**Consultant** - 7:8
**Contact** - 44:14
**Contain** - 57:21
**Contained** - 16:7, 18:8, 52:7, 53:8
**Continue** - 69:16
**Contrast** - 69:22, 72:14
**Contributing** - 37:2
**Contusion** - 15:4, 15:8, 15:13, 15:15, 15:18, 18:6, 39:22, 39:24, 40:2, 65:15, 71:14, 71:15, 71:16
**Contusions** - 15:21, 16:3, 16:6, 17:7, 17:11, 17:25, 37:11, 38:24, 39:13, 61:3, 71:13
**Conveyed** - 6:4
**Copies** - 61:15
**Copy** - 35:4, 53:5
**Cord** - 7:2, 11:16, 14:8, 14:11, 19:2, 20:7, 67:13, 67:14
**Core** - 48:25, 49:17, 50:2, 50:16, 54:17, 54:19
**Corner** - 40:5
**Coronary** - 49:23
**Cortex** - 15:24, 16:3
**Cortices** - 15:22
**Counsel** - 3:2, 45:20, 46:2, 75:9
**Count** - 17:12, 17:13, 17:17
**Couple** - 5:9, 31:9
**Course** - 12:6, 30:23, 30:24, 42:5, 51:11, 54:14
**Court's** - 58:8, 62:5
**Cover** - 42:13, 66:19
**Covered** - 22:17, 48:6
**Covering** - 30:16
**Covers** - 42:16
**CPR** - 72:3
**Cranial** - 64:24, 64:25, 65:3, 65:9, 65:10, 65:12
**Created** - 9:25
**Criteria** - 5:3, 5:4, 5:6, 7:10, 7:12, 8:16
**Cross** - 6:13, 21:9
**Crushed** - 63:8
**Cum** - 4:13
**Curve** - 52:20
**Cut** - 6:1, 7:19, 9:14, 40:3, 40:4, 40:7, 40:21, 40:22, 40:24, 40:25, 41:2, 63:7
**Cuts** - 29:23, 40:8, 40:9
**Cutting** - 8:9, 11:20, 12:20
**Cytopathology** - 6:5

| D |
| --- |

**Date** - 5:10, 25:22

**Day** - 10:13, 10:16, 30:16, 75:19
**Days** - 8:10, 8:12
**Dead** - 49:25, 50:25, 60:12
**Deals** - 27:4
**Deaths** - 28:11, 28:12, 28:13
**Deceased** - 26:25, 33:19
**December** - 24:3
**Decide** - 9:1
**Decides** - 25:15
**Deciliter** - 52:6
**Decrease** - 53:21
**Deep** - 12:19
**Defendant** - 3:2, 22:22, 46:2
**Define** - 5:15
**Defined** - 39:18
**Definitely** - 20:22, 57:11, 70:2, 75:18
**Definition** - 44:21, 48:21
**Definitively** - 46:21
**Degree** - 4:6, 4:7, 4:11, 19:11, 24:9, 24:10, 24:12, 24:15, 54:25, 64:11
**Degrees** - 48:21, 49:3, 49:5, 49:6, 49:18, 50:3, 50:17, 55:11, 55:23
**Delineation** - 39:20
**Dementia** - 32:4
**Department** - 9:16, 9:17
**Dependent** - 10:14, 31:24, 33:23
**Depicted** - 62:10
**Describe** - 15:15, 18:2, 26:17, 29:7, 31:16, 41:11, 48:20, 63:24
**Described** - 22:18, 46:11, 59:22, 64:14, 74:3
**Desk** - 58:13
**Determination** - 28:8, 28:24, 33:9, 33:15, 33:21, 33:23, 34:1, 34:4, 34:5, 34:6, 34:9, 34:11, 36:11
**Determine** - 7:11, 19:14, 26:24, 27:12, 27:24, 28:25, 31:12, 32:1, 33:6, 35:22, 36:3, 36:8, 44:9, 48:9, 49:1, 49:21, 50:21
**Determined** - 33:1, 35:16, 35:17, 35:23, 36:5, 36:12
**Determining** - 8:4
**Develop** - 69:3, 69:17
**Diagnose** - 8:1, 8:23, 46:21
**Diagnoses** - 64:4
**Diagnosis** - 6:3, 27:9, 46:19, 46:22, 48:3, 49:9, 49:12, 49:13, 49:14, 55:5

**Diagnostic** - 48:19, 70:20
**Diagram** - 57:21, 58:6, 61:1, 61:25, 62:25, 63:3, 63:17, 63:19, 64:8, 66:7
**Diagrams** - 41:25, 61:15, 62:16, 71:13, 71:22
**Dictates** - 5:2
**Didn't** - 17:17, 40:14, 51:12, 60:24, 70:14, 70:21, 71:6, 71:18, 71:20, 74:6
**Die** - 50:12, 50:15, 69:1
**Died** - 50:5, 50:7, 53:20, 74:9
**Dies** - 6:23
**Difference** - 39:21, 40:17, 72:19
**Different** - 30:10, 31:17, 36:7, 38:4, 52:16, 56:2, 63:7
**Differential** - 64:4
**Differentiate** - 40:8
**Difficult** - 8:21, 49:13
**Diffuse** - 18:10, 18:12, 18:16, 18:19, 47:15
**Dilate** - 73:18
**Directing** - 59:6
**Direction** - 50:11
**Directly** - 42:15, 66:14
**Director** - 3:25, 7:5
**Discoloration** - 73:25
**Discovered** - 74:25
**Discovers** - 49:25
**Disease** - 5:18, 12:17, 26:20, 26:23, 29:16, 30:2, 30:4, 31:22, 32:2, 32:3, 49:23
**Disoriented** - 50:13, 55:21
**Disparity** - 52:22, 53:7
**Disregard** - 75:24
**Disrupted** - 73:21
**Disrupting** - 68:25
**Disruption** - 70:15, 70:17
**Distance** - 70:22
**Distinction** - 40:4
**Division** - 45:2
**Doctorate** - 24:15
**Document** - 7:20, 29:13, 29:14, 30:4, 31:6, 34:23, 35:1, 57:15, 61:9, 61:16, 71:13
**Documentation** - 51:20
**Documented** - 29:17, 31:5, 38:25, 72:11
**Documenting** - 30:2
**Doesn't** - 6:20, 37:9, 46:20, 50:7, 50:11
**Don't** - 33:4, 34:14, 45:15, 47:6, 52:4, 53:2, 61:1,

72:18, 75:22
**Dorsal** - 38:24, 39:13, 39:15, 61:4, 71:14
**Dot** - 15:17
**Double** - 4:9
**Downtown** - 24:23
**Downward** - 20:6
**Downwards** - 14:16
**Dr** - 3:5, 9:9, 20:13, 21:15, 36:24, 42:2, 43:1, 58:16, 60:6, 60:20, 62:10
**Drag** - 70:23
**Drainage** - 66:3
**Dramatic** - 4:9
**Draw** - 22:25
**Drawn** - 6:10
**Dressed** - 56:18
**Driveway** - 49:24
**Drop** - 50:13, 69:1
**Dropped** - 50:6
**Drops** - 49:24
**Drug** - 32:10
**Drugs** - 50:10, 52:16
**Dryness** - 56:25
**Due** - 19:16, 28:11, 32:6, 32:17, 40:5, 40:9, 40:11, 50:22, 66:18, 67:1, 71:17, 72:11, 73:23, 73:24
**Dura** - 42:12, 66:19, 66:21, 67:2

| E |
|---|

**Each** - 5:12, 13:24, 64:12, 68:9
**Earlier** - 31:10, 55:12
**Easier** - 7:15
**Ecchymosis** - 59:12, 59:14, 62:18, 63:21, 63:24, 63:25, 64:1, 64:3, 64:13, 65:15, 65:18, 66:2
**Edge** - 37:9
**Edges** - 16:22, 41:4, 63:9
**Education** - 26:13
**Educational** - 4:3, 24:5
**Effect** - 26:21, 66:15, 67:4
**Effects** - 66:16, 74:19
**Efforts** - 72:17
**Elderly** - 32:11, 50:8, 55:21
**Electrical** - 54:11
**Emergency** - 51:10, 65:21
**Employed** - 3:24, 23:19, 23:20, 23:21, 23:22
**EMS** - 9:19, 53:24, 55:9
**Encase** - 11:16
**Encased** - 14:13
**Ends** - 16:13
**Enforcement** - 33:24
**Enjoyed** - 26:12
**Entailed** - 25:13

**Entails** - 7:8
**Entirety** - 18:17
**Entitled** - 22:22
**Entity** - 8:22
**Envelope** - 22:16
**Environment** - 49:17, 68:16, 69:20
**Environmental** - 68:17
**Essentially** - 5:17, 5:20, 6:16, 7:14, 13:2, 13:23, 14:24, 15:8, 15:14, 18:4, 18:7
**Et** - 32:4
**Etiologies** - 64:4
**Events** - 31:23
**Eventually** - 50:15, 55:22
**Everything** - 10:25, 28:23, 45:6, 55:23
**Everywhere** - 41:10
**Evidence** - 10:19, 10:21, 12:16, 12:21, 22:9, 22:23, 29:19, 31:2, 31:4, 32:8, 32:14, 32:18, 33:2, 33:3, 34:12, 44:13, 55:16
**Exam** - 5:7, 29:11, 29:13, 43:9, 57:19
**Examine** - 41:12, 42:20, 45:6
**Examined** - 30:1, 42:8, 55:9
**Examiner** - 4:1, 4:17, 7:9, 8:3, 8:22, 8:25, 9:7, 9:17, 9:25, 23:20, 23:23, 23:25, 24:25, 28:10, 30:10, 47:22, 48:9, 58:7, 62:1
**Examiners** - 7:9, 26:3
**Examiner's** - 3:24, 28:8
**Examining** - 8:9, 42:17, 45:3
**Example** - 5:1, 5:24, 6:12, 7:24, 49:22, 68:21
**Exams** - 25:19
**Except** - 67:11
**Exclusion** - 49:14
**Exclusively** - 32:2
**Exhibit** - 22:1, 22:2, 22:3, 36:19, 36:22, 36:23, 58:3, 58:6, 58:7, 58:17, 61:21, 61:25, 62:1, 62:11, 63:14
**Exhibits** - 22:15
**Exits** - 76:2
**Expand** - 67:8
**Expansion** - 14:6
**Expecting** - 71:9
**Experience** - 18:10, 26:7, 27:17, 46:24
**Expound** - 63:21
**Extended** - 60:13
**Extending** - 43:13, 64:21
**Extensive** - 44:19, 44:23,

72:10
**Extent** - 71:2
**External** - 29:4, 29:9, 29:11, 29:18, 29:21, 30:25, 31:1, 37:19, 43:9, 45:7, 51:4
**Extreme** - 56:5
**Extremities** - 37:24, 38:15, 38:16, 39:2, 39:8, 60:19, 60:22, 60:24, 73:7, 73:16, 73:19, 73:23, 74:1
**Extremity** - 38:19, 60:9, 60:10
**Eye** - 29:14, 52:13, 64:2, 65:15, 65:20
**Eyelid** - 38:8, 59:14
**Eyelids** - 38:6, 59:13, 62:17
**Eyes** - 7:3, 38:5, 38:6, 38:7, 62:20, 63:23, 64:3, 65:1, 65:2, 65:20, 65:22, 65:25, 66:4

| F |
|---|

**Face** - 37:24, 61:16, 65:16, 65:17
**Facial** - 59:5
**Facilities** - 28:18
**Facility** - 28:18, 28:20, 31:4, 74:23
**Facing** - 41:15
**Factors** - 49:22
**Fahrenheit** - 49:6, 55:1
**Faint** - 16:17, 17:3, 39:15, 61:4, 71:14
**Fair** - 36:7, 53:21
**Fairly** - 18:6, 39:19
**Fall** - 21:1, 28:10
**Falls** - 28:9, 28:15, 32:11, 69:15
**Faster** - 48:24, 56:16
**Fatal** - 31:23, 32:12
**Fear** - 32:15
**Feature** - 63:6
**Feel** - 7:20, 71:21
**Feels** - 73:17
**Feet** - 59:2
**Fellowship** - 4:16, 4:18, 24:24, 25:2
**Fever** - 49:4
**Field** - 26:1, 26:8
**Fifth** - 72:2
**Fight** - 71:5
**Find** - 11:6, 53:1
**Finding** - 11:21
**Findings** - 11:4, 19:16, 19:18, 20:13, 20:14, 20:24, 20:25, 33:17, 46:19, 46:22, 47:21, 51:18, 51:24, 51:25, 52:7,

69:8, 69:12
Fingertips - 74:7
Finishing - 75:18
Firms - 7:14
First - 5:15, 11:12, 11:21, 28:7, 29:11, 31:2, 31:15, 31:25, 48:16, 51:10, 55:16, 64:9, 68:11, 69:18
Fissure - 13:11, 13:12
Five - 31:24, 31:25, 34:3, 36:7, 75:5
Fix - 7:16, 8:11
Fixed - 7:15
Fixes - 7:14
Flat - 54:10
Floating - 11:17
Flow - 19:8, 20:2, 73:15
Flowing - 20:11
Flows - 19:25, 20:5
Fluid - 19:25, 20:1
Fluids - 27:4, 51:13, 74:14
Focus - 58:15
Folks - 75:16
Follow - 7:10, 45:17, 75:21
Following - 7:12, 24:15, 24:18, 24:21, 25:2
Footprints - 70:23
Foramen - 14:9, 67:12
Force - 20:20, 20:22, 20:23, 36:25, 37:4, 37:5, 37:22, 37:23, 38:2, 65:7, 65:8, 67:25, 68:1, 68:5, 72:23
Forearm - 38:23, 39:12, 41:12, 41:15, 41:17, 42:2, 60:14
Forensic - 4:16, 4:22, 6:18, 6:19, 24:24, 25:9, 25:17, 25:25, 26:15, 26:22, 26:23, 27:10, 27:14, 27:17, 31:12, 68:23
Forgot - 51:12
Form - 19:11
Formalin - 7:13, 8:6
Formerly - 22:3
Forms - 19:19
Formulate - 64:10
Formulating - 9:13
Forward - 41:22
Fossa - 64:22, 64:24, 64:25, 65:3, 65:9, 65:10, 65:12
Found - 48:6, 48:14, 49:16, 50:2, 50:16, 56:18, 70:16, 70:18
Four - 4:13, 17:15, 17:16, 24:17, 37:16
Fourth - 72:1

Fracture - 43:17, 44:8, 59:23, 66:1, 67:24, 68:1, 68:5
Fractured - 43:12, 60:2, 65:12, 72:17
Frame - 10:10, 26:6
Freely - 11:17, 19:8, 20:11
Fresh - 75:15
Friable - 65:4
Front - 13:2, 13:4, 13:9, 15:22, 42:10, 52:4, 59:5, 65:10
Frontal - 13:1, 13:3, 13:5, 13:11, 13:13, 15:21, 15:22, 20:3
Fuller - 42:22
Fully - 42:20
Function - 55:23
Further - 9:2, 21:6

**G**

Gastric - 48:12, 50:18
Gave - 22:7
General - 5:14, 5:16, 7:4, 8:13, 15:6, 18:2, 26:18, 28:3, 29:7, 31:9, 31:11, 31:24, 37:19, 67:17, 72:22
Generally - 10:9, 30:20
Generate - 48:24
Geographically - 37:21
Get - 6:10, 16:22, 37:18, 50:12, 50:13, 51:15, 52:17, 52:19, 55:18, 55:20, 55:21, 63:19, 68:15, 71:17, 73:21
Gets - 7:13, 9:16, 9:17, 34:17, 50:11
Gillman - 63:16
Gilman - 58:14, 60:4, 60:18, 61:6, 62:24, 63:12, 67:19
Give - 8:10, 16:19, 22:14, 40:21, 46:13, 49:22, 67:25, 68:3, 68:21, 70:1
Given - 9:18, 17:21, 20:20, 28:16, 48:13, 56:20, 66:21, 68:16, 68:17, 72:9, 74:13
Gives - 52:19
Go - 3:14, 4:6, 5:19, 5:25, 12:19, 24:8, 24:12, 24:22, 25:3, 25:15, 39:4, 39:6, 67:11, 67:16
Going - 3:9, 6:13, 6:21, 9:23, 12:14, 13:19, 19:7, 21:4, 31:15, 39:19, 40:25, 44:6, 45:12, 45:13, 75:9, 75:17
Good - 3:17, 3:18, 23:7, 23:8, 23:13, 23:14, 40:23,

