# ATTACHMENT 3

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                              SUPERIOR COURT DEPARTMENT
                                         OF THE TRIAL COURT

* * * * * * * * * * * * * * * * * * *
                                    *
COMMONWEALTH OF MASSACHUSETTS,      *
                                    *
v.                                  * Docket No. 2282CR00117
                                    *
KAREN READ.                         *
                                    *
* * * * * * * * * * * * * * * * * * *

                BEFORE THE HONORABLE BEVERLY CANNONE
                MONDAY JUNE 17, 2024
                TESTIMONY OF IAN WHIFFIN

APPEARANCES:

For the Commonwealth:
     BY:  ADAM LALLY, A.D.A.
          LAURA MCLAUGHLIN, A.D.A.

For the defendant:
     BY:  DAVID YANNETTI, ESQ.
          ALAN JACKSON, ESQ.
          ELIZABETH LITTLE, ESQ.

                    Dedham, Massachusetts
                    Room 25


Christine D. Blankenship, CVR
Court Reporter/Transcriber

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ian Whiffin | | | | |
| (By Mr. Lally) | 3 | | 75 | |
| (By Mr. Yannetti) | | 68 | | 77 |

Exhibits:

614-626    Charts

(Court in session.)

(Defendant is present with counsel.)

(Testimony commences.)

                    IAN WHIFFIN, affirmed

    THE COURT:  Whenever you're ready. Mr. Lally.

**DIRECT EXAMINATION**

**BY MR. LALLY:**

Q    Good afternoon, sir.

A    Good afternoon.

Q    And if it's at all helpful, that microphone before you is adjustable. You can put it in any direction you wish. Just try to keep your voice up, okay, sir?

A    Thank you.

Q    Now, sir, could you please state your name and spell your last name for the jury?

A    Yes. It's Ian Whiffin.  So I-A-N, W-H-I-F-F-I-N.

Q    And what is it that you do for work, sir?

A    I'm currently the coding product manager at Cellebrite.

Q    And what is Cellebrite?

A    Cellebrite is one of the world leaders in mobile forensics software.

Q    And when you say forensic software, can you explain to the jury a little bit about sort of what is forensic software and how it's used, specifically your Cellebrite?

A    Yes. So forensic software is used to gain access to

1-4

people's devices, cell phones, primarily to extract that data and to allow examiners to pass and decode that data to make sense of it in a more user-friendly way so that a report can be created for investigators.

Q    Now, sir, if I could ask you just a few questions, going back to some of your educational and prior work experience. With regard starting sort of with your undergraduate work, what, if any -- where did you go to school and what, if any, degree did you receive?

A    Okay. I didn't get a degree. I'm originally from the UK, where I did qualifications in computing, the Higher National Certificate in computing, and then joined the police in 2004.

Q    And what department was that, sir?

A    That was response work. So South Yorkshire Police as a response officer.

Q    And where did you go from there?

A    In 2009, I immigrated to Canada, where I was able to continue policing with the Calgary Police Service, where I spent approximately four, five years, again, working patrol before moving to the digital forensics team of Calgary Police.

Q    And with respect to moving to that digital forensics team, what if any specialized training did you receive in regard to that area?

A    So once I had made it into the digital forensics, I was sent to Ottawa for three weeks to do a foundational computer forensics course covering all manner of digital forensics to begin with. Throughout my eight years with Calgary Police, I did constant courses each year to keep information updated, including a two-week course again at the Canadian Police College in Ottawa, specifically about cell phone forensics. And then also during that time, additional courses for extracting data, for interpreting Internet artifacts or any other kind of information found on a phone or computer.

Q    And following that, where did -- where did you go from there, sir?

A    In 2020, I left Calgary Police Service and began working at Cellebrite as the senior digital intelligence expert, where I would use my knowledge of the forensic community to assist the developers with creating and maintaining a program that examiners would want to use.

And finally, about two years ago, I moved to the decoding product manager position.

Q    Can you explain to the jury, sort of what it is, what your role is, and what is it that you do for Cellebrite?

A    Yep.  So right now, in the position I'm in, again, I use my knowledge of the digital forensics landscape in the community. I talk with users about their daily challenges,

1-6

what applications are causing them problems, what they need to get access to, what they need to understand, and I take that information, create a priority list, and then determine, with our developers, what we will tackle, how we will tackle it, and how it will appear to the end user.

Q    Now with regard to your education in this area, what if any certifications do you have?

A    No specific certifications.  I've done the Cellebrite coursework since joining Cellebrite, but other than the -- the two, sorry, the three-week course in Ottawa and then again, the two-week course in Ottawa.  I don't have the SANS training, or any of that kind of training certifications.

Q    And in addition to your work with Cellebrite, what if any other areas of the field have you -- have you worked?

A    Sorry. Could you rephrase that?

Q    Sure. Have you given any presentations? Have you published any work in relation to this area?

A    Yes. So since working as an examiner, I identified that there were times that I needed to pass artifacts from applications that the main vendors didn't support. In response to that, I would do my own research. That research turned into a selection of digital forensics tools, and I created a website for myself to share that research, to share those tools with the community.

And directly related to that, I have published articles related to accessing data on phones, related to SQL databases, related to various other artifacts, primarily locations.

Q    Over the course of your work, have you had occasion to testify in other courts in relation to this specific field?

A    Yes, related to digital forensics, I've testified approximately 20 times mainly in Canada, but also once in Michigan, once in Australia, once in the UK.

Q    Now, as far as questions that come into -- come into your company with relation to interpretation of data, other sort of general forensic questions, what parts of the world do these questions come in from, and how widely used is your product?

A    So the product is used globally. There are a slight number of countries that we don't tech support to, but generally, if a police service is interested in digital forensics, then they're using at least some of our tools.

We operate a -- an email address which is open to any user called "stump us", and the idea is that users, if they come across an artifact that they can't explain, they can email to myself and some of my colleagues, and we can research that artifact, and we can try and give them an answer as to say why the artifact is there and how it should be interpreted.

Q    You used the term in there as far as an artifact, if you could please explain to the jury sort of what your understanding of that term is and how it's used within your specific image.

A    Yeah, so I would refer to an artifact as essentially any piece of data which I've recovered from the phone which is of interest. It could be a web history visit. It could be a text message.  It could be a photograph, any piece of information.

Q    Now, sir, turning your attention to September of 2023. At some point in that month, were you contacted by the Norfolk District Attorney's Office and the state police in regard to this case?

A    Eventually, yes.  Initially, I was contacted by a member of Cellebrite.

Q    And if you know, why was that initial as far as the initial contact or initial request from Cellebrite, can you speak about that?

A    My understanding was there was an artifact found on a device, and people were looking for an explanation as to how this particular time stamp was relevant to the case.

Q    Now, if you could explain to the jury, sort of what you -- what were you provided and what were you asked to look at?

A    So the original question is just basically how can we

explain this 227 time stamp. I spoke to my colleague and requested if he could contact the investigators and any information that they could share about where this particular time stamp was found so that I could investigate it. I was advised at that time that the case had already been uploaded to our own support network, so the full extraction of the device in question was already in Cellebrite's possession, and I was able to access it from there and start to examine what the issue was that was causing confusion.

Q   Now, with reference to this issue, can you describe to the jury just in general terms sort of what this issue was?

A   Yeah. So the issue as I was led to believe, is there was a time stamp for a web history artifact of 2:27 and 40 seconds a.m. local time, which would be UTC five, and it didn't make sense to the investigators. And the question was, is there any other interpretation for what this time stamp could mean.

Q   And so essentially, you were asked to explain the time stamp and how it came to be, correct?

A   Correct.

Q   And as far as this particular issue, has this risen in other instances? Have you been asked the same question or similar questions in regard to this type of artifact?

A   Yeah, several weeks later, so probably around December

1-10

time last year, I was contacted by a police investigator in Austria with a very similar question, but related to obviously a different Internet search. And about a week later, the defense expert in the same case also contacted me, asking the same question. The defense expert in that case was able to provide the database, and I was able to provide the answer.

Q    Now, as far as the full extraction, is that the entirety of what you looked at in this instance, or what, if anything else, were you provided with in regard to your view and your analysis in this case?

A    So I did work with the full extraction, but my interest was focused on just the web history artifacts.

Q    And what, if anything, did you find with regard to the web history artifacts?

A    So the 2:27:40 time stamp was correct insofar as that is the time that is shown within the database. It was indeed a deleted record, but the interesting thing was why the time stamp said 2:27:40.  And I did some testing on this and discovered the reason why 2:27:40 was actually listed in the database, even though that's not the time, in my opinion, that the search was conducted.

Q    And what is your opinion as to when the search was conducted?

A    There's plenty of other evidence on that extraction

that shows what activity was occurring at 2:27:40, and there's plenty of evidence later on in the day that shows that that particular search was conducted at 6:23 I believe 51 seconds, and then at a similar search at 6:24 and 18 seconds, I believe.

Q    And before we get to that --

MR. LALLY:  Your Honor, may I approach?

THE COURT:  Yes.

Q    Mr. Whiffin, I'm showing you a document and ask you to take a look at that and look up when you're done.

A    Yes.

Q    Do you recognize that, sir?

A    I do, yes.

Q    What do you recognize that to be?

A    This was the Internet history, the history.db database table, showing activity from the morning of the 29th of January, 2022.

MR. LALLY:  May I approach again, Your Honor?

THE COURT:  Yes.

MR. LALLY:  Commonwealth seeks to introduce this as the next exhibit.

MR. YANETTI:  No objection.

THE COURT:  Okay.

(Whereupon Exhibit No. 614, Chart, was marked as an exhibit.)

1-12

MR. LALLY:  Your Honor, may I return to the witness?

THE COURT:  Yes.

MR. LALLY:  Your Honor, if I may, may the report be published to the jury?

THE COURT:  Yes.

MR. LALLY:  Your Honor, may I approach just to retrieve?

THE COURT:  Yes.

Q    Now, Mr. Whiffin, do you recognize what's up on screen now as the exhibit you have before you?

A    I do, yes.

Q    And, Mr. Whiffin, there should be a laser point on the desk next to you. What I'm going to ask you to do is if you could using that laser point, explain to the jurors what we're looking at in this exhibit and what, if anything, of significance you observed within this exhibit.

A    Okay, of course. So this was a table I created based on the data from the phone. The first column shows the local time of the record that was written to the history database. This is a database which is tracking all web pages which are loaded as you use them.

The second column starts with the URL, so the Uniform Resource Locator, so what you would type in, or how the browser knows which website you want to visit.

The title is part of the website which is loaded. One

1-13

of the top attributes of the website will load the title.

Visit count relates to an internal counter within Safari, which just tracks how many times a particular website is visited in order to make suggestions to you down the road.

And then finally, the last column shows the source of this information. So history.db is the name of the database. History underscore visits is the name of the table, and then the number is the unique identifier which is assigned to that particular record in consecutive order. So every time you add a new record, that number will increase by one.

Q    And, Mr. Whiffin, a couple of foundational questions that I should have probably asked you first.  My apologies.

With respect to the cell phone extraction that you were provided, that was from an individual named Jennifer McCabe; is that correct?

A    That's my understanding, yes.

Q    And it's fair to say you don't know Jennifer McCabe, never met her, don't know anything about her?

A    Correct.

Q    And as far as an extraction is concerned, if you could please explain to the jury sort of what your understanding of that is, what is an extraction?

A    An extraction in this case, all of the files and

folders have been extracted from the device, saved on a computer in a zip file container. So essentially, in a way that is as close to the original from the device as possible.

Q    And again, what is your title specifically with Cellebrite?

A    It's decoding product manager at the moment.

Q    And so what if any relation does what you do have with relation to an extraction, and how that's --- what's sort of the relationship between what you do in a Cellebrite extraction?

A    So once the extractions been extracted, and we have the zip file, then Physical Analyzer is the tool that Cellebrite creates to allow examiners to look at that extracted data in a meaningful way. And my role is somewhat shaping how examiners will see that data when they open up Physical Analyzer and look at the extracted data.

Q    And how did your role play into that? What is it that you do that -- what, if any, relationship does what you do have to do with how examiners will view something from the Cellebrite tool?

A    Again, so after being an examiner for ten or eleven years, I've got that kind of understanding of how examiners work, being someone who also writes my own software and does my own research, then I can kind of cross that void

that usually exists between developers and examiners and help both parties try to come to a meaningful conclusion.

MR. LALLY:  Ms. Gilman, if you could shrink that just a little or zoom out a little.

Q    Now, again, Mr. Whiffin, if you could using that pointer direct the jurors' attention to what, if anything, of significance you observed in this particular case?

A    Yes, so the lower two records which are highlighted in green, are two records which occurred at 2:27 and 42 seconds local time, so two seconds after the Google search had allegedly been made.  And then the second record is five seconds after that at 2:27:47 seconds. Both those URLs relate to a website of hockomocksports.com.

Q    If you could explain to the jury, what is a contiguous identifier?

A    So every SQLite database will -- will assign a unique, contiguous identifier number. So again, the very first record created will be given a record ID of one, second record will be two, and so on and so forth. Those numbers are never reused. So if I was to delete record three, that record number will never be reused, and I can see that there's a gap and deleted data in that database.

Q    Now, you used another term in there as far as a SQLite database. If you could explain to the jury what your understanding of that term is based on your training and

experience?

A    Yeah, a SQLite database essentially, it's a series of tables. It's a way for data to be stored, again, in a meaningful, organized fashion that can be queried, can be examined, can be filtered, searched, et cetera. It can be useful for anybody who wants to get data from an organized file.

Q    Now, with reference to the searches that you observed within this particular web history, what, if any, relationship did the contiguous identifiers, sort of a range, what, if anything, did that cover?

A    I'm sorry.  Can you rephrase that?

Q    Sure. What if any observations did you make as far as those contiguous identifiers in the range they had in relation to the web history that you observed?

A    Okay.  So within the history.db file, there were no missing numbers from the beginning of January, essentially until early February. That told me as the examiner that no records have been deleted during that time.

        MR. LALLY:  May I approach again, Your Honor?

        THE COURT:  Yes.

Q    Do you recognize that, sir?

A    I do, yes.

Q    What do you recognize that to be?

A    This is the browser state record which identified a

search at 2:27:40 a.m.

MR. LALLY: May I approach again, Your Honor?

THE COURT: Yes.

MR. LALLY: Commonwealth would seek to introduce this as the next exhibit.

MR. YANETTI: We have no objection.

THE COURT: Okay.

(Whereupon Exhibit No. 615, Chart, was marked as an exhibit.)

MR. LALLY: May I return to the witness, Your Honor?

THE COURT: Yes.

MR. LALLY: And with the Court's permission, may we publish it to the jury?

THE COURT: Yes.

Q    Now, sir, directing your attention to the screen, is that what you have before you as the next exhibit?

A    It is, yes.

Q    And if you could explain to the jury while looking at this exhibit what, if any, information you're able to sort of glean as a forensic examiner.

A    Okay. So this is a searched item exhibit. It's technically a derivative of a different exhibit. that we find on the device. So we found what we consider a web history record. So a web history record would just mean we have a URL that was visited and potentially a time stamp

and a title.  Searched items looks at all of the web history items that we found and tries to identify were these actually searches that were conducted. So, for example, if you were to do a search on Google, you'd see that the website that you're taken to is Google.com, query, then it contains the query string that you've typed in.

We extract that information, we extract that query, and provide it to the user as a searched item. In this case, I can see that it came from the browser state dot DB WAL file.  The search query itself was "Hos long to die in cold," and it shows as a deleted record.

Q    Now, with respect -- I think you've used a couple of different terms within that as far as a knowledge C database. Can you explain to the jury what that is?

A    Don't recall saying the word C, but I can explain what most C is in this case.

Q    If you could.

A    Yes, the knowledge C database is at the heart of iOS. It stores lots of information about the activity on the device at any given time, things like when the backlights turned on, when the device is unlocked, what application is in focus at the time, and how long it's in focus for. And important to this case, which websites on screen at any given time as well.

Q    When you say when a website is in focus, can you

expound upon that as far as what exactly do you mean by when you say in focus?

A    So in terms of iOS itself, when it's in focus, it would be the primary item that's visible on screen. So with iOS, you can have applications in the background that you aren't using, but the one that you are currently using is considered in focus, taking up the entire screen.

