# ATTACHMENT 5

                    COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                         SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT

* * * * * * * * * * * * * * * * * * *
                                    *
COMMONWEALTH OF MASSACHUSETTS,      *
                                    *
v.                                  * Docket No. 2282CR00117
                                    *
KAREN READ.                         *
                                    *
* * * * * * * * * * * * * * * * * * *

          BEFORE THE HONORABLE BEVERLY CANNONE
          FRIDAY, JUNE 21, 2024
          TESTIMONY OF MARIE RUSSELL

APPEARANCES:

For the Commonwealth:
    BY:  ADAM LALLY, A.D.A.
         LAURA MCLAUGHLIN, A.D.A.

For the defendant:
    BY:  DAVID YANNETTI, ESQ.
         ALAN JACKSON, ESQ.
         ELIZABETH LITTLE, ESQ.

                    Dedham, Massachusetts
                    Room 25


Christine D. Blankenship, CVR
Court Reporter/Transcriber

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Marie Russell | | | | |
| (By Mr. Jackson) | 3 | | 43 | |
| (By Mr. Lally) | | 24 | | |

Exhibits:

None

(Court in session.)

(Defendant is present with counsel.)

(Jury in.)

                    MARIE RUSSELL, sworn

        THE COURT:  All right. Whenever you're ready, Mr. Jackson.

        MR. JACKSON:  Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. JACKSON:**

Q    Dr. Russell, could you please get a loud, clear voice, state your name and spell your last name for us, please.

A    Hi.  Dr. Marie Russell, R-U-S-S-E-L-L.

Q    Doctor, what do you do for a living?

A    I'm an emergency room forensic pathologist, just recently retired.

Q    And prior to retirement, what was your position?

A    The immediate position just recent before retirement was chief medical executive at the -- for the state of California at the Cochrane State Prison.

        THE COURT:  Dr Russell, I'm going to ask you to keep your voice up. Okay?

Q    And please --

        THE WITNESS:  Yes.

Q    There's a couple of air conditioners in here. Just keep your voice as loud as possible.

What is, in fact, an emergency physician?

A    Emergency physician is a medical specialist who has completed a residency, intern, internship, residency, residency in the field of emergency medicine, which is a field which involves taking care of patients that are sick or injured and go to the emergency room.

Q    Can you tell us what your education - starting with your education - your education, training, and background is that qualifies you as an emergency physician, starting with your education all the way back to college?

A    Okay.  Well, I completed at least sixteen years of formal education beyond high school, which includes college and then four years of medical school, and four years of emergency medicine residency and internship, and then four years of pathology residency, which includes two years anatomic and two years of forensic pathology.  And then I treated -- excuse me -- I've taken a bunch of other courses and attended seminars.

Q    Let's start with your college. Where'd you go to college? Where'd you start?

A    Okay. MIT. I did my first year at MIT where I took my premed courses.

Q    And then what happened after that? By the way, about what year was that?

A    Oh, that was in 1972 to '73.

1-5

Q    Where did you go after MIT?

A    So -- so what happened -- what happened.  I was interested in becoming a doctor, and so I took some premed courses and then subsequent to that first year, I learned that my mother had metastatic breast cancer, and so I decided to go home to New York to be with her.  After that -- well, she subsequently passed away, and I returned to Massachusetts and decided to take advantage of the time off from school to investigate my interest in law enforcement. And I subsequently became a police officer here in Massachusetts. So following MIT, did you go to a police academy?

A    I did.

Q    Which police academy did you go to?

A    I went to the Boston Police Academy.

Q    And did you end up becoming a sworn officer?

A    Yes.

Q    For how long?

A    I did it for seven years full time.

Q    And what department did you work for?

A    I worked for the city of Malden Police Department.

Q    What years were -- was that, if you can give me a range? A From 1977 to 1984.

Q    During the time that you were a Malden police officer, did you also go to school and continue your formal

1-6

education? A  I did.

Q    Describe that for us, please.

A    Well, I took -- I took specialized courses through the Massachusetts Criminal Justice Training Council --

MR. LALLY:  Objection.  Move to strike.

THE COURT:  All right.  So I'm going to strike that.

MR. JACKSON:  If I may?

THE COURT:  Jurors, disregard that.

Q    Let me ask you this way. I don't want to get into the specifics.

A    Okay.

Q    After -- while you were a police officer, did you also take formal education to further your medical training or your college?

A    Yes, I did.

Q    That's what I'm interested in.

A    Okay.

Q    Tell us about that.

A    Oh, yes. So I attended Northeastern University part-time and received a bachelor of science degree in psychology.

Q    After you got your degree in psychology from Northeastern, did you go onto continue your education in medicine?

A    I did. I attended medical school at the University of

Massachusetts Medical School from 1983 to 1987.

Q    Also known as UMass?

A    Yes.

Q    Did you ultimately end up with a medical degree?

A    I did.

Q    After you became a doctor, did you engage in a residency?

A    Yes.

Q    What years were the residency -- that first residency?

A    So the first residency was from 1987 to 1991 and that was in Los Angeles at the Los Angeles County University of Southern California Medical Center.

Q    Is that also known as LAUSC?

A    It was at the time, yes.

Q    And that's associated with the University of Southern California Medical Center; is that right?

A    Yes.

Q    After your first residency -- by the way, what was your first residency in?  What was the subspecialty?

A    So it was in emergency medicine. And USC is a very large trauma center.

Q    How would you describe the size and volume of the USC trauma center?

A    Well, it's one of the busiest in the United States.

Q    After your first residency in emergency medicine, did

you do a second residency?

A    Yes.

Q    What was the subspecialty in that second residency?

A    So I did a two years in anatomic pathology and two years as a fellow -- as a fellow in forensic pathology at the Los Angeles County Coroner's Office.

Q    So you did two full residencies as a -- after you became a doctor; is that right?

A    That is correct.

Q    What's the difference -- I don't want to go into great detail, but what's the difference between an emergency physician and, for instance -- for instance, the residency that you did in pathology, both anatomic pathology and forensic pathology, what are the differences?

A    Well, generally, the emergency physician treats live patients and the spectrum of, you know, injuries can be wide or illnesses can be wide, and the forensic pathologist treats or deals with deceased patients, generally.

Q    Did you become a fellow at the LA coroner's office --

A    Yes.

Q    -- following your second residency?

A    No, that was part of the second residency.

Q    Understood.  Describe that fellowship.

A    So that was two years of full time work at the LA coroner's office under the supervision of very experienced

1-9

medical examiners. And what I did was I did autopsies every day, one or two autopsies every day, attended conferences, and read journal articles, et cetera. It was a very formalized education.

Q    Did you also become at some point a professor or an assistant professor at LAUSC, the medical center side, the university side?

A    Yes. So while I was doing the forensic pathology and anatomic pathology residencies during the daytime, I worked as a full time ER doc supervisor in the capacity of an assistant professor in the evenings.

Q    Did you also become an adjunct professor at Cal State, Los Angeles, California State, Los Angeles?

A    Yes.

Q    Is that separate university?

A    Yes.

Q    And you had separate responsibilities as a professor in that role?

A    Yes.

Q    Were you also teaching legal medicine and forensic medicine in that capacity?

A    That is correct. It was a master's level program.

Q    How long were you an ER physician in total and an attending physician for Los Angeles County USC Medical Center?

1-10

A    Twenty-nine years in total. Four of those were in training, and the rest were as a supervisor.

Q    So of your 29 years, 25 of your 29 years, you were supervising others?

A    Correct.

Q    Meaning other doctors?

A    Other doctors, yes.

Q    And teaching other doctors?

A    Yes.

Q    And teaching medical students?

A    Yes. And seeing -- seeing their cases.  Once they examined the patient, they would present their case or tell me about the case, and then I would go in and see those patients in addition to my patients.

Q    That was my next question, Doctor, in addition to teaching, were you also specifically assessing, diagnosing, and treating patients of your own?

A    Yes --

Q    Throughout the --

A    Not all -- not all the time. Some shifts I didn't have to do that but most -- but much -- much of the time, yes, the bulk of the 29 years that you were an ER doc, an emergency physician in other words, were you also attending to patients as well?

A    Yes.

1-11

Q    All right. Once you left that fellowship with the LA coroner's office, did you remain active in any way or connected to the Los Angeles coroner's office?

A    Yes. So I would attend their weekly conferences when I could, when I went to -- you know, when I was available to do so. And I also consulted on some cases with them. So if they had something that was interesting and beyond their clinical expertise, they would sometimes consult me.

Q    During your tenure at LAUSC, did you become the director of any of their subprograms?

A    Yes.

Q    Can you describe that for the jurors, please?

A    Yes. I was director of the USC Center for Life Support Training, so -- and that involved teaching other doctors life support courses, such as advanced cardiac life support, or that we teach the surgeons advanced trauma life support.

Q    Did you also -- I'm sorry. Were you finished?

A    Go ahead.

Q    Were you also a director for their quality improvement in the early 2000s?

A    Yes, for the emergency medicine department.

Q    What was the reason for the quality improvement program, if you will, for LAUSC?

A    Well, for any program, it's ideal to have a quality

1-12

improvement component because what you want to do is look at cases that were treated and see if there were any errors, and if so, correct the errors, teach the doctors that involved, you know, what went wrong, and try to make systemic improvements or teach -- teach -- teaching improvements to prevent those errors from occurring in the future.

Q    Were you teaching, basically, best practices for emergency room physicians as well as trauma physicians and surgeons?

A    Yes, we tried.

Q    And you were the director of that program, correct?

A    Yes.

Q    Did you also become the director of LAUSC jail medical services?

A    Yes.

Q    What is the connection or the tether between the jail system in Los Angeles and LAUSC Medical Center?

A    Well, LAC Jail Ward was established about 70 years ago, and it was a place that the officers from various agencies such as LA Sheriffs, LAPD, California Highway Patrol, or any of the municipalities around could bring people that they arrested who were in need of medical care.

Q    So the jail system, very large jail system, I'm guessing, in Los Angeles, correct?

A    Correct, yes.

Q    There have to be medical attendants to that jail system, correct?

A    Yes.

