# ATTACHMENT 8

Volume: 21
Pages: 224
Exhibits: 96-97
Id: None

COMMONWEALTH OF MASSACHUSETTS

Norfolk, ss.

SUPERIOR COURT
DEPARTMENT OF
THE TRIAL COURT

* * * * * * * * * * * * * * * * * * * * * *

COMMONWEALTH

vs.

Criminal Docket No. 2282CR00117

KAREN READ

* * * * * * * * * * * * * * * * * * * * * *

JURY TRIAL
BEFORE THE HONORABLE BEVERLY CANNONE

TESTIMONY OF JENNIFER MCCABE

Tuesday
May 21, 2024
Courtroom 25
Norfolk Superior Court
Dedham, Massachusetts

Diane Cercone, Certified Court Reporter

2

A P E A R A N C E S

Representing the Commonwealth:

Office of Norfolk County District Attorney
Adam Lally, Assistant District Attorney


Representing the Defendant:

Alan Jackson, Esquire
David Yannetti, Esquire
Elizabeth Little, Attorney at Law

3

I N D E X

Witness                    Direct      Cross

Jennifer McCabe

(By Mr. Jackson)                          5

4

EXHIBITS

No.              Description                    Page

96         Thumb with Voice Recordings          98

97         Redacted Extraction Report
           (formerly NN for Identification)135

MARKED FOR IDENTIFICATION

Letter                                        Page

(None entered)

5

P R O C E E D I N G S

JENNIFER MCCABE-SWORN

THE COURT:  All right, Mr. Jackson, whenever you're ready.

MR. JACKSON:  Thank you, your Honor.


CROSS EXAMINATION
BY MR. JACKSON:

Q   Ms. McCabe, family is important to you, is it not?

A   Yes.

Q   As a matter of fact, it's probably fair to say that family is one of the most important things in your life?

A   Yes.

Q   You indicated on Friday that you know John O'Keefe or you knew John O'Keefe and you considered him a friend?

A   Yes.

Q   You also indicated that you know Ms. Read and at some point you considered her a

6

friend?

A   Yes.

Q   But clearly John O'Keefe was not family, was he?

A   No.

Q   He was not a McCabe, correct?

A   No.

Q   He was not an Albert?

A   No.

Q   Karen Read is not family, correct?

A   Correct.

Q   She's not a McCabe?

A   No.

Q   And she's not an Albert?

A   No.

Q   Ms. McCabe, when you were at Waterfall on the evening of the 28th going into the early morning hours of the 29th you spent some time with John O'Keefe and Karen Read?

A   Correct.

Q   You didn't see any tension between the two of them at the time?

A   No.

Q   As a matter of fact they seemed like a

7

normal couple to you?

A    I didn't see them interact much.

Q    They were both engaging with you, correct?

A    I had separate conversations with them.

Q    So John O'Keefe we've seen in several videos, I'm not going to play the video, John O'Keefe was situated for the most part over in that corner as the camera is looking, the right corner of the bar along with you, the Kolokithases, I think Matt McCabe was over there, as well, correct?

A    I can't be sure but I know I spoke to Karen in that corner.

Q    And certainly you saw nothing to suggest that there was any tension or discord between and among those individuals, certainly between Ms. Read and Mr. O'Keefe, correct?

A    Correct.

Q    When you left Fairview were you among the first to leave or among the last to leave?

A    I left with, there were four of us that left, total.

Q    Tell me who those were?

A    Myself, my husband Matt, Julie Nagel and

8

Sarah Levinson.

Q   When you walked out Karina Kolokithas was close by, close in tow, correct?

A   Wait, are you talking about leaving the Waterfall?

Q   Leaving the Waterfall?

A   Oh, I'm sorry, I was confused.  I was talking about Fairview.

Q   No, that's okay.

A   Leaving the Waterfall?

Q   Correct.

A   Yes, we were one of the last to leave.

Q   And Ms. Karina Kolokithas was sort of in tow right with you as you're walking out, correct?

A   Yes.

Q   And Karen Read, my client, was also heading in that direction, as well, correct?

A   Yes.

Q   And you said something to Ms. Read, did you not, as you walked out?

A   We were in a conversation, yes.

Q   Did you say specifically, You're coming with me, to Karen?

9

A  No.

Q  You didn't say that?

A  Not exactly those words.

Q  What exactly were the words that you used?

A  I said, Why don't you come with me.

Q  And you even waited outside in what was ultimately freezing cold temperatures for Ms. Read, correct?

A  Yes.

MR. JACKSON:  If you could take a look, your Honor, with the Court's permission, Exhibit 53, I'd like to play about maybe a fifteen second clip from that.

THE COURT:  Okay.

MR. JACKSON:  Actually, it's a little bit longer than that.  It may be a minute.  Could we pause.  For the record, your Honor, this is about run time 12:10 and 17 seconds or so.  If you could move it up, Mr. -- to about 12:10 and 45 seconds.  That's close enough.

Q  (By Mr. Jackson)  Ms. McCabe, do you recognize what's depicted in this portion of the video?

10

A    I see a car.    It's kind of hard to see.    I don't know what the white thing is.

Q    Let's go ahead and play it and see if you recognize any of this?

(Portion of Exhibit 53 was played)

MR. JACKSON:    Can you pause, please.    That's a terrible place to pause. A little further.

Q    (By Mr. Jackson)    It's also not super clear, can you see a person in that video?

A    From where I'm sitting, no.

Q    It's a little tough.

A    Yes.

Q    Let's just play it forward.    Actually, just a little bit, did you see a person in the background right there?

A    Honestly I don't.    I can't make out what that is.

Q    Let's play it forward and see if it's -- Okay.    Now do you see a person?

A    Yes.

Q    The lighting is terrible.    I apologize.

It's not my video.  Do you know who that person is?

A   I don't, no.

Q   That's you, isn't it?

A   I can't tell from that picture if that's me.

Q   Let's maybe play it a little bit further forward.  Pause.  Now, with the flag out of the way do you recognize anybody in the foreground down at the bottom right?

A   That looks to be John.

Q   Mr. O'Keefe?

A   Yes.

Q   Do you see someone to his right?

A   I do, yes.

Q   Who is that person?

A   I cannot make her out.  I cannot make it out in the photo.

Q   Let's play it forward.  And pause.  Do you see the person with the sort of white shoes just about the car?

A   Yes.

Q   Does that appear to be you?

A   I can't make that out that it's me but I know I was there.  And I know I spoke with

12

them.

Q    So you do recall walking outside and sort of waiting and hovering in about that area, correct?

A    I was talking with them.

Q    Does it appear that you're talking with them in this frame?

A    No, it looks like they've walked away.

Q    Right, as a matter of fact it looks like they walked away without talking to you outside, correct?

A    Well, do you have video of moments before that when I was standing talking to them?

Q    This is the point where I get to ask the questions and you need to answer them.

A    Okay.

Q    So I'm asking you do you see yourself standing in the parking lot after John and the person to his right had walked away?

A    Yes.

Q    Okay, let's play it forward just a few more seconds.  Pause.  And what do you appear to be doing at that point?

A    Walking to my car.

Q    So you turned around and left after Mr.

13

O'Keefe and the person to his right walked away, correct?

A   Correct.

Q   As you sit here, even though the video leaves a little to be desired you know that John O'Keefe left with Karen, correct?

A   Yes.

Q   So the person to his right, the more petite person with the long hair, that would be Karen?

A   I would assume.

Q   So you waited out in the parking lot for a few minutes after you said or joked, You're coming with me, or something like that, correct?

A   No, I was speaking to them and then I walked to my car.

Q   You didn't say to Mr. O'Keefe, you're coming with me, you said to Karen Read, You're coming with me, or something to that effect, correct?

A   Mr. O'Keefe was not outside when I said to Karen, You're coming with me.  I told Karen, You're coming with me, because John

14

was still in the bar with Matt.

Q   So you asked Karen to come with you in your car?

A   Yes.

Q   To give her a ride?

A   Yes.

Q   Separate from John O'Keefe?

A   Yes, I figured he could go with Matt because they were still in the bar.

Q   Was there a reason why you wanted to separate Ms. Read from Mr. O'Keefe at that moment?

A   No.

Q   Why not just walk to your car with Matt and go where you're going to go?

A   Matt was still inside.

Q   So you thought it was important enough to make the statement, You're coming with me, or something to that effect to my client to separate her from John O'Keefe, even though your testimony is John O'Keefe was just inside the bar, correct?

          MR. LALLY:  Objection.

          THE COURT:  Sustained as to that form.  Ask it differently.

15

MR. JACKSON:   Sure.

Q   (By Mr. Jackson)  Did you believe it was important at that point to ask Ms. Read to come with you which would separate her from John O'Keefe?

A   There was never any idea of separating them.

Q   Except for the fact the idea was, You're coming with me not, You two are coming with me, correct?

A   Incorrect.

Q   By definition if she came with you you'd be separating her from John, wouldn't you?

A   We were standing outside talking.

Q   My question can be answered yes or no.  Be definition your statement to her, You come with me would separate her from John, wouldn't it?

A   It would not because we were all going back to Fairview Road.

Q   But not at the same time, ma'am, correct? Your idea was to bring Karen with you separate and apart from John, wouldn't it?

A   We were waiting for John to come out and I said, Why don't you just come with me.  It

16

was innocent.

Q   I'm not asking for your explanation, you'll get to that with Mr. Lally, I'm asking for a yes or no question or a yes or no answer.  By definition, your invitation would separate Karen from John, would it not --

MR. LALLY:  Objection.

Q   -- for the ride over?

THE COURT:  Sustained.  Move on.

Q   (By Mr. Jackson)  Would it or would it not separate John and Karen for the ride over?

MR. LALLY:  Objection.

THE COURT:  Sustained.

Q   (By Mr. Jackson)  Now when you arrived at Fairview some folks were already there, correct?

A   Yes.

Q   Who was already there?

A   Brian Higgins, Brian Albert, Nicole Albert, Caitlin Albert, Julie Nagel, Sarah Levinson and Brian Albert, Jr.

Q   And then you arrived as we saw, you walked through the parking lot, got in your car, you arrived I presume with your husband,

17

Matt McCabe?

A    Yes, correct.

Q    I want to ask a question about Mr. Higgins.

A    Uh-huh.

Q    You testified on Friday that you saw his vehicle when you got to the scene, correct?

A    Yes.

Q    And you said that it was pulled up a little bit in front of the mailbox, correct?

A    Yes.

        MR. JACKSON:  Could we have Exhibit 66 with the Court's permission, please.

        THE COURT:  Okay.

Q    (By Mr. Jackson)  This is a digital model of the location, do you recognize this?

A    Yes.

Q    Does it appear to be a relative scale model of 34 Fairview?

A    Yes.

Q    This would be the front door, correct?

A    Yes.

Q    Where is the mailbox, if you can point to

18

it with the laser pointer.

A   (Witness complied)

Q   Okay, so you're pointing to an area just in front of a car that's in the driveway, correct?

A   Yes.

Q   And then the driveway is to the right?

A   Yes.

Q   And along this line is the front lawn area and property line of 34 Fairview, correct?

A   Yes.

Q   You indicated that that Jeep was just a little bit in front of the mailbox meaning about there, correct?

A   Yes.

Q   And the rear end of that Jeep would be butting up against the driveway?

A   Yes.

Q   Or at least the line of the driveway, correct?

A   Yes.

Q   That's quite a bit of detail about where that Jeep was, would you agree?

A   No, because I drove down the street and I took a left into the driveway and there

19

was a Jeep there.

Q  What I'm asking you is you didn't just say, your memory is not just somewhere in front of the house, it's literally right in front of the mailbox, the front end of it adjoining the line of the driveway, correct?

A  Yes.

Q  That detail obviously stuck out in your mind?

Q  It did because I was wondering whose Jeep it was.

Q  Did you discuss that detail with your husband at any point?

A  Not sure.

Q  You're not sure?  You might have?

A  I'm not sure if I said, Whose Jeep is that?

Q  No, I don't mean then, I mean between then and now have you and Mr. McCabe ever discussed where that Jeep was to your memories of where that Jeep was?

A  Possibly.

Q  You're aware that he put the Jeep in the exact same place as you did?

20

MR. LALLY: Objection.

THE COURT: Are you aware of that?

THE WITNESS: I am. Oh, wait, excuse me. Repeat the question?

Q (By Mr. Jackson) You're aware that he puts the Jeep in the exact same spot you just put the Jeep right in front of that mailbox, correct?

A I know he knows where the Jeep was. I'm not aware what he said in here.

Q Does he know where the Jeep was because you told him what to say about the Jeep?

A Absolutely not.

Q Okay.

A It's because we drove together in the car.

Q Got it.

A And I asked. I possibly could have asked.

Q You gave a statement --

THE COURT REPORTER: Let's have one at a time please, ma'am.

Q (By Mr. Jackson) Sorry, I didn't mean to step on your words. I thought you were finished.

A That's okay. You can continue.

Q Thank you. I appreciate that.

21

THE COURT:  I don't think we got your answer though.  I think Madam Court Reporter was asking for your answer.

Q   (By Mr. Jackson)  Can you repeat your answer?

A   To the question of did he know where the Jeep was?

Q   Whether or not you told him where the Jeep was?

A   I did not need to tell Matt where the Jeep is, was.  He knew because we were in the car together.

Q   But you two discussed it?

A   When are you asking?

Q   At any time between January 29th and today?

A   I'm sure we have, yes.

Q   You were also interviewed by Trooper Proctor on January 29th 2022, correct?

A   Yes.

Q   And you were asked a series of open-ended questions:  What did you see and where did you see it?  Correct?

A   Yes.

Q   Nobody put any words in your mouth?

A    No.

Q    Nobody told you what to say at that time?

A    No.

Q    And you told Trooper Proctor that when you arrived at the scene after you got there you quote, first observed the vehicle, meaning Ms. Read's SUV parked on the street by the driveway facing the direction of Chapman, correct?

A    Can I, do you have something I can look at to refresh my memory?

Q    Sure.  Do you not have a memory of exactly what you told Trooper Proctor?

A    Well, I know what I --

Q    Yes or no, do you need your memory refreshed?

A    I would like to see what the report says, please.

         MR. JACKSON: Permission?

         THE COURT:  Yes.

         MR. JACKSON:  Thank you.

         THE COURT:  Yes.

Q    (By Mr. Jackson)  Paragraph 3.  This is the face page.  You'll review that, especially the highlighted portion.  Let

23

me know after you've reviewed it.  Just
read it to yourself.  Does that refresh
your recollection?

A    Yes, I know I told --

Q    All I'm asking you, I'm so sorry to do
that, I don't mean to be rude, I'm just
asking does that or does that not refresh
your recollection?

A    Regarding?

Q    What you said to Trooper Proctor on the
29th?

A    I know what I said to the Proctor, trooper
on the 29th.

Q    I have to do it this way.

A    Okay.

Q    Court rules.

A    Uh-huh.

Q    Does that help you with your recollection
of what you told Trooper Proctor?

A    I told Trooper Proctor the car was
outside, when I looked at the front door
it was straight outside.

Q    Okay, I can't quite get the answer I'm
looking for.  The Court is going to
require me to ask this question again.

24

A    Uh-huh.

Q    Does that refresh your recollection, yes or no, as to what you told Trooper Proctor?

A    I did not say this to Trooper Proctor, no.

Q    So it doesn't help you?

A    No.

            MR. JACKSON:   May I approach?

            THE COURT:   Yes.

            MR. JACKSON:   Thank you.

Q    (By Mr. Jackson)   So you did speak to Trooper Proctor on the 29th, correct?

A    Correct.

Q    And Trooper Proctor asked you some very specific questions about where things were, correct?

A    Correct.

Q    He focused on Ms. Read's SUV, didn't he? He asked you questions about where Ms. Read's SUV was?

A    If you can show me in the report?

Q    You just read it.

A    Just off of what I just read is that what you're going off of?  Yes?

Q    I'm asking for your memory, you're

25

testifying.

A    Yes, so my memory is  --

THE COURT REPORTER:  Your Honor --

A    -- exactly where the car was.

THE COURT:  Hold on.  So it's very important that both of you, one person at a time speaks.

THE WITNESS:  Okay.

THE COURT:  Madam Court Reporter has to do what you're both saying and she can't do it simultaneously.  So the best way to do that is Ms. McCabe, just let counsel ask the question --

THE WITNESS:  Okay.

THE COURT:  -- and then you answer and if it takes a lot more time than we expect it to take, it does.

THE WITNESS:  Okay, thanks.

THE COURT:  So just, go ahead, Mr. Jackson.

MR. JACKSON:  Thank you, your Honor.  I'll slow it down.

Q    (By Mr. Jackson)  Did you talk to Trooper Proctor about where the SUV was?

26

A    Yes.

Q    Thank you.  And he asked you questions about where it was situated outside, correct?

A    Yes.

Q    And you told him that you first observed it parked on the street by the driveway facing the direction of Chapman, correct?

A    I told him that when I looked out the front door the car was straight ahead, and yes, it was facing up Chapman.

Q    You left out a little part by the driveway, correct?

A    That could have been his interpretation or an error on his part.

Q    I see.

A    Uh-huh.

Q    So Trooper Proctor is wrong about what you said?

        MR. LALLY:  Objection.

