# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN READ,<br><br>  Plaintiff,<br>v.<br><br>MICHAEL PROCTOR, in his personal capacity; SGT. YURIY BUKHENIK, in his personal capacity; LT. BRIAN TULLY, in his personal capacity; TOWN OF CANTON; BRIAN ALBERT; NICOLE ALBERT; JENNIFER McCABE; MATTHEW McCABE; and BRIAN HIGGINS,<br><br>  Defendants. | Civil Action No. 1:25-CV-13588-DJC |

## PLAINTIFF KAREN READ'S REVISED OPPOSITION TO HOUSE DEFENDANTS' SPECIAL MOTION TO DISMISS AND MOTION TO DISMISS

Plaintiff Karen Read opposes the Special Motion to Dismiss and Motion to Dismiss

Pursuant to Fed. R. Civ. P. 12(b)(6) [ECF No. 64], filed by what the Amended Complaint calls

the "House Defendants," Defendants Brian Albert, Nicole Albert, Jennifer McCabe, Matthew

McCabe and Brian Higgins. As set forth in detail below, the Court should deny the Special

Motion to Dismiss under the Massachusetts Anti-SLAPP Statute, G.L. c. 231, §59H because:

(a)    a special motion to dismiss under the Anti-SLAPP Statute should not be considered in federal court pursuant to Berk v. Choy, 607 U.S. 187, 146 S. Ct. 546, 223 L. Ed. 2d 463 (Jan. 20, 2026).

(b)    the House Defendants' tortious activity goes far beyond mere "petitioning" activity and involves a conspiracy to manufacture evidence inculpating Ms. Read in Mr. O'Keefe's death, and destroy evidence exculpating her, and;

(c)    the Amended Complaint plausibly alleges, and the attached factual materials show, that the crux of House Defendants' actions were "devoid of reasonable factual support or arguable basis in law" and caused Ms. Read "actual injury."

The Court should deny the 12(b)(6) Motion because:

(a)   absolute immunity does not apply to the House Defendants' non-testimonial actions of manufacturing and destroying evidence or to their initial statements to first responders that sparked the investigation;

(b)   the statute of limitation began to run when Ms. Read was acquitted in 2025 and, therefore, all of the claims are timely;

(c)   relating to the Malicious Prosecution claim (Count 5), the Amended Complaint plausibly alleges that the House Defendants initiated the prosecution by falsely implicating Ms. Read in Mr. O'Keefe's murder before the investigation even began, and there are ample plausible allegations of lack of probable cause because the House Defendants knew Ms. Read did not kill Mr. O'Keefe;

(d)   relating to the 42 U.S.C. § 1983 Conspiracy claim (Count 3), the Amended Complaint plausibly alleges a conspiratorial agreement between and among the House Defendants and the MSP officers Tully, Bukhenik, and Proctor, which satisfies the state action requirement of Section 1983;

(e)   relating to the Civil Conspiracy claim (Count 7), the Amended Complaint contains non-speculative allegations of a common plan by the House Defendants to frame Ms. Read coupled with multiple affirmative steps by them to carry out that plan;

(f)   relating to the Massachusetts Civil Rights Act claim (Count 4), the House Defendants' action in causing Ms. Read's prosecution is considered "intrinsically coercive" under Massachusetts law;

(g)   finally, relating the Intentional Infliction of Emotional Distress claim (Count 6), the Amended Complaint goes far beyond simply alleging wrongful arrest, but like <u>Limone v. United States,</u> 579 F.3d 79, 90 (1st Cir. 2009), involves allegations of knowingly manufacturing evidence to inculpate an innocent person.

## I.   The Court Should Deny the Special Motion to Dismiss Under the Massachusetts Anti-SLAPP Statute.

The House Defendants seek dismissal of all state claims against them, Counts 4-7, under the Massachusetts Anti-SLAPP Statute, G.L. c. 231, § 59H.  That statute authorizes a defendant to file a "special motion to dismiss" when facing "claims based on the defendant's "exercise of

its right of petition" under the federal and commonwealth constitutions.  See Blakesley v. Marcus, 158 F. 4th 90, 98 (1st Cir. 2025).  The statute requires the court to grant a special motion to dismiss based on petitioning activity "unless the party against whom such special motion is made shows that: (1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law; and (2) the moving party's acts caused actual injury to the responding party."  G.L. c. 231, § 59H.  In addition, filing a special motion to dismiss stays all discovery, unless the Court, after a hearing and a showing of good cause, allows specified discovery.  Id.

Here, the Court should deny House Defendants' Special Motion to Dismiss for three reasons: (1) a special motion to dismiss is no longer viable in federal court after the Supreme Court's recent decision in Berk v. Choy, (2) the claims in the Amended Complaint are not based solely on petitioning activity, and (3) pursuant to the well-pleaded allegations in the Amended Complaint and accompanying evidentiary evidence, the House Defendants' actions (conspiring to manufacture and destroy evidence) were devoid of any reasonable factual support or arguable basis in law.

A.      **Under Berk v. Choy, the Special Motion to Dismiss Cannot be Heard in Federal Court Because It Requires Plaintiff to Provide Evidence to Avoid Dismissal.**

A special motion to dismiss is different than a traditional motion to dismiss under Fed. R. Civ. P. 12(b)(6).  A 12(b)(6) motion is only successful if the movant shows the complaint fails Rule 8(a)(2)'s requirement to provide a "short plain statement of the claim showing the pleader is entitled to relief," even assuming the truth of all well-pleaded factual allegations.  See Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  On the other hand, the anti-SLAPP special motion to dismiss is "strong medicine" that, in part, provides the movant with

"presumptive entitlement to dismissal, unless the opposing party can prove a negative" – i.e., unless the pleader can prove "the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law; and (2) the moving party's acts caused actual injury to the responding party." Bristol Asphalt Co., Inc. v. Rochester Bituminous Prods., Inc., 493 Mass. 539, 555 (2024). To decide whether the non-movant has carried its burden, the Court must consider not only the pleadings but all "supporting and opposing affidavits." G.L. c. 231, § 59H.

Because an anti-SLAPP special motion to dismiss requires a non-movant to provide evidence to avoid dismissal, numerous Courts of Appeal have decided that similar anti-SLAPP procedures are incompatible with Rules 12 and 56 of the Federal Rules of Civil Procedure, and therefore, cannot be applied in Federal Court. See, e.g., La Liberte v. Reid, 966 F.3d 79, 86 (2d Cir. 2020) (collecting cases from 5th, 11th, D.C. Circuits rejecting application of special motions to dismiss in federal court).

The First Circuit, along with the Ninth Circuit, is in the minority on this circuit split. In Godin v. Schenks, 629 F.3d 79, 85-91 (2010), the First Circuit held that Maine's anti-SLAPP statute, Me. Rev. Stat. tit. 14, § 556, could be applied in federal court, because Rules 12 and 56 did not "attempt to answer the same questions" nor "address the same subject" as the anti-SLAPP law. The Court of Appeals interpreted the Maine anti-SLAPP statute to create substantive state law rights to protect petitioning activity by shifting the burden to the non-movant to establish the movant's petitioning activity had no reasonable basis in law or fact, and that "[n]either Fed. R. Civ. P 12(b)(6) nor Fed. R. Civ. P. 56 determines which party bears the burden of proof on a state-law created cause of action." Id. at 89. Since Godin, this Court and the First Circuit have adjudicated special motions to dismiss under Massachusetts' anti-SLAPP

statute, which is similar to Maine's. See, e.g., Blakesly, 158 F.4th at 98-101 (reviewing merits of District Court denial of special motion to dismiss); Kirby v. Petit, No. 24-cv-12015-AK, 2025 U.S. Dist. LEXIS 165113, at *12 (D. Mass. June 24, 2025).

