**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KAREN READ,<br><br>           Plaintiff,<br><br>v.<br><br>MICHAEL PROCTOR, in his personal capacity; SGT. YURIY BUKHENIK, in his personal capacity; LT. BRIAN TULLY, in his personal capacity; BRIAN ALBERT; NICOLE ALBERT; JENNIFER McCABE; MATTHEW McCABE; and BRIAN HIGGINS,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)  Civil Action No. 1:25-CV-13588-DJC<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE COMMONWEALTH WITNESSES' [1] SPECIAL MOTION TO DISMISS UNDER MASSACHUSETTS' ANTI-SLAPP STATUTE; AND [2] MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

James L. Tuxbury (BBO #624916)
Kieran T. Murphy (*pro hac vice*)
HINCKLEY, ALLEN & SNYDER LLP
28 State Street
Boston, MA 02109
Telephone: 617-345-9000
JTuxbury@hinckleyallen.com

30 S. Pearl Street, Suite 1101
Albany, NY 12210
Telephone: 518-396-3100
KMurphy@hinckleyallen.com

*Counsel for Defendants Brian Albert, Nicole Albert, Jennifer McCabe, Matthew McCabe, and Brian Higgins*

## PRELIMINARY STATEMENT

Karen Read's Opposition does not rescue her Amended Complaint. Instead, it confirms the Amended Complaint's fatal deficiency: each claim she asserts against the Commonwealth Witnesses is, at its core, an attempt to punish citizens for cooperating with law enforcement and testifying under oath—a theory of liability that no court has ever endorsed, that the Massachusetts anti-SLAPP statute was enacted to foreclose, and that Supreme Court precedent squarely prohibits.

In her Opposition, Ms. Read concedes that Supreme Court case law bars claims based on sworn testimony or statements to police, yet in the next breath disregards that controlling law and argues—without legal citation—that her allegations that the Commonwealth Witnesses allegedly lied to the police, or provided false testimony, are sufficient to state a claim. The Opposition fails to cite a single case where an acquitted criminal defendant successfully sued lay witnesses for malicious prosecution based on testimonial activity. That is because no such case exists.

Ms. Read attempts to escape the straightforward boundaries of the Massachusetts anti-SLAPP statute, absolute immunity doctrine, and state and federal law by recasting the Commonwealth Witnesses' conduct as something other than protected activity—principally, by alleging a conspiracy to "manufacture" or "destroy" certain evidence purportedly related to the death of Officer O'Keefe. Ms. Read's allegations do not support such characterization, and she fails to cite any legal authority to buttress her arguments.

With respect to her anti-SLAPP defense, Ms. Read fails to identify any non-petitioning activity that is germane to the claims pleaded against each Commonwealth Witness. In addressing the second anti-SLAPP prong, the Opposition itself, and the evidence submitted with it, defeats her arguments. Most telling is Ms. Read's affidavit, wherein she testifies under oath *for the first time* since Officer O'Keefe was killed. In that sworn statement, it is what Ms. Read fails to say that speaks the loudest. Ms. Read does not address the single most critical fact underlying her

1

entire complaint against the Commonwealth Witnesses: that she ever witnessed Officer O'Keefe enter 34 Fairview.  That omission is not an oversight.  It is an admission.  Equally telling is a second glaring omission in Ms. Read's affidavit: she does not dispute that she made several incriminating statements on the morning of January 29, 2022.  Thus, she does not refute the accuracy of Ms. McCabe's statements to police or Ms. McCabe's related testimony on that issue.

The Opposition compounds these failures by misrepresenting both the record and the law. With respect to the record, it grossly mischaracterizes exhibits in an attempt to prove that the Commonwealth Witnesses lied to investigators and fabricated evidence.  On the governing legal standards, the Opposition fares no better.  First, it misreads Supreme Court precedent to suggest that this Court is forbidden from hearing anti-SLAPP motions.  Moreover, it misinterprets Supreme Judicial Court authority in an attempt to place the Commonwealth Witnesses' statements to first responders outside the scope of the absolute immunity privilege.  The Opposition similarly misconstrues, *inter alia*, the accrual rules for certain torts, the elements of civil conspiracy under Massachusetts law, and the "intrinsically coercive" standard of the MCRA, in each instance stretching settled doctrine past its breaking point.

What Ms. Read is seeking is clear: she wants a federal court to punish witnesses toward whom she harbors clear animus for testifying and providing information to police simply because she contends that testimony and information may have contributed to her arrest, indictment, and prosecution.  Every Court has rejected such prior attempts, and this Court should do the same.

## **ARGUMENT**

### I.    **The Opposition Fails to Rebut the anti-SLAPP Special Motion to Dismiss.**

#### A.  ***Berk v. Choy*** **Does Not Overrule Binding anti-SLAPP Precedent.**

Ms. Read's principal argument against the Commonwealth Witnesses' anti-SLAPP motion is that the Supreme Court's recent decision in *Berk v. Choy*, 607 U.S. 187 (2026), renders the

Massachusetts anti-SLAPP statute inapplicable in federal court. This interpretation is misguided and attempts to establish controlling precedent where none exists.

In *Berk*, the Supreme Court addressed a narrow question: whether Delaware's affidavit-of-merit requirement for medical malpractice actions could be enforced against a plaintiff proceeding in federal court under diversity jurisdiction. The Court held that it could not, reasoning that Fed. R. Civ. P. 8 displaces a state law demanding more. *Berk*, 607 U.S. at 195. The Court emphasized that Rule 8 "sets a ceiling on the information that plaintiffs can be required to provide about the merits of their claims" and that Rule 12(b)(6) provides the sole merits-based ground for dismissal, prohibiting courts from looking to "matters outside the pleadings." *Id.* at 193-94. *Berk*'s entire analytical framework thus turned on the identification of a direct conflict between a state-imposed pleading or evidentiary gatekeeping requirement and the federal pleading rules. That conflict is wholly absent here. The anti-SLAPP statute does not add to the plaintiff's pleading burden. Instead, it creates a unique mechanism by which a defendant may file a special motion to dismiss claims arising from petitioning activity. *See Godin v. Schenks*, 629 F.3d 79, 89-92 (1st Cir. 2010).