53:25, 54:15
Graduated - 4:10, 4:12
Grams - 52:5
Graphic - 22:18, 22:21
Gray - 15:24
Grossly - 11:10
Ground - 21:4, 37:8, 49:25
Guess - 65:20, 66:15, 69:7
Gunshot - 68:24

**H**

Hair - 29:14, 29:19
Half - 39:16
Hammer - 40:24
Hand - 38:25, 39:14, 39:15, 39:16, 61:4, 71:15, 71:18
Handful - 17:15
Hands - 61:2, 71:12, 71:21
Hangings - 32:22
Hard - 14:5, 14:14, 16:11, 39:25
Harm - 32:15, 32:21
Healed - 10:21
Healing - 10:17
Hear - 27:7, 40:14, 75:23
Heart - 32:3, 49:19, 49:24, 50:4, 50:25, 54:12, 55:23, 69:5, 74:15
Heat - 48:24, 50:6, 50:24, 51:1, 55:18, 55:19, 56:15, 57:3, 57:10, 73:16
Heavy - 37:7
Height - 28:23, 58:21, 58:25
Hematoma - 66:9
Hemisphere - 13:24
Hemorrhages - 14:22, 46:9, 47:18, 47:19, 47:25, 48:1, 48:13, 50:18
Hence - 16:6
Herniate - 14:21
Herniated - 14:22
Herniation - 14:2, 14:7, 14:15, 14:20, 14:25, 19:4, 67:17
Higher - 49:4, 52:25, 53:13, 53:17, 53:19
Histology - 7:23, 8:2
History - 4:3, 24:6, 72:9
Hit - 39:25
Hold - 45:18
Hole - 14:10
Home - 6:23
Homicidal - 8:19
Homicide - 32:13, 36:15
Homicides - 34:17

Honors - 4:12
Hope - 74:15
Horns - 20:7
Horribly - 13:20
Hospital - 4:15, 4:19, 5:24, 9:21, 24:20, 27:8, 28:17, 31:4, 51:10, 55:10, 74:9, 74:12, 74:22, 74:23
Hours - 10:16, 11:3, 50:1, 70:3, 74:21
Human - 26:21, 26:24
Humor - 52:8, 52:12, 52:23, 52:24, 53:8
Hyperthermia - 46:17, 49:5
Hyphen - 23:18
Hypothermic - 48:3, 49:1, 49:20, 55:4, 55:10, 56:16, 69:14, 69:25, 74:1
Hypotheses - 47:7

**I**

ID - 22:3
I'd - 45:16, 75:6
Identification - 21:25
I'll - 38:15, 45:18, 45:20
Illustrate - 66:7
Immediately - 68:12, 68:21, 69:1
Immunohistochemistry - 7:25
Immunology - 24:15
Impact - 35:11, 37:11, 37:14, 37:17, 38:17, 43:13, 44:9, 44:13, 44:15, 48:11, 64:22, 65:4, 66:10, 68:6, 68:10, 69:12, 69:18, 72:14
Impacted - 65:7
Impounded - 21:22, 45:22, 75:12, 76:10
Incapacitated - 68:14, 69:19
Inch - 59:2
Inches - 59:2
Incised - 40:12, 40:15, 40:16, 40:19, 40:20, 41:1, 41:2, 63:7
Incision - 29:24
Increases - 47:9
Indicated - 12:5, 43:3
Indicating - 13:2, 14:10
Indication - 51:25
Indicative - 20:10
Indiscernible - 63:1, 63:17
Infectious - 6:16
Inflicted - 32:14, 32:20, 70:22
Influenced - 22:20

**Inhibit** - 57:9
**Initially** - 73:14
**Initiated** - 31:22
**Injured** - 67:2, 67:6
**Inner** - 13:25, 39:10
**Input** - 28:23
**Inside** - 64:15, 65:24
**Instantaneous** - 69:23
**Instruct** - 22:19
**Instruction** - 22:4, 22:8
**Instructions** - 75:21
**Intact** - 71:19
**Intake** - 9:16, 9:17
**Intends** - 22:9
**Intent** - 32:15, 32:21
**Intentional** - 32:9, 32:12, 32:20, 32:22, 34:14, 34:15
**Interacted** - 64:12, 64:13
**Interchangeably** - 18:7
**Interesting** - 9:1
**Internal** - 29:5, 29:9, 29:22, 42:3, 42:5, 42:7, 45:1, 45:4, 45:8, 46:5, 51:4, 71:23
**Interrupt** - 60:15
**Intervention** - 31:3
**Intimately** - 65:2
**Intoxicated** - 50:9, 50:10, 50:20
**Intoxication** - 32:7, 32:9, 32:18, 52:16, 57:9
**Intoxications** - 28:12
**Intravenous** - 74:13
**Intraventricular** - 19:19
**Introduce** - 22:9, 36:18, 58:2, 61:20
**Inventory** - 9:24
**Investigation** - 27:21, 33:25, 47:11, 75:23
**Investigative** - 33:23, 51:8
**Investigators** - 51:17, 51:21
**Involves** - 25:15, 29:22
**Inwards** - 14:3
**Irini** - 9:9, 21:16, 23:6, 23:17
**Irregular** - 63:8, 63:9
**Irritating** - 66:17
**Island** - 4:15, 4:19
**Isn't** - 50:11
**Issue** - 8:2
**It'll** - 14:15
**IV** - 71:17
**I've** - 26:14

| J |
| --- |

**Jacket** - 68:18
**January** - 30:5
**Jeans** - 56:21

**Job** - 7:8
**John** - 9:5, 22:2, 30:7, 35:4, 36:22
**Jurisdiction** - 28:9, 28:10, 28:15
**Jurisdictions** - 32:25
**Jurors** - 22:7, 45:17
**Jurors'** - 63:2
**Jury's** - 59:4, 60:7, 60:21, 62:14
**Juxtaposition** - 48:2

| K |
| --- |

**Killed** - 50:4
**Knee** - 39:2, 39:17, 60:25
**Knife** - 37:10, 40:23
**Knives** - 41:2
**Knocked** - 68:14
**Known** - 15:3, 15:13, 29:23, 41:13, 64:6, 64:22, 64:23, 64:24, 65:17, 72:25
**Knows** - 73:17
**Knuckles** - 71:19

| L |
| --- |

**Lab** - 6:9, 6:17, 51:14, 51:15
**Labeled** - 54:5, 54:9
**Laceration** - 38:7, 38:12, 39:22, 40:3, 40:18, 41:3, 43:8, 43:10, 44:7, 44:11, 59:15, 59:17, 59:20, 62:19, 63:4, 63:6, 63:10, 65:6
**Lacerations** - 37:13, 40:8, 40:9
**Lack** - 55:24, 68:18, 70:11, 70:17
**Lacking** - 71:10
**Lags** - 53:15
**Languages** - 4:9
**Large** - 18:12
**Larger** - 16:3
**Laser** - 58:13, 59:3, 60:7, 60:21, 62:13, 66:7
**Lastly** - 57:4
**Lateral** - 13:11, 13:12, 19:20, 20:7, 39:17
**Laude** - 4:13
**Layer** - 66:13
**Layers** - 39:24, 56:14, 56:15
**Laying** - 41:16
**Lead** - 66:17
**Leading** - 17:24, 33:13
**Leads** - 5:7, 47:10, 54:10, 69:9
**Leak** - 66:20
**Led** - 12:17, 20:23, 31:21,

31:23, 34:13, 43:25
**Left** - 13:6, 13:10, 13:24, 17:1, 33:6, 38:10, 39:16, 49:16, 59:16, 61:5, 63:17, 71:15
**Legal** - 6:20, 6:21, 34:1, 34:4
**Leptomeninges** - 11:15, 11:17, 12:1, 42:15, 66:15
**Lethal** - 68:12, 68:21
**Let's** - 18:14
**Level** - 27:11, 52:5, 52:23, 52:24, 53:12, 53:18, 53:20
**Levels** - 48:22
**Lights** - 67:20
**Limited** - 70:13
**Line** - 54:10
**Linear** - 38:20, 60:11, 62:23, 64:20
**List** - 35:9, 35:14
**Listed** - 34:8, 35:16, 35:19, 52:8
**Listing** - 35:8, 35:17
**Literature** - 4:10, 46:11, 46:25
**Liver** - 18:14, 18:16, 18:17, 32:3, 53:17
**Loaf** - 40:21
**Lobe** - 13:8, 13:12, 13:13, 17:1, 18:16
**Lobes** - 13:3, 13:23, 14:1
**Located** - 12:14, 12:24, 15:20, 18:23, 41:8
**Location** - 28:17, 64:1, 72:3
**Long** - 4:15, 17:14, 23:24, 56:21, 70:22
**Longer** - 16:7, 18:8
**Looked** - 9:11, 38:11, 51:16, 71:12, 74:25, 75:14
**Looking** - 6:6, 8:1, 17:3, 18:14, 22:4, 27:12, 27:14, 30:1, 44:3, 45:4, 49:11, 54:24, 64:18
**Loop** - 13:8
**Lose** - 56:15
**Loses** - 50:11, 55:19, 57:3
**Losing** - 48:24, 50:24, 50:25
**Loss** - 73:16
**Lost** - 50:6
**Lot** - 9:24, 16:13, 17:24, 27:6, 60:24, 70:15
**Loudly** - 3:11
**Low** - 48:20, 55:22, 73:21
**Lower** - 39:2, 49:5, 59:18, 59:20, 60:19, 60:22, 60:24

| M |
| --- |

**Madam** - 21:24

**Magna** - 4:13
**Magnum** - 14:9, 67:12
**Main** - 12:10, 29:11, 66:15
**Maintain** - 57:10, 73:20
**Major** - 4:9, 71:6
**Majority** - 37:23
**Make** - 6:3, 28:8, 29:16, 33:16, 33:23, 49:11, 49:13, 74:4, 74:25
**Making** - 29:22, 33:20, 34:1, 34:4, 34:10, 34:11
**Malignant** - 27:10
**Manifest** - 65:14, 69:24, 73:9
**Manifestation** - 65:19
**Manifestations** - 55:14, 55:25
**Manifested** - 69:4
**Manners** - 31:24, 36:7, 36:14
**Many** - 6:22, 17:10, 17:17, 17:22, 56:2, 70:2
**Mark** - 58:14, 71:16
**Marked** - 21:25, 22:3, 36:23, 58:7, 62:1
**Marks** - 70:24
**Massachusetts** - 23:23, 24:1, 24:2, 24:7, 25:5, 28:19, 30:11, 30:16
**Massive** - 50:4
**Match** - 6:14
**Materials** - 51:5, 51:6, 69:9
**Means** - 4:25, 17:21, 18:12, 18:22, 28:22, 32:1, 32:5, 33:1, 48:23, 54:8, 69:5, 73:4
**Measure** - 16:11, 16:19, 16:25
**Measured** - 38:25, 60:12
**Measurement** - 16:23
**Measurements** - 58:20, 58:25
**Measuring** - 16:10, 16:21, 59:1
**Mechanism** - 20:19, 40:18
**Mechanisms** - 57:10, 73:19
**Medial** - 13:22, 39:9, 39:10
**Medically** - 18:9
**Medications** - 32:23
**Medicine** - 24:18, 26:19
**Medulla** - 19:1
**Meet** - 5:3, 5:6
**Member** - 26:2
**Membrane** - 11:15, 11:24, 42:16
**Metabolism** - 52:20,

53:14
**Metabolized** - 53:16
**Miami** - 24:14
**Microbiology** - 6:15, 24:10
**Microphone** - 3:12, 37:6
**Microscope** - 6:2, 7:21, 27:9
**Midbrain** - 19:1
**Midline** - 43:19
**Mild** - 48:22, 56:5
**Millimeters** - 38:21, 39:12
**Milliseconds** - 69:2
**Minimum** - 8:12
**Monday** - 74:17
**Morning** - 56:19, 74:18, 75:25
**Morphologic** - 63:6
**Mortem** - 22:11
**Motor** - 32:10, 34:17
**Mount** - 24:17, 24:19, 24:21
**Move** - 14:13, 45:10, 69:19
**Moved** - 24:16, 25:4
**Moving** - 19:5
**Much** - 12:2, 20:22, 21:12, 47:2, 65:23, 67:19, 74:24
**Multiple** - 17:11, 17:21, 44:1, 44:20, 44:21, 44:22, 50:21
**Muscles** - 7:3

### N

**Nails** - 29:19, 71:19, 71:20
**National** - 26:2
**Natural** - 6:25, 12:17, 28:11, 31:25, 32:1, 32:2, 36:9
**Near** - 39:2, 72:2
**Necessary** - 6:3, 8:5, 29:20, 68:1
**Neck** - 29:25
**Nerves** - 7:3
**Neural** - 68:25
**Neurologic** - 55:19
**Neuropath** - 8:22, 10:1
**Neuropathologic** - 7:12, 8:21
**Neuropathological** - 10:4
**Neuropathologist** - 42:20, 42:21, 42:25
**Neuropathology** - 3:25, 4:18, 4:22, 7:1, 7:2, 7:6, 7:7, 51:18
**New** - 4:8, 4:15, 24:16, 24:23, 25:1, 25:4, 26:11, 26:13
**Nightstand** - 39:25, 40:6

**Non** - 8:22
**Normal** - 73:19
**Nose** - 38:11, 59:16, 62:21
**Note** - 18:18, 30:25, 43:7
**Noted** - 14:25, 31:2, 39:8, 39:11, 39:13, 41:25, 42:9, 42:11, 42:13, 54:20, 60:8, 62:15, 62:23, 63:3, 63:4, 63:5, 63:10, 64:19
**Notes** - 9:23, 9:24, 9:25, 11:23, 29:16, 39:3, 39:4, 39:6, 53:2, 57:19, 57:22
**Nourishes** - 20:2
**Numerical** - 28:16
**Nutrients** - 20:2
**NYU** - 4:14

### O

**Object** - 37:5, 37:7, 37:8, 37:10, 37:17, 40:5, 40:25, 41:3, 44:14, 44:16
**Objection** - 33:12, 34:19, 36:20, 58:4, 61:22, 61:23
**Objects** - 37:6, 40:9, 40:10
**Obscuring** - 17:5
**Observations** - 17:9, 17:19, 43:15, 47:24, 71:10, 71:23, 74:4
**Observe** - 10:3, 14:20, 15:19, 16:24, 17:10, 37:21, 38:17, 40:18, 41:24, 42:5, 44:19, 46:8, 47:13, 70:11, 70:24, 71:4
**Observing** - 12:15, 44:3
**Occasion** - 30:6
**Occasioned** - 22:24
**Occipital** - 19:19, 20:5, 20:7, 43:24
**Occupying** - 67:1
**Occurred** - 11:3, 28:14
**Occurring** - 10:12
**Occurs** - 11:14, 47:5
**OCME** - 24:2, 24:6, 28:4
**Office** - 3:25, 4:17, 23:22, 23:25, 24:25, 28:8, 30:12, 30:13, 30:14, 30:15, 30:16, 31:19, 42:19, 42:25, 48:4
**Officers** - 30:10
**Often** - 72:9
**Ones** - 44:20
**Onset** - 55:14, 56:3, 56:12, 56:23, 57:7, 68:8, 73:11
**Onsets** - 57:6
**Open** - 30:3, 42:8
**Opened** - 60:1
**Opening** - 73:5, 73:6