Q    I believe you had used the term as far as a browser a state dB; is that correct?

A    Correct.

Q    And can you explain to the jury what you're understanding that term is and how it relates to this?

A    Browser state DB is just the name of the database, the name that Apple gave it. It's gone through some changes over the last few years. For example, in iOS 14, it did store the state of the tabs that were open within a browser. In iOS 15, there was a significant change, and the only time that records were written to the database is when the tab was closed. So a significant difference in that it doesn't show you what's currently open, it only shows you what's previously been closed.

Q    Now, this search here, what, if anything, did you observe as far as this record in relation to the history DB related to the search?

A    This record is not mentioned at all within the history

DB database.

Q    And what if any missing records from this time frame did you observe, either?

A    There were no missing records in the history.db database.  Within this time frame, within the browser state database, there were three deleted records.

Q    And when you say deleted records, as far as your Cellebrite's tool is concerned, what exactly does deleted mean?

A    These are records that have been deleted, not necessarily by the user, potentially by the system, but they are considered deleted records that we're able to recover.

Q    What are some of the ways that something might be deleted by the system, and which -- are you talking about the phone or are you talking about your tool?

A    The phone, right.  Our tool is designed as a forensic tool. It's not going to edit, delete, or affect the data in any way - just present what is in the extraction. But there are multiple times on an iOS device or an Android device where cleanup essentially happens, and we start to lose data after a certain amount of time.

Q    Now, with respect -- let me just ask it this for one moment.

With respect to Cellebrite as far as the tools, have

there been a variety of different versions of those tools as far as conducting that forensic extraction?

A    Yes.  So Cellebrite Physical Analyzer has been available for approximately 12, 13 years in various versions.

Q    And what if any differences are there, I mean, in general terms between, say, an old version versus a newer version?

A    Obviously, in the digital forensics landscape, whenever a provider creates a new feature, we have to change our code to adapt to what they've now introduced. There can be research that's been done, so we now learn new things, and we add support all the time.  So something can be supported in this new version of Physical Analyzer that may not have been supported or even existed in a previous version.

Q    Now, with respect to your work in this field, have there -- what if any tools have you designed and or created or something that to conduct this type of work?

A    Aside from Physical Analyzer?

Q    Yes.

A    Okay.  So I have my own tool called Artex, which I've been working on for around five years, since -- since being an examiner myself and struggling to pass any particular application that I needed. So I started to write my own tools, and that's the one that is -- one that I still

maintain on the side of my own time, partly for my own knowledge, but partly because I think it still introduces some fantastic features which aren't available in any other tool for research purposes. So, yeah, I continue to write this tool to this day.

THE COURT REPORTER:  And can you just say the name of the tool?

THE WITNESS:  Artex. A-R-T-E-X.

THE COURT REPORTER:  Thank you, sir.

Q    Now with regard to the situation depicted in the exhibit up on the screen, what are some of the reasons why this may occur, or this why -- why this may read as it does?

A    Sorry.  Is it deleted?

Q    Yes.

A    The record itself has been deleted. As I said, the reason why it's deleted through my testing, I've only found two ways that that kind of record can be deleted by the user, and I don't believe either of those ways was actually utilized on this device.

Q    And what are those two ways?

A    The user has the option to selectively delete history items.  So you can delete either one at a time or the entire day's content, or the last two days' content, or you can delete all content altogether. If all content had been

deleted, we wouldn't have found any information on this phone at all related to web history. So I was able to discount that one quite quickly.

Q    And I guess alluding to what you had just said, why is it that you don't believe that either of those two methods of user deletion occurred in this context?

MR. YANETTI:  Objection.  May we approach, please?

THE COURT:  I'm sorry?

MR. YANETTI:  I said, "Objection. May we approach, please?"

THE COURT:  Okay.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

MR. LALLY:  May I have one moment, Your Honor?

THE COURT:  Sure.

Q    Mr. Whiffin, moving on from that for a moment.

MR. LALLY:  May I approach the witness, Your Honor?

THE COURT:  Yes.

A    Thank you.

Q    That document I've just handed you, Mr. Whiffin, do you recognize that?

A    I do, yes.

Q    And what do you recognize that to be?

A    It's a document that highlights both the search terms

that were found in mobile Safari dot P list and the method of searching.

MR. LALLY: May I approach again, Your Honor?

THE COURT: Yes.

MR. LALLY: Commonwealth would seek to introduce as the next exhibit.

MR. YANETTI: No objection.

THE COURT: Okay.

(Whereupon Exhibit No. 616, Chart, was marked as an exhibit.)

MR. LALLY: May I return it to the witness, Your Honor?

THE COURT: Yes.

MR. LALLY: As well as may I publish it to the jury?

THE COURT: Okay.

Q    And, Mr. Whiffin, do you recognize what's up on the screen as the next exhibit?

A    I do, yes.

Q    We did view the term in there, I believe, called a P list; is that correct?

A    Correct.

Q    Can you explain to the jury what you understand that terms to mean and how it relates to what you're about to talk about on the screen?

A    Yeah, so a P list or a proxy list, is Apple's way of storing serialized data. That essentially means a list of

1-25

data with names and values.

Q    And so if you could again using that laser pointer, direct the jury's attention to -- explain sort of what we're looking and what you observed in this particular slide or table?

A    Yeah. So again, this is a table I created from the data within the mobile Safari dot P list. The term shown down the left is what the user would have typed in to the search bar that's -- sorry, I just blinded somebody -- the search bar in the bottom of the Safari browser window.  The UTC time is the time which is actually recorded within the P list. It's recorded as a string, so just text as it's presented on the screen there.  And then I converted that and subtracted five hours to bring it into local time around Canton.

Q    Now, aside from this, just for a moment, with regard to -- showing you what's termed as a private browser mode?

A    Yes.

Q    And can you explain to the jury what that is and how it relates to this?

A    Yeah, so private browsing mode is a setting that you can set on iOS devices or primarily most devices, that prevents any of your browsing activity being recorded, so that it won't save the searches, it won't save the navigations.  It protects everything so that it can't be

1-26

found later on.

Q    And what if any relation did that have to what you -- your analysis of the extraction in this case?

A    If these searches had been conducted while in private browsing mode, these searches would not exist within this file.

Q    So is it your opinion that they were not conducted in any kind of private browsing mode?

A    Correct.

Q    Now, are you also familiar with the term as far as failure to load?

A    Yes.

Q    Can you explain that to the jury and how that applies to this?

A    Yes. So obviously, whenever you try to visit a web page, there's a stream of information coming from the web to the device, which then renders onto the screen.  At the completion of the load event, there's a function effectively which runs and that records the visit to the history database.  If, for some reason, the page doesn't load and it shows up with an unable to load message, so, for example, you don't have an Internet connection at all, that unable to load will be recorded.  If, however, the device stalls and it just sits kind of waiting to load, nothing gets written to the history database. And if you

were to close the browsing window prior to the page completing its load event, nothing will be written to history.

Q    Would that be written to somewhere else within the phone as far as any other storage areas?

A    Technically, the only place I found would be the browser state.

Q    Now, with regard to the P list files.  Does the -- P list files take all sort of history items or no?

A    Primarily, it's used to save preferences.  So you'd have a lot of information in there, if it's using the light mode or dark mode, or when you want tabs to auto clear, that kind of information, but it also records several days' history of searches.  The actual number of days' searches, I actually don't know.

Q    And what if any relationship does that have with regard to the search bar that's located on the bottom of this table here?

A    In order for the search item to be saved to the mobile Safari P list, you need to actually type into this particular search bar. If you were to just visit Google.com and start typing into the Google search bar, it will not be recorded within the mobile Safari dot P list.

Q    And so what, if anything, were you able to determine about those two searches with regards to what you observed

here?

A    So these particular two searches were conducted at 6:23:51 and 6:24:18, respectively. They were searched using the search bar that's built into Safari.  The fact that they didn't exist within history DB, and that there were no deleted records from history.DB leads me to believe that they never successfully loaded.

        MR. LALLY:  May I approach again, Your Honor?

        THE COURT:  Yes.

Q    I'll hand you that and I'll take this.  I handed you a document, do you recognize that?

A    I do, yes.

Q    What do you recognize that to be?

A    This was the additional -- the items from the history.db I believe.

        MR. LALLY:  May I approach, Your Honor?

        THE COURT:  Yes.

        MR. LALLY:  Commonwealth would seek to introduce and admit as the next exhibit.

        MR. YANETTI:  Objection.

        THE COURT:  Okay. Could you bring it with you?

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

        MR. LALLY:  May I return to the witness, Your Honor?

THE COURT: Yes.

Q    I'm sorry, Mr. Whiffin, if you could just repeat exactly what that is in the next exhibit?

A    Yes. Sorry, it's a comparison between the search terms found in the P list, so the mobile Safari P list and the search terms found within the history.db database.

Q    So the items contained within this table are items that were contained within the extraction that you examined, correct?

A    Correct.

MR. LALLY: And, Your Honor, with the Court's permission, if I could display that to the jury?

THE COURT: Yes. Yes.

Q    Mr. Whiffin, if you could, again, using the laser pointer, just describe for the jury what we're looking at in this table, and what, if anything, of significance between sort of the two sources of information depicted here?

A    Okay. So the first list, the P list term, shows the term within the mobile Safari dot P list excluding the two that we've already mentioned, which are of note. And the first time stamp column shows the time stamp according to that P list. The history item shows the search term as recorded in the history database, and then we have the time stamp as per the history database. So the purpose of this

1-30

document was to show that we have a search for "Raining Men" and a history item related to the Google search for "Raining Men," and they show within a second of each other.

Again, the next one down Antoinette Okoh basketball and the associated Google search. And again, the time stamps are within a second. This list was nonexhaustive. There was hundreds of examples within the history.db, but limited examples within the mobile Safari P list.db

And as I mentioned, the two searches of interest, the "how long ti die in cikd," and "hos long to die in the cold," didn't exist within the history DB at all.

MR. LALLY:  Ms. Gilman, you can take that down.

Q    Now, sir, if I could ask you just a little bit now about the browser state db.  Again, can you explain to the jury sort of what that is and how it -- if at all, it plays a role in your analysis here?

A    Yep. So initially, pre and including iOS 14, the browser state database would show all tabs that you currently had opened. So as soon as I go into my browser and open a new tab, a record is created. It includes information such as the time that I opened the tab, or the time I last viewed the tab, the current URL which is being displayed within that tab. It shows information whether it's in private browsing mode or not. So in that kind of case, in iOS 14 and below, we're able to see current

private browsing records and subsequently recover deleted ones.

But in iOS 15, things changed. The record was no longer written as soon as the tab was opened. It was only opened when the tab was -- sorry -- the record was only created when the tab was closed. That meant that our ability to recover that kind of history was significantly lower. It means that it no longer makes use of the private browsing field because now private browsing records simply are never written to that database. So now we can only really see a list of all of the tabs that have been closed, not which are currently open.

Q    Now with review -- sorry -- with regard to the browser state db, is there something referred to as a last view time stamp?

A    There is, yes.  That's one of the fields within the database.

Q    And can you explain, specifically with relation to that field, sort of what kind of information is kept there and what it means?

A    Yeah, so from my research based on this, that time stamp relates to the time that the tab took focus. So that's either when the user creates the brand new tab, when they switch between tabs and bring a tab back into focus, when they close a tab, which automatically brings one of

the background tabs into focus, or if Safari has been completely closed and reopened, that essentially acts like almost a new tab and the time stamp gets updated at that point.

Q    Now, can you explain how the earlier time stamp could be associated from, say, tab is open, something is done, tab is closed, tab is reopened, something else is done, how that earlier time stamp could then be associated data-wise with the subsequent search?

A    I think I find --

Q    Opening it.

A    I think I followed that. Okay. So if, for example, at 12:00 p.m., I create a new tab, I can do a search for whatever I want, and at that point, if I close the tab, then the record that gets created will show that I opened the tab at 12:00 p.m., and I did a search. Excuse me.

However, if I open the same tab at 12:00 p.m., do a search, close it, like completely closed down Safari and reopen Safari, that would actually -- that would also update the same time stamp to show that I'd opened it up again. What I meant to say at that point, is that if I create a 12 o'clock tab, minimize Safari, I can leave it for several hours, for several days, for several weeks. The time difference is not really important.  When I come back to it and open up Safari again from a background

1-33

state, the time stamp is not updated, so it will still show 12:00 p.m. today, and it will show whatever my most recent navigational event is.  So I can search for something in three weeks' time using the same tab I opened today, and the time stamp will show today's time.

THE COURT:  All right. I think this is a good place to take our break.

MR. LALLY:  Yes, Your Honor.

(Jury out.)

(Witness exits.)

THE COURT:  And can I see counsel regarding timing, please?

MR. LALLY:  Yes, Your Honor.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

(Court in recess.)

(Court in session.)

(Defendant is present with counsel.)

(Jury in.)

THE COURT:  Okay.  Whenever you're ready, Mr. Lally.

MR. LALLY:  Thank you.  Your Honor, may I approach?

THE COURT:  Yes.

Q    Sir, showing you another document.

A    Thank you.

Q    Do you recognize that?

A    I do, yes.

Q    And what do you recognize that to be?

A    This is the entire Google URL that was found on the browser state at record.  So broken down into each of its important sections.

MR. LALLY:  May I approach again, Your Honor?

THE COURT:  Yes.

MR. LALLY:  Commonwealth would seek to admit it as the next exhibit.

THE COURT:  Okay.

MR. YANETTI:  Same objection I had before at sidebar, Your Honor.

THE COURT:  Okay. There are a couple of different objections.  I need to see you at sidebar.  I don't know what you're talking about.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

THE COURT:  That will be the next exhibit.

(Whereupon Exhibit No. 618, Chart, was marked as an exhibit.)

THE COURT:  Thank you.

MR. LALLY:  May I approach the witness, Your Honor?

THE COURT:  Yes.

MR. LALLY:  May I publish it for the jury?

THE COURT:  Yes.

Q    Now, Mr. Whiffin, what's up on the screen now, is that what you have before you, Exhibit 618?

A    It is, yes.

Q    And if you could again with your laser pointer direct the jury's attention to what are we looking at in this exhibit?

A    Okay.  So the right -- sorry -- the left side of the table is the entire URL that was recovered from the browser state record. What I've done is broken it down into each of its individual components and explained what each of those components means. So the very first row is Google.com/search.  That just tells the browser that we're going to the Google website and that we want to run a search. The second part, the Q equals, is telling the browser what the query term is. So the query term here is, "Hos long to die in cold." The little plus symbols in between is in place of a space because spaces can't be part of a URL.

Next, we have the input encoding and the output encoding.  Just explains what kind of characters to use and

what language to use when you're accepting the search query and giving it back to the user.

And finally, the important part is the and client equals Safari. This is something that just tells Google that this query is being done using the Safari client. Again, if I was to use Safari and just visit the Google web page and type that in, that type of searching, that part of the string wouldn't be there. That's only there because I used the Safari search bar as part of the Safari application to do that search.

Q    Thank you, sir.

MR. LALLY:  Ms. Gilman, you can take that down.

Q    Now, sir, with reference to that, what if any relationship does that have to the information you were discussing just prior to the break?

A    Again, that confirms that this search was conducted via the Safari bar search feature that's part of the Safari browser application.  The same one that caused the records to be recorded in the P list.

MR. LALLY:  Your Honor, may I approach the witness again?

THE COURT:  Yes.

Q    Showing you another document. Do you recognize that, sir?

A    I do, yes.

Q    And what do you recognize that as?

A    This is the live records from the browser state.db database.

MR. LALLY:  May I approach, Your Honor?

THE COURT:  Yes.

MR. LALLY:  Commonwealth would seek to introduce it as the next exhibit.

MR. YANETTI:  No objection, Your Honor.

THE COURT:  All right. Thank you.

(Whereupon Exhibit No. 619, Chart, was marked as an exhibit.)

MR. LALLY:  May I return this to the witness?

A    Thank you.

MR. LALLY:  May I publish that for the jury as well, Your Honor?

THE COURT:  Yes.

Q    And, Mr. Whiffin, do you recognize what's up on the screen now is what you have before you as Exhibit 619?