Q    And you became the director of the jail medical services for the entirety of that system?

A    For the hospital component of it.

Q    Understood.  The -- in California, there is -- you're obviously licensed in California?

A    Yes.

Q    There is a state medical board in California, correct?

A    Yes.

Q    And did you ever do any work with that state medical board?

A    Yes, I worked with them for about seven years part-time as a regular employee embedded in their enforcement unit. And what that involved was examining cases that were referred to the medical board of -- because of substandard care or illegal activities of the provide -- of practitioners, providers. It was for physicians and physician assistants that we regulated.

Q    What was your title with the state medical board for that purpose -- for those purposes?

A    The title was medical -- excuse me -- medical consultant. That was the official title.

Q    Okay.  And then before your retirement -- by the way, what years were you the medical consultant for or a medical consultant for the state board in California?

A    I think from 2009 to 2016.  I think those were the years. I'm not positive.

Q    All right.

A    I did that -- that was a job I was doing, one -- I was doing the LA County USC Medical Center job, too.

Q    Right.

A    It was an extra job.

Q    So you didn't stop working as a physician, an ER, an emergency physician at LAUSC to take that position?

A    No.

Q    You just consulted with them?

A    I did it once a week, one day a week.

Q    Got it. And then with regard to the -- your -- one of your last positions that you held, did you become the Chief Medical Executive for the California State Prison Corcoran?

A    Yes.

Q    Tell me about that position and the years that you held that position.

A    So that was from 2018 to 2023, and as the chief medical executive, I was the supervisor of all the doctors and nurse practitioners that provided care to the inmates.

Q    And obviously, the California prison system is a very

large prison system?

A    Very.

Q    Doctor, are you board certified in emergency medicine?

A    Yes.

Q    Are you a member of the National Association of Medical Examiners?

A    Yes, I'm actually fellow status, which is higher than member.

Q    Are you a member of the American Academy of Forensic Science?

A    Yes, again, I'm a fellow there.

Q    Which also is an advancement above just being a member?

A    Correct.

Q    Have you ever published in the area -- now I'm going to get very specific. Have you ever published peer reviewed articles and done research in the area of animal bites and scratches?

A    Yes.

Q    Did you author or coauthor a peer reviewed article named "Managing Law Enforcement Dog Bites in the ER,"

A    Yes.

Q    About what year was that?

A    It was in the 1990s.

Q    Late 1990s, 1996, does that sound right?

A    Yes.

1-16

Q    Did you also author or coauthor an article called "Law Enforcement, K-9 Dog Bites: Injuries, Complications and Trends?"

A    Yes.

Q    So given those articles, did you study specifically dog bites, dog wounds on the human body?

A    Yes. I have a very strong interest in wounds in general, and I have a strong interest in dog bites in particular.

Q    During the course of your career, your professional experience, how many patients would you say you've seen or treated with animal injuries, including bites and scratches?  A It's very hard to estimate, but between my own practice and the residents that I supervised, it was, I'm sure, well over 500 and could possibly be double that.

Q    Could it be as many as a thousand?

A    It could be, yes.

Q    Have you qualified as an expert in emergency medicine in the past?

A    Yes.

Q    Have you qualified as an expert in the area of forensic pathology and wounds in the past?

A    Yes.

Q    Is that both in federal and state courts?

A    Yes.

Q    Doctor, were you asked to review certain materials related to this case in furtherance of coming to some opinions and conclusions about injuries suffered by John O'Keefe, specific to his right arm?

A    Yes.

Q    What did you review in coming to your opinions and conclusions?

A    Well, I reviewed hospital records and hospital -- and pictures taken of him in from -- in the hospital, when he was in the hospital. I reviewed autopsy records, the autopsy report, and photographs taken during and before the autopsy. I reviewed -- let's see, I reviewed the grant -- I reviewed the grand jury testimony of the autopsy pathologist. I reviewed affidavit of Dr. Sheridan. I reviewed the town of Canton the dog bite reports about regarding incidents.

        MR. LALLY:  Objection.  May we approach?

        THE COURT:  Yes.

(Sidebar commences:)

(Impounded proceedings.)

(End of sidebar.)

        THE COURT:  All right. Jurors, we're going send you out for ten minutes.

(Jury out.)

(Court in recess.)

(Court in session.)

(Defendant is present with counsel.)

(Jury in.)

THE COURT:  So the Commonwealth's objection is overruled.  You can continue.

MR. JACKSON:  Thank you, Your Honor.

Q    Doctor, you've listed several items that you've reviewed in coming to your opinions and conclusions. Did you also review a toxicological report?

A    Yes.

Q    And a neurology report -- a neuropathology report?

A    Yes.

Q    As well from the Commonwealth?

A    Yes.

Q    The -- based on your review of all of those materials, I don't want to know what your opinion or conclusion is yet, but were you able to come to an opinion or conclusion concerning the injuries specifically to John O'Keefe's arms?

A    Yes.

Q    Or his right arm. Were there any documents in the furtherance of your review from UC Davis?

A    Yes.

Q    Did you review those as well?

MR. LALLY:  Objection.

THE COURT:  Sustained.

MR. JACKSON:  With the Court's permission, may we display Exhibit 19.

THE COURT:  Okay.

Q    Doctor, I want to show you a photograph and ask you very quickly, have you seen this before?

A    Yes.

Q    Is this one of a number of photographs that you reviewed in furtherance of your evaluation of this case?

A    Yes, it is.

Q    I'd like to just focus your attention on this for just a quick second and ask you, does this accurately reflect the wounds or injuries that you saw on John O'Keefe's right arm in coming to your opinions and conclusions?

A    Yes, it reflects the injuries that I saw in photographs.

Q    All right.  Now, based on your review of all of the data that you've talked about, all of the information that you were given and reviewed, what is your opinion or conclusion about how these injuries were sustained?

A    I believe that these injuries were sustained by an animal, possibly a large dog, because of the pattern of the injuries.

Q    Could you describe for the jurors, please, on what you base that opinion?

1-20

A    Yes.  Well, there's -- may I use the --

THE COURT:  Sure.

A    There's a number of patterns here.  There -- on the upper part of the arm, there's parallel lines, and those were inflicted by either teeth or claw marks. So there's a number of patterns that could be teeth or claw mark. And so this is one set right here. This is -- this is one further down, closer to the elbow is another set of parallel marks, again, probably most likely from teeth marks. And the reason I say that is in addition to the parallel marks up here, down here there's also little punctate, incomplete puncture marks here --

Q    Well let me --

A    -- little round -- little round marks right there that were inflicted by the actual point of the tooth.

Q    That was my question. What relevance does that have to your determination that this was likely caused by an animal?

A    Yes.  And I can explain in a moment the various kinds of wounds that animals can inflict.

Q    Please.

A    But going on with the picture first, so then down right at the elbow, there's another series, different series of marks that, again, have linear abrasions up where the pointer is, and then down below some punctate, superficial,

round, small abrasions again representing upper and lower teeth, in my opinion. And then there are some irregular wounds down just below the elbow. And these are all, by the way, on the exterior surface, or what we call the post -- what doctors would call the posterior surface of the arm, which is the part of the arm that would sustain defensive type wounds. So if someone were to protect themselves.

MR. LALLY: Objection.

THE COURT: So sustained. Next question.

MR. JACKSON: Sure.

Q    Doctor, if I could ask another question. Just to clear up what you said a little earlier about some of the wounds on the -- close to the elbow, is it -- is it your opinion that both the top teeth and bottom teeth could have created some or all of the injuries on that elbow area?

A    Yes.

Q    Okay. So in other words, instead of the mouth going all the way around the arm, it could have -- the top and bottom jaw could have situated itself on the -- this portion that we're seeing the -- the posterior part of the arm?

A    Yes. And in this case, the animal did not get a good enough contact.

MR. LALLY: Objection. Move to strike.

THE COURT: So I'm going to strike that. Ask a different question.

Q    Have you seen contact wounds where the animal, a dog, for instance, gets a very solid purchase on the leg, arm, part of the body?

A    Yes.

Q    Okay. Is that this or is this something else?

A    Something else.

Q    Describe that.

A    Well, when an animal inflicts injuries, the type of injury depends on, in part, on the actual type of contact and how much force is applied by that animal, in addition to any relative movement between the animal and the victim in this case. So, for instance, in the law enforcement dog bites, many of --

MR. LALLY: Objection.

THE COURT: So the nature is it -- what's -- one word.

MR. LALLY: May we approach?

THE COURT: Okay.

(Sidebar commences:)

(Impounded proceedings.)

(End of sidebar.)

MR. JACKSON: May I, Your Honor?

THE COURT: Yes.

MR. JACKSON: Thank you.

1-23

Q    Without getting any specifics about police K-9s.

A    Okay.

Q    Does this appear as it's a pattern of injuries that you see appear consistent with an animal or a large dog?

A    Yes.

Q    Does the number of injuries that you see here relegated to just the right arm, is that also consistent with an animal or large dog?

A    Yes, it can be.

Q    Is the direction of the injuries or the consistency of the direction of the injuries or the parallel injuries, is that also consistent with an animal or large dog attack?

A    Yes.

Q    Based on everything that we've discussed today, Doctor, is it your opinion, based on a reasonable degree of medical certainty, that these injuries were from an animal attack, possibly a large dog?

A    Yes.

MR. JACKSON:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. JACKSON:  That's all I have at this time, Your Honor.

MR. LALLY:  May we approach?

THE COURT:  Okay.

(Sidebar commences:)

(Impounded proceedings.)

(End of sidebar.)

    MR. LALLY:  May I proceed, Your Honor?

    THE COURT:  Sure.

**CROSS-EXAMINATION**

**BY MR. LALLY:**

Q   Good afternoon, ma'am.

A   Good afternoon, sir.

Q   Now, you testified that you're certified in emergency medicine; is that correct?

A   That is correct.

Q   And you're not, nor were you ever, certified in forensic medicine; is that correct --

A   That is correct.

Q   -- or forensic pathology?

A   Correct.

Q   And when was the last time that you worked at a coroner's office?

A   1995 in terms of doing autopsies.