        THE COURT:  No, I'll let him have it.  Do you think he's wrong about what you said?

        THE WITNESS:  I 100 percent said it was straight out the front door.

THE COURT:  Okay, next question, please.

MR. JACKSON:  Thank you, your Honor.

Q  (By Mr. Jackson)  And during the course of that conversation you never once, Ms. McCabe, not once mentioned a several ton Jeep with a snowplow attached to it, did you?

A  I'm not sure if I did or not.

Q  If you take another look at the report would that refresh your recollection to see the report?

MR. LALLY:  Objection.

THE COURT:  Do you think that will help you?

THE WITNESS:  I'll take a look at it.

THE COURT:  Okay.

MR. JACKSON:  May I?

THE COURT:  Yes.

Q  (By Mr. Jackson)  I direct your attention again to paragraph 3.  You've had an opportunity to review it?

A  I have, yeah.

28

MR. JACKSON:  May I approach, your Honor?

THE COURT:  Yes.

Q  (By Mr. Jackson)  That looks like a report from Trooper Proctor of your interview, correct?

A  Correct.

Q  That interview was taken on January 29, correct?

A  Correct.

Q  That interview was taken just a few hours, not days or weeks, hours after the events in question, correct?

A  Correct.

Q  And you were asked what you saw, what you observed in front of 34 Fairview on that morning, correct, I'm sorry, the night before, correct?

A  He asked specific questions about Ms. Read's vehicle.

Q  Okay, and when you said where you remembered Ms. Read's vehicle being you placed it in the exact spot where you're now saying there was a Jeep with a snowplow on it, correct?

29

A    Incorrect.  I never placed Ms. Read's car
     in the spot where Mr. Higgins' vehicle
     was.

Q    So if Trooper Proctor was taking notes
     about what you were saying he got it
     wrong?

A    You'd have to ask Trooper Proctor.

Q    I will, and you never mentioned, according
     to that report, not one word about a Jeep,
     right?

A    I may never have been asked about a Jeep.

Q    So if you weren't asked about a Jeep you
     also weren't asked about a Nissan Ultima,
     did you mention that?

A    No.

Q    Right, because what he asked you was what
     did you observe in front of the house,
     ma'am, that's what he asked you, wasn't
     it?

A    No.

Q    And you said, I observed her car by the
     mailbox?

A    No.

Q    And you never mentioned a Jeep, did you?

A    You are not portraying what the

30

conversation was.

Q    Did you or did you not mention a Jeep
sitting right by that driveway to Trooper
Proctor, yes or no?

A    It's not in the report.  I don't recall if
he asked me about a Jeep.

Q    Now, following the events of January 28-
29, you spoke extensively to Chris and
Julie Albert, correct?

A    What do you mean by extensively?

Q    Did you speak at all?

A    Yes, we did.

Q    Between then and now to Chris and Julie
Albert?

A    Do I speak to Chris and Julie Albert?

Q    Have you spoken to them about these events
between then and now?

A    About this case?  Is that what you're
asking?

Q    Yes, Ms. McCabe, I'm asking about this
case?

A    Of course I speak to them all the time
about the vicious harassment we are all
receiving.

Q    That wasn't my question.  My question was,

did you talk to them about this case, Ms. McCabe?

A    Yes.

Q    I realize you want to give additional answers and editorialize.  I'm asking you very specific questions.

A    Uh-huh.

MR. LALLY:  Objection.

THE COURT:  Objection as to the form.  We've talked about this at side bar, Mr. Jackson.

Q    (By Mr. Jackson)  You've talked to them about the details of that night, correct? The 28th going into the morning of the 29th?

A    Yes.

Q    You've talked to them about what happened at the bar, correct?

A    We spoke about how we were all in the bar and Karen and John came in.

Q    Is that yes or no?

A    Yes.

Q    Okay, and you've spoken to them about your memory of what happened at the house at 34 Fairview that night, correct?

32

A    Yes.

Q    You've spoken to them about who was at the bar, not just what happened, but who was there, correct?

A    Correct.

Q    You talked to them about the timing of the night, correct?

A    I don't think specifically, no.

Q    When people came to the bar, when they left, when people got to Fairview, when they left Fairview, things of that nature?

A    Well, they were at the bar so they know who was there and when we left.

Q    I didn't ask if you know what they know. I'm asking if you've ever spoken to them about these issues, yes or no?

A    I can't be sure if we've spoken about the timeline.

Q    And you've talked to them about when they got there and when they left?

A    I have no idea when they arrived at the Waterfall.

Q    Once again, Ms. McCabe, that's not what my question was.  Did you understand my question?  Have you spoken to them about

33

their memory of that night and when they came and left?

A    They have not shared with me when they got there or when they left.

Q    In the two years or two-and-a-half years since this event you've had extensive conversations with your friends and family about this circumstance, correct?

A    Correct.

Q    That's fair to say?

A    Yes.

Q    You've told them your observations, your story, correct?

A    Correct.

Q    Your observations of the night?

A    Correct.

Q    And they you their observations of the night, correct?

A    Correct.

Q    So you all have compared and contrasted your perspectives of what happened that night, correct?

A    We've tried to figure out what happened to John, our friend.

Q    And you've talked to them extensively

34

about your observations and what your story or your version is, is that right?

A    To be honest not extensively.  Speaking about it is very painful and difficult.

Q    Well, what does extensively mean, more than twice?

A    Well, you tell me.

Q    I'm asking the questions, Ms. McCabe, that's how this works.  What does extensively mean to you?

A    I understand but extensively would mean almost every day.

Q    Do you talk to them almost every day?

A    I do, but not about the case.

Q    Do subjects about this case come up every day?

A    The harassment of the case does, yes.

Q    What about the specific facts of the case, Ms. McCabe?

A    No, the facts aren't spoken as much as the vicious harassment is spoken about.

Q    Understood.  So you've told them your version of the events, correct and they've told you their version of the events?

A    Correct.

Q    And remind me, Chris and Julie Albert are in fact Colin's parents?

A    Correct.

Q    At some point you became aware that your daughter, Ally, was involved in this matter to some extent, correct?

A    Yes.

Q    You became aware that there was an extraction of your phone that revealed some data about her whereabouts?

A    That's not how I became aware of it, no.

Q    Life 360?

A    Yes, I know what that is.

Q    That's what I'm asking you about.  You know your phone was extracted, correct?

A    I willingly handed over my phone.

Q    Oh, we'll get to that.

A    Oh, okay.

Q    You know that your phone was extracted?

A    Yes, I handed it over.

Q    And you know that your daughter's whereabouts were revealed based on data on that phone, correct?

A    That is not how I became aware of my daughter's whereabouts.

36

Q    You testified at the state grand jury under questions by Mr. Lally, correct?

A    Yes.

Q    You were asked about the Life 360?

A    Yes.

Q    Correct?  You answered those questions very fluidly?

A    Yes.

Q    Yes, I know what Life 360 is.  I use it all the time.  It's an app, et cetera?

A    Absolutely.

Q    Okay, let's go over that for a second.

A    Uh-huh.

Q    You admitted that it works as a quote, GPS, as far as where people go and everywhere that you go, correct?

A    Correct.

Q    You indicated that it works as a reliable quote/unquote tracking device was your testimony?

A    Correct.

Q    You indicated that you rely on it, quote, so you know where your kids are at all times, is that right?

A    Correct.

37

Q   And you even said that it's a quote/unquote, good parenting tool, is that right?

A   Correct.

Q   And the reason you said that is because it's accurate in your experience and it's reliable, is that right?

A   It's a good tool but it is not always accurate.

Q   But you said when you testified in front of the grand jury that it's accurate and it works as a GPS as far as where you go and everywhere you go, correct?

        MR. LALLY:  Objection.

        THE COURT:  Did you say that?

        THE WITNESS:  Can I see it?

        MR. JACKSON:  Sure.  May I approach, your Honor?

        THE COURT:  Yes.

Q   (By Mr. Jackson)  Lines 13 through 15.

A   You said 13 through 15?

Q   Yes, ma'am.

A   Uh-huh.  Okay.

        MR. JACKSON:  May I, your Honor?

        THE COURT:  Yes.

38

Q    (By Mr. Jackson)  Does that refresh your recollection?

A    It does, yes.

Q    The question and answer?

A    I just don't see the word "accurate" on there.  I don't know if I missed it.

Q    Ms. McCabe, does that refresh your recollection as to the question and answer about whether you said it works as sort of a GPS as far as where you go and everywhere that you go?

A    Correct.

Q    And your answer was, yeah, correct?

A    Yes.

Q    Okay.  So where did Ally go after she supposedly dropped off Colin Albert?

A    She went nowhere.

Q    Did you check her Life 360 app to verify that she went quote, nowhere?

A    At that point I had no reason to check her.

Q    So the answer is no, you didn't?

A    No.

Q    Okay.  Did you ever verify through the Life 360 app that in fact, Ally did not go

39

home but rather was out driving until after 1:30 a.m., did you ever check the app and see that?

A   Did I ever check the Life 360 app for that?

Q   Yes.

A   No.

Q   Okay, but you believed her when she said she came home?

A   Yes.

Q   And just like you believed her when she said she picked up Colin, dropped him off and then came home?

A   Yes.

Q   Okay.  The Alberts have a dog, had a dog, pardon me, correct?

A   Yes.

Q   What was the dog's name?

A   Chloe.

Q   You indicated that on the morning of January 29th after 6:00 a.m. it was still relatively dark out, you burst into the bedroom of Brian and Nicole Albert's home, correct?

A   Yes.

40

Q    You did that specifically to wake up, according to you, Brian Albert and Nicole Albert, correct?

A    Yes.

Q    Where was Chloe?

A    I don't know.

Q    So you'll agree that at least from their perspective you walked in the front door unexpectedly, correct?

A    Yes.

Q    You walked upstairs unexpectedly, correct?

A    Yes.

Q    It was still dark outside, right?

A    Yes.

Q    You walked through their door and you said you burst into the door, into a dark room where they were sleeping, correct?

A    Yes.

Q    Mr. Albert said that you were somewhat hysterical, would you agree with that?

A    Yes.

Q    You were loud, right?

A    I was trying to wake them up.

Q    You were somewhat chaotic?

A    Yes.

41

Q    And you don't remember a 70 pound German Shepard having any reaction?

A    No.

Q    As a matter of fact, you don't remember the dog being there at all, correct?

A    Correct.

Q    You never saw that dog, correct?

A    I have no memory of seeing that dog.

Q    As you sit here today --

A    Uh-huh.

Q    -- you cannot say that the dog was here because you don't have a memory of ever seeing it?

A    I did not see it, no.

Q    And remind me once again when you were leaving that night, that early morning before --

A    Uh-huh.

Q    -- who was the last person to leave, was it Caitlin?

A    I believe she left after us.

Q    We've talked about this and I want to get a little more detail about it.  You indicated that at some point you looked outside and you saw Karen Read's SUV in

42

front of the house, safe to say, correct?

A    Correct.

Q    About what time was that that you first saw it?

A    I can just give you maybe approximates. I know I texted when I saw them so whatever time that was.

Q    All right, let's see if we can narrow that down just a little bit.

A    Uh-huh.

Q    You also indicated that you saw Ryan Nagel's vehicle outside?

A    I saw lights.

Q    Okay, lights belonging to the vehicle, right?

A    Yes, I knew there was another vehicle outside.

Q    Where was that in relation to Ms. Read's vehicle?

A    It was behind it. I didn't pay much attention to it.

Q    Okay, and where was the Jeep in relation to Ryan Nagel's vehicle and Karen Read's SUV?

A    I remember seeing Karen Read's SUV

43

straight and then I saw the lights of Ryan
Nagel.  I did not pay attention to where
it was.  I just was looking at Ms. Read's
vehicle.

Q  Was Ryan Nagel's vehicle and those lights
that you remember, were they in front of
the Jeep or behind the Jeep?

A  I am not certain.

Q  Haven't you testified previously that you
remember the Jeep being between Ryan
Nagel's vehicle and the SUV?

A  I am not certain where Ryan Nagel's
vehicle was.

Q  As you sit here now you don't know if it's
in front of the Jeep as you placed it by
the mailbox behind the Jeep --

A  It would be --

Q  -- let me finish my question behind the
Jeep or somewhere in between?

A  It definitely was not in front of the
Jeep.

Q  It definitely was not in front of the
Jeep?

A  No.

Q  So it was definitely behind the Jeep?

44

A    Behind or to the side, I'm not sure.

Q    Well, if it's parked on the street in front of the house it's not going to be beside the Jeep right, that's going to be in the middle of the road?

A    It would have been in the middle of the road, correct.

Q    Right.

A    So if it's pulled over it's behind the Jeep.

Q    Okay, so now we've narrowed that down. It's Karen Read's SUV, as we're looking at the property, Karen Read's SUV, to the right of that as we're looking at it from the street at the property to the right of that Jeep behind that, Ryan Nagel's vehicle, correct?

A    Correct.

Q    You're sure about that?

A    If my memory serves right, yes.

Q    If your memory serves right, okay.  So you were asked about the arrival of Mr. Nagel's car at the state grand jury, do you recall that?

A    I believe so.

Q    That was in April, April 26, 2022?

A    Uh-huh, okay.

Q    Fair enough.  Okay.  Does that sound about right?  I don't expect you to memorize that date.

A    Yes.

Q    You were asked what time did you see Ryan Nagel's vehicle arrive at the location and you indicated that it was 12:23, do you remember that?

A    Do you have it?

        MR. JACKSON:  I do.  May I approach, your Honor?

        THE COURT:  Yes.

Q    (By Mr. Jackson)  Take a look at lines 21 down to the highlighted portions. Let me know when you're done.

A    Okay.

        MR. JACKSON:  May I, your Honor?

        THE COURT:  Yes.

Q    (By Mr. Jackson)  You were asked, do we know what time the brother came, meaning Ryan Nagel, correct?

A    Correct.

Q    And the question from Mr. Lally was, that

46

was front a grand juror, the question from Mr. Lally was, if you know, correct?

A    Correct.

Q    And your answer was, I believe he was out front at 12:23, is that right?

A    Correct.

Q    And the reason you could be so precise with that time, Ms. McCabe, is because you had asked Julie Nagel to give you her text messages with Ryan for that night and you had refreshed your recollection about the time, correct?

A    Correct.

Q    All right.  And you've also testified that as soon as you saw Ms. Read's SUV you texted John, is that right?

A    Correct.

Q    Here, exclamation point, question mark, that was the first text, right?

A    Correct.

Q    But your text to John was at 12:27, do you recall that?

A    Yes.

Q    That's four minutes after you know Ryan Nagel arrived at the scene, correct?

47

A    Correct.

Q    Since Karen Read arrived before Ryan Nagel she and John had to have been there four to five minutes before you ever saw her SUV, correct?

        MR. LALLY:  Objection.

        THE COURT:  I'll let him have it.

Q    (By Mr. Jackson)  Isn't that right?

A    Ryan Nagel texted his sister at 12:23 "here" and then he texted again that he was going to leave, then Julie Nagel went outside --

Q    Ms. McCabe, that's not my question.

A    I'm explaining what happened in four minutes.

Q    You can explain at another question.  My question is very specific.  Given the fact that Karen Read by definition arrived at the location before Ryan Nagel and Ryan Nagel arrived at 12:23 that means, and you didn't notice the SUV until 12:27 that means her car was there for at least four minutes before you ever noticed it, correct?

        MR. LALLY:  Objection.

48

THE COURT:  Is that correct?  Can you answer that question?

A  Correct.

Q  The snow condition, we've heard a lot about the snow condition.  I'm not going to beat that dead horse, but it's safe to say you would agree with me that it was a light dusting of snow, correct?  I should be specific about the time.  It was a light dusting of snow at or around 12:00 to 12:30, 12:45, something like that?

A  It was starting to accumulate.

Q  Okay, and accumulate means stick to the ground, not just fall and melt, right?

A  Yes.

Q  So it was starting like a very thin blanket of white?

A  Yes.

Q  You indicated on Friday that you saw some sort of tire tracks, is that right?

A  On Friday?  I don't believe --

Q  I thought on your testimony to Mr. Lally on Friday your testimony to Mr. Lally on Friday you indicated that you saw some tire tracks, I could be wrong?

49

A    Yes, I don't remember that.

Q    Okay, well, let me ask you, did you see any tire tracks?

A    At one point, yes.

Q    Okay, when was that point?

A    I'm not sure.

Q    Was it before Ms. Read's vehicle got there, was it after?  Let's use that as a barometer first.

A    I believe it was after Ms. Read's vehicle was there because that's why I was drawn to look outside.

Q    What did those tire tracks look like, how would you describe them?

A    Almost like as a wave that went like this, so a --

Q    Like a half-J?

A    To my recollection it was almost like started, if Ms. Read's vehicle is here, let's pretend, it was kind of like that.

Q    You just --

A    A bit of a wave, so if you started coming towards here it would be more of a wave like this in the road.

Q    What it sounds like is perhaps, I don't

50

want to put words in your mouth but perhaps what you're describing is tracks in the middle of the road if someone is pulling off parallel it would pull to the right and then stop, and those are the tracks that you saw, that's the wave that you saw?

A   It wasn't up to her car.  It was, it doesn't look like your description.