The Court should not apply Godin because its holding has been undermined by a recent Supreme Court case. See United States v. Sabetta, 221 F. Supp. 3d 210, 220 (D.R.I. 2016) (noting that it was not bound by First Circuit precedent conflicting with intervening Supreme Court precedent); but see Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004) ("Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority."). In January 2026, the Supreme Court decided Berk v. Choy, 223 L. Ed. 2d 463, which involved whether to apply in a federal court a Delaware statutory requirement that state malpractice claims be supported at the complaint stage with an "affidavit of merit" signed by a medical professional testifying that reasonable grounds exist for medical negligence. The Supreme Court held that the state law affidavit requirement could not be applied in federal court because it conflicted with Fed. R. Civ. P. 8, 12, and 56.

The Court explained that "when a Federal Rule of Civil Procedure is on point," the District Court need not undertake an Erie analysis to determine whether to apply state or federal law. Instead, "a valid Rule of Civil Procedure displaces contrary state law even if the state law would qualify as substantive under *Erie*'s test." Id. at 470. The starting question is whether the federal rule "answers the question in dispute." If so, the federal rule applies.

The Court held that the question of whether to dismiss a complaint because it lacked an affidavit in compliance with the Delaware law was answered by Rule 8. Because Rule 8(a)(2) only requires a short and plain statement of the claim, it establishes "implicitly, but with

5

unmistakable clarity that evidence of the claim is *not* required." (quotations and citation omitted, emphasis in original).   The Court also noted that Rule 12(d) provided that a District Court "cannot consider matters outside the pleadings," but only decide whether the complaint's well-pleaded factual allegations state a plausible claim for relief.  Thus, "Rule 8 sets a ceiling on the information that plaintiffs can be required to provide about the merits of their claim." Id. at 471-72.  Accordingly, the affidavit requirement could not apply in federal court.

Here, the Court should no longer follow Godin because it has "unmistakably been cast into disrepute by" Berk v. Choy. Just as a Delaware plaintiff alleging medical malpractice had to provide an affidavit to avoid dismissal of her claims, under the Massachusetts anti-SLAPP statute, because the House Defendants supported their special motion to dismiss with testimony, in part, Ms. Read must provide countervailing evidence to show by a preponderance of the evidence that "the [House Defendants'] exercise of [their] right to petition was devoid of any reasonable factual support or any arguable basis in law; and (2) the moving party's acts caused actual injury to the responding party." See Bristol Asphalt, 493 Mass. at 557. Indeed, the House Defendants argue that merely providing an affidavit is not enough and that the Anti-SLAPP Statute requires the Court to resolve disputed issues of fact on a paper record, without discovery, without testimony, and without a trial. See Special Mt. to Dismiss at 22; Bristol Asphalt, 493 Mass. at 558.

This requirement runs afoul of Rules 8, 12, and 56, and would deprive Ms. Read of her right to a jury trial under the Seventh Amendment.  The Delaware "affidavit requirement" conflicted with Rule 8 because "[u]nder Rule 8, factual allegations are sufficient, but under the Delaware law, the plaintiff needs evidence too." Berk v. Choy, 223 L. Ed. 2d at 472.  The same is true here.  Even though Ms. Read's Amended Complaint provides a short plain statement of

6

her claims, the Anti-SLAPP Statute also requires her to submit evidence to avoid dismissal. And, even though Rule 12(d) prohibits the consideration of evidentiary material like the declarations submitted by the House Defendants, the Anti-SLAPP Statute requires consideration of such evidence.

Finally, even if the Court were to consider the House Defendants' evidence and treat the motion as one for summary judgment (after allowing Ms. Read the opportunity to take discovery, see Berk v. Choy, 223 L. Ed. 2d at 473 (quoting Celotex Corp. v. Catrett, 477 U. S. 317, 322 (1986), and Fed. R. Civ. P. R. 12(d))), the special motion to dismiss procedure violates Rule 56 and Ms. Read's Seventh Amendment jury trial right because the Court is required to go beyond considering whether there are disputed issues of fact, and instead must decide those disputed issues and determine whether Ms. Read has satisfied a preponderance of the evidence standard. Compare Ehrlich v. Stern, 74 Mass. App. Ct. 531, 538 (2009) ("Requiring a plaintiff to make those showings by a preponderance of the evidence, though, requires the judge to assess the strength of competing affidavits, in marked contrast to her role when faced with competing affidavits filed in connection with a motion for summary judgment."), with Hi-Tech Pharm., Inc. v. Cohen, 208 F. Supp. 3d 350, 356 (D. Mass. 2016) (requiring only a prima facie showing of lack of reasonable basis for petitioning activity, because deciding between competing affidavit testimony is "reserved to the fact-finder and, absent the parties' waiver of their right to a trial by jury, are not properly within the Court's domain").

Because Godin's holding is contrary to Berk v. Choy, and because the anti-SLAPP procedure for deciding special motions to dismiss conflicts with Rules 8, 12 and 56, the Court should not consider the Special Motion to Dismiss. Instead, it should follow the standard 12(b)(6) protocol and simply determine whether the Complaint's factual allegations, taken as

7

true, together with the reasonable inferences taken from those allegations, state a plausible claim for relief.

**B.  The Amended Complaint Alleges Far More than "Petitioning Activities Alone."**

In Bristol Asphalt, 493 Mass. 539, the Supreme Judicial Court narrowed the applicability of the special motion to dismiss procedure under the Anti-SLAPP Statute to address concerns that special motions were becoming increasingly common in cases far afield from traditional SLAPP situations ("large developers filing SLAPP suits to silence local residents"), driving time-consuming and difficult legal decision-making at the very beginning of a case while staying discovery, and infringing the petitioning rights of special motion opponents.

Among other changes to the law, Bristol Asphalt returned to a "narrow and strict construction" of the Anti-SLAPP Statute such that special motions to dismiss are only cognizable when challenging claims based solely on petitioning activities. See 493 Mass. at 549-55 ("We thus conclude . . . that these powerful procedural protections [of the special motion] were intended to be employed in a limited context: to ensure the expeditious elimination of meritless lawsuits based on petitioning activities alone." (emphasis added)). Thus, the House Defendants are required, at this stage, to "show that the challenged count has no substantial basis in conduct other than or in addition to the special motion proponent's alleged petitioning activity." Id. at 555-56. The House Defendants' have not made this required showing because each of the claims they face is based on more than "petitioning activity."

Specifically, in addition to the many lies the House Defendants told the police, the Amended Complaint alleges that the House Defendants:

- "agreed on a simple plan to exonerate themselves and implicate Ms. Read: they would tell anyone who inquired: Mr. O'Keefe 'never entered the house,' and hide evidence that he was there, including his body." Amended Complaint ¶34 (emphasis added)

8

- "they re-positioned a Ford Edge vehicle at a spot adjacent to the front lawn, which obscured the view of that area of the lawn from potential passersby." Id. ¶35.