Indeed, the *Berk* Court's own logic confirms the inapplicability of its holding to the anti-SLAPP context. The Court found displacement because the Delaware law and Rule 8 "answer[ed] the same question"—namely, whether a complaint may be dismissed for failure to furnish evidence at the outset of a case. *Id.* at 198. An anti-SLAPP motion, by contrast, answers a fundamentally different question: whether a facially sufficient complaint targets petitioning activity and, if so, whether the non-moving party can demonstrate that the petitioning activity lacked a reasonable basis. That inquiry does not supplement ***pleading*** obligations; it provides an additional defense-side procedural protection akin to qualified immunity screening.[1]

---

[1] Moreover, the *Berk* Court expressly distinguished laws that create substantive rights or liabilities from those that merely regulate pleading mechanics. The Court acknowledged that a state law may have "some practical effect on

Indeed, the First Circuit previously employed the same reasoning as *Berk* in the anti-SLAPP context, holding that anti-SLAPP special motions can be brought in federal court. *See Godin*, 629 F.3d at 89-92. In *Godin*, the Circuit held that "Congress, in approving Rules 12 and 56, did not intend to preclude special rules designed to make it more difficult to bring certain types of actions where state law defines the cause of action," and therefore anti-SLAPP statutes can be applied in federal court. *Id.* at 91. The Court is, thus, bound by the controlling precedent that actually addressed the question of whether anti-SLAPP suits can be maintained in federal court.

At the very least, Ms. Read's conclusory assertion that *Berk* has "**unmistakably**" cast *Godin* into disrepute is misplaced. *See* Opp. at 5. Ms. Read offers no explanation as to how *Godin* is overruled by *Berk*. Indeed, for a district court to disregard binding circuit authority, the Supreme Court must have "**explicitly** revoked or **unmistakably** undermined" that authority. *See U.S. v. Renaud*, 2025 WL 1261169, at \*12 (D. Me. Apr. 30, 2025) (emphasis added). That is not the case here. *Berk* did not even address, let alone expressly revoke, the principle recognized in the First Circuit that anti-SLAPP special motions can be heard in federal court. Nor did it undermine the reasoning that the First Circuit applied in *Godin*.

### B. The Alleged "Non-Petitioning Activity" Is Not Relevant to Ms. Read's Causes of Action and Therefore Should Not Be Considered.

Faced with the reality that her claims are grounded exclusively in petitioning activity, the Opposition (Dkt. No. 74 or "Opp.") points to a handful of ancillary allegations to manufacture the relevance of non-petitioning conduct. This effort fails as a matter of law.

Tellingly, the Opposition does not discuss—or even cite—*477 Harrison Ave., LLC v. Jace*

---

the parties' rights" yet remain enforceable in federal court so long as it does not answer the same procedural question as a Federal Rule. Massachusetts's anti-SLAPP statute does far more than regulate pleading: it creates a substantive immunity from suit for petitioning conduct, attaching substantive consequences, such as cost shifting, to its invocation. Applying *Berk*'s own framework, anti-SLAPP laws do not "address[] what information a plaintiff must provide about the merits" at the outset of litigation. *Id.* at 195.

*Boston, LLC*, 477 Mass. 162 (2017) or *Wenger v. Aceto*, 451 Mass. 1 (2008).  Discussed throughout the Opening Motion (Dkt. No. 65 or "Mot."), *477 Harrison Ave.* made clear that, in assessing whether "the only conduct complained of is petitioning activity[,] . . . a judge considers only the allegations *that are relevant to the discrete causes of action brought*."   477 Mass. at 168 (emphasis added).  Where the purported non-petitioning activity "do[es] not bear any apparent relation" to the causes of action, it does not defeat the first prong of the anti-SLAPP analysis.  *Id.* at 170; *see also Wenger*, 451 Mass. at 5.  Ms. Read ignores this doctrine because it destroys her argument entirely.

While the Opposition goes to extreme lengths to bolster certain allegations in the Amended Complaint (*see, e.g.*, Opp. at 8-10), on its face, the purported "non-petitioning activity" boils down to only those (albeit preposterous) allegations that the Commonwealth Witnesses moved Officer O'Keefe's body, "destroyed or discarded" two cellphones, and communicated about the investigation with one another.[2]  As detailed in the Opening Motion, these allegations are irrelevant to the principal question underlying Ms. Read's primary tort claim: whether each of the individual Commonwealth Witnesses commenced or continued the prosecution of Ms. Read.  *See* Mot. at 16-29.[3]  The Opposition also fails to address any alleged non-petitioning activity with respect to each claim asserted against each Commonwealth Witness.  While the Opposition desperately tries to break out the allegations against each Commonwealth Witness and each cause of action, it only

---

[2] For the reasons addressed in the Opening Motion, as well as those described *infra*, Ms. Read's continued reliance on the allegation that Ms. McCabe Googled "Hos [sic] long to die in cold" at 2:27 a.m. should not be afforded any credence.  The singular expert whom Ms. Read proffered to render that conclusion was subsequently determined to be utterly unreliable between her first and second murder trials, as evidenced by Ms. Read's decision not to call him as an expert during her second trial.  Moreover, the Opposition cites directly to the testimony of another expert, Mr. Ian Whiffin, who credibly testified that Ms. Read's alleged Google search conspiracy was a farce.  Ms. Read should not be permitted to continuously rely on "evidence," especially in an attempt to satisfy a "difficult burden," that she knows to be false and misleading.