**Opens** - 8:25
**Opine** - 20:18, 50:22
**Opinion** - 9:13, 10:24, 17:20, 43:25, 51:2, 64:10, 67:24, 68:8, 69:17, 72:6
**Opinions** - 19:11
**Opposed** - 17:3, 27:2, 50:24
**Opposite** - 41:18
**Orbital** - 63:25, 64:14, 65:18
**Order** - 6:2, 7:10, 28:25, 45:3, 49:11
**Organ** - 27:3, 27:13, 27:14, 50:14
**Organizations** - 25:25
**Organs** - 29:25
**Oriented** - 13:23
**Origin** - 72:6
**Originating** - 43:13, 43:17, 44:1, 44:5, 44:8, 59:22, 60:3, 64:20
**Origination** - 72:6
**Outcome** - 32:12
**Overdoses** - 32:10, 32:22
**Overlying** - 43:11
**Own** - 5:1
**Oxygen** - 20:3

### P

**Paged** - 57:15
**Pair** - 56:21
**Palms** - 41:14
**Pancreas** - 47:14, 47:15, 47:16, 47:20, 50:19
**Pancreatic** - 48:1, 48:12
**Parenchyma** - 17:5
**Parts** - 29:11, 44:6, 44:22
**Pass** - 5:7
**Passing** - 25:19
**Past** - 10:19
**Pathological** - 27:22, 31:12
**Pathologist** - 6:1, 25:25
**Pathologists** - 27:6, 27:7, 27:8, 68:23
**Pathophysiology** - 47:6, 47:11
**Patient** - 27:23, 28:4, 30:7
**Patients** - 74:1
**Pattern** - 44:4
**Patterned** - 38:20
**Pause** - 45:12
**Pelvis** - 45:10
**People** - 18:6, 33:25, 34:16, 47:7, 47:9, 55:20
**Perform** - 30:6
**Performed** - 30:18, 30:24
**Perhaps** - 22:21
**Period** - 8:7, 48:8

**Periorbital** - 63:25
**Permanent** - 30:15
**Permission** - 58:9, 62:5
**Person** - 6:22, 32:14, 32:20, 49:23, 50:8, 50:9, 50:15, 65:16, 69:1
**Personnel** - 51:11
**Person's** - 18:14
**Perspective** - 10:4, 31:19, 39:22, 70:20
**Photo** - 60:9
**Photocopy** - 57:19
**Photographs** - 7:18, 7:19, 22:8, 22:10, 22:11, 22:17, 22:20, 22:24, 22:25, 51:21, 51:23, 70:7, 70:9, 70:10, 70:13, 70:14, 75:5, 75:14
**Photos** - 9:22
**Physical** - 29:13, 32:7, 55:24
**Physically** - 16:19, 74:17
**Physician** - 6:23, 9:22, 25:15, 28:14
**Physicians** - 65:21
**Physicist** - 68:3
**Pictures** - 28:22, 29:15, 71:1
**Pinpoint** - 71:16
**Pity** - 22:23
**Place** - 76:4
**Placed** - 22:15
**Play** - 48:14, 49:22
**Pleasant** - 22:18
**Plural** - 43:3
**Pointer** - 58:13, 59:3, 60:7, 60:21, 62:13, 66:7
**Pointing** - 33:2, 33:3
**Pole** - 13:6, 13:9, 13:10, 13:11
**Poles** - 13:1, 13:4, 13:5
**Police** - 9:19, 51:7
**Pons** - 18:19, 18:24, 19:1, 19:2, 19:3, 19:6
**Portion** - 13:4, 13:22, 13:25, 15:23, 20:4, 60:9, 63:3
**Position** - 30:15, 41:13
**Possibility** - 47:22, 69:14
**Post** - 22:11
**Posterior** - 13:17, 39:11, 41:11, 41:14, 41:18, 42:1, 64:22
**Postmortem** - 29:10
**Pounds** - 59:1
**Precursor** - 48:17
**Prefrontal** - 17:1
**Prescription** - 32:23
**Presence** - 46:20, 52:15
**Present** - 3:2, 46:2, 46:22,

47:21, 65:18, 67:1
**Pressing** - 17:23, 19:6
**Pressure** - 17:22, 66:11
**Previously** - 21:25, 40:20
**Prior** - 8:8, 24:6, 51:8, 53:19, 69:10
**Problem** - 55:17
**Procedure** - 27:24
**Proceed** - 29:2, 29:22
**Proceeded** - 31:6
**Proceedings** - 21:22, 45:22, 75:12, 76:10
**Processed** - 7:22, 28:21
**Processes** - 26:20, 26:23
**Program** - 4:14, 4:18, 25:16, 26:13
**Progresses** - 55:15
**Progression** - 56:3
**Prominences** - 17:23
**Propagate** - 65:9
**Protective** - 42:13, 66:19
**Provided** - 33:24, 51:5, 51:7, 51:8, 51:9, 72:10
**Provides** - 20:2
**Publish** - 58:9, 62:6
**Pumping** - 69:5
**Punctate** - 15:13, 15:14, 15:15, 15:18, 15:21, 16:2, 17:7
**Push** - 14:3, 14:4, 14:7, 14:15, 14:16
**Pushed** - 16:4
**Pushing** - 14:24, 61:1

**Q**

**Quickness** - 56:12

**R**

**Raccoon** - 65:19, 65:20
**Radiate** - 65:9
**Radiating** - 44:5, 60:3, 64:21
**Ranged** - 39:12
**Ranging** - 38:21
**Rapidity** - 56:12, 56:23, 57:8
**Rarely** - 74:8
**Rate** - 57:3
**Rather** - 75:16
**Raynaud's** - 73:17
**Razor** - 37:9
**Razors** - 41:2
**React** - 67:10
**Ready** - 23:10
**Realm** - 69:14
**Rear** - 43:23
**Reason** - 50:3, 74:11
**Reasonable** - 19:11, 64:10, 75:1

**Reasons** - 74:11
**Receive** - 4:7, 24:9
**Received** - 51:20, 51:25
**Receiving** - 24:12
**Recent** - 42:11
**Recognize** - 35:1, 35:3, 57:18, 61:12, 61:14, 62:10
**Records** - 9:20, 9:21, 22:2, 51:9, 53:25, 54:4, 54:5, 54:24
**Recovered** - 70:8, 70:12
**Red** - 17:3, 39:13, 73:23
**Redness** - 73:24
**Reduce** - 73:15
**Referral** - 9:8
**Referred** - 8:14, 8:15, 43:20, 43:22, 64:1
**Refers** - 73:5
**Reflected** - 53:13, 59:24
**Regards** - 56:9, 60:22
**Region** - 13:6, 13:7, 64:14
**Regulatory** - 73:19
**Relate** - 72:15
**Relation** - 10:2, 26:1, 35:15, 35:19, 47:20, 51:2, 51:6, 57:21, 64:2, 73:11
**Relations** - 73:9
**Relationship** - 43:7, 47:19, 55:3, 55:4, 56:11, 56:23, 57:1, 57:7
**Relayed** - 9:15
**Remain** - 36:14
**Remote** - 10:5
**Removed** - 5:25, 30:4, 42:17, 64:17
**Renee** - 3:6, 3:8, 3:21
**Report** - 8:3, 9:19, 51:7, 51:8, 51:15, 51:16, 53:5
**Reported** - 28:7, 48:5
**Reporter** - 11:23, 14:17, 21:24
**Reports** - 53:24
**Request** - 10:1
**Required** - 20:20, 28:25
**Requirements** - 25:18
**Requires** - 72:22
**Research** - 75:22
**Resembles** - 65:20
**Residency** - 4:14, 24:19, 24:21
**Resident** - 26:10
**Residents** - 26:10, 26:12
**Respect** - 7:7, 8:13, 9:3, 9:10, 15:18, 26:6, 28:1, 41:6, 53:7, 53:23, 54:13, 54:25, 55:13, 56:22, 57:7, 67:23, 68:7, 71:22
**Respective** - 68:9
**Responds** - 67:6
**Response** - 47:8, 67:18

**Result** - 20:15, 37:17, 69:15
**Results** - 6:11
**Resuscitated** - 72:17
**Resuscitation** - 31:5, 72:9, 72:10, 72:12
**Retrieve** - 67:21
**Return** - 62:2
**Reviewed** - 10:25, 19:9, 46:25, 53:24, 70:7
**Rewarming** - 74:13
**Rhode** - 4:19
**Rib** - 72:7
**Ribs** - 71:25, 72:2, 72:5, 72:16, 72:21
**Role** - 48:15
**Room** - 14:6, 55:17, 65:21
**Rough** - 9:18
**Routine** - 52:13
**Routinely** - 34:16
**Ruled** - 34:8, 49:15
**Run** - 67:13
**Rupture** - 12:18, 12:20, 12:21, 16:6
**Ruptured** - 11:19, 12:14
**Rupturing** - 17:24

**S**

**Sad** - 22:21
**Samaritan** - 53:25, 54:15
**Sample** - 52:11, 52:12
**Samples** - 52:14
**Save** - 9:1
**Saved** - 7:11, 7:13, 42:18
**Saving** - 47:2
**Saw** - 31:6, 70:14, 71:1, 71:12
**Scalp** - 43:10, 59:24, 59:25, 63:5
**Scalpel** - 37:10
**Scars** - 29:15
**Scene** - 51:22, 70:7, 74:22
**Scheduling** - 76:7
**School** - 4:12, 24:16, 24:17, 24:18
**Science** - 4:10
**Scordi** - 9:9, 21:16, 23:6, 23:17, 36:24, 42:2, 58:16, 60:6, 60:20, 62:10
**Scrape** - 38:14, 39:23, 44:12, 63:10
**Scrapes** - 38:20, 62:21
**Scratch** - 39:15
**Scratches** - 37:12, 38:10
**Screen** - 22:13, 58:16, 62:11, 63:20, 64:9, 66:8, 71:23
**Scroll** - 60:19, 62:24
**Scrolling** - 60:4

**Second** - 11:22, 32:5, 60:15
**Seconds** - 49:25, 68:13, 69:2
**Secretion** - 47:9
**Sections** - 7:21, 7:22
**Seeing** - 16:6, 64:6, 74:20
**Seek** - 36:18, 58:2, 61:20
**Seen** - 6:22, 12:5, 12:8, 46:18
**Seep** - 65:13
**Seepage** - 66:3
**Seizures** - 66:17
**Self** - 32:19
**Sent** - 42:19, 51:13
**Sequence** - 31:22
**Series** - 75:5
**Serve** - 17:17
**Serves** - 20:1
**Session** - 3:1, 46:1, 76:5
**Set** - 7:10, 21:13, 33:2, 68:16, 69:20
**Setting** - 69:11
**Severe** - 48:23, 49:23, 56:5
**Shaped** - 12:12, 13:8
**Sharp** - 37:9, 40:6, 40:7, 40:9, 40:23
**Sheets** - 9:25
**Shelter** - 50:12
**She's** - 21:18
**Shift** - 66:23
**Shirt** - 56:21
**Shiver** - 55:18
**Shivering** - 55:17
**Shoulder** - 29:24
**Shouldn't** - 11:12
**Shovel** - 49:24
**Show** - 32:8, 61:9
**Showing** - 22:10, 34:23, 53:5, 57:15, 75:5, 75:16
**Shown** - 22:13, 57:9, 70:9, 70:10, 70:14
**Shows** - 34:12, 50:3, 50:4
**Shred** - 41:1
**Shut** - 50:14
**Side** - 13:18, 38:11, 39:17, 39:18, 59:16, 59:18, 59:19, 59:20, 59:21, 61:1, 62:19, 68:24
**Sidebar** - 21:21, 21:23, 45:20, 45:21, 45:23, 75:10, 75:11, 75:13, 76:9, 76:11
**Sides** - 7:19, 11:9, 62:18
**Sign** - 6:23
**Signed** - 35:6
**Significance** - 17:18, 46:8, 48:2, 62:15, 63:2, 70:11, 70:19

**Significant** - 66:23, 67:9, 71:7, 72:14
**Signify** - 65:23
**Signs** - 29:16, 29:17, 30:2, 35:24, 48:10, 54:14, 71:6, 71:8, 71:9, 74:6, 74:8
**Similar** - 18:6, 22:8
**Sinai** - 24:18, 24:20, 24:21
**Single** - 57:15
**Sit** - 3:9, 12:9, 13:3, 14:1
**Sits** - 12:11, 42:13
**Sitting** - 16:14, 18:15, 64:17, 65:1
**Size** - 15:15
**Sizes** - 38:21
**Skin** - 37:14, 38:8, 38:10, 38:13, 39:24, 40:1, 40:4, 40:6, 40:7, 41:3, 41:4, 44:12, 63:8, 67:8, 67:9
**Sleeve** - 56:21
**Slides** - 7:23
**Slightly** - 43:18
**Slower** - 53:15, 56:14
**Small** - 38:7, 38:8, 38:21, 39:1, 39:16, 46:9, 46:10, 47:12, 59:15, 60:25, 62:19, 62:22
**Smooth** - 41:2
**Smoothly** - 40:7, 40:24
**Snow** - 48:6, 48:7, 49:17, 50:16, 56:18, 70:17
**Soft** - 65:14
**Solely** - 8:1, 22:22
**Solution** - 8:7, 8:8, 42:18
**Somewhat** - 38:20
**Sounds** - 29:12
**Source** - 44:1
**Sources** - 9:11
**Space** - 16:15, 66:20, 66:25, 67:7
**Spaces** - 67:15
**Special** - 42:18
**Specialty** - 4:25, 25:16, 26:19
**Specific** - 27:13, 46:12, 63:22
**Specifics** - 37:18, 70:1
**Specimen** - 5:25
**Specimens** - 5:5, 5:24, 6:2
**Spectrum** - 36:6
**Speed** - 57:2
**Spell** - 3:19, 11:24, 14:17, 23:15
**Spelled** - 23:17
**Spinal** - 7:2, 11:16, 14:8, 14:11, 19:2, 19:25, 20:1, 20:6, 67:13

**Spot** - 46:12
**Spots** - 46:14, 47:1, 47:7, 47:10, 47:17
**Spread** - 16:15
**Squeeze** - 67:16
**SS** - 21:25, 22:3
**Staff** - 59:1
**Staffed** - 30:17
**Stages** - 56:2
**Stand** - 3:6, 21:16
**Start** - 14:3, 14:4, 14:7, 14:15, 24:7, 38:15, 42:7, 45:6, 45:7, 45:9, 50:14, 55:18, 74:15, 75:15
**Started** - 26:9, 50:24, 50:25
**Starting** - 4:6, 5:21, 38:1, 38:5, 46:7, 59:4, 64:20
**Starts** - 16:13, 18:25, 20:3, 50:13, 55:17, 67:10, 67:11
**State** - 3:19, 5:18, 10:20, 12:17, 23:15, 28:19, 30:11, 69:25
**Stating** - 33:8
**Status** - 23:1
**Staying** - 75:19
**Stem** - 14:8, 14:11, 20:6, 67:13
**Step** - 27:11, 45:15, 45:16
**Steps** - 28:21
**Sternum** - 72:2
**Stomach** - 46:7, 46:10, 47:10, 47:13, 47:18, 47:25, 48:12, 50:19
**Stonebridge** - 3:6, 3:8, 3:21, 3:22, 20:13, 43:1
**Stony** - 4:8
**Stop** - 11:22, 76:4
**Stops** - 55:23
**Stored** - 74:22
**Storm** - 50:1
**Strength** - 55:24
**Stress** - 47:8
**Strip** - 15:25
**Strongly** - 32:19, 48:13
**Struck** - 21:3
**Students** - 26:11, 26:12
**Study** - 5:17, 5:20, 5:23, 6:19, 7:2
**Subacute** - 10:5, 10:15
**Subarachnoid** - 11:13, 11:18, 11:25, 12:23, 13:1, 16:8, 16:14, 16:25, 42:14, 66:8, 66:13, 66:16, 67:5
**Subdural** - 42:11, 66:9, 66:18, 66:24, 67:5
**Subsequent** - 20:24
**Substances** - 50:21
**Subtle** - 14:21