A    I do, yes.

Q    Now turning back to the browser DB database for this particular device, with regard to the time stamp and the last viewed time, what, if anything, did you observe in reference to that depicted in this and could you direct the jury's attention to it?

A    Yes. So this time stamp is the last viewed time according to the database itself.  It's already been offset so that it's in local time. This particular table, we can see there are records missing between records 4025 and 4031.  We have -- sorry -- 4025 and 4031, we have 4026, 27, 28, 29, and 30 missing. And typically, the time stamps that we do have here, some of them are separated by as little as a second or two.

Q    Now, with reference to the "Hos long to die in cold," that was record 4028; is that correct?

A    That's correct.

Q    And so based on records missing from this portion of the form as far as that database, what, if anything, did you endeavor to do with respect to ascertaining why?

A    So first of all, the task was to try to recover the deleted messages -- oh, sorry -- the deleted history records from browser state. So first of all, it was reading the deleted pages, essentially, to find the records that had been deleted from this current version of the page.

MR. LALLY:  May I approach again, Your Honor?

THE COURT:  Yes.

Q    I'm showing you another document and ask you if you could review that.

A    Yes.

Q    And do you recognize that document, sir?

A    I do, yes.

Q    What do you recognize that to be?

A    This is the same data source, so it's still browser state dot DB, but now looking at it with the unique recovered records.

Q    And what is that, that last term that you use, what does that mean? I'm sorry.

A    So typically there can be lots of different versions of a page within a WAL file. So you may have several page ones, several page twos, and so on. Why I looked at is doing is recovering the data whether records that I recover are different from each other. So if I recover the same record multiple times, I can ignore it, but if I recover the same record with a slight change, then I would show it in this view.

MR. LALLY:  May I approach, Your Honor?

THE COURT:  Yes.

MR. LALLY:  Commonwealth would seek to introduce it as the next exhibit.

MR. YANETTI:  No objection.

THE COURT:  Okay.

(Whereupon Exhibit No. 620, Chart, was marked as an exhibit.)

MR. LALLY:  Your Honor, with the Court's permission, may I publish that to the jury?

1-40

THE COURT: Yes.

Q    Again, Mr. Whiffin, if you could use the laser if you find it helpful, direct the jury's attention to what are we looking at here, and what if anything did you uncover during this portion of your analysis?

A    Yes. So again, the very first column on the left is the unique identifying number. You'll notice that there are some numbers here which are repeated. This is, as I said, because the records are recovered from multiple versions of the same page. There was actually 16 versions of this record across 60 -- across 23 different versions of this particular page. These three have some difference, primarily it was the -- what's called the tab order field, but that's the only difference that showed up across these three "Hos long to die in the cold," records. All the rest show the same URL, the same ID number at the beginning, or tab ID number, and the same time stamp.

Worth noting, there is no title shown in this particular record. Again, that speaks to the fact that this page didn't successfully complete loading. Otherwise, there would be a title of, "Google search. Hos long to die in the cold," as you saw on some of the other examples earlier.

Q    Now, sir, with respect to the table up here, is there any indication in regard to private browsing that you were

1-41

talking about before?

A   No. In iOS 15, as I mentioned, if you are using private browsing mode, there is no records recorded in this database at all.

Q   So the fact that that's not listed in this table, what, if anything, does that tell you?

A   Everything that was recorded in this database was conducted not in private browsing mode.

Q   Now, with respect to your work within your field, are you familiar with the term called session?

A   Yes.

Q   And can you explain to the jury what you want understand that term to mean and how it applies to this specific instance?

A   Essentially, the life of the particular tab. So when I start a tab and I start to use navigation, I go to different websites.  All of my navigation events would be considered part of the same browsing session, essentially.

Q   Now, sir, if I could turn your attention to the Knowledge C database for a moment.  And again, if you could, maybe I'm repeating just as far as -- can you explain to the jury what you understand that term to mean as far as what is the Knowledge C database in respect to the other databases we talked about.

A   Yeah.  So far, the bulk of what we've discussed - the

history.db, the browser state DB, and mobile Safari dot P list are all particular to the Safari application on iOS. Knowledge C is much more global. It's much more ingrained within iOS. Everything is essentially recorded in there on iOS 15. So again, backlight activity, unlock activity, application state activity, and web usage activity is all recorded as part of Knowledge C.

MR. LALLY:  May I approach again, Your Honor?

THE COURT:  Yes.

Q    Showing you another document.  If you could review that for a couple of minutes.

A    (Witness complies.) Yes.

Q    And do you recognize that document, sir?

A    I do, yes.

Q    What do you recognize that to be?

A    This is a document I created based on the Knowledge C web usage records.

MR. LALLY:  May I approach, Your Honor?

THE COURT:  Yes.

MR. LALLY:  Commonwealth would seek to introduce and admit as the next exhibit.

MR. YANETTI:  No objection.

THE COURT:  Thank you.

(Whereupon Exhibit No. 621, Chart, was marked as an
                              exhibit.)

MR. LALLY:  And, Your Honor, with the Court's permission, may we publish that to the jury?

THE COURT:  Yes.

Q    Sir, again, what's up on the screen, do you recognize that as what's before you as the next exhibit?

A    I do, yes.

Q    And if you could again --

MR. LALLY:  Ms. Gilman, if I could ask you to scroll down to the green tabs. Thank you.

Q    Now, if you could, sir, again using that laser pointer, if you could direct the jury's -- well, first, can I you, what is it that we're looking at in this exhibit?

A    This is a particular what's called a stream within Knowledge C.  A stream is basically all like information being grouped together. So in this particular case, the stream is related to Safari, and it's telling us what web page was visible on screen, what time it started, and what time it finished.

Q    Now, with respect to this particular tab, there are portions that are highlighted in green and portions that are highlighted in blue; is that correct?

A    Correct.

Q    Can you explain to the jury of what the portions highlighted in green represent?

A    I highlighted the sections in green due to their time

1-44

stamp. So typically, these items last between 2:27:37 a.m., and 2:27:53 a.m., so around the time of the Google search, if you were to believe the browser state.

Q   And with respect to the items that are highlighted in blue, what if any -- what are those?

A   The ones in blue are the actual Knowledge C records that show when the "Hos long to die in the cold" and the "How long ti die in the cikd," web pages were actually visible on screen.

Q   So from this, what, if anything, were you able to ascertain as to the searches or the time associated with the searches from your analysis here?

A   At 2:27:40, the only websites that were visible on screen were related to Ozone Basketball and Hockomock Sports, and that the, "How long ti die in the cikd," first appeared on screen at 6:23:56, and, "Hos long to die in cold," first appeared on the screen at 10:33 a.m.

Q   So those two searches from your review of this traction in this device never appeared on the screen prior to 6:23 in the morning, correct?

A   Correct.

Q   Now, from all this, sir, what, if anything, were you able to conclude with regard to these searches?

A   So essentially, ignoring the browser state time stamp is important because that is not a reliable time stamp to

show when that URL was visited. We have mobile Safari dot P list record searches that show 6:23 and 6:24, and we show the same searches with very similar time stamps within half a second as showing up on screen in Knowledge C, for the "how long ti die in cikd," and the, "hos long to die in the cold," was actually several hours later, which took a little bit more explaining, looking at knowledge C and when the applications were opened up.

Q    Now, with respect to your view of the extraction of the device around these times, were you able to ascertain as to what time this particular device connected to a WiFi sometime after 2:00 a.m.?

A    I actually didn't look at any WiFi connection information.

Q    And with respect to 2:27 in the morning, at 2:27 a.m., what were the websites that the device had visible, and what were the websites device was connected to at that time?

A    So according to the Knowledge C records, which were mostly also reflected within the history DB as well, it was the Hockomock Sports, YouTube, Ozone Basketball, and that's it for the main domains.

Q    Now, with regard to the WiFi connection, is your memory exhausted as it pertains to that?

A    Yeah, I don't remember looking at WiFi history.

MR. LALLY:  Your Honor, may I approach?

THE COURT:  Yes.

Q    I'm showing you a copy of your report.

A    Thank you.

Q    Review that and look up when you're finished.

A    (Witness complies.) Okay.

Q    And, sir, I'm sorry. In the interest of time, if I could ask you just to look at the next page as well just briefly?

A    (Witness complies.) Okay.

Q    Is your memory refreshed, sir?

A    I do, yes.

MR. LALLY:  May I approach to retrieve, Your Honor.

THE COURT:  Yes.

Q    So, Mr. Whiffin, from your review of the extraction report, in regard to this device of Ms. McCabe's, about what time was the connected to a WiFi network called McCabe?

A    I believe it was 0207.  I didn't actually remember the time stamp just then.

Q    And with respect to the disconnection from that, do you know when that was?

A    I can't recall.

MR. LALLY:  Your Honor, if I may approach?

THE COURT:  Yes.

MR. LALLY: And for purposes of the time, Your Honor, may the witness review the report?

THE COURT: Yes.

MR. LALLY: Thank you.

A    (Witness complies.)

Q    And, sir, if you can from looking at your report, if you can, just indicate to the jury as far as the WiFi connections with --

A    The WiFi was connected at 0212 and disconnected at 0539. There was no further WiFi activity until 11:00 a.m.

Q    Thanks.

MR. LALLY: May I approach just to retrieve, Your Honor?

THE COURT: Yes.

Q    Sir, are you familiar with something called a write ahead log or a WAL file?

A    I am, yes.

Q    And if you could explain to the jury what your understanding of that term is and how it applies in this specific case?

A    Yes. So a write ahead log is essentially a temporary store for database pages. When I'm talking about database pages, it's not something that the user ever sees. It's part of the structure of SQLite databases. Just as chapters in a book can span multiple pages, data in a

1-48

database can span multiple pages also, and it's not necessarily in the expected order. It's up to the database application to find those pages and order them correctly in order to display the data to the user.

The WAL file, on the other hand, it still contains pages, but they're organized in frames, essentially. And a frame is the same as a page, but with additional information at the top that identifies what page it is. So I mentioned earlier that it's possible to have multiple versions of the same page within the WAL file. That's because every time I write a record to the database, a new frame is created and the page is updated. So for example, if I was to have a new database, create a record, a new frame is created with page one, and it adds my record. As soon as I add a second record to that database and a new frame is created again, so I now have frame one and frame two. Both of those frames would contain a version of page one. The first frame would contain only record one. The second frame would contain records one and two and so on.

Forensically, where it gets interesting is on the edit or deletion of a record, because the same process is applied. So now a new frame is created. The page number is the same as previously, so we'd still have a page one, but now only the records that I don't want to delete are copied across. So I could end up in a situation where I have four

versions of page one, one has record one, one has records one and two, one has records one, two and three, but the most recent version of the page only has record one and three, for example.

Now, a normal piece of database software will only look for the most recent version of the page, so you would only see records one and three. The forensic software can look at all previous versions of the page as well, and that's how we're able to recover record two in that instance. And that's essentially how we were able to recover the browser state record from WAL.

Q    Now, sir, turning to that issue as far as deletion, what, if anything -- let me ask you this first just before we leave the WAL file. So with regard to the WAL file, what if any relevance is there that certain data only exists within the WAL file?

A    So again, if I create a record that's in the WAL and delete it before it gets committed, which means when it gets merged into the main database, then it exists only in the WAL. It could be that it's a brand new record that just hasn't been written yet, or it could be one which was deleted from the database prior to the commit occurring.

Q    When you say commit, what exactly is -- what does that mean?

A    Commit's a process where, essentially, the database

looks at all of the most recent versions of each page in the WAL file, copies them out from WAL and puts into the main database, and then deletes the WAL file altogether. So at that point, we lose the ability to recover data from WAL because the WAL doesn't exist, but we have all the most recent versions of the page.

Q    Now, sir, turning to the concept of the topic of deletion of data, what, if anything, did you find with regard to deletion of data with respect to this search as applied to the P list that you did stuff before?

A    Recovering data that's been deleted from the P list is not really possible. So all we can say is if this record exists within the P list, it hasn't been deleted.

Q    Now, same question with regard to issues of deleted data with regard to the history DB.

A    There was no records of any -- so there's no evidence of any records being deleted from history.db since early January. I think it was like the 3rd of January up to February 2.

Q    And how are you able to tell that with regard to the history.db?

A    Again, every record is given a unique number, and there'd be a gap in that numbering system if a file or if a record had been deleted.  The fact that there was no gaps indicates that nothing had been deleted.

Q    And with regard to deletion, what, if anything, were you able ascertain with regard to deletion versus web usage and the Knowledge C database?

A    Knowledge C contains such a large amount of different type of data that's always being added and deleted for various reasons, none at the discretion of the user.  It's a completely system driven event to delete information from Knowledge C. So we can't say what was deleted from Knowledge C, but we can see that during the times of Safari usage, records exist within Knowledge C that indicate, or certainly appear to indicate, that nothing was deleted.

Q    What, if anything, were you able to find with regard to deletion in respect to the browser state DB database?

A    Browser state did have numerous records that had been deleted. Some we were able to recover.  Three records from browser state all had a time stamp, very similar to 22740. These were three records that had been deleted at some point.

Q    What are some of the options for deleting data from that particular -- from the browser state DB?

A    So the first most prominent option is to delete absolutely everything from the device or delete all history from the device, which, as I mentioned earlier, we know that didn't happen because we still have other records. So the only other real option is to delete selectively. That

1-52

could mean delete one at a time, and it could mean delete either the full day, the last two days, or last hour, but in all of those cases, the record must exist in history.db in order to be deleted from browser state. The fact that this record, the hos long and the how long ti die in cikd, don't exist within the history database would mean that the user would never have the option to selectively delete that record.

MR. LALLY:  May I approach, Your Honor?

THE COURT:  Yes.

Q    Showing you another document, sir.

A    Thank you.

Q    If you could look at that and look up when you're finished.

A    (Witness complies.) Yes.

Q    Do you recognize that, sir?

A    I do, yes.

Q    What do you recognize that to be?

A    So this is a list of the browser state DB records showing a red line where a record or more have been deleted.

Q    And, again, the term deleted as far as it applies to this particular area of the database, what exactly does that mean again?

A    It means the record has been marked as deleted. If you

were to read this database in a regular database application, you would not see it. But it doesn't necessarily mean that we can't recover it.

MR. LALLY:  May I approach again, Your Honor?

THE COURT:  Yes.

MR. LALLY:  Commonwealth would seek to introduce and admit as the next exhibit.

THE COURT:  The exhibit.

MR. YANETTI:  I have no objection to the exhibit.

THE COURT:  That is the question.

(Whereupon Exhibit No. 622, Chart, was marked as an exhibit.)

MR. LALLY:  And, Your Honor, with the Court's permission, may we publish Exhibit 622 to the jury?

THE COURT:  Yes.

Q    Again, sir, what's up on the screen is that what you have before you as Exhibit 622?

A    It is, yes.

Q    And if you could please using the laser pointer direct the jury's attention to what, if anything, of significance you observed on this.

A    So again, we can use the number down the left side, which will identify the unique identifier given to each of these records. We can see that the red line between the first two records indicates that records between three-

nine-eight-six and three-nine-nine-three, have been deleted. We can see that record 4,001 is deleted. Records between 4,004 and 4,019 have been deleted. Record 4020 was deleted, and then finally, records between 4025 and 4031 had been deleted also.

Q    Now, sir, as far as records 4024 and 4025, what, if anything, were you able to ascertain as far as the dates and times associated with those?

A    Yeah. So these particular records show up at 22731 and 22733, respectively, and this matched records within Knowledge C that showed that at this particular time when the tab took focus, that particular website was also shown visible to the user in Safari.

Q    Now, as far as the date and time for 4024 and 4025, what, if anything, did you observe with respect to the date and time for 4026, and what can you tell about that?

A    So 4026 was approximately a second or two after the record here 22733.  I believe it was a 22735.  And then again, there was another record 4027, which, again, was another two or three seconds after that time. So within a nine second period between 22731 and 22740, there were four records -- sorry -- five records within browser state DB that had a time stamp within that nine seconds, all with completely different types of website ranging from PayPal, banking, YouTube, and the "Hos long to die in the cold."

1-55

Q    Now, sir, with respect to -- are you familiar with a term called spontaneous deletion?