Q   Now, when was it that you first spoke to anyone from defense counsel in regard to your coming in here and testifying today?

A   May 17.

    THE COURT:  Doctor, I am going to ask you to keep your voice up.

1-25

THE WITNESS:  Oh, sorry.

THE COURT:  Thank you.

THE WITNESS:  May 17, 2024.

Q    May 17, of this year; is that right?

A    2024.

Q    So about six weeks after this trial began?

A    I don't know when the trial began.

Q    Now, as far as who reached out to who?

A    I reached out to a district attorney that I worked with the LA coroner's office.

Q    And then somehow that person put you in touch with Mr. Jackson; is that right?

A    Yes.

Q    And was that also on May 17?

A    17th and 18th, yes.

Q    So I'm sorry, 17th or the 18th? Which? Which one was it that you spoke with Mr. Jackson?

A    I didn't speak to him.

Q    You did not speak to him?

A    Not speaking, not verbal. There was some email communication or text communication.

Q    So you communicated with him?

A    Yes.

Q    Was that on the 17th or the 18th?

A    Yes, both, I think.

Q    Both. Okay. And when did you render this opinion as far as what you've testified to here today?

A    Shortly after he sent me the files.

Q    Now, in regards to those files, you testified in this court a couple days ago, correct?

A    I did.

Q    And you were under oath at that point; is that correct?

A    Excuse me?

Q    You were under oath at that point; is that correct?

A    Yes.

Q    Okay. And when you were asked specifically what materials that you had reviewed, you included a number of items but you did not include anything about a Dr. Sheridan affidavit, anything about a UC Davis report, or anything about any sort of bite history for a canine that lived or resided at 34 Fairview Road, correct?

A    That's correct, because I hadn't reviewed them then.

Q    And so since then two days ago, now you've reviewed them, correct?

A    Yes, I became aware that those files existed. Yes.

Q    You became aware of those files. Were they not sent to you previously?

A    You know, I think there were technical difficulties regarding me and the computer and downloading from Dropbox, and so, yeah --

1-27

Q    Did you ever --

A    They were -- I think they were sent to me, but I think I didn't open them.

Q    Okay. Now, with reference to these technical difficulties, did you ever express any of those technical difficulties, or, hey, I can't see the whole file, or there's other things in here that are listed that I can't look at?

A    No, I wasn't aware.

Q    And so with regard to as far as your reaching out or contact in regard to this case, how did that come about?

A    I saw an article, I believe it was in the "Boston Globe" regarding this case. And I didn't, initially, I didn't think anything of it. Then I saw an article that indicated that there was some --

Q    I'm not asking you anything about anything any article indicated.  You saw an article in "The Boston Globe" about this case?

A    Yes.

Q    Is that, right?

A    Yes.

Q    And how did you come upon it?  Do you have a subscription to "The Boston Globe?"

A    I did at the time, yes.

Q    You did at the time. What time was this?

1-28

A    In May.

Q    May of 2024?

A    Yes.

Q    And how long had you had a subscription to "The Boston Globe" at the time that you saw this?

A    It was either a six month subscription or a year, I don't remember.

Q    And that was the first time that you had seen anything about that?

A    First time I paid attention to anything like that, yes.

Q    Now again, you had testified here just a couple of days ago when I asked you questions about this; is that right?

A    Yes.

Q    And wasn't it in your testimony just a couple of days ago that the subscription was actually for a year or 18 months --

A    No.

Q    -- not six months.

MR. JACKSON:  Objection.

THE COURT:  So only one person can talk at a time. So was that your testimony, Doctor?

THE WITNESS:  No, I don't believe so. I believe that I said it was six month subscription or a twelve months subscription.

Q    But in any event, you saw something.  Is that the first

time that you recall seeing anything in the media about this case was in May of 2024?

A    It was the first time that I recall reading anything about it, correct.

Q    Now, did you write a report in regard to your opinions that you've testified here today?

A    No.

Q    And I asked you that a couple of days ago as well?

A    Yes, sir.

Q    So last couple days, you've had time to review a UC Davis report, Dr. Sheridan's affidavit, and any sort of dog bite history, but you haven't had a chance to write a report?

MR. JACKSON:  Objection.

THE COURT:  Sustained.

Q    You haven't rendered a report, correct?

A    That's correct.

Q    Why not?

A    I haven't been asked to write a report, sir.

Q    Did you ever look at anything related to Mr. O'Keefe's head injury?

A    I looked at --

MR. JACKSON:  Objection.

THE COURT:  Sustained.

MR. JACKSON:  Your Honor, may we approach briefly?

1-30

THE COURT:  Yes.

(Sidebar commences:)

(Impounded proceedings.)

(End of sidebar.)

MR. LALLY:  May I have a moment, Your Honor?

THE COURT:  Yes.

Q    Now, Doctor, you testified that you had some familiarity with areas of forensic science. You're on some boards, things of that nature; is that correct?

A    Yes.

Q    And as a result of that or any other work experience, are you familiar with an NAS report from 2008?

A    Not with that limited information, no.

Q    You're not aware of a report issued by the National Association of Forensic Science in 2008 which specifically has a section of dealing with --

MR. JACKSON:  Objection.

THE COURT:  So I'm going to see you both at sidebar again.

(Sidebar commences:)

(Impounded proceedings.)

(End of sidebar.)

Q    So, ma'am, you're not familiar with that report specifically as it applies to forensic odontology?

THE COURT:  So could you say that again, Mr. Lally?

Q    Certainly. The National Academy of Sciences' 2008 report in relation to the section referring to forensic odontology.

A    I'm not familiar with that specific report, no.

Q    So then you're equally unfamiliar with the representation that that is not a -- from the NAS report that that is not a reliable science as far as bite marks are concerned?

A    There are certain aspects of bite marks that have been deemed not reliable.

Q    Okay.

A    And that -- and that I believe has to do with saying that this particular person or animal inflicted this particular bite, but that's -- that's very specific, and that's what I'm aware of, that recommendation.

Q    So you're not aware of any findings in the NAS report that has led to questioning and the value in scientific objectivity of such evidence?

A    For specifically identifying a bite mark to individual that might have inflicted the bite mark, I think that's what that applies to.

Q    I'm not asking -- again, this is a report. Are you familiar with it, or are you not familiar with it?

A    I'm familiar with a summary or an abstract of a report that indicates that forensic odontology is not very -- is

deemed not reliable when it comes to that particular narrow aspect of forensic odontology.

Q    And so you're not familiar with it also talking about sample data and collection, analyzes of these, interpretation and reporting of results, you're not familiar with those areas of the NAS report as well?

A    What specifically -- do you have a specific question about that or?

Q    My first question was whether or not you're familiar with the report. You indicated that you weren't.

A    I did not read the report.

Q    Now you're quoting from the report.

THE COURT REPORTER:  Mr. Lally.

THE COURT:  Let the witness answer.

MR. LALLY:  Sure.

THE COURT:  One question at a time, one speaker at a time.

Doctor, can you answer that question?

A    Sure. I did not read that report.

Q    Now, you had written some articles that you were asked about in reference to dog bites or canine dog bites in the emergency department; is that correct?

A    Yes, co-authored.

Q    And that's something you published or authored or co-authored sometime in the late 1990s; is that right?

A    Correct.

Q    And in that instance, you talk about law enforcement dogs and a bite and a hold technique, correct?

A    Yes.

Q    Now, part of the reason in writing that article had to do with sort of the applied forces and the unique spectrum of injuries from those kind of dog bites; is that correct?

A    Yes.

Q    And that spectrum of injuries would include deep puncture wounds; is that right?

A    It can, yes.

Q    Severe crush injuries; is that right?

A    Correct.

Q    Large tissue avulsions and lacerations; is that right?

A    Yes.

Q    Wounds necessitating surgical debridement; is that right?

A    Yes.

Q    Bony injuries, ranging from cortical violations to displaced fractures; is that right?

A    Yes.

Q    Neurovascular damage; is that right?

A    Yes.

Q    And other wounds at high risk for infection, correct?

A    Correct.

Q     Now --

A     But we also put a disclaimer in that article.

Q     I'm not asking you about any disclaimer.

A     Okay.

Q     I'm asking you about that's what the type of injuries that you were looking at; is that correct?

A     Yes, but we saw a skewed population.

Q     So you skewed population in a study; is that correct?

A     Well, we saw the worst of the worst.

Q     Yes or no.

A     Yes.

Q     Did you skew the population in the study?

A     I'm sorry I don't understand that question.

Q     Did you skew the population in the study?

A     Did we skew?

Q     Yes.

A     No. We reported on all the ones that presented to the emergency room for care. However, a lot of dog bites don't present to the emergency room.

Q     And so from the different cases that you report on within that article, are there any of those cases in which there is injuries to just one aspect of one part of the human body for the victims of dog attacks or dog bites in those cases?

A     There may have been.  That's a summary of the 700

cases. Seven -- more than seven hundred cases.

Q    Is it normal in any kind of animal attack for injuries to occur on just one side of one arm of the person that's being attacked, clawed, or bitten?

A    There are many people who are bitten or scratched.

Q    I'm asking if it's normal, ma'am.

MR. JACKSON:  Objection.

THE COURT:  Mr. Lally -- Hold on, Mr. Jackson.  Mr. Lally, ask a question, wait for the answer, and then start a next question. Do not interrupt the witness.

MR. LALLY:  I apologize, Your Honor. I don't mean to interrupt, but I'm asking for an answer responsive to the question.

THE COURT:  So ask a question, and ask it in a manner that you get a response.

Q    Dr. Russell, is it your testimony that it's normal in an animal attack for injuries to occur on just one side of one arm and nothing else, anywhere else on that person's body?

A    It can be, yes.

Q    I'm not asking if it can be. I'm asking is that normal?

A    I can't say.

MR. JACKSON:  Objection.

THE COURT:  Sustained. You have to ask the question differently.

Q    So from your observations, you looked at various photographs of Mr. O'Keefe; is that right?

A    I did.

Q    Did you observe any injuries on any other part of his body that you would attribute to an animal attack, whether they be claw marks or bite marks or anything else?

A    No.

Q    So nothing on his left arm, correct?