Q   Okay, fair enough.  Fair enough.  I'm just trying here.  So if it didn't go up to her car those tracks belonged to somebody else?

A   Well, when I saw her car it had already moved up.

Q   Well, wait a minute, you already said that you saw her car it was directly in front of you?

A   And then it moved at one point.

Q   That's what I'm asking about.  Let's take the point of which you first saw the car?

A   Uh-huh.

Q   Is that a yes?

A   Yes.

Q   Okay, when you first saw the car --

51

A    Uh-huh.

Q    -- that's when you saw the tire tracks, you just said that?

A    No, I did not say when I first saw the car I saw the tire tracks.

Q    I thought you just said a couple of questions ago that you saw the tire tracks because your attention was drawn to her car, that would be the first time you saw her car, correct?

A    I am saying I saw the tire tracks because I was looking out at her car.  I never said when I saw the tire tracks or where her car was when I saw the tire tracks.

Q    Well, I thought you just said because I asked, when did you see the tire tracks you said, I saw the tire tracks when I looked and saw her car because my attention was drawn to her car and I saw the tire tracks, that would be the first time you looked at her car, correct?

A    It's not, doesn't have to be the first time I looked at her car.

Q    Okay.

A    I looked out multiple times.

52

Q    Did you see the tire tracks the second time?

A    Well, I'm not exactly sure.

Q    Did you see them the third time?

A    Again, I'm not sure.

Q    Okay, so it could have been the first time?

A    It could have been.

Q    But they didn't lead to the back tires of her car, did they?

A    No.

          MR. JACKSON:    Let me have just a moment, your Honor?

          THE COURT:    Yes.

Q    (By Mr. Jackson)    In addition to Trooper Proctor interviewing you on the 29th you also gave extensive testimony on April 26, 2022, in front of a state court grand jury, correct?

A    Correct.

Q    And you were asked about the location of Ms. Read's vehicle, I'm still staying with that for just a quick second if you don't mind, is that right?

A    Correct.

53

Q    You were asked where that SUV was in relation to Ryan Nagel's car, is that right?

A    Would I be able to look at it to refresh my memory, please?

Q    Well, let's start with this.  Do you remember being asked about Karen Read's SUV and Ryan Nagel's truck?

A    To be honest, I've had a few grand juries so if you could show me what you're talking about --

Q    Sure.

A    -- I would greatly appreciate it.

          MR. JACKSON:  If I may have just a moment, your Honor?

          THE COURT:  Yes.

          MR. JACKSON:  May I approach?

          THE COURT:  Yes.

          MR. JACKSON:  I'm trying to speed things up, your Honor.  If I may just have a moment.

          THE COURT:  Okay, take your time.

          MR. JACKSON:  May I approach?

          THE COURT:  Yes.

          MR. JACKSON:  Thank you.

54

THE WITNESS:  Thank you.

Q   (By Mr. Jackson)  That's the entirety of your state court grand jury.

A   Okay.

Q   I'm going to direct your attention to pages 182 to 187.  You can probably scan those pretty quickly and just let me know after you scan --

A   Okay.

Q   Those pages?

MR. JACKSON:  May I, your Honor?

THE COURT:  Yes.

MR. JACKSON:  Thank you.

Q   (By Mr. Jackson)  Did you have an opportunity to glance at those pages?

A   I did, yes.

Q   As you glanced at those pages my question is a relatively simple one but I wanted you to have an opportunity.  At no point when you were describing the vehicles that were out front in front of 34 Fairview on that night, at no point under oath in front of that grand jury did you ever mention a Jeep, did you?

A   I was not asked about any other vehicles

55

out front.

Q    So when you were talking about the
vehicles that you saw in some painstaking
detail, talking about the black SUV and
Ryan Nagel's truck you just left out the
Jeep because nobody asked you about it?

A    I didn't read anything in that about Ryan
Nagel's vehicle.

Q    Did you miss it?

A    I must have.

Q    Okay.

A    Is it in there?

Q    Yeah, it is.

A    Okay.

Q    You were, in fact, asked about Ryan
Nagel's Jeep, weren't you?

A    If you want to show me.

Q    Well, I don't want to sit here, did you
review your transcript?

A    I just read it all.  I didn't see it.

Q    Ms. McCabe --

        MR. LALLY:  Objection.

Q    -- you can't interrupt when I'm talking.

A    Okay.

Q    And I will give the same courtesy to you,

okay?  As you reviewed those pages you were asked about the cars that you saw in front, did you not?

A   I was asked about Ms. Read's vehicle.

Q   Okay, and at no point did you mention a Jeep being behind Ms. Read's vehicle as you testified today, correct?

A   The questions were all about Ms. Read's vehicle.

Q   At no point, my question is this, yes or no, you did or you didn't, did you mention ever in that grand jury that there was a Jeep behind Ms. Read's vehicle, yes or no?

A   I'm not sure.  I'd have to read it all.

Q   As you sit here do you recall mentioning the Jeep?

A   I was asked about Ms. Read's vehicle and those were the questions I answered.

        THE COURT REPORTER:  I can't, you need to keep your voice up, please.

        THE WITNESS:  Sorry.

Q   Let's try this again.  As you sit here do you recall mentioning the Jeep, ma'am?

A   I would have to re-read the transcript.

Q   You don't have to re-read the transcript

to answer that question.  Do you recall mentioning the Jeep?  If you don't, you don't.

A    I may not have been asked about the Jeep so I did not mention the Jeep.

Q    Fair enough.  Did you and Mr. Higgins between then and now, the date of the incident and now have you ever had a conversation with Mr. Higgins about where his Jeep was parked?

A    No.

Q    Have you ever had a conversation with Mr. Higgins about anything having to do with this case?

A    I do not believe so.

Q    Did anyone leaving Mr. Higgins aside, did anyone tell you anything about Mr. Higgins' Jeep and what he testified to?

A    No.

Q    Were you ever asked by anybody to mention a Jeep being behind Ms. Read's SUV in this trial?

A    Can you repeat the question, please?

Q    Were you ever asked by anybody to make sure you mention a Jeep being parked

58

behind Ms. Read's SUV in this trial?

A    Not that I recall, no.

Q    After you arrived and you noticed this SUV outside you started paying somewhat close attention to it, did you not?

A    I went to the front door and looked out the window at the vehicle, yes.

Q    As a matter of fact you texted as soon as you saw the vehicle, at 12:27, "Here" correct?

A    Correct.

Q    And then a few minutes later at 12:31 you text, Pull behind me, to John, is that right?

A    Correct.

Q    And then at 12:40 you texted, Hello, correct?

A    Correct.

Q    And at 12:42 you texted, Where are you?

A    Correct.

Q    And at 12:45 you texted, Hello, correct?

A    Correct.

Q    So that's five text messages and each time you texted and you were walking to the door and looking out at the vehicle as

59

you're texting, correct?

A    I know for the first two I was.

Q    You testified at another hearing, another proceeding, on June 8, 2023, correct?

A    Correct.

Q    In that other proceeding did you testify that you got up and sat down and got up and sat down every time you were texting?

A    Possibly.

Q    Okay, so if you got up and you walked over to the door and you see the SUV and you text, then you walked away from the door and sit down for a second, that would be one text and one view of the SUV, correct?

A    Yes.

Q    So if you did that at 12:27, 12:31, 12:40, 12:42 and 12:45 you'd agree that's five times that you were up and down looking at the SUV, correct?

A    I'm not sure if I did it five times.

Q    How many times do you think you did do it?

A    I know I definitely did it the first when I said, "Here" I know I definitely did it when I said, "Pull behind me" because that's when the vehicle had moved up a

little bit.

Q   And did you see the vehicle move up again a second time?

A   Yes, that's when I told him to pull behind me.

Q   So that's the first time.  Just so we're clear, when you first saw the SUV it was stationary, correct?

A   When I first saw the vehicle it was straight ahead out the front door stationary.

Q   And you texted, Here?

A   Correct.

Q   Then you walked back over to the window, I'm sorry, to the door, to the storm door and you said, pull behind me, correct, at 12:31?

A   Correct.

Q   At that point you saw that it had moved up a little bit, is that right?

A   Yes.

Q   So if you saw it move up a second time which you just said you did then that would be a third time that you had to have seen it and texted, correct?

61

A   Why would that be the third time?

Q   Because it only moved once so far, you saw it move twice?

A   So, the first time I saw it, it was here.

Q   Correct.

A   And I said, Here, and then the next time I texted I said, Pull behind me, so that was one time, two times.

Q   Keep going.  You said you saw it pull up again a second time, you said you saw it move twice?

A   One place to the flagpole to further up.

Q   Right, so that's three times that you're up to the door?

A   Okay.

Q   Is that a yes?

A   I'm telling you my memory is twice to the door.

Q   Ms. McCabe, it's not a trick question.  You just testified that you saw the car move twice, by definition that has to be you looked at it three times, stationary, it moved once, it moved twice?

A   Maybe I used the wrong wording.

        MR. JACKSON:  Maybe.  If I may have

just a moment, your Honor?

THE COURT:  Sure.

Q  (By Mr. Jackson)  So when you testified in front of this other proceeding didn't you testify that you walked up and sat back down five different times watching that car and texting every single time?

A  Would you be able to show me that?

Q  It's going to take a minute.

MR. JACKSON:  May I have a moment, your Honor?  May I, your Honor?

THE COURT:  Yes.

Q  (By Mr. Jackson)  Take a look at those four pages.  For the record that's pages 780-784 --

THE COURT:  Okay.

Q  -- Bates stamped.  After you've had a chance to review that just look up and let me know.

MR. JACKSON:  May I?

THE COURT:  Yes.

MR. JACKSON:  Thank you.

Q  (By Mr. Jackson)  You had an opportunity, Ms. McCabe, to review those two pages from your testimony in June of 2023?

63

A    Yes.

Q    Did you talk about, you were asked about getting up and sitting down and looking at the SUV several different times and texting?

A    Yes.

Q    In fact, you indicated that you got up and checked, sorry, go up and looked outside through that storm door several times, correct?

A    Yes.

Q    And as a matter of fact you looked every single time that you texted, you indicated that you looked out at the SUV and saw something that prompted you to text something, correct?

A    Correct.

Q    And then after the last time which would be five times, five texts, five looks, after the last time you texted you got back up which would be a sixth time and the SUV was gone, just chronologically?

A    Correct, my husband and I were both getting up and looking so --

Q    I didn't ask you about your husband.

64

A    Okay.

Q    Just about you, the answer is correct?

A    Yes.

Q    Okay.  So you're indicating that you were trying to communicate with the occupant of the SUV that was sitting, what would you say, thirty feet outside the front door?

A    I'm not good with distance.

Q    It's further than you and I are from each other, correct?

A    Correct.

Q    At least double that, right?

A    Correct.

Q    Okay, so could you give me maybe yards are easier, like ten yards?  Fifteen yards?

A    Again, I'm not good with measurements.

Q    Just right outside the front door, though, within --

A    Straight outside, yes.

Q    Well, straight outside until it moved?

A    To the front door.  The front door is where it was.

Q    Ms. McCabe, straight outside until it moved, according to you, correct?

A    Yes, and then it moved, correct.

65

Q    And it moved a second time, correct?

A    Correct, it moved to the flagpole and then it moved up again.

Q    Okay, then you indicated that you had an absolutely clear view of the SUV, you were asked those questions, correct?

A    If I had a clear view?

Q    A clear view.

A    I could see the car out front, yes.

Q    You were asked, you were looking out the front door of the house, your answer was uh-huh.  You were asked:  (Reading)  And there's a window in that door, right? Answer:  It was open, yeah.  Question:  So you had a clear view outside?  Answer:  A clear view outside, yes.  Do you remember that?

A    Yes.

Q    Okay, and is that your memory?  You had a clear view?

A    I had a clear view of Karen's vehicle outside, correct.

Q    Right, and then you reiterated that with the following exchange.  (Reading) Question:  Was the amount of snow coming

down sufficient --

MR. LALLY:  Objection, your Honor.

THE COURT:  So let's hear the question.

Q  (By Mr. Jackson)  (Reading)  Was the amount of snow coming down sufficient to obstruct your view of the vehicle or did you have a clear view of it?  Answer:  I had a good view of it.

THE COURT:  Your objection?

MR. LALLY:  The objection is to the form of the question, the reading.

THE COURT:  No, that's okay.  I'm going to allow the question.

Q  (By Mr. Jackson)  Was that your testimony?

A  Yes.

Q  So not only did you have a clear view, you indicated in your words you had a good view of it, right?

A  Correct.

Q  Then you noticed that the SUV was gone after the 12:45 text, right?

A  Correct.

Q  So you're looking at that SUV over the course of between the beginning text and

67

the end text about nineteen minutes, right?  12:27 or so, to 12:45, eighteen-nineteen minutes, something like that, correct?

A    Correct.

Q    Maybe add a minute because you got back up and you didn't text the SUV was gone, right?

A    Correct.

Q    So you would agree if we just do some basic math you're looking at that SUV on average about every three, three-and-a-half minutes?

A    I guess.  If you want to pull out the times and you can look at them.

Q    Well, we talked about the times and you've agreed that you were texting between 12:27 and 12:45?

A    Correct.

Q    Right?  So if you were just to divide that by five times getting up and looking, I don't know, doing the math in my head, maybe every three minutes or so?

A    Correct.

Q    At no time did you hear any noise or sound

68

outside that was unusual that caught your attention?

A    No.

Q    You didn't hear any squealing of tires or squealing of brakes?

A    No.

Q    You didn't hear any screaming or yelling?

A    No.

Q    You didn't hear any loud voices or foul language or doors slam?

A    No.

Q    You didn't hear any verbal argument or revving of an engine, anything like that?

A    No.

Q    As a matter of fact you didn't hear any collision or crash, did you?

A    No.

Q    As a matter of fact the entire time that you looked out at that vehicle with that clear and that good view you didn't see anything out of the ordinary, did you?

A    No.

Q    And you would agree with me as you looked at the SUV you're looking over the lawn to the SUV out at the street, correct?

69

A    Correct.

Q    There was no obstruction between you and the SUV, you've already testified to that, is that right?

A    Correct.

Q    And you could see everything in your field of view?

A    Correct.

Q    And then you saw the SUV gone, it had driven away after 12:45?

A    Correct.

Q    So I have a question, Ms. McCabe?

A    Uh-huh.

Q    Where was the body?

A    I have no idea.  I'm assuming the body was on the front lawn.

Q    The problem with that is you were looking at the front lawn, weren't you?

A    I was looking at the vehicle and where it have moved.

Q    Do you know what field of view is?

A    Would you like to explain it?

Q    You had a clear and good view across that lawn to the SUV, didn't you?

A    When it was straight out, I did, yes.

70

Q    You had a clear and good view of that SUV the entire time until it left, didn't you?

A    I could see the black SUV, correct.

Q    Nothing was obstructing your vision?

A    I wasn't looking at the ground.

Q    I didn't ask you about the ground yet. We'll get to the ground.  Nothing was obstructing your vision was it?

A    No.

Q    So you had a clear and good, your words, not mine, a clear and good view of the SUV?

A    Yes.

Q    And everything in front of it?

A    I never said everything in front of it.  I saw the SUV.  It's black.  It had its lights on and as it moved I could see it with its lights.

Q    You had a clear view of everything between you and the SUV, all the things closer to you and the SUV?

A    I wouldn't say that.

Q    So your view was obstructed on what was between you and the SUV but not obstructed on the SUV?

A    That's not what I was saying.

Q    No, of course not because if you had a clear field of view to the SUV you could see everything in front of it, as well, meaning between you and the SUV as well, right?

A    If I'm looking straight out at an SUV I'm not looking down at the ground.

Q    Let me ask you a question about that. You're focusing right now on my face --

A    Yes.

Q    -- as you're answering these questions?

A    Uh-huh.

Q    You think you'd see, I don't know, an alligator sitting in front of me if it was there?

        MR. LALLY:  Objection, your Honor.

        THE COURT:  Sustained.

Q    (By Mr. Jackson)  Do you think you would see something, can you clearly see there is nothing between you and me except a podium?

A    Yes, well, there's a table.

Q    And you don't have to look down to see that, right?

72

A    Correct.

Q    You're looking directly in my face but you can see things that are between you and me because you have a field of vision, right?

MR. LALLY:  Objection.

THE COURT:  I want to see counsel at side bar for just a minute.

(SIDE BAR CONFERENCE, SEALED)

MR. JACKSON:  May I proceed, your Honor?

THE COURT:  Yes.

Q    (By Mr. Jackson)  Ms. McCabe, as you looked over that flat lawn with that good and clear view of the SUV you could see the SUV and everything between you and the SUV, correct?

A    When I looked out the front window I could see the SUV clearly like I'm looking at you right now and it was further away than you are.

Q    And you did it not once, not twice, not three times, you did it five times and then a sixth after it was gone, correct?

73

A    Correct.

Q    And after that SUV was gone and you looked out that window with that clear and good view there was no body, was there?

A    I never saw a body.

Q    Thank you.

A    I wish I had.

Q    Sounds like that's a little rehearsed?

A    Not at all.  It's not at all.

MR. LALLY:  Objection, your Honor.

THE COURT:  I'll let the answer stand.

Q    (By Mr. Jackson)  You left the location about 1:45, is that right?

A    Yes.