- "they carried or dragged Mr. O'Keefe's body to that same area in the yard, close to where one or more of them later claimed Ms. Read dropped off Mr. O'Keefe earlier that night. The plan was devised to make it appear that Mr. O'Keefe had been struck by Ms. Read's vehicle and then died as a result of exposure to the cold." Id. (emphasis added).

- "Mr. O'Keefe was either dead when the House Defendants left him on the Alberts' lawn, or he died shortly thereafter." Id. ¶36 (emphasis added).

- "Ms. McCabe directed them to go *back* to Mr. O'Keefe's home – where Ms. Read had just come from . . . . The illogical, McCabe-directed route to 34 Fairview was intentional. It allowed the House Defendants more time to finish creating the scene and hiding evidence before Mr. O'Keefe's body was discovered on the Alberts' lawn, and first-responders arrived." Id. ¶39.

- "[Jennifer McCabe] managed and communicated details about the House Defendants' messaging and the investigation itself, including visiting Proctor's and other investigators' private residences, mapping out timelines to coordinate statements with other witnesses, leading group text-message chains that were later partially deleted, and planning private meetings at all hours of the day and night." Id. ¶53.

- "Jennifer McCabe texted with her sister, Nicole Albert, that Kerry Roberts, who was present when Mr. O'Keefe's body was found: 'talked to cops and kept it simple.'" Id. ¶60.

- "While MSP interviewed Roberts, McCabe simultaneously texted her husband, Matthew McCabe, Nicole Albert, and Brian Albert, saying 'She's telling them everything,' 'all the stuff.' Nicole Albert responded, 'Good' and 'call us after.'" Id. ¶56.

- "Later, in other group texts with Jennifer McCabe and Brian and Nicole Albert, Matthew McCabe suggested having Chris Albert publicize their crafted story to a reporter." Id. ¶61.

- "Before both interviews, the McCabes and Alberts continued to coordinate their stories, as evidenced in group texts." Id. ¶65.

- Higgins and Alberts destroyed their phones, despite a state court preservation order. See id. ¶¶69-71.

- "By falsely representing that Mr. O'Keefe never entered the Albert house and by relocating his body to the location on the Alberts' property where they would claim Ms. Read dropped off Mr. O'Keefe, the Alberts, the McCabes, and Higgins caused Ms.

9

Read's wrongful indictment, arrest, and prosecution. Brian Albert and Brian Higgins also caused Ms. Read's wrongful indictment, arrest, and prosecution by destroying or discarding their phones, eliminating exculpatory evidence." Id. ¶¶178, 190, 196.

- "Shortly thereafter, as part of the plan, Jennifer McCabe deleted a Google search at 2:27 a.m. on January 29th for how long it takes a person to die in the cold." Id. ¶211. Ms. McCabe also deleted many calls and screenshots on her phone the night of Mr. O'Keefe's death. See id. ¶54.

Thus, the House Defendants are simply wrong when they argue that "[t]he only alleged conduct by each Commonwealth Witness relevant to [Ms. Read's] alleged injury is the fact that each gave information to the police and testified at Ms. Read's criminal trials." See Memo. of Law at 9. In fact, the Amended Complaint alleges numerous actions by the House Defendants that have nothing to do with statements to the police, such as moving Mr. O'Keefe's body, moving a Ford Edge to obscure the area where they dragged his body, directing Ms. Read to travel back to Mr. O'Keefe's house to give the House Defendants more time to destroy evidence, destroying phones, texts and communications among themselves to coordinate their actions, and deleting google search evidence.

These actions are not "petitioning activity," which is defined as

> any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

G.L. c. 231, § 59H (emphases added). "In other words, petitioning activity includes all statements made to influence, inform, or at the very least, reach governmental bodies -- either directly or indirectly." Ehrlich v. Stern, 74 Mass. App. at 535 (quotation omitted, emphasis added).

As asserted in the Amended Complaint, most of the House Defendants' activities are not "statements." Moving Mr. O'Keefe's body,[1] obscuring movement of the body by positioning the Ford Edge in front of the Alberts' house, delaying discovery of the body by redirecting Ms. Read on the morning the body was discovered, and destroying phones and Google search evidence, do not involve any statement or petition to the government. They involve actions, which are not "statements." See Henne v. City of Yakima, 341 P.3d 284, 291 (Wash. 2015) (holding that anti-SLAPP statute did not apply to non-communicative actions taken by defendant). Moreover, much of the conduct was not intended to reach the prosecutors: to the contrary, the House Defendants were attempting to hide from them information (like Mr. Albert's and Mr. Higgins' phone information and Ms. McCabe's incriminating google search). See Blakesley v. Marcus, 158 F.4th at 99 (noting requirement that the "communication was made to influence, inform, or at the very least, reach governmental bodies -- either directly or indirectly." (quotation and alteration omitted)).

At best for the House Defendants, Ms. Read's claims are "[m]ixed claims, that is, those based on a proponent's petitioning along with substantial conduct other than or in addition to the petitioning activities." See Bristol Asphalt, 493 Mass. at 554. "[T]he parsing of claims involving a mixture of petitioning and other matters is best addressed in the course of ordinary litigation,

---

[1] While the House Defendants maintain that the Amended Complaint does not allege certain of the Defendants were involved in moving Mr. O'Keefe's body, Memo. of Law at 11, in fact the Amended Complaint *does* allege that all House Defendants were involved. See Am. Complaint ¶¶34-36, 178, 190, 196. In addition, the Amended Complaint alleges a civil conspiracy in which all participants "may be held liable for actions done by others pursuant to a common design or with the defendant's substantial assistance or encouragement." Mass. Laborers' Health & Welfare Fund, by & Through its Trs. v. Philip Morris, Inc., 62 F. Supp. 2d 236, 244 (D. Mass. 1999). Thus, because all House Defendants entered into a common design and plan to inculpate Ms. Read by manufacturing some evidence and destroying other evidence, they are all liable for the actions done by the other pursuant to a common plan, including moving the body and destroying evidence. See also Blakesley v. Marcus, 158 F.4th at 101 (affirming District Court decision that coordination by defendants required denial of both defendants' special motions to dismiss even if one defendant not involved in non-petitioning activity).

11

where both sides' claims and defenses can be fully analyzed based on a more complete record, not special motions to dismiss." Id. Therefore, the Motion should be denied.

### C.   Even if the Court Finds the Amended Complaint is Based Solely on the House Defendants' Petitioning Activity, the House Defendants' Actions Were Devoid of Factual Support or Arguable Basis in Law and Caused Ms. Read Injury.

If the Court determines that Ms. Read's claims against the House Defendants are based on their petitioning activity alone, the claims still survive the second stage of the special motion to dismiss analysis, which requires the nonmovant to "show[] that the special motion proponent's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law; and (2) caused actual injury to the special motion opponent." See Bristol Asphalt, 493 Mass. at 557 (quotation and alterations omitted). The attached Affidavit of Karen Read ("Read Aff.") and the materials appended to the attached Declaration of Damon M. Seligson ("Seligson Dec.") do both. Specifically, they establish that the House Defendants' statements that Mr. O'Keefe never entered the Alberts' house was devoid of any reasonable factual support, and that Ms. Read suffered actual injury.