[3] Citations herein refer to the pagination generated by the Court's electronic filing system, CM/ECF.

confirms that Ms. Read impermissibly groups these five Commonwealth Witnesses collectively to mask the absence of any germane non-petitioning activity specific to them. Indeed, in attempting to circumvent the Opening Motion's group pleading argument, the Opposition fails to cite a single case supporting the proposition that moving a body, discarding a cellphone, or communicating with friends and family regarding the death of a loved one could constitute "initiating" a criminal prosecution for a malicious prosecution claim. The only allegations that could relate to that claim (and Ms. Read's other claims) would be the Commonwealth Witnesses' statements to police and their trial or grand jury testimony, all of which are paramount petitioning activities.

### C. Ms. Read Fails to Provide Any Evidence to Establish that the Commonwealth Witnesses' Statements Had No Legal or Factual Basis.

Because Ms. Read's claims against each of the Commonwealth Witnesses are based solely on petitioning activity, she must show by a preponderance of the evidence that the petitioning activity had no legal or factual basis, a "difficult task." *See Bristol Asphalt Co., Inc. v. Rochester Bituminous Prods., Inc.,* 493 Mass. 539, 557 (2024). Despite that "difficult task," Ms. Read offers *zero* evidence showing that each Commonwealth Witness's statements lacked any factual basis. Ms. Read does not even attempt to dispute the Commonwealth Witnesses' statements that Officer O'Keefe never entered 34 Fairview or Ms. McCabe's statements regarding several incriminating statements made by Ms. Read on January 29, 2022. Ms. Read's entire case hinges on whether those statements were lies.

Yet, remarkably, in her *first sworn testimony since Officer O'Keefe was killed*, Ms. Read conspicuously omits any assertion that she ever witnessed Officer O'Keefe enter the home. *See* Dkt. No. 75. While that omission destroys any contention that the Commonwealth Witnesses' statements were devoid of any factual or legal basis, Ms. Read's omission undoubtedly reflects the truth: she never saw Officer O'Keefe enter 34 Fairview because, in fact, he did not. That is what

6

she told the police on January 29, 2022. *See* Dkt. No. 65-2 at 12. That is consistent with the data admitted during Ms. Read's second murder trial.[4] That is consistent with the crime scene.[5] That is also consistent with the testimony of ***every single witness***.

Ms. Read's affidavit also conspicuously omits any denial that she made incriminating statements on the morning of January 29, 2022. In the Amended Complaint ("AC"), Ms. Read complained that Ms. McCabe allegedly gave false testimony that Ms. Read made incriminating statements on January 29, 2022. Ms. Read's failure to dispute this in her first-ever sworn testimony not only confirms her responsibility for the death of Officer O'Keefe, but also that Ms. McCabe's statements and testimony regarding the incriminating statements constitute protected petitioning activity grounded in a clear factual basis.

Rather than attempt to show that the Commonwealth Witnesses' statements were devoid of a factual or legal basis, Ms. Read instead cites evidence attempting to (1) establish that she did not murder Officer O'Keefe; and (2) attack the Commonwealth Witnesses' credibility. *See* Opp. at 12-13. This effort to deflect not only fails to address the relevant anti-SLAPP issue (wherein credibility determinations are decided against Ms. Read) but also fails to achieve its stated goal.[6] Instead, Ms. Read mischaracterizes the relied-upon evidence in an egregiously self-serving manner, deliberately misleading this Court regarding what was admitted at trial.

---

[4] *See* Supplemental Declaration of James L. Tuxbury ("Supp. Tuxbury Decl."), Ex. A (*People v. Karen Read*, Ian Whiffin's March 2025 Expert Report, concluding that there was "no evidence of a Flight Climb event occurring once [Officer O'Keefe's] device had arrived at Fairview Road," that the battery temperature of Officer O'Keefe's iPhone declined for several hours after 12:37 a.m. on January 29, 2022, that "the final user interaction with [Officer O'Keefe's] device was at 00:32:09 when the device was locked" and that "[t]he last step of the health data was recorded at 00:32:16.").

[5] *See* Dkt. No. 65-1 at ¶ 6.

[6] In doing so, Ms. Read gratuitously ignores the critical evidence reflecting her responsibility for the death of Officer O'Keefe: his and her phone data; his phone temperature; his phone pocket state; his phone GPS information; her car data; the fact he stopped moving the very moment she completed a high speed reverse; the significant damage to her right rear taillight, which cannot be explained away by her contact with Officer O'Keefe's Chevy Traverse; the evidence at the crime scene; and her own several incriminating statements on January 29, 2022.

For example, the Opposition cites the trial testimony of Dr. Irini Scordi-Bello.  *See* Opp. at 12.  Ms. Read asserts, ***without pincite***,[7] that Dr. Scordi-Bello "testified that Mr. O'Keefe's injuries were not consistent with a vehicle strike but rather a physical altercation."  *Id.*  However, a review of this trial testimony reveals that Dr. Scordi-Bello never said anything of the sort.  To the contrary, when asked whether the injuries sustained by Officer O'Keefe could "be consistent with being struck by a vehicle and then going to the ground," Dr. Scordi-Bello testified, "Yes, they can be."  Dkt. No. 74-3 at 22:3-5; *see also id.* at 108:1-6.  Dr. Scordi-Bello also testified that she "didn't see any signs, major signs, of what [she] would call a significant altercation."  *Id.* at 72:2-7.  Ms. Read also states, again without proper citation, that Dr. Scordi-Bello's testimony supports the allegation that "Mr. O'Keefe [] suffered dog bite wounds."  Opp. at 13.  Again, this is false.  Instead, when asked about the scratches found on Officer O'Keefe's right arm, Dr. Scordi-Bello stated that she did not know what caused them.  *See* Dkt. No. 74-3 at 115:19-23.  At no point throughout her testimony did Dr. Scordi-Bello state anything about a dog or dog bites.