**Successfully** - 25:19
**Suffers** - 49:24
**Suggested** - 47:8, 47:9, 48:13
**Suggests** - 53:12, 53:18, 70:21
**Suicide** - 32:17, 36:8
**Suicides** - 32:23
**Summary** - 9:18
**SUNY** - 4:8
**Superficial** - 38:10, 39:9, 39:24
**Supply** - 12:11
**Supports** - 46:19
**Supposed** - 16:15
**Supraorbital** - 64:1
**Surface** - 13:17
**Surfaces** - 11:9, 17:22
**Surgery** - 6:13
**Surgical** - 5:5, 5:23, 27:6, 29:23
**Surprise** - 8:24
**Surrounded** - 38:13
**Suspicious** - 8:19
**Sustained** - 33:14, 34:20, 36:1, 68:11
**Swell** - 66:4, 67:11
**Swelling** - 38:7, 62:20, 67:6, 67:17
**Switch** - 60:15
**Sworn** - 3:8, 23:6
**Sympathy** - 22:23
**System** - 19:24, 20:10, 20:12, 28:24, 52:3, 57:6
**Systems** - 5:19, 50:14, 68:25

| T |
| --- |

**Table** - 41:14, 41:16
**Taking** - 11:23, 25:19
**Tattoos** - 29:15
**Teaching** - 26:7, 26:9, 26:10, 26:12, 26:14
**Tear** - 38:8, 38:12, 40:3, 40:4, 40:6, 44:11, 62:19
**Tears** - 37:14
**Temperature** - 48:21, 49:1, 49:18, 50:2, 50:6, 50:12, 50:16, 54:17, 54:19, 54:21, 54:23, 54:25, 55:6, 55:8, 55:10, 73:20, 74:15
**Temperatures** - 55:22, 73:21
**Temporal** - 13:6, 13:7, 13:8, 13:10, 13:12, 13:13, 13:17, 13:22, 13:25, 15:22, 15:23
**Ten** - 8:12
**Term** - 15:3, 15:7, 15:12,

15:13, 27:7, 27:18, 28:2, 43:20, 43:22, 48:17, 48:20, 63:21, 72:25, 73:2, 73:4
**Termed** - 18:9, 40:12
**Terms** - 5:14, 7:4, 8:4, 8:13, 10:2, 15:6, 18:2, 26:16, 28:3, 29:8, 37:19, 38:15, 54:3, 59:9, 67:4
**Testimony** - 31:10, 55:13
**Testing** - 7:24, 9:5, 11:5, 12:7
**Tests** - 6:2
**Thanks** - 60:17
**Therefore** - 19:8, 68:13, 68:16, 73:22, 74:18
**Thereof** - 70:11
**There's** - 6:11, 6:23, 7:25, 8:23, 11:11, 12:9, 15:10, 17:21, 18:15, 18:16, 40:3, 52:7, 65:23, 67:11, 73:16, 74:24
**They'll** - 22:15, 22:16
**They're** - 9:18, 18:6, 46:13, 50:1, 56:10
**Thick** - 16:18, 17:4, 68:4
**Thicker** - 16:16, 17:2, 72:22
**Thickness** - 72:15, 72:20, 72:21
**Thin** - 11:15, 15:25, 42:16, 65:3, 65:4, 65:13, 66:13
**Thinner** - 16:16
**Thorough** - 29:12
**Thoroughly** - 30:1
**Three** - 17:14, 17:16, 24:19, 28:18, 30:10, 75:21
**Times** - 16:14
**Timing** - 68:9
**Tiny** - 15:16, 18:13
**Tissue** - 5:18, 14:23, 19:7, 63:5
**Tissues** - 27:8, 47:16, 65:14
**Today** - 75:15, 75:17, 75:20
**Tomorrow** - 75:16, 75:20, 75:25
**Took** - 57:19, 69:3, 69:16
**Top** - 41:9, 42:15, 58:15, 63:17, 64:17, 66:14, 66:19
**Torso** - 60:5, 60:8
**Totality** - 19:9
**Tough** - 42:12, 66:19
**Towards** - 19:5, 20:4, 33:2, 33:3, 58:15, 59:18
**Toxicologic** - 51:14
**Toxicological** - 51:24
**Toxicology** - 50:20, 51:15, 51:16, 52:4, 52:7,

53:5
**Track** - 75:18
**Tracking** - 9:24
**Trained** - 8:22
**Training** - 18:10, 27:17, 46:24
**Transferred** - 74:21, 74:23
**Transfusion** - 6:14
**Transported** - 28:16, 31:3
**Trauma** - 8:19, 11:21, 19:17, 20:11, 20:15, 26:20, 40:11, 64:5, 67:2, 67:18
**Traumatic** - 16:2, 19:14, 20:19
**Travel** - 70:21
**Tray** - 64:16
**Treatment** - 54:14
**Tries** - 26:24
**Tuesday** - 75:20
**Tumor** - 5:25
**Tunnel** - 19:24
**Turn** - 11:4, 17:6, 31:8, 42:2
**Turning** - 30:5, 51:24
**Turns** - 14:8, 14:11, 19:1
**Two** - 4:18, 7:16, 8:10, 8:17, 17:14, 26:16, 29:3, 29:11, 31:11, 35:24, 36:12, 36:14, 39:13, 45:9, 61:9, 62:21, 64:23, 74:11
**Types** - 6:24, 8:13, 8:14, 31:17, 37:16, 46:25, 49:10, 56:10
**Typical** - 8:7
**Typically** - 8:15, 8:20, 12:8, 12:13, 27:20, 30:13, 30:14, 48:25

### U

**Umbrellas** - 31:25
**Unable** - 69:19
**Unci** - 13:20, 13:22, 13:25, 14:1, 14:2, 14:4, 14:17, 14:20, 14:21, 19:5
**Undergraduate** - 24:7
**Underlying** - 17:5
**Underneath** - 16:1
**Understood** - 28:2
**Undetermined** - 32:25, 33:7, 36:4
**Unfair** - 73:8
**Uniform** - 41:4
**University** - 4:11, 4:19, 24:11, 24:14
**Unlike** - 67:8
**Unpleasant** - 22:21
**Unresponsive** - 49:18
**Upper** - 37:24, 38:6,

38:16, 38:19, 38:22, 39:9, 59:13, 60:8, 60:10, 60:13, 62:17
**Upwards** - 41:14
**Urine** - 52:15
**Used** - 48:20, 52:15, 61:15
**Uses** - 57:10
**Using** - 59:3, 60:6, 60:20, 62:13, 63:1, 64:8

### V

**Vague** - 16:11, 71:14
**Value** - 52:17, 52:18, 52:19
**Variable** - 10:14
**Varying** - 38:21
**Vaso** - 73:5
**Vasoconstriction** - 73:13
**Vasodilation** - 72:25, 73:4, 73:5, 73:12, 73:13, 73:14, 73:23, 73:24, 74:6, 74:8, 74:19, 75:1
**Vehicle** - 21:4, 32:10, 34:17
**Veins** - 66:18, 67:2
**Ventricles** - 19:20, 19:24, 20:8
**Ventricular** - 20:10, 20:12
**Verdict** - 22:19, 22:22
**Versus** - 27:4, 39:21, 39:22, 49:2, 53:8, 56:25, 72:20
**Vessel** - 15:9, 18:5, 18:8, 73:5
**Vessels** - 12:8, 12:12, 12:15, 12:16, 12:18, 12:19, 12:22, 16:5, 16:7, 17:24, 40:1, 69:6, 73:6, 73:15, 73:18
**Violent** - 28:11
**Vital** - 54:14
**Vitreous** - 52:8, 52:12, 52:17, 52:23, 52:24, 53:8, 53:14, 53:18
**Voice** - 3:10
**Voluntary** - 25:14

### W

**Warm** - 74:13
**Warmer** - 68:15, 69:20
**Warning** - 22:14
**Warranted** - 29:20
**Watch** - 33:13
**Weakness** - 55:24
**Wearing** - 56:10, 56:21
**Weather** - 50:10
**Week** - 75:19
**Weeks** - 7:16, 8:10, 51:14

**Weighed** - 59:1
**Weight** - 28:22, 58:21, 58:25
**Welcome** - 12:3, 21:8, 21:11
**We'll** - 37:18, 45:13, 75:15, 75:25
**We're** - 29:18, 45:8, 45:11, 45:13, 49:3, 64:18, 76:4
**Western** - 30:15
**Westfield** - 30:15
**Wet** - 56:25, 57:2
**What's** - 29:23, 41:13, 58:16, 61:9, 62:10
**Whereabout** - 37:20
**Whereupon** - 22:2, 36:22, 58:6, 61:25
**White** - 16:1, 74:6
**Whiteness** - 73:25
**Whole** - 27:12, 27:14
**Who's** - 73:10
**Willing** - 6:23
**Willis** - 12:10
**Winthrop** - 4:15
**Wischnewski** - 46:14, 47:1
**Witness** - 3:4, 3:13, 11:25, 12:3, 14:18, 21:8, 21:11, 21:14, 22:10, 23:3, 23:8, 34:25, 39:6, 45:18, 57:17, 61:11, 62:3, 75:8, 76:2
**Word** - 59:12, 63:24
**Work** - 3:23, 4:3, 6:12, 6:24, 7:5, 24:5, 24:8, 26:1, 27:16, 30:13, 30:14, 45:7, 75:20
**Worked** - 25:4
**Working** - 24:6, 25:24, 45:11, 74:16
**Wouldn't** - 60:4
**Wound** - 40:13, 40:19, 40:20, 41:1, 63:7, 68:24
**Wounds** - 41:2

### Y

**Year** - 4:13, 4:16, 4:18, 24:24, 25:2
**Years** - 6:22, 8:17, 24:17, 24:19
**York** - 4:8, 4:15, 24:16, 24:23, 25:1, 25:4, 26:11, 26:13
**You'd** - 3:11, 45:15
**You'll** - 22:11
**You've** - 18:1, 23:24, 25:24, 31:9, 39:18, 46:25

### 0

**0.28** - 53:6

### 2

**2016** - 24:3, 25:4
**2022** - 30:5
**21** - 52:5, 53:13
**216** - 59:1
**26** - 53:1
**28** - 53:13
**29th** - 56:19

### 3

**31** - 30:5
**35** - 48:21, 49:5
**37** - 49:3

### 6

**6:57** - 54:24
**641** - 22:2
**642** - 36:22
**643** - 58:6
**644** - 61:25

### 7

**7:19** - 54:22
**73** - 59:2

### 8

**80** - 50:2, 50:17
**80.1** - 54:20, 54:25
**85** - 49:18, 50:17

### 9

**90** - 55:22
**95** - 49:6, 55:11
**98** - 49:3

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT

* * * * * * * * * * * * * * * * * * *
                                   *
COMMONWEALTH OF MASSACHUSETTS,     *
                                   *
v.                                 * Docket No. 2282CR00117
                                   *
KAREN READ.                        *
                                   *
* * * * * * * * * * * * * * * * * * *

           BEFORE THE HONORABLE BEVERYLY CANNONE
           FRIDAY, JUNE 21, 2024
           TESTIMONY OF IRINI SCORDI-BELLO

APPEARANCES:

For the Commonwealth:
    BY:  ADAM LALLY, A.D.A.
         LAURA MCLAUGHLIN, A.D.A.

For the defendant:
    BY:  DAVID YANNETTI, ESQ.
         ALAN JACKSON, ESQ.
         ELIZABETH LITTLE, ESQ.

                    Dedham, Massachusetts
                    Room 25


Christine D. Blankenship, CVR
Court Reporter/Transcriber

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Irini Scordi-Bello | | | | |
| (By Mr. Lally) | 4 | | 36 | |
| (By Ms. Little) | | 17 | | |

Exhibits:

645    Photograph

645    Photograph

646    Photograph

646    Photograph

647    Photograph

648    Photograph

649    Photograph

650    Photograph

1-3

(Court in session at 9:05 a.m.)

(Defendant is present with counsel.)

(Jury in.)

THE CLERK:  22-117, the Commonwealth versus Karen Read.

THE COURT:  Good morning, Counsel.  Good morning, Ms. Read. Good morning, jurors. I have to ask you those same three questions.  Were you all able to follow the instructions and refrain from discussing this case with anyone since we left yesterday?

THE JURY:  Yes.

Everyone said yes or nodded affirmatively. Were you also able to follow the instructions and refrain from doing any independent research or investigation into this case?

THE JURY:  Yes.

THE COURT:  Everyone said yes or nodded affirmatively. Did anyone happen to see, hear, or read anything about this case since we left here yesterday?

THE JURY:  No.

THE COURT:  Everyone shook their heads.  Thank you very much.  Can we have Dr. Scordi-Bello, please.

                    IRINI SCORDI-BELLO, sworn

THE COURT:  Whenever you're ready, Mr. Lally.  Good morning, Doctor.

THE WITNESS:  Good morning.

**DIRECT EXAMINATION**

**BY MR. LALLY:**

Q    Good morning, Doctor.

A    Good morning.

Q    Doctor Scordi-Bello, if I can ask you some questions just turning back a little bit from what you were testifying to about yesterday. You had mentioned in your testimony yesterday that you had received some -- an additional -- in addition to the internal and external examination that you conducted of Mr. O'Keefe, you were to receive some other material that you had reviewed, correct?

A    Correct.

Q    Now, included within that material was some material from the state police as far as the investigative agency investigating Mr. O'Keefe's death?

A    Correct.

Q    Now, is that something -- is that typical, is that abnormal? If you could, describe sort of in general terms as far as what if any communication would you typically have with the investigating body or agency in relation to any sort of autopsy or examination you do?

A    Yes.  In Massachusetts under Massachusetts law, the medical examiner's office is responsible, and our role is to determine the cause and manner of death by doing an autopsy.  The scene or the scene of death or the place

where the decedent is found is controlled by the district attorney's office and state police will do an investigation. When we accept a case into our office, we request reports, police reports, to explain and describe the circumstances of the death. It could be a house. It could be somewhere else. It could be outside. Every case comes with a police report, and we review that police report, and if we feel that we need more information, then we contact the investigating body and ask for more information, again, depending on the case.

Q    And specifically in this case, in regard to Mr. O'Keefe, did you reach out to get some more information?

A    I did reach out, yes.

Q    Was that in part in relation to what you were talking about in your testimony yesterday as far as the diagnosis of hypothermia and trying to sort of better understand the circumstances?

MS. LITTLE:  Objection, Your Honor.

THE COURT:  Sustained.

Q    Why did you reach out?

A    I reached out because when the case was presented to us, and after I did the autopsy, I did not have all the information that I needed in order to certify the manner. The cause of death to me was -- I was able to determine the cause of death from the autopsy. When an event is

unwitnessed, we usually reach out to the investigating agency and ask them whether they have any more information than they did on the day that the autopsy was done, because investigations sometimes take some time. So in the days and the weeks following the autopsy, I reached out and asked if there was any more information than what I was originally presented with. Was there any video from the surrounding areas? Where -- did anybody come forward to say that they actually witnessed whatever happened? And again, by the time I was ready to finalize the case, and we have approximately three months or ninety days from the day of the autopsy until we issue a report. I was not provided with enough information for me to be able to determine the manner.

Q    Now, Doctor, do you recall specifically who it was that you spoke with from the state police?

A    Yes, I documented that I spoke with Trooper Proctor, I believe, twice.

Q    And with reference, not asking you anything as far as what that conversation consisted of, but as far as the tone of that conversation, did you feel pressured or coerced to come up with a certain determination?

A    No, I did not.

Q    And even if you had been, what would your response have been in reference to that?

1-7

A    My response was that I am responsible for what goes on the death certificate, and unless I have enough information, clear and convincing evidence, I cannot determine a manner.

MR. LALLY:  May I approach?

THE COURT:  Yes.

Q    Now, Doctor, I'm showing you five photographs that I gave you yesterday. Do you recognize those?

A    Yes, I do.

Q    And what do you recognize those to be?

A    I recognize these as photographs of Mr. O'Keefe's body. I believe these were taken at the hospital. One of them is a photograph taken at the time of autopsy.

MR. LALLY:  May I approach again, Your Honor?

THE COURT:  Yes.