A    I believe so.

Q    And can you explain to the jury what that is?

A    It's not a term I would use, but essentially, a cleanup operation would occur on the device where it would look for orphaned records, records that are old enough to not be required anymore, and they would just be deleted by the system without any direction from the user.

Q    Now, during the testing that occurred, your testing, which occurred with respect to this device, what, if anything, did you observe with regard to spontaneous deletion?

A    I wasn't able to replicate the spontaneous deletion. I was able to replicate completely orphaned records, so a record that existed in browser state without a corresponding record in history.db, and it meant that there was no way for me to delete that record manually without deleting everything from the device regarding history.

MR. LALLY:  May I approach, Your Honor?

THE COURT:  Yes.

MR. YANETTI:  May we approach, please?

THE COURT:  Okay.  Could you turn the lights on, please, Tony. Thank you.

(Sidebar commences.)

(Impounded proceedings.)

(End of sidebar.)

THE COURT:  All right.  So you're introducing that those four pages or whatever it is, Mr. Lally?

MR. LALLY:  Yes, Your Honor.

THE COURT:  As one exhibit.

MR. LALLY:  As the next four exhibits.

THE COURT:  Okay. All right.  So that will be -- those will be admitted.

THE COURT:  Were you going to publish those? Because you can go ahead and publish them while this is --

MR. LALLY:  I don't think that's ...

May I have just one moment, Your Honor?

THE COURT:  Sure.

MR. LALLY:  Your Honor, if I can take them just one by one, I think that might be.

THE COURT:  Okay.

Q    Sir, I'm showing you a document.  Do you recognize that?

A    I do, yes.

Q    What do you recognize that to be?

A    This is a report from my Artex tool showing the history database at 213934 on the 27th of January, and 225509 on the 27th of January.

MR. LALLY:  May I approach again, Your Honor?

THE COURT: Yes.

MR. LALLY: Commonwealth would seek to introduce it as the next exhibit.

THE COURT: All right. So all four are in. Okay. So we don't need to --

MR. LALLY: They have not been marked.

(Whereupon Exhibit No. 623, Chart, was marked as an exhibit.)

MR. LALLY: Can I have one moment, Your Honor? And, Your Honor, with the Court's permission, if we could publish that to the jury?

THE COURT: Yes.

Q    Now, sir, with regard to this, we're looking at record number 4026; is that correct?

A    Yes, I believe we are.

Q    And again, if you could direct the jurors' attention to what exactly are we looking at in this exhibit with regard to record 4026.

A    Yes, so in the right column we see the source of the information. So history.db is the database. History underscore visits would be the table, and then the unique identifying number of 31407 and 31408, we see that the start time or the time that that particular website was navigated to, according to history.db, was, as I say, both on the 27th of January, one at 2139 and 34 seconds local

1-58

time, and one at 225509 local time. Both of these websites are related to Hockomock Sports. We have the URL at the top, followed by the title of the page, followed by a visit count that tells us how many times that page has been visited before.

MR. LALLY:  I'm sorry.  One moment, Your Honor.

THE COURT:  Yes.

Q    That next document, do you recognize that, sir?

A    I do, yes.

Q    What do you recognize that to be?

A    This is the same kind of report. This is related to the YouTube record that was part of the browser state database related to "It's Raining Men" on YouTube.

Q    Is that the record number 4027; is that correct?

A    It is, yes.

MR. LALLY:  Your Honor, may I approach again?

THE COURT:  Yes.

MR. LALLY:  I'd ask that that be marked as the next exhibit.

THE COURT:  Okay.

(Whereupon Exhibit No. 624, Chart, was marked as an exhibit.)

MR. LALLY:  Your Honor, very briefly, may I publish to the jury as well?

THE COURT:  Yes.

Q    And, sir, what's up on the screen now, is that what you have before you as the next exhibit?

A    It is, yes.

Q    And again, if you could, using the laser pointer, just direct the jury's attention to what -- what, if anything, of significance you observed in this record of 4027.

A    Yes. So again, we have -- we have five records related to the YouTube video "It's Raining Men" starting at record 31398, 31399, 31400, 31401, and 31402.  These were all accessed on the afternoon of the 27th of January, 2022.

        MR. LALLY:  May I approach again, Your Honor?

        THE COURT:  Yes.

Q    Showing you another document.  Do you recognize that?

A    I do.

Q    And what do you recognize that to be?

A    This is some -- the same again, related to record 4029. It shows that a website was visited on the 28th of January, 2021.

        MR. LALLY:  And, Your Honor, I ask that this be marked as the next exhibit.

        THE COURT:  Okay.

        (Whereupon Exhibit No. 625, Chart, was marked as an

                        exhibit.)

        MR. LALLY:  And, Your Honor, with the Court's

1-60

permission, may I publish that briefly to the jury as well?

THE COURT:  Yes.

Q    And, sir, what's up on the screen is that what you have before you as the next exhibit in regards to 4029?

A    It is, yes.

Q    And again, if you could explain to the jury what we're looking at?

A    Yes. So this URL cantonma.org relates to the URL that was provided in record 4029 of the browser state database. It shows that this web page was accessed at 1:00 p.m. and 17 seconds -- sorry -- 17 minutes and 0 seconds and 1:00 pm 17 minutes and 8 seconds on the 28th of January, 2022.

MR. LALLY:  May I approach again, Your Honor?

THE COURT:  Yes.

Q    Handing you another document, sir, do you recognize that?

A    I do.

Q    And what do you recognize that to be?

A    Again, the same kind of report. Again, this time for record 4030 from browser state, and it shows access to Ozone Basketball.

Q    And with regard to that report, as far as the same kind of report that's from your tool, the Artex tool; is that correct?

A    Correct.

Q    And that Artex tool, is that a widely available tool used within the field of forensic investigators?

A    Yeah, it's something, as I said, I've worked on for around five years. I've given it away free to the digital forensics community for five years. There's approximately 600 users globally, and it's taught as part of the SANS digital forensics training courses.

MR. LALLY:  May I approach again just to retrieve, Your Honor?

THE COURT:  Yes.

MR. LALLY:  Commonwealth would ask that this be marked as the next exhibit.

THE COURT:  Yes.

(Whereupon Exhibit No. 626, Report, was marked as an exhibit.)

THE COURT:  Thank you.

MR. LALLY:  May I publish that for the jury, Your Honor?

THE COURT:  Yes.

Q    With regards to this exhibit up on the screen record 4030, again could you just draw the jurors' attention or direct the jurors' attention to what, if anything, of significance you observed on this exhibit.

A    Yes, so again, we have records from the history database related to Ozone Basketball, and it shows that

1-62

this website was accessed at 11:00 a.m. and 26 minutes on the 25th of January, 2022.

MR. LALLY:  May I approach, Your Honor?

THE COURT:  Yes.

Q    Now with respect to sort of the totality of your analysis, Mr. Whiffin, what if any conclusions did you come to as to the timing of the two searches in question with relation to what you observed in your analysis and testing of this device?

A    So in conclusion, I determined that the tab that was used was focused at 22740. So the tab was opened at that time, at which point it was being used to show Ozone Basketball and Hockomock Sports websites.  The 623, that time stamp, is when the search was first conducted.  It never loaded the page. Otherwise, there'd be a record in the history database.  While that page was still loading a secondary search was conducted for "hos long to die in the cold." Again, that page never loaded either, although these both did show up in the Knowledge C database to show that the browser was trying to display these pages. Safari was closed prior to the "hos long to die in the cold" record being shown on screen at all. But when it was reopened at 1033 in regards to whatever other Safari activity was to be conducted, it appeared on screen. So we have a 1033 record where "hos long to die in the cold" was shown on screen,

1-63

even though the page never successfully loaded.

Q    And with respect to your analysis and your testing here, what if any opinion do you have as to whether or not any of the data marked as deleted was actually user deleted or user -- the user actually actively went through the process of deleting it?

A    Yeah.  So again, we know that she didn't -- we know that nobody deleted the entire history.  So that leaves the only option to be selectively deleting records. The fact that there are no missing records in history DB shows that it's impossible that that record could have been deleted by the user. It would have just been orphaned in the database, and I believe would have deleted itself at some stage whenever a particular cleanup function ran.  Although as I said earlier, I haven't been able to replicate that.

I was able to continue to read the various versions of the page that contained "hos long to die in the cold" browser state record, and found that it existed at the same time as another record that was created at least two days later. Therefore, I can determine that that particular record was not deleted until at the earliest 10:00 p.m. on the 31st of January, and that it's not possible that the user could have created or caused that deletion to occur.

Q    Now, over the course of your analysis and testing, a review of the extraction in this case, did you have

1-64

occasion to review an affidavit of a Mr. Richard Green?

A    I did, yes.

Q    And what if any opinions or conclusions do you have as to that affidavit?

A    I had issues with several of the statements being made as part of the affidavit.

Q    And what issues were those?

A    Namely, it specified that Cellebrite report identified that the search was conducted at 22740. And as I've explained, I believe the tab took focus at 22740, not when the search occurred. The report mentioned that Cellebrite report identified it was deleted by the user. We don't do that. We'll tell you that a record is deleted, but we don't specify how the record was deleted. That's something for the examiner to determine.

I forget. Oh, and then there was a mention of the purpose of the browser state database. The explanation given was correct for iOS 14 and below, but not for 15 and above, which is relevant in this case.

Q    Now, you mentioned this issue as far as coming up, obviously, in this case and some other instances of phone calls or inquiries that you received from Austria and other places.    What, if anything, has -- have you or your company, Cellebrite, done with regard to rectifying this issue?

MR. YANETTI:  Objection.

THE COURT:  I'll allow it.

A    We recognize that this time stamp could be misleading. Regardless of how we label that time stamp, the very fact that a time stamp is there, we feel would be, well, potentially misrepresented. So the decision was taken to remove the time stamp altogether from that information. So now we show the webpage was visited, but we don't attribute a time to that purely because it could be wildly inaccurate.

MR. LALLY:  Your Honor, this may be the appropriate time for the instruction.

THE COURT:  Okay.  All right.  So, jurors, we're about to see a demonstration by Mr. Whiffin. Simply, it's simply a demonstration to help you to understand the evidence that you've heard. It's not evidence from this case, but it helps you understand the evidence in this case. You must decide this case based solely on a fair consideration of the evidence and nothing but the evidence. But this is a demonstration to help you understand that evidence.

MR. YANETTI:  Your Honor, our rights are preserved, correct?

THE COURT:  Yes.

MR. YANETTI:  Thank you.

Q    And so to that point, Mr. Whiffin, were you able to

prepare a demonstration in regard to what you've been discussing through the course of your testimony?

A    I was, yes.

Q    And that demonstration doesn't specifically reflect on the searches or the extraction report that you looked at in this case, correct?

A    Correct.

Q    But as far as the overall issues that you've been discussing in your testimony, correct?

A    That's correct.

MR. LALLY:  And with the Court's permission, may the witness now illustrate that to the jury?

THE COURT:  Yes.

A    (Demonstration displayed.) Okay.  So first of all on the left there, you can see a screen of an iPhone, and that is a phone I have in front of me live. It's just demonstrating what I can see on the phone.

This is my Artex tool, and the feature which I continuously use this tool for, which is not available really, in any other vendor tools, is the ability to create a live connection between my computer and the phone. The live connection is what I've just started here, and what's going to happen is all of the files and folders that exist on the phone will be mapped to my computer so that I can navigate it.  I can look around and I can take a look at

live, near enough live records on the device. Prior to the availability of this tool, I would have to test the theory on a phone, do a -- do an extraction, and then pass the extraction which could take anywhere between 20 minutes and several hours.

The reason that I'm using this tool today is because I can do those same tests within ten or twenty seconds, typically. So I just need to wait for this section to do. So it's already mapped out all the files and folders. It's now asking for a few important pieces of information, which it will then populate on the screen, so information such as the device, serial number, et cetera.

What we're interested in, though, is the browser state record. So I can go to the browser state database and take a look at that and open that up. You can see that at this moment in time, I have no records in the database at all. If I go back into the live view of the phone, you can see I have Safari open from last night, so it's been sat in the background overnight and not doing anything. But at ten past eight last night, I performed this search in a brand new window. So start at Safari, opened up a new tab, immediately searched for new tab at 2010 on the 16th of June.

If I now search for the time right now, 1442, what I can do is go back to my Artex tool and press this reload

1-68

button.  That's going to delete the database from my computer only, a copy of the most recent copy of the database, and WAL file from my phone back to my computer where it shows me I still have no records. That's expected behavior because at the moment I've not closed the tab. So if this again was iOS 14, there would be a record there to say what tab I had open. But iOS 15 doesn't work that way.

I now go back to my tabs and actually just close this window. I can go back into Artex and hit reload again, and we now see we have some -- some records. I can look at this particular record, and you'll see the title is 1442 Google search. You'll see the Google search record here. So I just need to change the time zone as well to eastern time.  So you see it's the most recent search which I conducted, the 1442 search.  The last viewed time, though, still shows as 8:10 p.m., last night, because that's the time the tab was focused, not the time that the search was conducted.

MR. LALLY:  Thank you, sir. If I may have a moment, Your Honor?

THE COURT:  Yes.

MR. LALLY:  Thank you, sir. I have no further questions, Your Honor.

THE COURT:  Okay. Mr. Yannetti.

MR. YANETTI:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. YANETTI:

Q    Good afternoon, Mr. Whiffin.

A    Good afternoon.

Q    Sir, you had spoken a little bit about what was your assignment here in terms of the data that was sent to you, and I believe that you testified regarding that 2:27 a.m. or 227 and 40 a.m. time stamp that it didn't make sense to the investigators, correct?

A    Correct.

Q    Were you told that one of the investigators was Trooper Michael Proctor?

A    I don't recall any names being mentioned. The ticket came to me or the request came to me via another Cellebrite employee who had been asked about this case and asked whether we could offer any help.

Q    Okay. Thank you. You would agree with me that when you're making or doing a simulation, you want it to be as close to an apples to apples comparison as you can get?

A    As best possible, yes.

Q    And to get truly accurate research results, you want to eliminate as many variables as you can, correct?

A    Correct.

Q    You wouldn't, for instance, want to use an android operating system to try to replicate the activity from Jennifer McCabe's Apple iPhone, correct?

A    Correct.

Q    What version of iOS did you use for your testing of Jennifer McCabe's data?

A    So this test has been undertaken on various different versions of iOS from iOS 12, 13, 14, 15, 16, 17, and most recently, on the beta version of 18 last week.  This particular demonstration was on 15.8.2.

Q    Okay. And you're aware that -- you said 15.8.2, correct?

A    Correct. I've also tested on 15.7.

Q    Oh, fair enough. You're aware, however, that Ms. McCabe was using iOS version 15.2.1, correct?

A    Correct.

Q    And you would agree that the way that an artifact is stored would depend on the iOS version that you use, correct?

A    Correct.

Q    And your simulation did not use the iOS version that Ms. McCabe was running on her iPhone, correct?

A    Correct. I used the closest version I could find.

Q    So I'd like to ask you some questions about the characteristics of browser state.db dash WAL in record number 4028.

A    Okay.

Q    That record number I believe you testified was found to

be deleted, correct?

A    Correct.

Q    But you were able to recover the date and time associated with it, correct?

A    The date and time of the last viewed?

Q    Of that?

A    Yes.

Q    And what was that date and time?

A    2:27 and 40 seconds a.m.

Q    You were also able to recover the content of that particular Google search itself?

A    I was able to recover the URL for it, yes.

Q    Okay.  And what was that Google search?

A    "Hos long to die in the cold."

Q    And it's true, however, that the session history could not be recovered, correct?

A    That's correct.

Q    Now, given those characteristics that you've just discussed, did your testing result in a WAL file record, W-A-L, file record that matched the characteristics of 4028? In other words, deleted with session history not recoverable.

A    The issue with the session history, I was able to recover only the first page of session history. What happens is, when there's a large amount of data that's

1-72

split over multiple pages, if it's a live record, all those pages point to each other so that you can chain it together and get one large amount of information. Once they've been deleted, some of those pages can be overwritten, and therefore the pointers don't make sense anymore. So the amount of information in this session was way larger than one page, and I wasn't able to recover anything further.