A    Nothing that I identified as a dog bite or a scratch.

Q    Nothing on his legs; is that correct?

A    That's correct.

Q    Nothing on his torso; is that correct?

A    That's correct.

Q    Now, you say an animal attack, possibly a large dog, correct?

A    Yes.

Q    Can you say what type of animal left these marks that you attribute to an animal attack?

A    Not with 100 percent certainty, no.

Q    Can you say where physically Mr. O'Keefe was located when those -- the animal attack supposedly occurred?

MR. JACKSON:  Objection.

THE COURT:  Can you say that?

THE WITNESS:  No.

THE COURT:  Okay.

Q    Can you say when Mr. O'Keefe reportedly sustained these injuries from an animal attack?

A    Well, to a certain degree, yes.  Before -- it was before death, but not long enough to have a big inflammatory reaction. So yes.  So out -- minutes to hours before death.

Q    Minutes to hours before death, but at some point before death, correct?

A    Yes.

Q    Can you say anything about the breed of dog?

A    No.

Q    Can you say anything about whether it occurred inside the house, outside the house, anything like that?

A    No.

Q    As far as you mentioned some of the different things that you reviewed over the course of your testimony -- excuse me -- over the preparation of your testimony both prior to Tuesday and between Tuesday and today.  Any of those things contain any forensic reports or phone examinations or anything else related to this case?

A    Could you repeat that?  I didn't -- what kind of examination?  Phone?

Q    Sure. Any other materials that you reviewed, whether it be prior sometime between May 17, and Tuesday, or anything that you reviewed between Tuesday and today, did any of

those materials that you reviewed contain any sort of forensic reports or anything beyond the UC Davis?

A   Yes, I saw a photograph.

Q   So you saw photographs.  And to that point, you never actually saw Mr. O'Keefe's body, correct, you just saw photographs?

A   That's true.

Q   And with respect to the UC Davis report as far as canine DNA, are you aware that the results of that were that there was no canine DNA --

MR. JACKSON:  Objection.

Q   -- on Mr. O'Keefe -- on swabbings that were sent to the UC Davis lab?

THE COURT:  I'm going to allow it.

A   Yes, but there was clothing in between.

Q   Okay.  But the swabbings came from the clothing with tears in the clothing in the same area as the injuries, correct?

A   Okay.

Q   Do you know that or no?

A   I couldn't tell if they came from the wound or the clothing. I thought that they came from the clothing, but.

Q   So you couldn't tell by reviewing the report whether or not swabbings came from clothing or from Mr. O'Keefe's body?

1-39

A    I know the clothing was sent to the laboratory.

Q    You know the clothing was sent to what laboratory?

A    To the DNA laboratory.

Q    To UC Davis?

A    Oh, I don't know that. No, I'm sorry.

Q    But you are aware that that came back as far as negative for any canine DNA, correct?

A    That's correct.

Q    Now, as far as the injuries that you observed, your testimony is that both the top teeth of whatever animal this is and the bottom teeth of whatever animal this is, both made contact with only the top of Mr. O'Keefe's arm or the posterior of his arm?

A    Wait. Both sets of teeth made contact with certain of those wounds, yes, but not all of them.

Q    But neither the top nor the bottom teeth made any contact that you observed, assuming your issue as far as an animal attack, there's no evidence of any animal attack on the bottom of Mr. O'Keefe's right arm, correct?

A    I'm not sure what you mean by bottom.

Q    Anterior.

A    Anterior, that's correct.

Q    And nothing on the posterior or the anterior of his left arm?

A    That is correct.

1-40

Q    And nothing on his legs?

A    That's correct.

Q    Nothing on his torso?

A    Correct.

Q    Nothing on his head; is that correct?

A    Correct.

Q    Now, as far as the marks that you did observe that you do attribute to an animal attack, can you even say with certainty whether or not those marks you feel are bite marks versus scratch marks. Do you have any idea which are which?

A    There may be a combination.

Q    So is that no?

A    Well, no, I think that the ones that had the linear abrasions above the small, round punctate abrasions, I believe that those are bite marks from upper and lower teeth.

Q    Now, you indicated that part of what you had reviewed was a dog bite history for a dog from 34 Fairview Road named Chloe; is that right?

A    Yes.

Q    And there were a couple of different instances of that dog essentially getting in a fight with other dogs, correct?

A    Yes.

Q    And at any point in time, did you see anything in there, as far as a dog going after a human in which there was no -- no other dog present?

A    No.

Q    And there were actually photographs contained within that material of dog bites from that dog, from Chloe, correct?

A    Yes.

Q    Did any of those dog bites that you saw in those photographs look anything like what you observed in the photos that you saw of Mr. O'Keefe's arm?

A    No, but.

Q    That's all, ma'am.

MR. JACKSON:  Objection, Your Honor.

THE COURT:  No. So the answer is no.  You can get back up, Mr. Jackson, but the answer that question is no. Next question.

Q    So is it your testimony that from reviewing what you reviewed that what you observe on Mr. O'Keefe's arm is consistent with an animal attack to the exclusion of any other possibilities?

A    To a degree of reasonable medical certainty, yes.

Q    So as far as any other sort of blunt impact injuries or other manifestations of how those scratches got there, you're saying, no, it had to be an animal attack.

A    I've seen thousands of wounded --

Q    Yes or no. What I'm asking you is --

MR. JACKSON:  Objection.

THE COURT:  So --

Q    -- based on what you observed --

THE COURT:  -- Mr. Lally, I'm going to let the witness answer.

Q    Go ahead, ma'am.

A    I've seen thousands of people with injuries to their skin and from blunt, from sharp, from all different mechanisms.  Those injuries did not look like blunt force injuries.

Q    So it's your testimony that the injuries to his arm don't look anything like blunt force injuries that you've seen before, and you wouldn't characterize them as that?

A    That's correct.

Q    And that's based on some photographs and some other materials that you began reviewing sometime May 17, 2024?

A    Yes, I'm an ER doctor. I need to make a diagnosis quickly when I see something, and I'm trained to do that. That's my -- that's my specialty.

Q    Were you being asked as an ER doctor to come to a quick conclusion and -- in this case?

A    No.

Q    But you did anyway.

A     It's how I'm trained.

MR. LALLY:  Nothing further.

MR. JACKSON:  Very briefly, Your Honor, if it please the Court.

THE COURT:  Go ahead.

**REDIRECT EXAMINATION**

**BY MR. JACKSON:**

Q     Concerning the forensic odontology report, the NAS report that Mr. Lally asked you about, what is your understanding about the report as it pertains to identifying individuals who left a bite mark?  Explain that for the jurors, please.

A     I believe the report says that that is not reliable as it once was thought to be.

Q     Like a fingerprint identifying a human being, DNA identifying a person, or a bite mark identifying a person, NAS said, not the bite mark.  It doesn't work that way.

A     That's correct.

Q     It has nothing to do with the pattern of injuries that you've seen a thousand times from animals, correct?

A     Correct.

Q     You were asked several questions about the injuries that you saw and studied attended to dog -- highly trained dog -- highly trained K-9s, police dogs, correct?

A     Yes.

Q    Very different than just a domestic dog that somebody might have as a pet, correct?

A    Correct.

Q    And the bite injuries are very, very different as well, aren't they?

A    That is correct.

Q    You were asked whether or not you were aware, based on UC Davis's report, that there was no canine DNA found on the -- on the swabs that were sent to them, correct?

A    Yes.

Q    Are you also aware that there was pig DNA?

A    I'm aware of that.

Q    Did that have any impact in your -- did you analyze that at all one way or the other?

A    Not to any degree of scientific certainty, no.

Q    But you do know that dogs chew on pig ears sometimes, correct?

    MR. LALLY:  Objection.

    THE COURT:  Sustained.

Q    You've reviewed at least a report if not a series of reports that indicate that a particular dog, Chloe, has an attack history, correct?

A    Yes.

Q    You were asked specifically by Mr. Lally whether or not the wounds in a dog attack on another dog attack where a

1-45

human stuck a hand in the middle look anything like these, correct? Do you remember that question?

A    I remember a question like --

Q    And you said no, but, and then you were cut off. Do you remember that?

A    Yes.

Q    Can you finish that answer for us?

A    Yes. So animals, and dogs in particular, can inflict a wide variety of injuries on the skin, from -- from just individual puncture wounds to abrasions where there's a scratching of the skin to where there's actually a pulling away -- pulling away of the skin from the underlying tissues, the ripping effect. And so there's a variety of wounds that, you know, or patterns that one can see from an animal attack. It depends a lot on the thickness of the skin, the movement of the -- between the -- the victim and the animal, and also the power of the animal and the training of the animal. Yes.

Q    So in other words, not all wounds inflicted by a particular animal are going to look exactly the same?

A    Correct.

Q    It's a very dynamic situation, isn't it?

        MR. LALLY:  Objection.

        THE COURT:  Sustained.

Q    Doctor, having seen up to a thousand bite and claw

marks on the human body and based on your review of the entirety of the case file that you reviewed, including the nature and the pattern and the consistency of the injuries that you saw on Mr. O'Keefe's right arm, what is your opinion to a reasonable degree of scientific certainty about the nature of those injuries?

MR. LALLY:  Objection.

THE COURT:  Sustained.

Q    What is your ultimate conclusion and opinion about the injuries that you saw and that you reviewed --

MR. LALLY:  Objection.

THE COURT:  Sustained.

Q    Can you tell the jurors at the end of the -- at the end of the day, what is your opinion and conclusion about those injuries?

MR. LALLY:  Objection.

THE COURT:  Sustained.

MR. JACKSON:  Your Honor, could we approach?

THE COURT:  Sure.

(Sidebar commences:)

(Impounded proceedings.)

(End of sidebar.)

MR. JACKSON:  Thank you, Your Honor.  No more questions.

THE COURT:  Mr. Lally, you had no more questions.

1-47

MR. LALLY:  No, Your Honor.

THE COURT:  All right, Doctor, you are all set.

THE WITNESS:  Thank you.

(Witness exits.)

THE COURT:  All right, jurors, we will take our lunch break.

(Jury out.)

(Court in recess.)