Q    You didn't see anything out of the ordinary as you got in, was it your car or Mr. McCabe's car?

A    It was my car.

Q    When you got in that SUV of yours you didn't see anything out of the ordinary outside, correct?

A    I wasn't looking outside.

Q    Okay.  I know that that is the answer that you want to give to every question.  My

74

question is yes or no, did you see anything out of the ordinary?

A    No.

Q    Thank you.  You didn't see anything out of the ordinary when you got in the vehicle?

A    No.

Q    You didn't see anything out of the ordinary when the vehicle backed up?

A    No.

Q    When that vehicle turned to, I guess it would be to the right I believe towards Chapman and the headlights illuminated the area in front of you, you didn't see anything about of the ordinary then?

A    I wasn't looking out the front window.

Q    Again, there is that question, I mean there is that answer.  My question is, did you see anything out of the ordinary?

A    Well, you were asking about the headlights out the front.  That's why I said I didn't see anything out there, front.

Q    You didn't see the headlights turned on?

A    I was turned to the back.

Q    Right, did you see that the headlights came on in the car?

75

A    Yes, in the driveway the headlights came on.

Q    Right, and you're seated in the front passenger's seat, right?

A    Correct.

Q    So according to you, you got in the car and immediately twisted yourself directly to the rear and never turned back around and never looked out the window?

A    Correct.

Q    Got it.  Is that normal for you?

A    Yeah, I'm a very chatty person so I turned to talk to the girls.

Q    So you made sure you didn't look out the window?

A    No, that's not it at all.

Q    You also didn't hear anybody, you did hear some girls in the back because they were chatty talking about bread and sandwiches or something, right?

A    Correct.

Q    But you never heard anybody say anything about noticing anything out of the ordinary, correct?

A    Correct.

76

Q    You didn't hear Julie Nagel say that she
     saw a black object in the yard?

A    I never heard that.

Q    But you were turned around, looking right
     at them according to you, correct?

A    Correct.

Q    Indeed, engaging them in conversation,
     according to you?

A    Correct.

Q    So that you could make sure you weren't
     looking out the front or right windows?

          MR. LALLY:  Objection.

          THE COURT:  Can you answer that?

     Is that why you did it?

A    No, that's not why I did it.  I was
     talking to the two girls.

Q    When you got home what did you do?

A    I went up to bed.

Q    What time do you think you got home?

A    Somewhere after approximately, between
     2:00 and 2:15.

Q    It took you a few minutes to drop the
     girls off?

A    Correct.

Q    When you got home you got on your phone,

correct?

A   Yes.

Q   Before you got on your phone you went upstairs to your bedroom?

A   Yes.

Q   Did you use any applications, well, let me ask it this way first.  Did you make any phone calls in using your phone after you got home either downstairs or upstairs?

A   I do not believe so.

Q   Did you use any applications to communicate with anybody through Wi-fi, do you know what I mean by that, by Facetime audio or What's App, phone calls, things like that?

A   Text message?

Q   No, actually, you may not use these but did you use any kind of third-party app use Wi-fi, DOIP calls other than just a phone call?

A   No.

Q   Okay.  It sounds like you don't even know what that is?

A   I don't know what you're talking about.

Q   Fair enough.  So it's safe to say that you

78

didn't use or don't use any multi-media to communicate, you don't use Facetime or Snapchat or Single or anything like that?

A    I've used Facetime with my children, yes.

Q    But not for phone calls?

A    No.

Q    Facetime audio is the way you can make the call, no?

A    I've Facetimed with my kids at school.

Q    Right, that's videos.

A    Yeah, okay, so I guess not.

Q    You didn't do that either?

A    Not that I recall.

Q    Now I'm going to get back to your question.  Did you text anybody?

A    I did, yes.

Q    Who did you text?

A    I texted my sisters and I texted my husband and a friend in a group chat.

Q    You texted your husband and a friend in a group chat?

A    Uh-huh.

Q    Is that yes?

A    Yes.

Q    Your husband was home?

A    Yes.

Q    I want to switch gears for a second and ask you real quick about later that morning when you went to John O'Keefe's house.  You mentioned on Friday that you went into his house and began to look around for him when you first got there with Kerry Roberts and my client, Karen Read, correct?

A    Yes.

Q    You indicated you looked in his bedroom and saw that the bed was made, correct?

A    Yes.

Q    You indicated that you looked around other parts of the house looking for him, searching for him, is that right?

A    Yes.

Q    You obviously saw the blankets and pillows on the couch downstairs in the living room, correct?

A    I peeked over at the couch.

Q    And you're aware that Karen Read stayed on the couch that night to wait for John to come home?

A    I'm not aware of that, no.

80

Q   You testified on Friday that my client said at the scene, when you got back to the scene at 34 Fairview just after 6:00 a.m. that she said, I hit him, three times she declared it, correct?

A   Correct.

Q   Not once, not twice, three times, I hit him, I hit him, I hit him, correct?

A   Correct.

Q   You have a very specific memory of that event, do you not?

A   I do.

Q   Obviously that's an incredibly impactful thing for you to remember, is that right?

A   It was an impactful statement, yes.

Q   And you remember it today as well you as you remembered it the day she did it?

A   Yes.

        MR. JACKSON:  If I might have just a moment, your Honor.  Thank you.  May I?

        THE COURT:  Yes.

Q   (By Mr. Jackson)  I'm going to hand you a document.  Before I ask you about that specific document did you review anything in preparation for your testimony today or

81

Friday?

A  Yes.

Q  Did you review your grand jury testimony?

A  I did, yes.

Q  You did review your grand jury testimony, correct?

A  Yes.

Q  So the document in front of you, you recognize it?

A  Yes.

Q  That is in fact a true and correct copy of your grand jury testimony that you gave on April 26, 2022, is that right?

A  Correct.

Q  You'll agree your testimony in that case, in that hearing, rather, in April of 2022 that was just a few months after the events in question, right?

A  Yes.

Q  You were under oath at the time that you gave that testimony?

A  Yes.

Q  And you were subject to the penalty of perjury when you were answering those questions, correct?

82

A    Yes.

Q    Ms. McCabe, I'd like you to turn to the page since you reviewed this, turn to the page of that document where you ever said in your testimony that my client said, I hit him, I hit him, I hit him?

A    Was I asked what she said?

Q    I get to ask the questions.

A    Well, I'd like you to direct me where to look.

Q    I want you to look at the entire grand jury testimony if you need to and turn to the page where you ever said that my client said, I hit him, I hit him, I hit him?

A    I'm not sure if it's in this document but I can tell you today with 100 percent clarity she said, I hit him, I hit him, I hit him on that morning.

Q    So it's not in that document, is it?

A    I'm not sure.  If I could take the time and if you want me to read over 200 pages?

        MR. JACKSON:  May I approach?

        THE COURT:  Yes.

Q    (By Mr. Jackson)  No, I don't want to take

83

the time because you just indicated that you reviewed this document in anticipation of your testimony, right?

A    Correct.

Q    You've gone over it recently?

A    A few weeks back.

Q    So we don't need to read it.  You know that you never testified to that at the grand jury in April of 2022, don't you?

A    I don't know that as a fact.  I would have to re-read 222 pages or however long it is.

Q    Do you think you might have missed it when you reviewed your testimony I'm sorry, when you reviewed your transcript in anticipation for your testimony?

        MR. LALLY:  Objection.

        THE COURT:  I'll allow it.

A    I read it a few weeks ago.

Q    Probably the most powerful part of your testimony, ma'am?

A    And I will never forget it.

        MR. LALLY:  Objection.

        THE COURT:  So that's stricken.

Q    (By Mr. Jackson)  Would you agree, you

84

think that's a powerful part of your testimony?

MR. LALLY: Objection.

THE COURT: I'll allow that.

A    It is, yes.

Q    Did you see it in the transcript?

A    I cannot recall. It's over 200 pages.

MR. JACKSON: May I approach, your Honor?

THE COURT: Yes.

Q    (By Mr. Jackson) Ma'am, these are select pages out of your grand jury testimony. Isn't it true, Ms. McCabe that you were asked when you testified no fewer than twelve times what my client said either at the scene or on the way to the scene?

A    At the scene. I was asked twice, according to this.

Q    My question is, isn't it true that in April of 2022 you testified no fewer than twelve times, twelve separate statements you gave about what my client's statements were either at the scene or in the car ride leading up to going to the scene, do you remember that?

85

A    I do.

Q    Okay, so on page 190 of what you're looking at --

A    Uh-huh.

Q    -- it should all be highlighted.

A    It is.

Q    You testified that my client said to you over the phone at 4:53 a.m. she asked the question, Did I hit him, do you see that?

A    I do.

Q    Number 2 on page 192, talking about when you all were in the car on the way to the scene Karen asked the question, Could I have hit him?  Do you see that?

A    Yes.

Q    Page 193, lines 1 through 2, you testified that in the car once again she asked the question, Could she have hit him?  You're relaying that meaning, Could I have hit him, correct?

A    Correct.

Q    Page 193, line 23, in John's driveway she asked the question, Quote:  And she's asking if she had hit him?

A    Yes.

86

Q    Page 201, driving to Fairview she asked the question, What if I hit him and could I have hit him, correct?

A    Correct.

Q    Page 202, lines 1 through 2, while driving to Fairview she asked the question, Could I have hit him, correct?

A    Correct.

Q    Page 208, lines 24 through 25, outside at Fairview she asked the question, Did I hit him?  And went on to ask, Could I have hit him, correct?

A    Correct.

Q    And your testimony was also on page 208, that Karen was yelling non-stop in front of the female EMT, Did I hit him?  Could I have hit him?  Is he dead?  Correct?

A    Correct.

MR. JACKSON:  May I approach?

THE COURT:  Yes.

Q    (By Mr. Jackson)  That's twelve times that you reiterated under oath, under penalty of perjury in April of 2022 what my client's statements were either at the scene or leading up to getting to the

87

scene, correct?

A    Correct.

Q    Every single one of those, twelve separate times you indicated that she asked a question something like, Could I have hit him or Did I hit him?

A    Correct.

Q    Not one time in that testimony did you say she declared, I hit him, I hit him, I hit him, did you?

A    The questions that were asked, when she said, I hit him, I hit him, I hit him, that was at the scene in response to an officer asking questions. What I just read was us when she first called me or when we were driving in the car or when we were at John's house, so I was answering the question that I was asked.

Q    So you believe that you weren't asked the question, Did she say to an officer, I hit him, I hit him, I hit him, and if you're not asked the question, Did she say to an officer, I hit him, I hit him, I hit him, you're not going to volunteer that she said, I hit him, I hit him, I hit him,

88

that's your testimony?

A   No, that's not --

Q   What is your testimony?

A   My testimony is an officer was asking her what his name was and different things about him and at that point she was saying, I hit him, I hit him, I hit him.

Q   Which officer?

A   I do not recall.

Q   Well, you recall the I hit him, you just told me that was the most impactful thing in the morning?

A   It was, it was shocking.

Q   So what officer did she say this to, supposedly?

A   I was more focused on her and her hysteria than which officer was asking the question.

Q   So you have no idea who the officer was even, right?

A   I'm not sure which officer was asking her. It could have been an EMT.  Someone said, what is his name?  Does he have medical conditions?  How old is he?

Q   But you were asked that question, ma'am,

89

on page 208 you were asked what she said in front of the female EMT who was asking her questions and her answer was, I'm sorry, your answer was, she said, Did I hit him?  Could I have hit him?  Is he dead?

A    Uh-huh.

Q    Is that right?

A    That is correct but --

Q    That would have been a good time to offer up that she confessed, I hit him, I hit him, I hit him, right?

MR. LALLY:  Objection.

THE COURT:  Sustained as to that form.

Q    (By Mr. Jackson)  Ms. McCabe, the truth of the matter is you've manufactured this new story for this jury because you think it helps you out?

A    Absolutely not.

Q    You called 911 at 6:04 a.m., is that right?

A    Yes.

MR. JACKSON:  Your Honor, with the Court's permission Exhibit 36 has already

90

been marked and entered.  I would ask to play a portion of that 911 tape, not the entirety of it?

THE COURT:  Okay.

MR. JACKSON:  With the Court's permission I'd ask to play about run time 1:30 to 1:45?

(Portion of Exhibit No. 36 played)

Q  (By Mr. Jackson)  Do you recognize the voice on that tape?

A  Yes, that's mine.

Q  Does that appear to be a true and accurate, at least that portion a true and accurate recording of the 911 call that you made that morning?

A  It was a very brief clip.  I'd have to hear more.

MR. JACKSON:  Go ahead and play starting at 1:30 to about 1:45.

(Portion of Exhibit No. 36 played)

Q  (By Mr. Jackson)  Was that you?

A    Yes, that was.

Q    Is that the 911 call?

A    Yes, it was.

Q    What did you just say?

A    I said, I don't know, he got out of the car.

Q    He got out of the car --

A    Uh-huh.

Q    -- is what you said, correct?

A    And this was at 6:03 in the morning, correct?

A    Correct.

Q    This was before you ever talked to Brian Albert?

A    Correct.

Q    Before you ever talked to your sister, Nicole Albert?

A    Correct.

Q    Before you ever talked to Chris Albert?

A    Correct.

Q    Before you ever talked to Julie Albert?

A    Correct.

Q    You hadn't talked to anybody at this point other than Kerry Roberts, correct?

A    And Karen Read.

Q    And my client?

A    Correct.

Q    And in that 911 call you said he got out of the car, didn't you?

A    I did, because Karen Read had told me that she had left him there.

Q    You words were, he got out of the car, correct?

A    Correct.

Q    Did you make any other calls other than to 911?

A    I called my sister.

Q    What time was that?

A    I believe it was after the 911 but I'm not sure.

Q    You claim that your sister didn't answer, is that right?

A    She did not answer.

Q    But you do know that your extraction shows that that was an answered call at 6:07?

A    If that's what it shows but I can tell you that she did not answer the phone.

Q    And you are as sure about that as you are as my client said, I hit him three times, right?

93

A    I certainly am, yes.

Q    Okay, you also called her at 6:08?

A    I might have called her twice, yes.

MR. JACKSON:  Your Honor, I have an exhibit.  This may be as good a time as any for a break if you wish.  I just have to queue it up.  It's up to you.  I don't mind.

THE COURT:  Folks, we'll take our morning break.

THE COURT OFFICER:  All rise.  Jury exiting.  Follow me.

(Jury exited courtroom)

THE COURT OFFICER:  Please be seated.

THE COURT:  So Mr. Jackson, when you said it's an exhibit is it in evidence?

MR. JACKSON:  It's not.

THE COURT:  Okay.

MR. JACKSON:  I ask to mark it. It's a digital recording of a four minute voice mail on John O'Keefe's phone.  It

94

does include the 911 call.  I will not play the entirety of the 911 call but I do want to play the entirety of this particular four minute voice mail.

THE COURT:  Do you know what it is, Mr. Lally?

MR. LALLY:  I do.

THE COURT:  Okay.  Is there an agreement that it's coming in?

MR. LALLY:  There's no objection to it.

THE COURT:  Okay.  All right.  I just needed to know it if would make sense for me to review it if there was an objection.  Thank you.

THE COURT OFFICER:  All rise for the Court, please.

(Recess at 10:53 a.m.)

(Court and Jury Entered at 11:19 a.m.)

THE COURT OFFICER:  Thank you.  You may be seated.  Court is in session.

THE COURT:  So Mr. Jackson, is it

95

all queued up or do we need the, well, we need  witness, were there any questions first or are you going right to the video?

MR. JACKSON:  I'll ask a few questions first and then I'll ask --

THE COURT:  Let's bring Ms. McCabe in.

JENNIFER MCABE-RESUMED STAND

THE COURT:  Okay, whenever you're ready, Mr. Jackson.

MR. JACKSON:  Thank you, your Honor.

RESUMED CROSS-EXAMINATION

BY MR. JACKSON:

Q   Ms. McCabe, I want to go back very briefly to something you said just before we broke and that was in respect of the statements that you attribute to my client at the scene you said, well, there was an officer possibly asking questions or it could have been a female EMT, I wasn't answering

96

questions about that, correct?  Hence, you didn't say, I hit him, I hit him, I hit him?

A    Can you be clearer on your question?

Q    Let me rephrase that.  Before we broke a few minutes ago you had said the reason I didn't say I hit him, I hit him, I hit him was because I was never asked but never came up what an officer asked her when she declared that you didn't offer it or you said it could have been an EMT?

A    Yes, I'm unclear who was there.

Q    Isn't it true that at the grand jury the question that was posed to you and Counsel, this is page 208 in the grand jury, the question was posed to you quote, (Reading) So where does, what happens next with yourself, Ms. Roberts and Ms. Read? And your answer was,  (Reading)  So there was, you know, different police officers getting statements from us.  At one point I'm standing with Ms. Read and she is saying, Did I hit him?  Could I have hit him?  And there was I believe, an EMT, a female standing right next to me and

97

listening to her yelling, Did I hit him?
Could I have hit him?  Is it dead?  Is he
dead?  It was pretty much non-stop.  Do
you remember that testimony?

A    I do.

Q    So in point of fact you were answering the
direct question about what happened in
front of the police officer and the EMT,
correct?

A    There were multiple police officers and
multiple EMTs present.

Q    So now this is another police officer and
a different EMT?