Specifically, Plaintiff establishes on this evidentiary record, more likely than not, that the House Defendants lied about Mr. O'Keefe never entering the home:

- Ms. Read did not strike Mr. O'Keefe with her vehicle. See Read Aff., ¶ 5

- The Massachusetts Chief Medical Examiner testified that Mr. O'Keefe's injuries were not consistent with a vehicle strike but rather a physical altercation. See Testimony of Dr. Irini Scordi-Bello, Attachment 1 to Seligson Decl.

- Mr. O'Keefe did not show signs of a physical altercation before Ms. Read dropped him off, and he and Ms. Read did not have such an altercation before she dropped him off at the Alberts' house. See Read Aff. ¶ 6.

- Mr. O'Keefe also suffered a contrecoups wound on the back of his head, which is consistent with falling on the ridged surfaces present in the Alberts' home garage. See Testimony of Dr. Irini Scordi-Bello, Attachment 1 to Seligson Decl.

12

- Mr. O'Keefe also suffered dog bite wounds and the Alberts' German shepherd had a history of aggression. See Testimony of Dr. Irini Scordi-Bello, Attachment 1 to Seligson Decl.

- In addition, evidence was presented at Ms. Read's trial that Mr. O'Keefe's phone was at some point inside the Alberts' home. See Testimony of Ian Whiffin, Attachment 3 to Seligson Decl.

- Finally, the evidence at Ms. Read's trial also revealed that Ms. McCabe had used her phone to search at 2:27 am on January 28 how long it takes for a person to die in the cold. See Testimony of Richard Green, Attachment 10 to Seligson Decl.

In addition, and without any discovery yet in this action, the Court should take into consideration that the House Defendant have already been caught making misrepresentations in attempting to cover up their conspiracy:

- o Brian Higgins

  - Mr. Higgins originally told police he went to the Canton Police Department on the morning of January 29 to do "administrative work" (in the middle of a snowstorm." See Testimony of Brian Higgins, Attachment 13 to Seligson Decl. Mr. Higgins then told the grand jury and said he went to the Canton Police Department "to move cars around." See id, Attachment 6 to Seligson Decl. Yet later at trial, video evidence showed Higgins moving a large parcel from one vehicle to another, disappearing into his office and then spending a period of time in another unseen area of CPD, and then finally exiting CPD. See Canton Police Department Incident Report, Attachment 7 to Seligson Decl.

  - Mr. Higgins testified that he didn't speak to anyone after leaving the Alberts' house until he was notified of Mr. O'Keefe's death the morning of January 29. See id, Attachment 13 to Seligson Decl. However, evidence at trial showed that he and Brian Albert communicated by phone at 2:22am that morning before Mr. O'Keefe's body was found. See Call Higgins-Albert Logs, Attachment 2 to Seligson Decl.

  Nicole & Brian Albert

  - On January 29, they told Sgt. Lank that their daughter, Caitlin Albert, was only briefly at the Alberts House and left around 12:15am. See Canton Police Department, at page 8, ¶ 6, Attachment 6 to Seligson

13

Decl. However, Caitlin was later interviewed by MSP and said she was the last to leave 34 Fairview. See Massachusetts State Police Interview of Caitlin Albert, Attachment 11 to Seligson Decl. Trial testimony by all the House Defendants confirmed Caitlin was the last to leave the Alberts' house at around 2am. See Transcript of Trial Testimony of Jennifer McCabe, Attachment 8 to Seligson Decl.

- Nicole Albert told police she was asleep until Ms. McCabe came into her bedroom just before 7am on January 29. See Transcript of Trial Testimony of Nicole Albert, Attachment 14 to Seligson Decl. However, call logs show a 38 second answered call from Jen to Nicole at 5:07:21am. See Jennifer McCabe Phone Records at page 11, Attachment 12 to Seligson Decl.

- Nicole Albert testified before the grand jury that she went to bed as soon as everyone left her house. See Attachment 9 to Seligson Decl. Yet, Brian Albert testified before the federal grand jury that he and Nicole were awake and having intimate relations at 2:22am. See Attachment 9 to Seligson Decl.

- Brian Albert testified that he didn't make any calls during the night of January 29, but call logs showed activity between him and Brian Higgins at 2:22am. See Brian Albert Trial Testimony, Attachment 9 to Seligson Decl.

o Jennifer McCabe

- Ms. McCabe falsely identified herself as "Nicole" to interviewing FBI agents and falsely told them that she had not made any phone calls in the brief period after the agents first showed up and then returned for questioning. See Jennifer McCabe Trial Transcript, Attachment 8 to Seligson Decl. After threatened with the penalties of lying to agents "from another organization," Ms. McCabe admitted to calling her husband, Brian Albert, Peg O'Keefe, and Adam Lally. See Attachment 8 to Seligson Decl.

- Ms. McCabe omitted during her trial testimony that she went to Sgt. Lank's house on Jan. 30 until the defense presented her phone's location data. See Attachment 8 to Seligson Decl. She also testified that she drove straight to Sgt. Lank's house from the O'Keefes' house, but her path of travel showed she went directly to Sgt. Lank from her own house after stopping at the Alberts' house. See Attachment 8 to Seligson Decl. She also denied ever stopping at the Alberts' house, but the phone data at trial revealed a 5-minute stop on the way to Sgt. Lank's residence. See Attachment 8 to Seligson Decl.

14

- Ms. McCabe falsely told first responders that Ms. Read said, "Could I have hit him?" See Attachment 8 to Seligson Decl. She later testified at trial Ms. Read said "I hit him I hit him I hit him." See Attachment 10 to Seligson Decl.

In support of their argument that they had reasonable factual support or any arguable basis in law to tell first responders, investigators, and juries that Mr. O'Keefe never entered the Alberts' home, the House Defendants offer two sources of evidence: the Commonwealth's Statement of Case filed after Ms. Read's indictment and their declarations. Each fail. The Statement of the Case does not offer competent evidence, since it is not a sworn statement based on personal knowledge, but simply contains allegations the Commonwealth intended to prove at trial. See Fed. R. Evid. 602.[2] Thus, the Court should not consider the Statement of the Case for the purposes proffered by the House Defendants – the truth of the unsworn allegations in the Statement. With respect to the House Defendants' declarations, the Court should not credit them for two reasons: first, their coordinated statements that Mr. O'Keefe did not enter the Alberts' home is contradicted by the evidence submitted at Ms. Read's two criminal trials; second, because the House Defendants have a documented history of making false statements they are not credible witnesses.

Relating to her injuries, Ms. Read easily establishes her actual injuries, *inter alia*, including loss of employment and income, millions of dollars in legal fees to defend herself, emotional harm, and exacerbation of her multiple sclerosis and Crohn's disease symptoms. See Read Aff. ¶¶ 8, 9 (testifying to the injuries, expenses, and losses suffered as a result of the prosecution). Nor do the House Defendants' Special Motion even argue Ms. Read did not suffer

---

[2] The House Defendants argue the Statement of the Case can be considered as a "matter of public record." Memo. of Law at 32 n.8 (citing Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir. 2008)). The public record exception to the rule that 12(b)(6) motions are to be decided based on the pleadings and incorporated documents, "generally allows a court to conclude only that the record exists; the exception does not allow the court to treat all information in the record as true." Blackwell v. Nocerini, 123 F.4th 479, 487 (6th Cir. 2024).

actual injury or contest that their actions and statements led to the wrongful prosecution of Ms. Read. Therefore, Ms. Read satisfies this element too.