In addition to the testimony of Dr. Scordi-Bello, Ms. Read relies on the testimony of Ian Whiffin.  Specifically, the Opposition states that evidence was presented through Mr. Whiffin that "Mr. O'Keefe's phone was at some point inside the Alberts' home."  Opp. at 13.  Ms. Read fails to point the Court to where in Mr. Whiffin's testimony he made such a statement, ***because he never did***.  Indeed, the testimony annexed to the Opposition concerns only Ms. McCabe's Google search and Mr. Whiffin's conclusion that such search did not occur at 2:27 a.m.  *See* Dkt. No. 73-

---

[7] Indeed, the Opposition is littered with citations to hundreds of pages of trial testimony that fail to direct the Court to the precise portions of the trial testimony that purportedly support Ms. Read's assertions.  The filing also fails to include a copy of "Attachment 4" (selectively curated grand jury testimony), which was not subject to a motion to seal or provided to defense counsel prior to the filing of this Reply despite counsel's best efforts to obtain it.  *See* Opp. at 12-14. Moreover, the Opposition and supporting exhibits were filed without optical character recognition ("OCR"), which would require taking the affirmative step of printing the documents, scanning them, and then reuploading them prior to filing.  Of course, filing documents without OCR deprives the Court (and counsel) of the ability to effectively search those documents.  These efforts only underscore the Opposition's wholesale attempt to mislead this Court regarding critical facts by frustrating any ability to verify the accuracy of Ms. Read's representations.

5 at 77:22-78:2 ("***I'm of no doubt that the only time those two searches were conducted was at 6:23 and 6:24 on the morning of [January] 29th***.") (emphasis added).  Nothing in the testimony of Mr. Whiffin cited by Ms. Read concerns anything regarding Officer O'Keefe's cellphone.[8]

Moreover, Ms. Read continues to assert her innocence by contending that Ms. McCabe conducted a Google search at 2:27 a.m. regarding how long it takes a person to die in the cold, relying on the testimony of "expert" Richard Green.  *See* Opp. at 13; *see also* Dkt. No. 74-12.  As Ms. Read is aware, that theory was nullified during her second criminal trial, as evidenced by the testimony of Mr. Whiffin that Ms. Read (mistakenly or otherwise) attaches to her Opposition. Indeed, based on the issues with Mr. Green's theory that surfaced between Ms. Read's first and second criminal trials, Ms. Read chose not to call Mr. Green at all during her second trial.  Thus, her continued reliance on such stale, false, and unsupported assertions to project this conspiracy theory is, at best, a red herring and certainly does not establish that the Commonwealth Witnesses' statements regarding the whereabouts of Officer O'Keefe are devoid of any factual or legal basis.

The Opposition's flagrant mischaracterizations of the testimony presented during Ms. Read's criminal trials are entirely improper and serve only to deflect the Court's attention away from the plethora of evidence pointing to Ms. Read's liability, as outlined in detail in the Opening Motion.  *See* Mot. at 27-29.  The Court should not credit such gamesmanship, particularly when assessing whether Ms. Read has satisfied her burden under the anti-SLAPP analysis.  Accordingly, the Commonwealth Witnesses' special motion to dismiss should be granted.

---

[8] To the extent the Opposition mistakenly included the wrong portion of Mr. Whiffin's testimony, the assertion that he ever testified that Officer O'Keefe's phone "was at some point inside the Alberts' home" is still false.  During Ms. Read's second murder trial, Mr. Whiffin discussed the GPS location data extracted from Officer O'Keefe's phone but never testified conclusively that Officer O'Keefe's cellphone was ever inside of 34 Fairview.  To the contrary, Mr. Whiffin stated that, in his expert opinion, Officer O'Keefe's cellphone "never moved far away from the flagpole" outside of 34 Fairview between 12:24:33 a.m. and 6:00 a.m. on January 29, 2022.  *See* Law&Crime Trials, *Ian Whiffin, Cellebrite Expert, Full Testimony: Karen Read Trial*, YOUTUBE (Aug. 30, 2025), https://www.youtube.com/watch?v=FF-_a161dss&t=9444s, at 2:36:39-2:37:02.

## II.    The Opposition Only Bolsters the Commonwealth Witnesses' 12(b)(6) Motion.

### A. Ms. Read Concedes that All of the Germane Allegations Made Against the Commonwealth Witnesses are Protected by the Doctrine of Absolute Immunity.

In arguing that the absolute immunity doctrine does not apply, Ms. Read expressly acknowledges that the doctrine forbids "claims 'based on [a] witness' testimony' or an alleged conspiracy to provide false testimony." Opp. at 16 (quoting *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012)). She also concedes that even witnesses who testify falsely "may not be held liable for their false statements to the grand jury and false testimony at trial." *Id.* at 17.

As outlined in the Opening Motion, the AC relies on exactly this type of protected conduct over a dozen times. *See* Mot. at 32. Yet, despite now recognizing that statements made during judicial proceedings are immune from liability, Ms. Read continues to pursue claims that depend on exactly that. *See id.* ("each claim brought against the Commonwealth Witnesses directly alleges that (1) they coordinated to tell investigators that Mr. O'Keefe never entered 34 Fairview and that Ms. Read made inculpatory statements; (2) some of them 'provided false testimony at Read's criminal trials'; and (3) Ms. McCabe 'lied' to a separate law enforcement agency in 2023.") (AC citations omitted). Having occurred during the investigation and prosecution of Ms. Read, the allegations underlying each of Ms. Read's causes of action are, at their core, activities that the absolute immunity doctrine has protected for centuries. Accordingly, Ms. Read's concession that the Commonwealth Witnesses are immune from liability for their grand jury and trial testimony leaves her complaint as a hollow shell that fails to satisfy the requisite pleading standards.