MR. LALLY:  Commonwealth would seek to introduce and admit as the next exhibit.

THE COURT:  Ms. Little.

MS. LITTLE:  No objection.

THE COURT:  Thank you.

(Whereupon Exhibit No. 645, Photograph, was marked as an exhibit.)

(Whereupon Exhibit No. 646, Photograph, was marked as an exhibit.)

(Whereupon Exhibit No. 647, Photograph, was marked as an

1-8

exhibit.)

(Whereupon Exhibit No. 648, Photograph, was marked as an exhibit.)

(Whereupon Exhibit No. 649, Photograph, was marked as an exhibit.)

MR. LALLY: Thank you very much. Your Honor, may I have moment? I just want to make sure they're in the --

THE COURT: Yes.

MR. LALLY: May I approach again?

THE COURT: Yes.

MR. LALLY: And, Your Honor, with the Court's permission, may I publish these for the jury?

THE COURT: So, jurors, remember the instruction I gave you yesterday on these photographs. Okay.

MR. LALLY: Ms. Gilman, if I could have photograph 2853. Q And, Doctor, do you recognize what's up on the screen?

A    Yes, this is a picture taken of Mr. O'Keefe body.

Q    And, Doctor, if you could, using the laser pointer that you have there, direct the jury's attention to what, if anything, you observed of significance in this photograph related to the injuries that you were testifying about yesterday?

A    Yes, so first thing you notice is the medical intervention, which I talked about yesterday. There's the

defibrillator, adhesive pads on the chest. There is what's known as the C collar, a cervical stabilization collar for the neck.  And he has been intubated prior to going to the hospital. The injuries that are obvious in this picture include the abrasions on his right forearm and arm, and you can see here there is discoloration of the upper eyelid of the right eye with some blood that's dripping. That's the orbital or supraorbital ecchymosis that I described before with -- we're too far to see the very, very small laceration that is present there, but that's what's causing the bleeding.

        MR. LALLY:  And, Ms. Gilman, if I could have photograph 2857.

Q    Now, Doctor, this is not before you at the current time.  It's formerly marked as Exhibit 442.  Do you recognize what's up on the screen?

A    Yes, this is a picture of the abrasions that I described in my report, posterior upper arm and forearm. You can see that they have some sort of pattern into it. Anytime we see a pattern, we try to document it as best as we possibly can.

Q    Now, Doctor, with reference to these injuries as far as the abrasions to Mr. O'Keefe's right arm, what if any role did that play as far as your determination as far as cause of death of Mr. O'Keefe?

A    These are superficial abrasions to the skin. They are not lethal. They're not contributory to the cause of death. The trauma that I observed on the head along with the hypothermia are the two factors contributing to his death. These are present. They're noted, they're described, they're photographed, but I do not know how they came to be, and I did not contribute them to the cause of death.

MR. LALLY:  Now, Ms. Gilman, if I could have photograph 286, please.

Q    Doctor, returning to the exhibit to the photos that you have before you, do you recognize what's up on the screen here?

A    Yes, this is a photograph of Mr. O'Keefe's right hand. This is the dorsum or the dorsal aspect of the hand as opposed to the palm, and you can see that there are some contusions or bruises. There's a larger one here and two very small ones here. This particular contusion has two pinpoint, small defects associated with it. I believe this is -- this could be due to attempts at gaining IV access during the many attempts of resuscitation, but I cannot be absolutely sure.

MR. LALLY:  And, Ms. Gilman, if I could have photograph 2865.

Q    And Dr. Scordi-Bello, if you could again using the laser pointer, direct the jurors' attention to what, if

anything, of significance you note in this photograph.

A    Again, this is a slightly closer view of Mr. O'Keefe's face. You can see the discoloration, the ecchymosis on the right eye with a slight amount of bleeding. You can see here that there's also some discoloration of his left eye -- left eyelid.

Q    And, Doctor, with reference to the other injuries that you were testifying about yesterday as far as the small cuts or abrasions or lacerations, are those visible in this photograph as well?

A    I can't hear your question, and you could just repeat it and a little louder.

Q    Sure. My apologies, Doctor.

With reference to this photograph, as far as your testimony yesterday, in regard to the other smaller injuries around the nose and eyes area of Mr. O'Keefe, are those visible in this photograph as well?

A    We can see some discoloration of the nose, but this is not a very good picture of it, and I think there's a linear abrasion on the left side of the nose that I described, and it's probably this.

MR. LALLY:  Ms. Gilman, could I have photograph 2877?

Q    And, Doctor, if you could, again using the laser pointer direct the jurors' attention to sort of anything of significance you observed in this photograph.

1-12

A    Yes, this is a view of the left side of Mr. O'Keefe's face. You can see the discoloration of the left eyelid, and now you can see this linear abrasion on his nose and a small abrasion more towards the middle of his nose.

MR. LALLY:  Ms. Gilman, lastly from this set, if I could have photograph 9488.

Q    Same, Dr. Scordi-Bello, if you could using the laser pointer direct the jurors' attention to what, if anything, of significance you observed in this.

A    This is the laceration to the back of Mr. O'Keefe's head. You can see this defect here. It's ragged. It's a typical classic blunt impact injury. And you can see the abrasion, the scrape that is adjacent to it.

Q    Thank you, Doctor.

MR. LALLY:  Ms. Gilman, you can take that down. And also if we could have the lights.  Thanks.

Q    Now, Doctor, with reference to what you were testifying yesterday as far as the subscapular bleeding, the bleeding under the scalp, is that more or less prominent on one side versus the other side of Mr. O'Keefe's scalp?

A    Yes, it was more prominent under the laceration that we just looked at.

Q    And so would that be more prominent on the right side; is that correct?

A    Yes.

Q    Now, you testified yesterday about a blunt object's injury in relation to the injury to the back of the head then leading to the fractures and the bleeding in the brain, correct?

A    Correct.

Q    And then further leading to ecchymosis; is that correct? A    In the eyes, yes.

Q    Now that blunt object, what, if anything, can you say about what -- what that blunt object could be?

A    It could be any blunt object.

Q    Now, from your training and experience with reference to the number of autopsies and examinations that you conducted over the years, would that blunt object the possibility include the ground, especially if it was frozen ground?

A    Yes.

      MS. LITTLE:  Objection.

      THE COURT:  Ask the question differently.

Q    The injuries that you observed to the back of Mr. O'Keefe's head, the skull fracture, would that be consistent with a fall to the ground?

A    It could be.

Q    Would that be consistent with being projected by an object say in a pedestrian collision, and then striking your head on the ground?

A    It's possible.

Q    Now, the arm injuries that you observed, would those be consistent with scratches from either glass or a piece of plastic or a piece of metal?

A    It's possible.

Q    And the injuries that you observed, would that be consistent with injuries that you observed in other cases of a pedestrian collision?

A    They're not the classic pedestrian injuries that we observed, no.

Q    And to that point, as far as when you say classic as far as a pedestrian collision is concerned, you've conducted autopsies on a number of different pedestrian collisions over the course of your career; is that correct?

A    Yes, I have.

Q    Do they all sort of mirror each other. Is there sort of disparity depending on how the person interacted with the car?

       MS. LITTLE:  Objection.

       THE COURT:  Sustained.  Watch the form, Mr. Lally.

Q    What if anything -- are every injuries from a pedestrian collision the same?

A    No.

Q    And why not?

A    It depends on many factors. It depends on the position

1-15

of the body of the pedestrian or the person being struck. It depends on whether they are moving or standing still. It depends on the speed of the car. It depends on whether brakes were applied or not. There's a lot of factors that come into play.

Q    Would another factor be sort of the shape of the vehicle that strikes a pedestrian?

A    That's also possible. Yes, that's a factor.

Q    And did you have occasion to see any photographs or have you seen any photographs in relation to the defendant's vehicle in this case?

A    I have seen photographs, yes.

Q    And the size or shape of that vehicle, what if any significance did that have to you as far as your examination?

        MS. LITTLE:  Objection.

        THE COURT:  I'll allow it.

A    When we have a potential vehicle, clearly, we look at the height because one of the things that we do in most or all pedestrian or people struck by a motor vehicle is look at the legs, because in the majority we see injuries to the legs from the bumper of the car.  Again, depending on the kind of car, the size of the car, and the height of the bumper. So in Mr. O'Keefe, I did not see any injuries in the lower extremities. And looking at the car, I did note

1-16

that it was a much bigger car with much higher, I would say a much higher taillight, bumper. It was not a sedan or a car that's low to the ground where the bumper would be at the level of let's say the knee or slightly above or slightly below.

Q    And again I believe yesterday in your testimony, you indicated that the skull is a pretty thick bone; is that correct?

A    Yes.

MS. LITTLE:  Objection.

THE COURT:  Sustained.

Q    With regards to the thickness of the skull bone what if any significance -- or what, if any -- what if anything you say as far as the type or amount of force that would be caused -- would be necessary to cause the fracture that you observed?

MS. LITTLE:  Objection.

THE COURT:  Overruled.

A    I would consider the amount of force to be significant again without being able to quantify it.

MR. LALLY:  May I have a moment, Your Honor.

THE COURT:  Yes.

Q    Now, Doctor, from the internal and external examination that you conducted in regard to Mr. O'Keefe as well as the other materials that you reviewed, were you able to come to

an opinion to a reasonable degree of medical certainty as
to the cause of death of John O'Keefe?

A    Yes, the cause of death was due to blunt impact
injuries of the head and hypothermia.

MR. LALLY:  Thank you, Doctor. Your Honor, I have no
further questions.

THE COURT:  All right. Cross-examination.

MS. LITTLE:  Thank you.

**CROSS-EXAMINATION**

**BY MS. LITTLE:**

Q    Good morning, Dr. Scordi-Bello.

A    Good morning.

THE COURT:  Ms. Little, keep your voice up.

MS. LITTLE:  Absolutely.

Q    You testified regarding a number of injuries that you
referred to as blunt impact injuries, correct?

A    Yes.

Q    And to be clear, blunt impact injuries are a very, very
large category that includes contusions, lacerations,
abrasions, and fractures?

A    Correct.

Q    And you testified similarly that a blunt object can
also refer to a large range of objects; is that right?

A    Correct.

Q    And I think yesterday you gave the example of a

microphone being a blunt object?

A    Correct.

Q    It could also include something like a baseball bat?

A    Correct.

Q    A dumbbell?

A    Could be.

Q    The ground?

A    Yes.

Q    Or a German shepherd's claws?

A    Claws, possibly, yes.

Q    You'd agree that John O'Keefe had a number of blunt impact injuries on his face, on his head, and his right arm?  A  Yes.

Q    Besides his right arm, which we'll discuss in a second, taking his body from the neck down, he did not have any significant injuries?

A    From the neck down, not significant, no.

Q    Let's take those one at a time. No injury whatsoever to the shoulders?

A    Correct.

Q    No injuries whatsoever to his chest area, aside from sort of the CPR related injuries that you discussed?

A    Yes, correct.

Q    And that was in the sternum; is that right?

A    It was in the ribs just adjacent to the sternum, yes.

Q    Okay.  No injuries to his torso other than that?

A    No.

Q    No injuries to his back?

A    No.

Q    No injuries to his hips?

A    Correct.

Q    No injuries to his pelvis?

A    Correct.

Q    No injuries to his thighs?

A    To his?

Q    Thighs?

A    No.

Q    No injuries to his knees?

A    Correct.

Q    No injuries to his shins?

A    Correct.

Q    No injuries to his ankles?

A    Correct.

Q    No injuries to his feet?

A    Correct.

Q    From the neck down, he did not have a single broken bone again, aside from those CPR related injuries you discussed, correct?

A    That's correct.

Q    Not a single fracture?

1-20

A    Other than CPR, correct.

Q    And you sort of -- you spoke earlier about how the bumper was a little higher than on - say - a regular sedan, correct?

A    Correct.

Q    And so usually in a pedestrian collision, you would see injuries to the knees; is that right?

    MR. LALLY:  Objection.

    THE COURT:  I'll allow it.

A    Depending on the kind of car, depending on the speed, depending on the height of the individual and the car. You might -- you might -- you might see injuries to their lower extremity, yeah.

Q    But in this case, you didn't see any injuries to his thighs, to his pelvis, anything even at the height of the bumper; is that correct?

A    Correct.  He had a very minor abrasion to the side of his right knee.

Q    So surely, you'd agree that John O'Keefe's injuries or lack thereof are inconsistent with having been struck by a 7,000 pound vehicle at 24 miles per hour and being projected 30 feet?

    MR. LALLY:  Objection.

    THE COURT:  Sustained. You can break it down. Ask it differently.

Q    Would you agree that John O'Keefe's injuries, or lack thereof, are inconsistent with having been struck by a vehicle at 24 miles per hour?

A    I would say it's likely and unlikely at the same time depending on the position of the body and the vehicle in question.

Q    Well, let me give you a hypothetical. Let's say the person were standing with their arm like this (demonstrating) and they were struck by the rear taillight of a vehicle at 24 miles per hour. Would you agree that his injuries are inconsistent with that scenario?

MR. LALLY:  Objection.

THE COURT:  Sustained.

MS. LITTLE:  May we approach, Your Honor?

THE COURT:  Sure.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

Q    Would you agree that John O'Keefe's injuries to his arm - let's start there - are inconsistent with having been struck by a vehicle at 24 miles per hour and then causing him to spin around and be projected 30 feet?

THE COURT:  Okay.  So you need to break it down.

Q    Would you agree that John O'Keefe's injury to his arm are inconsistent with having been struck by a vehicle at 24

1-22

miles per hour?

A    I don't know. I am not a reconstruction expert. I'm not a biomechanics expert. I never personally inspected the car, so I can't offer an opinion on that.

Q    You did examine John O'Keefe's arm, correct?

A    Yes.

Q    You observed no significant bruising?

A    Correct.

Q    No fractures?

A    Correct.

Q    And no broken bones?

A    Correct.

Q    I'd like to talk about the injuries to John O'Keefe's face. You testified that Mr. O'Keefe had a laceration on his right upper eyelid?

A    Correct.

Q    You also described multiple abrasions on his nose?

A    Two, yes.

Q    Although these injuries may not have been the ultimate cause of his death, you'd agree that less severe injuries can still be very important in interpreting the manner or the context in which that person died, correct?

A    Correct.

Q    And in furtherance of that, you've been taught that when doing an autopsy, details matter?

A    Correct.

Q    No matter how small?

A    Correct.

Q    And that's one of the reasons as a medical examiner you have to notate every single injury you find on a person; is that right?

A    Correct.

Q    If I could show you --

MS. LITTLE:  May I approach, Your Honor?

THE COURT:  Yes. Show Mr. Lally.

Q    Do you recognize that photograph?

A    I do.

Q    And is that a photograph that was taken in connection with your autopsy?

A    Yes, it was taken at the time of autopsy after the face was cleaned.

THE COURT:  I'm sorry, after what?

THE WITNESS:  The face was cleaned up.

THE COURT:  Okay.

MS. LITTLE:  I move to admit, Your Honor.

THE COURT:  Any objection, Mr. Lally?

MR. LALLY:  No, Your Honor.

THE COURT:  Okay.

(Whereupon Exhibit No. 650, Photograph, was marked as an exhibit.)

1-24

MS. LITTLE:  Permission to publish.

THE COURT:  Yes.

Q    Are these the facial injuries that you were testifying to earlier?

A    Yes.

Q    And could you kind of describe in that photograph what injuries you observed to his face?

A    The orbital ecchymosis on both eyes, the small laceration to the right eyelid, the abrasions on the nose.

Q    And you testified that the injuries his face were also the result of a blunt force trauma?

A    Correct.

Q    So that's the laceration to the eye and the two abrasions that we see there on his nose?

A    Correct.

Q    And you'd agree that those injuries don't just manifest out of nowhere, right?

A    Absolutely.

Q    They have to originate from something?

A    Yes.

Q    Would you agree that his injuries to his face are consistent with having been punched?

A    That is a possibility.

MS. LITTLE:  You can take that down, Mr. Bates.  Thank you.