Q    Okay. And you'd agree that the simulation was done using a different operating system, correct?

A    Correct.

Q    Were you able to recreate the other deletions that appeared before and after that record 4028?

A    Which deletions, sorry.

Q    Well, you had testified I believe there was an exhibit that was introduced that showed that there were multiple deletions both before and after, correct?

A    Correct.

Q    Were you able to recreate those deletions?

A    When I manually deleted records from the history, then the records also were deleted from the browser state.

Q    Now, I believe that you testified, and if you didn't, I believe it's in your report, that there are essentially five mechanisms for record deletions in the browser state database, correct?

A    Correct.

Q    You ruled out four of them pretty quickly, correct?

A    Correct.

Q    And I believe you've testified to that today, correct?

A    Correct.

Q    The only remaining option was selective deletion by the user, or there's some internal mechanism for record deletion that is not fully understood, correct? A  Correct.

Q    And you know of, as you've testified today, you know of no internal mechanism for record deletion that's not fully understood, correct?

A    I've not been able to replicate that function, no.

Q    All right.  If there is no internal mechanism for record deletion that's not fully understood, that would leave selective deletion by the user, correct?

A    Not in this case, no.

Q    All right. Well, selective deletion, you would agree, means that a user selects what to delete, correct?

A    Correct.

Q    And regarding the user, the term user, what is this? Who is it?

A    Whoever's using the phone at the time.

Q    Okay.  So it's actually somebody who is using the actual iPhone itself, correct?

A    Correct.

Q    Not necessarily a computer expert, correct?

1-74

A    Correct.

Q    Would you agree with me that somebody who had access to the data before it was extracted and sent to you could have made selective deletions of the data?

MR. LALLY:  Objection.

THE COURT:  I'll allow that.

Q    No, I don't.

Q    Are you aware of an app called MySQL?

A    Yes.

Q    What is MySQL?

A    MySQL is just a method for viewing SQLite databases.

Q    All right.  If someone had access to the raw data, again before it was sent to you, and used that app, it could make selective deletions of the data, couldn't they?

A    I assume you're talking about opening the extraction, taking out the particular file and editing it?

Q    Sorry.  I interrupted you.  You're right.  Your Honor, I apologize.  And I apologize to you.  If you could restate your question -- or answer or give me your full answer.

A    Okay. So it would be possible with the extraction to take out particular databases, alter them, and put them back into the extraction. But there's something called a hash mechanism that we have in place that would -- it essentially hashes the original data, and then it can be

hashed again at a later date. It results in a long string of characters, and if there's any changes to the original data, then we'd see that it's been modified.

Q   Would you agree with me that someone with access to that data and appropriate application or program could also delete and renumber history.db and knowledge.cso so that it would appear as though there was no break in the numbering, so that it would also appear that nothing was deleted?

A   It's potentially possible, but would require a large amount of knowledge and skill to do in a way that can't be detected.

MR. YANETTI:  Thank you very much, sir.

THE COURT:  Mr. Lally.

**REDIRECT EXAMINATION**

**BY MR. LALLY:**

Q   Any discrepancy between the iOS version in Ms. McCabe's phone and the iOS version in the demonstration that you did, what, if any, impact does that have on what you showed this jury?

A   So in this particular case, every iOS version I tested, as I mentioned, from 12, 13, 14, 15, 16, 17, 18, the time stamp is always referring to the time that the tab took focus. So even though there are some differences with when the record's created, the meaning behind that time stamp has been consistent.

Q    Now, what you were asking about selective -- what you were asked about in regard to selective deletion, you indicated that there's no evidence of that in this case; is that correct?

A    Correct.  Selective deletion would require that the record existed in the history database in order to be selected to be deleted. The fact that there's no missing records indicates it was never written into that database, and therefore, could not have been selectively deleted.

Q    Now, the hash mechanism that you testified as far as detecting whether or not someone had surreptitiously gone in and deleted things, do you see any evidence of that in your view of the extraction of Ms. McCabe's phone?

A    I didn't have access to the hash information to see whether any changes had been made. That's something that the original examiner would have had access to. From my point of view, there was nothing in there that would indicate that tampering had occurred. The time stamps all made sense for the files.  The historical pages all made sense. It's probably possible, but it would take a large amount of skill to do.

Q    Now, with regard to your analysis and your testing in this case, again, what is your opinion or conclusion as for when these two Google searches were conducted?

A    I'm of no doubt that the only time those two searches

were conducted was at 6:23 and 6:24 on the morning of the 29th.

MR. LALLY: Thank you, sir. Nothing further, Your Honor.

**RECROSS-EXAMINATION**

**BY MR. YANNETTI:**

Q    Prior to today, have you ever heard of spontaneous deletion?

A    It's not a term I'm familiar with.

MR. YANETTI: Thank you.

THE COURT: All right, sir. You are all set. You may step down.

THE WITNESS: Thank you.

THE COURT: Do you need a couple of minutes to get yourself down?

THE WITNESS: I'll be quite fast. Thank you. Fast. Thank you.

(End of requested testimony.)

1-78

C E R T I F I C A T I O N


I, CHRISTINE D. BLANKENSHIP, NOTARY PUBLIC, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT FROM THE RECORD OF THE COURT PROCEEDINGS IN THE ABOVE-ENTITLED MATTER AS TAKEN BY NANCY KING, CVR.

I, CHRISTINE D. BLANKENSHIP, FURTHER CERTIFY THAT I NEITHER AM COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THIS ACTION.


*Christine D. Blankenship, September 30, 2024*
CHRISTINE D. BLANKENSHIP, NOTARY PUBLIC
RECORDED BY FTR, TRANSCRIPT PRODUCED FROM COMPUTER
29B MECHANIC STREET
FOXBORO, MASSACHUSETTS 02035
(508) 904-9508
C.DORANBLANKENSHIP@GMAIL.COM

6-17-24 WHIFFIN

## A

Ability - 31:6, 50:4, 66:20
Above - 64:19
Accepting - 36:1
Access - 3:25, 6:2, 9:8, 60:20, 74:2, 74:12, 75:4, 76:14, 76:16
Accessed - 59:10, 60:10, 62:1
Accessing - 7:2
According - 29:22, 38:2, 45:19, 57:24
Accurate - 69:20
Across - 7:21, 40:11, 40:14, 48:25
Actively - 63:5
Activity - 11:1, 11:16, 18:19, 25:23, 42:5, 42:6, 47:10, 62:23, 69:24
Acts - 32:2
Actual - 27:14, 44:6, 73:23
Adapt - 21:11
Add - 13:11, 21:13, 48:15
Added - 51:5
Addition - 6:14
Address - 7:19
Adds - 48:14
Adjustable - 3:11
Admit - 28:19, 34:12, 42:21, 53:7
Admitted - 56:9
Advised - 9:5
Affect - 20:18
Affidavit - 64:1, 64:4, 64:6
Affirmed - 3:4
Afternoon - 3:8, 3:9, 59:10, 69:2, 69:3
Agree - 69:16, 70:14, 72:8, 73:16, 74:2, 75:4
Ahead - 47:16, 47:21, 56:11
Allegedly - 15:11
Allow - 4:2, 14:14, 65:2, 74:6
Alluding - 23:4
Alter - 74:22
Altogether - 22:25, 50:3, 65:7
Amount - 20:22, 51:4, 71:25, 72:3, 72:6, 75:10, 76:21
Analysis - 10:11, 26:3, 30:16, 40:5, 44:12, 62:6, 62:8, 63:2, 63:24, 76:22
Analyzer - 14:13, 14:17, 21:3, 21:14, 21:19
Android - 20:20, 69:23

Antoinette - 30:4
Anymore - 55:8, 72:5
Anywhere - 67:4
Apologies - 13:14
Apologize - 74:19
App - 74:8, 74:13
Appear - 6:5, 51:11, 75:7, 75:8
Appeared - 44:16, 44:17, 44:19, 62:24, 72:12
Apple - 19:14, 69:25
Apples - 69:18
Apple's - 24:24
Application - 18:21, 21:24, 36:10, 36:18, 42:2, 42:6, 48:3, 53:2, 75:5
Applications - 6:1, 6:21, 19:5, 45:8
Applied - 48:22, 50:10
Applies - 26:13, 41:13, 47:19, 52:22
Appropriate - 65:11, 75:5
Approximately - 4:20, 7:8, 21:4, 54:17, 61:5
Area - 4:25, 6:6, 6:18, 52:23
Areas - 6:15, 27:5
Aren't - 19:5, 22:3
Artex - 21:21, 22:8, 56:22, 60:23, 61:1, 66:18, 67:25, 68:9
Articles - 7:1
Artifact - 7:21, 7:23, 7:24, 8:1, 8:5, 8:19, 9:14, 9:24, 70:14
Artifacts - 5:10, 6:20, 7:3, 10:13, 10:15
Ascertain - 44:11, 45:10, 51:2, 54:7
Ascertaining - 38:14
Assign - 15:16
Assigned - 13:10
Assignment - 69:5
Assist - 5:17
Associated - 30:5, 32:6, 32:8, 44:11, 54:8, 71:4
Attention - 8:10, 15:6, 17:15, 25:3, 35:10, 37:24, 40:3, 41:19, 53:20, 57:16, 59:5, 61:21, 61:22
Attorney's - 8:12
Attribute - 65:8
Attributes - 13:1
Australia - 7:9
Austria - 10:2, 64:22
Auto - 27:12
Automatically - 31:25
Availability - 67:2

Available - 21:4, 22:3, 61:1, 66:19
Aware - 70:8, 70:11, 74:8

## B

Back - 4:6, 31:24, 32:25, 36:2, 37:20, 67:17, 67:25, 68:3, 68:8, 68:9, 74:23
Background - 19:5, 32:1, 32:25, 67:19
Backlight - 42:5
Backlights - 18:20
Banking - 54:25
Bar - 25:9, 25:10, 27:17, 27:21, 27:22, 28:4, 36:9, 36:17
Based - 12:17, 15:25, 31:21, 38:12, 42:16, 65:18
Basketball - 30:4, 44:14, 45:21, 60:21, 61:25, 62:13
Began - 5:14
Behavior - 68:5
Behind - 75:24
Below - 30:25, 64:18
Beta - 70:6
Bit - 3:23, 30:13, 45:7, 69:4
Blinded - 25:9
Blue - 43:21, 44:5, 44:6
Book - 47:25
Both - 15:2, 15:12, 23:25, 48:17, 57:24, 58:1, 62:19, 72:16
Bottom - 25:10, 27:17
Brand - 31:23, 49:20, 67:20
Break - 33:7, 36:15, 75:7
Brings - 31:25
Broken - 34:8, 35:14
Browsing - 25:21, 25:23, 26:5, 26:8, 27:1, 30:24, 31:1, 31:8, 31:9, 40:25, 41:3, 41:8, 41:18
Built - 28:4
Bulk - 41:25
Button - 68:1

## C

Calgary - 4:19, 4:21, 5:5, 5:14
Called - 7:20, 21:21, 24:18, 40:13, 41:10, 43:13, 46:17, 47:15, 55:2, 74:8, 74:23
Calls - 64:22
Canada - 4:18, 7:8
Canadian - 5:7

Can't - 7:21, 25:25, 35:22, 46:23, 51:8, 53:3, 75:10
Canton - 25:15
Cantonma - 60:8
Cases - 52:3
Caused - 36:18, 63:23
Causing - 6:1, 9:10
Cell - 4:1, 5:8, 13:15
Cellebrite's - 9:8, 20:8
Certain - 20:22, 49:15
Certainly - 51:11
Certificate - 4:12
Certifications - 6:7, 6:8, 6:13
Cetera - 16:5, 67:12
Chain - 72:2
Challenges - 5:25
Change - 19:17, 21:10, 39:14, 68:13
Changed - 31:3
Changes - 19:14, 75:2, 76:15
Chapters - 47:25
Characteristics - 70:22, 71:18, 71:20
Characters - 35:25, 75:2
Chart - 11:24, 17:8, 24:9, 34:24, 37:10, 39:22, 42:24, 53:11, 57:7, 58:21, 59:23
Cikd - 30:10, 44:8, 44:15, 45:5, 52:5
Cleanup - 20:21, 55:5, 63:14
Close - 14:3, 27:1, 31:25, 32:14, 32:18, 68:8, 69:18
Closed - 19:19, 19:21, 31:6, 31:11, 32:2, 32:7, 32:18, 62:21, 68:5
Closest - 70:20
Code - 21:11
Coding - 3:18
Cold - 18:11, 30:11, 35:21, 38:9, 40:15, 40:22, 44:7, 44:17, 45:6, 54:25, 62:18, 62:21, 62:25, 63:17, 71:14
Colleague - 9:1
Colleagues - 7:22
College - 5:7
Column - 12:18, 12:22, 13:6, 29:22, 40:6, 57:19
Com - 15:13, 18:5, 27:21
Com/Search - 35:17
Come - 7:10, 7:13, 7:21, 15:2, 32:24, 62:6
Coming - 26:16, 64:20
Commences - 3:3, 23:12, 28:22, 33:14, 34:20, 55:25

6-17-24 WHIFFIN

**Commit** - 49:22, 49:23
**Commit's** - 49:25
**Committed** - 49:18
**Commonwealth** - 11:20, 17:4, 24:5, 28:18, 34:12, 37:6, 39:18, 42:20, 53:6, 57:2, 61:11
**Community** - 5:17, 5:25, 6:25, 61:5
**Company** - 7:11, 64:24
**Comparison** - 29:4, 69:18
**Complete** - 40:20
**Completely** - 32:2, 32:18, 51:7, 54:24, 55:15
**Completing** - 27:2
**Completion** - 26:18
**Complies** - 42:12, 46:6, 46:10, 47:5, 52:15
**Components** - 35:15, 35:16
**Computer** - 5:3, 5:11, 14:2, 66:21, 66:24, 68:2, 68:3, 73:25
**Computing** - 4:11, 4:12
**Concept** - 50:7
**Concerned** - 13:22, 20:8
**Conclude** - 44:23
**Conclusion** - 15:2, 62:10, 76:23
**Conclusions** - 62:6, 64:3
**Conduct** - 21:18
**Conducted** - 10:22, 10:24, 11:3, 18:3, 26:4, 26:7, 28:2, 36:16, 41:8, 62:14, 62:17, 62:24, 64:9, 68:14, 68:17, 76:24, 77:1
**Conducting** - 21:2
**Confirms** - 36:16
**Confusion** - 9:10
**Connected** - 45:11, 45:17, 46:17, 47:9
**Connection** - 26:22, 45:13, 45:23, 66:21, 66:22
**Connections** - 47:8
**Consecutive** - 13:11
**Consider** - 17:23
**Consideration** - 65:18
**Considered** - 19:7, 20:12, 41:18
**Consistent** - 75:25
**Constant** - 5:5
**Contact** - 8:17, 9:2
**Contacted** - 8:11, 8:14, 10:1, 10:4
**Contain** - 48:17, 48:18, 48:19
**Contained** - 29:7, 29:8, 63:17

**Container** - 14:2
**Contains** - 18:6, 48:5, 51:4
**Content** - 22:24, 22:25, 71:10
**Context** - 23:6
**Contiguous** - 15:14, 15:17, 16:10, 16:14
**Continue** - 4:19, 22:4, 63:16
**Continuously** - 66:19
**Converted** - 25:13
**Copied** - 48:24
**Copies** - 50:2
**Copy** - 46:3, 68:2
**Correctly** - 48:3
**Corresponding** - 55:17
**Couldn't** - 74:14
**Counsel** - 3:2, 33:11, 33:22
**Count** - 13:2, 58:4
**Counter** - 13:2
**Countries** - 7:16
**Couple** - 13:13, 18:12, 34:17, 42:11, 77:14
**Course** - 5:3, 5:6, 6:10, 6:11, 7:5, 12:17, 63:24, 66:2
**Courses** - 5:5, 5:9, 61:7
**Coursework** - 6:9
**Courts** - 7:6
**Court's** - 17:12, 29:11, 39:24, 43:1, 53:13, 57:10, 59:25, 66:11
**Cover** - 16:11
**Covering** - 5:3
**Create** - 6:3, 32:13, 32:22, 48:13, 49:17, 66:20
**Created** - 4:4, 6:24, 12:17, 15:18, 21:17, 25:6, 30:20, 31:5, 32:15, 42:16, 48:12, 48:14, 48:16, 48:22, 63:19, 63:23, 75:24
**Creates** - 14:14, 21:10, 31:23
**Creating** - 5:17
**Cross** - 14:25, 68:25
**Cso** - 75:6
**Current** - 30:22, 30:25, 38:19
**Currently** - 3:18, 19:6, 19:20, 30:19, 31:12