1-48

C E R T I F I C A T I O N

I, CHRISTINE D. BLANKENSHIP, NOTARY PUBLIC, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT FROM THE RECORD OF THE COURT PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I, CHRISTINE D. BLANKENSHIP, FURTHER CERTIFY THAT THE FOREGOING IS IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE OF THE TRIAL COURT DIRECTIVE ON TRANSCRIPT FORMAT.

I, CHRISTINE D. BLANKENSHIP, FURTHER CERTIFY THAT I NEITHER AM COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THIS ACTION.

*Christine D. Blankenship, October 9, 2024*
CHRISTINE D. BLANKENSHIP, NOTARY PUBLIC
RECORDED BY FTR, TRANSCRIPT PRODUCED FROM COMPUTER
29B MECHANIC STREET
FOXBORO, MASSACHUSETTS 02035
(508) 904-9508
C.DORANBLANKENSHIP@GMAIL.COM

6-21-21 RUSSELL

| A |
|---|

**Able** - 18:17
**Above** - 15:12, 40:15
**Abrasions** - 20:24, 21:1, 40:15, 45:10
**Abstract** - 31:24
**Academy** - 5:12, 5:14, 5:15, 15:9, 31:1
**Accurately** - 19:12
**Active** - 11:2
**Activities** - 13:19
**Actual** - 20:15, 22:11
**Addition** - 10:14, 10:15, 20:10, 22:12
**Adjunct** - 9:12
**Advanced** - 11:15, 11:16
**Advancement** - 15:12
**Advantage** - 5:8
**Affidavit** - 17:14, 26:14, 29:11
**Afternoon** - 24:7, 24:8
**Agencies** - 12:20
**Ahead** - 11:19, 42:8, 43:5
**Air** - 3:24
**Allow** - 38:14
**American** - 15:9
**Analyze** - 44:13
**Analyzes** - 32:4
**Anatomic** - 4:16, 8:4, 8:13, 9:9
**Angeles** - 7:11, 8:6, 9:13, 9:24, 11:3, 12:18, 12:25
**Animals** - 20:20, 43:20, 45:8
**Anterior** - 39:21, 39:22, 39:23
**Anyway** - 42:25
**Anywhere** - 35:18
**Apologize** - 35:11
**Appear** - 23:3, 23:4
**Applied** - 22:12, 33:6
**Applies** - 30:24, 31:21
**Approach** - 17:17, 22:18, 23:23, 29:25, 46:18
**Area** - 15:14, 15:16, 16:21, 21:16, 38:17
**Areas** - 30:8, 32:6
**Aren't** - 44:5
**Arms** - 18:19
**Arrested** - 12:23
**Article** - 15:19, 16:1, 27:12, 27:14, 27:16, 27:17, 33:5, 34:2, 34:21
**Articles** - 9:3, 15:16, 16:5, 32:20
**Aspect** - 32:2, 34:22
**Aspects** - 31:9
**Assessing** - 10:16

**Assistant** - 9:6, 9:11
**Assistants** - 13:21
**Associated** - 7:15
**Association** - 15:5, 30:15
**Attack** - 23:12, 23:16, 35:2, 35:17, 36:5, 36:14, 36:18, 36:21, 37:2, 39:18, 40:8, 41:20, 41:25, 44:22, 44:25, 45:15
**Attacked** - 35:4
**Attacks** - 34:23
**Attend** - 11:4
**Attendants** - 13:2
**Attended** - 4:18, 6:19, 6:25, 9:2, 43:23
**Attending** - 9:24, 10:23
**Attention** - 19:11, 28:10
**Attorney** - 25:9
**Attribute** - 36:5, 36:18, 40:8
**Author** - 15:19, 16:1
**Authored** - 32:23, 32:24, 32:25
**Autopsies** - 9:1, 9:2, 24:19
**Autopsy** - 17:10, 17:11, 17:12, 17:13
**Available** - 11:5
**Avulsions** - 33:14
**Aware** - 26:20, 26:21, 27:9, 30:14, 31:15, 31:16, 38:9, 39:6, 44:7, 44:11, 44:12

| B |
|---|

**Bachelor** - 6:20
**Back** - 4:10, 39:6, 41:15
**Background** - 4:8
**Base** - 19:25
**Based** - 18:15, 19:17, 23:14, 23:15, 42:5, 42:17, 44:7, 46:1
**Became** - 5:10, 7:6, 8:8, 13:5, 26:20, 26:21
**Become** - 8:19, 9:5, 9:12, 11:9, 12:14, 14:17
**Becoming** - 5:3, 5:16
**Began** - 25:6, 25:7, 42:18
**Below** - 20:25, 21:3
**Big** - 37:4
**Bite** - 17:15, 26:15, 29:12, 31:7, 31:9, 31:14, 31:19, 31:20, 33:3, 36:6, 36:9, 40:9, 40:16, 40:19, 43:11, 43:16, 43:17, 44:4, 45:25
**Bites** - 15:16, 15:20, 16:2, 16:6, 16:8, 16:12, 22:15, 32:21, 33:7, 34:18, 34:23,

41:6, 41:9
**Bitten** - 35:4, 35:5
**Blunt** - 41:23, 42:10, 42:11, 42:14
**Board** - 13:11, 13:14, 13:18, 13:22, 14:3, 15:3
**Boards** - 30:9
**Body** - 16:6, 22:5, 34:23, 35:19, 36:5, 38:5, 38:25, 46:1
**Bony** - 33:19
**Boston** - 5:15, 27:12, 27:17, 27:23, 28:4
**Both** - 8:13, 16:24, 21:15, 25:25, 26:1, 30:18, 37:17, 39:10, 39:12, 39:14
**Bottom** - 21:15, 21:20, 39:11, 39:16, 39:19, 39:20
**Break** - 47:6
**Breast** - 5:5
**Breed** - 37:10
**Bulk** - 10:22
**Bunch** - 4:17
**Busiest** - 7:24

| C |
|---|

**Cal** - 9:12
**California** - 3:19, 7:12, 7:16, 9:13, 12:21, 13:8, 13:9, 13:11, 14:3, 14:18, 14:25
**Call** - 21:4, 21:5
**Called** - 16:1
**Cancer** - 5:5
**Canine** - 26:15, 32:21, 38:9, 38:10, 39:7, 44:8
**Can't** - 27:6, 27:7, 35:22
**Canton** - 17:15
**Capacity** - 9:10, 9:21
**Cardiac** - 11:15
**Care** - 4:5, 12:23, 13:19, 14:24, 34:18
**Career** - 16:10
**Case** - 10:12, 10:13, 17:2, 19:9, 21:23, 22:14, 27:11, 27:13, 27:18, 29:2, 37:20, 42:23, 46:2
**Cases** - 10:11, 11:6, 12:2, 13:17, 34:20, 34:21, 34:24, 35:1
**Caused** - 20:17
**Center** - 7:12, 7:16, 7:21, 7:23, 9:6, 9:25, 11:13, 12:18, 14:8
**Certain** - 17:1, 31:9, 37:3, 39:14
**Certainly** - 31:1
**Certainty** - 23:16, 36:19,

40:9, 41:22, 44:15, 46:5
**Certified** - 15:3, 24:9, 24:12
**Cetera** - 9:3
**Chance** - 29:12
**Characterize** - 42:15
**Chew** - 44:16
**Chief** - 3:18, 14:17, 14:22
**Chloe** - 40:20, 41:6, 44:21
**City** - 5:21
**Claw** - 20:5, 20:6, 36:6, 45:25
**Clawed** - 35:4
**Clinical** - 11:8
**Close** - 21:14
**Closer** - 20:8
**Clothing** - 38:15, 38:16, 38:17, 38:22, 38:24, 39:1, 39:2
**Co** - 32:23, 32:24
**Coauthor** - 15:19, 16:1
**Cochrane** - 3:19
**Collection** - 32:4
**College** - 4:10, 4:12, 4:19, 4:20, 6:14
**Combination** - 40:12
**Come** - 18:17, 27:11, 27:22, 42:22
**Comes** - 32:1
**Coming** - 17:2, 17:6, 18:8, 19:14, 24:21
**Commences** - 17:19, 22:20, 23:25, 30:2, 30:20, 46:20
**Commonwealth** - 18:13
**Commonwealth's** - 18:4
**Communicated** - 25:22
**Communication** - 25:21
**Completed** - 4:3, 4:11
**Complications** - 16:2
**Component** - 12:1, 13:7
**Computer** - 26:24
**Concerned** - 31:8
**Concerning** - 18:18, 43:8
**Conclusion** - 18:16, 18:17, 19:20, 42:23, 46:9, 46:14
**Conclusions** - 17:3, 17:7, 18:8, 19:14
**Conditioners** - 3:24
**Conferences** - 9:2, 11:4
**Connected** - 11:3
**Connection** - 12:17
**Consistency** - 23:10, 46:3
**Consistent** - 23:4, 23:7, 23:12, 41:20
**Consult** - 11:8
**Consultant** - 13:25, 14:2,

6-21-21 RUSSELL

14:3
**Consulted** - 11:6, 14:14
**Contact** - 21:24, 22:3, 22:11, 27:11, 39:12, 39:14, 39:17
**Contain** - 37:19, 38:1
**Contained** - 41:5
**Continue** - 5:25, 6:23, 18:5
**Corcoran** - 14:18
**Coroner's** - 8:6, 8:19, 8:25, 11:2, 11:3, 24:18, 25:10
**Cortical** - 33:19
**Couldn't** - 38:21, 38:23
**Council** - 6:4
**Counsel** - 3:2, 18:2, 24:21
**County** - 7:11, 8:6, 9:24, 14:8
**Couple** - 3:24, 26:5, 28:11, 28:14, 29:8, 29:10, 40:22
**Course** - 16:10, 37:16
**Courses** - 4:17, 4:22, 5:4, 6:3, 11:15
**Courts** - 16:24
**Court's** - 19:2
**Created** - 21:15
**Criminal** - 6:4
**CROSS** - 24:5
**Crush** - 33:12
**Cut** - 45:4

| D |
| --- |

**Damage** - 33:22
**Data** - 19:18, 32:4
**Davis** - 18:22, 26:14, 29:11, 38:2, 38:8, 38:13, 39:4
**Davis's** - 44:8
**Day** - 9:2, 14:15, 46:14
**Days** - 26:5, 26:18, 28:11, 28:14, 29:8, 29:10
**Daytime** - 9:9
**Dealing** - 30:16
**Deals** - 8:18
**Death** - 37:4, 37:6, 37:7, 37:8
**Debridement** - 33:16
**Deceased** - 8:18
**Decided** - 5:6, 5:8
**Deemed** - 31:10, 32:1
**Deep** - 33:9
**Defendant** - 3:2, 18:2
**Defense** - 24:21
**Defensive** - 21:7
**Degree** - 6:20, 6:22, 7:4, 23:15, 37:3, 41:22, 44:15,