A    I'm not saying that.

Q    Okay, but nowhere in this did you say she
declared the words, I hit him, correct?
We'll agree on that?

A    Correct.

        MR. JACKSON:  Your Honor, I have an
item I would like to have marked in next
order --

        THE COURT:  Okay.

        MR. JACKSON:  May I approach?

        THE COURT:  Yes.

98

(Thumb drive with voice recording, Marked, Exhibit No. 96.)

MR. JACKSON:  With the Court's permission I would like to play a portion of this and then stop it.

THE COURT:  Okay.

MR. JACKSON:  And ask the witness a couple of questions about it.  It's audio only.

(Exhibit No. 96 played.)

MR. JACKSON:  Would you stop it.

Q  (By Mr. Jackson)  Ms. McCabe, I paused the audio tape just to ask you a couple of foundational questions.  Do you recognize what's on that audio tape?

A  Yes, that is my voice.

Q  Okay.  You recognize you starting a 911 call, correct?

A  Correct.

Q  Similar the call we just listened to a few minutes ago which would be the actual 911

99

call, correct?

A    What's the difference between the two of them?

Q    I'm about to explain it.  It's a confusing question and I apologize.  This appears to be an open voice mail overhearing your 911 call, do you recognize that?

A    Now that you explain it, okay.

Q    You hear a rhythmic boom-boom-boom?

A    The windshield wipers.

Q    So that would have been, that was my next question, that would have been an open voice mail that was recording inside the cab of the SUV that you were seated in?

A    Correct.

Q    Overhearing you called 911 and overhearing whatever else was going on and the noise at the scene, correct?

A    Correct.

Q    Does it sound like a true and correct copy of at least the portion of the 911 call that you heard?

A    I'd have to listen to it again, but.

Q    Why don't we continue listening to it and see if you recognize it?

100

A    Okay.

MR. JACKSON:  With the Court's permission?

THE COURT:  Yes.

MR. JACKSON:  It's about four minutes in total, your Honor.

THE COURT:  Okay.


(Exhibit No. 96 was played)


MR. JACKSON:  Can you pause it?


Q    (By Mr. Jackson)  Do you hear a person in the background screaming?

A    Yes.

Q    Who is that?

A    Miss Read.

MR. JACKSON:  Can you play it?


(Exhibit No. 96 was played)


Q    (By Mr. Jackson)  Did you hear the audio recording we just marked into evidence?

A    I did.  It was very muffled and some parts were very hard to understand.

101

Q  Understood.  The person on the phone, who was that person?

A  I called 911.

Q  And the person that was, for the most part the person's voice you could hear screaming hysterical, who was that?

A  Karen.

Q  Did you also hear Kerry Roberts' voice at various times in the background?

A  Yes.

Q  She was, for lack of a better word, trying to calm Karen down?

A  Yes.

Q  At some point telling her to just shut up, you're not helping?

A  Yes, exactly.

Q  She was so hysterical and so upset?

A  Erratic.

Q  I want to play the rest of this.  It appears that this recording is longer than your 911 call, you would agree with that?

A  I'd have to see.

Q  Well, the 911 call had already ended, correct?

A  I'm not sure.  How long was the 911 call?

102

Q    Okay.   This is about three-and-a-half minutes into a four minute recording.   My only question is would you agree that the 911 call is subsumed within this full four minute recording?

A    I couldn't make that from that muffled.

Q    You couldn't tell?

A    I couldn't tell.   So if you have my phone record you could, I'm assuming, tell when the 911 call ended because I know the 911 call was long because, you know, they had transferred me multiple times.

Q    Right.   My question to you is I'd like you to listen very, very closely and I know it is a muffled recording by definition it might be -- from this point forward I want you to pay very close attention.   I want to ask you if you hear a voice very muffled towards the end of this recording.

         MR. JACKSON:   Can I play it with the Court's permission?

         THE COURT:   Yes.

(Exhibit No. 96 was played)

103

MR. JACKSON:  Stop.

Q   (By Mr. Jackson)  Did you hear a muffled voice in the foreground after you heard Ms. Read scream or yell?

A   I heard two people talking.

Q   And one of those was a very muffled voice on this recording, correct?

A   Most of the recording was muffled.

Q   The one I'm talking about I just played the voice that was muffled in the foreground of the audio recording for want of a better phrase?

A   Yes.

Q   You heard that?

A   I heard that, yes.

Q   Was that you?

A   I don't know if that was me.

Q   There was nobody else in the cab of the car with you, was there?

A   I was standing at the trunk of the car.

Q   Kerry Roberts was over by Mr. O'Keefe?

A   Yes, they were kind of running back and forth at times.

Q   And Karen was over by Mr. O'Keefe for most of that?

104

A    Yes.

Q    But you were the one by the car?

A    Back and forth, uh-huh.

Q    You called Nicole, your sister?  By the way, can we finish playing this?  Okay, thank you.

(Exhibit No. 96 was played)

Q    (By Mr. Jackson)  Okay, that appears to be the end of the tape?

A    Okay.

Q    Okay.  You called your sister at 6:07 and 42 seconds, correct?

A    I don't have my phone record in front of me.

Q    Does that sound about right?

A    Approximately.

Q    And you made a second phone call at 6:08 and 17 seconds, does that sound about right?

A    I did call her twice, yes.

Q    And both of those calls show in your extraction that they were answered phone calls, correct?

105

A   I don't have my extraction in front of me.

Q   Well, you've been asked this question a bunch times, right?  You were asked this question at the other proceeding, is that right?

A   Yes.

Q   And the cell phone record?

A   If you have them I can see them here.

Q   You were shown phone records then?

A   Yes.

Q   And at that time you were confronted with the fact that the phone records show a seven second call for 6:07, correct?

           MR. LALLY:  Objection.

           THE COURT:  I'm going to strike the word confronted.  Go ahead and ask --

           MR. JACKSON:  I'll pick another word.

           THE COURT:  Go ahead and ask the question.

Q   (By Mr. Jackson)  You were shown evidence that the 6:07 call lasted seven seconds?

A   My sister never answered the phone.

Q   Okay, I know you want to answer your own questions.

106

A    Yeah.

Q    I'd like you to answer my question.  Were you shown records that show the called lasted seven seconds?

A    I cannot recall the exact record I was shown but I was shown a phone record.

Q    Okay, and the same record showed that the 6:08 call lasted eight seconds, correct?

A    Again, I don't have it in front of me.

Q    Does that sound about right?

A    About right.  There were a number of other calls that showed answered that weren't answered.

Q    We'll get to those in a minute.  The two calls at 6:07 and 6:08 at least the records indicate about fifteen seconds worth of open line time, talk time, seven seconds, eight seconds, right?

A    You have the record in front of you, I don't.

Q    I'm just asking if you were confronted, there's that word again, shown records that established that based on your own phone extraction, your phone records that the 6:07 call the seven second call, the

107

6:08 call the eight second call, right?

A   I was shown records but I don't know exactly what they were, how long the call said because she never answered the phone regardless.

Q   You also made another phone call at 6:23, did you not, to Brian Albert?

A   If you could share my phone record it would be very helpful.

Q   Do you recall it?

A   I know I called my sister and I called my brother-in-law in the house.  I do not know the exact times.

Q   That's all I'm asking.  You made a phone call to Brian Albert, as well, right?

A   I believe so.

Q   That was around 6:23.  It was a few minutes after you had called Nicole twice, right?

A   Correct.

Q   And that call was not answered?

A   None of them were answered.

Q   But the records showed that that call was not answered, as opposed to Nicole's two calls, right?

108

A    Right.

Q    Okay.  The calls to Nicole were deleted from your phone before you turned that phone into law enforcement, weren't they?

A    Not by me.

Q    By somebody else?

A    I never deleted any calls when I willingly handed my phone over.

Q    You claim that you didn't delete calls but you do know your phone was forensically analyzed and those calls were in the deleted file folder, right?

A.    I have seen that but there were twenty calls all in a group that were all deleted so cherry picking a few makes it look a different way.

Q    So we'll get to those.  I'm not cherry picking anything, Ms. McCabe.

A    Uh-huh.

Q    I'm just asking questions about the records.

A    Which I would love a copy of if I could see.

Q    We'll get to that in a second.  You're just going by your memory.  You've seen

109

these records a bunch of times, you've been questioned about these records a bunch of times, right?

A   Yes.

Q   So we know that you called at 6:07, 6:08 or thereabouts and about 6:23, two to Nicole, one to Brian, correct?

A   Correct.

Q   And you'll agree with me that notwithstanding those calls, by the way, did you leave voice mails?

A   No.

Q   When did you hang up, before it went to voice mail or was it into voice mail before you hung up?

A   It was a bit of a hysterical scene that morning and I was in a state of shock and I was just calling my sister and by brother-in-law.  They did not answer the phone.

        I cannot tell you when I hung up because it was a hysterical scene.  I was in a state of shock.  Everyone was running around and what seems to be forgotten is that my friend was lying there on the

110

ground.

Q   I don't think anybody has forgotten that. You, in fact, did not leave voice mails for any of those three calls, do you?

A   Again, I don't have my phone record in front of me.

Q   That's because Nicole didn't get any voice mails because the calls were answered, right?

A   The calls were not answered.

Q   You agree with me that Brian and Nicole Albert, Brian Albert being a police officer, never came out of the house, correct?

A   Correct, neither did any neighbor.

Q   I know you'd like to continue editorializing --

A   Uh-huh.

Q   -- after the fact, there's probably a time and a place for it.  This isn't it.  If you can answer my question I'd ask that you do that.  Did Brian Albert come out of the house?

A   No.

Q   Did Nicole Albert come out of the house?

111

A    No.

Q    Thank you.  How many of the initial police officers from Canton Police Department who responded to the scene were you friends with?

A    I would say I am friendly with Mike Lank. He was five years older than me.  I knew him, I knew of him growing up.  If I saw him around town I would say, Hey, how are you?  Pretty much that's the extent.

Q    Anybody else other than Mike Lank that you were friends with?

A    Not that I am friends with.  I knew of Officer Sean Goode but I wouldn't say I was friends with him.  I just knew who he was.

Q    And you also knew that Officer Lank was very good friends with the Albert family?

A    Good friends, yes.

Q    You knew that Mike Lank and Chris Albert had a long time, long standing friendship?

A    Correct.

Q    You had just indicated you knew Officer Goode, is that right?

A    Didn't know, I said I knew of him.

112

Q   With regard to names like Saraf Blaine,
    not so much?
A   Saraf has a sister that's the same age as
    my sister but I had never, to my
    knowledge, met Saraf.
Q   And of all the officers who responded to
    the scene the two who actually went inside
    the Albert home to talk to Brian Albert
    and others was in fact Mike Lank and
    Officer Goode?
A   I don't remember Officer Goode in the
    house.  I only remember Officer Lank.
Q   The reason you know that, the reason you
    have a memory of what was happening inside
    the house was because you were allowed to
    actually go into that home, correct?
A   Correct.
Q   And you went into that home before any of
    the officers went into the home?
A   Correct.
Q   Is that right?
A   Correct.
Q   You were allowed to have private
    conversations with Brian Albert?
A   I woke Brian Albert up.

113

Q    Were you allowed to have private
conversations with Brian Albert?

A    Yes.

Q    And you were allowed to have private
conversations with your sister, Nicole?

A    Yes.

Q    And that was before the police ever went
into to do any formal interviews of you,
Brian or Nicole, correct?

A    Correct.

Q    Did you discuss in these private
conversations how you three were going to
answer any questions for the police when
you were asked?

A    No.

Q    Did you talk about what you were going to
say in any respect?

A    We were in shock.  There was no --

Q    Yes or no?

A    No.

Q    Did you talk about what Brian and Nicole
were going to say in their interviews with
the police?

A    No.

Q    Did Brian Albert give you any advice as a

114

Q  police detective what you should do or say when you were interviewed?

A  No.

Q  Did he give you any advice as a police detective what you should do with your cell phone?

A  No.

Q  Did he tell you that the police might want to get a hold of your cell phone at some point?

A  No.

Q  Did you two discuss the calls that you made to Nicole Albert at 6:07 and 6:08 and the call that you made to Brian Albert at 6:23?

A  No.

Q  Did you ever discuss the idea of eventually deleting any of those calls that were made in that early morning?

A  Absolutely not.

Q  Would you tell us if you did?

A  Yes, because I'm an honest and truthful person.

Q  Did you tell him which officers were outside?

115

A    I don't recall.

Q    Did you tell them that Officer Lank, specifically, a friend of the Alberts was outside?

A    I don't recall.

Q    And then your husband Matt McCabe arrived at the scene, correct?

A    Correct.

Q    He was allowed to come in the house as well, right?

A    I believe Officer Lank was in the house before Matt came into the house.

Q    And a little bit later that morning Julie Albert came over, correct?

A    Correct.

Q    By the way Officer Lank after just a few minutes had left the house, correct?

A    Correct.

Q    Leaving all the witnesses inside together?

A    Correct.

Q    And I can't remember if I asked this question or if I thought of it out loud, did Julie Albert come over?

A    She did.

Q    And then Chris came over?

116

A    Yes.

Q    Even Brian Higgins came over?

A    Correct.

Q    These are all friends and family of yours, correct?

A    No, Brian Higgins I had only met a handful of times.

Q    But you'd consider him a friend?

A    A friend of Brian Albert's is how I would reference him.

Q    Fair enough.  So these are friends and family of Brian Albert?

A    Correct.

Q    And everyone was permitted to discuss the circumstances of the evening before going into the early morning house with each other with no police there, correct?

A    I sat with my family in shock and horror.

Q    Were you allowed to discuss the circumstances of the night before going into the early morning hours amongst yourself without the police present, yes or no?

A    There was no reason for us to be allowed or not allowed.  We did nothing wrong.

Q   Stay with my question.  Did you get it?

A   Yes, I understand your question.

Q   Just answer it yes or no.  Would you allow that group of folks, were you allowed to discuss the case without a police presence?

A   Yes.

Q   Okay.  So you listened during that friends and family gathering, you listened to what Brian Albert had to say, correct?

A   He didn't really say much.

Q   He was able to listen to what you had to say?

A   Again, you're creating a scene that didn't happen.

Q   I'm not creating anything, Ms. McCabe. I'm asking some questions that you don't seem to want to answer.

        MR. LALLY:  Objection, your Honor.

        THE COURT:  All right, so let's ask a question and let's get an answer, okay?

        THE WITNESS:  Uh-huh.

Q   (By Mr. Jackson) Yes or no, was Brian Albert there within earshot when you discussed your version of what had

118

happened?

A    I didn't discuss much.  I sat there in shock and horror so I spoke very little, to be honest with you.

Q    When you did speak he could hear?

A    Yes.

Q    And Nicole could hear?

A    Yes.

Q    And Chris could hear?

A    Chris came much later.

Q    And your husband, Matt McCabe, he could hear?

A    Yes.

Q    When Chris was talking about what happened at Waterfall you could hear and Brian could hear, everybody could hear everybody?

A    Chris came much later.  When Chris came I was almost about to leave.

Q    I'm guessing that the topic of what had happened was still on everybody's mind here?

A    Everybody was trying to figure out what had happened.

Q    And you were discussing it amongst

119

Q yourselves, that's my point?

A With my sister and my brother-in-law and my husband, correct.

Q Before you left, you said you were about to leave, before you left another Albert came over to the house, correct?

A I don't recall seeing him.

Q Who is him?

A Kevin Albert.

Q How did you know I was talking about Kevin Albert?

A Because you said another Albert came over and I was --

Q There are six brothers?

A I was told later it was Kevin.

Q I see.  So you believe Kevin was not there when you were still there?

A I was in a state of shock.  He may have walked in.

Q Do you remember?

A I don't remember it, no.

Q He could have been?

A He could have been, absolutely.

Q And you knew he was a Canton police officer?

120

A    Yes.

Q    You had already gotten a call from Michael Proctor, hadn't you?

A    Yes.

Q    He told you he wanted to speak with you?

A    Correct.

Q    So you knew at that point that the Massachusetts State Police troopers had taken over the investigation of the case, correct?

A    Correct.

Q    Did Michael Proctor tell you that the Canton Police Department had been recused from the case?

          MR. LALLY:    Objection.

          THE COURT:    Sustained.

Q    (By Mr. Jackson)    Let me ask it a different way.    Did you have knowledge in any way in any form or fashion at that point that the Canton Police Department was not supposed to be involved in the case?

          MR. LALLY:    Objection.

          THE COURT:    Sustained.

Q    (By Mr. Jackson)    Speaking of Trooper

121

Proctor, when you first interviewed with him that was January 29, 2022, we've already discussed that a little bit today, correct?

A    Correct.

Q    And he was taking notes while you were interviewing with him, is that right?

A    I believe so.

Q    You mentioned on Friday your observations of the taillight that day, is that right?

A    Correct.

Q    You told Mr. Lally that you indicated that the taillight looked, when you saw it, just like the photograph that he showed you, correct?

A    I told him it was hard to make out and with the snow on it but it looked, in the picture that he showed.

Q    He showed you a second photo, a close-up?

A    Uh-huh.

Q    Basically of the SUV in the sallyport?

A    Uh-huh.

Q    Is that right?

A    Yes.

Q    And you said, Yeah, that's the condition

122

Q of the taillight, correct?