**III.    The Court Should Deny the 12(b)(6) Motion.**

Unlike the House Defendants' special motion to dismiss pursuant to the Anti-SLAPP Statute, their Motion pursuant to Rule 12(b)(6) is subject to the well-known standard, which assumes the truth of the plaintiff's allegations and takes all reasonable inferences in the plaintiff's favor.

**A.    Absolute Immunity Does Not Shield the House Defendants' Actions or Initial Statements.**

First, the House Defendants contend that all the claims against them are barred because they are absolutely immune from liability arising from their testimony in the judicial proceedings involving Ms. Read as well as statements made to the police prior to those proceedings. See Memo. of Law at 23-25. But that misses the point entirely: Ms. Read's claims against the House Defendants involve far more than their false statements and testimony, and these other actions are not immune.

Pursuant to the absolute immunity doctrine, Defendants are immune from Section 1983 claims "based on the witness' testimony" or an alleged conspiracy to provide false testimony, and evidence of the witness' testimony may not be used to support a Section 1983 claim concerning the initiation or maintenance of a prosecution. See Rehberg v. Paulk, 566 U.S. 356, 369 (2012). However, absolute immunity does not extend to "all activity that a witness conducts outside of the [courtroom]." Id. at 369 n.1. Specifically, the Supreme Court in Rehberg made clear that absolute immunity does not apply to non-testimonial actions like falsification of an affidavit or fabrication of evidence of a crime. See id.; Buckley v. Fitzsimmons, 509 U.S. 259, 275 (1993) ("Respondents have not cited any authority that supports an argument that a

prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime was immune from liability at common law, either in 1871 or at any date before the enactment of § 1983). Thus, while the House Defendants may not be held liable for their false statements to the grand jury and false testimony at trial, they do not have immunity for their actions falsifying evidence by moving Mr. O'Keefe's body, and manufacturing and destroying evidence. These actions lie at the heart of every claim against the House Defendants. See Am. Complaint ¶¶168 (destruction of phones), 178, 190, 196, 211.

Moreover, absolute immunity does not apply to the false story they told the police prior to or at the very start of the investigation into Mr. O'Keefe's death, including the claim that Mr. O'Keefe had never entered the house and that Ms. Read had made inculpatory statements on the morning of January 29. See Am. Complaint ¶¶41, 45, 47. The SJC has made clear that not all reports of a crime are absolutely privileged. The critical question is whether, at the time of the defendants' statements, "a criminal or judicial proceeding was then being contemplated or proposed." Correllas v. Viveiros, 410 Mass. 314, 323 (1991). In "borderline" cases "between unsubstantiated reports of criminal activity and statements made in the course of proposed judicial proceedings," a "careful, fact-specific" analysis is required. See id. The House Defendants significantly overstate the law when they claim the absolute privilege extends to these additional statements because they are "'pertinent to' judicial proceedings as a matter of law." Memo. of Law at 25.

Here, no criminal or judicial proceedings were contemplated or proposed at the time the House Defendants made their initial statements. Ms. McCabe initiated the call to 911 reporting "a man passed out in the snow." See Am. Complaint ¶41. The Alberts and McCabes then falsely told one of the first responders on the scene that morning, Sgt. Lank of the Canton Police

17

Department, that Mr. O'Keefe had never entered the Alberts' house. See id. ¶45. Ms. McCabe then reached out to Sgt. Lank later to falsely say Ms. Read had said that morning "I hope I didn't hit him." Am. Complaint ¶47. Unlike the timing in Correllas, where the relevant statements were made when "a criminal investigation . . . was well underway," 410 Mass. at 324, here the statements were made *prior to* investigation by the State police and to one of the first responders on the scene. The statements to a first responder before an investigation was underway (that are consistent with efforts to fabricate evidence before the police know of the crime) is more akin to the cases where the "defendants went to the police, or communicated with others, on their own initiative and published an accusation which might otherwise never have been known." Correllas v. Viveiros, 410 Mass. at 322. Thus, at this early stage, prior to discovery and assuming the truth of the allegations in the Amended Complaint, the House Defendants have not carried their burden of establishing an absolute privilege to make their initial false statements to the police officers on scene.

**B.     Ms. Read's Claims Against the House Defendants Are Timely Because They Were Filed Less than Three Years After Her Acquittal.**

The House Defendants next argue that Ms. Read's claims are untimely because she failed to assert them in the midst of her three-year criminal prosecution, based in large part on the House Defendants' statements and conduct. According to the House Defendants, Ms. Read learned of their conspiracy to frame her by June 2022, and the statute of limitations began to run at that time, even though the criminal case they wrongfully helped initiate and sustain did not terminate until her acquittal in June 2025. See Memo. of Law at 26-30. However, that simply is not the law. In fact, the Supreme Court has explicitly rejected this argument and held that a criminal defendant like Ms. Read is not required to assert her civil claims while still defending herself against that prosecution:

18

That rule would create practical problems in jurisdictions where prosecutions regularly last nearly as long as---or even longer than—the limitations period. Criminal defendants could face the untenable choice of letting their claims expire or filing a civil suit against the very person who is in the midst of prosecuting them. The parallel civil litigation that would result if plaintiffs chose the second option would run counter to core principles of federalism, comity, consistency, and judicial economy.

McDonough v. Smith, 588 U.S. 109, 110 (2019).

This makes sense because, in the early stages of prosecution, a defendant cannot know whether their prosecution is actionable because the defendant has been neither convicted nor acquitted. If convicted, no claim would exist at all. Savory v. Cannon, 947 F.3d 409, 427 (7th Cir. 2020) ("Without favorable termination, a plaintiff lacks a complete and present cause of action." (quotations omitted)). Thus, the defendant would be forced to file a civil claim before a cause of action even exists. Moreover, requiring defendants to pursue parallel civil litigation while simultaneously defending their criminal case would put undue burdens on defendants and potentially prejudice their defense. The defendant "risks tipping h[er] hand as to h[er] defense strategy, undermining h[er] privilege against self-incrimination, and taking on discovery obligations not required in the criminal context." McDonough, 588 U.S. at 120. This approach would also invite collateral attacks on criminal proceedings, risking inconsistent rulings between civil and criminal courts. Heck v. Humphrey, 512 U.S. 477, 484-85 (1994).

For these reasons, claims premised on false evidence and infirm prosecutions do not accrue until the underlying criminal proceedings terminate in the defendant's favor. Nieves v. McSweeney, 73 F. Supp. 2d 98, 104 (D. Mass. 1999) (Section 1983 conspiracy to commit malicious prosecution); Billings v. Commerce Ins. Co., 458 Mass. 194, 198 (2010) (common law malicious prosecution); Brophy v. Goslin, No. 25-cv-10266-ADB, 2026 U.S. Dist. LEXIS 35007 at *6 (D. Mass. Feb. 19, 2026) ("Claims for malicious prosecution under common law, § 1983,

19

and the MCRA are similar in that they each accrue when the underlying criminal action terminates."); <u>Arias v. City of Everett,</u> No. 19-10537-JGD, 2019 WL 6528894, 2019 U.S. Dist. LEXIS 209532, at *35 (D. Mass. Dec. 4, 2019) (denying dismissal of emotional distress claims and noting "courts have allowed claims of intentional infliction of emotional distress to proceed (along with malicious prosecution claims) many years after a conviction, where the conviction was later overturned"). Here, Ms. Read's claims against the House Defendants are timely because they did not accrue until her acquittal in June 2025 when the underlying criminal proceedings terminated in her favor.