To counter this unavoidable reality, Ms. Read attempts to salvage her claims by arguing that the Commonwealth Witnesses' initial statements to first responders on the morning of January 29 somehow fall outside the doctrine's protection because, according to Ms. Read, no "criminal or judicial proceedings were [then being] contemplated or proposed." Opp. at 17-18. Yet again,

10

this argument mischaracterizes both the AC and the law. First, Ms. Read's characterization of what occurred on the morning of January 29 ignores her own pleading. According to the AC, by the time the Commonwealth Witnesses spoke with Sgt. Lank, officers had already arrived at the scene in response to a 911 call, a victim had been transported to the hospital, and a police investigation was plainly underway. *See* AC at ¶ 42. Indeed, the AC itself states that the "***Investigation Begins***" when CPD officers arrived "on scene shortly after 6 a.m." *Id.* at p. 13. And, critically, the AC alleges that Sgt. Lank—the very officer to whom the Commonwealth Witnesses spoke—was the detective sergeant who "opined on a telephone call to MSP homicide" that Officer O'Keefe "looked like he had been in a fight." *Id.* at ¶ 42. Thus, the AC places the statements squarely in the context of a law enforcement investigation into a suspicious death in which homicide was already being contemplated. Ms. Read cannot now reframe her own allegations to argue that no investigation was "contemplated or proposed" at the time the Commonwealth Witnesses' statements were made. That is contrary to her own pleading.

Nevertheless, in support, Ms. Read cites a single case, *Correllas v. Viveiros*, 410 Mass. 314 (1991). Opp. at 17-18. But that case actually undermines her argument. Here, the statements to Sgt. Lank were made in the context of an active police response to a 911 call reporting an unresponsive person, a situation which Sgt. Lank reported to be suspicious, with multiple officers already on scene. This is not a situation where a private citizen made an accusation "which might otherwise never have been known." *Correllas*, 410 Mass. at 322.[9]

---

[9] Regardless, even if this Court were to adopt Ms. Read's novel theory, stripped of the protected testimony and statements to investigating officers that followed—*i.e.*, the grand jury testimony, the trial testimony, and the later statements to law enforcement—the remaining "initial statements" cannot independently support any of the five causes of action. The AC itself underscores this point. The overwhelming majority of Ms. Read's allegations against the Commonwealth Witnesses concern their statements to MSP investigators (AC ¶¶ 63, 65-66, 78), their testimony before the state grand jury (AC ¶ 79), their testimony at trial (AC ¶¶ 171, 179, 191, 197, 212), and their statements to a "separate law enforcement agency" (AC ¶¶ 122–27). All of that conduct is concededly protected. The elements of each claim, as discussed in the Opening Motion, require far more than a few initial remarks to a responding officer at the scene of a death investigation.

11

Ms. Read's only other attempt to escape the absolute immunity doctrine is to characterize certain alleged conduct, such as moving Officer O'Keefe's body, destroying phones, and deleting evidence, as "non-testimonial actions" to which absolute immunity does not attach.  Even assuming the truth of these baseless allegations, they do not, by themselves, support any element underlying Ms. Read's claims.  For example, an allegation that "one or more" of the Commonwealth Witnesses relocated Officer O'Keefe's body is not relevant to whether any particular Commonwealth Witness "commenced or continued" criminal proceedings against Ms. Read.  The phone destruction allegations similarly do not state a claim: Mr. Albert and Mr. Higgins maintained their phones until well after Ms. Read's arrest and indictment, and, therefore, these acts could not possibly have contributed to law enforcement's decision to charge and prosecute Ms. Read.[10]  And even if the body-relocation or phone-destruction allegations were intended to show that subsequent statements to police were motivated by a desire to cover up wrongdoing, that motivation does not strip the testimony and witness statements of their absolute protection. Immunity covers "all statements by a witness, regardless of motive." *Eberle v. Diviacchi*, 1996 WL 218210, at *2 (Mass. Super. Ct. Mar. 29, 1996).

In sum, once the protected conduct is stripped away, as it must be, the AC is left with nothing more than vague, group-pled allegations of non-communicative conduct that cannot independently satisfy the elements of any claim against any individual Commonwealth Witness. Accordingly, the absolute immunity doctrine requires dismissal.

### B. Ms. Read Does Not Dispute that She Became Aware of the Pertinent Facts Underlying Most of Her Causes of Action in June of 2022.

As the Opening Motion demonstrates, by June 10, 2022, Ms. Read obtained the

---

[10] As outlined in the Opening Motion, should this case proceed to discovery, the Commonwealth Witnesses will establish that Ms. Read's continued assertions that Mr. Albert and Mr. Higgins "discarded or destroyed" their cellphones are entirely false.

Commonwealth Witnesses' statements to police, which the AC illustrates were foundational in the conspiracy to "frame" her. *See* AC at ¶¶ 164, 178, 196, 209. She had the extraction data from Ms. McCabe's phone, which she describes as providing "a window into [the] conspiracy and misconduct." *See id.* at ¶ 62. And by September 2022, she deployed this evidence in a Rule 17 motion to argue the exact same conspiratorial theory that she presents in the AC. *See* Dkt. No. 65-4 at 9. In Opposition, Ms. Read does not dispute any of this. She does not claim to have discovered the alleged conspiracy at some later date. She does not invoke the discovery rule. She does not allege fraudulent concealment. The reason for that is obvious: the public record, which the AC incorporates by reference, forecloses any such argument.