1-25

Q    Your internal examination notes also cite a tongue laceration on the right front of the victim's tongue. Do you recall that?

A    Yes.

Q    And you'd agree that a tongue laceration can be also caused by blunt force trauma?

A    Correct.

Q    And that could also include something like a punch to the victim's face or jaw?

A    That's a possibility.

Q    In addition to the facial injuries, you described that Mr. O'Keefe had a significant laceration on the back of his head?

A    He had one laceration to the back of his head, correct.

Q    And I believe we saw a photograph earlier.

A    Yes.

Q    You testified that the skin around the laceration on the back of his head was also scratched; do you recall that?

A    Yes, I do.

Q    But you did not testify as to how you opined that might have happened?

A    No.

Q    Would you agree that someone could certainly get scratched on the back of their head if they were, for

1-26

instance, dragged on the ground?

A    It's possible.

Q    You described the open wound to the back of his head as a laceration which is sort of a blunt force injury that's not the result of sharp force trauma; is that right?

A    Yes.

Q    And you'd agree that Mr. O'Keefe's head injury came from some sort of blow to the back of the head, whether it be an object or the ground; is that right?

A    Yes.

MR. LALLY:  Objection.

THE COURT:  I'll allow it.

Q    And that injury could be the result of falling backward from the standing position onto concrete?

A    It's possible.

Q    It could also be the result of being struck with a large object such as a baseball bat or a barbell?

A    It's possible.

Q    In other words, it was an irregular laceration that resulted from some blunt force trauma?

A    Correct.

Q    I'd like to sort of circle back to those injuries to Mr. O'Keefe's arm. You testified that there were, again, no fractures, no broken bones, no significant contusions?

A    Correct.

1-27

Q    But you did describe the wounds Mr. O'Keefe's arm as having discrete linear abrasions which were caused by some sort of blunt object, correct?

A    Yes.

Q    What does discrete mean?

A    It means each one is an individual injury as opposed to confluent where it would be all meshed together.

MS. LITTLE:  Your Honor, if I could publish what's been previously marked as Exhibit 19.

THE COURT:  Okay.

Q    And these are sort of the linear wounds that you're referring to?

A    Yes.

Q    And you testified that these also sort of appear in clusters or groups?

A    Yes.

Q    You called them pattern abrasions; is that right?

A    Yes, I did.

Q    And you'd agree that, for example, road rash does not result in this type of discrete, linear wounds?

A    It could, but not exactly like this.

Q    Well, typically, road rash covers sort of a large area of the skin. It would be a large abrasion. And we've seen numerous, numerous cases of road rash in your career?

A    Yes.

Q    And it doesn't look like that?

A    Correct.

Q    Blunt force trauma can include injuries from various objects, as you testified, including an animal claw, correct? A    Correct.

Q    And you agree that these discrete, linear abrasions are inconsistent with having been struck by a smooth rear taillight at 24 miles per hour?

MR. LALLY:  Objection.

THE COURT:  Can you answer that, Doctor?

THE WITNESS:  I can't.

THE COURT:  Okay.

THE WITNESS:  By a smooth -- no.

THE COURT:  All right. Next question.

Q    By a smooth rear taillight, you said that is not what you would see at 24 miles per hour, correct?

MR. LALLY:  Objection.

THE COURT:  Sustained.

Q    As you testified earlier, you've indicated that based on the facts that were presented to you, you don't know what caused those significant scratches on Mr. O'Keefe's right arm?

A    I do not.

MS. LITTLE:  May I approach, Your Honor?

THE COURT:  Sure.

MR. LALLY:  If I could just see what was ...

MS. LITTLE:  Oh, I'm sorry, Mr. Lally.

Q    Do you recognize that photograph?

A    I do. It's a photograph of Mr. O'Keefe's right hand.

MS. LITTLE:  May I mark that as the next number?

THE COURT:  Is there an objection?

MR. LALLY:  May we approach?

THE COURT:  Okay.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

MR. JACKSON:  Thank you, Your Honor.

MS. LITTLE:  Thank you, Your Honor. Permission to publish.

THE COURT:  Well, we need to mark it first.  So we'll mark it for identification, and then when it's appropriate, it will be transferred to being an exhibit. But --

MS. LITTLE:  Thank you.

THE COURT:  But, yes, you can publish. Is it all set to be published, appropriately?

MS. LITTLE:  Yes, Your Honor.

(Whereupon Exhibit NNN, Photograph, was marked for identification.)

THE COURT:  Okay.

Q    Dr. Scordi-Bello, you indicated on direct examination

that at least one of the bruises from Mr. O'Keefe's right hand could potentially be attributed to an attempt to get IV fluid into the hand; is that correct?

A    Correct.

Q    During the course of your conducting your autopsy, you reviewed records from the Canton Fire Department and EMS as well as Good Samaritan Hospital; is that correct?

A    I did.

Q    And do you recall reviewing records indicating that the IV fluids in this particular case were administered through the tibia and then later through a catheter at the hospital?  A  Yes, they were administered through intraosseous lines in both leg's shins. And at the hospital, they were administered through a femoral central line. Yes.

Q    And you'd agree that bruising to the backs of hands is also consistent with defensive wounds?

A    That's -- yes, that's correct.

Q    And there are actually four separate distinct bruises outside of the one that you discussed earlier on Mr. O'Keefe's right hand, correct?

A    Yes, I would say three, but I can see how you would say four.  One, two, three.  That might be one together, but, yes, I can see how you would say four.

Q    And you testified yesterday that there was also an

injury to Mr. O'Keefe's left hand.

A    There was a vague contusion on his left hand, correct.

Q    You were asked by Mr. Lally --

THE COURT:  Can we take this down now, Ms. Little?

MS. LITTLE:  Yes, Your Honor.

Q    You testified on direct examination that you didn't see any sort of obvious signs of a fight because Mr. O'Keefe's fingernails were intact and you didn't observe any fractures on his hands; is that right?

A    Correct.

Q    But broken fingernails and fractured hands aren't the only observable fine -- signs of a fight; isn't that correct?

A    That's correct.

Q    In fact, you noted a laceration over his eye?

A    Yes.

Q    You notice multiple lacerations on his nose?

A    Abrasions on his nose, yes.

Q    And multiple abrasions on his nose?

A    Correct.

Q    You noticed a laceration to his tongue?

A    Yes.

Q    You noted the contusions on the back of his right hand?

A    Correct.

Q    The injury -- the contusion to his left hand as well?

A    Correct.

Q    And as you just testified, bruising on the back of hands may be consistent with defensive wounds?

A    It could be.

Q    So, in fact, if you have a body that presents with a laceration to one of the brows, a laceration or abrasions to the nose, an egg over an eye, contusions and abrasions on the hands, and a laceration to the tongue, these injuries are consistent with a physical altercation, correct?

       MR. LALLY:  Objection.

       THE COURT:  Sustained.

Q    Are those injuries consistent with a physical altercation?

       MR. LALLY:  Objection.

       THE COURT:  Sustained.

       MS. LITTLE:  Your Honor, may we approach?

       THE COURT:  Sure.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

Q    Shifting gears for a second. You indicated on direct examination that you reviewed some photographs from law enforcement that showed no footprints in the snow; do you recall that testimony?

A    I do.

Q    Were those provided to you by Trooper Proctor?

A    Yes.

Q    Do you have those photographs with you?

A    No, I don't.

Q    Do you recall what was depicted in those photographs?

A    Yes.  If I remember correctly, it was the area of the fire hydrant and the area where Mr. O'Keefe's body was discovered. It's the front of the house, the area of the fire hydrant, and I believe the flagpole.

Q    Thank you. You testified that Mr. O'Keefe had multiple fractures to his skull, but they seemed to be originating from a single point of impact on the back of his head; is that correct?

A    It appeared so, yes.

Q    Are you reasonably certain that all of his injuries were the result of a single impact to the back of the head?

A    It could be a single impact.

Q    But it also could be multiple impacts, correct?

A    It could be, yes.

Q    Because as you just testified, Mr. O'Keefe suffered multiple injuries to the front of his face as well?

A    Correct.

Q    In other words, he could have suffered trauma to the face and then fallen and sustained the injury to the back

of the head, correct?

A    That is possible. Yes.

Q    And you testified before the state grand jury that the areas of bruising to the brain were likely due to a fall; is that correct?

A    Yes.

Q    In your expert medical opinion, is it possible for someone to get punched in the face hard enough to lose consciousness and fall backward?

MR. LALLY:  Objection.

THE COURT:  I'll allow it.

A    It's possible.

MS. LITTLE:  May I have one moment?

THE COURT:  Sure.

MS. LITTLE:  May I see the exhibits that were just marked, Your Honor?

If I could have permission to publish what's been previously admitted as Exhibit 19.

THE COURT:  Yes.

Q    Dr. Scordi-Bello, it's kind of hard to see in this picture, but there's some redness that you observe on the body by the ribs that we observed in some of the other photographs that were presented by Mr. Lally.

MR. JACKSON:  May we have just a moment, Your Honor?

THE COURT:  Yes.

1-35

MR. JACKSON:  Ask to approach.

MS. LITTLE:  May I approach, Your Honor?

Q    I'd like to show you it's been previously marked as People's Exhibit 648.

MS. LITTLE:  Ms. Gilman, would it be -- Mr. Bates, can you take that one?

Ms. Gilman, would it be possible to display Exhibit 648.

May I approach, Your Honor?

THE COURT:  Yes.

MS. LITTLE:  It's 2853.  Thank you.

Q    Dr. Scordi-Bello, you were shown this photograph by Mr. Lally on direct examination?

A    Yes.

Q    Do you see the redness sort of next to his rib cage on the bottom crest?

A    Yes.

Q    What is that?

A    That is livor.

Q    Lividity?

A    Lividity, yes.

Q    Can you describe to the jury what lividity is?

A    Yes. Lividity is the pooling of blood to the dependent areas of the body after someone is deceased.

Q    So even though it sort of appears to look like a

1-36

bruise, that's lividity, correct?

A    That is lividity. Yes, it goes all the way down.

Q    And it's not the result of an injury?

A    No.

MS. LITTLE:  Thank you. No further questions.

THE COURT:  Okay.  The lights, please. Thank you.  Mr. Lally.

MR. LALLY:  Yes, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. LALLY:**

Q    Dr. Scordi-Bello, you did observe a minor abrasion to Mr. O'Keefe's right knee; is that correct?

A    Correct.

Q    And what part of the knee was that on if you recall?

A    It was on the side of the lateral side of his right knee.

Q    And by lateral, sort of the side that faces away from the body; is that correct?

A    Correct.

Q    You were asked whether or not the small injuries on Mr. O'Keefe's face could possibly be from a punch; is that correct?

A    Correct.

Q    And you said that's one of the possibilities; is that correct?

A    Yes.

Q    And what are some of the other possibilities?

A    Could be impact during a fall. It could be coming in contact with any blunt object in the snow.

Q    Would glass be a possibility as far as a blunt object?

A    It could be under certain circumstances.

Q    A piece of plastic under certain circumstances, as far as a blunt object, would that be also a possibility?

A    Correct, yes.

Q    Now, as far as the abrasion near the laceration on the back of Mr. O'Keefe's head, you were asked some questions about whether or not that could be from dragging, correct?

A    Correct.

Q    Now, as far as injuries or abrasions concerning dragging, would it be typical to see just one isolated abrasion in the area of the laceration?

A    Not typical, but possible.

Q    Could that also be a result of the blunt impacts for as one of the possibilities you've testified before, from hitting the ground?

A    Yes.

Q    Now you were asked about hitting the ground, specifically hitting concrete. Would that impact injuries to the back of Mr. O'Keefe's head also be consistent with striking his head on frozen ground?

A    I'm sorry.

MS. LITTLE:  Objection.

THE COURT:  No, I'll allow it.

A    Can you -- can you repeat the question?

Q    Sure. You were asked a question on cross-examination about the laceration and abrasion to the back of Mr. O'Keefe's head being consistent with striking his head on concrete, correct?

A    Yes.

Q    Would that also be consistent with striking his head on frozen ground?

A    It could be, yes.

Q    You were asked about certain wounds as being a possibility of defensive wounds. What are some of the other types of defensive wounds that you would expect to see that you do not see in this case?

A    I would expect to see or I have seen multiple bruising to the -- again, posterior aspects of the forearms. I have seen cuts, lacerations, depending on how a person might be defending themselves, the position of their arms.

Q    And would that also includes breaks in the fingernails and fractures to the hands?

MS. LITTLE:  Objection.

THE COURT:  Watch the form, Mr. Lally.  Sustained.

Q    What if anything else would that include?

A    It might include bruising to the knuckles. It might include broken fingers.

Q    Now, with reference to the injuries that you were asked about with respect to Mr. O'Keefe's right hand, would those also be consistent with impact from a blunt object as well?

A    They are blunt impact injuries, yes.

Q    Now, again, if I could, just with reference to you were asked about different possibilities with the skull fractures and bleeding in the brain. What is your opinion as to sort of how that was caused and sort of, if you could, again, just go through your opinion as to the head injuries, the skull fracture, and the bruising?

        MS. LITTLE:  Objection.

        THE COURT:  Ask it again, Mr. Lally, in a different way.

Q    You were asked about some possibilities. What is your opinion as to how those injuries were sustained or manifested in Mr. O'Keefe?

A    I don't know how they came to be. I described them and I stated previously that they are consistent with a fall to the back of the head.

Q    And so I'm sorry, Doctor, my question is more geared towards as far as the single impact to the back of the skull, and then sort of radiating fractures in the skull. If you could explain that in reference to the subdural

1-40

hemorrhage, subarachnoid hemorrhage, and the ecchymoses that you observed?

A    Again, a single impact with a fall could cause all the injuries that were seen in the brain and the skull.

MR. LALLY:  Okay. I have nothing further.

MS. LITTLE:  No further questions.

THE COURT:  All right. Doctor, you are all set. Thank you very much.

(Witness exits.)

THE COURT:  Okay. All right. Mr. Lally.

MR. LALLY:  Thank you, Your Honor. The Commonwealth rests.

THE COURT:  All right.

MR. JACKSON:  Your Honor, the defense would move the Court for --

THE COURT:  So I'm going to stop you right there.  A short recess?

MR. JACKSON:  If the Court needs one.

THE COURT:  I don't need one, but I will see you at sidebar.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

(End of requested testimony.)

1-41

C E R T I F I C A T I O N

I, CHRISTINE D. BLANKENSHIP, NOTARY PUBLIC, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT FROM THE RECORD OF THE COURT PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I, CHRISTINE D. BLANKENSHIP, FURTHER CERTIFY THAT THE FOREGOING IS IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE OF THE TRIAL COURT DIRECTIVE ON TRANSCRIPT FORMAT.

I, CHRISTINE D. BLANKENSHIP, FURTHER CERTIFY THAT I NEITHER AM COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THIS ACTION.