**D**

**Daily** - 5:25
**Dark** - 27:12
**Dash** - 70:22
**Databases** - 7:3, 41:24,

47:24, 74:11, 74:22
**Date** - 54:14, 54:15, 71:3, 71:5, 71:8, 75:1
**Dates** - 54:7
**Day** - 11:2, 22:5, 52:2
**Days** - 32:23, 52:2, 63:19
**Days'** - 22:24, 27:13, 27:14
**Day's** - 22:24
**December** - 9:25
**Decide** - 65:18
**Decision** - 65:6
**Decode** - 4:2
**Decoding** - 5:20, 14:7
**Defendant** - 3:2, 33:22
**Defense** - 10:4, 10:5
**Degree** - 4:9, 4:10
**Delete** - 15:20, 20:18, 22:22, 22:23, 22:25, 48:24, 49:18, 51:7, 51:21, 51:22, 51:25, 52:1, 52:7, 55:18, 68:1, 73:17, 75:6
**Deletes** - 50:3
**Deleting** - 51:19, 55:19, 63:6, 63:9
**Deletions** - 72:11, 72:13, 72:16, 72:18, 72:23, 74:4, 74:14
**Demonstrating** - 66:17
**Demonstration** - 65:14, 65:15, 65:20, 66:1, 66:4, 66:14, 70:7, 75:17
**Department** - 4:14
**Depicted** - 22:10, 29:17, 37:23
**Derivative** - 17:22
**Describe** - 9:11, 29:15
**Designed** - 20:17, 21:17
**Desk** - 12:13
**Detected** - 75:11
**Detecting** - 76:11
**Determine** - 6:4, 27:24, 63:20, 64:15
**Determined** - 62:10
**Developers** - 5:17, 6:4, 15:1
**Devices** - 4:1, 25:22
**Didn't** - 4:10, 6:21, 9:16, 28:5, 30:11, 40:20, 45:13, 46:19, 51:24, 63:7, 69:7, 72:21, 76:14
**Die** - 18:10, 30:10, 35:21, 38:9, 40:15, 40:21, 44:7, 44:8, 44:15, 44:16, 45:5, 52:5, 54:25, 62:17, 62:21, 62:25, 63:17, 71:14
**Difference** - 19:19, 32:24, 40:12, 40:14

**Differences** - 21:6, 75:23
**Different** - 10:3, 17:22, 18:13, 21:1, 34:17, 39:8, 39:12, 40:11, 41:17, 51:4, 54:24, 70:4, 72:9
**Digital** - 4:21, 4:23, 5:1, 5:3, 5:15, 5:24, 6:23, 7:7, 7:17, 21:9, 61:4, 61:7
**Directing** - 17:15
**Direction** - 3:11, 55:9
**Directly** - 7:1
**Disconnected** - 47:9
**Disconnection** - 46:21
**Discount** - 23:3
**Discovered** - 10:20
**Discrepancy** - 75:16
**Discretion** - 51:6
**Discussing** - 36:15, 66:2, 66:9
**Display** - 29:12, 48:4, 62:20
**Displayed** - 30:23, 66:14
**District** - 8:12
**Document** - 11:9, 23:21, 23:25, 28:11, 30:1, 34:2, 36:23, 38:22, 38:25, 42:10, 42:13, 42:16, 52:11, 56:18, 58:8, 59:14, 60:15
**Doesn't** - 19:20, 26:20, 50:5, 53:2, 66:4, 68:7
**Domains** - 45:22
**Dot** - 18:9, 24:1, 25:7, 27:23, 29:20, 39:4, 42:1, 45:1
**Doubt** - 76:25
**Draw** - 61:21
**Driven** - 51:7
**Due** - 43:25

**E**

**Each** - 5:5, 30:3, 34:8, 35:14, 35:15, 39:12, 50:1, 53:23, 72:2
**Earlier** - 32:5, 32:8, 40:23, 48:9, 51:23, 63:15
**Earliest** - 63:21
**Early** - 16:18, 50:17
**Eastern** - 68:13
**Edit** - 20:18, 48:20
**Editing** - 74:17
**Education** - 6:6
**Educational** - 4:6
**Effectively** - 26:19
**Eight** - 5:4, 54:1, 67:20
**Eleven** - 14:22
**Eliminate** - 69:21
**Email** - 7:19, 7:22

6-17-24 WHIFFIN

Employee - 69:14
Encoding - 35:24, 35:25
Endeavor - 38:14
Entire - 19:7, 22:24, 34:7, 35:13, 63:8
Entirety - 10:9
Equals - 35:19, 36:4
Et - 16:5, 67:12
Events - 41:17
Eventually - 8:14
Everything - 25:25, 41:7, 42:4, 51:22, 55:19
Evidence - 10:25, 11:2, 50:16, 65:15, 65:16, 65:17, 65:19, 65:20, 76:3, 76:12
EXAMINATION - 3:6, 68:25, 75:14, 77:5
Examine - 9:9
Examined - 16:5, 29:8
Examiner - 6:19, 14:22, 16:18, 17:20, 21:23, 64:15, 76:16
Examiners - 4:2, 5:18, 14:14, 14:16, 14:20, 14:23, 15:1
Example - 18:4, 19:15, 26:22, 32:12, 48:12, 49:4
Examples - 30:7, 30:8, 40:22
Excluding - 29:20
Exhausted - 45:24
Exhibits - 56:7
Existed - 21:15, 55:16, 63:18, 76:6
Exists - 15:1, 49:15, 49:19, 50:13
Exits - 33:10
Expected - 48:2, 68:4
Experience - 4:7, 16:1
Expert - 5:16, 10:4, 10:5, 73:25
Explained - 35:15, 64:10
Explaining - 45:7
Explains - 35:25
Explanation - 8:20, 64:17
Expound - 19:1
Extract - 4:1, 18:7
Extracted - 14:1, 14:12, 14:15, 14:17, 74:3
Extracting - 5:9
Extractions - 14:12

**F**

Failure - 26:11
Fair - 13:19, 65:18, 70:11
Fantastic - 22:3
Fashion - 16:4

Fast - 77:16
Feature - 21:10, 36:17, 66:18
Features - 22:3
February - 16:18, 50:19
Feel - 65:5
Field - 6:15, 7:6, 21:16, 31:9, 31:19, 40:13, 41:9, 61:2
Fields - 31:16
File - 14:2, 14:13, 16:7, 16:16, 18:10, 26:6, 39:9, 47:16, 48:5, 48:10, 49:14, 49:16, 50:2, 50:3, 50:23, 68:3, 71:19, 71:20, 74:17
Files - 13:25, 27:8, 27:9, 66:23, 67:9, 76:19
Filtered - 16:5
Finally - 5:19, 13:6, 36:3, 54:4
Find - 10:14, 17:23, 32:10, 38:18, 40:3, 48:3, 50:8, 51:12, 70:20
First - 12:18, 13:14, 15:17, 29:19, 29:22, 35:16, 38:15, 38:17, 40:6, 43:11, 44:15, 44:17, 48:18, 49:13, 51:21, 53:25, 62:14, 66:14, 71:24
Five - 4:20, 9:15, 15:12, 21:22, 25:14, 54:22, 59:7, 61:4, 61:5, 72:23
Focus - 18:22, 18:25, 19:2, 19:3, 19:7, 31:22, 31:24, 32:1, 54:12, 64:10, 75:23
Focused - 10:13, 62:11, 68:17
Folders - 14:1, 66:23, 67:9
Followed - 32:12, 58:3
Following - 5:12
Forensic - 3:22, 3:23, 3:25, 5:16, 7:12, 17:20, 20:17, 21:2, 49:7, 61:2
Forensically - 48:20
Forensics - 3:21, 4:21, 4:23, 5:1, 5:3, 5:4, 5:8, 5:24, 6:23, 7:7, 7:18, 21:9, 61:5, 61:7
Forget - 64:16
Form - 38:13
Forth - 15:19
Found - 5:10, 8:19, 9:4, 17:23, 18:2, 22:17, 23:1, 24:1, 26:1, 27:6, 29:5, 29:6, 34:7, 63:18, 70:25
Foundational - 5:2, 13:13

Four - 4:20, 48:25, 54:21, 56:4, 56:7, 57:4, 73:1
Frame - 20:2, 20:5, 48:7, 48:12, 48:14, 48:16, 48:18, 48:19, 48:22
Frames - 48:6, 48:17
Free - 61:4
Friendly - 4:3
Front - 66:16
Full - 9:6, 10:8, 10:12, 52:2, 74:20
Fully - 73:7, 73:9, 73:13
Function - 26:18, 63:14, 73:11
Further - 47:10, 68:21, 72:7, 77:3

**G**

Gain - 3:25
Gap - 15:22, 50:23
Gaps - 50:24
Gave - 19:14
General - 7:12, 9:12, 21:7
Generally - 7:17
Get - 4:10, 6:2, 11:6, 16:6, 69:18, 69:20, 72:3, 77:14
Gets - 26:25, 32:3, 32:15, 48:20, 49:18, 49:19
Gilman - 15:3, 30:12, 36:12, 43:8
Give - 7:23, 74:20
Given - 6:17, 15:18, 18:20, 18:24, 50:22, 53:23, 61:4, 64:18, 71:18
Glean - 17:20
Global - 42:3
Globally - 7:15, 61:6
Go - 4:8, 4:17, 5:12, 30:19, 41:16, 56:11, 67:14, 67:17, 67:25, 68:8, 68:9
Going - 4:6, 12:13, 20:18, 35:18, 56:10, 66:23, 68:1
Gone - 19:14, 76:11
Good - 3:8, 3:9, 33:6, 69:2, 69:3
Google - 15:10, 18:4, 18:5, 27:21, 27:22, 30:2, 30:5, 34:7, 35:17, 35:18, 36:4, 36:6, 40:21, 44:2, 68:11, 68:12, 71:11, 71:13, 76:24
Got - 14:23
Green - 15:9, 43:9, 43:20, 43:24, 43:25, 64:1
Grouped - 43:15
Guess - 23:4

**H**

Half - 45:3
Hand - 28:10, 48:5
Handed - 23:21, 28:10
Hash - 74:24, 76:10, 76:14
Hashed - 75:1
Hashes - 74:25
Hasn't - 49:21, 50:13
Haven't - 63:15
Heard - 65:16, 77:7
Heart - 18:18
Help - 15:2, 65:15, 65:20, 69:15
Helpful - 3:10, 40:3
Helps - 65:17
Higher - 4:11
Highlighted - 15:8, 43:20, 43:21, 43:24, 43:25, 44:4
Highlights - 23:25
Historical - 76:19
Hit - 68:9
Hockomock - 44:14, 45:21, 58:2, 62:13
Hockomocksports - 15:13
Hos - 18:10, 30:10, 35:21, 38:9, 40:15, 40:21, 44:7, 44:16, 45:5, 52:5, 54:25, 62:17, 62:21, 62:25, 63:17, 71:14
Hour - 52:2
Hours - 25:14, 32:23, 45:6, 67:5
Hundreds - 30:7

**I**

IAN - 3:4, 3:16
ID - 15:18, 40:16, 40:17
I'd - 32:20, 58:18, 70:21
Identified - 6:19, 16:25, 64:8, 64:12
Identifier - 13:9, 15:15, 15:17, 53:23
Identifiers - 16:10, 16:14
Identifies - 48:8
Identifying - 40:7, 57:22
Ignoring - 44:24
I'll - 28:10, 65:2, 74:6, 77:16
Illustrate - 66:12
I'm - 3:18, 4:10, 5:23, 11:9, 12:13, 16:12, 23:8, 29:2, 38:22, 39:7, 41:21, 46:3, 46:7, 47:22, 56:18, 58:6, 67:6, 76:25, 77:9
Image - 8:4

6-17-24 WHIFFIN

**Immediately** - 67:22
**Immigrated** - 4:18
**Impact** - 75:18
**Important** - 18:23, 32:24, 34:9, 36:3, 44:25, 67:10
**Impossible** - 63:11
**Impounded** - 23:13, 28:23, 33:15, 34:21, 56:1
**Inaccurate** - 65:10
**Increase** - 13:12
**Indeed** - 10:18
**Indicated** - 76:3
**Indication** - 40:25
**Ingrained** - 42:3
**Initial** - 8:16, 8:17
**Initially** - 8:14, 30:17
**Input** - 35:24
**Inquiries** - 64:22
**Insofar** - 10:16
**Instruction** - 65:12
**Intelligence** - 5:15
**Interest** - 8:7, 10:12, 30:9, 46:7
**Interesting** - 10:18, 48:20
**Internal** - 13:2, 73:6, 73:9, 73:12
**Internet** - 5:10, 10:3, 11:15, 26:22
**Interpretation** - 7:11, 9:17
**Interpreted** - 7:25
**Interpreting** - 5:9
**Interrupted** - 74:18
**Introduce** - 11:20, 17:4, 24:5, 28:18, 37:6, 39:18, 42:20, 53:6, 57:2
**Introduced** - 21:11, 72:15
**Introduces** - 22:2
**Introducing** - 56:3
**Investigate** - 9:4
**Investigator** - 10:1
**Investigators** - 4:4, 9:2, 9:16, 61:2, 69:8, 69:10
**Iphone** - 66:15, 69:25, 70:19, 73:23
**Issue** - 9:9, 9:11, 9:12, 9:13, 9:22, 49:12, 64:20, 64:25, 71:23
**Issues** - 50:14, 64:5, 64:7, 66:8
**Item** - 17:21, 18:8, 19:4, 27:19, 29:23, 30:2
**Items** - 18:1, 18:2, 22:23, 27:9, 28:14, 29:7, 44:1, 44:4
**I've** - 6:8, 7:7, 8:6, 14:23, 21:21, 22:17, 23:21, 35:14, 61:3, 61:4, 64:9, 66:22, 68:5, 70:10, 73:11

| J |
| --- |

**January** - 11:17, 16:17, 50:18, 56:23, 56:24, 57:25, 59:11, 59:18, 60:12, 62:2, 63:22
**Jennifer** - 13:16, 13:19, 69:25, 70:3
**Joined** - 4:12
**Joining** - 6:9
**June** - 67:23
**Jurors** - 12:14, 65:13
**Jurors'** - 15:6, 57:16, 61:21, 61:22
**Jury's** - 25:3, 35:10, 37:24, 40:3, 43:11, 53:20, 59:5

| K |
| --- |

**Knows** - 12:24

| L |
| --- |

**Label** - 65:4
**Landscape** - 5:24, 21:9
**Language** - 36:1
**Large** - 51:4, 71:25, 72:3, 75:9, 76:20
**Larger** - 72:6
**Laser** - 12:12, 12:14, 25:2, 29:14, 35:9, 40:2, 43:10, 53:19, 59:4
**Later** - 9:25, 10:4, 11:2, 26:1, 45:6, 63:20, 75:1
**Leaders** - 3:20
**Leads** - 28:6
**Learn** - 21:12
**Leave** - 32:22, 49:14, 73:14
**Leaves** - 63:8
**Led** - 9:13
**Left** - 5:14, 25:8, 35:12, 40:6, 53:22, 66:15
**Light** - 27:11
**Lights** - 55:23
**Limited** - 30:7
**Line** - 52:20, 53:24
**Listed** - 10:21, 41:5
**Load** - 13:1, 26:11, 26:18, 26:21, 26:23, 26:24, 27:2
**Loaded** - 12:21, 12:25, 28:7, 62:15, 62:18, 63:1
**Loading** - 40:20, 62:16
**Local** - 9:15, 12:18, 15:10, 25:14, 38:3, 57:25, 58:1
**Located** - 27:17
**Locations** - 7:4
**Locator** - 12:23
**Log** - 47:16, 47:21