46:5
**Department** - 5:20, 5:21, 11:22, 32:22
**Describe** - 6:2, 7:22, 8:23, 11:12, 19:24, 22:9
**Determination** - 20:17
**Diagnosing** - 10:16
**Diagnosis** - 42:19
**Didn't** - 10:20, 14:11, 25:18, 27:3, 27:13, 27:14, 37:21
**Difference** - 8:10, 8:11
**Differences** - 8:14
**Different** - 20:23, 22:2, 34:20, 37:15, 40:22, 42:10, 44:1, 44:4
**Differently** - 35:25
**Difficulties** - 26:23, 27:5, 27:6
**Direction** - 23:10, 23:11
**Director** - 11:10, 11:13, 11:20, 12:12, 12:14, 13:5
**Disclaimer** - 34:2, 34:3
**Displaced** - 33:20
**Display** - 19:3
**Disregard** - 6:8
**District** - 25:9
**DNA** - 38:9, 38:10, 39:3, 39:7, 43:15, 44:8, 44:11
**Doc** - 9:10, 10:22
**Doctor** - 3:13, 5:3, 7:6, 8:8, 10:15, 15:3, 17:1, 18:7, 19:5, 21:12, 23:14, 24:24, 28:21, 30:7, 32:18, 42:19, 42:22, 45:25, 47:2
**Doctors** - 10:6, 10:7, 10:8, 11:14, 12:3, 14:23, 21:5
**Documents** - 18:21
**Doesn't** - 43:17
**Dogs** - 33:3, 40:23, 43:24, 44:16, 45:8
**Domestic** - 44:1
**Don't** - 6:9, 8:10, 18:16, 25:7, 28:7, 28:22, 34:13, 34:18, 35:11, 39:5, 42:14
**Double** - 16:15
**Downloading** - 26:24
**Dr** - 3:10, 3:12, 3:20, 17:14, 26:13, 29:11, 35:16
**Dropbox** - 26:24
**Dynamic** - 45:22

| E |
| --- |

**Earlier** - 21:13
**Early** - 11:21
**Ears** - 44:16
**Education** - 4:7, 4:8, 4:10,

4:12, 6:1, 6:13, 6:23, 9:4
**Effect** - 45:13
**Elbow** - 20:8, 20:23, 21:3, 21:14, 21:16
**Email** - 25:20
**Embedded** - 13:16
**Employee** - 13:16
**Enforcement** - 5:9, 13:16, 15:20, 16:2, 22:14, 33:2
**Engage** - 7:6
**Entirety** - 13:6, 46:2
**Equally** - 31:5
**ER** - 9:10, 9:23, 10:22, 14:11, 15:20, 42:19, 42:22
**Errors** - 12:3, 12:6
**Essentially** - 40:23
**Established** - 12:19
**Estimate** - 16:13
**Et** - 9:3
**Evaluation** - 19:9
**Evenings** - 9:11
**Everything** - 23:14
**Evidence** - 31:18, 39:18
**EXAMINATION** - 3:8, 24:5, 37:22, 43:6
**Examinations** - 37:20
**Examined** - 10:12
**Examiners** - 9:1, 15:6
**Examining** - 13:17
**Exclusion** - 41:20
**Executive** - 3:18, 14:18, 14:23
**Exhibit** - 19:3
**Existed** - 26:20
**Exits** - 47:4
**Experience** - 16:11, 30:11
**Experienced** - 8:25
**Expert** - 16:18, 16:21
**Expertise** - 11:8
**Explain** - 20:19, 43:11
**Express** - 27:5
**Exterior** - 21:4
**Extra** - 14:10

| F |
| --- |

**Fairview** - 26:16, 40:19
**Familiarity** - 30:8
**Far** - 25:8, 26:1, 27:10, 31:7, 37:15, 38:8, 39:6, 39:9, 39:17, 40:7, 41:2, 41:23
**Federal** - 16:24
**Feel** - 40:9
**Fellow** - 8:5, 8:19, 15:7, 15:11
**Fellowship** - 8:23, 11:1
**Field** - 4:4, 4:5
**Fight** - 40:23

**File** - 27:6, 46:2
**Files** - 26:3, 26:4, 26:20, 26:21
**Findings** - 31:16
**Fingerprint** - 43:15
**First** - 4:21, 5:4, 7:9, 7:10, 7:18, 7:19, 7:25, 20:22, 24:20, 28:8, 28:10, 28:25, 29:3, 32:9
**Focus** - 19:11
**Following** - 5:11, 8:21
**Force** - 22:12, 42:11, 42:14
**Forces** - 33:6
**Formal** - 4:12, 5:25, 6:13
**Formalized** - 9:4
**Found** - 44:8
**Four** - 4:13, 4:14, 10:1
**Fractures** - 33:20
**Full** - 5:19, 8:7, 8:24, 9:10
**Further** - 6:13, 20:7, 43:2
**Furtherance** - 17:2, 18:22, 19:9
**Future** - 12:7

| G |
| --- |

**General** - 16:8
**Generally** - 8:15, 8:18
**Get** - 3:10, 6:9, 15:15, 21:23, 35:15, 41:15
**Gets** - 22:4
**Give** - 5:22
**Given** - 16:5, 19:19
**Globe** - 27:13, 27:17, 27:23, 28:5
**Go** - 4:6, 4:19, 5:1, 5:6, 5:11, 5:14, 5:25, 6:23, 8:10, 10:13, 11:19, 42:8, 43:5
**Going** - 3:20, 6:6, 15:14, 17:22, 20:22, 21:18, 22:1, 24:24, 30:18, 38:14, 41:2, 42:6, 45:20
**Good** - 21:23, 24:7, 24:8
**Got** - 6:22, 14:16, 41:24
**Grand** - 17:13
**Grant** - 17:12
**Guessing** - 12:25

| H |
| --- |

**Hadn't** - 26:17
**Hand** - 45:1
**Hard** - 16:13
**Haven't** - 29:12, 29:16, 29:19
**Head** - 29:21, 40:5
**Held** - 14:17, 14:20

6-21-21 RUSSELL

Hey - 27:6
Hi - 3:12
High - 4:12, 33:24
Higher - 15:7
Highly - 43:23, 43:24
Highway - 12:21
History - 26:15, 29:12, 40:19, 44:22
Hold - 33:3, 35:8
Home - 5:6
Honor - 3:7, 18:6, 22:23, 23:19, 23:22, 24:3, 29:25, 30:5, 35:11, 41:14, 43:3, 46:18, 46:23, 47:1
Hospital - 13:7, 17:8, 17:9, 17:10
Hours - 37:5, 37:7
House - 37:13
Human - 16:6, 34:23, 41:2, 43:15, 45:1, 46:1
Hundred - 35:1

**I**

I'd - 19:11
Ideal - 11:25
Identified - 36:9
Identifying - 31:19, 43:11, 43:15, 43:16
Illegal - 13:19
Illnesses - 8:17
Immediate - 3:17
Impact - 41:23, 44:13
Impounded - 17:20, 22:21, 24:1, 30:3, 30:21, 46:21
Improvement - 11:20, 11:23, 12:1
Improvements - 12:5, 12:6
Incidents - 17:16
Incomplete - 20:11
Indicated - 27:15, 27:17, 32:10, 40:18
Infection - 33:24
Inflammatory - 37:5
Inflict - 20:20, 45:8
Inflicted - 20:5, 20:15, 31:13, 31:20, 45:19
Inflicts - 22:10
Initially - 27:13
Injured - 4:6
Injury - 22:11, 29:21
Inmates - 14:24
Inside - 37:12
Interest - 5:9, 16:7, 16:8
Interesting - 11:7
Intern - 4:3
Internship - 4:3, 4:14

Interpretation - 32:5
Interrupt - 35:10, 35:12
Investigate - 5:9
Involves - 4:5
Irregular - 21:2
Isn't - 45:22
Issue - 39:17
Issued - 30:14
Items - 18:7, 26:13
It's - 7:24, 11:25, 16:13, 23:3, 35:6, 35:16, 42:13, 43:1, 45:22
I've - 4:17, 42:1, 42:9

**J**

Jail - 12:14, 12:17, 12:19, 12:24, 13:2, 13:5
Jaw - 21:20
Job - 14:7, 14:8, 14:10
John - 17:3, 18:18, 19:13
Journal - 9:3
Jurors - 6:8, 11:12, 17:22, 19:24, 43:12, 46:13, 47:5
Jury - 3:3, 17:13, 17:24, 18:3, 47:7
Justice - 6:4

**K**

Kinds - 20:19
Known - 7:2, 7:13

**L**

LA - 8:19, 8:24, 11:1, 12:21, 14:8, 25:10
Lab - 38:13
Laboratory - 39:1, 39:2, 39:3
LAC - 12:19
Lacerations - 33:14
LAPD - 12:21
Large - 7:21, 12:24, 15:1, 19:22, 23:4, 23:8, 23:12, 23:17, 33:14, 36:14
Late - 15:24, 32:25
LAUSC - 7:13, 9:6, 11:9, 11:24, 12:14, 12:18, 14:12
Learned - 5:4
Led - 31:17
Left - 11:1, 36:8, 36:17, 39:24, 43:11
Leg - 22:4
Legal - 9:20
Legs - 36:10, 40:1
Let's - 4:19, 17:12
Level - 9:22
Licensed - 13:9
Limited - 30:13