A Yes.

Q You also told Trooper Proctor about your observations of the taillight on that same day, the 29th, right?

A Correct.

Q That's literally the same day that you saw the taillight, right?

A Correct.

Q Just a few hours later, is that right?

A Correct.

Q And what you told Trooper Proctor that day was that you Quote, saw a crack in it, End quote, correct?

A I told him that the taillight was cracked.

Q The words that you used were that you saw and I'm not fighting you over those words, you saw that it was cracked, you actually said, I saw a crack in it, correct?

A That's what he said I said.  I'm telling you I said the taillight was cracked.

Q This is another example of him screwing up your words, correct?

A You'd have to ask Trooper Proctor.

Q So I'm asking you, did you say, I saw a

123

crack in it?

A   I said the taillight was cracked.

Q   So you didn't say I saw a crack in it, right?

A   I said the taillight was cracked.

Q   The photograph you were shown, with the Court's permission, it's Exhibit 92, I believe from Friday.

        THE COURT:  Okay.

        MR. JACKSON:  May I, your Honor?

        THE COURT:  Yes.

Q   (By Mr. Jackson)  Do you see this photograph?  You were shown this photograph on Friday?

A   Yes.

Q   Does that look like the taillight has a crack in it?

A   It's cracked, yes.

Q   It's actually completely missing, isn't it?

A   Yeah, and I believe in one of the reports, one of the many reports it will say that I said it was cracked and missing pieces.

Q   Right, does that look like it's cracked and missing pieces or does that look like

124

the entirety of the taillike is basically gone?

A    Again, in that picture there are the red pieces.  There are some of it still there so it's cracked and missing.  In a state of shock that was my description.

Q    Got it.  So in a state of shock you said there was a crack in it?

A    No.

Q    Hours after?

A    I said it was cracked.  I never said there was a crack in it.

Q    So if Trooper Proctor wrote that down that would be an example of him getting your words wrong yet again?

        MR. LALLY:  Objection.

Q    (By Mr. Jackson)  Correct?

        THE COURT:  That's been answered. Let's move on, please.

        MR. JACKSON:  Thank you for that. Thank you, your Honor.

        THE COURT:  Okay.

Q    (By Mr. Jackson)  I want to get back to January 29th, that interview with Trooper Proctor.

125

A    Uh-huh.

Q    After this interview with Michael Lank you eventually made your way back to your house, is that right?

A    Yes.

Q    You went with your husband, Matt?

A    Yes.

Q    And you knew that Trooper Proctor was going to show up and interview you and Matt, Mr. McCabe, correct?

A    On the phone he asked, he wanted to speak with me.

Q    Is that a yes?

A    So I wasn't aware.  He asked to speak with me.  I wasn't aware if he was going to speak with Matt.

Q    Okay.  You were at least aware that you were going to be interviewed?

A    Correct.

Q    You told Brian Albert that Trooper Proctor was planning on interviewing you, as well?

A    Correct.

Q    Before Trooper Proctor showed up to conduct that interview at your house Brian Albert actually showed up at your house,

126

Q    correct?

A    Correct.

Q    So Brian Albert made sure that he was in your home before Trooper Proctor made it to your house, correct?

MR. LALLY:  Objection.

THE COURT:  Sustained.

Q    (By Mr. Jackson)  Brian Albert was in your home before Trooper Proctor was in your home, is that right?

A    I am not sure who arrived first.

Q    But he was there when you were interviewed, wasn't he?

A    He was upstairs, yes.

Q    And you believe, of course, that that statement he didn't hear anything about what was going to happen, right?

A    What --

Q    He didn't hear anything about the interview?

A    No, I don't think he could hear it from where he was.

Q    But you knew he was just a few feet away?

A    I knew he was up in my bedroom.

Q    We talked a little bit about your call

127

records and I want to pivot for a second
and ask you about those call records.
This is Exhibit 90.

MR. JACKSON:  Your Honor, may I
approach?

THE COURT:  Yes.

A    Thank you.

Q    Do you recognize this document?

A    I do, yes.

Q    You were shown this document last week, is
that right?

A    Yes.

Q    This is a forensic extraction report of
John O'Keefe's cell phone that you were
shown on Friday, right?

A    Correct.

Q    You acknowledge that it's an accurate
report of calls found on John's phone
between you and him, is that right?

A    I believe so, yes.

Q    Okay, and this shows calls that you made
to John's phone or you received from
John's phone at or between 12:14 a.m. and
12:50 a.m., I want to direct your
attention to those times frames, correct?

A    Correct.

Q    I want to start at the bottom and it may go in reverse chronological order.

A    Okay.

Q    I think it does.  At 12:14 is shows that you called John O'Keefe and that call was answered, is that right?

A    Yes, correct.

Q    At 12:18 a.m. it shows that John O'Keefe called your phone and that was answered, as well?

A    Correct.

Q    And then at 12:29 a.m. you also called John O'Keefe's phone and you all had a short conversation, as well, is that right?

A    No.

Q    The record shows, I think it shows, pardon me, unknown, correct?   In terms of whether it was missed or answered?

A    Excuse me, can you repeat that?

Q    Sure.   At 12:29, I want to concentrate on the 12:29 call.

A    Okay.

Q    That one in the Cellebrite extraction it

129

shows in terms of whether the call was answered or not the status is unknown, correct? It's on the last page?

A   Yes.

Q   Second row from the top?

A   At 12:29, unknown, yes.

Q   However, you've already acknowledged that you all had a short conversation on that 12:29 call, correct?

A   No, we didn't speak at 12:29. We spoke at 12:14 and we spoke at 12:18. We never spoke at 12:29.

Q   So you're indicating that the 12:29 call was either missed or otherwise, went to voice mail, something?

A   The 12:29, yes.

Q   I want to show you a document, well, let me ask it this way. According to this there were six more calls between your phone and John O'Keefe's phone?

A   Correct.

Q   Count them, one, two, three, four, five, six and that's up to 12:50, is that right?

A   Correct.

Q   I'd like to show you another document.

130

MR. JACKSON:  Your Honor, if I could approach briefly?  May I?

THE COURT:  Yes.

A    Thank you.

Q    So we don't get them mixed up I'll take Exhibit 90 back.

A    Okay, thank you.

Q    I want to show you one more document that you weren't shown on Friday.  Do you recognize this one?

A    No.

Q    Okay, if you look where it indicates on the left column, I'm putting my thumb here, the left column MSISD end user there's a number that ends there?

A    MSISD?

Q    Sorry, 0-1-4-2.

MR. LALLY:  Your Honor, may we approach?

THE COURT:  Yes.

MR. JACKSON:  Your Honor, may I get an answer to this question before we approach?

THE COURT:  I have no idea what we're approaching about, this document?

131

MR. LALLY:  Yes.

THE COURT:  Why don't we just go up there?

MR. JACKSON:  Sure.

THE COURT:  May I have that, please.  I need to look at it.

(SIDE BAR CONFERENCE, SEALED)

MR. JACKSON:  Your Honor, just for ease of maintenance may I approach and hand the witness an unredacted version?

THE COURT:  Yes.

THE WITNESS:  Thank you.

Q  (By Mr. Jackson)  You're welcome.  If you look on the left column, Ms. McCabe --

A  Yes.

Q  -- you'll see something that says Apple ID?

A  Yes.

Q  Look to the right of it do you recognize that unredacted portion, I don't want you to read it out or anything, do you recognize that?

A  Yes.

132

Q    Whose Apple ID is that?

A    That's mine.

Q    If you look six lines below that, there's a full phone number.  Again, don't read the phone number out, do you recognize it?

A    I do.

Q    Whose is that?

A    That's mine.

            MR. JACKSON:  May I approach, your Honor?

            THE COURT:  Yes.

Q    (By Mr. Jackson)  I'll take the unredacted copy back --

A    Okay.

Q    -- so we don't get it mixed up.

A    Okay.

Q    Does this appear to be a Cellebrite extraction of your phone records and your Apple ID?

A    Yes.

Q    And you recognize, without telling you what it is, do you recognize that phone number as your phone number back at the time and the Apple ID back at the time?

A    Yes.

Q    Associated with the phone that you then turned into law enforcement, correct?

A    Correct.

Q    Okay.    You've just looked at the extraction report for John O'Keefe's phone and you saw those calls between your phone and John O'Keefe's phone after going from 12:14 after that, all the way up to 12:50, correct?

A    Correct.

Q    Take a look at the last couple of pages, page 3 and 4 of your own cell phone extraction report and tell me if you see a single call listed between you and John O'Keefe for January 29 between 12:14 and 12:50?

A    There are calls to a number that I'm assuming is John.

Q    What number?

A    I'm just not sure.    I see a call, wait a minute.    This report has times everywhere.

Q    Right, it's chronological except for the calls that were deleted.    Do you see a call at 5:52 to John O'Keefe's phone?

A    I see a call at 5:52, yes.

134

Q   But there is not a single call before 5:52
    a.m. between 12:14 and 12:58 a.m., is that
    right?  Not one?

A   It's very hard to -- this report time-
    wise.

Q   You can look at every single time on the
    report, there's not that many.

A   Uh-huh.  Right, I'm just trying to say
    that it goes from 7:21 to 5:52 to 7:33,
    7:49.  They're out of order.

Q   I understand that Ms. McCabe, but if you
    look at every one of the entries there's
    not a single entry for 12:14, 12:18 or any
    of the subsequent 12:29, any of the
    subsequent phone calls that are all shown
    on John O'Keefe's cell phone extraction,
    would you agree with that?

A   Correct.

            MR. JACKSON:  May I approach?

            THE COURT:  Yes.

            MR. JACKSON:  Thank you.  Your
    Honor, I would move for the admission of
    NN.

            THE COURT:  Okay, is there an
    objection?

135

MR. LALLY:  No, your Honor.

(Redacted Extraction Report RE: Jennifer McCabe, Formerly NN for Identification, Marked, Exhibit No. 97.)

MR. JACKSON:  May I inquire, your Honor?

THE COURT:  Yes.

Q  (By Mr. Jackson)  The fact of the matter is according to those Cellebrite records and that extraction from your own phone every one of the calls that you made to John O'Keefe's phone between 12:29, I'm sorry, between 12:14 and 12:50 a.m. was deleted and unrecovered, correct?

A  I didn't understand that report and I'm not an expert.

Q  When you compared the two you saw a bunch of calls on John O'Keefe's phone, right? You know he couldn't have deleted them, he passed away, right?

A  Correct.

Q  You saw your cell phone extraction which is the handshake for John O'Keefe's phone

136

and all your calls are missing, right?

MR. LALLY:  Objection.

THE COURT:  Can you answer that question?

THE WITNESS:  I'm confused.  That paper, I don't understand it.  It was vague.  There were numbers.  There were calls everywhere.  There were a number of missing calls.

Q  There's a bunch of missing calls, right? You didn't see any of the calls that were reflected on John O'Keefe's phone, is that right, yes or no, they're not there?

A  A lot of calls are missing.  I'm not really even sure what's there because the numbers are all, it's all redacted.

Q  So you were not seeing any redacted calls?

A  The page you just had in front of me was redacted.

THE COURT:  It's now an exhibit.

Q  (By Mr. Jackson)  It's now an exhibit. Your personal information was redacted, none of your calls were redacted, ma'am.

A  The numbers, I don't know people's phone numbers.  I just have them as contacts.

137

Q    Ms. McCabe, you just said a second ago, we can do this all day long or we can just make it simple.  The fact of the matter is that report did not show any of the calls that John O'Keefe's phone report showed, correct?  From 12:14, 12:15 --

A    I believe there was one on there.

Q    5:52.

A    Uh-huh.

Q    That's the next morning, ma'am, right?

A    Were there other calls in that time period on Cellebrite?

A    You just said there weren't, you just looked at them?

A    I told you that that Cellebrite report was extremely hard to read.

Q    Right, the fact is there are no calls on your own phone extraction between you and John O'Keefe between 12:14 and 12:50, would you just agree with that at last on that report?

            MR. LALLY:  Objection, your Honor.

            THE COURT:  Sustained.

Q    (By Mr. Jackson)  The fact is that you deleted your call records before you

138

turned your phone in, didn't you, Ms. McCabe?  That's what that report shows?

A    Absolutely not.

Q    You sanitized your phone because you didn't want the police to know who you had been calling or the fact that you had been calling John O'Keefe's phone incessantly, correct?

A    Incorrect.  I willingly turned over my phone.

Q    After you deleted your phone call log, correct?

A    Absolutely not.

Q    What date did you turn your phone over?

A    Possibly February 3rd.

Q    How many days after this incident was that?

A    Four, five.

Q    So you had plenty of time to talk to that that friends and family group and ultimately decide to delete your phone calls, correct?

MR. LALLY:  Objection.

THE COURT:  Sustained.

Q    Did you ever have any group chats with

139

family members who were witnesses in this case?

A    Yes.

MR. JACKSON:  May I approach, your Honor?

THE COURT:  Yes.

Q    (By Mr. Jackson)  While Mr. Lally is looking through that packet can I just ask to make sure the record is clear, did you delete any of your calls before you turned your phone in to law enforcement?

A    I spoke with the two officers that I handed my phone over to and I asked if I could delete the personal conversations with my daughters and they said absolutely, yes, that I could.

Q    So other than calls with your daughters that you deleted did you delete any other calls on your phone at all?

A    Text messages, it was actually text messages with my daughters that I deleted and that was all I deleted.

Q    Did you delete any phone calls?

A    I do not recall deleting any phone calls at all.  I would have no reason to delete

140

anything.

Q   That's very different than I didn't delete any phone calls.  I do not remember deleting phone calls means you might have?

A   In day-to-day life people delete things but I do not recall deleting any phone calls.

Q   In day-to-day life did you delete any of the calls to John O'Keefe?

A   No.

Q   Did you delete any of your calls to Nicole Albert?

A   No.

Q   Did you delete any of your calls with Brian Albert?

A   No.

Q   With Chris Albert?

A   No.

Q   With Julie Albert?

A   No.

Q   Colin Albert?

A   No.

Q   With any of the witnesses in this case, did you delete any calls before you turned that phone over to law enforcement?

141

A    No.

MR. JACKSON:  May I approach?

THE COURT:  Yes.

Q    (By Mr. Jackson)  Ms. McCabe, I'm handing you a packet of documents.  It appears to be about ten pages long.  Do you recognize what's in those documents?

A    Yes.

Q    You indicated already that you were part of a group chat with certain members of your family and friends?

A    Yes.

Q    Does that group chat, I'm most interested in the group chat between yourself, Nicole Albert, Brian Albert, Matt McCabe, that group chat starting on or around February 1st, 2022.

A    Okay.

Q    Does that look like a true and accurate reflection of the text messages between or certain of the text messages between and among that group?

A    Yes, the ones I've seen, yes.

THE COURT:  Can you just tell me what page you're on?  I'm sorry.

142

MR. JACKSON:  Of course, your Honor.

THE COURT:  Or Bates stamp number?

MR. JACKSON:  2148.

THE COURT:  Okay, thank you.

MR. JACKSON:  Is where it starts and they should go relatively chronologically, your Honor, page by page.

THE COURT:  Okay.

Q  (By Mr. Jackson)  On February 1, 2022, around 2:15 in the afternoon this group chat did you receive a message from your husband on the group, this is on page 2148, that should be the middle bubble, the middle and the bottom bubble.  Quote: Julie said Channel 4 is in DE, do you see that?

A  Yes.

Q  And the response from Matt McCabe is, Eating, I assume?  Quote: Ask Chris to ask some questions.  Tell them the guy never went in the house, end quote.  Do you see that?

A  Yes.

Q  If you look at the next page at the top,

143

2149.

A    Uh-huh.

Q    There's a one-word answer from Brian Albert.

A    Uh-huh.

Q    What is that answer?

A    Exactly.

Q    Does it appear to you from this chat that Matt McCabe was directing witnesses, specifically Chris Albert, what to say to the news media?

        MR. LALLY:  Objection.

        THE COURT:  I'll allow that.  Is that what you're seeing?

A    This is not how I would understand this.

Q    Tell them he never went in the house was a story that had been concocted between and among this group people on this chat, correct?

        MR. LALLY:  Objection.

        THE COURT:  I'll allow that.

A    No, John never went in the house.  It wasn't a story.  It was the truth and it is the truth.

Q    Just like she said, I hit him?

144

A    Correct.

Q    So according to this chat at least at the very base level this is one witness telling another witness to give certain information to the media that could be useful to the group, correct? Tell them the guy never went in the house, right?

          MR. LALLY:  Objection.

          THE COURT:  Sustained.

Q    (By Mr. Jackson)  Matt McCabe was directing Chris Albert and Chris Albert wasn't even at the house, was he?

A    Chris Albert was not at the house, no.

Q    But this chat is, I'm sorry, Matt McCabe, your husband, telling Chris Albert he was never at the house and would have no personal knowledge of what happened at the house to specifically say, the guy never came in the house.  The guy, by the way, being John O'Keefe, right?

A    That's what he wrote.

Q    Does that sound to you a little bit like collusion?

          MR. LALLY:  Objection.

          THE COURT:  Sustained.

145

Q    (By Mr. Jackson)   At some point you sought out Kerry Roberts' cell phone number shortly after the 29th, or maybe not, maybe on the 29th, correct?