To avoid this conclusion, the House Defendants attempt to recast the Amended Complaint as alleging only that they participated in a conspiracy to have Plaintiff wrongfully arrested, rather than the larger conspiracy described in the Amended Complaint's many allegations. <u>See</u> Memo. of Law at 19. According to the House Defendants, this means that Ms. Read's claims accrued in June 2022, when she learned of the false statements leading to her arrest. <u>Id.</u>; <u>see Nieves,</u> 73 F. Supp. at 103-04 (claim for conspiracy to commit wrongful arrest accrues at time plaintiff learns of injury, while claim for conspiracy to commit wrongful prosecution accrues at termination of underlying proceedings). Contrary to the House Defendants' argument, however, Counts 3 through 7 of the Amended Complaint expressly allege that the House Defendants participated in a conspiracy to maliciously prosecute Ms. Read, not merely to have her wrongfully arrested.

The Amended Complaint contains many allegations that go beyond false statements intended to cause the police to arrest Ms. Read. For example, the House Defendants coordinated amongst themselves to provide false statements (and ultimately false testimony), including that Mr. O'Keefe "never entered the house," and that Plaintiff told Ms. McCabe, "I hope I didn't hit

20

him." Am. Complaint ¶¶45, 47 63. The night of the murder, Brian Higgins and Brian Albert called each other multiple times to coordinate their stories, and Ms. McCabe performed a Google search for "Ho[w] long to die in cold." *Id.* at ¶38. The House Defendants also collaborated to hide evidence, moving Mr. O'Keefe's body and re-positioning a vehicle to obscure the crime scene. *Id.* ¶35. Then, during the prosecution, Brian Albert and Brian Higgins destroyed their cell phones after Ms. Read's defense team requested to preserve them. *Id.* ¶68.

Throughout the criminal proceedings, the House Defendants continued to coordinate their stories with police. Proctor, the lead investigator, repeatedly communicated with the House Defendants through his sister, helping to coordinate their stories and pass along details of the investigation before they were public. *Id.* ¶¶8, 73-77. Indeed, Proctor was close friends with the Alberts, and met with Ms. McCabe at his private residence during the investigation. *Id.* ¶53. The House Defendants' and their families' frequent interactions with Proctor outside of normal protocols amply support an inference that the House Defendants conspired with police throughout the prosecution.

Thus, because Ms. Read's claims allege harm from wrongful prosecution, not just wrongful arrest, they accrued when Ms. Read was acquitted, and are therefore timely.

### C.     The Amended Complaint Plausibly Pleads a Malicious Prosecution Claim.

The House Defendants make three arguments for dismissal of Count 5, the common law malicious prosecution claim. None warrant dismissal.

First, the House Defendants argue they did not "commence or continue" the prosecution because "Ms. Read fails to allege that the [House Defendants] took an active role in her investigation or prosecution, and she does not assert that they induced or pressured law enforcement to arrest Read in any way." Memo. of Law at 31. This misstates the law. In fact,

the contrast between the facts alleged in the Amended Complaint and those before the court in the case the House Defendants rely upon, Limone v. United States, 579 F.3d 79, 90 (1st Cir. 2009), illustrates why.  Limone applied Correllas v. Viveiros's holding that merely providing information to an investigating officer is not actionable and that "the defendant must have, in some sense, initiated the prosecution." Correllas, 410 Mass. at 318. In Limone, the First Circuit rejected a malicious prosecution claim against FBI agents accused of "shoring up" the false story that was initially provided by a witness in a murder investigation.  The malicious prosecution claim failed because there was no proof the defendants "voluntarily reach[ed] out to law enforcement officials and cause[d] them to commence a new line of inquiry." Id. at 90.

Ms. Read's Amended Complaint alleges the exact opposite.  The essence of her malicious prosecution and related claims against the House Defendants is that they initiated the entire prosecution by casting Ms. Read as the suspect even before the investigation started.  Ms. Read alleges that the House Defendants directed first responders and investigators to Ms. Read almost immediately (and the investigators willingly took the bait).  As part of a concerted plan to distract from their own guilt, and among other things, they moved Mr. O'Keefe's body to the area in front of the Alberts' house where they later claimed to have seen Ms. Read drop off Mr. O'Keefe.  See Amended Complaint ¶35.  Ms. McCabe voluntarily reached out to a police officer responding to the scene several hours after the body was found, saying that Ms. Read had said twice "I hope I didn't hit him." Id. ¶47.  The House Defendants then coordinated the story that Mr. O'Keefe never entered the house. Id. ¶¶38, 53-56, 167.  Mr. Higgins and Mr. Albert destroyed their phones, and Ms. McCabe deleted her Google search history, to hide any incriminating evidence. Id. ¶¶70-72, 168.

Accordingly, the Amended Complaint plausibly alleges the House Defendants initiated the prosecution when they colluded to focus the police on Ms. Read before investigators even appeared on the scene, cemented their efforts by reaching out to Proctor and others with false statements after the investigation commenced, and then corrupted the ongoing investigation by coordinating stories and destroying evidence that exculpated Ms. Read. Not surprisingly, and as planned by the House Defendants, the Alberts' family friend and the lead investigator, Proctor, focused solely and exclusively on Ms. Read from the very first hours of investigation. See id. ¶¶5-6. Because the Amended Complaint plausibly alleges the House Defendants initiated the prosecution, the malicious prosecution count states a claim under Massachusetts law. See also Petricca v. City of Gardner, 429 F. Supp. 2d 216, 225 (D. Mass. 2006) (denying summary judgment where the plaintiff alleged the defendant "made knowingly false statements about him under oath in support of the criminal complaint"); Restatement (Second) of Torts. § 653 cmt. g. ("In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false." (emphasis added)).

The House Defendants' second and third arguments overlap. They contend that the Amended Complaint fails to establish a lack of probable cause and fails to show that the House Defendants acted with malice. See Memo. of Law at 32-34. The malice argument is not developed but is instead reliant on the lack of probable cause argument. See id. at 34 ("Those same reasons why the malicious prosecution claim fails under the prior two elements demonstrate how Ms. Read fails to show that the [House Defendants] acted with actual

23

malice."). The argument thus boils down to a single assertion: "any reasonable person would have suspected Ms. Read's culpability." Id. at 33. The House Defendants then cite what they say is incriminating evidence: her presence the night before in the area Mr. O'Keefe's body was found the next day, a cracked taillight on Ms. Read's car, and her seeing the body immediately upon returning to the Albert house the morning of January 29. Id.

The argument fails because it ignores the salient allegations in the Amended Complaint. Ms. Read alleges that the House Defendants were responsible for Mr. O'Keefe's death, based on the injuries to Mr. O'Keefe, consistent with being attacked by the Alberts' dog and hitting the back of his head on a ridged surface like those present in the Alberts' garage. See Am. Complaint ¶¶4, 33. The Amended Complaint also alleges the House Defendants tried to hide their guilt by moving Mr. O'Keefe's body in order to incriminate her. Id. ¶¶34-35. These allegations, which must be accepted as true for purposes of the Motion to Dismiss, paint a textbook case of lack of probable cause: that the complainant knew the person they were implicating was not responsible. As the Restatement provides:

> A private prosecutor can not have probable cause for initiating criminal proceedings against another if he does not believe that the accused was guilty of the crime charged against him. If he does not so believe, it is immaterial that the facts of which he had knowledge or belief were such that reasonable men might have regarded them as proof of the guilt of the accused.