Under settled law, a plaintiff "does not have to possess actual knowledge of every element" of her claim; accrual occurs "as soon as a plaintiff possesses knowledge of the facts sufficient to put [her] on inquiry notice of a possible claim." *Salcedo v. Town of Dudley*, 629 F. Supp. 2d 86, 97-98 (D. Mass. 2009). Ms. Read had far more than inquiry notice by June 2022; she had the foundation for her entire case. The conspiracy, MCRA, and IIED claims are time-barred.

The thrust of Ms. Read's statute of limitations argument is that all her claims (including the Section 1983 conspiracy, MCRA, common law conspiracy, and IIED claims) are really "malicious prosecution" claims that did not accrue until her acquittal. *See* Opp. at 20. But the First Circuit has already rejected this very theory. In *Nieves v. McSweeney*, 241 F.3d 46 (1st Cir. 2001), the plaintiffs made the same argument Ms. Read now makes, alleging a single conspiracy that encompassed their false arrest, the filing of baseless charges, and the ensuing malicious prosecution, to argue that the limitations period on the entire conspiracy did not begin until acquittal. The court squarely rejected this theory, refusing to treat all components of a conspiracy as a unit. *Id.* at 52. As the court explained, the "fact of a conspiracy does not toll the statute of

13

limitations with respect to earlier clear-cut violations of rights that have not been concealed from the plaintiff." *Id.* at 51 (quoting *Hernandez Jimenez v. Calero Toledo*, 576 F.2d 402, 404 (1st Cir. 1978)). This "separate running" rule has been applied consistently in this Circuit. *See Kennedy v. Town of Billerica*, 502 F. Supp. 2d 150, 155 (D. Mass. 2007); *Salcedo*, 629 F. Supp. 2d at 98.

The AC itself alleges that the Commonwealth Witnesses' false statements "caused Ms. Read's wrongful ***indictment, arrest,*** and prosecution." AC at ¶¶ 178, 190, 196 (emphasis added). But the alleged injuries from these actions—including Ms. Read's arrest, indictment, and the emotional distress and civil rights violations she claims to have suffered as a result—were known to her by June 2022. The fact that a prosecution followed does not defer accrual on claims whose injuries were already realized.

Ms. Read's opposition relies on *McDonough v. Smith*, 588 U.S. 109 (2019). However, *McDonough* did not establish the broad rule Ms. Read needs. *McDonough* addressed the narrow question of when a fabricated evidence claim against individuals actually prosecuting the plaintiff accrues and held that such a claim, which is "most naturally understood" as a malicious prosecution claim, does not accrue until the criminal proceedings terminate. 588 U.S. at 118-20. The Court's reasoning was tied to the elements of malicious prosecution, which requires favorable termination as a prerequisite to suit. *McDonough* did not hold, however, that every claim tangentially connected to a prosecution accrues only upon acquittal. That interpretation would swallow the rule this Circuit has long recognized: each civil rights violation accrues when the plaintiff knows or should know of the injury, regardless of whether a prosecution is pending.[11]

---

[11] *Schand v. City of Springfield*, 380 F. Supp. 3d 106 (D. Mass. 2019), is particularly instructive. There, this Court confronted a plaintiff who had served nearly 27 years for a murder he did not commit and sought to invoke a *Heck*-type tolling rule to preserve his state common law conspiracy claim. The Court declined to extend the favorable-termination accrual rule to the plaintiff's common law claims, holding that the plaintiff knew or should have known of his injury well before the limitations period and that crafting a broad tolling exception would be "an unprecedented overstep." If a plaintiff wrongfully imprisoned for 27 years cannot invoke a generalized tolling rule to save his state

The Opposition insists that "Counts 3 through 7 of the AC expressly allege that the House Defendants participated in a conspiracy to maliciously prosecute Ms. Read, not merely to have her wrongfully arrested." Opp. at 20. But labeling a claim is not the same as establishing its substance. Courts do not simply accept a plaintiff's characterization of her claims at face value; they examine "the constitutional right at stake" to determine the applicable accrual rule. *Nieves*, 241 F.3d at 52. This Court should look at what the AC actually alleges. The gravamen of Ms. Read's claims against the Commonwealth Witnesses is that they (1) made false statements to police in late January and early February 2022; (2) agreed to tell a false story; and (3) allegedly destroyed or concealed evidence. These are allegations of conduct purportedly designed to cause Ms. Read's arrest in February 2022. The Opposition attempts to layer on allegations that the Commonwealth Witnesses "continued to coordinate their stories with police" throughout the prosecution, but these allegations of continued coordination are precisely the kind of "mere continuance of the conspiracy" that the First Circuit has held "does not affect the accrual of the limitation period with respect to a completed object of a conspiracy." *Nieves*, 241 F.3d at 51 (quotation omitted).[12]

Ms. Read's theory, taken to its logical conclusion, would mean that any civil plaintiff who was also a criminal defendant could defer accrual of any claim—no matter how attenuated its connection to the prosecution—until after the criminal case concludes. That is not the law. The "separate running" rule exists precisely to prevent plaintiffs from using the umbrella of a criminal

---

law conspiracy claim, Ms. Read, who was free on bail throughout her prosecution, certainly cannot.

[12] Ms. Read cites several cases for the proposition that "claims premised on false evidence and infirm prosecutions do not accrue until the underlying criminal proceedings terminate in the defendant's favor." Opp. at 19-20. The very cases she cites, however, preclude the result she seeks. For example, in *Arias v. City of Everett*, 2019 WL 6528894 (D. Mass. Dec. 4, 2019), the court's analysis was specific to malicious prosecution claims; the court separately assessed the timeliness of the plaintiff's IIED and other tort claims, noting that those claims had different accrual dates. The *Arias* court allowed certain emotional distress claims to proceed alongside malicious prosecution claims only because those claims were intertwined with the prosecution itself, not because it adopted a blanket rule that all claims remotely connected to a prosecution accrue at acquittal. Moreover, and most notably for purposes of this litigation, the *Arias* court **dismissed the claims brought against lay witnesses for the very reasons outlined here and in the Opening Motion**.