*Christine D. Blankenship, October 4, 2024*
CHRISTINE D. BLANKENSHIP, NOTARY PUBLIC
RECORDED BY FTR, TRANSCRIPT PRODUCED FROM COMPUTER
29B MECHANIC STREET
FOXBORO, MASSACHUSETTS 02035
(508) 904-9508
C.DORANBLANKENSHIP@GMAIL.COM

| A |
|---|

**Able** - 3:7, 3:12, 5:24, 6:13, 16:20, 16:25
**Abnormal** - 4:18
**Above** - 16:4
**Abrasion** - 11:20, 12:3, 12:4, 12:13, 20:17, 27:23, 36:11, 37:10, 37:16, 38:6
**Abrasions** - 9:5, 9:17, 9:23, 10:1, 11:9, 17:20, 22:17, 24:9, 24:14, 27:2, 27:17, 28:6, 31:18, 31:19, 32:6, 32:7, 37:14
**Accept** - 5:3
**Access** - 10:19
**Addition** - 4:9, 25:11
**Adhesive** - 9:1
**Adjacent** - 12:13, 18:25
**Administered** - 30:10, 30:12, 30:14
**Admit** - 7:17, 23:20
**Admitted** - 34:18
**Agency** - 4:14, 4:20, 6:2
**Agree** - 18:11, 20:19, 21:1, 21:10, 21:19, 21:24, 22:20, 24:16, 24:21, 25:5, 25:24, 26:7, 27:19, 28:6, 30:16
**Allow** - 15:17, 20:9, 26:12, 34:11, 38:3
**Altercation** - 32:9, 32:14
**Amount** - 11:4, 16:14, 16:19
**Animal** - 28:4
**Ankles** - 19:17
**Anytime** - 9:20
**Apologies** - 11:13
**Appear** - 27:14
**Appeared** - 33:15
**Appears** - 35:25
**Applied** - 15:4
**Approach** - 7:5, 7:14, 8:9, 21:14, 23:9, 28:24, 29:7, 32:17, 35:1, 35:2, 35:9
**Appropriate** - 29:16
**Appropriately** - 29:20
**Approximately** - 6:11
**Area** - 11:16, 18:21, 27:22, 33:7, 33:8, 33:9, 37:16
**Areas** - 6:8, 34:4, 35:24
**Aren't** - 31:11
**Arm** - 9:5, 9:18, 9:23, 14:2, 18:13, 18:14, 21:8, 21:19, 21:24, 22:5, 26:23, 27:1, 28:22
**Arms** - 38:20
**Aspect** - 10:14
**Aspects** - 38:18
**Associated** - 10:18

**Attempt** - 30:2
**Attempts** - 10:19, 10:20
**Attention** - 8:20, 10:25, 11:24, 12:8
**Attorney's** - 5:2
**Attributed** - 30:2
**Autopsies** - 13:12, 14:13
**Autopsy** - 4:21, 4:25, 5:22, 5:25, 6:3, 6:5, 6:12, 7:13, 22:25, 23:14, 23:15, 30:5

| B |
|---|

**Backs** - 30:16
**Backward** - 26:13, 34:9
**Barbell** - 26:17
**Baseball** - 18:3, 26:17
**Based** - 28:19
**Bat** - 18:3, 26:17
**Bates** - 24:24, 35:5
**Bello** - 3:20, 3:21, 4:5, 10:24, 12:7, 17:11, 29:25, 34:20, 35:12, 36:11
**Below** - 16:5
**Biomechanics** - 22:3
**Bit** - 4:6
**Bleeding** - 9:11, 11:4, 12:18, 13:3, 39:9
**Blood** - 9:7, 35:23
**Blow** - 26:8
**Body** - 4:20, 5:9, 7:11, 8:18, 15:1, 18:15, 21:5, 32:5, 33:8, 34:22, 35:24, 36:18
**Bone** - 16:7, 16:12, 19:22
**Bones** - 22:11, 26:24
**Both** - 24:8, 30:13
**Bottom** - 35:16
**Brain** - 13:4, 34:4, 39:9, 40:4
**Brakes** - 15:4
**Break** - 20:24, 21:23
**Breaks** - 38:21
**Broken** - 19:21, 22:11, 26:24, 31:11, 39:2
**Brows** - 32:6
**Bruise** - 36:1
**Bruises** - 10:16, 30:1, 30:19
**Bruising** - 22:7, 30:16, 32:2, 34:4, 38:17, 39:1, 39:12
**Bumper** - 15:22, 15:24, 16:2, 16:3, 20:3, 20:16

| C |
|---|

**Cage** - 35:15
**Called** - 27:17
**Can't** - 11:11, 22:4, 28:11

**Canton** - 30:6
**Car** - 14:18, 15:3, 15:22, 15:23, 15:25, 16:1, 16:3, 20:10, 20:11, 22:4
**Career** - 14:14, 27:24
**Case** - 3:8, 3:13, 3:17, 5:3, 5:6, 5:10, 5:11, 5:21, 6:10, 15:11, 20:14, 30:10, 38:16
**Cases** - 14:7, 27:24
**Category** - 17:19
**Catheter** - 30:11
**Cause** - 4:24, 5:24, 5:25, 9:24, 10:2, 10:7, 16:15, 17:2, 17:3, 22:20, 40:3
**Caused** - 16:15, 25:6, 27:2, 28:21, 39:10
**Causing** - 9:10, 21:21
**Central** - 30:14
**Certain** - 6:22, 33:16, 37:6, 37:7, 38:13
**Certainly** - 25:24
**Certainty** - 17:1
**Certificate** - 7:2
**Certify** - 5:23
**Cervical** - 9:2
**Chest** - 9:1, 18:21
**Circle** - 26:22
**Circumstances** - 5:5, 5:17, 37:6, 37:7
**Cite** - 25:1
**Classic** - 12:12, 14:9, 14:11
**Claw** - 28:4
**Claws** - 18:9, 18:10
**Cleaned** - 23:16, 23:18
**CLERK** - 3:4
**Closer** - 11:2
**Clusters** - 27:15
**Coerced** - 6:21
**Collar** - 9:2
**Collision** - 13:24, 14:8, 14:12, 14:22, 20:6
**Collisions** - 14:14
**Come** - 6:8, 6:22, 15:5, 16:25
**Comes** - 5:7
**Coming** - 37:3
**Commences** - 21:16, 29:9, 32:19, 40:21
**Commonwealth** - 3:4, 7:16, 40:11
**Communication** - 4:19
**Concerned** - 14:12
**Concerning** - 37:14
**Concrete** - 26:14, 37:23, 38:8
**Conducted** - 4:10, 13:13, 14:13, 16:24
**Conducting** - 30:5

**Confluent** - 27:7
**Connection** - 23:13
**Consciousness** - 34:9
**Consider** - 16:19
**Consisted** - 6:20
**Consistent** - 13:21, 13:23, 14:3, 14:7, 24:22, 30:17, 32:3, 32:9, 32:13, 37:24, 38:7, 38:10, 39:5, 39:20
**Contact** - 5:9, 37:4
**Context** - 22:22
**Contribute** - 10:7
**Contributing** - 10:4
**Contributory** - 10:2
**Controlled** - 5:1
**Contusion** - 10:17, 31:2, 31:25
**Contusions** - 10:16, 17:19, 26:24, 31:23, 32:7
**Conversation** - 6:20, 6:21
**Convincing** - 7:3
**Correctly** - 33:7
**Counsel** - 3:2, 3:5
**Course** - 14:14, 30:5
**Court's** - 8:11
**Covers** - 27:22
**CPR** - 18:22, 19:22, 20:1
**Crest** - 35:16
**Cross** - 17:7, 17:9, 38:5
**Current** - 9:14
**Cuts** - 11:9, 38:19

| D |
|---|

**Day** - 6:3, 6:11
**Days** - 6:4, 6:11
**Death** - 4:15, 4:24, 4:25, 5:5, 5:24, 5:25, 7:2, 9:25, 10:2, 10:4, 10:7, 17:2, 17:3, 22:20
**Deceased** - 35:24
**Decedent** - 5:1
**Defect** - 12:11
**Defects** - 10:18
**Defendant** - 3:2
**Defendant's** - 15:11
**Defending** - 38:20
**Defense** - 40:14
**Defensive** - 30:17, 32:3, 38:14, 38:15
**Defibrillator** - 9:1
**Degree** - 17:1
**Demonstrating** - 21:9
**Department** - 30:6
**Dependent** - 35:23
**Depicted** - 33:6
**Describe** - 4:18, 5:4, 24:6, 27:1, 35:22
**Described** - 9:8, 9:18, 10:5, 11:20, 22:17, 25:11,

26:3, 39:19
**Determination** - 6:22, 9:24
**Determine** - 4:24, 5:24, 6:13, 7:4
**Diagnosis** - 5:15
**Didn't** - 20:14, 31:6, 31:8
**Died** - 22:22
**Different** - 14:13, 39:8, 39:14
**Differently** - 13:18, 20:25
**Discoloration** - 9:6, 11:3, 11:5, 11:18, 12:2
**Discovered** - 33:9
**Discrete** - 27:2, 27:5, 27:20, 28:6
**Discussing** - 3:8
**Disparity** - 14:17
**Display** - 35:7
**Distinct** - 30:19
**District** - 5:1
**Document** - 9:20
**Documented** - 6:17
**Doesn't** - 28:1
**Don't** - 22:2, 24:16, 28:20, 33:5, 39:19, 40:19
**Dorsal** - 10:14
**Dorsum** - 10:14
**Dr** - 3:20, 10:24, 12:7, 17:11, 29:25, 34:20, 35:12, 36:11
**Dragged** - 26:1
**Dragging** - 37:12, 37:15
**Dripping** - 9:7
**Due** - 10:19, 17:3, 34:4
**Dumbbell** - 18:5

E

**Each** - 14:16, 27:6
**Earlier** - 20:2, 24:4, 25:15, 28:19, 30:20
**Ecchymoses** - 40:1
**Ecchymosis** - 9:8, 11:3, 13:6, 24:8
**Egg** - 32:7
**EMS** - 30:6
**Enforcement** - 32:24
**Everyone** - 3:11, 3:15, 3:19
**Evidence** - 7:3
**EXAMINATION** - 4:1, 4:10, 4:21, 15:15, 16:23, 17:7, 17:9, 25:1, 29:25, 31:6, 32:23, 35:13, 36:9, 38:5
**Examinations** - 13:12
**Examine** - 22:5
**Examiner** - 23:4
**Examiner's** - 4:23
**Example** - 17:25, 27:19

**Exhibits** - 34:15
**Exits** - 40:9
**Expect** - 38:15, 38:17
**Experience** - 13:11
**Expert** - 22:2, 22:3, 34:7
**Explain** - 5:4, 39:25
**External** - 4:9, 16:23
**Extremities** - 15:25
**Extremity** - 20:13
**Eye** - 9:7, 11:4, 11:5, 24:13, 31:15, 32:7
**Eyelid** - 9:6, 11:6, 12:2, 22:15, 24:9
**Eyes** - 11:16, 13:7, 24:8

F

**Face** - 11:3, 12:2, 18:12, 22:14, 23:15, 23:18, 24:7, 24:10, 24:21, 25:9, 33:22, 33:25, 34:8, 36:21
**Faces** - 36:17
**Facial** - 24:3, 25:11
**Factors** - 10:4, 14:25, 15:4
**Fall** - 13:21, 34:4, 34:9, 37:3, 39:20, 40:3
**Fallen** - 33:25
**Falling** - 26:13
**Feel** - 5:8, 6:21
**Feet** - 19:19, 20:22, 21:22
**Femoral** - 30:14
**Fight** - 31:7, 31:12
**Finalize** - 6:10
**Find** - 23:5
**Fine** - 31:12
**Fingernails** - 31:8, 31:11, 38:21
**Fingers** - 39:2
**Fire** - 30:6, 33:8, 33:10
**First** - 8:24, 29:15
**Five** - 7:7
**Flagpole** - 33:10
**Fluid** - 30:3
**Fluids** - 30:10
**Follow** - 3:7, 3:12
**Following** - 6:5
**Footprints** - 32:24
**Force** - 16:14, 16:19, 24:11, 25:6, 26:4, 26:5, 26:20, 28:3
**Forearm** - 9:5, 9:18
**Forearms** - 38:18
**Form** - 14:20, 38:24
**Formerly** - 9:15
**Forward** - 6:8
**Found** - 5:1
**Four** - 30:19, 30:23, 30:24
**Fracture** - 13:20, 16:15, 19:25, 39:12
**Fractured** - 31:11

**Fractures** - 13:3, 17:20, 22:9, 26:24, 31:9, 33:12, 38:22, 39:9, 39:24
**Front** - 25:2, 33:9, 33:22
**Frozen** - 13:14, 37:25, 38:11
**Further** - 13:6, 17:6, 36:5, 40:5, 40:6
**Furtherance** - 22:24

G

**Gaining** - 10:19
**Gave** - 7:8, 8:13, 17:25
**Geared** - 39:22
**Gears** - 32:22
**General** - 4:18
**German** - 18:9
**Get** - 5:12, 25:24, 30:2, 34:8
**Gilman** - 8:15, 9:12, 10:8, 10:22, 11:22, 12:5, 12:15, 35:5, 35:7
**Give** - 21:7
**Glass** - 14:3, 37:5
**Go** - 39:11
**Going** - 9:3, 40:16
**Good** - 3:5, 3:6, 3:22, 3:24, 4:3, 4:4, 11:19, 17:11, 17:12, 30:7
**Grand** - 34:3
**Ground** - 13:14, 13:15, 13:21, 13:25, 16:3, 18:7, 26:1, 26:9, 37:20, 37:22, 37:25, 38:11
**Groups** - 27:15

H

**Hand** - 10:13, 10:14, 29:4, 30:2, 30:3, 30:21, 31:1, 31:2, 31:23, 31:25, 39:4
**Hands** - 30:16, 31:9, 31:11, 32:3, 32:8, 38:22
**Hard** - 34:8, 34:20
**Hear** - 3:16, 11:11
**Height** - 15:19, 15:23, 20:11, 20:15
**Hemorrhage** - 40:1
**Higher** - 16:1, 16:2, 20:3
**Hips** - 19:5
**Hitting** - 37:20, 37:22, 37:23
**Hospital** - 7:12, 9:4, 30:7, 30:12, 30:14
**Hour** - 20:21, 21:3, 21:10, 21:21, 22:1, 28:8, 28:16
**House** - 5:5, 33:9
**Hydrant** - 33:8, 33:10
**Hypothermia** - 5:16, 10:4, 17:4

**Hypothetical** - 21:7

I

**I'd** - 22:13, 26:22, 35:3
**Identification** - 29:16, 29:23
**I'll** - 15:17, 20:9, 26:12, 34:11, 38:3
**I'm** - 7:7, 22:2, 23:17, 29:2, 38:1, 39:22, 40:16
**Impact** - 12:12, 17:3, 17:16, 17:18, 18:12, 33:13, 33:17, 33:18, 37:3, 37:23, 39:5, 39:6, 39:23, 40:3
**Impacts** - 33:19, 37:18
**Important** - 22:21
**Impounded** - 21:17, 29:10, 32:20, 40:22
**Inconsistent** - 20:20, 21:2, 21:11, 21:20, 21:25, 28:7
**Indicated** - 16:7, 28:19, 29:25, 32:22
**Indicating** - 30:9
**Injury** - 12:12, 13:2, 18:18, 21:24, 23:5, 26:4, 26:7, 26:13, 27:6, 31:1, 31:25, 33:25, 36:3
**Inspected** - 22:3
**Instruction** - 8:13
**Instructions** - 3:8, 3:12
**Intact** - 31:8
**Interacted** - 14:17
**Internal** - 4:9, 16:23, 25:1
**Interpreting** - 22:21
**Intervention** - 8:25
**Intraosseous** - 30:13
**Introduce** - 7:16
**Intubated** - 9:3
**Investigating** - 4:15, 4:20, 5:9, 6:1
**Investigation** - 3:13, 5:3
**Investigations** - 6:4
**Investigative** - 4:14
**IRINI** - 3:21
**Irregular** - 26:19
**Isn't** - 31:12
**Isolated** - 37:15
**Issue** - 6:12
**It's** - 9:15, 11:21, 12:11, 14:1, 14:5, 21:4, 26:2, 26:15, 26:18, 29:4, 29:16, 33:9, 34:12, 34:20, 35:3, 35:11, 36:3
**IV** - 10:19, 30:3, 30:10

J

**JACKSON** - 29:12, 34:24,

35:1, 40:14, 40:18
**Jaw** - 25:9
**John** - 17:2, 18:11, 20:19, 21:1, 21:19, 21:24, 22:5, 22:13
**Jurors** - 3:6, 8:13
**Jurors'** - 10:25, 11:24, 12:8
**Jury** - 3:3, 3:10, 3:14, 3:18, 8:12, 34:3, 35:22
**Jury's** - 8:20