**Longer** - 31:3, 31:8
**Look** - 8:23, 11:10, 14:14, 14:17, 45:13, 46:5, 46:8, 49:5, 49:7, 52:13, 55:6, 66:25, 67:15, 68:10
**Looked** - 10:9, 39:10, 66:5
**Looking** - 8:20, 12:15, 17:18, 25:4, 29:15, 35:10, 39:4, 40:4, 43:12, 45:7, 45:25, 47:6, 57:13, 57:17, 60:7
**Lose** - 20:21, 50:4
**Lot** - 27:11
**Lots** - 18:19, 39:8
**Lower** - 15:8, 31:7

| M |
| --- |

**Main** - 6:21, 45:22, 49:19, 50:3
**Mainly** - 7:8
**Maintain** - 22:1
**Maintaining** - 5:18
**Make** - 4:3, 9:16, 13:4, 16:13, 69:7, 72:5, 74:14
**Making** - 69:17
**Manager** - 3:18, 5:20, 14:7
**Manually** - 55:18, 72:19
**Many** - 13:3, 58:4, 69:21
**Mapped** - 66:24, 67:9
**Marked** - 11:24, 17:8, 24:9, 34:24, 37:10, 39:22, 42:24, 52:25, 53:11, 57:6, 57:7, 58:18, 58:21, 59:20, 59:23, 61:11, 61:14, 63:4
**Matched** - 54:10, 71:20
**Mccabe** - 13:17, 13:19, 46:18, 70:11, 70:19
**Mccabe's** - 46:16, 69:25, 70:3, 75:16, 76:13
**Meaningful** - 14:15, 15:2, 16:4
**Means** - 24:25, 31:8, 31:20, 35:16, 49:18, 52:25, 73:17
**Meant** - 31:6, 32:21, 55:17
**Mechanism** - 73:6, 73:9, 73:12, 74:24, 76:10
**Mechanisms** - 72:23
**Member** - 8:15
**Memory** - 45:23, 46:11
**Men** - 30:2, 30:3, 58:13, 59:8
**Merged** - 49:19
**Message** - 8:8, 26:21
**Messages** - 38:16
**Met** - 13:20

**Method** - 24:1, 74:11
**Methods** - 23:5
**Michael** - 69:11
**Michigan** - 7:9
**Microphone** - 3:10
**Minimize** - 32:22
**Misleading** - 65:3
**Misrepresented** - 65:6
**Missing** - 16:17, 20:2, 20:4, 38:4, 38:6, 38:12, 63:10, 76:7
**Mobile** - 3:20, 24:1, 25:7, 27:19, 27:23, 29:5, 29:20, 30:8, 42:1, 45:1
**Mode** - 25:17, 25:21, 26:5, 26:8, 27:12, 30:24, 41:3, 41:8
**Modified** - 75:3
**Month** - 8:11
**Morning** - 11:16, 44:20, 45:15, 77:1
**Moved** - 5:19
**Moving** - 4:21, 4:23, 23:17
**Much** - 42:3, 75:12
**Multiple** - 20:20, 39:13, 40:9, 47:25, 48:1, 48:9, 72:1, 72:15
**Mysql** - 74:8, 74:10, 74:11

| N |
| --- |

**Named** - 13:16
**Names** - 25:1, 69:12
**National** - 4:12
**Navigate** - 66:25
**Navigated** - 57:24
**Navigation** - 41:16, 41:17
**Navigational** - 33:3
**Navigations** - 25:25
**Near** - 67:1
**Needed** - 6:20, 21:24
**Network** - 9:6, 46:17
**New** - 13:11, 21:10, 21:12, 21:14, 30:20, 31:23, 32:3, 32:13, 48:11, 48:13, 48:15, 48:22, 49:20, 67:21, 67:22
**Newer** - 21:7
**Night** - 67:18, 67:20, 68:16
**Nine** - 54:1, 54:21, 54:23
**Nobody** - 63:8
**Nonexhaustive** - 30:6
**Norfolk** - 8:12
**Normal** - 49:5
**Note** - 29:21
**Notice** - 40:7
**Noting** - 40:18

6-17-24 WHIFFIN

**Numbering** - 50:23, 75:7
**Numbers** - 15:19, 16:17, 40:8

**O**

**Objection** - 11:22, 17:6, 23:7, 23:9, 24:7, 28:20, 34:15, 37:8, 39:20, 42:22, 53:9, 65:1, 74:5
**Objections** - 34:18
**Observations** - 16:13
**Observe** - 19:23, 20:3, 37:22, 54:15, 55:12
**Observed** - 12:16, 15:7, 16:8, 16:15, 25:4, 27:25, 53:21, 59:6, 61:23, 62:8
**Occasion** - 7:5, 64:1
**Occur** - 22:12, 55:6, 63:23
**Occurred** - 15:9, 23:6, 55:10, 55:11, 64:11, 76:18
**Occurring** - 11:1, 49:22
**Offer** - 69:15
**Office** - 8:12
**Officer** - 4:16
**Offset** - 38:2
**Okoh** - 30:4
**Old** - 21:7, 55:7
**Ones** - 31:2, 39:10, 44:6
**Open** - 7:19, 14:16, 19:16, 19:20, 30:20, 31:12, 32:6, 32:17, 32:25, 67:15, 67:18, 68:7
**Opened** - 30:19, 30:21, 31:4, 32:15, 32:20, 33:4, 45:8, 62:11, 67:21
**Opening** - 32:11, 74:16
**Operate** - 7:19
**Operating** - 69:24, 72:9
**Operation** - 55:6
**Opinion** - 10:22, 10:23, 26:7, 63:3, 76:23
**Opinions** - 64:3
**Option** - 22:22, 51:21, 51:25, 52:7, 63:9, 73:5
**Options** - 51:19
**Order** - 13:4, 13:11, 27:19, 40:13, 48:2, 48:3, 48:4, 52:4, 76:6
**Org** - 60:8
**Organized** - 16:4, 16:6, 48:6
**Original** - 8:25, 14:3, 74:25, 75:2, 76:16
**Originally** - 4:10
**Orphaned** - 55:7, 55:15, 63:12
**Otherwise** - 40:20, 62:15
**Ottawa** - 5:2, 5:7, 6:10,

6:11
**Output** - 35:24
**Overnight** - 67:19
**Overwritten** - 72:4
**Own** - 6:22, 9:6, 14:24, 14:25, 21:21, 21:24, 22:1
**Ozone** - 44:14, 45:21, 60:21, 61:25, 62:12

**P**

**Parties** - 15:2
**Parts** - 7:12
**Pass** - 4:2, 6:20, 21:23, 67:3
**Past** - 67:20
**Patrol** - 4:20
**Paypal** - 54:24
**People** - 8:20
**People's** - 4:1
**Performed** - 67:20
**Period** - 54:21
**Permission** - 17:12, 29:12, 39:24, 43:2, 53:14, 57:10, 60:1, 66:11
**Phones** - 4:1, 7:2
**Photograph** - 8:8
**Physical** - 14:13, 14:17, 21:3, 21:14, 21:19
**Piece** - 8:6, 8:8, 49:5
**Pieces** - 67:10
**Place** - 27:6, 33:6, 35:22, 74:24
**Places** - 64:23
**Play** - 14:18
**Plays** - 30:15
**Plenty** - 10:25, 11:2
**Pm** - 60:11
**Pointer** - 15:6, 25:2, 29:15, 35:9, 43:10, 53:19, 59:4
**Pointers** - 72:5
**Police** - 4:13, 4:15, 4:19, 4:22, 5:5, 5:7, 5:14, 7:17, 8:12, 10:1
**Policing** - 4:19
**Populate** - 67:11
**Portion** - 38:12, 40:5
**Portions** - 43:20, 43:23
**Position** - 5:20, 5:23
**Possession** - 9:8
**Potentially** - 17:25, 20:11, 65:6, 75:9
**Pre** - 30:17
**Preferences** - 27:10
**Prepare** - 66:1
**Present** - 3:2, 20:19, 33:22
**Presentations** - 6:17

**Presented** - 25:13
**Preserved** - 65:21
**Press** - 67:25
**Prevents** - 25:23
**Previous** - 21:15, 49:8
**Previously** - 19:21, 48:23
**Prior** - 4:6, 27:1, 36:15, 44:19, 49:22, 62:21, 67:1, 77:7
**Priority** - 6:3
**Private** - 25:17, 25:21, 26:4, 26:8, 30:24, 31:1, 31:8, 31:9, 40:25, 41:2, 41:8
**Problems** - 6:1
**Proceedings** - 23:13, 28:23, 33:15, 34:21, 56:1
**Proctor** - 69:11
**Product** - 3:18, 5:20, 7:14, 7:15, 14:7
**Program** - 5:18, 75:5
**Prominent** - 51:21
**Protects** - 25:25
**Provide** - 10:6, 10:7, 18:8
**Provided** - 8:23, 10:10, 13:16, 60:9
**Provider** - 21:10
**Proxy** - 24:24
**Publish** - 17:13, 24:13, 35:4, 37:14, 39:25, 43:2, 53:14, 56:10, 56:11, 57:11, 58:23, 60:1, 61:17
**Published** - 6:18, 7:1, 12:4
**Purely** - 65:9
**Puts** - 50:2

**Q**

**Qualifications** - 4:11
**Queried** - 16:4
**Query** - 18:5, 18:6, 18:7, 18:10, 35:20, 36:1, 36:5
**Quickly** - 23:3, 73:1

**R**

**Raining** - 30:1, 30:3, 58:13, 59:8
**Ran** - 63:14
**Range** - 16:11, 16:14
**Ranging** - 54:24
**Raw** - 74:12
**Ready** - 3:5, 33:24
**Reason** - 10:20, 22:17, 26:20, 67:6
**Reasons** - 22:11, 51:6
**Receive** - 4:9, 4:24
**Received** - 64:22

**Recent** - 33:2, 49:3, 49:6, 50:1, 50:6, 68:2, 68:14
**Recently** - 70:6
**Recorded** - 25:11, 25:12, 25:23, 26:23, 27:23, 29:24, 36:19, 41:3, 41:7, 42:4, 42:7
**Record's** - 75:24
**Recover** - 20:13, 31:1, 31:7, 38:15, 39:11, 39:12, 39:13, 49:9, 49:10, 50:4, 51:15, 53:3, 71:3, 71:10, 71:12, 71:24, 72:7
**Recoverable** - 71:22
**Recovered** - 8:6, 35:13, 39:5, 40:9, 71:16
**Recovering** - 39:11, 50:11
**Recreate** - 72:11, 72:18
**RECROSS** - 77:5
**Rectifying** - 64:24
**Red** - 52:20, 53:24
**REDIRECT** - 75:14
**Referred** - 31:14
**Reflect** - 66:4
**Reflected** - 45:20
**Refreshed** - 46:11
**Regards** - 27:25, 60:4, 61:20, 62:23
**Regular** - 53:1
**Relate** - 15:13
**Relation** - 6:18, 7:6, 7:11, 14:8, 14:9, 16:15, 19:23, 26:2, 31:18, 62:8
**Relationship** - 14:10, 14:19, 16:10, 27:16, 36:14
**Relevance** - 49:15
**Reliable** - 44:25
**Reload** - 67:25, 68:9
**Remaining** - 73:5
**Remove** - 65:7
**Renders** - 26:17
**Renumber** - 75:6
**Reopen** - 32:19
**Reopened** - 32:2, 32:7, 62:22
**Repeated** - 40:8
**Repeating** - 41:21
**Replicate** - 55:14, 55:15, 63:15, 69:24, 73:11
**Report** - 4:4, 12:3, 46:3, 46:16, 47:2, 47:6, 56:22, 58:11, 60:19, 60:22, 60:23, 61:14, 64:8, 64:11, 64:12, 66:5, 72:22
**REPORTER** - 22:6, 22:9
**Request** - 8:17, 69:13
**Requested** - 9:2, 77:18
**Require** - 75:9, 76:5

6-17-24 WHIFFIN

**Required** - 55:8
**Research** - 6:22, 6:24, 7:23, 14:25, 21:12, 22:4, 31:21, 69:20
**Resource** - 12:23
**Respectively** - 28:3, 54:10
**Response** - 4:15, 4:16, 6:22
**Result** - 71:19
**Results** - 69:20, 75:1
**Retrieve** - 12:7, 46:13, 47:12, 61:8
**Return** - 12:1, 17:10, 24:11, 28:25, 37:12
**Reused** - 15:20, 15:21
**Richard** - 64:1
**Rights** - 65:21
**Risen** - 9:22
**Road** - 13:5
**Role** - 5:22, 14:15, 14:18, 30:16
**Row** - 35:16
**Ruled** - 73:1
**Run** - 35:18
**Running** - 70:19
**Runs** - 26:19

S

**SANS** - 6:12, 61:6
**Sat** - 67:18
**Save** - 25:24, 27:10
**Saved** - 14:1, 27:19
**Saw** - 40:22
**School** - 4:9
**Scroll** - 43:8
**Searched** - 16:5, 17:21, 18:1, 18:8, 28:3, 67:22
**Searches** - 16:8, 18:3, 25:24, 26:4, 26:5, 27:14, 27:25, 28:2, 30:9, 44:11, 44:12, 44:18, 44:23, 45:2, 45:3, 62:7, 66:5, 76:24, 76:25
**Searching** - 24:2, 36:7
**Second** - 12:22, 15:11, 15:18, 30:3, 30:6, 35:19, 38:8, 45:4, 48:15, 48:19, 54:17, 54:21
**Secondary** - 62:17
**Seconds** - 9:15, 11:4, 11:5, 15:10, 15:12, 54:20, 54:23, 57:25, 60:11, 60:12, 67:7, 71:9
**Sections** - 34:9, 43:25
**Seek** - 17:4, 24:5, 28:18, 34:12, 37:6, 39:18, 42:20, 53:6, 57:2

**Seeks** - 11:20
**Sees** - 47:23
**Selected** - 76:7
**Selection** - 6:23
**Selective** - 73:5, 73:14, 73:16, 74:4, 74:14, 76:1, 76:2, 76:5
**Selectively** - 22:22, 51:25, 52:7, 63:9, 76:9
**Selects** - 73:17
**Senior** - 5:15
**Sent** - 5:2, 69:5, 74:3, 74:13
**Separated** - 38:7
**September** - 8:10
**Serial** - 67:12
**Serialized** - 24:25
**Series** - 16:2
**Service** - 4:19, 5:14, 7:17
**Session** - 3:1, 33:21, 41:10, 41:18, 71:15, 71:21, 71:23, 71:24, 72:6
**Set** - 25:22, 77:11
**Setting** - 25:21
**Several** - 9:25, 27:13, 32:23, 39:9, 39:10, 45:6, 64:5, 67:5
**Shaping** - 14:16
**Share** - 6:24, 6:25, 9:3
**Show** - 19:20, 30:1, 30:3, 30:18, 32:15, 32:20, 33:1, 33:2, 33:5, 39:14, 40:16, 44:7, 45:1, 45:2, 54:9, 62:12, 62:19, 65:8
**Showed** - 40:14, 54:11, 72:15, 75:18
**Showing** - 11:9, 11:16, 25:17, 34:2, 36:23, 38:22, 42:10, 45:4, 46:3, 52:11, 52:20, 56:18, 56:22, 59:14
**Shown** - 10:17, 25:7, 40:18, 54:12, 62:22, 62:25
**Shows** - 11:1, 11:2, 12:18, 13:6, 18:11, 19:20, 26:21, 29:19, 29:22, 29:23, 30:23, 59:18, 60:10, 60:20, 61:25, 63:10, 68:4, 68:15
**Shrink** - 15:3
**Side** - 22:1, 35:12, 53:22
**Sidebar** - 23:12, 23:14, 28:22, 28:24, 33:14, 33:16, 34:15, 34:18, 34:20, 34:22, 55:25, 56:2
**Significance** - 12:16, 15:7, 29:16, 53:20, 59:6, 61:23
**Significant** - 19:17, 19:19