Linear - 20:24, 40:14
Lines - 20:4
Listed - 18:7, 27:7
Lived - 26:15
Located - 36:20
Long - 5:18, 9:23, 28:4, 37:4
Look - 12:1, 27:8, 29:20, 41:10, 42:11, 42:14, 45:1, 45:20
Looked - 29:22, 36:1
Looking - 34:6
Los - 7:11, 8:6, 9:13, 9:24, 11:3, 12:18, 12:25
Lot - 34:18, 45:15
Loud - 3:10, 3:25
Lower - 21:1, 40:16
Lunch - 47:5

**M**

Make - 12:4, 42:19
Malden - 5:21, 5:24
Managing - 15:20
Manifestations - 41:24
Many - 16:11, 16:16, 22:15, 35:5
MARIE - 3:4, 3:12
Mark - 20:6, 31:19, 31:20, 43:11, 43:16, 43:17
Marks - 20:5, 20:8, 20:9, 20:10, 20:12, 20:14, 20:24, 31:7, 31:9, 36:6, 36:17, 40:7, 40:9, 40:10, 40:16, 46:1
Massachusetts - 5:8, 5:11, 6:4, 7:1
Master's - 9:22
Material - 41:6
Materials - 17:1, 18:15, 26:12, 37:23, 38:1, 42:18
Mechanisms - 42:11
Media - 29:1
Medicine - 4:4, 4:14, 6:24, 7:20, 7:25, 9:20, 9:21, 11:22, 15:3, 16:18, 24:10, 24:13
Member - 15:5, 15:8, 15:9, 15:12
Metastatic - 5:5
MIT - 4:21, 5:1, 5:11
Month - 28:6, 28:23
Months - 28:16, 28:18, 28:23
Mother - 5:5
Mouth - 21:18
Move - 6:5, 21:25
Movement - 22:13, 45:16
Much - 10:21, 22:12

Municipalities - 12:22

**N**

Named - 15:20, 40:20
Narrow - 32:1
NAS - 30:12, 31:6, 31:16, 32:6, 43:8, 43:17
National - 15:5, 30:14, 31:1
Necessitating - 33:16
Neither - 39:16
Neurology - 18:11
Neuropathology - 18:11
Neurovascular - 33:22
New - 5:6
Nine - 10:1
Nor - 24:12, 39:16
Normal - 35:2, 35:6, 35:16, 35:21
Northeastern - 6:19, 6:23
Nurse - 14:24

**O**

Objectivity - 31:18
Observations - 36:1
Observe - 36:4, 40:7, 41:19
Observed - 39:9, 39:17, 41:10, 42:5
Occur - 35:3, 35:17
Occurred - 36:21, 37:12
Occurring - 12:6
Odontology - 30:24, 31:3, 31:25, 32:2, 43:8
Office - 8:6, 8:19, 8:25, 11:2, 11:3, 24:18, 25:10
Officer - 5:10, 5:16, 5:24, 6:12
Officers - 12:20
Official - 13:25
O'keefe - 17:4, 36:2, 36:20, 37:1, 38:12
O'keefe's - 18:18, 19:13, 29:20, 38:5, 38:24, 39:12, 39:19, 41:11, 41:19, 46:4
One - 7:24, 9:2, 14:7, 14:15, 14:16, 19:8, 20:7, 22:17, 25:16, 28:20, 32:16, 34:22, 35:3, 35:17, 35:18, 44:14, 45:14
Ones - 34:17, 40:14
Open - 27:3
Opinion - 18:16, 18:17, 19:19, 19:25, 21:2, 21:14, 23:15, 26:1, 46:5, 46:9, 46:14
Opinions - 17:3, 17:6,

6-21-21 RUSSELL

18:8, 19:14, 29:5
**Overruled -** 18:5
**Own -** 10:17, 16:13

**P**

**Paid -** 28:10
**Parallel -** 20:4, 20:8, 20:10, 23:11
**Passed -** 5:7
**Past -** 16:19, 16:22
**Pathologist -** 3:14, 8:17, 17:14
**Pathology -** 4:15, 4:16, 8:4, 8:5, 8:13, 8:14, 9:8, 9:9, 16:22, 24:15
**Patient -** 10:12
**Patients -** 4:5, 8:16, 8:18, 10:14, 10:17, 10:24, 16:11
**Patrol -** 12:21
**Pattern -** 19:22, 23:3, 43:19, 46:3
**Patterns -** 20:3, 20:6, 45:14
**Peer -** 15:15, 15:19
**People -** 12:22, 35:5, 42:9
**Percent -** 36:19
**Permission -** 19:2
**Person -** 25:11, 28:20, 31:13, 35:3, 43:16
**Person's -** 35:18
**Pet -** 44:2
**Phone -** 37:19, 37:22
**Photograph -** 19:5, 38:3
**Photographs -** 17:11, 19:8, 19:16, 36:2, 38:4, 38:6, 41:5, 41:10, 42:17
**Photos -** 41:11
**Physically -** 36:20
**Physician -** 4:1, 4:2, 4:9, 8:12, 8:15, 9:23, 9:24, 10:23, 13:21, 14:11, 14:12
**Physicians -** 12:9, 13:20
**Picture -** 20:22
**Pictures -** 17:9
**Pig -** 44:11, 44:16
**Place -** 12:20
**Pointer -** 20:25
**Police -** 5:10, 5:11, 5:14, 5:15, 5:21, 5:24, 6:12, 23:1, 43:24
**Population -** 34:7, 34:8, 34:12, 34:14
**Portion -** 21:21
**Position -** 3:16, 3:17, 14:12, 14:20, 14:21
**Positions -** 14:17
**Positive -** 14:5
**Possibilities -** 41:21

**Post -** 21:4
**Posterior -** 21:5, 21:21, 39:13, 39:23
**Power -** 45:17
**Practice -** 16:14
**Practices -** 12:8
**Practitioners -** 13:20, 14:24
**Premed -** 4:22, 5:3
**Preparation -** 37:17
**Present -** 3:2, 10:12, 18:2, 34:19, 41:3
**Presented -** 34:17
**Prevent -** 12:6
**Previously -** 26:22
**Prior -** 3:16, 37:18, 37:24
**Prison -** 3:19, 14:18, 14:25, 15:1
**Proceed -** 24:3
**Proceedings -** 17:20, 22:21, 24:1, 30:3, 30:21, 46:21
**Professional -** 16:10
**Professor -** 9:5, 9:6, 9:11, 9:12, 9:17
**Program -** 9:22, 11:24, 11:25, 12:12
**Protect -** 21:7
**Provide -** 13:19
**Provided -** 14:24
**Providers -** 13:20
**Psychology -** 6:21, 6:22
**Published -** 15:14, 15:15, 32:24
**Pulling -** 45:11, 45:12
**Punctate -** 20:11, 20:25, 40:15
**Puncture -** 20:12, 33:10, 45:10
**Purchase -** 22:4

**Q**

**Qualified -** 16:18, 16:21
**Qualifies -** 4:9
**Quality -** 11:20, 11:23, 11:25
**Questioning -** 31:17
**Quick -** 19:12, 42:22
**Quickly -** 19:6, 42:20
**Quoting -** 32:12

**R**

**Range -** 5:23
**Ranging -** 33:19
**Reached -** 25:8, 25:9
**Reaching -** 27:10
**Reaction -** 37:5

**Ready -** 3:5
**Reason -** 11:23, 20:10, 33:5
**Reasonable -** 23:15, 41:22, 46:5
**Received -** 6:20
**Recent -** 3:17
**Recently -** 3:15
**Recommendation -** 31:15
**Records -** 17:8, 17:10
**REDIRECT -** 43:6
**Referred -** 13:18
**Reflect -** 19:12
**Reflects -** 19:15
**Regards -** 26:4
**Regular -** 13:16
**Regulated -** 13:21
**Relation -** 31:2
**Relative -** 22:13
**Relegated -** 23:6
**Relevance -** 20:16
**Reliable -** 31:7, 31:10, 32:1, 43:13
**Remain -** 11:2
**Render -** 26:1
**Rendered -** 29:16
**Reported -** 34:17
**Reportedly -** 37:1
**REPORTER -** 32:13
**Reporting -** 32:5
**Reports -** 17:15, 37:19, 38:2, 44:21
**Representation -** 31:6
**Research -** 15:16
**Resided -** 26:16
**Residencies -** 8:7, 9:9
**Residency -** 4:3, 4:4, 4:14, 4:15, 7:7, 7:9, 7:10, 7:18, 7:19, 7:25, 8:1, 8:3, 8:12, 8:21, 8:22
**Residents -** 16:14
**Respect -** 38:8
**Response -** 35:15
**Responsibilities -** 9:17
**Responsive -** 35:12
**Result -** 30:11
**Results -** 32:5, 38:9
**Retired -** 3:15
**Retirement -** 3:16, 3:17, 14:1
**Returned -** 5:7
**Reviewing -** 38:23, 41:18, 42:18
**Ripping -** 45:13
**Risk -** 33:24
**Road -** 26:16, 40:19
**Role -** 9:18
**Room -** 3:14, 4:6, 12:9,

34:18, 34:19
**Round -** 20:14, 21:1, 40:15
**RUSSELL -** 3:4, 3:10, 3:12, 3:20, 35:16