A    Correct.

Q    You didn't have her cell number in your phone?

A    No.

Q    One of your primary concerns was to make sure that you got in contact with Kerry Roberts before the day's end, right?

A    I wanted to speak to Kerry as she was on her way to the hospital and I wanted to check in on John.

Q    One of your primary concerns, Ms. McCabe, was that you wanted to make sure you got a hold of Kerry Roberts and had communication with her before the end of the day?

A    It had nothing to do with getting in touch with her by the end of the day.  It was a friend reaching out wondering how her friend was doing who was just taken off the front lawn.

Q    On the 29th?

146

A    Yes.

Q    So before the end of the day, Ms. McCabe, and we can do this all day long, before the end of the day you were trying to get a hold of Terry Roberts, correct?

A    Immediately in the morning I wanted to get in touch with her.

Q    Right, so you sought out her phone number. First you tried my client, Karen Read, correct?

A    Correct.

Q    But then you found another source for that information, is that right?

A    Correct.

Q    And you said a second ago you claim that you needed that information because you were, you knew that she was on the way to see John O'Keefe's parents?

A    She was picking them up.

Q    And you wanted to check on them?

A    Correct.

Q    You've been friends with the O'Keefe family for years, haven't you?

A    Correct.

Q    So you didn't have a need to get Kerry

Roberts' phone number, did you?

A    I wanted to speak with Kerry, see how she was doing.  I was not going to call Peg.

Q    You had her phone number, didn't you?

A    I do, yes.

Q    So if you wanted to check on somebody you could have just called her?

A    I was not going to call Peg O'Keefe on the way to see her son at the hospital.

Q    To check on your friend, that was just too much?

A    I wanted to ask Kerry.  I'm sure she was boggled down and probably did not want to speak with anyone.  It was a simple thing.

Q    You --

A    I made sure I got Kerry Roberts' number so I could check in and see how John was doing, also we had just been through an extremely traumatic event together. There's nothing evil here.

Q    You reason wanted Kerry Roberts' number, Ms. McCabe is you wanted to make sure that you controlled her story as she left your sight, correct?

A    Absolutely not.

148

Q   Did you take any steps whatsoever, any steps whatsoever to influence Kerry Roberts' statements?

A   No.

Q   Because that would be collusion, wouldn't it?

            MR. LALLY:   Objection.

            THE COURT:   Sustained.

Q   (By Mr. Jackson)  Did you write a text to the group including Nicole Albert, Brain Albert and Matt McCabe where you informed them that quote, and this is, your Honor, on page 2158.

            Where you informed them quote, Kerry is here.  Going over timeline, end quote.

A   Correct.

Q   So you reported back to Brian, Nicole and Matt that Kerry was where?

A   She came over my house.

Q   And you two sat down and went over a quote, timeline together?

A   Peggy spoke to Kerry.

Q   Yes or no, I didn't ask about Peggy.

A   That's where the timeline started at.

149

Q    Did you ask Kerry or did Kerry show up at your house, and quote-unquote go over a timeline?

A    Kerry showed up asking to sit down with me to do a timeline so we would remember everything that had happened.

Q    And you wanted to be super helpful about that, right?

        MR. LALLY:  Objection, your Honor.

        THE COURT:  Ask it differently.

        MR. JACKSON:  Sure.

Q    (By Mr. Jackson)  You wanted to be helpful to Kerry Roberts?

A    The two of us were trying to figure out what had happened to our friend.

Q    And so you made sure that you created and drafted with Kerry Roberts a timeline, correct?

A    I didn't make sure of anything.  She was the one that asked me to do it.

Q    Not only did you create a timeline you then reported back to your group, Brian Albert, Nicole Albert, Matt McCabe that she was creating this timeline with you on February 1, 2022, is that right?

150

A   Yes.

Q   After you created or drafted this timeline with Kerry she actually sat for an interview with the police did she not? That's not in the chats. I'm just asking. She sat down for an interview with the police, didn't she?

A   When?

Q   You tell me. It's my question.

A   I'm not sure of when you're talking about.

Q   Okay. Let's start over.

A   Yes.

Q   After the timeline was created on February 1st --

A   Uh-huh.

Q   -- at some point thereafter Kerry Roberts conducted a formal interview with the police about this case, correct?

A   Do you have the report of that date?

Q   Ms. McCabe, we're sort of burying the lead. He did the interview in your living room, ma'am, right?

A   There was, on Tuesday two officers came to the house and she sat in the other room and spoke with them.

151

Q  So using my question she did the interview at your house, correct?

A  They came to my house to interview me and she happened to be there so they asked if they could speak with her, also.

Q  Okay, did she or did she not do an interview at your house?

A  She did, yes.

Q  That wasn't that hard.  You were present for that interview, weren't you?

A  I was eating dinner.

Q  You were present for the interview, Ms. McCabe?

A  I was in the house, yes.

Q  And you listened to that interview, didn't you?

A  No, I did not.

Q  You made sure you gave Kerry Roberts everything she needed for that interview, correct, quote, everything she might need for the interview, didn't you?

A  And where is this that you're quoting from?

Q  I'm asking you.

A  Oh, I'm sorry.  When you quoted I thought

152

it was in here.  I apologize.

Q  We'll get to it in a second.  Did you tell her everything that you wanted her to say?

A  No, I did not.

Q  Did you in any way attempt to influence her testimony before she gave that interview in your living room?

A  Absolutely not.  Kerry is her own person.

Q  But then you did report her progress to the Albert and McCabe group in that group chat, didn't you?

A  Can you show me where, please?

Q  Sure.  Isn't it true that in a group text with Brian Albert, Nicole Albert, Matt McCabe you wrote, and this is on page 2159:  Quote:  And handed phone to Kerry. Do you remember that?

A  I see that, yes.

Q  And the very next text is from you telling the group:  She's telling him everything, in all caps, two exclamation points?

A  Yes.

Q  And then you went on to say at 2:55 p.m. at basically the same moment:  Quote:  All the stuff, end quote, correct?

153

A    Correct.

Q    So when you said a couple of minutes ago that you weren't listening to what she was saying that was a lie, wasn't it?

A    We're talking about two different interviews.  I am talking about when the officers came to my house and spoke to her there.  You're saying that I handed the phone over so that would be a different interview.

Q    Ms. McCabe, this is on February 1st at 2:55, I wasn't there, you were there.  She was in your house on February 1st giving an interview to the police, wasn't she?

A    One day she was there giving an interview to the police.

Q    And while she was there --

A    But I do not believe it was at 2:55.  It was later in the evening so I think you might have two events confused.

Q    But either way whether she was on the phone with the police or sitting there in your living room with the police you were listening to her and reporting back to the group:  She's telling them everything,

154

correct?

A    No, it's not correct.  The one that she did with the police she did in the other room and the one that she did on the phone I said she's telling them everything.

Q    I know --

A    Because Kerry is an extremely blunt person and she was giving personal feelings about the situation and I was horrified by it.

Q    To the police?

A    To the police.

Q    And you're listening?

A    I heard a statement she said that horrified me.

Q    And then you were reporting it back to the group, weren't you?

A    That one thing she stated I reported back to the group, yes.

Q    So you're listening in on a police interview, correct?

A    It was a phone call.

Q    One side of it, right?

A    It was a phone call.

Q    You're listening in on a police interview, one side of it, correct?

155

A   Correct.

Q   You're eavesdropping on that interview, correct?

A   I'm sitting with her and she's taking the call.

Q   And then you're reporting that interview back or success in that interview in your mind, back to the group involving Brian Albert, Nicole Albert and Matt McCabe, is that what you're doing?

          MR. LALLY:  Objection.

          THE COURT:  I'll allow it.

A   Absolutely not.  That is not how it went. I was horrified because Kerry is a blunt person, not like me and she had made a comment about Miss Read and Mr. O'Keefe's relationship and I was shocked and horrified that she said it the way that she did.

Q   You were shocked and horrified that --

A   I said, Oh, my God, she's telling them everything, yes.

Q   You decided it was so important that you needed to report that back to Brian Albert and his friends and family?

156

A   I was horrified.

Q   So you reported that back?

A   Yes, I said she told them everything.

Q   When you were first confronted with these messages at a separate proceeding in June of 2023 you claimed that you couldn't remember what that exchange was about, correct?

A   Correct.

Q   And now you just all of a sudden you have this newfound memory of exactly what that text message was referring to, correct?

        MR. LALLY:   Objection.

        THE COURT:   I'll allow it.

A   Yes, because Kerry Roberts said a statement and it jogged, I said, oh, my God, that's what I meant when I said, she's telling them everything.

Q   When did she say this statement?

A   Probably in the fall.  She has made this statement a few times in reference to Karen.

Q   You and Kerry Roberts are still coordinating your statements together?

A   Oh, no, we're not.  It's just an opinion

157

she has of Miss Read.

Q   And all of a sudden that became your, quote, everything, all the stuff?

A   It didn't just become it, forgot that I had written it and one day Kerry made the statement.  I'm sure it happens to everyone.  You forget something and then you're like Oh, my God, that's what it was.

Q   I'm not sure that happens to everyone.

         MR. LALLY:  Objection.

         THE COURT:  Sustained.

Q   (By Mr. Jackson)  Let me ask you a different question.  When you were asked under oath a year ago when things were fresher in your mind you were asked specifically what you were referring to and your answer was, I have no idea, correct?

A   Correct.

Q   Because you didn't want to tell them that you had coordinated your statement with Kerry Roberts, isn't that right?

A   No, that is not right.  I did not remember what it was.

158

Q    Went on to be asked specifically, do you know who you were referring to and you said, maybe Kerry, maybe I'm talking to Kerry.  And the question was, but you don't recall this text?  And your answer was, I don't remember, that's what you testified to a year ago, correct?

A    Correct.

Q    But now you're talking about some memory of a disparaging comment that Kerry Roberts has about my client and that's the other thing in your mind?

A    Yes, the things that she was saying.

Q    Quote obviously what you were referring to in that text in real time, Ms. McCabe, was that Kerry Roberts was telling the police Quote, Everything that you had laid out for her in this timeline meeting you had with her, correct?

          MR. LALLY:  Objection.

          THE COURT:  So it's sustained as to that form.  You can ask that question in a proper way.

Q    (By Mr. Jackson)  The everything you referred to in that text in real time was

what you had worked out with Kerry in that timeline meeting, wasn't it?  That was the everything that you were referring to, correct?

A    Incorrect.  We never worked together to come up with a story.  We have the facts and the everything was a comment about your client.

Q    You went on in your group chat with Brian Albert, Nicole Albert and Matt McCabe to give running updates about whether or not Kerry Roberts was actually following the script, correct?

A    Incorrect, there was no script.

Q    Page 167, Matt McCabe texted the group, Brian, comma, sitting separate, end quote, correct?

A    Yes.

Q    It sounds like Matt McCabe in reporting back to Brian Albert following the instructions, we're sitting separately?

        MR. LALLY:  Objection.

        THE COURT:  Sustained.

Q    (By Mr. Jackson)  One minute later Brian Albert had a one-word response to the

160

Brian sitting separate, correct?

A    Yes.

Q    What was that one-word response?

A    Okay.

Q    So it sounded like he was giving his approval for where people were situated in that meeting, correct?

MR. LALLY:    Objection.

THE COURT:    Sustained.

Q    (By Mr. Jackson)    At page 2168 at 5:15.

A    It's very hard to just look at two texts and try to understand what the context is.

Q    Ms. McCabe, if you don't understand a question that I have just let me know, but otherwise, just let me ask the question. I'm sorry, on page 2168 at 5:15 you wrote to the group, Quote, You listening, correct?

A    Yes.

Q    And at the same time, 5:15 you then wrote, Cops here again, end quote, correct?

A    Correct.

Q    That was in reference to the police coming over to your house to further interview Kerry Roberts, wasn't it?

161

A   That was when they came to talk to me.

Q   And Kerry Roberts was there, correct?

A   At my house, correct.

Q   And a few minutes later at 5:23 Nicole Albert texts:  Call us after, correct?

A   Correct.

Q   And a few minutes after that Matt McCabe text quote:  This girl could write a book, dot, dot, dot, nonstop, correct?

A   Correct.

Q   So obviously Matt McCabe along with you was listening to Kerry Roberts in her interview?

A   We were sitting in the kitchen eating dinner with our children and Kerry Roberts is in a different room but she was going on and on and on as she does.

Q   How you know?  How do you know?

A   Because they were in the other room.

Q   And you could listen?

A   I could hear voices.

Q   You could hear her interview with the police?

A   I could not hear her interview.  I could hear them talking but I was sitting at a

162

table with my children eating dinner getting ready to go to a basketball game.

Q   You then responded to Matt McCabe, I love it, didn't you?

A   Yes.

Q   And then you responded about this interview you just testified under oath and under penalty of perjury not hearing anything about, just hearing voices, your next text was, Quote, She is telling them everything?

A   Yes.

Q   End quote, correct?

A   Yes.

Q   So what you said just a few minutes ago about not knowing what she was saying and just hearing voices that was a lie, wasn't it, Ms. McCabe?

        MR. LALLY:   Objection.

        THE COURT:   Sustained.

Q   (By Mr. Jackson)   And a couple of seconds later Nicole Albert responds one word, what was her response?

A   Good.

Q   So in order, those texts say, you

163

listening?  You say, you listening?

MR. LALLY:  Objection, your Honor.

Q   Cops here again.

THE COURT:  The objection is sustained.

Q   (By Mr. Jackson)  At the end of the day you were eavesdropping on an interview that Kerry Roberts was having with law enforcement in their official capacity, weren't you?

A   No, I was sitting eating dinner and some of the things obviously I overheard but I was not eavesdropping.

Q   Oh, now some of the things you overheard?

A   I am saying there is a possibility if I'm sitting in this room eating dinner and someone is in another room talking you can hear bits and pieces.  Was I eavesdropping, no.  Is there some big cover up story, no.

Q   Well, why, Ms. McCabe, does your story, does your testimony keeps evolving.  A second ago you said, you told the jury you said, I couldn't hear a thing.  All I could is voices, like muffled voices from

164

the other room.  She's going on and on about something?

A    Yeah.

Q    And then when I confronted you with a text message where you said, She's telling them everything, now it's, well, I may have heard a couple of things.  Which is it?

A    No, she was going on and on and on like she does.

Q    And you were listening on and on and on like you do?

A    I was overhearing hearing bits and pieces.

Q    Why was it so important to report back to the group that you were happy that Kerry Roberts was saying quote, everything?

         MR. LALLY:  Objection.

         THE COURT:  I'll allow it.

A    We had both lost our friend.  Kerry Roberts was in shock as I was in shock. The two of us had all this information that just kept coming back to us and back to us and it's terrifying when you go through an experience and you're in shock and Kerry was remembering things.

         I was remembering things so I was

165

happy for her that she was piecing it all together and I had pieced it all together because at the end of the day our friend was dead and we were trying to figure out what had happened to him together.

There was no direction. We were all trying to figure out what had happened because that's what you do when you lose somebody that you love.

Q   Were you happy for her or were you happy for you and Brian and Matt and Nicole?

A   For me and for her because we were going through this together. There was no convers --

Q   Because you got the story out that you're trying to get out through Kerry Roberts, correct?

MR. LALLY:  Objection.

THE COURT:  I'll allow that.

Q   (By Mr. Jackson)  Is that right?

A   There is no story. There's facts and truth on this side. There is no story. The story that you've created is not the truth.

166

Q    That I created?  I hit him, I hit him, I hit him or did you?

A    That's fact.

Q    A fact that conveniently you didn't mention in your report to Lank, to Proctor, to the grand jury -- that kind of fact?

        MR. LALLY:  Objection.

        THE COURT:  Overruled.

Q    (By Mr. Jackson)  Is that right?

A    That is fact I had mentioned, so in some reports it's there.

Q    The fact is you wanted to keep very close tabs on Kerry Roberts, didn't you?

A    No.

Q    On January 29th if you look on page 2223, did you text the group, Quote:  Kerry talked to cops and kept it simple, end quote?

A    Yes.

Q    Ms. McCabe, it's becoming a habit for you to keep tabs on Kerry Roberts, isn't it?

        MR. LALLY:  Objection.

        THE COURT:  Sustained.

Q    (By Mr. Jackson)  You'll agree that over

and over and over and over again you're reporting to this tight group:  Nicole, Brian Albert, your husband, how Kerry is doing in her stories to the police, aren't you, over and over and over?

A    I am telling them --

Q    Yes or. no?

A    -- what is going on.  I wouldn't say, well, let's count them.  Was there four of them.  You're saying over and over and over and over, it's a bit extreme.

Q    I see.  So you take issue with the way that I phrased over and over and over?

A    Well, it's misleading, I believe.

Q    I see.  Okay, so let me see if I can try this in a non-misleading way, Ms. McCabe.

A    Okay.

Q    So at least one of us, I'll withdraw it. You consistently reported back to the group how Kerry Roberts was doing with the police, didn't you?

A    I would update them after Kerry saw and spoke to the police.  Again, we were all trying to figure out what had happened to John.

168

Q    There's yet another text from Brian's wife, Nicole on January 29th and this is on page 2226, and she says, Quote, We'll get more info tomorrow.  Don't want to text about it.  End quote.  And then you texted, Right, correct?

A    Correct.