See Restatement (Second) of Torts § 662 cmt. c.

As the House Defendants correctly explain in their Motion, their "conduct must be adjudged by [their] honest and reasonable belief at the time he instituted the complaint rather than by what may turn out later to have been the actual state of things." Memo. of Law at 32 (citing Lincoln v. Shea, 361 Mass. 1, 5 (1972)). For a 12(b)(6) motion, that "honest and reasonable belief" must be determined based on the allegations in the

24

complaint and the reasonable inferences in the plaintiff's favor that spring from such allegations. According to the Amended Complaint, here, the House Defendants knew at the time they conspired to incriminate Ms. Read that she was not responsible for Mr. O'Keefe's death. Thus, they lacked probable cause for their instigation of Ms. Read's prosecution.[3]

### D.    The Amended Complaint Plausibly Pleads a Civil Rights Conspiracy

Count 3 alleges a conspiracy to deprive Ms. Read of her Fourth Amendment rights under 42 U.S.C. § 1983. A Section 1983 conspiracy has two elements, (1) "a conspiratorial agreement"; and (2) "an actual abridgment of some federally-secured right." Sánchez v. Foley, 972 F.3d 1, 11 (1st Cir. 2020). The House Defendants argue the claim should be dismissed because they are not state actors. However, proof of a conspiracy between state officials and private actors satisfies the state action requirement of Section 1983. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 152 (1970) ("[A] private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983."); Dennis v. Sparks, 449 U.S. 24, 29, 101 S. Ct. 183, 187 (1980) ("Private parties who corruptly conspire with a judge in connection with such conduct are thus acting under color of state law within the meaning of § 1983 as it has been construed in our prior cases."); Sánchez v. Foley, 972 F.3d at 11 ("Conspiracy is merely the mechanism by which to obtain the necessary state action, or to impose liability on one defendant

---

[3] The House Defendant's undeveloped argument that there are insufficient allegations of malice also fails. The Amended Complaint plausibly alleges that the House Defendants framed Ms. Read to hide their complicity in Mr. O'Keefe's death. That is obviously "a wrong or unjustifiable motive," Smith v. Egan, 802 F. Supp. 3d 86, 92 (D. Mass. 2025); an "attempt[]to achieve an unlawful end or a lawful end through unlawful means," or "vexation, harassment, [or]annoyance," Beecy v. Pucciarelli. 387 Mass. 589, 593 (1982). It is the exact opposite of the legitimate "purpose . . . of bringing an offender to justice." Restatement (Second) of Torts § 668.

for the acts of the others performed in pursuance of the conspiracy."). Therefore, House Defendants' argument fails.

A civil rights conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (quotations omitted). "[I]t is not necessary to show an express agreement to prove a conspiracy." Id. at 845. Instead, the "plaintiff must prove either the existence of a single plan the essential nature and general scope of which was known to each person who is to be held responsible for its consequences, or at the least that the parties decided to act interdependently, each actor deciding to act only because he was aware that the others would act similarly." Sánchez v. Foley, 972 F.3d at 12 (quotations and alterations omitted). Plaintiff is not required to allege direct evidence of an agreement but can instead rely on circumstantial evidence. See id.

The House Defendants argue that "dispositively, the [Amended] Complaint fails to allege any coordination between the [House Defendants] and any state actors." Memo. of Law at 34. They are wrong.

First, there was a pre-existing relationship between the House Defendants and the investigators. The Alberts and Proctors were very close, a "second family." Am. Complaint ¶49. Proctor, Bukhenik, and Tully suppressed the existence of this close relationship, leading to the inference that they knew the connection was improper in the context of an ongoing relationship. See id. In addition, Brian Albert and Higgins worked in law enforcement, which meant, as Proctor admitted to his friends on the night O'Keefe's body was found (before he had conducted any meaningful investigation of the House Defendants) that "[the MSP] are out to make it cut

26

and dry since it involves cops," and that Brian Albert would not "receive some shit." Amended Complaint ¶85. Instead, Ms. Read had "zero chance [of] skating…she's fucked." Id. ¶¶5, 70. A reasonable inference from these admissions is that Brian Albert, Higgins, and Proctor, all in law enforcement, knew the plan – cops would not investigate other cops.

Second, there was extensive communication between Proctor and the House Defendants before and during the investigation. See Sánchez v. Foley, 972 F.3d at 12 (noting circumstantial evidence of conspiracy can include "communication among officers before the alleged unlawful conduct occurred, coupled with a story that a jury could conclude was fabricated to justify or cover up the original actions"). Proctor communicated with Julie Albert, who was related to Brian and Nicole, regularly, id. ¶50, even speaking to her on his personal phone after his official interview with her, id. ¶63. Proctor also spoke to his sister Courtney multiple times a day, knowing she was in close contact with Julie. Id. ¶73. Courtney and Julie spoke multiple times in the first days of the investigation, and dozens of times thereafter. Id. Nicole Albert was confident she had a back channel into the investigation through Julie, telling Jennifer McCabe in the time leading up to witness interviews that "We'll get more info tomm. Don't want to text about it." Id. ¶76. For her part, Jennifer McCabe visited Proctor's and other investigators' private residences. Id. ¶53. Proctor also used his personal cell phone to coordinate witness interviews with Brian Albert's brother, Kevin. Id. ¶110.

Third, the MSP defendants acted against protocol and standard investigative practices by not investigating the House Defendants. For instance, there was no search of the Alberts' house for ridged surfaces consistent with Mr. O'Keefe's fatal wound, no inspection of the House Defendants' bodies for signs of an altercation consistent with Mr. O'Keefe's injuries, and no searches of their cell phones. Id. ¶50. There was no effort to determine if the Alberts kept any

27

video surveillance at the house. Id. ¶105. The interviews of the House Defendants were unrecorded, and took place at their homes, family members' homes, their attorneys' homes, places of employment, or over the phone. Id. ¶51. The MSP defendants failed to conduct follow-up investigations even after incriminating information about the House Defendants came to light, such as evidence that Brian Albert and Higgins destroyed their phones after receiving notice Ms. Read's criminal defense team was seeking to preserve the evidence on the phones.

In sum, the Amended Complaint plausibly alleges that (1) Proctor admitted to his friends at the outset of the investigation he was going to make the investigation "cut and dry" to avoid blaming another member of law enforcement who happened to be part of his "second family," (2) the investigation proceeded exactly according to the plan with no focus on the House Defendants, and (3) all the while there were extensive unofficial, unrecorded communications between the MSP defendants and the House Defendants. The Amended Complaint thus sufficiently alleges circumstantial evidence of a conspiracy, that "at the least that the parties decided to act interdependently, each actor deciding to act only because he was aware that the others would act similarly."