15

prosecution to toll the limitations period on claims that are fully formed and ripe for adjudication. Ms. Read had three years from June 2022 to bring her conspiracy, MCRA, and IIED claims. She waited until November 2025, and only after her acquittal gave her a platform, to file suit. That tactical choice does not override the statute of limitations. The claims are time-barred.

### C. Ms. Read Otherwise Fails to Salvage the Plausibility of Her Causes of Action.

#### i. Common Law Malicious Prosecution

Ms. Read now argues that the Commonwealth Witnesses "initiated the entire prosecution by casting Ms. Read as the suspect even before the investigation started." Opp. at 22. This characterization fundamentally misstates both the law and the AC's allegations. A citizen who provides information to law enforcement does not thereby "commence or continue" a prosecution. *See Watson v. Mita*, 396 F. Supp. 3d 220, 225 (D. Mass. 2019). A defendant's "share in continuing the prosecution must be *active*, as by *insisting upon or urging* further prosecution." *See Degree v. Gendreau*, 2025 WL 3702535, at *10 (D. Mass. Dec. 19, 2025) (emphasis added).

The Opposition relies on *Limone v. United States*, 579 F.3d 79 (1st Cir. 2009), but that case proves the Commonwealth Witnesses' point, not Ms. Read's. As she acknowledges, in *Limone*, the Court *rejected* a malicious prosecution claim against *FBI agents* accused of "shoring up" a false story precisely because there was "no proof the defendants 'voluntarily reach[ed] out to law enforcement officials and cause[d] them to commence a new line of inquiry.'" 579 F.3d at 89-90. The AC here presents an even weaker case. There is simply no allegation that any Commonwealth Witness "pressed the police to apply for a complaint," *Conway v. Smerling*, 37 Mass. App. Ct. 268, 271 (1994), "demanded or directed the police to arrest" Ms. Read, *Ziemba v. Fo'cs'le, Inc.*, 19 Mass. App. Ct. 484, 488 (1985), or otherwise asserted control over the prosecution.

Fatally, the AC is devoid of allegations that any Commonwealth Witness ever implicated Ms. Read in Officer O'Keefe's death. They merely reported that Officer O'Keefe did not enter 34

Fairview and what they observed about Ms. Read the morning Officer O'Keefe's body was found.[13]  No Commonwealth Witness is alleged to have ever told the police or testified that Ms. Read killed Officer O'Keefe.  Nor does the AC allege that any Commonwealth Witness ever told any police or prosecutor that Ms. Read should be arrested, indicted, or prosecuted.

Ms. Read's attempt to distinguish *Limone* by arguing that the Commonwealth Witnesses "directed first responders and investigators to Ms. Read almost immediately," Opp. at 22, is conclusory rhetoric unsupported by the AC's own allegations (as evidenced by the Opposition's lack of citation).[14]  The AC admits that a separate, independent investigation into the death of Officer O'Keefe was undertaken, which, after review, produced no additional arrests, indictments, or charges prior to its closure.  That fact is fundamentally inconsistent with, and undermines, any inference that the Commonwealth Witnesses exercised "a peculiar degree of control" over the Commonwealth's independent prosecutorial authority or its charging decisions.

### ii.    42 U.S.C. § 1983 Conspiracy

Ms. Read's § 1983 conspiracy claim requires her to plead "in some detail" a relationship or cooperation between the Commonwealth Witnesses and state actors.  *Glaros v. Perse*, 628 F.2d 679, 685 (1st Cir. 1980).  The Opposition makes clear that Ms. Read's allegations do not satisfy this standard.  The "pre-existing relationship" Ms. Read describes is a speculative, backdoor chain running through multiple non-parties who are not alleged to have participated in any conspiracy. The allegations that the Alberts and Proctors knew one another, and that Mr. Albert and Mr.

---

[13] The fact that Ms. McCabe is alleged to have reached out to law enforcement three hours after leaving 34 Fairview on January 29, 2022 does not alter the Court's analysis.  Merely reporting to police what Ms. Read said on the morning of January 29 (which, under oath, Ms. Read conspicuously failed to refute) does not constitute "pressuring" law enforcement to do anything.  What law enforcement ultimately chose to do with the information provided by Ms. McCabe does not, by proxy, automatically implicate Ms. McCabe in the prosecution's commencement.

[14] This argument also relies entirely on statements that the Commonwealth Witnesses made to the police, which ***Ms. Read has already conceded are entirely immune*** from liability under clear controlling Supreme Court authority.

17

Higgins also worked in law enforcement, cannot possibly impute state action, which occurs only "in rare circumstances." *Jarvis v. Village Gun Shop, Inc.,* 805 F.3d 1, 8 (1st Cir. 2015). The AC lacks any allegation that any Commonwealth Witness ever spoke with law enforcement outside of their statements given in January and early February 2022. The assertion that some sort of back-channel communication was ongoing through Defendant Proctor's sister, who then apparently communicated with Mr. Albert's sister-in-law, who then apparently communicated with the Commonwealth Witnesses, is far too attenuated to impute state action on private parties, especially when the AC fails to allege that those communications had anything to do with law enforcement's decision-making. Ms. Read's allegations are precisely the type of "speculation fueled by [plaintiff's] own suspicions" that courts routinely reject in this context. *Chadbrown v. Coles*, 2011 WL 5325610, at \*2 (D. Me. Nov. 2, 2011). The Court should do the same here.