### K

**Karen** - 3:4
**Knee** - 16:4, 20:18, 36:12, 36:14, 36:16
**Knees** - 19:13, 20:7
**Known** - 9:2
**Knuckles** - 39:1

### L

**Lacerations** - 11:9, 17:19, 31:17, 38:19
**Lack** - 20:20, 21:1
**Large** - 17:19, 17:23, 26:17, 27:22, 27:23
**Larger** - 10:16
**Laser** - 8:19, 10:25, 11:23, 12:7
**Lastly** - 12:5
**Later** - 30:11
**Lateral** - 36:15, 36:17
**Leading** - 13:3, 13:6
**Left** - 3:9, 3:17, 11:5, 11:6, 11:20, 12:1, 12:2, 31:1, 31:2, 31:25
**Legs** - 15:21, 15:22
**Leg's** - 30:13
**Lethal** - 10:2
**Let's** - 16:4, 18:18, 21:7, 21:20
**Level** - 16:4
**Lights** - 12:16, 36:6
**Line** - 30:15
**Linear** - 11:19, 12:3, 27:2, 27:11, 27:20, 28:6
**Lines** - 30:13
**Lividity** - 35:20, 35:21, 35:22, 35:23, 36:1, 36:2
**Livor** - 35:19
**Look** - 15:18, 15:20, 28:1, 35:25
**Looked** - 12:22
**Looking** - 15:25
**Lose** - 34:8
**Lot** - 15:4
**Louder** - 11:12
**Low** - 16:3
**Lower** - 15:25, 20:12

### M

**Majority** - 15:21
**Make** - 8:7
**Manifest** - 24:16
**Manifested** - 39:18
**Many** - 10:20, 14:25
**Mark** - 29:5, 29:15, 29:16
**Marked** - 7:21, 7:23, 7:25, 8:2, 8:4, 9:15, 23:24, 27:9, 29:22, 34:16, 35:3
**Massachusetts** - 4:22
**Material** - 4:11, 4:13
**Materials** - 16:25
**Means** - 27:6
**Medical** - 4:23, 8:24, 17:1, 23:4, 34:7
**Meshed** - 27:7
**Metal** - 14:4
**Microphone** - 18:1
**Miles** - 20:21, 21:3, 21:10, 21:21, 22:1, 28:8, 28:16
**Minor** - 20:17, 36:11
**Mirror** - 14:16
**Months** - 6:11
**Morning** - 3:5, 3:6, 3:23, 3:24, 4:3, 4:4, 17:11, 17:12
**Motor** - 15:20
**Move** - 23:20, 40:14
**Moving** - 15:2
**Much** - 3:20, 8:6, 16:1, 16:2, 40:8
**Multiple** - 22:17, 31:17, 31:19, 33:11, 33:19, 33:22, 38:17

### N

**Near** - 37:10
**Necessary** - 16:15
**Neck** - 9:3, 18:15, 18:17, 19:21
**Needed** - 5:23
**Ninety** - 6:11
**NNN** - 29:22
**Nose** - 11:16, 11:18, 11:20, 12:3, 12:4, 22:17, 24:9, 24:14, 31:17, 31:18, 31:19, 32:7
**Notate** - 23:5
**Note** - 11:1, 15:25
**Noted** - 10:5, 31:15, 31:23
**Notes** - 25:1
**Notice** - 8:24, 31:17

### O

**Object** - 13:8, 13:9, 13:10, 13:13, 13:24, 17:22, 18:1, 26:9, 26:17, 27:3, 37:4, 37:5, 37:8, 39:5

**Objects** - 17:23, 28:4
**Object's** - 13:1
**Observable** - 31:12
**Observe** - 31:8, 34:21, 36:11
**Observed** - 8:21, 10:3, 11:25, 12:9, 13:19, 14:2, 14:6, 14:7, 14:10, 16:16, 22:7, 24:7, 34:22, 40:2
**Occasion** - 15:9
**Offer** - 22:4
**Office** - 4:23, 5:2, 5:3
**O'keefe** - 4:10, 5:12, 8:18, 9:25, 11:16, 15:24, 16:24, 17:2, 18:11, 22:14, 25:12, 33:11, 33:21, 39:18
**One** - 7:12, 10:16, 12:19, 15:19, 18:18, 23:4, 25:14, 27:6, 30:1, 30:20, 30:23, 32:6, 34:13, 35:6, 36:24, 37:15, 37:19, 40:18, 40:19
**Ones** - 10:17
**Open** - 26:3
**Opined** - 25:21
**Opinion** - 17:1, 22:4, 34:7, 39:9, 39:11, 39:17
**Opposed** - 10:15, 27:6
**Orbital** - 9:8, 24:8
**Order** - 5:23
**Originally** - 6:6
**Originate** - 24:19
**Originating** - 33:12
**Overruled** - 16:18

### P

**Pads** - 9:1
**Palm** - 10:15
**Pattern** - 9:19, 9:20, 27:17
**Pedestrian** - 13:24, 14:8, 14:9, 14:12, 14:13, 14:22, 15:1, 15:7, 15:20, 20:6
**Pelvis** - 19:7, 20:15
**People** - 15:20
**People's** - 35:4
**Permission** - 8:12, 24:1, 29:13, 34:17
**Person** - 14:17, 15:1, 21:8, 22:22, 23:5, 38:19
**Personally** - 22:3
**Photographed** - 10:6
**Photographs** - 7:7, 7:11, 8:14, 15:9, 15:10, 15:12, 32:23, 33:4, 33:6, 34:23
**Photos** - 10:10
**Physical** - 32:9, 32:13
**Picture** - 8:18, 9:4, 9:17, 11:19, 34:21
**Piece** - 14:3, 14:4, 37:7
**Pinpoint** - 10:18
**Place** - 4:25

**Plastic** - 14:4, 37:7
**Play** - 9:24, 15:5
**Pointer** - 8:19, 10:25, 11:24, 12:8
**Police** - 4:14, 5:2, 5:4, 5:7, 6:16
**Pooling** - 35:23
**Position** - 14:25, 21:5, 26:14, 38:20
**Possibilities** - 36:24, 37:2, 37:19, 39:8, 39:16
**Possibility** - 13:14, 24:23, 25:10, 37:5, 37:8, 38:14
**Posterior** - 9:18, 38:18
**Potential** - 15:18
**Potentially** - 30:2
**Pound** - 20:21
**Present** - 3:2, 9:10, 10:5
**Presented** - 5:21, 6:7, 28:20, 34:23
**Presents** - 32:5
**Pressured** - 6:21
**Previously** - 27:9, 34:18, 35:3, 39:20
**Prior** - 9:3
**Proceedings** - 21:17, 29:10, 32:20, 40:22
**Proctor** - 6:17, 33:2
**Projected** - 13:23, 20:22, 21:22
**Prominent** - 12:19, 12:21, 12:23
**Provided** - 6:12, 33:2
**Publish** - 8:12, 24:1, 27:8, 29:14, 29:19, 34:17
**Published** - 29:20
**Punch** - 25:8, 36:21
**Punched** - 24:22, 34:8

### Q

**Quantify** - 16:20

### R

**Radiating** - 39:24
**Ragged** - 12:11
**Range** - 17:23
**Rash** - 27:19, 27:22, 27:24
**Reach** - 5:12, 5:13, 5:20, 6:1
**Reached** - 5:21, 6:5
**Ready** - 3:22, 6:10
**Rear** - 21:9, 28:7, 28:15
**Reasonable** - 17:1
**Reasonably** - 33:16
**Reasons** - 23:4
**Receive** - 4:11
**Received** - 4:8
**Recognize** - 7:8, 7:10,

7:11, 8:16, 9:16, 10:11, 23:11, 29:3
**Reconstruction** - 22:2
**Records** - 30:6, 30:9
**REDIRECT** - 36:9
**Redness** - 34:21, 35:15
**Referred** - 17:16
**Refrain** - 3:8, 3:12
**Regards** - 16:12
**Regular** - 20:3
**Relation** - 4:20, 5:14, 13:2, 15:10
**Report** - 5:7, 5:8, 6:12, 9:18
**Reports** - 5:4
**Request** - 5:4
**Requested** - 40:24
**Research** - 3:13
**Respect** - 39:4
**Response** - 6:24, 7:1
**Responsible** - 4:23, 7:1
**Rests** - 40:12
**Result** - 24:11, 26:5, 26:13, 26:16, 27:20, 33:17, 36:3, 37:18
**Resulted** - 26:20
**Resuscitation** - 10:20
**Returning** - 10:10
**Reviewed** - 4:11, 16:25, 30:6, 32:23
**Reviewing** - 30:9
**Rib** - 35:15
**Ribs** - 18:25, 34:22
**Road** - 27:19, 27:22, 27:24
**Role** - 4:23, 9:23

### S

**Samaritan** - 30:7
**Saw** - 25:15
**Scalp** - 12:19, 12:20
**Scenario** - 21:11
**Scene** - 4:25
**Scordi** - 3:20, 3:21, 4:5, 10:24, 12:7, 17:11, 29:25, 34:20, 35:12, 36:11
**Scrape** - 12:13
**Scratched** - 25:18, 25:25
**Scratches** - 14:3, 28:21
**Screen** - 8:17, 9:16, 10:11
**Second** - 18:14, 32:22
**Sedan** - 16:2, 20:3
**Seek** - 7:16
**Seen** - 15:10, 15:12, 27:23, 38:17, 38:19, 40:4
**Separate** - 30:19
**Session** - 3:1
**Set** - 12:5, 29:19, 40:7
**Severe** - 22:20
**Shape** - 15:6, 15:13

**Sharp** - 26:5
**Shepherd's** - 18:9
**Shifting** - 32:22
**Shins** - 19:15, 30:13
**Shook** - 3:19
**Shoulders** - 18:19
**Show** - 23:8, 23:10, 35:3
**Showed** - 32:24
**Showing** - 7:7
**Shown** - 35:12
**Side** - 11:20, 12:1, 12:19, 12:20, 12:23, 20:17, 36:15, 36:17
**Sidebar** - 21:16, 21:18, 29:9, 29:11, 32:19, 32:21, 40:20, 40:21, 40:23
**Significance** - 8:21, 11:1, 11:25, 12:9, 15:14, 16:13
**Significant** - 16:19, 18:16, 18:17, 22:7, 25:12, 26:24, 28:21
**Signs** - 31:7, 31:12
**Similarly** - 17:22
**Single** - 19:21, 19:25, 23:5, 33:13, 33:17, 33:18, 39:23, 40:3
**Size** - 15:13, 15:23
**Skin** - 10:1, 25:17, 27:23
**Skull** - 13:20, 16:7, 16:12, 33:12, 39:8, 39:12, 39:24, 40:4
**Slight** - 11:4
**Slightly** - 11:2, 16:4, 16:5
**Small** - 9:9, 10:17, 10:18, 11:8, 12:4, 23:2, 24:8, 36:20
**Smaller** - 11:15
**Smooth** - 28:7, 28:13, 28:15
**Snow** - 32:24, 37:4
**Speed** - 15:3, 20:10
**Spin** - 21:22
**Stabilization** - 9:2
**Standing** - 15:2, 21:8, 26:14
**Start** - 21:20
**State** - 4:14, 5:2, 6:16, 34:3
**Sternum** - 18:24, 18:25
**Stop** - 40:16
**Strikes** - 15:7
**Striking** - 13:24, 37:25, 38:7, 38:10
**Struck** - 15:1, 15:20, 20:20, 21:2, 21:9, 21:21, 21:25, 26:16, 28:7
**Subarachnoid** - 40:1
**Subdural** - 39:25
**Subscapular** - 12:18
**Suffered** - 33:21, 33:24

**Superficial** - 10:1
**Supraorbital** - 9:8
**Surely** - 20:19
**Surrounding** - 6:7
**Sustained** - 5:19, 14:20, 16:11, 20:24, 21:13, 28:18, 32:12, 32:16, 33:25, 38:24, 39:17
**Sworn** - 3:21

### T

**Taillight** - 16:2, 21:9, 28:8, 28:15
**Taking** - 18:15
**Taught** - 22:24
**Terms** - 4:18
**Testimony** - 4:8, 5:15, 11:15, 16:6, 32:25, 40:24
**Thanks** - 12:16
**That's** - 9:7, 9:10, 15:8, 16:3, 19:24, 23:4, 24:13, 25:10, 26:4, 30:18, 31:14, 36:1, 36:24
**Thereof** - 20:20, 21:2
**There's** - 8:25, 10:16, 11:5, 11:19, 15:4, 34:21
**These** - 7:11, 7:12, 8:12, 8:14, 9:22, 10:1, 10:5, 22:19, 24:3, 27:11, 27:14, 28:6, 32:8
**They're** - 8:7, 10:2, 10:5, 10:6, 14:9
**Thick** - 16:7
**Thickness** - 16:12
**Thighs** - 19:9, 19:11, 20:15
**Three** - 3:7, 6:11, 30:22, 30:23
**Tibia** - 30:11
**Time** - 6:4, 6:10, 7:13, 9:15, 18:18, 21:4, 23:15
**Tone** - 6:20
**Tongue** - 25:1, 25:2, 25:5, 31:21, 32:8
**Torso** - 19:1
**Towards** - 12:4, 39:23
**Training** - 13:11
**Transferred** - 29:17
**Trauma** - 10:3, 24:11, 25:6, 26:5, 26:20, 28:3, 33:24
**Trooper** - 6:17, 33:2
**Turning** - 4:6
**Twice** - 6:18
**Two** - 10:4, 10:16, 10:17, 22:18, 24:13, 30:23
**Types** - 38:15
**Typical** - 4:17, 12:12, 37:15, 37:17
**Typically** - 4:19, 27:22

### U

**Ultimate** - 22:19
**Unless** - 7:2
**Unlikely** - 21:4
**Unwitnessed** - 6:1
**Upper** - 9:6, 9:18, 22:15
**Using** - 8:19, 10:24, 11:23, 12:7

### V

**Vague** - 31:2
**Vehicle** - 15:7, 15:11, 15:13, 15:18, 15:20, 20:21, 21:3, 21:5, 21:10, 21:21, 21:25
**Versus** - 3:4, 12:20
**Victim's** - 25:2, 25:9
**Video** - 6:7
**View** - 11:2, 12:1
**Visible** - 11:9, 11:17
**Voice** - 17:13

### W

**Watch** - 14:20, 38:24
**Weeks** - 6:5
**We'll** - 18:14, 29:15
**We're** - 9:9
**We've** - 27:23
**What's** - 8:16, 9:1, 9:10, 9:16, 10:11, 27:8, 34:17
**Whatsoever** - 18:18, 18:21
**Whereupon** - 7:21, 7:23, 7:25, 8:2, 8:4, 23:24, 29:22
**Will** - 5:2, 29:17, 40:19
**WITNESS** - 3:24, 23:18, 28:11, 28:13, 40:9
**Witnessed** - 6:9
**Words** - 26:19, 33:24
**Wound** - 26:3
**Wounds** - 27:1, 27:11, 27:20, 30:17, 32:3, 38:13, 38:14, 38:15

### Y

**Years** - 13:13
**Yesterday** - 3:9, 3:17, 4:7, 4:8, 5:15, 7:8, 8:14, 8:23, 8:25, 11:8, 11:15, 12:18, 13:1, 16:6, 17:25, 30:25
**You'd** - 18:11, 20:19, 22:20, 24:16, 25:5, 26:7, 27:19, 30:16
**You're** - 3:22, 27:11
**You've** - 14:12, 22:24, 28:19, 37:19

| 1 |
|---|

**19 -** 27:9, 34:18

| 2 |
|---|

**22-117 -** 3:4
**24 -** 20:21, 21:3, 21:10,
21:21, 21:25, 28:8, 28:16
**2853 -** 8:16, 35:11
**2857 -** 9:13
**286 -** 10:9
**2865 -** 10:23
**2877 -** 11:22

| 3 |
|---|

**30 -** 20:22, 21:22

| 4 |
|---|

**442 -** 9:15

| 6 |
|---|

**645 -** 7:21
**646 -** 7:23
**647 -** 7:25
**648 -** 8:2, 35:4, 35:8
**649 -** 8:4
**650 -** 23:24

| 7 |
|---|

**7,000 -** 20:21

| 9 |
|---|

**9:05 -** 3:1
**9488 -** 12:6