**Significantly** - 31:7
**Similar** - 9:24, 10:2, 11:4, 45:3, 51:16
**Simply** - 31:9, 65:14
**Simulation** - 69:17, 70:18, 72:8
**Sits** - 26:24
**Situation** - 22:10, 48:25
**Six** - 54:1
**Skill** - 75:10, 76:21
**Slide** - 25:5
**Slight** - 7:15, 39:14
**Software** - 3:21, 3:22, 3:24, 3:25, 14:24, 49:5, 49:7
**Solely** - 65:18
**Somewhat** - 14:15
**Source** - 13:6, 39:3, 57:19
**Sources** - 29:17
**South** - 4:15
**Space** - 35:22
**Spaces** - 35:22
**Span** - 47:25, 48:1
**Speaks** - 40:19
**Specialized** - 4:24
**Specific** - 6:8, 7:6, 8:4, 41:14, 47:20
**Specified** - 64:8
**Specify** - 64:14
**Spell** - 3:14
**Spent** - 4:20
**Split** - 72:1
**Spoken** - 69:4
**Spontaneous** - 55:2, 55:12, 55:14, 77:7
**Sports** - 44:15, 45:21, 58:2, 62:13
**SQL** - 7:2
**Sqlite** - 15:16, 15:23, 16:2, 47:24, 74:11
**Stage** - 63:13
**Stalls** - 26:24
**Stamps** - 30:5, 38:6, 45:3, 76:18
**Start** - 9:9, 20:21, 27:22, 41:16, 57:23, 67:21
**Started** - 21:24, 43:17, 66:22
**Starting** - 4:7, 59:8
**Starts** - 12:22
**Statements** - 64:5
**Step** - 77:12
**Storage** - 27:5
**Store** - 19:16, 47:22
**Stored** - 16:3, 70:15
**Stores** - 18:19
**Storing** - 24:25
**Stream** - 26:16, 43:13,

43:14, 43:16
**String** - 18:6, 25:12, 36:8, 75:1
**Structure** - 47:24
**Struggling** - 21:23
**Stump** - 7:20
**Subsequent** - 32:9
**Subsequently** - 31:1
**Subtracted** - 25:14
**Successfully** - 28:7, 40:20, 63:1
**Suggestions** - 13:4
**Support** - 6:21, 7:16, 9:6, 21:13
**Supported** - 21:13, 21:15
**Surreptitiously** - 76:11
**Switch** - 31:24
**Symbols** - 35:21
**System** - 20:11, 20:15, 50:23, 51:7, 55:9, 69:24, 72:9

T

**Table** - 11:16, 12:17, 13:9, 25:5, 25:6, 27:18, 29:7, 29:16, 35:13, 38:3, 40:24, 41:5, 57:21
**Tables** - 16:3
**Tabs** - 19:16, 27:12, 30:18, 31:11, 31:24, 32:1, 43:9, 68:8
**Tackle** - 6:4, 6:5
**Taking** - 19:7, 74:17
**Tampering** - 76:18
**Task** - 38:15
**Taught** - 61:6
**Team** - 4:21, 4:24
**Tech** - 7:16
**Technically** - 17:22, 27:6
**Telling** - 35:19, 43:16
**Tells** - 35:17, 36:4, 58:4
**Temporary** - 47:21
**Ten** - 14:22, 67:7, 67:19
**Termed** - 25:17
**Terms** - 9:12, 18:13, 19:3, 21:7, 23:25, 24:22, 29:4, 29:6, 69:5
**Test** - 67:2, 70:4
**Tested** - 70:10, 75:20
**Testimony** - 3:3, 66:2, 66:9, 77:18
**Testing** - 10:19, 22:17, 55:10, 62:8, 63:2, 63:24, 70:2, 71:19, 76:22
**Tests** - 67:7
**Text** - 8:8, 25:12
**Thanks** - 47:11
**Theory** - 67:2

6-17-24 WHIFFIN

There'd - 50:23, 62:15
Therefore - 63:20, 72:5, 76:9
There's - 10:25, 11:2, 15:22, 26:16, 26:18, 50:16, 61:5, 71:25, 73:6, 74:23, 75:2, 76:3, 76:7
These - 7:13, 18:3, 20:10, 26:4, 26:5, 28:2, 40:12, 40:14, 44:1, 44:23, 45:10, 51:17, 53:24, 54:9, 58:1, 59:10, 62:18, 62:20, 76:24
They're - 7:18, 48:6
They've - 21:11, 72:3
Three - 5:2, 6:10, 15:20, 20:6, 33:4, 40:12, 40:15, 49:2, 49:4, 49:7, 51:15, 51:17, 53:25, 54:1, 54:20
Ti - 30:10, 44:8, 44:15, 45:5, 52:5
Ticket - 69:12
Times - 6:20, 7:8, 13:3, 20:20, 39:13, 45:10, 51:9, 54:8, 58:4
Timing - 33:11, 62:7
Title - 12:25, 13:1, 14:5, 18:1, 40:18, 40:21, 58:3, 68:11
Today - 33:2, 33:4, 67:6, 73:3, 73:8, 77:7
Today's - 33:5
Tony - 55:24
Took - 31:22, 45:6, 54:12, 64:10, 75:22
Tool - 14:13, 14:21, 20:8, 20:16, 20:17, 20:18, 21:21, 22:4, 22:5, 22:7, 56:22, 60:23, 61:1, 66:18, 66:19, 67:2, 67:6, 67:25
Tools - 6:23, 6:25, 7:18, 20:25, 21:1, 21:17, 21:25, 66:20
Top - 13:1, 48:8, 58:3
Topic - 50:7
Totality - 62:5
Tracking - 12:20
Tracks - 13:3
Traction - 44:18
Training - 4:24, 6:12, 15:25, 61:7
Tries - 18:2
Trooper - 69:10
Truly - 69:20
Turn - 41:19, 55:23
Turned - 6:23, 18:21
Turning - 8:10, 37:20, 49:12, 50:7
Twenty - 67:7

Twos - 39:10
Typed - 18:6, 25:8
Types - 54:24
Typically - 38:6, 39:8, 44:1, 67:8
Typing - 27:22

**U**

UK - 4:11, 7:9
Unable - 26:21, 26:23
Uncover - 40:4
Undergraduate - 4:8
Underscore - 13:8, 57:21
Understood - 73:7, 73:10, 73:13
Undertaken - 70:4
Uniform - 12:22
Unique - 13:9, 15:16, 39:4, 40:7, 50:22, 53:23, 57:21
Unlock - 42:5
Unlocked - 18:21
Update - 32:20
Updated - 5:6, 32:3, 33:1, 48:12
Uploaded - 9:6
URL - 12:22, 17:25, 30:22, 34:7, 35:13, 35:23, 40:16, 45:1, 58:2, 60:8, 71:12
Urls - 15:12
Usage - 42:6, 42:17, 51:2, 51:10
Used - 3:24, 3:25, 7:13, 7:15, 8:1, 8:3, 15:23, 18:12, 19:8, 27:10, 36:9, 61:2, 62:11, 62:12, 70:20, 74:13
Users - 5:25, 7:20, 61:6
Using - 7:18, 12:14, 15:5, 19:6, 25:2, 27:11, 28:3, 29:14, 33:4, 36:5, 41:2, 43:10, 53:19, 59:4, 67:6, 70:12, 72:9, 73:21, 73:22
UTC - 9:15, 25:10
Utilized - 22:20

**V**

Values - 25:1
Variables - 69:21
Variety - 21:1
Vendor - 66:20
Vendors - 6:21
Version - 21:7, 21:8, 21:14, 21:15, 38:19, 48:17, 49:3, 49:6, 70:2, 70:6, 70:12, 70:15, 70:18, 70:20, 75:16, 75:17, 75:20

Versions - 21:1, 21:5, 39:8, 40:9, 40:10, 40:11, 48:10, 49:1, 49:8, 50:1, 50:6, 63:16, 70:5
Versus - 21:7, 51:2
Via - 36:16, 69:13
Video - 59:8
View - 10:11, 14:20, 24:18, 31:14, 39:15, 45:9, 67:17, 76:13, 76:17
Viewed - 30:22, 37:22, 38:1, 68:15, 71:5
Viewing - 74:11
Visible - 19:4, 43:17, 44:9, 44:13, 45:16, 54:13
Visit - 8:7, 12:24, 13:2, 26:15, 26:19, 27:21, 36:6, 58:3
Visited - 13:4, 17:25, 45:1, 58:5, 59:18, 65:8
Visits - 13:8, 57:21
Voice - 3:12
Void - 14:25

**W**

Wait - 67:8
Waiting - 26:24
WAL - 18:9, 39:9, 47:16, 48:5, 48:10, 49:11, 49:14, 49:16, 49:17, 49:20, 50:2, 50:3, 50:4, 50:5, 68:3, 70:22, 71:19
Wants - 16:6
Wasn't - 55:14, 72:7
Ways - 20:14, 22:18, 22:19, 22:21
Web - 8:7, 9:14, 10:13, 10:15, 12:20, 16:9, 16:15, 17:24, 18:1, 23:2, 26:15, 26:16, 36:6, 42:6, 42:17, 43:16, 44:8, 51:2, 60:10
Webpage - 65:8
Website - 6:24, 12:24, 12:25, 13:1, 13:4, 15:13, 18:5, 18:25, 35:18, 54:12, 54:24, 57:23, 59:18, 62:1
Websites - 18:23, 41:17, 44:13, 45:16, 45:17, 58:1, 62:13
We'd - 48:23, 75:3
Week - 5:6, 6:10, 6:11, 10:3, 70:6
Weeks - 5:2, 9:25, 32:23
Weeks' - 33:4
We'll - 64:13
We're - 12:15, 20:12, 25:4, 29:15, 30:25, 35:17, 43:12, 49:9, 57:13, 60:6,

65:13, 67:13
We've - 29:21, 41:25
What's - 12:9, 14:9, 19:20, 19:21, 24:15, 25:17, 35:6, 37:17, 40:13, 43:4, 43:5, 43:13, 53:16, 59:1, 60:3, 66:22
Whereupon - 11:24, 17:8, 24:9, 34:24, 37:10, 39:22, 42:24, 53:11, 57:7, 58:21, 59:23, 61:14
Whoever's - 73:21
Widely - 7:13, 61:1
Wifi - 45:11, 45:13, 45:23, 45:25, 46:17, 47:7, 47:9, 47:10
Wildly - 65:9
Window - 25:10, 27:1, 67:21, 68:9
Wise - 32:8
Wish - 3:11
Witness - 12:1, 17:10, 22:8, 23:18, 24:11, 28:25, 33:10, 35:2, 36:20, 37:12, 42:12, 46:6, 46:10, 47:2, 47:5, 52:15, 66:12, 77:13, 77:16
Won't - 25:24
Word - 18:15
Words - 71:21
Work - 3:17, 4:6, 4:8, 4:15, 6:14, 6:18, 7:5, 10:12, 14:24, 21:16, 21:18, 41:9, 68:7
Worked - 6:15, 61:3
Working - 4:20, 5:15, 6:19, 21:22
World - 3:20, 7:12
Worth - 40:18
Wouldn't - 23:1, 36:8, 69:23
Write - 21:24, 22:4, 47:15, 47:21, 48:11
Writes - 14:24
Written - 12:19, 19:18, 26:25, 27:2, 27:4, 31:4, 31:10, 49:21, 76:8

**Y**

YANETTI - 11:22, 17:6, 23:7, 23:9, 24:7, 28:20, 34:15, 37:8, 39:20, 42:22, 53:9, 55:22, 65:1, 65:21, 65:24, 68:24, 69:1, 75:12, 77:10
Yannetti - 68:23, 77:6
Year - 5:5, 10:1
Years - 4:20, 5:4, 5:19,

6-17-24 WHIFFIN

14:23, 19:15, 21:4, 21:22,
61:4, 61:5
**Yorkshire -** 4:15
**You'd -** 18:4, 27:10, 72:8
**You'll -** 40:7, 68:11, 68:12
**You're -** 3:5, 11:10, 17:19,
18:5, 19:11, 24:22, 33:24,
34:19, 36:1, 46:5, 52:13,
56:3, 69:17, 70:8, 70:11,
74:16, 74:18
**Youtube -** 45:21, 54:25,
58:12, 58:13, 59:8
**You've -** 18:6, 18:12,
65:16, 66:1, 66:8, 71:18,
73:3, 73:8

| Z |
|---|

**Zip -** 14:2, 14:13
**Zone -** 68:13
**Zoom -** 15:4

| 0 |
|---|

**0207 -** 46:19
**0212 -** 47:9
**0539 -** 47:10

| 1 |
|---|

**1:00 -** 60:10, 60:11
**10:00 -** 63:21
**10:33 -** 44:17
**1033 -** 62:23, 62:24
**11:00 -** 47:10, 62:1
**12 -** 21:4, 32:22, 70:5,
75:21
**12:00 -** 32:13, 32:16,
32:17, 33:2
**13 -** 21:4, 70:5, 75:21
**14 -** 19:15, 30:17, 30:25,
64:18, 68:6, 70:5, 75:21
**1442 -** 67:24, 68:11, 68:15
**15 -** 19:17, 31:3, 41:2,
42:5, 64:18, 68:7, 70:5,
75:21
**15.2.1 -** 70:12
**15.7 -** 70:10
**15.8.2 -** 70:7, 70:8
**16 -** 40:10, 70:5, 75:21
**16th -** 67:22
**17 -** 60:11, 60:12, 70:5,
75:21
**18 -** 11:4, 70:6, 75:21

| 2 |
|---|

**2:00 -** 45:12
**2:27 -** 9:14, 15:9, 45:15,
69:6, 71:9

**2:27:37 -** 44:1
**2:27:40 -** 10:16, 10:19,
10:20, 11:1, 17:1, 44:13
**2:27:47 -** 15:12
**2:27:53 -** 44:2
**20 -** 7:8, 67:4
**2004 -** 4:13
**2009 -** 4:18
**2010 -** 67:22
**2020 -** 5:14
**2021 -** 59:19
**2022 -** 11:17, 59:11, 60:12,
62:2
**2023 -** 8:10
**2139 -** 57:25
**213934 -** 56:23
**225509 -** 56:23, 58:1
**227 -** 9:1, 69:7
**22731 -** 54:9, 54:21
**22733 -** 54:10, 54:18
**22735 -** 54:18
**22740 -** 51:16, 54:21,
62:11, 64:9, 64:10
**23 -** 40:11
**25th -** 62:2
**26 -** 62:1
**27 -** 38:5
**27th -** 56:23, 56:24, 57:25,
59:11
**28 -** 38:6
**28th -** 59:18, 60:12
**29 -** 38:6
**29th -** 11:16, 77:2

| 3 |
|---|

**30 -** 38:6
**31398 -** 59:9
**31399 -** 59:9
**31400 -** 59:9
**31401 -** 59:9
**31402 -** 59:10
**31407 -** 57:22
**31408 -** 57:22
**31st -** 63:22
**34 -** 57:25
**3rd -** 50:18

| 4 |
|---|

**4,001 -** 54:2
**4,004 -** 54:3
**4,019 -** 54:3
**40 -** 9:14, 69:7, 71:9
**4020 -** 54:3
**4024 -** 54:6, 54:14
**4025 -** 38:4, 38:5, 54:4,
54:6, 54:14
**4026 -** 38:5, 54:16, 54:17,

57:14, 57:18
**4027 -** 54:19, 58:14, 59:6
**4028 -** 38:10, 70:23,
71:20, 72:12
**4029 -** 59:17, 60:4, 60:9
**4030 -** 60:20, 61:21
**4031 -** 38:5, 54:4
**42 -** 15:9

| 5 |
|---|

**51 -** 11:4

| 6 |
|---|

**6:23 -** 11:3, 44:19, 45:2,
77:1
**6:23:51 -** 28:3
**6:23:56 -** 44:16
**6:24 -** 11:4, 45:2, 77:1
**6:24:18 -** 28:3
**60 -** 40:11
**600 -** 61:6
**614 -** 11:24
**615 -** 17:8
**616 -** 24:9
**618 -** 34:24, 35:7
**619 -** 37:10, 37:18
**620 -** 39:22
**621 -** 42:24
**622 -** 53:11, 53:14, 53:17
**623 -** 57:7, 62:13
**624 -** 58:21
**625 -** 59:23
**626 -** 61:14

| 8 |
|---|

**8:10 -** 68:16