**S**

**Sample -** 32:4
**Saw -** 19:13, 19:15, 27:12, 27:14, 27:17, 28:5, 28:25, 34:7, 34:9, 38:3, 38:4, 38:5, 41:9, 41:11, 43:23, 46:4, 46:10
**School -** 4:12, 4:13, 5:9, 5:25, 6:25, 7:1
**Science -** 6:20, 15:10, 30:8, 30:15, 31:7
**Sciences' -** 31:1
**Scientific -** 31:17, 44:15, 46:5
**Scratch -** 36:9, 40:10
**Scratched -** 35:5
**Scratches -** 15:17, 16:13, 41:24
**Scratching -** 45:11
**Second -** 8:1, 8:3, 8:21, 8:22, 19:12
**See -** 10:13, 12:2, 17:12, 23:4, 23:6, 27:6, 30:18, 41:1, 42:20, 45:14
**Seeing -** 10:11, 21:21, 29:1
**Seen -** 16:11, 19:6, 22:3, 28:8, 42:1, 42:9, 42:15, 43:20, 45:25
**Seminars -** 4:18
**Sent -** 26:3, 26:21, 27:2, 38:12, 39:1, 39:2, 44:9
**Separate -** 9:15, 9:17
**Series -** 20:23, 44:20
**Services -** 12:15, 13:6
**Session -** 3:1, 18:1
**Set -** 20:7, 20:8, 47:2
**Sets -** 39:14
**Seven -** 5:19, 13:15, 35:1
**Several -** 18:7, 43:22
**Severe -** 33:12
**Sharp -** 42:10
**Sheridan -** 17:14, 26:13
**Sheridan's -** 29:11
**Sheriffs -** 12:21
**Shifts -** 10:20
**Shortly -** 26:3
**Show -** 19:5
**Sick -** 4:5
**Side -** 9:6, 9:7, 35:3, 35:17
**Sidebar -** 17:19, 17:21,

6-21-21 RUSSELL

22:20, 22:22, 23:25, 24:2, 30:2, 30:4, 30:18, 30:20, 30:22, 46:20, 46:22
**Situated** - 21:20
**Situation** - 45:22
**Six** - 25:6, 28:6, 28:18, 28:23
**Sixteen** - 4:11
**Size** - 7:22
**Skew** - 34:12, 34:14, 34:15
**Skewed** - 34:7, 34:8
**Skin** - 42:10, 45:9, 45:11, 45:12, 45:16
**Small** - 21:1, 40:15
**Solid** - 22:4
**Sound** - 15:24
**Southern** - 7:12, 7:15
**Speaker** - 32:16
**Specialist** - 4:2
**Specialized** - 6:3
**Specialty** - 42:21
**Specific** - 15:15, 17:4, 31:4, 31:14, 32:7
**Specifics** - 6:10, 23:1
**Spectrum** - 8:16, 33:6, 33:9
**Spell** - 3:11
**Start** - 4:19, 4:20, 35:9
**Starting** - 4:7, 4:9
**State** - 3:11, 3:18, 3:19, 9:12, 9:13, 13:11, 13:13, 13:22, 14:3, 14:18, 16:24
**Status** - 15:7
**Stop** - 14:11
**Strike** - 6:5, 6:6, 21:25, 22:1
**Strong** - 16:7, 16:8
**Stuck** - 45:1
**Students** - 10:10
**Studied** - 43:23
**Study** - 16:5, 34:8, 34:12, 34:14
**Subprograms** - 11:10
**Subscription** - 27:23, 28:4, 28:6, 28:15, 28:23, 28:24
**Subsequent** - 5:4
**Subsequently** - 5:7, 5:10
**Subspecialty** - 7:19, 8:3
**Substandard** - 13:18
**Suffered** - 17:3
**Summary** - 31:24, 34:25
**Superficial** - 20:25
**Supervised** - 16:14
**Supervising** - 10:4
**Supervision** - 8:25
**Supervisor** - 9:10, 10:2,

14:23
**Support** - 11:13, 11:15, 11:16, 11:17
**Supposedly** - 36:21
**Surface** - 21:4, 21:5
**Surgeons** - 11:16, 12:10
**Surgical** - 33:16
**Sustain** - 21:6
**Sustained** - 19:1, 19:20, 19:21, 21:10, 29:15, 29:24, 35:24, 37:1, 44:19, 45:24, 46:8, 46:12, 46:17
**Swabbings** - 38:12, 38:16, 38:24
**Swabs** - 44:9
**Sworn** - 3:4, 5:16
**System** - 12:18, 12:24, 13:3, 13:6, 14:25, 15:1
**Systemic** - 12:5

| T |
| --- |

**Taking** - 4:5
**Teach** - 11:16, 12:3, 12:5
**Teaching** - 9:20, 10:8, 10:10, 10:16, 11:14, 12:5, 12:8
**Tears** - 38:17
**Technical** - 26:23, 27:4, 27:5
**Technique** - 33:3
**Teeth** - 20:5, 20:6, 20:9, 21:2, 21:15, 39:10, 39:11, 39:14, 39:16, 40:17
**Ten** - 17:23
**Tenure** - 11:9
**Terms** - 24:19
**Testimony** - 17:13, 28:14, 28:21, 35:16, 37:16, 37:17, 39:10, 41:18, 42:13
**Tether** - 12:17
**Text** - 25:21
**There's** - 3:24, 20:1, 20:3, 20:4, 20:5, 20:11, 20:23, 27:7, 39:18, 45:10, 45:11, 45:13
**These** - 19:20, 19:21, 21:3, 23:16, 27:4, 32:4, 36:17, 37:1, 45:1
**Thickness** - 45:15
**Thousand** - 16:16, 43:20, 45:25
**Thousands** - 42:1, 42:9
**Times** - 43:20
**Tissue** - 33:14
**Tissues** - 45:13
**Title** - 13:22, 13:24, 13:25
**Today** - 23:14, 24:22, 26:2, 29:6, 37:18, 37:25

**Took** - 4:21, 5:3, 6:3
**Tooth** - 20:15
**Top** - 21:15, 21:19, 39:10, 39:12, 39:16
**Torso** - 36:12, 40:3
**Total** - 9:23, 10:1
**Touch** - 25:11
**Town** - 17:15
**Toxicological** - 18:9
**Trained** - 42:20, 43:1, 43:23, 43:24
**Training** - 4:8, 6:4, 6:13, 10:2, 11:14, 45:18
**Trauma** - 7:21, 7:23, 11:16, 12:9
**Treated** - 4:17, 12:2, 16:12
**Treating** - 10:17
**Treats** - 8:15, 8:18
**Trends** - 16:3
**Trial** - 25:6, 25:7
**Tuesday** - 37:18, 37:24, 37:25
**Twelve** - 28:23
**Twenty** - 10:1
**Two** - 4:15, 4:16, 8:4, 8:7, 8:24, 9:2, 26:18

| U |
| --- |

**UC** - 18:22, 26:14, 29:10, 38:2, 38:8, 38:13, 39:4, 44:8
**Ultimate** - 46:9
**Umass** - 7:2
**Underlying** - 45:12
**Understood** - 8:23, 13:8
**Unfamiliar** - 31:5
**Unique** - 33:6
**Unit** - 13:16
**United** - 7:24
**University** - 6:19, 6:25, 7:11, 7:15, 9:7, 9:15
**Upper** - 20:4, 21:1, 40:16
**USC** - 7:20, 7:22, 9:24, 11:13, 14:8

| V |
| --- |

**Value** - 31:17
**Variety** - 45:9, 45:13
**Verbal** - 25:20
**Versus** - 40:10
**Victim** - 22:13, 45:16
**Victims** - 34:23
**Violations** - 33:19
**Voice** - 3:10, 3:21, 3:25, 24:25
**Volume** - 7:22

| W |
| --- |

**Wait** - 35:9, 39:14
**Ward** - 12:19
**Wasn't** - 27:9, 28:14
**Week** - 14:15
**Weekly** - 11:4
**Weeks** - 25:6
**We're** - 17:22, 21:21
**Weren't** - 32:10
**We've** - 23:14
**What's** - 8:10, 8:11, 22:17
**Where'd** - 4:19, 4:20
**Whole** - 27:6
**Wide** - 8:17, 45:9
**Will** - 11:24, 47:5
**WITNESS** - 3:23, 25:1, 25:3, 28:22, 32:14, 35:10, 36:24, 42:6, 47:3, 47:4
**Word** - 22:17
**Words** - 10:23, 21:18, 45:19
**Work** - 5:20, 8:24, 13:13, 30:11, 43:17
**Worked** - 5:21, 9:9, 13:15, 24:17, 25:9
**Working** - 14:11
**Worst** - 34:9
**Wouldn't** - 42:15
**Wound** - 38:21
**Wounded** - 42:1
**Wounds** - 16:6, 16:7, 16:22, 19:13, 20:20, 21:3, 21:7, 21:13, 22:3, 33:10, 33:16, 33:24, 39:15, 44:25, 45:10, 45:14, 45:19
**Write** - 29:5, 29:12, 29:19
**Writing** - 33:5
**Written** - 32:20

| Y |
| --- |

**Year** - 4:21, 4:24, 5:4, 15:22, 25:4, 28:6, 28:15
**Years** - 4:11, 4:13, 4:15, 4:16, 5:19, 5:22, 7:9, 8:4, 8:5, 8:24, 10:1, 10:3, 10:22, 12:19, 13:15, 14:2, 14:5, 14:20
**York** - 5:6
**You're** - 3:5, 13:8, 24:9, 24:12, 30:8, 30:14, 30:23, 31:5, 31:16, 32:3, 32:5, 32:9, 32:12, 41:25
**You've** - 16:11, 18:7, 19:18, 26:2, 26:18, 29:6, 29:10, 42:14, 43:20, 44:20

6-21-21 RUSSELL

'73 - 4:25

### 1

**100 -** 36:19
**17 -** 24:23, 25:3, 25:4, 25:14, 37:24, 42:18
**17th -** 25:15, 25:16, 25:24
**18 -** 28:15
**18th -** 25:15, 25:16, 25:24
**19 -** 19:3
**1972 -** 4:25
**1977 -** 5:23
**1983 -** 7:1
**1984 -** 5:23
**1987 -** 7:1, 7:10
**1990s -** 15:23, 15:24, 32:25
**1991 -** 7:10
**1995 -** 24:19
**1996 -** 15:24

### 2

**2000s -** 11:21
**2008 -** 30:12, 30:15, 31:1
**2009 -** 14:4
**2016 -** 14:4
**2018 -** 14:22
**2023 -** 14:22
**2024 -** 25:3, 25:5, 28:2, 29:2, 42:18
**25 -** 10:3
**29 -** 10:3, 10:22

### 3

**34 -** 26:16, 40:19

### 5

**500 -** 16:15

### 7

**70 -** 12:19
**700 -** 34:25

### 9

**9s -** 23:1, 43:24