Q    What's that about?

MR. LALLY:  Objection.

THE COURT:  I'll allow it.

A    We decided that we would talk on the phone.  My children look on my phone.  Her children look on her phone.  We were working with the police.  I was sharing information in everything that had happened.

We didn't want it to leave our little circle because we were trying to figure out what happened and we're not going to go running around letting people see, Oh, my gosh, they think this might have happened or that might have happened.  It was nothing more than let's not text about it.

Q    So you wanted to keep it in your words, in

169

your little circle, correct?

A    Correct, I didn't want it all out there what we had thought had happened. I was going to let the police do their job.

Q    So by definition the info that Nicole Albert was talking about, that needed to be kept very tight, very secret, correct?

A    We needed the police to do their job so we weren't --

Q    You wanted your text and Nicole wanted her text and the group wanted their text to be kept secret and private, isn't that right?

A    Not secret and private. We just weren't going to communicate certain things over text.

Q    Did you give or did anybody give you any private information the next day on January 30th?

A    Did anyone give me private information?

Q    Sure, let me put it in context. That text from Nicole Albert, we'll get info, we'll get more info tomorrow. I don't want to text about it. That was on the 29th, right --

A    Okay.

170

Q   -- that you saw?  Did you get additional info on the 30th, the next day?

A   I have no idea.

Q   Did anything significant happen on January 30th in connection with this case, any meetings?  Any get-togethers?  Anything that you can think of?

A   I went to the O'Keefe's house.

Q   Other than that, anything else?

A   On the way home Kerry Roberts' daughter is good friends with Michael Lank so we dropped her off at Michael Lank's house and Mike's wife came out of the house. Him and Kerry are friends and she, you know, jumped in the car and was consoling Kerry and asks how the O'Keefe's were doing, and you know, we talked to her.

Q   So you pulled up to Michael Lank's house on the 30th, that's never been reported has it?

A   I guess I never thought much of it.

Q   You never thought about reporting the fact that one of the first responding officers on the case working for the Canton P.D. which is conflicted off the case, you had

171

a meeting with, and it wasn't reported the next day?

A   I didn't meet with Michael Lank.

Q   I see.  You pulled up in the car.  Tell me about that again?  You pulled up in the car and what happened?

A   And her daughter went into the house.

Q   Okay, and then, you just drove away?

A   No, Michael's wife came out of the house.

Q   Okay, and you all had a conversation about what?

A   She got in the car and her and Kerry are friends and she was checking on Kerry, and you know, just saying Oh, my God, this is so crazy, you know, just checking in on the O'Keefe's.

Q   How long did that take?

A   Kerry is a talker so it could have been an hour.

Q   It could have been an hour standing outside?

A   Sitting in the car.

Q   Sitting in the car on February 30th, never came in the house?

A   Not February 30th.

172

Q    I'm sorry, I said February 30, January 30, never went in the house?

A    I might have ran in to go to the bathroom.

Q    It's the back end of a blizzard, it's freezing cold outside?

A    Uh-huh.

Q    Sitting in the car for an hour?

A    The car was running.  Kerry, they were talking.  It's her friend.

Q    Did you have any conversation before your testimony today with anybody about you going to Michael Lank's house on January 30, anybody?

A    Yes.

Q    Tell me about that.  Who was it and when?

A    It was a couple of weeks ago at the DA's office.

Q    The DA's office had an interview with you, correct?

A    Not an interview.  They just explained this process.

Q    I mean, a conversation, how about that?

A    Yes.

Q    You met with the DA's office, who did you meet with?

173

A   Mr. Lally, Ms. McLaughlin, Steven Nelson, Trooper Brian Tully, I believe, oh, and another woman. I can't remember her name, unfortunately.

Q   Someone from the DA's office?

A   Yes.

Q   Beland?

A   No.

Q   Lynne Beland?

A   No, she's here today. She works with Steve Nelson.

Q   Oh, but an employee of the DA's office?

A   Yes.

Q   It sounds like a pretty big meeting?

A   I wouldn't call it a big meeting. It was what, five of them.

Q   Five of them and then you, right?

A   My daughter Ally came with me, also.

Q   The meeting is getting bigger? Anybody else?

A   No, we both went.

Q   Was Ally in the room when you were, I was going to say interviewed but you take issue with every word I use, when you were talked to by the DA?

174

A    Ally and I were both in the room when they received, when they went over everything, you know, how this all works because this is all brand new to us and then they asked me to leave the room.

Q    You were about to say and I lost the end of that sentence, when they received what?

A    I didn't mean the word received.

Q    Did you receive anything?

A    No, I looked at my grand jury notes.

Q    Now at this meeting was anybody taking notes?

A    No.

Q    You have a bunch of lawyers and the DA and nobody has a notepad in front of them, like notes?

A    I believe Mr. Lally had a number of folders on the table.

Q    Taking notes?

A    No, I do not believe anyone was taking notes.  It was a casual meeting to explain this process.

Q    Was that meeting recorded in any way that you're aware of?

A    No.

175

Q    How long did the meeting last?

A    Ally and I were probably in the room, I
don't know, approximately twenty minutes,
then I left and they spoke with her and
then I went back in and they spoke with
me.

Q    How long did they speak with you?

A    Honestly, maybe a half hour, hour.

Q    During that half hour to an hour did they
go over with you what they expected your
testimony to be?

A    They never spoke about what they expected
my testimony to be.  They just showed me
some pictures that might be shown.  I
listened to the 911.

Q    What pictures?

A    Just of the house and how I'd be asked to
you know, show, okay, we're going to show
a picture of the house, you'll have a
laser.

Q    Ms. McCabe, when you started this
conversation it was because you said in
answer to my question, was anything ever
brought up to you about this meeting at
Mike's house.

176

A    Uh-huh.

Q    You said yes.

A    Uh-huh.

Q    So obviously they did talk to you about your testimony, it wasn't just about the process, correct?

A    I asked what discovery had been turned in in regard to me.

Q    So you wanted to prepare to make sure that you knew what you might be asked on cross-examination, correct?

A    I wanted to know what was coming, yes.

Q    And you knew that one of the things that was coming after this meet, well, let me ask it a different way.

       During this meeting did Mr. Lally tell you that one of the things that's going to be coming is you had an off the books meeting at Lank's house for 45 minutes, did he tell you that?

A    No, that's not how I was told.

Q    Did he tell you that the defense had uncovered a report that established that you were actually at Michael Lank's house for 45 minutes that had never been

177

reported to the defense or the prosecution before the phone extraction had been done, did he tell you that?

A    I was told, I was asked, oh, were you at Michael Lank's on the 30th.

Q    So you had a lot of time to come up with a story about why you were at Michael Lank's, correct?

MR. LALLY:    Objection.

THE COURT:    I'll allow it.

A    I didn't need time to, make up a story because I have the truth of why we went.

Q    And the truth according to you is you pulled up at Michael Lank's house, the first responding officer and friend of the Alberts, had a meeting with him the next day that was never reported to anybody for any purpose?

A    I --

Q    You just met with his wife out in the car while the car was running for 45 minutes to an hour, that's your story?

A    It's not a story.  It's the truth.  Kerry dropped her daughter off.  The wife came out.  Kerry is a talker.  They started

178

talking.  A tragedy had happened the day
before.

Q   It is interesting, would you not agree,
that the day before you have this off the
books meeting at Michael Lank's house
Nicole Albert says, we'll get more info
tomorrow, meaning the very day you show up
at Lank's house?

A   Again, I never spoke with Mike Lank at his
house.  It was not an off the books
meeting.  It was Kerry dropping her
daughter at one of her good friend's house
whose husband happens to be a Canton cop.
That is what it is.  That is the truth.

Q   And a large coincidence, you'd agree?

        MR. LALLY:  Objection.

        THE COURT:  Sustained.

        MR. JACKSON:  May I have just a
moment, your Honor?

        THE COURT:  Yes.

Q   (By Mr. Jackson)  By the way, what did Mr.
Lally show you in respect to this issue
about this meeting at Michael Lank's
house?

A   He showed me nothing.

179

Q He just told you about it?

A Brian Tully told me.

Q Okay, what did Mr. Tully tell you, if you recall, what exactly did he tell you about this meeting about this Michael Lank issue?

A He said, Did you go to Michael Lank's on January 30th, and at first I said, No, I've never been to his house. Then I thought about it and I said, Oh, my gosh, yes, I did go there and that was the extent of the conversation.

Q You said, Yeah, I did go there and he didn't ask a follow-up like what the heck were you doing at Michael Lank's house that day after this issue, this incident?

MR. LALLY: Objection.

THE COURT: I'll allow it.

Q (By Mr. Jackson) He didn't ask a follow-up to that?

A I do not believe he did.

Q So, Trooper Tully had you come down for an interview. He confronted you with a fact that had never been disclosed before, to wit, you showed up at Michael Lank's house

180

and when you said, Yeah, Oh, yeah, hang on, I think your words were, Oh, my gosh, yeah, I think I did go there, and he didn't ask a follow-up question?

A   He was there.

Q   Yes or no?

A   You're spinning all of this.

Q   Ma'am, I do a lot of things.

A   Yeah.

Q   I don't spin.  There's a judge here to make sure I don't spin.  I'm asking you a question.  It's very direct.

A   I do not believe he asked me a follow-up question.

Q   So that was the end of that conversation about Michael Lank, correct?

A   Correct.

Q   Mr. Lally didn't have any follow-up questions?

A   I don't believe Mr. Lally was in the room.

Q   I thought you said Mr. Lally, Ms. McLaughlin?

A   They were.  They might have not been in the room at that time.

Q   I see.  So Mr. Lally just happened to

181

what, just saunter out?

A    It was a different time.

Q    So Mr. Lally was in and out of the conversation?

A    Mr. Lally was not there when this conversation happened.

Q    Well, why is that?

A    Because I met with Brian Tully and he was not there.

Q    Did Brian Tully take any notes?

A    No.

Q    He's a state trooper interviewing the witness and he --

A    He was --

            MR. LALLY:  Objection.

            THE COURT:  Sustained.

Q    (By Mr. Jackson)  The same report that has you at Michael Lank's house --

A    Uh-huh.

Q    -- also has you picking up Nicole Albert going by 34 Fairview just before you went to Michael Lank's house, are you aware of that?

A    We did not pick up Nicole Albert.

Q    So you went by 34 Fairview, then diverted,

182

and right after you went by 34 Fairview went directly over to Michael Lank's house, what was the reason you stopped by 34 Fairview first?

A   We didn't stop by.  Maybe Kerry slowed down by we did not stop by 34.

Q   You did a drive by at 34 Fairview, for giggles?  What?

A   No, that's how we get to Michael Lank's house.

Q   If the report shows that you actually stopped at 34 Fairview and then went to Michael Lank's house, did we have another, oh, my gosh moment?

A   No, no oh, my gosh moment.  We did not pick up Nicole Albert.

Q   Did anybody else go with you to Michael Lank's house?

A   No, it was Kerry, myself and her daughter.

MR. JACKSON:  Your Honor, may we approach briefly?

THE COURT:  Okay.


(SIDE BAR CONFERENCE, SEALED)

183

THE COURT:  Jurors, we're going to try and go right up until 1:00 o'clock, okay?

Q    (By Mr. Jackson)  Ms. McCabe, we've talked in some detail about your calls with John O'Keefe on the morning of January 29th, do you recall that conversation?

A    Yes.

Q    I want to focus your attention at or about 12:14 a.m. moving up to about 12:50 a.m., do you have that time in mind?

A    Yes.

Q    You've seen the Cellebrite extraction from John O'Keefe's phone which Mr. Lally showed you the other day, correct?

A    Correct.

Q    And you went through the series of phone calls that were made that appear on his extraction report, correct?

A    Correct.

Q    I just want to run through those very time-wise very quickly just to orient you if I can and then I'll ask you some specific questions about it.  There was a call at 12:14 a.m., correct?

184

A    Correct.

Q    That was a call that you indicated was answered, you had conversation with Mr. O'Keefe?

A    Correct.

Q    That was a call at 12:18 and 47 seconds, that call also was answered by you.  John O'Keefe made that phone call, correct?

A    Correct.

Q    Then there's the 12:29 and 44 second call that you indicated was not answered?

A    Correct.

Q    And that was a call from you to him?

A    Correct.

Q    There was a 12:41 call from you to John O'Keefe, correct?

A    Correct.

Q    There was a 12:41 and 54 second call from you to him, is that right?

A    Correct.

Q    There was a 12:43 and 19 second call from you to him?

A    Correct.

Q    12:46 a.m. and 16 seconds from you to him?

A    Correct.

185

Q    12:47 and 52 seconds from you to him?

A    Correct.

Q    And 12:50 and 37 seconds from you to him?

A    Correct.

Q    You saw in his extraction report that all of those calls after 12:18 were missed calls, correct?

A    In his report that you showed me?

Q    Correct, in other words, the only two calls that were answered were the 12:14 and 12:18, everything else was a missed call?

A    I believe so.  I would have to refer to it again because I've seen so many reports.

Q    And Ms. McCabe, according to the extraction report that you've seen this morning comparing yours to his, every single one of those calls was deleted off your phone, correct, according to the reports?

A    According to that report, yes.

Q    Let me ask you another question, have you ever misplaced your phone?

A    Yes.

Q    In fact, everybody does, right?

186

A    Yes.

Q    What is one of the first things you do with your daughter or your husband or a friend in your house when you misplace your phone, what do you do?

A    I'll ask them to call my phone.

Q    Right, even over and over and over, right?

A    Correct.

Q    It could be as many as five, six, seven times?

A    Usually I hear it the first or second time.

Q    You're looking for a buzz or a ring, isn't that right?

A    Correct.

Q    And you might do that if you're searching for a missing phone, correct?

A    Correct.

Q    With regard to the calls that were deleted in your phone you were asked about this under oath at another proceeding, weren't you?

A    Correct.

Q    And you claimed at another proceeding that you had an explanation for all these

187

missed calls starting at 12:29, 12:41, 12:41, 12:43, 12:46, 12:47, 12:50, you have an explanation for that, right?

A    Can I see the report?

Q    I'm asking you about your prior testimony?

A    Am I'm ask --

Q    About these calls --

A    Yes, and I'm asking, can I see it, please.

Q    I'm asking you a different question.  At this other proceeding --

A    Uh-huh.

Q    -- you were under oath?

A    Yes.

Q    You explained that these calls were, what, were missed calls, incessant missed calls, what were they, you used the word, as a matter of fact it's two words?

A    I believe I used the word butt dial.

Q    You claimed that every one of these calls was a butt dial, is that right?

A    Yes.

Q    So according to you, you literally butt dialed John O'Keefe's phone six times in a span of nineteen minutes, is that right?

A    I don't remember making any of those calls

188

so my assumption is I put my phone in my back pocket and that was it.

Q    When you dial someone by mistake and hit a button, set your phone down, the phone has to be open you'll agree with that, right?

A    Correct.

Q    It can't be locked because it takes several iterations of movement to get a phone open, Face ID or password, right?

A    Correct.

Q    So when you hit the button by mistake, walk away, that's a butt dial, what people call butt dials, what happens with the call?

A    I assume it goes to voice mail.

Q    That's a good assumption because that's exactly what it does, doesn't it?  You've had a phone for a lot of years, right?

A    Yes.

Q    It rings and rings and rings until it goes to voice mail?

A    Correct.

Q    So in order to hang up that butt dial you have to interact with that phone yet again, don't you?

189

A   Yes.

Q   So if you had six butt dials, correct, wait seven but dials, you'd not only have to interact with the phone once to butt dial John, you'd then have to interact with it every single time to turn off that phone ringer so it doesn't go to voice mail, wouldn't you?

A   I suppose.

Q   Which makes fifteen interfaces with that phone over the course of nineteen minutes, is that right?

A   I mean, I guess.  I don't have it all right in front of me but there were also text messages I was sending so again, maybe I said, Oh, shoot, I called him and then I turned it off.

Q   But your claim is you don't remember those incessant butt dials and those incessant hang ups at all, correct?

A   I honestly don't.

Q   So you would have had to forget that you interacted with that phone, by the way, you'll agree that the phone extraction shows John got no voice mails from you,

190

correct?

A    I didn't look.

Q    So that means you would have had to interact with that phone fourteen times over the course of nineteen minutes at the exact timeframe that the Commonwealth suggests John O'Keefe lost his life?

MR. LALLY:  Objection.

THE COURT:  Sustained.  You can ask that differently and this will be your last question for today, please.

MR. JACKSON:  Yes, your Honor.

Q    (By Mr. Jackson)  The period between 12:29 and 12:50 which is the exact period that you were Quote, butt dialing John multiple times that's also the exact period that John O'Keefe was rendered incapacitated, is that correct?

MR. LALLY:  Objection.

THE COURT:  That's sustained. We'll start up again tomorrow, okay?

MR. JACKSON:  Thank you.


(CROSS-EXAMINATION-SUSPENDED)

191

COMMONWEALTH OF MASSACHUSETTS

I, Diane Cercone, certify that the foregoing is a true and accurate transcript from the record of the court proceedings in the above-entitled matter.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action. In witness whereof, I have hereunto set my hand and seal this 28th day of May 2024.


_____          May 28, 2024
Diane Cercone,
Notary Public
My Commission Expires: August 22, 2025