### E.    The Amended Complaint Plausibly Alleges a Civil Conspiracy Among the House Defendants Under Massachusetts Law.

A civil conspiracy based on a concerted action theory under Massachusetts law "applies to a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." Greene v. Philip Morris USA Inc., 491 Mass. 866, 871-72 (2023). The Amended Complaint alleges such a common plan among the House Defendants to "to make it look like Mr. O'Keefe died due to exposure after being hit by Ms. Read's car" even though they knew he had been killed inside the Alberts' house or garage as a result of an altercation. See Am. Complaint ¶¶33-35, 203-04. The

28

Amended Complaint goes on to allege the House Defendants took multiple steps to carry out the plan, including moving Mr. O'Keefe's body to the area of the front lawn where Ms. Read had dropped him off earlier in the night. Id. ¶¶36, 211

The House Defendants argue the civil conspiracy count, Count 7, should be dismissed for several reasons. First, they contend the allegations concerning relocation of the body are vague and speculative. See Memo. of Law at 36. They are not. The Amended Complaint references the trial testimony of Brian Loughran who drove a snowplow in Canton. See Am. Complaint ¶¶106-08. He testified that he didn't see a body on the lawn in front of the Alberts' house at 2:30 am on January 29, hours after Ms. Read dropped Mr. O'Keefe, but at 3:30 am did see a Ford Edge (the type of car Brian Albert drove at the time) parked in the spot where Mr. O'Keefe's body was ultimately found. Id. The Amended Complaint also alleges Mr. O'Keefe suffered injuries consistent with being injured inside the Alberts' house, such as bite wounds from the Alberts' dog, which had a history of attacking people and other dogs, id. ¶¶4, 33, and a head wound consistent with falling on a ridged surface, such as those present in the Alberts' garage, id. A reasonable inference from these factual allegations is that Mr. O'Keefe was killed or incapacitated in the Alberts' house and then his body moved at some point after 2:30 am to where it was ultimately found a few hours later. Additionally, during Read's criminal trial, the medical examiner – a witness called by the prosecution – testified that Mr. O'Keefe's wounds were inconsistent with being struck by a vehicle but rather were consistent with being involved in a physical altercation.

Second, the House Defendants argue that no conspiracy can exist "where an alleged participant lacks knowledge that a wrongful act is being perpetrated," and that the Amended Complaint fails to allege that they knew the statements they gave to the police were false. This

29

argument fails for multiple reasons. To begin with, the false statement the House Defendants gave to the police was only one of the affirmative steps and tortious actions they took pursuant to their conspiracy. The other tortious acts, like moving Mr. O'Keefe's body and destroying evidence, are sufficient by themselves to support a conspiracy claim. See Kurker v. Hill, 44 Mass. App. Ct. 184, 189 (1998) ("In the tort field, the doctrine appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result.") (emphasis added). In any event, the Amended Complaint does allege the House Defendants knew they were lying when they told investigators Mr. O'Keefe was not in the house. In fact, the Amended Complaint goes much further and alleges that they knew he had been killed in the house and they were trying to hide it. See Am. Complaint ¶¶34-35.

F.    **Causing Ms. Read's Prosecution is "Intrinsically Coercive" Under the Massachusetts Civil Right Act.**

The House Defendants next argue that Count 4, the claim under G.L. c. 12, § 11*I*, the Massachusetts Civil Right Act should be dismissed because the Amended Complaint "does not adequately plead that Ms. Read was ever threatened, intimidated, or coerced by" the House Defendants. While an MCRA claim does require proof that interference with a constitutional or statutory right be accomplished through threats, intimidation, or coercion, under Massachusetts law "[a]rrest and detention have been held to be 'intrinsically coercive' under the MCRA." Lucien-Calixte v. David, 405 F. Supp. 3d 171, 180 (D. Mass. 2019). Put simply, causing law enforcement to prosecute Ms. Read was intrinsically coercive under the MCRA and is actionable. See Sarvis v. Bos. Safe Deposit & Tr. Co., 47 Mass. App. Ct. 86, 93 (1999) (MCRA liability attaches to private entity that directed officers to arrest plaintiff for trespassing).

30

**G.     The Amended Complaint Plausibly Alleges Intentional Infliction of Emotional Distress.**

As the House Defendants state, the tort of intentional infliction of emotional distress ("IIED") has four elements: (1) defendants intended to inflict emotional distress or knew or reasonably should have known that emotional distress was likely to result from such conduct; (2) the conduct was extreme and outrageous; (3) the defendants' conduct proximately caused plaintiff's emotional distress; and (4) the distress was so severe that no reasonable man could be expected to endure it. See Limone, 579 F.3d at 94. The House Defendants' Motion to Dismiss focuses only on the "extreme and outrageous" element.

The House Defendants first argue that IIED does not lie where the alleged cause is an arrest supported by probable cause. Putting aside for the moment that the House Defendants' statement of such a categorical rule is incorrect, more importantly however, it is irrelevant. In this case, assuming the truth of the allegations against the House Defendants, there was no probable cause because the House Defendants manufactured incriminating evidence against Ms. Read and the House Defendants destroyed exculpatory evidence. See Sena v. Commonwealth, 417 Mass. 250, 260 (1994) (holding criminal defendant not collaterally estopped from arguing lack of probable cause in later civil action following acquittal).

The House Defendants also argue that "even where probable cause is lacking . . . distress associated with 'wrongful' arrests is 'not sufficiently outrageous.'" Memo. of Law at 39-40. But even the cases the House Defendants cite show that this too is not an accurate statement of the law. In a sense, this case is the mirror image of Limone. There the Court of Appeals upheld a trial verdict for IIED against the FBI for "assist[ing] a witness in embellishing his apocryphal tale [implicating the plaintiff in murder], helped him to sell that tale to state authorities and the jury, and covered up their perfidy by stonewalling the scapegoats' petitions for post-conviction

31

relief." 579 F.3d at 99. The Court concluded that such behavior was sufficiently extreme and outrageous to constitute IIED.

The allegations in the Amended Complaint against the House Defendants are even more outrageous. Unlike the FBI in Limone, which merely assisted a third party in framing an innocent person, here, the House Defendants themselves directed police towards Ms. Read and manipulated and destroyed evidence to support the theory they wanted to take hold, and to exonerate themselves. Such behavior goes far beyond the conduct in the other cases cited by the House Defendants. See Sholley v. Town of Holliston, 49 F. Supp. 2d 14, 22 (D. Mass. 1999) (police officer arrested individual who was later acquitted of one charge but convicted of other); Sena, 417 Mass. at 264 (police officer arrested individual on good faith belief he had received stolen goods, but who was later acquitted); Lund v. Henderson, 22 F. Supp. 3d 94, 106 (D. Mass. 2014) (police officer using excessive force in allegedly wrongful arrest at scene of riot). Trying to put an innocent person in prison for murder to protect oneself, should be "intolerable in a civilized community," because it undermines society's fundamental interests in public safety and justice.

## IV.    Conclusion.

The House Defendants' Special Motion to Dismiss based on the Anti-SLAPP Statute should be denied because the Amended Complaint is based on much more than the House Defendants' alleged petitioning activity as demonstrated by the factual materials submitted with this opposition. Their Motion to Dismiss pursuant to Rule 12(b)(6) should also be denied because the Amended Complaint states a claim upon which relief may be granted, particularly when all facts are deemed true and all reasonable inferences are taken in Ms. Read's favor, as they must.

32

Respectfully submitted,

KAREN READ,

By her attorneys,

*/s/ Charles M. Waters*
Damon M. Seligson (BBO# 632763)
Charles M. Waters (BBO# 631425)
Aaron D. Rosenberg (BBO# 684826)
Sheehan Phinney Bass & Green, PA
28 State Street, 22nd Floor
Boston, MA 02109
617.897.5600
dseligson@sheehan.com
cwaters@sheehan.com
arosenberg@sheehan.com

Dated: June 1, 2026