### iii.    Common Law Conspiracy[15]

The Opposition states that the Commonwealth Witnesses entered a "common plan . . . to make it look like Mr. O'Keefe died due to exposure after being hit by Ms. Read's car" and that they "took multiple steps to carry out the plan, including moving Mr. O'Keefe's body to the area of the front lawn where Ms. Read had dropped him off." Opp. at 28-29. The Opposition then defends this body-relocation theory as supported by a snowplow driver's testimony that he did not see a body at 2:30 a.m. and based on purported testimony from a medical examiner that Officer O'Keefe's injuries were inconsistent with being struck by a vehicle. *Id.* at 29. However, Ms. Read's own allegations undercut this conspiracy theory entirely. The AC concedes that Ms. McCabe arrived home with her husband at approximately 2:12 a.m. and remained there, and that

---

[15] Again, Ms. Read's civil conspiracy claim is dependent upon her malicious prosecution claim. Because the underlying tort is insufficiently pled, the conspiracy count necessarily fails. *See, e.g.*, *Britton v. Athenahealth, Inc.*, 2013 WL 2181654, at \*7-8 (Mass. Super. Ct. May 3, 2013).

18

Mr. Higgins was seen in the parking lot of the Canton Police Department at 1:30 a.m.  *See* AC at ¶¶ 54, 67.  Her own timeline thus excludes multiple Commonwealth Witnesses from the very conduct she alleges against them as a group.  *See Piccone v. Carrington Mortg. Servs., LLC*, 2023 WL 3293054, at *4 (D. Mass. May 5, 2023) (vague, group-pled allegations are insufficient to state a claim).  Moreover, as detailed *supra*, the Opposition's own evidence confirms that the medical examiner never testified that Officer O'Keefe's injuries were inconsistent with a vehicle strike.  To the contrary, she opined that they could have been consistent with a vehicle strike.

The remaining allegations are similarly meritless.  As described in the Opening Motion, even accepting the allegations as true, the Commonwealth Witnesses were not committing a wrongful act when they told police that Officer O'Keefe never entered 34 Fairview.  Even if they were aware of additional facts pertaining to the death of Officer O'Keefe, "a citizen ordinarily has no legal obligation to volunteer exculpatory information to law enforcement authorities." *People v. Dawson*, 50 N.Y.2d 311, 317-18 (1980); *see also Com. v. Cotto*, 471 Mass. 97, 109 (2015).  Thus, Ms. Read's conspiracy theory fails as a matter of law.  *See Kyte v. Philip Morris Inc.,* 408 Mass. 162, 167-68 (1990) ("a conspiracy requires an agreement to commit a wrongful act.").

### iv.    Massachusetts Civil Rights Act

The Opposition contends only that "causing law enforcement to prosecute Ms. Read was intrinsically coercive under the MCRA."  Opp. at 30.  In what has now become thematic throughout this motion practice, this argument improperly conflates the actions of law enforcement with those of private citizens.  The "intrinsic coercion" doctrine applies only where the defendant themselves effectuated an arrest or detention, such as directing an officer to arrest someone.  *See Sarvis v. Bos. Safe Deposit & Tr. Co.*, 47 Mass. App. Ct. 86, 93 (1999).  It does not extend to private citizens who provided witness statements that were later incorporated into an independent law enforcement investigation and a grand jury indictment, especially when those private citizens

never gave statements implicating Ms. Read or requesting that Ms. Read be arrested. Such an expansion of the doctrine would effectively eliminate the "threats, intimidation, or coercion" requirement for any witness whose statements contributed to a prosecution. Indeed, this Court recently held that "conducting a sham investigation of the actual perpetrator, [] coaching, coercing or otherwise fabricating evidence against the Plaintiff, or causing witnesses to give statements and/or testimony that would result in [] misidentification, or by offering false statements and testimony" do not constitute "threats, intimidation, or coercion" under the MCRA. *Cifazzari v. Town of Milford*, 2025 WL 1899043, at *15 (D. Mass. July 9, 2025). *Cifazzari* thus forecloses Ms. Read's MCRA theory.

### v.    Intentional Infliction of Emotional Distress

In support of her IIED claim, Ms. Read again relies on *Limone*, arguing that it is a "mirror image" of her case. Opp. at 31-32. That characterization is not just misleading, it is preposterous. *Limone* involved **FBI agents** who assisted an informant in doctoring statements, framed scapegoats, and "scrambled to cover up the frame job by obstructing the scapegoats' efforts to clear their names." 579 F.3d at 94, 98. The extraordinary level of sustained governmental corruption and official misconduct prevalent in *Limone* bears no resemblance to the circumstances alleged against the Commonwealth Witnesses, which involve private citizens providing witness statements. Ms. Read's attempt to analogize *Limone* is legally and factually baseless and should be rejected.

### CONCLUSION

For the foregoing reasons, the Court should dismiss Ms. Read's Amended Complaint against the Commonwealth Witnesses with prejudice, award the Commonwealth Witnesses their attorneys' fees, and grant any other relief the Court deems just and proper.

20

Dated: June 3, 2026                    Respectfully submitted,

                                       BRIAN ALBERT, NICOLE ALBERT, JENNIFER
                                       McCABE, MATTHEW McCABE, and BRIAN
                                       HIGGINS

                                       By their attorneys,

                                       */s/ James L. Tuxbury*
                                       James L. Tuxbury (BBO No. 624916)
                                       Kieran T. Murphy (*pro hac vice*)
                                       HINCKLEY, ALLEN & SNYDER LLP
                                       28 State Street
                                       Boston, MA  02109
                                       (617) 378-4162
                                       jtuxbury@hinckleyallen.com

                                       30 S. Pearl Street, Suite 1101
                                       Albany, NY 12210
                                       (518) 396-3100
                                       kmurphy@hinckleyallen.com

21

## CERTIFICATE OF SERVICE

I certify that, on June 3, 2026, this document was electronically filed with the Clerk of the Court using the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing, pursuant to Local Rule 5.4(C).

*/s/ Kieran T. Murphy*
Kieran T. Murphy

22